# EXHIBIT A

**IN THE CIRCUIT OF THE SIXTH JUDICIAL CIRCUIT**
**CHAMPAIGN COUNTY, ILLINOIS**

| | | |
|---|---|---|
| TERRENCE SHANNON JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2024 CH _____ |
| | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| a body corporate and politic, and | ) | |
| TIMOTHY KILLEEN, in his | ) | |
| official capacity as President of the | ) | |
| University of Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF</u>**

Robert H. Lang (ARDC #6225414)
Zoe S. Spector (ARDC #6333392)
Thompson Coburn LLP
55 East Monroe Street, 37th Fl.
Chicago, IL 60603
rhlang@thompsoncoburn.com
(312) 346-7500
Fax: (312) 580-2201

J. Steven Beckett (ARDC #0151580)
Steve Beckett Law Office LLC
508 S. Broadway Avenue
Urbana, IL 61801
steve@stevebeckettllc.com
(217) 328-0263
Fax: (217) 328-0290

Mark C. Goldenberg (ARDC #0990221)
Thomas C. Horscroft (ARDC #6327049)
Goldenberg Heller & Antognoli, P.C.
2227 South State Route 157
Edwardsville, IL 62025
mark@ghalaw.com
(618) 656-5150
Fax: (618) 656-6230

Mark Sutter (ARDC #6238207)
Sutter Law Group, LLC
One Lincoln Centre
18w140 Butterfield Road, Suite 1500
Oakbrook Terrace, IL 60181
msutter@sutterlawgroup.com
(312) 724-5600

# TABLE OF CONTENTS

Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Verified Complaint for Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      a.  Summary of Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      b.  The Parties, Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      c.  The Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      d.  Illinois Suspension of TJ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

      e.  More Facts Bearing on Irreparable Harm
          and The Inadequacy of Legal Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Count I – Injunctive and Declaratory Relief: Title IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Count II – Declaratory and Injunctive Relief: Scholarship Contract Applies . . . . . . . . . . . . . . 26

Count III – Injunction-Implied Contract (DIA Policy) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Count IV – Declaratory and Injunctive Relief: Unconscionability of DIA Policy . . . . . . . . . . .32

Count V – Declaratory and Injunctive Relief: Court Determination
          of Which Standards Actually Govern the Suspension Process . . . . . . . . . . . . . . .36

Count VI – 42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

Count VII – Declaratory and Injunctive Relief: Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

## POINTS AND AUTHORITIES

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**

*CASES* *PAGE*

*Khan v. Yale Univ.*, 347 Conn. 1 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Khan v. Yale Univ.*, 85 F.4th 86 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*STATUTES*

110 ILCS 305/1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

735 ILCS 5/2-101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Title IX . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 13, 14, 15, 16, 17, 22, 26, 27, 28, 29, 33, 36, 39, 41

735 ILCS 5/11-101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27, 29, 32, 35, 36, 38, 39, 41

735 ILCS 5/2-701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27, 32, 36, 39

IN THE CIRCUIT OF THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS

| | | |
|---|---|---|
| TERRENCE SHANNON JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2024 CH _____ |
| | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| a body corporate and politic, and | ) | |
| TIMOTHY KILLEEN, in his | ) | |
| official capacity as President of the | ) | |
| University of Illinois, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, Terrence Shannon Jr. ("TJ"), by and through his attorneys, for his Verified Complaint for Injunctive and Other Relief against the Defendants, The Board of Trustees of the University of Illinois, a body corporate and politic ("Illinois") and Timothy Killeen, in his official capacity as President of the University of Illinois ("Killeen") alleges as follows:

## SUMMARY OF LAWSUIT

1.     Does the presumption of innocence **really** mean anything? That question is at the heart of this case. Illinois has promised TJ that it would adhere to this presumption, but in practice Illinois has not applied it by suspending TJ and ruining his career as if he were already convicted.

2.     **TJ maintains his innocence**, for the record. Sexual assault is a horrific crime, and TJ is appalled that his name is mentioned in the same sentence with such a crime, and he in no way seeks to minimize that it is a real problem. TJ has no criminal history. TJ has no history

of disciplinary problems. TJ is a rule-follower. TJ is supported by numerous character affiants, including three Illinois employees, who stand by TJ. TJ also acknowledges that this whole ordeal has been difficult for Illinois. He does not relish having to file a lawsuit against the university that he loves and has proudly represented.

3.      TJ plays for the University of Illinois at Urbana-Champaign's ("UIUC") men's basketball team ("Team") and has been widely projected to be a "lottery pick" in the National Basketball Association's ("NBA") 2024 draft. TJ has been accused of sexual crimes in Douglas County, Kansas. The circumstances of the charges, however, are suspect, emanating from a jurisdiction that has a recent history of wrongfully convicting an African American student of rape.

4.      Illinois nonetheless has served as judge, jury, and executioner by suspending TJ from the team before the resolution of his criminal charges, eradicating the presumption of innocence and other due process to which TJ is entitled. On December 28, 2023, Illinois suspended TJ from his participation on the UIUC's men's basketball team and has refused to reconsider that suspension unless and until the aforementioned criminal charges against him are resolved. Those criminal charges, however, will not be resolved through trial until well after the conclusion of the current basketball season and after the NBA draft.

5.      Illinois has not afforded TJ any due process, despite Illinois' obligations and promises to do so. First, Illinois has refused to afford the protections to which TJ is entitled pursuant to Title IX of the Education Amendments of 1972 ("Title IX"). Alternatively, (a) Illinois has violated its own policies in suspending TJ from the Team; (b) Illinois has breached obligations of alleged contracts to TJ in doing the same, which are also unconscionable; (c) regardless, Illinois has been vague and contradictory in defining exactly

what standards apply to disciplinary proceedings against TJ; and/or (d) Illinois has otherwise violated TJ's due process rights. In any event, Illinois has waived any right it had to suspend TJ by waiting so long to do so after first knowing that TJ was the target of a criminal investigation.

6.     Accordingly, TJ has a clearly ascertainable right in his basketball career that is in need of protection. TJ will suffer irreparable harm without injunctive relief, as his career will certainly be ruined if the suspension continues, trouncing on his business interests including contractual rights. Money damages are obviously inadequate-one cannot put a number on the destruction of a promising career at this early stage of it. Further, there is at least a "fair question" as to TJ's claims, and therefore he has a likelihood of success on the merits. A balancing of the harms favors TJ because the harm to TJ in continuing the suspension, killing his career and the ability to support his family while undercutting his defense in the criminal case, dramatically outweighs any harm to Illinois that may be incurred by awarding TJ injunctive relief.

7.     Thus, through this lawsuit, TJ seeks injunctive relief to enjoin the Defendants from continuing TJ's suspension unless and until he receives a fair process under Title IX, or as otherwise promised by Illinois to TJ or as required by law, and further requiring Illinois to immediately reinstate TJ to the Team. Alternatively, TJ seeks declaratory relief.

## THE PARTIES, JURISDICTION, AND VENUE

8.     TJ is an Illinois citizen who resides in Champaign, Champaign County, Illinois.

9.     Illinois is an Illinois body corporate and politic, that can "be sued" in regard to "all its various departments and relations …."  110 ILCS 305/1.

10.     UIUC is a division of Illinois, and the term "Illinois" as used herein includes UIUC where applicable.

- 3 -

11.     Killeen is the President and Chief Executive Officer of the University of Illinois system including its campuses at Urbana-Champaign, Springfield, and Chicago.

12.     Venue is proper in this county because Defendants reside and/or do business in this county, including through UIUC, and because events giving rise to this lawsuit occurred in Champaign County pursuant to 735 ILCS 5/2-101.

## **THE CHARGES**

13.     Illinois' disciplinary actions at issue in this lawsuit ("DIA Action") have been ostensibly conducted by UIUC's Division of Intercollegiate Athletics ("DIA") purportedly to address alleged criminal charges ("Charges") against TJ that arise out of an alleged incident early on September 9, 2023, in Lawrence, Kansas.

14.     TJ, Justin Harmon (another UIUC basketball player) ("Harmon"), and university employee and men's basketball graduate assistant DyShawn Hobson ("Hobson") drove to Lawrence, Kansas from Champaign on September 8, 2023, to attend the UIUC-University of Kansas ("KU") football game that night. The three returned to Champaign on September 9, 2023.

15.     Hobson drove TJ and Harmon to and from Lawrence at the direction of the Illinois men's basketball coaching staff, to supervise TJ and Harmon. Hobson, as an Illinois employee in furtherance of Illinois' basketball program, escorted and monitored TJ during this trip, including during the time of the alleged incident. [Exhibit A, Hobson Affidavit.]  Hobson was with TJ the vast majority of that night and did not witness TJ committing the criminal act alleged against him (nor did anyone else, according to the police reports and the probable cause affidavit received from the authorities).

16.     The alleged incident occurred between midnight and 1:00 a.m. at a bar on KU's
campus in Lawrence, Kansas called the Jayhawk Café. In terms of reporting from the authorities,
TJ has only received redacted police reports (which he received from UIUC on December 28,
2023) (collectively, the "Reports") and a redacted probable cause affidavit from the Lawrence
(Kansas) Police Department ("LPD"). (All Reports were redacted when TJ first received them in
late December 2023, and TJ has made additional redactions so as to attempt to avoid any
possible identifying references to the complainant.)

17.     Therefore, the following is a summary of the allegations taken from those
documents, which include (a) redacted September 9, 2023 LPD notes regarding surveillance
video taken at the Jayhawk Café on the night in question (a true and correct copy of which is
attached hereto and incorporated herein as Exhibit B-1); (b) redacted September 9, 2023 LPD
notes regarding the LPD's review of the complainant's smartphone (including internet searches)
(a true and correct copy of which is attached hereto and incorporated herein as Exhibit B-2);
(c) redacted September 11, 2023, LPD notes of an LPD interview of the complainant (a true and
correct copy of which is attached hereto and incorporated herein as Exhibit B-3); (d) redacted
September 11, 2023, LPD notes of an LPD interview of the complainant's friend (a true and
correct copy of which is attached hereto and incorporated herein as Exhibit B-4); and
(e) redacted October 4, 2023, Douglas County probable cause affidavit (a true and correct copy
of which is attached hereto and incorporated herein as Exhibit B-5):

A.  "as they [complainant and friend] were trying to leave [the "Martini Room" level
    of the Jayhawk Café bar], there was a black male near the door she thought was
    attractive who started to waive (*sic*) her over." The complainant's friend then
    "encouraged her to go back into the Martini room and talk to him." Complainant
    "confirmed she felt like the touching of her buttocks over her skirt was ok with
    her but it was not ok with her with [the accused] placing his finger inside her
    vagina." The complainant "stated she did not speak with the male at all or have

any interactions with him." The complainant "stated the male did not physically restrain her."  [Exhibit B-3.]

B. The alleged incident occurred in a very crowded bar, yet there are no witnesses to the alleged incident, which allegedly occurred while the accused had another female in one of his arms at the same time as the alleged incident. [Exhibits B-1, B-4, B-5.]  The complainant's friend who accompanied her in the bar during the alleged incident did not witness the alleged incident. [Exhibit B-4.]

C. The complainant had been consuming unknown amounts of alcohol that evening and was out for at least several hours before the alleged incident. [Exhibits B-2, B-3, B-4.]

D. Surveillance video does not corroborate the alleged incident, nor does it show TJ and the complainant together in the bar. [Exhibit B-1.]

E. The alleged incident occurred during the early hours of September 9. After the alleged incident, the complainant and her friend did not immediately leave the bar. Nor did the complainant or her friend notify bar management or security or police at that time. [Exhibit B-3, Exhibit B-4.]

F. Instead, the complainant went home, performed several internet searches including on the "Kansas state basketball roster," and the University of Kansas basketball and football teams, and then the University of Illinois football and basketball teams. The complainant also performed internet searches related to "sexual assault, state and federal crime definitions."  The complainant also performed social media searches. [Exhibit B-2, Exhibit B-3, Exhibit B-4.]

G. About 15 hours after the alleged incident, and after the complainant identified TJ only by identifying an African-American that looked like him through her above-mentioned internet and social media searches, the complainant reported it to the LPD. [Exhibit B-3.]

18.     Therefore, the alleged incident occurred in full public view without any witnesses whatsoever, and there is no confirming physical evidence tying TJ to the alleged incident.

19.     The Douglas County criminal process status as applied to TJ has been as follows:

A. TJ was not indicted by any grand jury. TJ was never identified as the accused by the complainant in a lineup. TJ was not charged until December 5, 2023, three months after the alleged incident.

B. The charge is one count, charged in the alternative: felony rape *or* misdemeanor sexual battery. [Exhibit C.] It is unusual for the prosecution to allege as an alternative a misdemeanor in addition to a felony, and particularly so as it relates

to these distinct offenses. This could indicate law enforcement's lack of confidence in the rape allegation.

C.  TJ is scheduled to appear in court for his arraignment on January 18 where he intends to plead not guilty. Approximately 90 days or so thereafter, there should be a preliminary hearing by which time TJ's criminal defense counsel should receive discovery from the prosecution, and TJ's counsel will have an opportunity to confront the complainant at that hearing. Kansas' speedy trial statute has been suspended until March, but in any event the trial is not expected to proceed until after the June 27, 2024, NBA draft (and certainly not until well after the end of the current basketball season).

20.    TJ learned that on January 3, 2024, **after** the Charges were filed against him, that the LPD was just then asking to interview a specific KU basketball player named by the complainant in her September 11, 2023 interview with the LPD. [*See e.g.,* Exhibit B-3 at p. 4; Exhibit B-4 at p. 1, or Exhibit B-5 at ¶ 10.]

21.    Additionally, TJ believes based on the current information available to him, that the LPD only interviewed the complainant and her friend before making the Charges against TJ, despite knowing the identity of the aforementioned KU basketball player (and many others) in the exact vicinity of the alleged incident. Nor has the LPD or any other criminal authorities interviewed Harmon or Hobson who also accompanied TJ the night of the alleged incident.

22.    There are questionable circumstances involving the police investigation and recent prosecution of Albert Wilson, a 20-year old African-American KU student, who was then convicted of a rape in Douglas County (the same jurisdiction prosecuting TJ). Mr. Wilson was charged although there was no corroboration of rape. The charge, however, was later vacated for ineffective assistance of counsel. The Douglas County District Attorney decided there was insufficient evidence and decided not to retry Mr. Wilson. Instead, Mr. Wilson is now suing the State of Kansas for wrongful prosecution. Albert Wilson - National Registry of Exonerations (umich.edu). [Exhibit D.]

23.     Further, the Douglas County District Attorney herself is facing disciplinary proceedings arising out of contentious circumstances with the Douglas County judiciary, with charges being levied against the District Attorney in August 2023 shortly before the alleged incident involving TJ:  Douglas County DA shares regrets in day 2 of disciplinary hearing – The Lawrence Times (lawrencekstimes.com).  [Exhibit E.]

## ILLINOIS' SUSPENSION OF TJ

24.     As detailed in the UIUC Athletic Director's ("AD") December 29, 2023 press conference regarding TJ's situation, Illinois was aware that TJ was of interest to the LPD since late September 2023, when the LPD notified the UIUC police department ("Illinois Police") that the LPD was investigating TJ and interested in interviewing him. (josh whitman press conference terrence shannon - Google Search (video) starting at approximately 11:07, transcript attached as Exhibit F].

25.     Illinois interviewed TJ about the inquiry, and the AD reported that "he [TJ] was very forthcoming with us."  [Exhibit F at approximately 11:30.]  Illinois subsequently learned "that the allegations that were being investigated seemed to be something that occurred in public in the Lawrence bar, where TJ interacted with a young woman and the allegation was that he engaged in some inappropriate touching of her over the course of that interaction."  [Exhibit F, at approximately 12:24.]

26.     Illinois representatives, according to the AD, had unanimously concluded that the information that Illinois had prior to receiving notification of the Charges on December 27, 2023 was not enough to trigger the DIA Action as to TJ. [Exhibit F, at approximately 13:40.]

27.     Shortly thereafter, Illinois learned that TJ was the actual subject of the inquiry. *Id.*

28.     TJ was charged with the Charges on December 5, 2023, but TJ did not receive notice of the Charges until December 27, 2023, when Illinois asserts it first learned that fact (Illinois advised TJ of this fact). On December 28, 2023, Illinois temporarily suspended TJ [Exhibit G, true and correct copy of notice of temporary suspension] pursuant to the DIA Student-Athlete Policy ("DIA Policy"), a true and correct copy of which can be found at Student Conduct Policies (SA Handbook) - University of Illinois Athletics (fightingillini.com) and Exhibit H.

29.     Thereafter, pursuant to the DIA Policy, the DIA furthered the DIA Action apparently executed by a panel consisting of two Illinois professors and an assistant dean of students ("Panel"). The Panel purportedly convened on January 3 to decide whether to continue the temporary suspension or reinstate TJ, apparently pursuant to the following standards and after receiving TJ's personal statement:

> The Student-Athlete Conduct Panel shall convene within 48 hours of DIA providing notice to the student-athlete of the interim action. The student-athlete may waive the Panel review or request a delay in the convening of the Panel. The Panel may convene via a phone or video conference. The Panel will not act as an investigative body but will exercise good faith and reasonable judgment to draw needed conclusions based on the information available to it at the time it convenes. The Panel will undertake an individualized analysis to determine whether the available information justifies withholding the student-athlete from some or all athletic activities pending resolution of the charges or allegations. *Based on the information available to the Panel at the time the Panel is convened, the Panel may consider the broad spectrum of risks to the University of (a) immediately reinstating the student-athlete, should further investigation reveal that the student-athlete committed the alleged major offense, against (b) continuing to withhold the student-athlete from athletic activities, should further investigation reveal that the student-athlete did not commit the alleged major offense.*

> *With the assessment of these risks as the determining factors, and by* majority vote, the Panel may take any or all of the following interim actions: (a) withhold the student-athlete from practice; (b) withhold the student-athlete from competition; (c) withhold the student-athlete from accessing any or all athletic department services (including DIA facilities and academic services); and/or (d) reinstate the student-

athlete to some or all athletic activities pending resolution of the charges or allegations.

*If the Panel decides to withhold the student-athlete from any athletic activity or related support service, it will do so in compliance with, and consideration of, all applicable University, state, and federal regulations applicable to such withholding.*

[See, Exhibit H.]

30.     On January 3, 2024, based on the Panel's decision, Illinois suspended TJ from any participation with the Team until the Charges are resolved ("Suspension"). A true and correct copy of Illinois' written notice of the Suspension to TJ is attached hereto and incorporated herein as Exhibit I. Therefore, the Suspension is indefinite, and will likely last the entire season without court intervention since, as alleged herein, the Charges will not go to trial until well after the current basketball season is over.

31.     TJ was provided no due process prior to the Suspension. There was no presumption of innocence. There was no hearing that he attended. There was no written notice as to who exactly assessed his fate and how (other than knowing that they were Illinois employees, not neutrals). No record of any proceedings was provided to him. The utter lack of safeguards provided to TJ are detailed more below, especially when compared to Title IX and an entirely separate Illinois action initiated against TJ on January 5, 2024.

32.     At his December 29, 2023 Press Conference, the AD explained more about the DIA Action that led to the Suspension [Exhibit F, transcript of press conference from 3:42 to 8:30.]: (a) each Fall, the AD explains to the athletes that there are three tracks that may apply to a student who has engaged in alleged misconduct: (i) the criminal authorities/process; (ii) Illinois' Office of Student Conflict Resolution ("OSCR") (Home | Office for Student Conflict Resolution | UIUC (illinois.edu) [Exhibit J], which enforces Illinois' Student Code and the "UIUC Student Disciplinary Procedures (illinois.edu)" [Exhibit M] ("OSCR Policy"), which in turn contains the

Illinois Sexual Misconduct Policy in its Article 1 (Article 1 » Student Code » Illinois, Exhibit K)

*see also,* Exhibit P); and (iii) the DIA Action, that includes an unidentified panel of three from

Illinois' faculty but which is independent of the DIA according to the AD. The AD reiterated that

the DIA is not an investigator, but instead the DIA relies on law enforcement or OSCR for that

function. The AD stated at his December 29, 2023, press conference that these three tracks are

parallel and independent, but can also "intersect."

33.     After the Panel purportedly convened and decided not to lift TJ's suspension, TJ

received notice on January 5, 2024, that OSCR began an investigation which subjected him to

the OSCR Policy ("OSCR Action). [Exhibit L, notice.]  As outlined in that notice, and as further

outlined below, the OSCR Policy affords far more rights to the accused:  UIUC Student

Disciplinary Procedures (illinois.edu) [Exhibit M.]  But the OSCR Action is far from fair as will

be detailed below.

34.     Although the OSCR Policy does have provisions to proceed under Title IX, TJ

once again was not afforded Title IX protection by Illinois as to the OSCR Action either.

[Exhibit M at Appendix D; Exhibit L.]

35.     The action that led to the Suspension in the first place was fatally flawed in one or

more of the following ways:

> a.  The panel that decided TJ's fate entirely consisted of all university employees,
>     not anyone neutral or impartial.  While each of the panel members no doubt
>     has high integrity, they nonetheless are depending on Illinois for their
>     professional livelihood.  This is exacerbated by the fact that the panel's ruling
>     standard was exclusively centered on assessing risk to their employer, Illinois.
>
> b.  It did not presume TJ's innocence, despite Illinois' promises that it would do
>     so. In fact, although the aforementioned notice of suspension [Exhibit I]
>     claims that Illinois did not determine TJ's guilt or innocence, it nonetheless
>     suspended TJ until the "resolution of the charges against you stemming from
>     the September 2023 incident in Kansas."

c.   TJ was not formally notified of the identity of who actually concluded TJ would be suspended, akin to a secret court where the accused does not know the identity of those deciding his fate. Also, Illinois learned the identity of the complainant before TJ. In fact, Illinois was the one who first informed TJ of the complainant's identity on January 5, 2024 (which again, was after the Panel purportedly convened and made its determination against TJ).

d.   Although TJ was permitted to submit a written statement, he was not permitted to appear before those who decided his fate to present evidence or to confront his accuser.

e.   The Suspension was levied against TJ despite the obvious flaws of the criminal investigation against him to date, and the fact that the criminal process is in its very early stages, with TJ not even having received discovery from the prosecutors yet, and the criminal authorities still apparently not interviewing any witnesses besides the complainant and her friend despite the fact that the alleged incident occurred in an extremely crowded bar subject to surveillance video and wherein the complainant identified at least one specific KU basketball player (no doubt well known in Lawrence, Kansas, where KU basketball reigns).

f.   It did not provide TJ the other safeguards to which TJ would be afforded under Title IX, the OSCR Policy (deficient as it is) including the Illinois Sexual Misconduct Policy, or the Scholarship Contract alleged below.

g.   By the AD's admission, Illinois, through the DIA, is not an investigatory body, and therefore, at least as was disclosed to TJ, did not do its own investigation of the facts aside and apart from reading the Reports and TJ's personal statement, upon information and belief.

h.   Further, the DIA did not provide any written ruling or any explanation for the Suspension beyond the bare Charges.

i.   The singular DIA Action to decide TJ's fate-which included a multitude of other differences between the DIA Action and other avenues available to Illinois as detailed in this Complaint-was in and of itself a fatal flaw by Illinois in its handling of TJ's situation.

36.   The AD stated as follows regarding Illinois policies when addressing TJ's proceedings within Illinois: "…DIA policy affords student-athletes appropriate levels of due process based on the nature and severity of the allegations." No. 11 Illinois suspends Terrence Shannon Jr. with FDU up next - CBSSports.com. [Exhibit N.]  The AD also stated at the

aforementioned press conference that the presumption of innocence "continues to apply" to the DIA Action. [Exhibit F at approximately 1:27.]

37.     The AD also clearly admitted that "DIA is not an investigator," instead relying on OSCR (which had not even started its investigation (to TJ's knowledge) when the Panel purportedly convened) and law enforcement investigations. [Exhibit F at approximately 5:57.]

38.     TJ does not recall ever signing any contract or other document wherein he agreed to the DIA Policy and subjected himself to the DIA Action. The only contract with Illinois of which TJ is aware is his April 27, 2022, Tender of Financial Aid, executed by both TJ and the university ("Scholarship Contract"). [A true and correct copy of this contract is attached hereto and incorporated herein as Exhibit O.]  Under the terms of that contract, specifically its "Schedule A," TJ can only lose his athletic scholarship if he is convicted of a crime involving sexual misconduct or pleads guilty or no contest to such a crime (or if he is found responsible for sexual misconduct by a "formal institutional disciplinary action….")  None of this has occurred.

39.     Further, Illinois has a another sexual misconduct policy in its Campus Administrative Manual ("Second Sexual Misconduct Policy"):  *See* Sexual Misconduct – Campus Administrative Manual (illinois.edu) [Exhibit P.] Illinois' Second Sexual Misconduct Policy is also enforced by OSCR and applies to all students and explicitly states: "This policy includes the processes to be used for all reports or complaints of sexual misconduct."  [Exhibit P, "Policy" section which is under the "Authority" section.]

40.     Illinois' Second Sexual Misconduct Policy implements Title IX at Illinois (as do its other applicable policies). As an institution that receives federal financial assistance from the U.S. Department of Education (the "Department"), Illinois must comply with Title IX. 20 U.S.C. §1681 et. seq. As explained by the Department in the preamble to Title IX's implementing

regulations, one key purpose of the Title IX regulations is to "hold [institutions of higher education] accountable for responses to sexual harassment designed to protect complainants' equal educational access and provide due process protections to both parties before restricting a respondent's educational access." 85 Fed. Reg. 30026, 30044 (May 14, 2020). The Department further noted that absent Title IX's regulations ensuring due process, institutional policies addressed sexual harassment grievance procedures "unevenly" and "at times employing procedures incompatible with constitutionally guaranteed due process and principles of fundamental fairness, and lacking impartiality and reliability." 85 Fed. Reg. 30048.

41.     Illinois did not apply Title IX in issuing the Suspension. Had Illinois applied Title IX, it could not suspend TJ from the Team unless and until Illinois' Title IX coordinator "undertakes an individualized safety and risk analysis, [and] determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of sexual harassment justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal" ("Title IX Risk Analysis").  34 CFR §106.44(c).

42.     Illinois has never performed a Title IX Risk Analysis of TJ. Regardless, TJ has been on Illinois' campus since the alleged incident, without any criminal, disciplinary, or other issues. Prior to his December 28, 2023, temporary suspension, TJ was a full participant on the Team, traveling to numerous destinations. And all along TJ has continued his studies at Illinois, again working towards a degree in sociology in May 2024. Further, according to the various affiants [Exhibits A and Q-1 through Q-7], TJ is not a threat to anybody at Illinois or otherwise, and Illinois has not alleged to the contrary. Instead, Illinois has allowed TJ to remain on campus as a student and otherwise.

43.    As alleged above, the AD stated that TJ is subject to three parallel and at times intersecting tracks. The first track, law enforcement, is supposed to provide TJ with the well-known constitutional rights afforded to the accused. The following is a comparison of the second track (OSCR Policy) [Exhibit M], which is just now commencing against TJ approximately three months or more after Illinois knew that TJ was the subject of a criminal investigation, to the third track (DIA Action) [Exhibit H], through which TJ was suspended and which is the challenged action in this lawsuit (as to OSCR, §2.05 applies if Illinois' case coordinator is the police, judge, jury, and executioner, while under §2.06 Illinois' case coordinator is the police, but a panel of three Illinois students, faculty, and/or staff serve as judge, jury, and executioner):

| Right afforded | OSCR Policy Allow Right? | DIA Policy Allow Right? |
|---|---|---|
| Respondents' Rights Section | Yes (2.03) | No |
| Appeal of initial decision | Yes (2.03b) | No |
| "Objectivity" section (decisions must be based on objective evaluation of evidence) | Yes (2.03f) | No |
| Participation (respondent can identify and present witnesses, provide relevant information, and actually participate in hearing) | Yes (2.03g) | No |
| Notice-Detailed description of dates and location of alleged incident | Yes (2.04(b)(i)) | No |
| Notice-Identity of complainants | Yes (2.04(b)(ii)) | No |
| Initial meeting with case coordinator | Yes (2.04(b)(v)) | No |
| Decision after initial meeting by case coordinator whether case coordinator or subcommittee on student conduct will decide the issue | Yes (2.04(d)) | No |

| | | |
|---|---|---|
| Illinois (through case coordinator) investigates, interviews witnesses (including complainants), and other witnesses) | Yes (2.05(b)(i) or 2.06 (c)(i)) | No (as the AD stated, DIA is not an investigative authority) |
| Illinois provides respondent with all investigative materials | Yes (2.05(b)(ix) or 2.06(c)(v)) | No |
| Preponderance of evidence standard-did respondent violate Student Code (or Sexual Misconduct Policy, if applicable)? | Yes (2.05(c) and 2.06(11)) | No (and the governing standard, which is silent as to burden of proof, is entirely university-centered, not student-athlete centered) |
| (If panel and not case coordinator decides) Respondent learns identity of panel members and can challenge their objectivity | Yes (2.05(f) or 2.06(f)) | No |
| Evidence including witnesses provided by respondent at final hearing | Yes (2.05(h) or 2.06(h)) | No |
| Audio recording of hearing (but only by OSCR staff, not a court reporter) | Yes (2.05(h)(vii) or 2.06(h)(7)) | No |
| Respondent learns details of procedure of hearing, and actual fact finding by panel | Yes (2.05(i) and 2.06(h),(i), and (j)) | No |
| Sentencing procedure with additional evidence if student found guilty of misconduct | Yes (three panel alternative only) (2.06(j)(ii)) | No |
| Conflicts of interest rules, including disqualification, for finders of fact | Yes (2.08) | No |
| Reprimand, censure, probation, or other less severe alternatives to suspension | Yes (2.10(b-d)) | No |
| Detailed appellate procedure | Yes (Article III) | No (no appeals) |
| Respondents' access to university files about them | Yes (4.05) | No |
| Alternative dispute resolution (Informal Resolution Option) | Yes (4.07) | No |
| Specific references to "due process" in the policy | Yes (2.06(b)(1) and 4.03(a)) | No |

44.     Therefore, the OSCR Action monumentally provides more safeguards to the student respondent compared to the DIA Action which is embarrassingly barren of such safeguards. Yet, Illinois rushed to judgment and suspended TJ essentially for the entire season (given the timing of the criminal proceedings) without first providing him with any of the safeguards of the OSCR Action. (As alleged below, although the OSCR Action provides more safeguards to TJ than the DIA Policy, that is not to say that it is fair.)

45.     Additionally, the OSCR Policy specifically applies to UIUC students involved in "varsity athletics."  [Exhibit M, §2.10(c)(ii)), one of the penalties that can come from an OSCR Action is as follows: "Behavioral Restrictions. The student is restricted from certain activities on campus (e.g. participation in certain registered student organizations, intramural or **varsity athletics**; contact with specific people or physical locations; or other restrictions deemed just and appropriate.")]  Therefore, the OSCR and DIA Actions overlap in many ways (or, as the AD stated, they "intersect.")

46.     This is not, however, to acknowledge that the OSCR Action is fair by any stretch of the imagination. First, it is possible that one person, an OSCR case coordinator, could decide TJ's fate with minimal rights afforded to TJ (unless OSCR determines that "the allegations, if true would likely result in suspension or dismissal from the university"). [Exhibit M, § 2.05.]

47.     Otherwise, a panel of three, comprised of at least one UIUC student and at least one UIUC faculty or staff member will decide TJ's fate if not enjoined. [Exhibit M, § 2.06.] There are specifics as to an OSCR Action, as outlined above, but the following are among the troublesome items of this scenario:

> a.  Neither Illinois nor the accused appears to have any subpoena power. This is especially acute where there is a parallel legal proceeding (criminal case). Without subpoena power, any genuine fact-finding is dramatically inhibited.

b. The accused does not have the right to directly confront witnesses or the accusers. Instead, the accused must feed questions to the panel "Chair," who then decides whether or not to ask a question proffered by the accused. [Exhibit M, §§ 2.06(h)(x)).]  This concern is exacerbated by the fact that the complainant apparently does not have to actually participate in the proceedings, or at least is able to refuse to answer questions posed by the panel. [Exhibit M, §2.02(g).]

c. While the accused has the right to have an advisor (counsel) present during meetings with the OSCR case coordinator or at the hearing, the advisor is not permitted to actually participate in any such meetings or the hearing. [Exhibit M, §2.03(a).]

d. Character evidence is deemed irrelevant at the liability phase of the "hearing," and may only be introduced at the "sentencing" phase. [Exhibit M, §§ 2.06(h)(v).]

e. The "hearing is closed to the public."  [Exhibit M, §§ 2.06(h)(i).]

f. Although the hearing is audio-recorded, that is only done by OSCR staff, not a real court reporter, raising questions as to authenticity and quality of recording. And "no other participants are permitted to record the hearing." [Exhibit M, §§ 2.06(h)(v).]

g. A word search of the search terms "oath" or "perjur!" reveals no obligation of any witness to testify truthfully. As recently confirmed by the Connecticut Supreme Court, such proceedings are inherently unfair and illegitimate, since they lack safeguards to ensure truth-seeking. *Khan v. Yale Univ.*, 347 Conn. 1 (2023) [opinion attached as Exhibit X], where a **7-0** panel of the Connecticut Supreme Court basically found that Yale University disciplinary proceedings wholly unreliable.

h. In more "legalese" terms, Yale University, overseeing a similar proceeding to the one that Illinois is now subjecting TJ to through OSCR, was not immune to defamation and related claims brought by an accused against his accuser and Yale University who oversaw the proceeding because the proceeding was simply not fair to the accused, finding in part (at 38-39):

> After reviewing the record before us, we conclude that the UWC proceeding did not incorporate sufficient procedural safeguards to be considered quasi-judicial. Specifically, the UWC proceeding failed ***(1) to require complainants to testify under oath or to subject them to explicit and meaningful penalties for untruthful statements,*** (2) ***to provide Khan, or his counsel, the meaningful opportunity to cross-examine adverse witnesses in real time,*** (3) to provide parties a reasonable opportunity to call witnesses to testify, ***(4) to afford Khan the opportunity to have the***

- 18 -

> ***active assistance of counsel during the UWC hearing,*** and **(*5*) *to provide Khan any record or transcript of the proceeding that would assist him in obtaining adequate review of the UWC decision or to expose the legitimacy or fairness of the proceeding to public scrutiny.*** Although we do not maintain that all of these procedural features are required for our recognition of a quasi-judicial proceeding, we conclude that the collective absence of such features militates against a determination that the proceeding had adequate safeguards to ensure reliability and promote fundamental fairness.

(The Connecticut Supreme Court in *Khan* was answering certified questions on Connecticut law directed to it by the United States Court of Appeals for the Second Circuit as to the accused's federal lawsuit involving the (in his words) "kangaroo court" to which he was subjected, very similar to Illinois' OSCR Action. *Khan v. Yale Univ.*, 85 F.4th 86 (2d Cir. 2023. The Second Circuit left all but one of the accused's claims intact (the one being dismissed based on statute of limitations grounds) in this ruling dated October 25, 2023)).

48.    Illinois has known that TJ was the subject of the criminal investigation that led to the Charges since September 2023, yet it took no action until December 28, 2023, and then came to an effectively permanent decision just 6 days later on January 3, 2024. There should always be time for due process, especially when Illinois is taking actions that will destroy a student's career.

49.    The concept of protecting the rights of the accused is also embodied in Title IX. Ironically, if the alleged incident involving TJ occurred on UIUC's campus, there would be no question that he would have been entitled to all Title IX safeguards by Illinois' own position. The fact that Illinois chose to implement a policy so devoid of due process safeguards, as opposed to Title IX, is arbitrary and capricious.

50.     Additionally, the AD did not mention TJ's Scholarship Contract in his recitation of those three tracks. The Scholarship Contract, however, is a valid and binding agreement between Illinois and TJ, and provides more specific safeguards to TJ (i.e., he cannot be penalized unless and until he is convicted of a crime involving sexual misconduct, pleads guilty or no contest to the same).

### MORE FACTS BEARING ON IRREPARABLE HARM AND THE INADEQUACY OF LEGAL REMEDIES

51.     TJ's mother and father separated when he was 2 years old, and he lived with his mom since that time.

52.     He now supports his mother and his four siblings through her (ages 7, 12, 14, and 21) and provides significant financial support to his additional three siblings through his father (ages 12, 17, and 19).

53.     TJ believes that he may have one year of NCAA eligibility remaining. However, he intends to try to play professionally after receiving his degree in sociology from Illinois this May. It was always his goal to get his degree, and he hopes to be able to attain that goal this May. Illinois employee affiants confirm that TJ is a good, hard-working, and conscientious student. [Exhibits Q-6 and Q-7.]

54.     TJ has been an Illini team captain for the past two seasons. At the outset of this season, he was projected to be a second round draft pick. *See e.g.,* Bleacher Report: Updated mock draft and Round 1 NBA comparisons | NBA.com. [Exhibit R-1.]  However, as the season progressed, TJ has played better than expected, leading the Illini to a top 10 current national ranking while scoring 21.7 points per game. Therefore, he has now risen to a projected first round NBA draft choice (2024 draft). *See e.g.,* 2024 NBA Mock Draft: Pro Comparisons and Full 2-Round Predictions | News, Scores, Highlights, Stats, and Rumors | Bleacher Report (#14)

and NBA Mock Draft - NBADraft.net (#20) [Exhibits R-2 and R-3].  Such prospects could be

expected to make $3,500,000 to $4,000,000 per year for the first three years of their career. *See*

*e.g.,* NBA Rookie Scale - RealGM [Exhibit R-4.] Without question, TJ's draft stock will drop to

little to nothing unless he is immediately reinstated. [See attached, Exhibits Q-1, Q-2, Q-3, and

Exhibit S.]

55.    There are now seventeen games left in the Team's regular season, and there

promises to be many more games in the Big 10 and NCAA tournaments. The next game is

January 11 against Michigan State.  [Exhibit T, schedule.] TJ has already missed three games

due to suspensions.  The Suspension may also jeopardize TJ's Name Image and Likeness (NIL)

deal.

56.    TJ has no prior criminal history. TJ has no history of academic or athletic

disciplinary issues. To the contrary, coaches and religious personnel who know TJ describe him

as an "incredible [or "exceptional"] young man," who "plays by the rules," who "respects

authority," who is a "rule follower," who is a "nice person with a good heart," who "genuinely

cares about others," and who treats women "with the utmost respect."  [See attached, Exhibits Q-

1 through Q-5]

57.    Further, two Illinois employees have provided character affidavits supporting TJ.

[Exhibits Q-6 and Q-7.]

58.    These affidavits also strongly affirm TJ's character, respect for others, and

contributions to the university community outside of basketball.

59.    The examples of false or otherwise unsubstantiated accusations against athletes

are too numerous to list here, but the following are just a few examples:

      a.    Brian Banks:  Falsely Accused: The Brian Banks Story - Legal Talk Network
          [Exhibit U-1]. Mr. Banks, at the time he was a USC football recruit, was

falsely accused of rape, pleaded no contest due to bad legal advice, and was later exonerated when his false accuser admitted to the false allegations.

b. Sean Oakman:  After Being Acquitted of Rape, Former Baylor Player Hopes to Join NFL – NBC 5 Dallas-Fort Worth (nbcdfw.com) [Exhibit U-2].  Mr. Oakman was acquitted of rape three years after the charges but the charges ruined his chances at an NFL career.

c. Duke Lacrosse case:  Duke Lacrosse Incident Duke lacrosse case - Wikipedia [Exhibits U-3 and U-4]. The circumstances of this case are well-known. The rush to judgment also included significant faculty sentiment, expressed in writing, against the falsely accused players before they were exonerated. It is reported that Duke University paid $60,000,000 in settlement.

d. Malik St. Hilaire and Dhameer Bradley:  Black Former Football Players Sue College And White Woman For False Rape Allegations | News | BET [Exhibit U-5]. Two African-American football players for Sacred Heart University were falsely accused by a white woman were exonerated, but only after one lost his scholarship and both withdrew from school while facing possible discipline from the school.

e. Amir Riep and Jahsen Wint:  Ex-Ohio State football players acquitted of rape, kidnapping | AP News [Exhibit U-6]. Messrs. Riep and Wint were kicked off the OSU football team in 2020 after being arrested on sensational charges of rape and kidnapping. Approximately three years later they were acquitted after the jury deliberated for four hours.

f. Jackson Mahomes:  Charges against Jackson Mahomes requested to be dismissed: Prosecutors (usatoday.com) [Exhibit U-7] and Jackson Mahomes sees felony charges in Kansas battery case get dropped (foxnews.com) [Exhibit U-8]. Although Jackson Mahomes is not well-known as an athlete, he is the brother of Kansas City Chiefs star quarterback Patrick Mahomes. He was accused of three counts of felony sexual assault for a 2023 incident that happened in a Kanas bar. On January 3, 2024, the prosecutors dropped those charges when the victim advised that she would assert the Fifth Amendment right against self-incrimination if she were forced to testify against Mahomes, because the incident was consensual.

60.    One of many points of the above cases is that an athlete's career is often ruined by their institution's suspensions or expulsion months or years before the criminal process exonerates them.

**COUNT I-INJUNCTIVE AND DECLARATORY RELIEF: TITLE IX (ILLINOIS)**

61.     TJ adopts and reincorporates paragraphs 1 through 60 by and for paragraph 61 as if more fully alleged herein.

62.     The Illinois Injunction Act, 735 ILCS 5/11-101, *et seq.* and the Illinois Declaratory Judgment Act, 735 ILCS 5/2-701, *et seq.*, have been in full force and effect at all relevant times.

63.     There is an actual and justiciable controversy in need of this Court's immediate resolution. TJ, on the one hand, asserts that Title IX and all of its safeguards protecting those in his situation should actually be applied to his situation. Illinois, on the other hand, asserts that Title IX does not apply to TJ's situation.

64.     Further, money damages cannot fully and adequately compensate TJ for the reasons alleged above.

65.     Hobson, a paid university employee, in the scope of his employment and in furtherance of Illinois' interests in the Team, transported and escorted TJ on his entire trip from Champaign to Lawrence wherein the alleged incident giving rise to the Charges occurred. [Exhibit A.]  Hobson did so at the directive of his superiors, three assistant coaches for the Team. [*Id.*]  Hobson checked in with two coaches from the Team for the entire trip. [*Id.*]

66.     Title IX is applicable because Illinois has actual knowledge of alleged sexual harassment that took place in an education program or activity of the university against a person in the United States. *See,* 34 CFR §106.30; §106.44(a).

67.     The alleged conduct took place in an "education program or activity" of Illinois' because Illinois exercised substantial control over both TJ and the alleged context in which the alleged incident occurred. *See,* 34 CFR §106.44(a) ("education program or activity" covered by

Title IX includes "circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs.)"

68.     Further, Title IX, as a remedial statute, must be liberally construed in favor of applicability. *See e.g.,* Keeley B. Gogul, "The Title IX Pendulum: Taking Student Survivors Along for the Ride." 90 Univ. of Cincinnati Law Rev., 1016 (March 2022).

69.     Once Title IX applies, Illinois is required to follow all applicable regulations and guidance when responding to claims of sexual harassment. In particular, Title IX regulations explicitly state that Illinois may **not** suspend or remove the accused from an education program or activity pending a determination of responsibility at the conclusion of a grievance process, unless and until the university "undertakes an individualized safety and risk analysis, [and] determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of sexual harassment justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal."  34 CFR §106.44(c).

70.     Such regulatory requirements, which have the force and effect of law, supersede any Illinois policies to the contrary, including the DIA Policy or the OSCR Policy. Further, as noted above, the DIA Policy itself is explicit that its terms are subject to applicable federal regulations, including Title IX (as is the OSCR Policy):

> *If the Panel decides to withhold the student-athlete from any athletic activity or related support service, it will do so in compliance with, and consideration of, all applicable University, state, and federal regulations applicable to such withholding.*

71.     There has been no finding that there is any need for emergency removal of TJ pursuant to 34 CFR §106.44(c) or any other rule or law. In fact, the circumstances beg otherwise, as alleged above.

72. Further, Illinois is required to comply with §106.44(a) and (c), outlining circumstances when an emergency suspension/removal of a student is appropriate, regardless of whether a formal complaint is filed. However, Title IX applies even where the complainant has not filed a formal Title IX complaint "and is not participating in or attempting to participate in the school's education program or activity." Question 24 of <u>Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021) (PDF) (ed.gov)</u> [Exhibit V]. "Put simply, there are circumstances when a Title IX Coordinator may need to sign a formal complaint that obligates the school to initiate an investigation regardless of the complainant's relationship with the school or interest in participating in the Title IX grievance process. This is because the school has a Title IX obligation to provide all students, not just the complainant, with an educational environment that does not discriminate based on sex." *Id.*

73. Also, "[t]he Department [of Education] may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment." 34 CFR §106.44(a).

74. Therefore, TJ requests that the Court issue an order declaring as follows:

    a. that Title IX applies to this situation; and,

    b. that Illinois either immediately perform an individualized safety and risk analysis pursuant to 34 CFR §106.44(c) to determine if TJ constitutes an immediate threat to the physical health or safety of any student or other individual that justifies suspension or should contemporaneously and immediately reinstate TJ as a full participant in on the Team.

75. Also, TJ requests that the Court awards him temporary, preliminary, and permanent injunctive relief because money damages are inadequate (as alleged above), he will incur irreparable harm without injunctive relief, he has a likelihood of success on the merits, a

- 25 -

balancing of the equities favors him, and the public interest will not be harmed by injunctive relief in TJ's favor (to the extent the Court applies the last two factors).

WHEREFORE, Plaintiff, Terrence Shannon Jr., respectfully requests that this Court enters a judgment against the Defendant, The Board of Trustees of the University of Illinois as follows:

    a.   orders a declaratory judgment in favor of the Plaintiff, and against the Defendant, as follows:

        i.   that Title IX applies to this situation;

        ii.   that Illinois' Title IX coordinator should initiate a Title IX Complaint so that due process and other safeguards afforded to TJ, his accuser, and others are followed;

        iii.   that Defendant either immediately perform an individualized safety and risk analysis pursuant to 34 CFR §106.44(c) to determine if TJ constitutes an immediate threat to the physical health or safety of any student or other individual that justifies suspension, or should contemporaneously and immediately reinstate TJ as a full participant on the Team;

    b.   orders temporary, permanent, and/or injunctive relief pursuant to 735 ILCS 5/11-101 to preserve the status quo until a full resolution of this count on the merits; and/or

    c.   awards Plaintiff such other relief this Court deems just.

**COUNT II-DECLARATORY AND INJUNCTIVE RELIEF:**
**SCHOLARSHIP CONTRACT APPLIES**
**(PLEAD ALTERNATIVELY) (ILLINOIS)**

76.    TJ adopts and reincorporates paragraphs 1 through 56 by and for paragraph 76 as if more fully alleged herein.

77.     The Illinois Injunction Act, 735 ILCS 5/11-101, *et seq.* and the Illinois

Declaratory Judgment Act, 735 ILCS 5/2-701, *et seq.*, have been in full force and effect at all

relevant times.

78.     There is an actual and justiciable controversy in need of this Court's immediate

resolution. TJ, on the one hand, asserts that the Scholarship Contract, and not the DIA Policy or

the OSCR Policy, should be applied to Illinois' handling of TJ's situation. Illinois, on the other

hand, asserts that the Scholarship Contract does not apply to TJ's situation regarding the

Charges, and instead the DIA Policy and/or the OSCR Policy applies.

79.     Further, money damages cannot fully and adequately compensate TJ for the

reasons alleged above.

80.     The Scholarship Contract was executed by TJ and Illinois upon an offer,

acceptance, and the exchange of proper consideration.

81.     TJ has complied with all material terms of the Scholarship Contract. So long as TJ

remains compliant with the provisions of the Scholarship Contract, he remains as a student in

good standing at the UIUC.

82.     The Scholarship Contract is the only contract that TJ ever executed with Illinois

to his recollection.

83.     Schedule "A" to the Scholarship Contract, Exhibit O, states as follows:

**SCHEDULE A TO TENDER OF FINANCIAL AID**
**DURING ACADEMIC YEAR(S)** 22-23, 23-24

Pursuant to paragraph 4 of the "Conditions of Financial Aid" section and paragraph 4 of the "Acceptance" section of the Tender of Financial Aid, the following additional conditions of financial aid apply at this institution:
Athletic aid may be reduced or cancelled in cases of serious or repeated violations of the Division of Intercollegiate Athletics Code of Conduct, published team rules, and/or published academic standards
Athletic aid may also be reduced, cancelled or not renewed for the following reasons:
* Failure to disclose or misrepresentation of a known physical or mental medical condition;
* Conviction, guilty plea or no contest plea to a crime involving sexual misconduct or dating or domestic violence;
* A finding of responsibility for sexual misconduct or dating or domestic violence by a formal institutional disciplinary action of any collegiate or secondary educational institution;
* Failure to graduate at the end of the period of the award if the student-athlete has remaining eligibility (multi-year tenders only);
* Failure to graduate within four years after initial full-time enrollment at any collegiate or secondary educational institution;
* Graduation;
* The Division of Intercollegiate Athletics reserves the right to reduce athletic aid where a student-athlete receives an increase in exempted institutional financial aid as defined under NCAA legislation.

SIGNED _Brian Russell, Ph.D._ Digitally signed by Brian Russell Date: 2022.04.27 15:17:04 -05'00'
Director of Athletics

SIGNED _Kimberly Hamilton_ Digitally signed by Kimberly Hamilton Date: 2022.04.27 15:20:07 -05'00'
Financial Aid Director

SIGNED _____    DATE 4/28/22    STUDENT ID # (optional) _____
Student's Signature

SIGNED _____    DATE _____
Parent or Legal Guardian's Signature

84.    The Scholarship Contract should supersede the DIA Policy as the Scholarship Contract is a written contract executed by TJ and Illinois, while the DIA Policy is not. The Scholarship Contract therefore governs TJ's status at Illinois, including with the Team, since the Scholarship Contract pertains to TJ's athletic scholarship at Illinois.

85.    And since the Scholarship Contract supersedes the DIA Policy, Illinois cannot terminate TJ's status on the Team unless and until he is convicted of a crime involving sexual misconduct, pleads guilty or no contest to the same, and/or is found responsible for the same by a formal disciplinary institutional action. None of these events have occurred. To treat TJ in any fashion as a student not in good standing with Illinois is an action in breach of the Scholarship Contract.

86.    Therefore, TJ requests that the Court issue an order declaring as follows:

a.   that the Scholarship Contract applies to Illinois' proceedings, and not the DIA Policy;

b.   that Illinois should contemporaneously and immediately reinstate TJ as a full participant on the Team since his suspension from the Team is not permitted by the Scholarship Contract.

87.   Also, TJ requests that the Court awards him temporary, preliminary, and permanent injunctive relief because money damages are inadequate (as alleged above), he will incur irreparable harm without injunctive relief, he has a likelihood of success on the merits, a balancing of the equities favors him, and the public interest will not be harmed by injunctive relief in TJ's favor (to the extent the Court applies the last two factors).

WHEREFORE, Plaintiff, Terrence Shannon Jr., respectfully requests that this Court enter the following relief against the Defendant, The Board of Trustees of the University of Illinois as follows:

a.   orders a declaratory judgment in favor of the Plaintiff, and against the

Defendant, as follows:

   i.   that the Scholarship Contract applies to Illinois' proceedings, and not the DIA Policy and/or OSCR Policy;

  ii.   that Defendant should contemporaneously and immediately reinstate TJ as a full participant on the Team since his suspension from the Team is not permitted by the Scholarship Contract;

 iii.   ordering temporary, permanent, and/or injunctive relief pursuant to 735 ILCS 5/11-101 to preserve the status quo until a full resolution of this count on the merits;

b.   orders temporary, permanent, and/or injunctive relief pursuant to 735 ILCS

5/11-101 to preserve the status quo until a full resolution of this count on the

merits; and/or

c.   awards Plaintiff such other relief this Court deems just.

**COUNT III-INJUNCTION-IMPLIED CONTRACT (DIA POLICY)**
**(PLEAD ALTERNATIVELY) (ILLINOIS)**

88.     TJ adopts and reincorporates paragraphs 1 through 87 by and for paragraph 88 as if more fully alleged herein.

89.     Pleading in the alternative, to the extent this Court finds the DIA Policy applicable (which TJ denies, but again, pleading in the alternative), then the DIA Policy is an implied contract between TJ and Illinois.

90.     TJ has complied with all material terms of the DIA Policy.

91.     The explicit terms of the DIA Policy include, but are not limited to:

    a.  that the DIA will not act against a student-athlete unless it receives "credible information that a student-athlete may have engaged in misconduct, the DIA will evaluate the information to determine whether the allegations, if substantiated, would constitute" a relevant offense. [Exhibit H.]

    b.  that the DIA "will exercise good faith and reasonable judgment to draw needed conclusions based on the information available to it at the time it convenes." [*Id.*].

    c.  further, as admitted by the AD, the DIA Policy terms also include, whether explicit or not, the necessity that the DIA presumes TJ's innocence and otherwise affords TJ due process in coming to its decisions. [Exhibits F and N.]

    d.  The DIA Policy incorporates federal law (Title IX) as noted above.

92.     Moreover, the DIA Policy contains an implied covenant of good faith and fair dealing that precludes Illinois from acting arbitrarily or unreasonably in its exercise of any discretion it enjoys under the DIA Policy.

93.    Illinois breached the DIA Policy in one or more of the following ways:

    a.  By not acting on credible information to suspend TJ, especially given the fact that Illinois had basically the same information regarding the facts of the Charges from late September through December 27, 2023 (when it did not suspend TJ) as Illinois had when it decided to temporarily suspend TJ on December 28, 2023, and permanently suspend TJ on January 3, 2024. In fact, the Reports, to the extent they truly were not previously received by Illinois, only provided more exculpatory information in favor of TJ, as alleged above;

    b.  By not affording TJ the presumption of innocence, instead penalizing him as if he were guilty of the Charges in ways that will destroy his career before he has his day in criminal court;

    c.  By not following the letter or spirit of the following language from the DIA Policy which provides instructions to a risk balancing analysis:

        "*Based on the information available to the Panel at the time the Panel is convened, the Panel may consider the broad spectrum of risks to the University of (a) immediately reinstating the student-athlete, should further investigation reveal that the student-athlete committed the alleged major offense, against (b) continuing to withhold the student-athlete from athletic activities, should further investigation reveal that the student-athlete did not commit the alleged major offense.*"

        TJ, however, does not know if the panel actually performed this analysis because TJ did not get any explanation. Regardless, for all the reasons alleged, the risks to Illinois of not reinstating TJ to the Team outweigh the risks of reinstating TJ to the Team, particularly when he is still a student.

    d.  By failing to exercise good faith and reasonable judgment with respect to the Suspension in that the risks to Illinois of not reinstating TJ to the Team outweigh the risks of reinstating TJ to the Team, particularly when he is still a student.

    e.  By otherwise not affording TJ due process, including, but not limited to, the opportunity to be fully heard (including the right to appear before the panel deciding his fate and present witnesses to them), the right to a panel of neutrals, the right to formally know the specific identity of those deciding his fate and exactly how they came to their decision, the right to a genuine investigation of the facts by Illinois before making its suspension decisions (as Illinois' DIA, which decided the Suspension, has admitted it is not an investigatory body, and instead would have to rely on another of Illinois'' divisions to do so), the right to reasonable accommodations that would allow him to fully participate on the Team unless he is found to be a danger to others

- 31 -

on campus, and the numerous other deficiencies of the DIA Action alleged herein.

94.     TJ requests that the Court awards him temporary, preliminary, and permanent injunctive relief because money damages are inadequate (as alleged above), he will incur irreparable harm without injunctive relief, he has a likelihood of success on the merits, a balancing of the equities favors him, and the public interest will not be harmed by injunctive relief in TJ's favor (to the extent the Court applies the last two factors).

WHEREFORE, Plaintiff, Terrence Shannon Jr., respectfully requests that this Court enters judgment in his favor and against the Defendant, The Board of Trustees of the University of Illinois temporary, permanent, and/or injunctive relief pursuant to 735 ILCS 5/11-101 to preserve the status quo until a full resolution of this count on the merits; and/or other further relief this Court deems just.

## COUNT IV – DECLARATORY AND INJUNCTIVE RELIEF: UNCONSCIONABILITY OF DIA POLICY (PLEAD ALTERNATIVELY) (ILLINOIS)

95.     TJ adopts and reincorporates paragraphs 1 through 87 by and for paragraph 95 as if more fully alleged herein.

96.     The Illinois Injunction Act, 735 ILCS 5/11-101, *et seq.* and the Illinois Declaratory Judgment Act, 735 ILCS 5/2-701, *et seq.*, have been in full force and effect at all relevant times.

97.     There is an actual and justiciable controversy in need of the Court's immediate resolution in that TJ, on one hand, contends (pleading in the alternative) that the DIA Action pursuant to which Illinois issued the Suspension is unconscionable and unenforceable, rendering the Suspension invalid. Illinois disputes TJ's position.

98.     Pleading in the alternative, to the extent this Court finds the DIA Policy to govern Illinois' DIA Action against TJ and that Illinois did not breach the DIA Policy (which TJ denies, but again, pleading in the alternative), then the DIA Policy is unconscionable and unenforceable and, therefore, the Suspension is invalid.

99.      The DIA Policy is a contract of adhesion drafted by Illinois and imposed on TJ and other student-athletes without any meaningful opportunity for rejection of its oppressive and one-sided terms.

100.     The DIA Policy is confusing and contradictory in that it purports to require that the Panel solely consider the interests of Illinois in making determinations, yet it also purports to require consideration of other applicable Illinois, state, and federal regulations, such as Title IX and even the OSCR Policy (deficient as it is), which require consideration of interests beyond those of Illinois and provide meaningful procedural safeguards.

101.     Accordingly, the DIA Policy implicates a high degree of procedural unconscionability.

102.     Further, the DIA Policy exhibits a high degree of substantive unconscionability in that the DIA Policy's terms are so one-sided that they oppress and unfairly surprise TJ and other student-athletes accused of sexual crimes by stripping such persons of the most basic of procedural protections. Without limitation, the following one-sided aspects of the DIA Policy, which contrast sharply with the procedural safeguards afforded respondents under Title IX and the OSCR Policy (deficient as it is), oppress and unfairly surprise TJ and other student-athletes accused of sexual crimes:

> a.    that the DIA Policy permits Illinois to make determinations without any consideration whatsoever of the interests of student-athletes;

b.      the absence of any express requirement that respondents be afforded a presumption of innocence;

c.      the absence of any Respondents' Rights Section;

d.      the absence of any express requirement that the Panel's decisions be based on an objective evaluation of evidence;

e.      the absence of any express right of the respondent to identify and present witnesses, provide relevant information, and participate in the hearing;

f.      the absence of any express requirement that the respondent be provided notice of the identity of the complainant or description of dates and location of the alleged incident;

g.      the absence of any express requirement that the Panel conduct any investigation before rendering a determination;

h.      the absence of any express requirement that Illinois provide a respondent with all investigative materials and provide the respondent with an opportunity to respond in writing to the allegations;

i.      the absence of any express requirement that the Panel base its decision on a reasonable and defined evidentiary standard;

j.      the absence of any express requirement that the respondent be provided the identity of the panel members so that the respondent can challenge their objectivity;

k.      the absence of any express requirement that the respondent be allowed to present witnesses at any hearing;

l.      the absence of any express requirement that a hearing follow reasonable procedures and involve actual fact finding by the panel;

m.      the absence of any express conflicts of interest rules, including disqualification for conflicted panel members;

n.      the absence of any express procedures permitting respondents to access Illinois files about them; and

o.      the absence of any express appellate rights or procedures.

103. Individually and collectively, these failings strip respondents like TJ of even a modicum of due process, resulting in gross oppression and irreparable harm.

104. Accordingly, the DIA Policy is unconscionable and unenforceable.

105. The unenforceability of the DIA Policy renders invalid the Suspension.

106. TJ requests that the Court awards him temporary, preliminary, and permanent injunctive relief because money damages are inadequate (as alleged above), he will incur irreparable harm without injunctive relief, he has a likelihood of success on the merits, a balancing of the equities favors him, and the public interest will not be harmed by injunctive relief in TJ's favor.

WHEREFORE, Plaintiff, Terrence Shannon Jr., respectfully requests that this Court enters declaratory judgment in his favor and against the Defendant, The Board of Trustees of the University of Illinois, declaring that the DIA Policy is unconscionable and unenforceable and that, therefore, the Suspension is invalid; awards temporary, permanent, and/or injunctive relief pursuant to 735 ILCS 5/11-101 to preserve the status quo until a full resolution of this count on the merits; awards Plaintiff his costs; and/or awards Plaintiff any other relief this Court deems just.

## COUNT V-DECLARATORY AND INJUNCTIVE RELIEF:
## COURT DETERMINATION OF WHICH STANDARDS ACTUALLY GOVERN THE
## SUSPENSION PROCESS
## (PLEAD ALTERNATIVELY) (ILLINOIS)

107.    TJ adopts and reincorporates paragraphs 1 through 106 by and for paragraph 107

as if more fully alleged herein.

108.    The Illinois Injunction Act, 735 ILCS 5/11-101, *et seq.* and the Illinois

Declaratory Judgment Act, 735 ILCS 5/2-701, *et seq.*, have been in full force and effect at all

relevant times.

109.    There is an actual and justiciable controversy in need of this Court's immediate

resolution. TJ, on the one hand, and pleading in the alternative, asserts that Illinois' various

policies, including Title IX policies, the OSCR Policy (deficient as it is) (and its attendant Sexual

Misconduct Policy), and the DIA Policy are contradictory (in that the first two allow TJ far more

safeguards, while the DIA Policy does not) (not to mention other possibly applicable policies

like the Second Sexual Misconduct Policy). Illinois, on the other hand, asserts that these policies

can operate at the same time and intersect, even though they have different standards.

110.    TJ was suspended under the DIA Policy that has the fewest safeguards for him, as

outlined above. Further, despite Illinois' promises to the contrary, the DIA Policy does not heed

the presumption of innocence or other basic due process rights.

111.    Further, money damages cannot fully and adequately compensate TJ for the

reasons alleged above.

112.    TJ therefore requests a declaratory judgment to the following effect:

    a.  that the DIA Action and OSCR Action initiated against TJ are null and void
       unless and until Illinois demonstrates to the Court exactly which standards
       apply to TJ's status as a student-athlete and that such standards comply with
       due process;

b.   alternatively, that:

i.   the safeguards (deficient as they are, and TJ reserves all assertions as
to the same) afforded by the OSCR Policy should be applied to any
Illinois actions deciding TJ's status with the Team, and that any past
actions that did not do so are null and void; and

ii.   that OSCR must complete its investigation and its process before
Illinois (including, but not limited to, its DIA or those acting at the
request of the DIA) takes any action against TJ, including, but not
limited to, suspension from the Team, and therefore TJ should be
reinstated to the Team.

113.   Also, TJ requests that the Court awards him temporary, preliminary, and
permanent injunctive relief because money damages are inadequate (as alleged above), he will
incur irreparable harm without injunctive relief, he has a likelihood of success on the merits, a
balancing of the equities favors him, and the public interest will not be harmed by injunctive
relief in TJ's favor (to the extent the Court applies the last two factors).

WHEREFORE, Plaintiff, Terrence Shannon Jr., respectfully requests that this Court
enters the following relief against the Defendant, The Board of Trustees of the University of
Illinois:

a.   a declaratory judgment in favor of the Plaintiff, and against the Defendant, as
follows:

i.   that the DIA Action and OSCR Action initiated against TJ are null and
void unless and until Illinois demonstrates to the Court exactly which
standards apply to TJ's status as a student-athlete and that such
standards comply with due process;

ii.   alternatively, that:

1.   the safeguards afforded by the OSCR Policy should be applied
to any Illinois actions deciding TJ's status with the Team, and
that any past actions that did not do so are null and void; and

2.   that OSCR must complete its investigation and its process
before Illinois (including, but not limited to, its DIA or those

acting at the request of the DIA) takes any action against TJ, including, but not limited to, suspension from the Team, and therefore TJ should be reinstated to the Team

   iii.   in any event, that Defendant should contemporaneously and immediately reinstate TJ as a full participant on the Team;

b.   ordering temporary, permanent, and/or injunctive relief pursuant to 735 ILCS 5/11-101 to preserve the status quo until a full resolution of this count on the merits; and/or

c.   awarding Plaintiff his costs and such other relief this Court deems just.

**COUNT VI-42 U.S.C. §1983**
**(PLEAD ALTERNATIVELY) (KILLEEN)**

114.    TJ adopts and reincorporates paragraphs 1 through 113 by and for paragraph 114 as if more fully alleged herein.

115.    At all times relevant, Killeen, acted under color of state law, as President of the University of Illinois system, has had oversight over the DIA including the Team and can direct his subordinates at the DIA.

116.    Killeen, as President of Illinois, has deprived TJ of a constitutionally protected property interest by suspending him from the Team, thereby depriving TJ of the right not to be suspended from the Team without good cause and due process, as required by Title IX, as set forth in the Scholarship Contract, and/or otherwise.

117.    Killeen, as President of Illinois, also deprived TJ of a constitutionally protected liberty interest to pursue a career of his choice without the stigma of the Suspension.

118.    Killeen, as President of Illinois, also threatens to deprive TJ of a constitutionally protected property interest by subjecting him to the deficient OSCR Action.

119.    Killeen, as President Illinois, has violated TJ's procedural due process rights, as alleged herein. TJ was suspended under the DIA Policy that has the least amount of safeguards

for him, as outlined above. Further, despite Illinois' promises to the contrary, the DIA Action does not heed the presumption of innocence or other basic due process rights. Additionally, the OSCR Policy process that is being applied to TJ does not provide sufficient fairness or due process.

120.    Money damages cannot fully and adequately compensate TJ for the reasons alleged above.

121.    TJ therefore requests that the Court awards him temporary, preliminary, and permanent injunctive relief because money damages are inadequate (as alleged above), he will incur irreparable harm without injunctive relief, he has a likelihood of success on the merits, a balancing of the equities favors him, and the public interest will not be harmed by injunctive relief in TJ's favor (to the extent the Court applies the last two factors).

WHEREFORE, Plaintiff, Terrence Shannon Jr., respectfully requests that this Court enters the following relief against the Defendant, Timothy Killeen:

      a.  ordering temporary, permanent, and/or injunctive relief pursuant to 735 ILCS 5/11-101 to preserve the status quo until a full resolution of this count on the merits; and/or

      b.  awarding Plaintiff such other relief this Court deems just.

## COUNT VII-DECLARATORY AND INJUNCTIVE RELIEF: WAIVER (ILLINOIS)

122.    TJ adopts and reincorporates paragraphs 1 through 121 by and for paragraph 122 as if more fully alleged herein.

123.    The Illinois Injunction Act, 735 ILCS 5/11-101, *et seq.* and the Illinois Declaratory Judgment Act, 735 ILCS 5/2-701, *et seq.*, have been in full force and effect at all relevant times.

124.     There is an actual and justiciable controversy in need of this Court's immediate resolution. TJ, on the one hand asserts that Illinois waived its rights to enforce the DIA Policy and/or the OSCR Policy against TJ because Illinois knew that TJ was the subject of the criminal investigation that led to the Charges since approximately September 2023, yet Illinois took no action against TJ until December 28, 2023. In the interim, TJ remained at Illinois and played the first eleven games of the season.

125.     Accordingly, to the extent that Illinois had the right to apply the DIA Policy and/or the OSCR Policy to TJ, Illinois waived its right to do so.

126.     Further, money damages cannot fully and adequately compensate TJ for the reasons alleged above.

127.     TJ therefore requests a declaratory judgment that Illinois waived any alleged right to apply the DIA Policy and/or the OSCR Policy to TJ.

128.     Also, TJ requests that the Court awards him temporary, preliminary, and permanent injunctive relief because money damages are inadequate (as alleged above), he will incur irreparable harm without injunctive relief, he has a likelihood of success on the merits, a balancing of the equities favors him, and the public interest will not be harmed by injunctive relief in TJ's favor (to the extent the Court applies the last two factors).

WHEREFORE, Plaintiff, Terrence Shannon Jr., respectfully requests that this Court enters the following relief against the Defendant, The Board of Trustees of the University of Illinois:

      a.   a declaratory judgment in favor of the Plaintiff, and against the Defendant, that Defendant waived any alleged right to apply the OSCR Policy and/or the DIA Policy to Plaintiff and therefore TJ should be immediately reinstated to the Team; and

b.  ordering temporary, permanent, and/or injunctive relief pursuant to 735 ILCS 5/11-101 to preserve the status quo until a full resolution of this count on the merits; and/or

c.  awarding Plaintiff his costs and such other relief this Court deems just.

Respectfully submitted,
TERRENCE SHANNON, Jr., Plaintiff

By: /s/ Robert H. Lang
Robert H. Lang (ARDC #6225414)
Zoe S. Spector (ARDC #6333392)
Thompson Coburn LLP
55 East Monroe Street, 37th Fl.
Chicago, IL 60603
rhlang@thompsoncoburn.com
(312) 346-7500
Fax: (312) 580-2201

By: /s/ Mark C. Goldenberg
Mark C. Goldenberg (ARDC #0990221)
Thomas C. Horscroft (ARDC #6327049)
Goldenberg Heller & Antognoli, P.C.
2227 South State Route 157
Edwardsville, IL 62025
mark@ghalaw.com
(618) 656-5150
Fax: (618) 656-6230

By: /s/ J. Steven Beckett
J. Steven Beckett (ARDC #0151580)
Steve Beckett Law Office LLC
508 S. Broadway Avenue
Urbana, IL 61801
steve@stevebeckettllc.com
(217) 328-0263
Fax: (217) 328-0290

By: /s/ Mark Sutter
Mark Sutter (ARDC #6238207)
Sutter Law Group, LLC
One Lincoln Centre
18w140 Butterfield Road, Suite 1500
Oakbrook Terrace, IL 60181
msutter@sutterlawgroup.com
(312) 724-5600

<u>**VERIFICATION**</u>

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements as set forth in the above **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF** are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true to the best of his knowledge and belief.

_____
**Terrence Shannon Jr.**

# EXHIBIT A

## <u>VERIFIED STATEMENT OF DYSHAWN HOBSON</u>

Pursuant to Section 1-109 of the Illinois Code of Civil Procedure I declare under penalties of perjury as follows:

1.  I am over 18 years of age and competent to make this statement, which is based on my personal, first-hand knowledge, and my best recollection.

2.  I have been a graduate assistant for the University of Illinois at Urbana-Champaign's ("Illinois") men's basketball team from June 2023 through the present. I have been a paid employee of Illinois since that time. I report to the men's basketball coaching staff in my capacity as graduate assistant.

3.  I am also a roommate of Terrence Shannon Jr. (TJ) and Justin Harmon (Justin), who also plays on the men's basketball team. On September 7, 2023, I overheard that Justin and TJ wanted to go to Illinois' football game at Lawrence, Kansas against the University of Kansas (KU) that night.

4.  I was concerned about TJ and Justin driving to and from Lawrence. So after basketball practice earlier in the day on September 8, 2023 I told several Illinois men's assistant basketball coaches, Geoff Alexander, Chester Frazier, and Tyler Underwood, about TJ and Justin's plans. I report to each of these assistant coaches as a graduate assistant. These coaches directed me to drive TJ and Justin to and from Lawrence. They were concerned about TJ's driving as TJ had been in a recent accident in Florida. I also advised the coaches were that TJ had  to be back in Champaign an N.I.L.-related event for the ICON Collective early on September 9. Besides transporting TJ and Justin back and forth, I understood from the coaches that I was to oversee TJ and Justin on the trip. Basically all three of the coaches were directing me to do this.

5.   So I drove TJ and Justin to and from Lawrence that day in my capacity as an Illinois graduate assistant.  It certainly was not a leisure trip for me, as not only did I drive TJ and Justin to and from Lawrence, but I also drove them to the various locations we attended that night and generally kept an eye on them.  I stayed completely sober during the whole trip because of those duties.

6.   Coach Alexander also told me that I would be reimbursed for any gas or hotel expenses. I did not seek reimbursement from Illinois at the end of the day.

7.   About 30 minutes or so after receiving my directives from the coaches, I drove TJ and Justin to Lawrence. Justin, TJ, and I went to the Illinois-KU football game that evening. After the game we went to housing where KU basketball players lived and we socialized there with some KU players.

8.   After that I drove Justin, TJ, and several KU basketball players to the KU campus bar area. We went to the Jayhawk Café. I was with TJ almost the whole time, except when he went to the bathroom, etc.  At the Jayhawk Café, TJ, Justin, and I were hanging out with high-profile KU basketball players and we seemed to be a spectacle because they are locally well-known and also because of the tall heights of many in our group.

9.   The Jayhawk Café was very crowded that night.

10. I am familiar with the alleged charges against TJ, and I did not see any such thing occur, at all. Nothing remotely close. And based on what I know about TJ, it would be completely out of character for him to ever do something like that.

11. We ended up returning to Champaign from Lawrence the morning of September 9, around 4:30 a.m. During the whole trip from Champaign to Lawrence, coaches Tyler Underwood and Geoff Alexander were checking in with me at various times via a group text with me.

- 2 -

/s/ DyShawn Hobson
Date: January 3, 2024

# EXHIBIT B-1

## LAWRENCE POLICE DEPARTMENT
## INVESTIGATIVE REPORT

REPORT:  5

| | | | |
|---|---|---|---|
| Case#: | L23048869 | Victim: | ███████ |
| Offense: | Rape | Suspect: | Terrance Shannon Jr. |
| Date/Time: | 09/09/2023 | Detective: | Josh Leitner |

Document Tag: Cf9dAKmg

### SURVEILLANCE VIDEO
The Jayhawk Cafe
1340 Ohio Street
Hunter Austin-Manager
Authority -Consent
ACTI NVR
Time Offset : 4015 days, 17 hours, 17 minutes 37 seconds slower than real time.
Time period downloaded: 09/09/2023 from 00:17:37 hours to 01:17:37 hours.

On September 12th, 2023, Reporting Officer (R/O) Detective Josh Leitner along with Detective Welch met with ███████ the manager at The Jayhawk Café, 1340 Ohio Street at approximately 1500 hours.

R/O photographed the screen showing a live timestamp of the surveillance video. R/O compared the timestamp on the surveillance video with the embedded timestamp of the photograph and determined the timestamp on the Network Video Recorder was 4015 days, 17 hours, 17 minutes 37 seconds slower than real time.

R/O downloaded the video from cameras 2, 8, and 13 as they appeared to show the relevant area of the bar.  R/O noted Hunter advised they recently had camera system trouble and some of their cameras were not operation during the day of the incident.  R/O extracted the video using the built in backup option, which exported .AVI files to a USB drive.

R/O later analyzed those video files with AMPED FIVE software.  R/O observed the video showed the victim, ███████ and her friend, ███████ in the Martini Room at the Jayhawk Café.  After several minutes in the bar, they moved toward the door, left the Martini Room for a few minutes before coming back in.  Both ███████ and ███████ moved towards the bar and ███████ left the camera frame for a little over two minutes.  ███████ returned to the camera frame, appeared to speak with ███████ and they both left the room.  A short time later, ███████ and ███████ are seen walking from the hallway near the Martini Room entrance, walk up the stairs and into the Pineroom. R/O did not see ███████ and ███████ leave the bar because of the crowd of people and the camera angle.

For additional information, see the attached report and the videos in Evidence.com.  R/O has nothing further.

Officer: _____     Approved: _____

# EXHIBIT B-2

**LAWRENCE POLICE DEPARTMENT**
**INVESTIGATIVE REPORT**

**REPORT:   6**

| | | | |
|---|---|---|---|
| Case#: | L23048869 | Victim: | ▇▇▇▇▇▇▇ |
| Offense: | Rape | Suspect: | Terrence Shannon Jr. |
| Date/Time: | 09/09/2023 | Detective: | Josh Leitner |

Document Tag: 4J3WkeyK

**EVIDENCE**
Apple iPhone 13
Owner: ▇▇▇▇▇▇▇
Authority: Consent

On September 13th, 2023, Reporting Officer (R/O) Detective Josh Leitner contacted ▇▇▇▇▇▇▇ regarding this investigation and requested she allow R/O to download the contents of her phone for evidence in the investigation. ▇▇▇▇ gave R/O permission to review the contents of her phone related to this investigation and provided the passcode for the device.

R/O utilized a GrayKey device to extract the contents of the device. The extraction completed successfully. R/O opened the extraction inCellebrite UFED Physical Analyzer and created a report that contained information from 09/08/2023 through 09/09/2023. R/O later zipped the extraction and the report together and uploaded the files to Evidence.com. The following is a brief summary of the data R/O identified as evidence in this investigation. For specific details, see the UFED Reader report in Evidence.com.

R/O observed the device corroborated statements ▇▇▇▇ made to R/O during her interview. The device showed ▇▇▇▇'s phone was at the Memorial Stadium during the KU Football game and went to her residence, 2511 W. 31st Street, at approximately 2138 hours. The device showed it was first in the area of the Jayhawk Café, 1340 Ohio Street, at approximately 2123 hours. The device showed ▇▇▇▇'s phone was in the area of the Jayhawk Café from approximately 2240 hours until 2310 hours. The device showed it moved to the area of the 700 block of Massachusetts between 2317 hours and 2357 hours. The device showed it moved back to the area of the Jayhawk Cafe at 0000 hours. The device showed it remained at the Jayhawk Café until 0055 hours. The device showed it traveled from the area of the Jayhawk Café to the 1400 block of Ohio Street, where it appeared they had parked, and then traveled back to 2511 W. 31st Street, arriving at approximately 0109 hours.

R/O observed on 09/09/2023 at approximately 0216 hours, ▇▇▇▇ searched "kansas state basketball roster". R/O observed numerous searches related to the KU Basketball team, KU football team, Illinois Football team and the Illinois Basketball team on the device between 0216 hours and 0349 hours. Later in the day, R/O observed ▇▇▇▇ continued searching terms related to sexual assault, state and federal crime definitions. R/O observed at 1247 hours, ▇▇▇▇ searched the name "Terrence

## LAWRENCE POLICE DEPARTMENT
## INVESTIGATIVE REPORT

**REPORT:   6**

| | | | |
|---|---|---|---|
| Case#: | L23048869 | Victim: | █████████ |
| Offense: | Rape | Suspect: | Terrence Shannon Jr. |
| Date/Time: | 09/09/2023 | Detective: | Josh Leitner |

Shannon Jr."  The device showed an image on Terrence which showed his dreadlocks, including several that were dyed different colors.  R/O observed ██████ searched for ways to make a report to the Lawrence Kansas Police Department.

For additional information, see the UFED Reader report in Evidence.com.  R/O has nothing further.

Officer: _____     Approved: _____

# EXHIBIT B-3

## LAWRENCE POLICE DEPARTMENT
## INVESTIGATIVE REPORT

REPORT:  3

| | | | |
|---|---|---|---|
| Case#: | L23048869 | Victim: | ███████ |
| Offense: | Rape, Sexual Battery | Suspect: | Terrance Shannon Jr. |
| Date/Time: | 09/11/2023 | Detective: | Josh Leitner |

Document Tag: aqYCeTS4

### INTERVIEW

DOB

On  September 11th, 2023, at approximately 1413 hours, Reporting Officer (R/O) Detective Josh Leitner conducted an interview with ████████ at the Lawrence Police Department Headquarters regarding this investigation.

███████ contacted police on Saturday, September 9th, 2023 to report a rape that occurred at 1340 Ohio Street, the Jayhawk Café, earlier in the day.  At the direction of police, ██████ also responded to Lawrence Memorial Hospital for a sexual assault examination regarding this investigation.

R/O activated digital audio and video recording equipment for this interview. For specific details on her statements, see the interview room recording, which was uploaded to Evidence.com.

R/O began the interview by introducing himself and obtaining █████'s personal information.

███████ stated she and her friend, ██████████, went to The Jayhawk Café after the football game on Friday, September 7th, 2023. ██████ stated they were both in the Martini room, which is in the basement when the incident occurred. ██████ reported there were a lot of people in the Martini room and so it was difficult to move around.

███████ stated she had a drink in her hand, but had only taken a few sips from it and was not in any way intoxicated. ██████ stated because of how crowded the Martini room was, it was hot and uncomfortable so she and ████ made their way to the door. ██████ stated as they were trying to leave, there was a black male near the door she thought was attractive who started to waive her over. ██████ stated they exited the room and once in the hallway outside, told ████ about the guy waiving her over. ██████ stated ██████ encouraged her to go back into the Martini room and talk to him.

## LAWRENCE POLICE DEPARTMENT
## INVESTIGATIVE REPORT

**REPORT:  3**

| | | | |
|---|---|---|---|
| Case#: | L23048869 | Victim: | ███████ |
| Offense: | Rape, Sexual Battery | Suspect: | Terrance Shannon Jr. |
| Date/Time: | 09/11/2023 | Detective: | Josh Leitner |

███████ stated she reentered the room and began making her way towards the male. ███████ stated once she got close to her, the male started "grabbing" on her and "grabbing my butt" to pull her towards him. ███████ stated the male started grabbing her buttocks on the outside of her clothing before putting his hands under her skirt and grabbing her buttocks. ███████ stated he pulled her to him and nearly immediately placed his finger under her underwear and inserted it into her vagina. ███████ stated because of how crowded the room was, and her position next to the male and the wall, she couldn't move or "do anything" while this happened. ███████ stated this also caught her by surprise and she was in shock. ███████ stated the physical contact lasted only approximately 30 seconds before she was able to get away from the male and exit the room. ███████ stated she tried to tell ███████ what happened but ███████ couldn't understand her because of how loud it was in the bar. ███████ stated they exited the Martini room area and told ███████ what happened. ███████ stated she was so uncomfortable after this happened, she needed to leave. ███████ stated they remained at the bar for just a short time before leaving and going home.

███████ clarified the timeline of events and stated she thought the incident occurred at approximately 0045 hours. ███████ stated she was gone by 0100 hours and on the way back home.

R/O asked ███████ to help R/O understand where she was when this happened. R/O drew a quick sketch of the Martini room and ███████ indicated where she was when the incident happened.  The sketch is pasted below.

## LAWRENCE POLICE DEPARTMENT
## INVESTIGATIVE REPORT

**REPORT:  3**

| | | | |
|---|---|---|---|
| Case#: | L23048869 | Victim: | ███████████ |
| Offense: | Rape, Sexual Battery | Suspect: | Terrance Shannon Jr. |
| Date/Time: | 09/11/2023 | Detective: | Josh Leitner |

███████████ indicated she was in the position of the red circle when the incident happened.

███████████ described her clothing as being a black shirt and black cargo skirt. ███████████ stated her shirt had sleeves that were not attached at the shoulder.

███████████ stated the male used one hand to pull her towards him and said she was not sure which hand went inside her vagina. ███████████ stated the male's hand was around behind her buttocks and entered her vagina from behind. ███████████ stated she guessed the entire encounter was approximately one minute long. ███████████ stated the male's finger was inside her vagina approximately five to ten seconds.

R/O explained to ███████████ it was important to understand some facts as they related to consent and force. R/O asked ███████████ what she did when this happened. ███████████ stated she froze when the male placed his finger in her vagina. ███████████ stated she was shocked at what happened and the crowd in the room also kept her from moving. ███████████ stated the male did not physically restrain her but the quickness of his actions and the density of the crowd prevented her from stopping the act. ███████████ stated she also had a drink in one hand and her phone in the other hand which also left her unable to do anything.

███████████ stated she remembered the male had another female in his other arm. ███████████ stated once this happened, she did not confront the male but immediately turned and pushed through the crowd to get away from him.

R/O asked ███████████ if there was any action of hers or statement she made that may have led the male to believe she was okay with him touching her in this way. ███████████ stated there was not. ███████████ stated she did not speak with the male at all, or have any other interactions with him. ███████████ stated prior to the touch, there was "no intimacy at all". ███████████ stated she thought the male did this "for power" and "just to prove he could do it."

R/O asked ███████████ how the male moved her underwear and she clarified the male put his hands inside her underwear from the leg opening, "flicked it" out of the way, and put his finger inside her vagina. ███████████ stated she did not have any marks, or injuries from the encounter and her underwear were not torn. ███████████ confirmed she went to Lawrence Memorial Hospital and participated in a sexual assault examination where her underwear was collected.

## LAWRENCE POLICE DEPARTMENT
## INVESTIGATIVE REPORT

REPORT:   3

| Case#: | L23048869 | Victim: | ███████ |
|---|---|---|---|
| Offense: | Rape, Sexual Battery | Suspect: | Terrance Shannon Jr. |
| Date/Time: | 09/11/2023 | Detective: | Josh Leitner |

████ stated the male did not give his name, but she was able to identify him on social media. ████ stated there was a male next to the suspect that ████ recognized as ████████, a KU basketball player. ████ stated she reviewed the entire KU basketball roster but did not see the suspect. ████ stated she then reviewed most of the KU football roster, but did not see the suspect. ████ stated she thought it was possible the male was from Illinois because this was the team KU was playing in football. ████ stated she went to the Illinois basketball team roster and immediately identified the suspect as Terrance Shannon Jr. ████ stated she also observed on the Illinois basketball team Instagram page, there was a photograph of Terrance Shannon Jr. at the KU football stadium from the day before the incident occurred. ████ stated she was able to identify him by his face and by his hair. ████ described Terrance as having dreadlocks with two of them dyed a different color. ████ stated in the Instagram post, Terrance was pictured with the same male she saw next to him in the bar. ████ texted R/O the photograph, which is pictured below, and entered into Evidence.com.



**LAWRENCE POLICE DEPARTMENT**
**INVESTIGATIVE REPORT**

REPORT:  **3**

| | | | |
|---|---|---|---|
| Case#: | L23048869 | Victim: | ▮▮▮▮▮ |
| Offense: | Rape, Sexual Battery | Suspect: | Terrance Shannon Jr. |
| Date/Time: | 09/11/2023 | Detective: | Josh Leitner |

▮▮▮▮▮ advised the male in the Illinois jersey was the suspect. ▮▮▮▮ stated during the incident, Terrance was wearing a mustard yellow shirt.

▮▮▮▮▮ stated she did not have any other communication with the suspect. ▮▮▮▮ stated to her knowledge, none of her friends have reached out or communicated with the suspect. R/O recommended she and her friends not post about this on social media. ▮▮▮▮ stated she did not communicate with other people about this electronically.

▮▮▮▮ showed R/O a photograph of her and ▮▮▮▮ from that night in order for R/O to identify them on camera.

▮▮▮▮ stated from her interaction with Terrance, she felt like what happened was not ok and Terrance should have some consequences. ▮▮▮▮ stated she is willing to go forward with prosecution. R/O explained the process of the investigation and what charges seemed appropriate. ▮▮▮▮ confirmed she felt like the touching of her buttocks over her skirt was ok with her but it was not ok with her when Terrance placed his hand under her skirt. ▮▮▮▮ stated she was not ok with Terrance placing his finger inside her vagina.

R/O asked ▮▮▮▮ if because of how crowded it was in the bar, if it was possible it was someone else's finger that penetrated her vagina. ▮▮▮▮ stated it was not possible that it was anyone else.

For additional information, refer to the interview recording. R/O has nothing further.

Officer: _____    Approved: _____

# EXHIBIT B-4

## LAWRENCE POLICE DEPARTMENT
## INVESTIGATIVE REPORT

**REPORT:   4**

| | | | |
|---|---|---|---|
| Case#: | L23048869 | Victim: | ██████████ |
| Offense: | Rape, Sexual Battery | Suspect: | Terrance Shannon Jr. |
| Date/Time: | 09/11/2023 | Detective: | Josh Leitner |

Document Tag: u858VOyG

### INTERVIEW



On September 11th, 2023, Reporting Officer (R/O) Detective Josh Leitner conducted a recorded interview with ██████████, a witness in this investigation.  R/O activated a digital audio and video recording device and later uploaded the recording to Evidence.com.  For specific details of her statement, see the recording.

██████ stated she and her friend, ██████████, DOB 05/24/2005, went to the Jayhawk Café on Friday, September 8th, 2023 after the football game. ██████ stated they arrived at the Jayhawk Café around 2230 hours but left shortly after and went to Logies bar, 729 Massachusetts Street.  ██████ stated they didn't stay at Logies very long before returning to The Jayhawk Café at approximately 0010 hours.  ██████ stated they were visiting with a friend of hers named ██████ in the Martini room. ██████ stated she and ██████ had just gotten their first drink, but had not consumed much of it. ██████ stated the Martini bar was very packed and it was hot inside so they walked towards the exit.

██████ stated once they exited into the hallway between the buildings, ██████ told her there was a male who was waiving her over that ██████ thought was cute. ██████ stated she encouraged ██████ to go back into the Martini room and talk with him.  ██████ stated as they entered the Martini room, she observed the male, who she didn't recognize, but did recognize the male he was with as a KU basketball player named ██████████.  ██████ stated as ██████ moved towards the male, she observed the people around him.  ██████ stated there was a girl who was already in this man's arms, which she thought was rude because he was trying to talk to two girls at once.

██████ stated after a few moments, ██████ approached her and told her they needed to go.  ██████ stated once they left the Martini room, ██████ told her what the man had done and that she needed to leave.  ██████ stated she didn't understand exactly what ██████ told her but knew she wanted to leave so she wanted to say goodbye to her friend ██████ before they left.  ██████ stated they reentered the Martini bar from the other door and tried to make their way to ██████, however

## LAWRENCE POLICE DEPARTMENT
## INVESTIGATIVE REPORT

REPORT:   4

| | | | |
|---|---|---|---|
| Case#: | L23048869 | Victim: | ▮▮▮▮ |
| Offense: | Rape, Sexual Battery | Suspect: | Terrance Shannon Jr. |
| Date/Time: | 09/11/2023 | Detective: | Josh Leitner |

▮▮ was having a hard time dealing with what happened and turned to leave. ▮▮ stated they both walked out of the bar, and ▮▮ began to cry. ▮▮ stated ▮▮ told her she needed to go home and she felt dirty because of what happened to her.

▮▮ stated once at home, ▮▮ told her the man groped her buttocks both on the outside and inside of her skirt and that he placed his finger inside her vagina without her permission. ▮▮ stated ▮▮ never spoke with the male or even had a conversation. ▮▮ stated she was upset about what happened to her friend. ▮▮ stated ▮▮ told several people in her residence what happened and she was crying uncontrollably. ▮▮ stated ▮▮ went to her room alone.

▮▮ stated the following day she spoke with ▮▮ who told her she reviewed multiple social media accounts relating to KU athletics and the Illinois athletic department and was able to identify the male as Terrance Shannon Jr. ▮▮ stated she also saw the photograph from the Illinois basketball team's Instagram account and confirmed the person identified as Terrance Shannon Jr. is the suspect.

▮▮ stated ▮▮ told her that because of the noise, and the density of people in the Martini room, she wasn't able to do anything to defend herself against Terrance. ▮▮ stated ▮▮ told her it was too loud that nobody would hear if she yelled at him and there were so many people she couldn't even put her arms down to pull her skirt back into place over her buttocks.

▮▮ stated the incident occurred at approximately 0045 hours and they were home by 0100 hours. ▮▮ stated they were in the bar less than 10 minutes after the incident occurred. ▮▮ stated she didn't have any photographs of ▮▮ and Terrance together because they weren't together very long. ▮▮ stated she knew Terrance was wearing a yellow shirt at the bar.

For additional information, see the interview recording.  R/O has nothing further.

Officer: _____     Approved: _____

# EXHIBIT B-5

IN THE DISTRICT COURT OF DOUGLAS COUNTY, KANSAS          L23048869
(Seventh Judicial District)

STATE OF KANSAS,

Plaintiff,

vs.

Terrence Shannon Jr.
DOB 07/30/2000,

Defendant.

## AFFIDAVIT

STATE OF KANSAS, COUNTY OF DOUGLAS, SS:

Josh Leitner, of lawful age, being first duly sworn upon oath, states:

Affiant is an Detective with the Lawrence Kansas Police Department. Based on

an investigation, training, and experience, Affiant alleges and states:

1.  On Saturday, September 9th, 2023, at approximately 1530 hours, Officer Bryan Martes Munoz responded to a report of a sex crime that occurred at 1340 Ohio Street, the Jayhawk Café, earlier in the day.  The victim, ███████ ████ ██ ███████ reported she was groped and raped by a male in the Martini Room at the Jayhawk Café in the early morning hours of September 9th, 2023. ████████ advised she was willing to respond to the Lawrence Memorial Hospital for a sexual assault examination, which she did.

2.  On Monday, September 11th, 2023, Affiant, Detective Josh Leitner conducted a recorded interview with ████████.  ████████ stated she and her friend, ████████ ██ went to The Jayhawk Café after the KU football game on Friday, September 7th, 2023.  ████████ stated they were both in the Martini room, which is in the basement when the incident occurred.  ████████ reported there were a lot of people in the Martini room and it was difficult to move around.

3.  ████████ stated she had a drink in her hand, but had only taken a few sips from it and was not in any way intoxicated.  ████████ stated because of how crowded the Martini room was, it was hot and uncomfortable so she and ████████ made their way to the door.  ████████ stated as they were trying to leave, there was a black male near the door she thought was attractive who started to waive her over. ████████ stated they exited the room and once in the hallway outside, told ████████ about the guy waiving her over.  ████████ stated ████████ encouraged her to go back into the Martini room and talk to him.

4.  ████████ stated she reentered the room and began making her way towards the male.  ████████ stated once she got close to him, the male started "grabbing" on her and "grabbing my butt" to pull her towards him.  ████████ stated the male started grabbing her buttocks on the outside of her clothing before putting his hands under her skirt and grabbing her buttocks.  ████████ stated he pulled her to him and nearly immediately placed his finger under her underwear and inserted it into her vagina.

AFFIDAVIT                                                          L23048869
State vs. Terrence Shannon Jr.
DOB 07/30/2000
Page 2

██████ stated because of how crowded the room was, and her position next to the male and the wall, she couldn't move or "do anything" while this happened. ██████ stated this also caught her by surprise and she was in shock. ██████ stated the physical contact lasted only approximately 30 seconds before she was able to get away from the male and exit the room. ██████ stated she tried to tell ██████ what happened but ██████ couldn't understand her because of how loud it was in the bar. ██████ stated they exited the Martini Room and told ██████ what happened. ██████ stated she was so uncomfortable after this happened, she needed to leave. ██████ stated they remained at the bar for just a short time before leaving and going home.

5. ██████ stated the male used one hand to pull her towards him. ██████ stated the male's hand was around behind her buttocks and entered her vagina from behind. ██████ stated she guessed the entire encounter was approximately one minute long. ██████ stated the male's finger was inside her vagina approximately five to ten seconds.

6. Affiant explained to ██████ it was important to understand some facts as they related to consent and force. Affiant asked ██████ what she did when this happened. ██████ stated she froze when the male placed his finger in her vagina. ██████ stated she was shocked at what happened and the crowd in the room also kept her from moving. ██████ stated the male did not physically restrain her but the quickness of his actions and the density of the crowd prevented her from stopping the act. ██████ stated she also had a drink in one hand and her phone in the other hand which also left her unable to do anything.

7. ██████ stated she remembered the male had another female in his other arm. ██████ stated once this happened, she did not confront the male but immediately turned and pushed through the crowd to get away from him.

8. Affiant asked ██████ if there was any action of hers or statement she made that may have led the male to believe she was okay with him touching her in this way. ██████ stated there was not. ██████ stated she did not speak with the male at all, or have any other interactions with him. ██████ stated prior to the touch, there was "no intimacy at all". ██████ stated she thought the male did this "for power" and "just to prove he could do it."

9. Affiant asked ██████ how the male moved her underwear and she clarified the male put his hands inside her underwear from the leg opening, "flicked it" out of the way, and put his finger inside her vagina. ██████ stated she did not have any marks, or injuries from the encounter and her underwear were not torn. ██████ confirmed she went to Lawrence Memorial Hospital and participated in a sexual assault examination where her underwear was collected.

10. ██████ stated the male did not give his name, but she was able to identify him on social media. ██████ stated there was a male next to the suspect that ██████

AFFIDAVIT                                                                L23048869
State vs. Terrence Shannon Jr.
DOB 07/30/2000
Page 3

    recognized as ▮▮▮▮▮▮▮▮ a KU basketball player. ▮▮▮▮ stated she reviewed the entire KU basketball roster but did not see the suspect. ▮▮▮▮ stated she then reviewed most of the KU football roster, but did not see the suspect. ▮▮▮▮ stated she thought it was possible the male was from Illinois because this was the team KU was playing in football. ▮▮▮▮ stated she went to the Illinois basketball team roster and immediately identified the suspect as Terrence Shannon Jr. ▮▮▮▮ stated she also observed on the Illinois basketball team Instagram page, there was a photograph of Terrence Shannon Jr. at the KU football stadium from the day before the incident occurred. ▮▮▮▮ stated she was able to identify him by his face and by his hair. ▮▮▮▮ described Terrence as having dreadlocks with two of them dyed a different color. ▮▮▮▮ stated in the Instagram post, Terrence was pictured with the same male she saw next to him in the bar.

11.  Affiant interviewed ▮▮▮▮ ▮▮ ▮▮▮▮ about the incident. ▮▮▮ stated she was with ▮▮▮▮ when the incident occurred and corroborated ▮▮ statements about the timeline and the suspect. ▮▮▮ stated she did not see the incident occur as she was talking to other people in the bar. ▮▮▮ provided the account of the incident that ▮▮▮▮ gave to her, which is the same as what ▮▮▮ told Affiant.

12.  Affiant reviewed ▮▮▮▮ cellular phone and it corroborated ▮▮▮▮ statement as well. The phone showed it was at the Memorial Stadium during the KU Football game and went to her residence, ▮▮ ▮▮ ▮▮▮▮ , at approximately 2138 hours. The device showed it was first in the area of the Jayhawk Café, 1340 Ohio Street, at approximately 2123 hours. The device showed ▮▮▮▮ phone was in the area of the Jayhawk Café from approximately 2240 hours until 2310 hours. The device showed it moved to the area of the 700 block of Massachusetts between 2317 hours and 2357 hours. The device showed it moved back to the area of the Jayhawk Cafe at 0000 hours. The device showed it remained at the Jayhawk Café until 0055 hours. The device showed it traveled from the area of the Jayhawk Café to the 1400 block of Ohio Street, where it appeared they had parked, and then traveled back to ▮▮ ▮▮ ▮▮▮▮ , arriving at approximately 0109 hours.

13.  Affiant observed on 09/09/2023 at approximately 0216 hours, ▮▮▮▮ searched "kansas state basketball roster". Affiant observed numerous searches related to the KU Basketball team, KU football team, Illinois Football team and the Illinois Basketball team on the device between 0216 hours and 0349 hours. Later in the day, Affiant observed ▮▮▮▮ continued searching terms related to sexual assault, state and federal crime definitions. Affiant observed at 1247 hours, ▮▮▮▮ searched the name "Terrence Shannon Jr." The device showed an image on Terrence which showed his dreadlocks, including several that were dyed different colors. Affiant observed ▮▮▮▮ searched for ways to make a report to the Lawrence Kansas Police Department.

14.  Affiant reviewed surveillance video from the Jayhawk Café during the incident and observed the video showed ▮▮▮▮▮▮▮▮ , in the Martini Room at the

AFFIDAVIT                                                    L23048869
State vs. Terrence Shannon Jr.
DOB 07/30/2000
Page 4

Jayhawk Café. After several minutes in the bar, they moved toward the door, left the Martini Room for a few minutes before coming back in. Both ████ and ████ moved towards the bar and ████ left the camera frame for a little over two minutes. ████ returned to the camera frame, appeared to speak with ████ and they both left the room. A short time later, ████ are seen walking from the hallway near the Martini Room entrance, walk up the stairs and into the Pineroom. Affiant observed ████ on the back as they went up the stairs as if to console her. The video also showed a person identical to Shannon off camera in the same area where ████ was off camera.

15. Affiant believes there is probable cause to charge Terrence Shannon Jr. with Rape for placing his finger inside ████ vagina by force and Sexual battery for groping her buttocks under her skirt.

All of the above occurred in Douglas County, Kansas.

FURTHER, AFFIANT SAYS NOT.

Det. Josh Leitner
Lawrence Kansas Police Department

Subscribed and sworn to before me this 4th day of October, 2023.

Notary Public

Jennifer Jones
Notary Public
State Of Kansas
My Appt Expires 11-2-24

# EXHIBIT C

STATE OF KANSAS,
        Plaintiff,

vs.

Case No. DG-2023-CR-300181

**TERRENCE EDWAARD SHANNON, JR,**
        Defendant.

L23048869

## COMPLAINT

Jennifer Tatum, Chief Assistant District Attorney, of lawful age, being first duly sworn

upon oath deposes and states:

### COUNT 1
### RAPE

That on or about September 9, 2023, in Douglas County, Kansas, **TERRENCE EDWAARD SHANNON JR** did unlawfully, feloniously, and knowingly engage in sexual intercourse with a person, to-wit:   who did not consent to the sexual intercourse under circumstances when she, was overcome by force or fear, **a severity level 1 person felony**, in violation of K.S.A. 21-5503(a)(1)(A) & (b)(1)(A).

Penalty Range: From a minimum of 147 months to a maximum of 653 months in prison and/or a fine of up to $300,000 and 36 months of post-release supervision, pursuant to K.S.A. 21-6804, 21-6807, 21-6611(a)(2), & 22-3717(d)(1)(A), and amendments thereto.

### OR, IN THE ALTERNATIVE
### COUNT 1
### SEXUAL BATTERY

That on or about September 9, 2023, in Douglas County, Kansas, **TERRENCE EDWAARD SHANNON JR** did unlawfully touch another, to-wit:   , who was 16 or more years of age, to wit: DOB:   and who did not consent to the touching, with the intent to arouse or satisfy the sexual desires of the offender or another, **a class A person misdemeanor**, in violation of K.S.A. 21-5505(a) & (c)(1).

Penalty Range: From up to one year in the county jail and/or a fine of up to $2,500, pursuant to K.S.A. 21-6602(a)(1) & 21-6611(b)(1), and amendments thereto.

# EXHIBIT D

# Albert Wilson - National Registry of Exonerations

**M** law.umich.edu/special/exoneration/Pages/casedetail.aspx

## Albert Wilson

Other Kansas Exonerations



Lawrence Journal-World

On September 11, 2016, a 17-year-old girl known in court records as Jane Doe went to a hospital in Lawrence, Kansas, and requested a sexual-assault examination. She said that the night before, she had met 20-year-old Albert Wilson at the Jayhawk Café, a popular bar near the University of Kansas, where Wilson was a student.

The girl said they had kissed, and that Wilson had sexually assaulted her at the bar, then taken her back to his apartment, where he sexually assaulted her again. Wilson would tell police said he didn't sexually assault the girl. He said they had kissed and petted above the waist but never had sex. The rape kit did not find any pubic hair or secretions.

Police arrested Wilson on October 11, 2017, after a swab from the girl's chest showed DNA

| | |
|---|---|
| **State:** | Kansas |
| **County:** | Douglas |
| **Most Serious Crime:** | Sexual Assault |
| **Additional Convictions:** | |
| **Reported Crime Date:** | 2016 |
| **Convicted:** | 2019 |
| **Exonerated:** | 2021 |
| **Sentence:** | 12 years and 3 months |
| **Race/Ethnicity:** | Black |
| **Sex:** | Male |
| **Age at the date of reported crime:** | 20 |
| **Contributing Factors:** | False or Misleading Forensic Evidence, Perjury or False Accusation, Inadequate Legal Defense |

**027**

consistent with his genetic profile. He was charged with sexual assault and rape by force of fear. The assault charge was tied to the alleged incident at the bar; the rape charge was tied to the alleged incident at the apartment.

Prior to the trial's start in Douglas County District Court, the state hired Dr. John Spiridigliozzi, a psychologist, to perform an evaluation of the girl. He met with her several times in March 2018 and issued a report on May 10, 2018, that said she had post-traumatic stress disorder (PTSD). Most of his findings were based on responses that the girl and her mother had given to his questions. He had asked the women for Doe's medical records, but they did not provide him with this information.

Wilson, who was from Wichita, Kansas, had no criminal record. He was represented by Forrest Lowry, who was being paid half his customary rate through the state's Board of Indigent Defense Service. Lowry would later say: "My theory was that this was a case of consent and that it was a case of buyer's remorse from a young woman whose family pressured her into pressing charges in this case."

At trial, Doe testified about the events of September 10, 2016. She said that she had gotten drunk at the bar and as an inexperienced drinker: "I'd only really had beer like, once or twice sort of thing." She also testified that the sexual assault left her with panic attacks, and that she was afraid of crowds and being around people.

Spiridigliozzi shored up Doe's testimony, lending credibility to her accounts of PTSD and how the assault had damaged her life. He said: "She lost friends. At school she would hide because she couldn't stand being around larger groups of people." He also testified that he had vouched for the accuracy of Doe's self-reporting. "Everything here has more than one source that I have reported," Spiridigliozzi said.

| Did DNA evidence contribute to the exoneration?: | No |
| --- | --- |

028

Based on Doe's statements, Spiridigliozzi testified that she had a blood-alcohol content of 0.25 at the time of the alleged attack. Although not a medical doctor, Spiridigliozzi told the jurors the effects of that level of intoxication and used a chart to illustrate the issue.

He also testified that Doe had superior intelligence. This was not based on the administration of an IQ test, but rather her acceptance as a National Merit Scholar and her enrollment in "gifted programs" at school.

The trial judge had told Spiridigliozzi that he could not say the girl had been raped; that was an issue for the jury. But in his testimony about her disassociation from the alleged attack, Spiridigliozzi said: "After the rape, she said that he had removed or pulled down her undergarments, and she was lying with her legs off of the bed …" Lowry did not object. Later, he would say, "I guess I just missed it." He made little attempt to cross-examine Spiridigliozzi and probe how he arrived at his findings.

Rachel Hunt, a forensic scientist in the biology section of the Kansas Bureau of Investigation, testified that a swab from Doe's chest found a "partial foreign DNA profile" was "consistent with the known DNA profile of Albert Wilson." She also said there was no evidence of DNA from Wilson anywhere else on Doe's body.

Wilson testified in his own defense. He denied sexually assaulting the girl and said they didn't have sex. Blacks are approximately 4 percent of Douglas County's population, and Wilson was tried before an all-white, mostly female jury. The jury hung on the sexual-assault charge but convicted Wilson of the rape charge on January 10, 2019. Wilson was later sentenced to 12 years and three months in prison.

Wilson appealed. His new attorney, Michael Whelan, filed a motion on January 13, 2020, for a hearing on whether Lowry provided ineffective assistance of counsel.

First, Whelan said, Lowry had done only a cursory investigation on Wilson's behalf. Lowry hired a private investigator, but he didn't locate any witnesses from the bar. And neither Lowry nor the investigator ever interviewed the five other persons who lived with Wilson, which would have "revealed character and community evidence that was strongly supportive of Mr. Wilson."

Prior to trial, the state had turned over to Lowry 2,000 pages of text messages and photos from Doe's phone. Lowry would later acknowledge he failed to review this evidence, which contradicted her testimony and undermined the testimony of Spiridigliozzi.

The text messages indicated that Doe was a frequent drinker, despite her age and testimony, and that she was sexually experienced at the time of the attack. Generally, courts do not allow a victim's sexual history to be used by defendants, but Doe had reported to Spiridigliozzi that she had only had sex one time prior to the alleged attack, and he would later acknowledge the falsehood went to a question of honesty in her self-reporting. In addition, her text messages indicated that she continued to socialize with large groups of people, rather than withdraw from friends because of her trauma.

The messages also showed that Doe was taking anti-depressants before the incident on September 10, 2016. Doe and her mother had not disclosed this information to Spiridigliozzi.

Separately, the state had given Lowry a redacted version of Spiridigliozzi's report. Lowry didn't ask for the unredacted version, which mentioned Doe's present use of anti-depressants and her previous mental-health treatments. The motion argued that having this information would have allowed Lowry to more effectively cross-examine Spiridigliozzi and Doe about whether her alleged PTSD was connected to the incident with Wilson or was related to earlier events in her life.

A two-day hearing was held on November 2-3, 2020. It revealed additional problems with Lowry's representation and the credibility of the state's evidence.

Spiridigliozzi wrote in his report that he had used a video from the Jayhawk bar in his research. But he hadn't, because the state never gave it to him. Instead, he relied on still photos. The videos were at odds with Doe's testimony. She had said that she was unsteady on her feet and that Wilson had picked her up and carried her. The video showed the two walking "at a rather brisk pace," with no evidence of "disorientation," Spiridigliozzi said at the hearing. He said that the video was not "consistent" with Doe's self-reporting.

Lowry admitted at the hearing that he should have requested the unredacted report.

In a pleading filed on December 20, 2021, Whalen and attorney Josh Dubin, who had joined Wilson's defense, wrote: "Once Mr. Lowry was made aware that these same documents were in his possession the whole time, he acknowledged that he would have used them and they could have affected the outcome of the trial. There is no act more basic to an attorney representing a client than to review the discovery given to them by the State. That is simply how criminal defense works."

Judge Sally Pokorny of Douglas County District Court vacated Wilson's conviction on March 16, 2021. Wilson was released from prison on March 23, 2021.

"The court's confidence in the jury's verdict is undermined by Mr. Lowry's failure to review text messages," Pokorny said. She also said the text messages undermined Spiridigliozzi's testimony. "It is my firm belief that if a jury knew the information contained in the 2,000 text messages taken from the victim's phone, there is a substantial likelihood the outcome of this case would have been different."

By now, Wilson's case—which involved a young Black man being convicted by an all-white jury of a sexual assault of a white girl—had drawn national attention. In an attempt to avoid a retrial, the Douglas County District Attorney's Office offered Wilson a plea deal, but he refused to accept it.

On December 22, 2021, the case was dismissed after a motion by District Attorney Suzanne Valdez. She said in a statement that prosecutors and Wilson's attorneys worked to resolve the case through mediation and a commitment to restorative justice. In this case, she said, Doe wanted "to address Mr. Wilson directly and to convey to him the impact this entire experience has had on her."

Wilson agreed to the meeting, and the two parties met with Retired District Judge Kevin Moriarty serving as the mediator.

"Justice comes in different forms, and there is no 'one size fits all' approach when it comes to resolving delicate, difficult matters," Valdez said. "By and large, justice is dictated by the unique intricacies of each individual case and the objectives and expectations of the parties. The unique intricacies of this case led the parties to a resolution by way of restorative justice."

In April 2022, Wilson filed a claim against the state of Kansas, seeking compensation under the state's wrongful conviction statute.

– *Ken Otterbourg*

---

Report an error or add more information about this case.

---

Posting Date: 3/21/2022
Last Updated: 4/21/2022

# EXHIBIT E

# Douglas County DA shares regrets in day 2 of disciplinary hearing

LT **lawrencekstimes.com**/2023/12/19/valdez-hrg-day2/

TOPEKA — Douglas County District Attorney Suzanne Valdez became tearful as she repeatedly apologized and expressed how embarrassed she was to be sitting in her disciplinary hearing Tuesday afternoon.

She said she's lived with the shame of her actions for nearly three years.

"I don't want to be here. It is humiliating," she said. "… I regret it. I regret all of that. It was a very difficult time."

Valdez only got through just short of an hour of testimony late Tuesday afternoon before Day 2 of her three-day hearing wrapped.

The rest of the day's testimony included former Senior Assistant District Attorney Alice Walker, Douglas County District Judge Mark Simpson and Pro Tem Judge Blake Glover.

Valdez's attorney, Stephen Angermayer, also called Deputy DA Joshua Seiden to testify in Valdez's defense.

The disciplinary hearing is regarding a complaint about Valdez's conduct toward Chief Judge James McCabria, and specifically some public statements she had made that called his integrity into question — and by extension, the integrity of the entire court, as some witnesses testified Monday.

Valdez in March 2021, just two months after she took office, issued a press release that implied McCabria had falsely asserted that her office was on board with a plan to resume jury trials in April 2021.

**Catch up on the details of the dispute** and Day 1 of the hearing at this link.

Walker worked for the DA's office for about 10 years. She had been thinking about moving on from the office for a few reasons when Valdez issued her first press release about jury trials in March 2021.

Walker said she applied for her new job, with the Office of the Disciplinary Administrator, the same day. She said she was shocked, she didn't want to be "attached to that" for her career, and she couldn't work with Valdez.

She became a bit emotional describing tightness in her chest that she'd get when she walked into work each day, caused by the stress of the job.

035

Walker said Valdez would often say negative situations occurred "Because I'm a woman."

Simpson testified that Seiden and Valdez had agreed to meet with him to discuss a new program to improve handling of care and treatment cases, or cases that often involve involuntary hospitalizations. However, he said the two skipped the meeting with him and the county's director of behavioral health projects without notice.

Seiden later testified that they had not gone to the meeting because the DA's attorney at the time had cautioned them to be very careful about attending meetings with judges if it was anything that could result in some kind of discord, or potential allegations of rules violations.

Simpson also said the DA had sort of issued an ultimatum via email, saying her office wouldn't file journal entries for expungements anymore if the court wouldn't correct errors in entries that had been rejected. He said it was not an issue that had been discussed in court, and he didn't have a problem looking into the issue, but the ultimatum approach bothered him.

Glover testified about the DA's office opting to "stand silent" when the Office of Judicial Administration brought to the court's attention nearly 1,000 traffic cases that could soon automatically generate notices that people's licenses would be suspended if the cases were not resolved. Some of the cases dated back more than 10 years. Many had been continued amid COVID-19. (Read more about that in this article.)

## Defense case

Seiden testified about several ways the DA's office has worked with the district court to find solutions to issues, make processes more efficient and more over the past few years.

Much of the testimony against Valdez has focused on negative fallout from her statements — hostility and distrust between the judges and the DA's office, for instance.



Mackenzie Clark/Lawrence Times Stephen Angermayer, left, counsel for Douglas County District Attorney Suzanne Valdez, walks with Deputy DA Joshua Seiden, Dec. 19, 2023.

Seiden said he thinks there's a "healthy degree of independence" between the bench and the DA's office, but he does not believe there's any disruption to the administration of justice. He said he feels like the DA's office can work with the bench, and he hopes the feeling is reciprocated.

Special prosecutor Kimberly Bonifas asked Seiden several questions about his involvement in the complaint case, noting that the exhibits appeared to have been printed by him rather than Valdez. He said he's better with technology than his boss, and he helped get some emails and information together.

Seiden said as he recalled, Valdez had drafted her initial March 2021 press release and he had copy edited it. He said he thinks all the time about what would have happened if he had never hit "send," and in hindsight, it would probably have been a better choice not to send out the release at all.

Valdez testified that as she took office in January 2021, she was probably working 20 hours a day. It was around the height of the COVID-19 pandemic, she was learning the job, her office was short staffed, and it was "chaos," she said.

Those were the circumstances surrounding when she issued the press release, which she said was out of character. She said she never realized how deeply it affected Walker and other prosecutors who left the office, but that she had spoken to each staff member and apologized.



Mackenzie Clark/Lawrence Times Douglas County District Attorney Suzanne Valdez, right, heads into the second day of her disciplinary hearing, Tuesday, Dec. 19, 2023.

She said she has tried to meet with judges a few times to express a sincere apology, but they have declined to meet with her.

She said she got a sense that the fallout from her press release could blow over, and "the press certainly didn't help with this."

She said she hoped that her office's criminal mediation initiative could potentially be useful in resolving the dispute, but the judges declined to participate.

If local journalism like this matters to you, please support The Lawrence Times. Click here to subscribe.

Valdez has not yet been asked specific questions about her Facebook post and texts to McCabria. However, Seiden testified Tuesday about what she had told him regarding the Facebook post.

Valdez had shared the press release from the district attorney's office's Facebook page to her personal page, which was public, with the message, "Women of the world- be prepared! If you are hardworking, outspoken, honest, AND in a position of authority, the INSECURE MAN will try to tear you down. Not me, says I!!"

Seiden said Valdez told him she was referring to a Taylor Swift song, "The Man," and that the post was about "the insecure man in general."

Seiden said he didn't know until a few months ago about texts Valdez sent to McCabria the night he issued a press release to let the public know about jury trials resuming.

Valdez wrote in the texts, "You should be ashamed of yourself. We were TOLD, not consulted. The only reason you commented is because I am a Hispanic female (in) a position of power. … I will shine the light of truth on everything."

Seiden said if you look far enough in anyone's text messages, you could probably find something they wouldn't want printed in the news. He said he didn't think it was inappropriate for her to reach out to McCabria that way. He also said he didn't agree that McCabria issued the press release because Valdez is a Hispanic woman; he said he believed there were a lot of reasons, including loyalty to the four-term former DA, Charles Branson.

The hearing resumes at 8:30 a.m. Wednesday, Dec. 20 at the Kansas Judicial Center in Topeka. The panel hearing the complaint ruled that there would be no livestream of the hearing, and no members of the public or media are allowed to use electronic devices or cameras in the courtroom.

Douglas County District Judges Sally Pokorny and Stacey Donovan are expected to testify for the prosecution as "aggravating witnesses," followed by the conclusion of Valdez's testimony.

Ultimately, the panel of three attorneys hearing the case must determine whether they believe Valdez violated any of four professional rules of conduct as charged in the formal complaint against her.

The panel could recommend that Valdez face censure, probation, suspension for a definite or indefinite period of time, or disbarment. If any of those things happen, the disciplinary administrator must docket the case with the Kansas Supreme Court.

Angermayer said in his opening statements Monday that he and his client believe that a public censure would be an appropriate remedy in the case.

A Kansas Supreme Court hearing is not required if the panel imposes an informal admonition, imposes no discipline or dismisses the case, unless the disciplinary administrator or respondent files a written objection.

If our local journalism matters to you, please help us keep doing this work.

Support The Lawrence Times
▶ Don't miss a beat … Click here to sign up for our email newsletters
Mackenzie Clark (she/her), reporter/founder of The Lawrence Times, can be reached at mclark (at) lawrencektimes (dot) com. Read more of her work for the Times here. Check out her staff bio here.



**More coverage:**



Mackenzie Clark/Lawrence Times

The prosecutor handling a complaint against Douglas County DA Suzanne Valdez asked a disciplinary panel Wednesday to consider whether they believe the testimony of Valdez and her deputy, or that of the other 13 witnesses who testified.



Mackenzie Clark/Lawrence Times

Douglas County District Attorney Suzanne Valdez, left, speaks with Cheryl Cadue and Joshua Seiden on
the second day of Valdez's disciplinary hearing, Tuesday, Dec. 19, 2023.

Douglas County District Attorney Suzanne Valdez became tearful as she repeatedly
apologized and expressed how embarrassed she was to be sitting in her disciplinary hearing
Tuesday afternoon.



Mackenzie Clark/Lawrence Times

Derogatory public statements by the district attorney have altered Douglas County's criminal legal system from March 2021 forward, according to testimony in the DA's disciplinary hearing Monday.



The panel of attorneys who will listen to evidence in a disciplinary case against Douglas County DA Suzanne Valdez has ruled that the three-day hearing in Topeka will not be available in any format other than in person.

MORE …

## Latest Lawrence news:

# EXHIBIT F

**Illini AD Josh Whitman discusses Terrence Shannon Jr. Suspension**

**Transcript with timestamp and speakers**

00:00:00

Let's see.

00:00:01 Speaker 1

OK for those.

00:00:02 Speaker 2

In the back of our line, we're ready to get started and have an opening statement from Josh Whitman and then please raise your hand for questions. We have Mike Holmes.

00:00:15 Speaker 3

Well, good evening, everybody. Thank you for coming.

00:00:19 Speaker 3

I have a.

00:00:19 Speaker 3

Few opening comments and then answer your questions.

00:00:25 Speaker 4

Excuse me.

00:00:26 Speaker 3

As you know, we we issued a statement yesterday pertaining to the status of one of our men's basketball student athletes, Terrence Shannon Junior. Terence yesterday was arrested and charged in the state of Kansas. We have suspended him from participation in our men's basketball program.

00:00:46 Speaker 3

University or athletic program, of course. Take this matter incredibly seriously. I want to state unequivocally that we have 0 tolerance at this university.

00:00:58 Speaker 3

Across the university.

00:00:59 Speaker 3

Of Illinois system and within DIA for sexual misconduct. It is antithetical.

00:01:05 Speaker 3

To our mission as an educational institution to grow, develop, prepare young people.

**046**

00:01:12 Speaker 3

As I'll explain, we'll continue to demonstrate our commitment to this value through our policies, our actions when we learn of alleged behavior of this variety, we will act in a way that is both timely and appropriate.

00:01:27 Speaker 3

At the same time, we also have to understand that we respect due process when we understand that when allegations arise, especially allegations like these that are criminal in nature, the presumption of innocence continues to apply.

00:01:46 Speaker 3

I think it's important before I get into the details of Terence's situation and I spend a few minutes talking about how we as an athletic program have prepared for years to handle a situation like this. We we hoped we never would have to, but we wanted to make sure that we were.

00:02:04 Speaker 3

Prepared in case we.

00:02:05 Speaker 3

Did shortly after I arrived here.

00:02:08 Speaker 3

In early 2016, we underwent a review of our risk management strategies. If you go back in time and and think about the 2015, 2016 window, there were a lot of challenges from funding athletic programs across the.

00:02:24 Speaker 3

Country there were situations that were really unfortunate playing out at various institutions as we studied those situations and trying to learn from from what was happening there and what we could do to do our part to to try and minimize the risk of those things happening here. A few key themes emerged.

00:02:44 Speaker 3

Number one, we want to be prepared in advance. Too often, we saw institutions that appeared to be caught flat footed when moments of crisis occurred. We wanted to develop thoughtful structure and.

00:02:56 Speaker 3

Policy we wanted to remove DIA personnel, especially coaches, administrators from investigative roles and from and from short term decision making roles.

00:03:09 Speaker 3

Would be proactive and address situations early and we want to communicate early and often with various campus personnel, including our Chancellor and campus legal counsel.

047

00:03:22 Speaker 3

As part of that preparation strategy, we have adopted an approach with our student athletes where we talked with them at the beginning of every school year on a variety of topics about their experience as a student athlete at this university. One of those topics is student athlete discipline and and at that all student.

00:03:42 Speaker 3

Meeting at the beginning of each fall, I'm the one who delivers that particular topic. We we talk about what we call the three track.

00:03:51 Speaker 3

Of student athlete discipline, I think it's worth a moment to touch on those track one is the legal system. Obviously, we've seen that play out here in this situation involving Terrance. The second track is one that maybe doesn't get talked about as much. It is operated by our university, the Office of Student conflict resolution.

00:04:11 Speaker 3

We refer to that as Oscar. They have the opportunity to investigate situations, to determine whether students at large have conducted themselves in ways that violated the University student code.

00:04:24 Speaker 3

And then track 3, which is where we spend most of our time deals with.

00:04:30 Speaker 3

Potential misconduct that violates policy here within the division of intercollegiate athletics. Each of those tracks, as we tell our student athletes, exists on the parallel and independently, although they do in some circumstances intersect with one another.

00:04:49 Speaker 3

Want to talk for a moment about that third track? The DIA discipline track? We have created a structure near led by our Chief Integrity Officer, Ryan Squire. Ryan has served in that role since shortly after my arrival. He is operates completely independently within our structure. He has no oversight.

00:05:09 Speaker 3

Of sports or coaches and among his many responsibilities, he is responsible for.

00:05:15 Speaker 3

Taking the lead.

00:05:16 Speaker 3

On all matters involving potential student athlete misconduct and.

00:05:20 Speaker 3

One shortly after we created that position, Ryan and I worked together with a variety of offices across campus, including the President's office, the Chancellor's Office, Student Affairs, the Office of Title 9, campus legal Counsel, and others to develop what is now our student athlete misconduct policy. And I hope some of you have the opportunity to to.

00:05:42 Speaker 3

Review that we shared it in a link in the release that we issued yesterday. That policy does contemplate misconduct of all different kinds up to and of course including the most serious of offenses.

00:05:57 Speaker 3

What I think is important from that process is that DIA is not an investigator. That is not a role that we play in any of these tracks that I that I discussed. We don't have the expertise, nor do we have the personnel to investigate these kinds of claims, especially as they become more serious and and in some cases, criminal.

00:06:17 Speaker 3

In nature, instead, we rely on the information that is gathered by our counterparts in this system, talking about, in particular, law enforcement or our colleagues across campus and the Oscar office.

00:06:32 Speaker 3

As we gather information through those entities, we have an opportunity to make decisions more informed decisions.

00:06:39 Speaker 3

About how to.

00:06:40 Speaker 3

Manage our student athletes participation in our program. In most cases, those processes a legal process, a student conduct process will ultimately resolve.

00:06:52 Speaker 3

And we will make a decision about a students long term status within our program based on that resolution. And so if for example, a student athlete is found guilty of a crime.

00:07:03 Speaker 3

Then we will know. OK, well, he was guilty of this. What does that mean in terms of his long term status in our program? The challenge with that is that those processes take time. They take a long time. They can take months and some cases they can take a year in order for them to reach their full conclusion.

00:07:21 Speaker 3

The challenge that we have that athletic programs like ours face is what do you do in that interim period? What do you do during that period?

00:07:29 Speaker 3

**049**

I mean, when you receive substantiated allegations until a process is concluded through.

00:07:35 Speaker 3

The Court of Law.

00:07:36 Speaker 3

Through the Office of Student Conflict resolution. And that's really what our policy is designed to live is in that intermediate period of time.

00:07:46 Speaker 3

The way we've chosen to approach it through our policy is that upon receiving sufficient triggering information, we will suspend immediately when we're talking about matters of of serious misconduct. There are no questions asked. Once that happens, we then have a student or, I'm sorry, a university conduct panel.

00:08:06 Speaker 3

That is convened. They will meet within 48 hours of the initial suspension. That panel exists independent of the athletic department, and it will determine using the information that we have available at that given time, whether that suspension should remain upheld or should be amended, or in some cases, lifted altogether.

00:08:25 Speaker 3

The panel is populated by a member of our faculty at the College of Law.

00:08:32 Speaker 3

Is populated by one of our faculty athletics representatives and 3rd is a staff member from our Student Affairs Office. All of these folks have been selected by the chancellor and again are designed to exist outside of the realm of the athletic program.

00:08:51 Speaker 3

As the flight director, my role is limited to determining when we have enough information to trigger this process. When do we and and.

00:09:00 Speaker 3

Consultation with Brian Squire, our Chief Integrity Officer and as appropriate with our Chancellor, with our legal counsel, when do we have such information as we should start that process which results in immediate suspension and then ultimately that conduct panel convenient. So I appreciate a few minutes to talk through that.

00:09:20 Speaker 3

Process. I think it's important again in context to help everyone understand the preparation that has gone into of course, not knowing exactly that today would come. But knowing that the possibility.

00:09:31 Speaker 3

Of something like today.

00:09:33 Speaker 3

Could happen. I feel very prepared.

00:09:35 Speaker 3

And I feel confident in the decisions that we've made.

00:09:39 Speaker 3

With that, I'll transition and talk specifically about Terence's situation. As you saw in the statement we released yesterday.

00:09:48 Speaker 3

We indicated that.

00:09:49 Speaker 3

We had received some preliminary information about this back in late September. I'll talk more in detail about what we knew and when we knew it, but it was the collective opinion.

00:10:00 Speaker 3

Of myself, and in consultation with others across campus, including the chancellor again, campus legal counsel, that the information we had received was not such to pass the threshold necessary to launch.

00:10:14 Speaker 3

Our our misconduct process that stayed in that vein until just two days ago, Wednesday, December 27th. One last caveat before I get into the timeline. This is of course an active legal proceeding and we are very respectful of the process.

00:10:34 Speaker 3

That the Lawrence Police Department has undertaken, we have tried to remain in that position throughout the entirety of this process. We have had no.

00:10:43 Speaker 3

Direct communication with the Lawrence police about Terrence. All of our communication has been funneled through the University of Illinois Police Department, and they've been the intermediary for us as we've worked through this over the last several months.

00:10:59 Speaker 3

OK, so going in terms of a timeline, late September UIPD received a communication from the Lawrence police.

00:11:10 Speaker 3

That they were interested in conducting an interview with Terrence the inquiry was light on the tails. We didn't know at the time whether Terence was the subject of the inquiry or whether he might have been a witness to some other matter that had happened in Lawrence was very short on specifics.

00:11:29 Speaker 3

We immediately had.

00:11:30 Speaker 3

A conversation with TJ about his weekend in Lawrence. I think everyone realizes he had traveled to Lawrence to see our football game that spent the weekend there. He was very forthcoming with us. He detailed his visit, but nothing he shared with us triggered any cause for us to.

00:11:49 Speaker 3

Institute any discipline or or take any action over the course of the next several days. We learned that TJ was in fact the subject of the inquiry, but again details remain very limited. We followed up again with TJ still offered nothing additional at around this time. TJ.

00:12:10 Speaker 3

Contained his own counsel, who then began communicating directly with the Lawrence police on TJ's behalf.

00:12:18 Speaker 3

In subsequent conversations, we did learn again through.

00:12:22 Speaker 3

UIPD.

00:12:24 Speaker 3

That the allegations that were being investigated seemed to be something that occurred in public in the Lawrence bar, where TJ interacted with a young woman and the allegation was that he engaged in some inappropriate touching.

00:12:40 Speaker 3

Of her in the course of that interaction.

00:12:43 Speaker 3

Everything that we.

00:12:44 Speaker 3

Received was verbal, informal. It was it was light on details. It was in some unsubstantiated it was unclear to us whether Lawrence authorities intended to pursue anything further. What additional information they were trying to obtain. We weren't made aware of any specific charges.

00:13:04 Speaker 3

That the folks in Lawrence were considering as we evaluated the information we had compared it to some of our prior experiences. We've used this policy on numerous occasions.

00:13:16 Speaker 3

We saw that we didn't have the same kind of information that we have used to initiate the process in the past that.

00:13:22 Speaker 3

We didn't have anything.

00:13:23 Speaker 3

In writing, there was no written notes, validations, no documentation. We didn't have a police report and so we were. We were looking to obtain something more than just the verbal updates that we had.

00:13:36 Speaker 3

Received from Lawrence PD through U of I PD to.

00:13:40 Speaker 3

Thus, throughout that process, as we obtained whatever information we did have, we shared it again with the Office of the Chancellor at the campus Title 9 Office and University Council seeking their input and thoughts on when the information we had was sufficient to again trigger implementation of our misconduct.

00:14:01 Speaker 3

Policy and throughout the entirety of that experience, the the unanimous opinion of all of those people was that we did not.

00:14:10 Speaker 3

We we actually then went the extra step again, we knew what we needed in order to initiate the process and we we asked LPD through U of I PD for something more concrete we asked to see a police report we asked for updates with some frequency over the course of the the weeks and months that followed.

00:14:31 Speaker 3

But nothing was forthcoming. I don't say that in a judgmental way. Again, understanding that Lawrence PD had their own investigation to run and we don't expect them to prioritize what was happening here in Champaign. But the fact of the matter is we we weren't able to get additional information despite our requests to do so.

00:14:50 Speaker 3

That was the state of things as they as they remained until just two days ago, on Wednesday, December 27th.

00:14:59 Speaker 3

We'll talk now a little bit about the last couple of days. Things have obviously picked up pace and and a lot has transpired early Wednesday afternoon I received a phone call from U.

00:15:11 Speaker 3

Of I, PD.

00:15:12 Speaker 3

Indicating that they had a communication from the Lawrence police that they would be sending over a warrant.

00:15:18 Speaker 3

For TJ's arrest, that warrant arrived mid afternoon while the team was practicing, and later that night we also gained access to their police reports for the first time.

00:15:29 Speaker 3

No, but this was the first time any of us had.

00:15:31 Speaker 3

Seen any formal?

00:15:32 Speaker 3

Allegations against Steve getting any documentation related to this situation. It was also the first time that any of us were made aware that the charge in this case would be raped, as that term is defined under Kansas law. We've never been, as I mentioned earlier.

00:15:49 Speaker 3

Made aware of what charges were being considered by the people in Kansas, and we certainly were not aware of that. It might be something so serious as well was finally included in the warrant for his arrest.

00:16:03 Speaker 3

Immediately after practice we we pulled Coach Underwood.

00:16:06 Speaker 3

Off the court.

00:16:07 Speaker 3

Had a chance to update him on the situation. Not long after that we brought Terrence into the room. I delivered the news to him myself and talked with him about the situation, provided him verbal notice of his immediate suspension from the program.

00:16:22 Speaker 3

At the same time, U of IPD confirmed that TJ could present himself to the Lawrence authorities the next day.

00:16:32 Speaker 3

And then transition to the next day. Yesterday on Thursday the 28th, we arranged for TJ to be transported to Lawrence by members of our staff. They left early yesterday morning, arrived in Lawrence around 11:30. Terence presented himself. He was booked, posted bond.

00:16:51 Speaker 3

And I I believe was released shortly after 12:00, our group was back on the road, returning to Champaign by 12:15 or so, and I got back to campus last night sometime between 6:30 and 7:00.

00:17:05 Speaker 3

In the course of the day yesterday, we also provided TJ with written notice of his suspension formal notice as we are required to do under our policy.

00:17:16 Speaker 3

Brad met yesterday morning with the team, notified them for the first time of TJ's situation meeting, started at 10:30, let immediately into our practice, which started at 11. I did have the opportunity to participate in that meeting. I was impressed by by Brad's message, by his tone.

00:17:36 Speaker 3

I was grateful to our.

00:17:38 Speaker 3

Team for their maturity, for their connected.

00:17:40 Speaker 3

This and then last note about yesterday for the first time I I did yesterday see the official complaint. In this case, I know some of you.

00:17:49 Speaker 3

Have seen it as well.

00:17:51 Speaker 3

Which was apparently filed against TJ on December 5th. We were not made aware of that filing, but in fact one of our staff members retrieved it.

00:18:00 Speaker 3

From social media.

00:18:01 Speaker 3

Last night, so we had a chance to view that for the first.

00:18:03 Speaker 3

Time as well.

00:18:06 Speaker 3

I mentioned Coach Underwood probably a good time to to talk a bit about his involvement in this throughout the course of the last few months, we made Brad's aware of that initial inquiry back in late September. We kept him apprised of of new information as we received it.

00:18:26 Speaker 3

We refreshed him on our misconduct process. Again, this is a process we've developed. Overtime we communicate about this extensively with our staff, but we reminded him of how this could work if and when we receive.

00:18:39 Speaker 3

The the the the necessary information to to trigger the process in the 1st place up to and and potentially including terrence's suspension. But let's remember and this goes back to some of my comments at the outset, the policy is designed to move our coaches out of the process altogether.

00:18:58 Speaker 3

And so Brad.

00:19:00 Speaker 3

Has been kept largely on the sidelines during this. We don't want our coaches conducting their own investigations asking questions. That's not their expertise. It's not the lane that they should occupy. It prevents them and us from putting them in situations that places our university our or questions the integrity of our our.

00:19:23 Speaker 3

So to be clear, it was not Bradt scission whether to suspend TJ or not. This is not a a traditional, you know, violation of team rules situation because of the nature of the allegations, the magnitude is reserved for evaluation by my office and.

00:19:42 Speaker 3

In the implementation of our.

00:19:44 Speaker 3

So I want to make sure we're we're clear on that. Just to wrap this up.

00:19:48 Speaker 3

And then open.

00:19:49 Speaker 3

It up for your questions. Obviously an incredibly unfortunate situation on on so many different levels. We've all enjoyed watching Terence play this year. We've enjoyed seeing our team compete.

00:20:03 Speaker 3

But in moments like this, we have to understand that.

00:20:06 Speaker 3

Basketball must take a back seat and and we have an obligation here as a university to take allegations such as these incredibly seriously, which we are doing and have done. Sexual misconduct has no place on this campus or in any other.

00:20:22 Speaker 3

Campus for that.

00:20:23 Speaker 3

Matter. Our priority is the well-being of.

00:20:26 Speaker 3

The people who.

00:20:27 Speaker 3

Are involved and will handle the situation with great care, appropriate diligence and concern. Just to reiterate one last time, all of us associated with Illinois Athletics, University of Illinois, the University of Illinois system, stand United.

00:20:43 Speaker 3

And making sure that we provide a welcoming, safe campus environment to all of our students, we have no tolerance for instances of sexual misconduct.

00:20:53 Speaker 3

And with that, we'll open it up to your questions. Please understand that my responses may be limited by, of course, the legal proceedings and privacy of the the folks involved. But with that take take questions.

00:21:08 Speaker 2

Start with Doug will go to.

00:21:09 Speaker 6

Jeremy next Josh just did the information about the incident that Terence provided to you. Did that jive with what you've seen on the documents provided by the DA and the Police Department?

00:21:22 Speaker 3

I don't recall saying that that Terrence provided me any information.

00:21:25 Speaker 3

The incident.

00:21:29 Speaker 5

**057**

Josh, you said you're in this inappropriate touching of late September, correct? Why was the DIA comfortable then playing promoting Terrence Shannon and that?

00:21:39 Speaker 5

In the meantime.

00:21:41

As I said.

00:21:42 Speaker 3

I think the determination for us is whether the information we had.

00:21:48 Speaker 3

Of a level that allowed us to initiate our our misconduct process in consulting with a variety of campus officials it.

00:21:57 Speaker 3

We didn't feel like what we had at the time was enough and we we had verbal information that had been provided through the intermediary UI PV in prior instances.

00:22:09 Speaker 3

We always had something in writing. We had something more formal. Whether that was a written allegation of formal notice of allegations, a police report, we had nothing in writing that was more concrete than.

00:22:21 Speaker 3

Than some of the the the relatively limited details that we were able to receive through UID.

00:22:27 Speaker 2

Put a match and then.

00:22:28 Speaker 7

Josh, Josh, sorry were good.

00:22:33 Speaker 7

Is it accurate to suggest based off the conduct policy that where we are now is that the next step is that thirty person student athlete conduct panel that is that is that the next step?

00:22:44 Speaker 7

For Terrence and and this contact policy, at this point, yes.

00:22:49 Speaker 8

Within that, the construct of that panel and the process there, is it possible that a determination will be made on his playing status before the legal process plays out, or how? How does that chain of events?

00:23:01 Speaker 3

Work together. It is possible that that's one of the reasons we designed the conduct panel the way that we did was recognizing that.

00:23:09 Speaker 3

These legal processes, or in the alternative, are campus.

00:23:14 Speaker 3

Conduct processes can take a long time and we don't always have the luxury of of that time in making some of our determinations about a student athlete status. And so under the policy, our our conduct panel will meet within 48 hours of of the suspension.

00:23:33 Speaker 4

Josh obviously given Terence's role on your team, he's somebody that you guys put at the forefront of a lot of different things. So why were you comfortable knowing that the knight have any paperwork to trigger the suspension, but knowing there was some sort of investigation to promote him the?

00:23:45 Speaker 4

Way that you.

00:23:45 Speaker 3

Guys did. Yeah. Again we up until Wednesday.

00:23:51 Speaker 3

We didn't have any concrete information that we felt justified any sort of change in Terence status and and so we that, that same decision permeated throughout all the rest of the the things that are related to the operation of.

00:24:06 Speaker 3

A basketball program.

00:24:09 Speaker 9

Josh in the back, have you been told by anybody or any authorities that anyone else is involved or is this isolated just a Terrence?

00:24:17 Speaker 3

I'm only work, Terrence.

00:24:19 Speaker 9

And then as as a leader, I would.

00:24:22 Speaker 9

Is it on you in these?

00:24:23 Speaker 9

Times to lead your program in the DIA.

00:24:25 Speaker 9

And how much do you take on?

00:24:26 Speaker 9

This of that to be that.

00:24:29 Speaker 3

I I think that I I stand as the leader of this athletic program day in and day out. You all have been around me in good times and bad times. I've never shield away from that leadership responsibility and I feel like in in these situations in particular it's it's necessary for for me and for others.

00:24:49 Speaker 3

To demonstrate strong leadership.

00:24:53 Speaker 5

Josh, do you feel like that misconduct policy held up like it did its job that he?

00:24:57 Speaker 5

Felt he needed to do.

00:24:59 Speaker 3

I do. And again I I talked with Ryan Squires today. I asked him how many times he thought we had implemented the misconduct policy and and use the the conduct panel and and he estimated a dozen times.

00:25:14 Speaker 3

Over the last seven or eight years, so this is not something that, that.

00:25:19 Speaker 3

This is something that we have used on numerous occasions. We have great experience using policy and I think it I think it has held up well overtime and I think it served.

00:25:27 Speaker 3

Us well, in this instance as well.

00:25:31 Speaker 7

Like that, Josh, I'd like to ask you about the complaint that was filed in District Court on December 5th. Is it again, I want to ask, is it your understanding that you yesterday was the?

00:25:43 Speaker 7

First day you had seen that at all.

00:25:45 Speaker 3

That was the first day I'd seen.

00:25:46 Speaker 3

You guys.

00:25:47 Speaker 7

Would that have document have been presented shortly after it had been filed? Would that have changed the dynamic of how quickly the conduct policy would have would have been enacted at?

00:25:58 Speaker 3

I'm not following your question, I'm.

00:26:00 Speaker 7

Sorry, would that would you and knowing that document existed like say after like December 6th immediately after it was filed, would that have changed the timeline of which this would have, you would have acted and the policy would have kicked in?

00:26:13 Speaker 3

Well, that requires some speculation. I I don't know that I'm comfortable with getting into that, but I I I will say that clearly it's a charging document it it's, it's a document that contains strong allegations against one of our student athletes. It's a formal initiates, a formal court proceeding.

00:26:31 Speaker 3

And so a document like that certainly would be very relevant to our consideration and and to the implementation of policy.

00:26:37 Speaker 2

Cody, Derek and then back.

00:26:38 Speaker 8

To Scott, Josh, as you mentioned, the conduct panel is independent of you independent of your department, but based on your knowledge of it and the process, what would go into a decision of of playing time without legal resolution?

00:26:53 Speaker 3

The the conduct.

**061**

00:26:54 Speaker 3

Panel will be presented with the information that we have available to us at the moment and and ultimately they'll be empowered to consider a number of different factors in determining what serves the best interests of our Community, our students and of course our university.

00:27:12 Speaker 2

The follow up, do you know when the panel will convene and when a decision might be revealed?

00:27:18 Speaker 3

I don't want to get into the detail about when that might occur.

00:27:23 Speaker 2

Go to Robert here in the middle.

00:27:26 Speaker 10

You you mentioned how this came down on the afternoon of the 27th. I think some of the perception the the video for example that came out at 8:00 PM.

00:27:35 Speaker 10

On that event.

00:27:36 Speaker 10

Showing the team exchanging gifts, Terrence giving gifts to his demons. I think there's a perception, you know, if if the school already knew that this was going down, why our videos promoting things like that going out. Can you respond to that?

00:27:50 Speaker 3

I think Joey perhaps kind of touched on that already and I think I generally.

00:27:55 Speaker 3

Arrested until we had information that.

00:27:59 Speaker 3

That triggered our policy. Then terrence's status with the programs unchanged and and in situations like that, and we weren't in a position to provide directive to some of the younger members on our staff who had no idea that these things were happening to to to change course.

00:28:19 Speaker 3

Relative to how we're promoting the basketball program.

00:28:24 Speaker 11

**062**

Just in the official release, you mentioned that you rely on the policy and prior experiences to kind of maybe shape the response to the situation. Are there any specific prior experiences here that maybe you went back to you as you doubled?

00:28:36 Speaker 11

This one.

00:28:37 Speaker 3

None that I want to discuss with you.

00:28:40 Speaker 4

But there were.

00:28:42 Speaker 3

Of course, sure. As I mentioned we, we've, we've implemented this policy.

00:28:47 Speaker 3

Numerous times over the years we we've convened the conduct panel multiple times over the years and so each time we've done that, we have learned from that experience and we have built some level of precedent and how we intended to implement the policy going forward.

00:29:05 Speaker 5

If you can answer this, but what is his status?

00:29:07 Speaker 5

With the university and just just to be clear, like what would have to happen for him to return to the team?

00:29:15 Speaker 3

The the status with the university I'm not.

00:29:17 Speaker 3

Positioned to speak.

00:29:18 Speaker 3

To that, that's not an area that's sort of within my purview in terms of what would have to happen in order for him to return to the team. I don't. I don't want to speculate about that sitting here today ultimately.

00:29:33 Speaker 3

One of two things would have to happen. Either the conduct panel would have to vote to return him to status during this interim period or there would be some.

00:29:44 Speaker 3

Resolution of the case in the legal system that would open the door for his return.

00:29:53 Speaker 6

Just to just to follow up on the first question.

00:29:57 Speaker 6

I asked. You did say that.

00:29:58 Speaker 6

In September, you had an initial conversation with Terence and he was forthcoming with the work. What was he forthcoming about? And and did it match the documents that you?

00:30:08 Speaker 3

He he he talked about.

00:30:10 Speaker 3

The activities that he engaged in over the.

00:30:12 Speaker 3

Course of the weekend in Lawrence.

00:30:15 Speaker 4

Just for clarity to the pool, so the suspension lost access to all facilities during the suspension.

00:30:22 Speaker 3

No, he's not. He he is suspended from team activities and and so he is still a scholarship student athlete at the University of Illinois. He still has access to certain support services and personnel.

00:30:36 Speaker 3

But he will not be engaged with the team in any any manner.

00:30:39 Speaker 2

Brad Rd.

00:30:41 Speaker 1

Josh, how do you balance obviously this situation with supporting Terence as one of your student athletes, but also understanding the severity or seriousness of the allegations as he goes through this process?

00:30:54 Speaker 3

I think that there.

00:30:56 Speaker 3

There is a really delicate balance there. Clearly we we.

00:31:00 Speaker 3

Have known Terrence for two years. We we care deeply about him, but we also recognize that this situation is incredibly serious and the nature of the allegations are serious and and we have to treat it as such and and so as I mentioned at the outset.

00:31:15 Speaker 3

That we have to make sure that we are sending the appropriate message in terms of how we will approach sexual misconduct as an athletic program, as a university, while at the same time honoring Terence's due process rights, his presumption of innocence, and so it's a it's a delicate balance, but it's one that that is.

00:31:35 Speaker 3

The report for us to strike.

00:31:38 Speaker 7

Josh, Mike again the with the student conduct policy. Is it my understanding is my understanding correctly that you can now then override the three person panel and then therefore the next step would then be the chance that can override your decision. Is that do I?

00:31:52 Speaker 7

Have that correct?

00:31:54 Speaker 3

The three person panel is not advisory.

00:31:58 Speaker 3

Getting by and and so the the decision that I make and again in consultation with the chances office and others is do we have information that is sufficient to?

00:32:07 Speaker 3

Trigger the policy.

00:32:09 Speaker 3

Once they answer that is yes, then the immediate suspension begins. That immediate suspension should last no more than 48 hours before it's reviewed by the conduct panel. At that point, the conduct panel will make a decision about whether the suspension should stand or not, and the decision of the conduct panel in that.

00:32:29 Speaker 3

Instance is final.

00:32:30 Speaker 7

**065**

Follow up unrelated is have you inquired through the University of Illinois PD through Lawrence PD why there was a 22 day window in which Terrance was charged, and then a warrant was made out?

00:32:43 Speaker 7

For his arrest.

00:32:48 Speaker 2

There we go ahead and this is our.

00:32:49 Speaker 2

Last one, then repair.

00:32:51 Speaker 8

On the note of a decision being final is that to push forward an indefinite suspension or will it have a definite timeline as far as that decision?

00:33:01 Speaker 3

The The conduct panel can reconvene at anytime if new information were to be received there was forthcoming and and again bear in mind that the conduct panel's decision relates to this interim period of time and and so if at some point there is resolution again to the legal process.

00:33:21 Speaker 3

Then the responsibility for determining the student athletes long term status within the program falls back to me as the athletic director, and so the control panel deals only with these short term interim situations. I I will deal with long term status once these matters are resolved through their their outstanding.

00:33:40 Speaker 2

Sorry processes. OK, I'll wrap this.

00:33:43 Speaker 2

Up. Thanks, Josh. Thank you.

00:33:44

Thank you, Jeff.

# EXHIBIT G



**ADMINISTRATION**

University of Illinois at Urbana-Champaign
Division of Intercollegiate Athletics
Bielfeldt Athletic Administration Building
1700 South Fourth Street
Champaign, Illinois 61820
Office: (217) 333-3631
Fax: (217) 244-9753

December 28, 2023

Dear Terrence Shannon, Jr:

The purpose of this letter is to inform you that the Division of Intercollegiate Athletics (DIA) has received notice that you were charged with a felony offense based on an incident that occurred in Lawrence, Kansas in September 2023.

Per University of Illinois DIA policy, a felony charge requires that you be temporarily suspended from all team activities effective immediately and until further notice. For the time that the suspension is in place, you may not participate in organized practice, competition, conditioning workouts, or meetings.

Please note that this action is not a determination of your guilt or responsibility for the alleged behavior.

Under our policy, a Conduct Panel will convene within 48 hours of this notice to review this action. You have the opportunity to provide a written statement and/or other documentary evidence related to this incident before the convention of the Panel. Such information must be received by <u>noon on December 29, 2023</u>. You may submit the statement and/or other documents to me in hard copy or e-mail to me at <u>squire@ilinois.edu</u> and I will provide them to the Panel.

You are entitled to request a delay of the convention of the Panel, but if you do so the suspension will continue during the delay. After the Panel meets, you will be notified in writing of the Panel's decision to continue, modify, or remove the suspension.

It is important that you understand that any retaliation or attempt to contact any person involved in this incident may result in disciplinary action. This matter is confidential, and you should not discuss it with anyone other than your family, your representatives, and those copied on this letter.

Please contact me if you have any questions.

Sincerely,

Ryan Squire
Executive Senior Associate Athletic Director/Chief Integrity Officer

cc:     Brian Russell
        Brad Underwood
        Josh Whitman

# EXHIBIT H

# University of Illinois Athletics

fightingillini.com/sports/2022/7/21/student-conduct-policies-sa-handbook.aspx

## Student-Athlete Handbook - Section 1

RETURN TO TABLE OF CONTENTS

## Key Policies Governing Student-Athlete Conduct

### University of Illinois Student Code

The University's Student Code (http://www.admin.illinois.edu/policy/code/) outlines the rights and responsibilities of all University students and covers a wide-array of subjects including standards of civility, academic policies, and use of campus facilities. Each year, student-athletes are expected to review the Student Code to ensure they understand their rights and responsibilities created by this document.

Student-athletes violating the Student Code are subject to discipline by the University. Any sanctions taken against a student-athlete by the DIA Director of Athletics ("director") and/or a head coach for violations of the Student Code (as described below) shall be in addition to any actions taken or sanctions issued by the University.

### Student-Athlete Code of Conduct and Discipline Process

As highly visible members of the University of Illinois ("University") community, student-athletes are expected to conduct themselves in a way that positively reflects upon the University, the Division of Intercollegiate Athletics ("DIA"), their coaches, and their teammates. This document establishes a non-exclusive list of primary expectations for all varsity student-athletes and describes the process for imposing discipline or corrective action for student-athletes who fail to follow these expectations.

#### DIA Student-Athlete Expectations

1. Student-athletes must take their academic responsibilities seriously. Student-athletes must attend, and be punctual to, all classes and study halls (unless their absence is required by team travel or an excused illness). Cheating and other forms of academic misconduct are prohibited.

2. Student-athletes must conduct themselves according to the highest levels of ethical behavior in all their dealings with other individuals, both on- and off-campus. They are expected to follow: all local, state and federal laws and regulations; all University of Illinois, DIA and team rules, policies, procedures and regulations; and all NCAA or Big Ten Conference policies and regulations.

3. Student-athletes must annually read and comply with the University's Student Code and the University of Illinois Student-Athlete Handbook.

4. Student-athletes must be respectful and courteous in their interactions with their professors, other University students, community members, fans, DIA administrators and staff, their coaches, their teammates, game officials and members of the opposing team.

5. Student-athletes must engage in principles of good sportsmanship and follow both the spirit and the letter of the rules of the sport they play at all times, including practice and competitions.

6. Student-athletes must maintain a proper level of physical conditioning and must attend all required weight and strength-training sessions, communicate all injuries to their coaches and trainers, and closely follow all treatments and exercises prescribed by their trainers. Student-athletes are also encouraged to meet with and follow the suggestions of the dietitian.

7. Student-athletes must refrain from the use of any illegal drugs at all times. Student-athletes are only permitted to drink alcohol if they are over the age of 21. Smoking is strictly prohibited on the University of Illinois campus. Use of any tobacco product during practice or competition is prohibited by NCAA rules.

8. Student-athletes must attend, and be punctual to, all team and administrative meetings, training sessions, practices, games, matches and meets. Student-athletes must also comply with all team curfews.

9. Student-athletes must obtain prior approval from their head coach and the DIA Office of Compliance before participating in an outside athletic event or competition.

10. Student-athletes must obtain prior approval from their head coach and the DIA Office of Compliance before participating in any employment activities during the academic year.

11. Student-athletes are prohibited from selling, trading, or offering in exchange for any other benefits or services, any items, awards, memorabilia, apparel, complimentary tickets or equipment that they receive because they are members of a DIA varsity team.

12. Student-athletes are prohibited from receiving any benefit or service that would not also be available to any other student of the University or general public.

13. Student-athletes are prohibited from gambling on any collegiate athletic competition (or any professional athletic competition in a sport where there is a collegiate championship). Student- athletes are also prohibited from providing any information about their own or any other DIA varsity athlete's playing or injury status to anyone who places bets on college or professional sports.

14. Student-athletes are prohibited from hazing other members of their team or any other DIA varsity team.

15. Student-athletes are prohibited from engaging in discriminatory or harassing behavior based on the following protected categories: race, color, religion, sex, pregnancy, disability, national origin, citizenship status, ancestry, age, order of protection status, genetic information, marital status, sexual orientation (including gender identity), arrest record status, military status, unfavorable discharge from military service and any other protected class as recognized by state or federal law or the University.

16. Student-athletes must cooperate with all NCAA, Big Ten Conference, University, and DIA investigations and must honestly and accurately answer all questions asked of them during such investigations.

17. Student-athletes must report all known or suspected violations of state or federal law as well as all known or suspected violations of NCAA, Big Ten Conference, University or DIA rules, regulations, policies or procedures.

## Discipline Procedures

## Levels of Misconduct

The Division of Intercollegiate Athletics (DIA) has established levels of misconduct, based on the seriousness of the underlying offense(s). As described below, the level of misconduct will guide the DIA in determining appropriate actions to take in response to misconduct by a student-athlete. Information regarding potential criminal acts and alleged violations of the University's Student Code and the Sexual Misconduct Policy will be shared with appropriate officials.

**Major Offenses**

Major offenses are the most serious of all types of student-athlete misconduct and include allegations, which, if substantiated, would constitute any of the following:

1. A violation of a state or federal law that is designated as a felony;

2. A violation of a term of probation or other condition imposed upon a student-athlete by a court of law in any criminal proceeding;

3. A serious violation of a term of probation or other condition imposed by a University official or a DIA administrator or coach;

4. Any offense related to sexual misconduct and/or domestic violence including but not limited to criminal sexual assault, aggravated criminal sexual assault, predatory criminal sexual assault of a child, criminal sexual abuse, aggravated criminal sexual abuse, domestic violence, domestic battery, dating violence, stalking, aggravated stalking, cyber stalking, rape or attempted rape, sexual exploitation, sexual harassment, and retaliation against individuals who have made allegations of any of these types of misconduct;

5. Any offense that involves the use or possession of a firearm in violation of federal or state law or University policies;

6. Any offense involving the possession or manufacturing of illegal drugs or substances with intent to distribute; and/or

7. Sports wagering activities in violation of NCAA rules, point shaving, game fixing or other similar activities.

**Secondary Offenses**

Secondary offenses are serious types of student-athlete misconduct that do not rise to the level of a major offense, as set forth above, and include, but are not limited to, allegations which, if substantiated, would constitute an of the following:

1. A violation of any state or federal non-felony criminal statute or regulation, except for any non-felony sexual misconduct and domestic violence offenses as described above as major offenses;

2. A violation of a term of probation or suspension imposed by a University official or DIA administrator or coach that does not constitute a major offense;

3. A violation of University or DIA policies, rules and/or regulations, including violations of the University's Student Code and serious or persistent violations of the DIA Student-Athlete Expectations or team rules of conduct;

4. Willfully giving false or misleading information to a University or DIA official in conncection with a major or secondary offense; and/or

5. A knowing violation of any NCAA or Big Ten Conference rule, regulation, or policy other than violations involving sports wagering, point shaving, game fixing or similar activities, which are described above as major offenses.

**Infractions**

Infractions are the least serious level of student-athlete misconduct that do not rise to the level of a major or secondary offense, as set forth above, and include, but are not limited to, allegations, which, if substantiated, would constitute an of the following:

1. A violation of a minor campus regulation, such as those related to parking or visitor policies in campus residence halls;

2. A failure to meet a student-athlete's academic obligations (when such violations do not amount to a major or secondary offense);

3. A violation of the DIA Student-Athlete Expectations or team rules of conduct (when such violations do not amount to a major or secondary offense);

4. A failure to engage in respectful behavior toward other University students, University instructors, a student-athlete's coaches, teammates, support staff, members of an opposing team or coaching staff, a contest's officials, or spectators.

## Addressing Alleged Student-Athlete Misconduct

DIA has authority to impose discipline, sanctions, or corrective action against student-athletes for misconduct only insofar as the discipline, sanctions, or corrective action relate to a student-athlete's status and associated privileges as a member of the University of Illinois athletic program. Any discipline, sanctions, or corrective action imposed by the legal system or the University's Office for Student Conflict Resolution are outside DIA's purview.

DIA-imposed discipline, sanctions or corrective actions against student-athletes for engaging in misconduct that constitutes a Major Offense, Secondary Offense, or Infraction will be determined by the level of misconduct, the student-athlete's conduct history: and other extenuating or aggravating circumstances. DIA will make best efforts to ensure that similarly situated student-athletes (e.g., student-athletes who have similar conduct histories) will receive similar discipline, sanctions or corrective actions and be treated with impartiality while accounting for individual circumstances and relevant differences. In some cases, teams may establish more severe levels of sanctions for certain types of misconduct. Teams choosing to establish more severe levels of sanctions for certain types of misconduct must distribute this information, in writing, to that team's student-athletes prior to the first day of participation in that team's sport on an annual basis.

Possible discipline, sanctions or corrective actions for student-athlete misconduct include, but are not limited to, the following: warning, reprimand, probation with or without conditions, restitution, personal rehabilitation (e.g., counseling and community service), suspension from athletic activity, suspension from access to any or all DIA services, revocation of part or all of the student-athlete's scholarship and, if the student-athlete's conduct is severe or frequent enough, dismissal from the athletic program.

Upon receipt of credible information that a student-athlete may have engaged in misconduct, the DIA will evaluate the information to determine whether the allegations, if substantiated, would constitute a Major Offense, Secondary Offense, or Infraction. If not, the DIA will close the case. If credible  information does describe a possible Major Offense, Secondary Offense, or Infraction, the DIA will proceed as outlined below and in accordance with applicable regulations and University policies and procedures. The DIA, in its discretion, may reopen the closed case, adjust its determination of the level of misconduct, and consider its actions if substantial new and credible information should become available. The DIA personnel will not engage in investigative activities but may engage in a third party and will consider relevant and credible information available to i in assessing whether a student-athlete should be sanctioned under these Discipline Procedures

## Major Offenses

### 1. Interim Actions - Conduct Panel Review of Decisions to Withhold Student-Athletes from Athletic Activities

<u>Consistent with this section and applicable regulations, the DIA may take interim action to withhold a student-athlete from athletic activities pending resolution of the appropriate review process upon receipt of credible information that a student-athlete committed a Major Offense.</u>

The Director of Athletics (Director) (or designee) will provide written notice to the student-athlete of the interim action to withhold the student-athletes from athletic activities, pending review by the Student-Athlete Conduct Panel (the Panel). The notice shall include a description of the alleged misconduct, the alleged offense the student-athlete has been accused of committing, and the process for reviewing the decision to withhold the student-athlete from athletic activities. The student-athlete may submit a written statement and any other evidence or information that the student-athlete wants the Panel to consider when reviewing whether the student-athlete should be returned to athletic activities. Any statement to the Panel by the student-athlete should address whether the student-athlete should continue to be withheld from athletic activities and any information or evidence provided to the Panel by the student-athlete should be relevant to that issue.

The Office of the Chancellor shall identify members of the Panel, with the advice and counsel of the Office of University Counsel and upon consultation with the Director of Athletics, the Vice Chancellor for Student Affairs, and the Dean of the College of Law (or their designees). The Panel will have three active members: one Faculty Athletics Representative, one representative from the Office of the Vice Chancellor for Student Affairs, and one faculty member from the College of Law. If a pool of the preceding panelists is unavailable, the Chairperson of the Athletic Board shall serve as a panelist in order to facilitate timely participation by three independent individuals. In cases involving sexual misconduct or domestic violence, a representative from the University Title IX Office will be appointed as a subject matter expert to advise the Panel but shall not be present for, or participate in, a final vote or decision on a student-athlete's status. The Director of Athletics and the Executive Senior Associate Athletic Director/Chief Integrity Officer may provide information to the Panel but shall not be present for, or participate in, a final vote or decision on whether a student-athlete should continue to be withheld from athletic activities. <u>The Panel may consult with a representative from the Office of University Counsel, who may be present during any stage in the process but will not vote on a student-athlete's status.</u>

The Student-Athlete Conduct Panel shall convene within 48 hours of DIA providing notice to the student-athlete of the interim action. The student-athlete may waive the Panel review or request a delay in the convening of the Panel. The Panel may convene via a phone or video conference. The Panel will not act as an investigative body but will exercise good faith and reasonable judgment to draw needed conclusions based on the information available to it at the time it convenes. The Panel will undertake an individualized analysis to determine whether the available information justifies withholding the student-athlete from some or all athletic activities pending resolution of the charges or allegations. *Based on the information available to the Panel at the time the Panel is convened, the Panel may consider the broad*

*spectrum of risks to the University of (a) immediately reinstating the student-athlete, should further investigation reveal that the student-athlete committed the alleged major offense, against (b) continuing to withhold the student-athlete from athletic activities, should further investigation reveal that the student-athlete did not commit the alleged major offense.*

*With the assessment of these risks as the determining factors, and by* majority vote, the Panel may take any or all of the following interim actions: (a) withhold the student-athlete from practice; (b) withhold the student-athlete from competition; (c) withhold the student-athlete from accessing any or all athletic department services (including DIA facilities and academic services); and/or (d) reinstate the student-athlete to some or all athletic activities pending resolution of the charges or allegations.

*If the Panel decides to withhold the student-athlete from any athletic activity or related support service, it will do so in compliance with, and consideration of, all applicable University, state and federal regulations applicable to such withholding.*

*As new information becomes available, the Panel may modify any conditions of participation or other actions that were previously imposed.*

## 2. Final Actions

A final determination that a student-athlete has committed a Major Offense will be based on relevant and credible information of such an offense including, but not limited to, the following: a student-athlete's conviction of, or guilty plea or plea of no contest to, criminal or civil charges that would constitute a Major Offense or a finding of responsibility by a University office (including the Office for Student Conflict Resolution) or other University disciplinary body.

In the absence of a conviction, guilty plea or plea of no contest to, criminal or civil charges that would constitute a Major Offense or a finding of responsibility by a University office (including the Office for Student Conflict Resolution) or other University disciplinary body, the DIA officials may still conclude that the student-athlete committed a Major Offense and disciplinary action is appropriate. In drawing such conclusions, the DIA personnel will not engage in investigative activities but will evaluate all relevant and credible information available to it. Examples of relevant and credible information include, but are not limited to, the following with respect to the allegations under consideration: arrest records, police reports, statements of law enforcement officers, University records, third-party or witness statements (including statements by coaches, DIA staff and other varsity athletes), and statements or admissions by the student-athlete.

When it has been determined that a student-athlete has committed a Major Offense and disciplinary action should be taken, the Director of Athletics (or the Director's designee), exercising good faith, shall impose final sanctions on the student-athlete that, in the Director's reasonable judgment, are in the best interests of the University. Such sanctions

**076**

may include, but are not limited to: suspension, probation following the student-athlete's return from suspension, requirements for restitution, conditions to encourage personal rehabilitation (e.g., counseling and community service), and conditions related to satisfactory academic performance. If the student-athlete's actions are severe, the Director (or the Director's designee) may dismiss the student-athlete from the athletic program and/or revoke athletically related financial aid in accordance with NCAA rules and University procedures.

B.Secondary Offenses

If it is determined that a student-athlete has committed a Secondary Offense, sanctions that the Director of Athletics (or the Director's designee) may impose against the student-athlete include, but are not limited to: warning, reprimand, probation with or without conditions, requirements for restitution, conditions to encourage personal rehabilitation (e.g., counseling and community service), conditions related to satisfactory academic performance, suspension from practice, suspension from competition, suspension from access to DIA services, and, if the student-athlete's conduct is severe or frequent enough, dismissal from the athletic program.

A determination that a student-athlete has committed a Secondary Offense will be based on specific and credible information of such an offense including, but not limited to, the following: a student-athlete's conviction of, or guilty plea or plea of no contest to, criminal or civil charges that would constitute a secondary offense (as defined herein); a finding of guilt or responsibility by a University office (including the Office for Student Conflict Resolution); documents, including arrest records, police reports, statements of law enforcement officers, University records, third-party or witness statements, that provide credible information regarding the student-athlete's actions; or statements or admissions by the student-athlete.

C.Infractions

Allegations of Infractions will be reviewed by a team's head coach, with any corresponding discipline, sanctions or corrective actions imposed by the head coach. Discipline, sanctions or corrective actions that the head coach may impose against a student-athlete who has committed an infraction include, but are not limited to: warning, reprimand, probation with or without conditions, requirements for restitution, conditions to encourage personal rehabilitation (e.g., counseling and community service), or conditions related to satisfactory academic performance. If the student-athlete's conduct is severe enough or if the student-athlete has engaged in additional misconduct, the head coach may suspend the student-athlete from practice, competition, access to certain DIA services, or dismiss the student-athlete from the athletic program. A head coach's decision to suspend or dismiss a student-athlete can be made only after consultation with the respective sport administrator.

D.Notice and Appeal

In cases involving Major or Secondary Offenses that result in a final determination that a student-athlete will be removed from any athletic activity or dismissed from the program, the Director (or the Director's designee) shall notify the student-athlete, in writing, of the specific Major or Secondary Offense or infraction and the corresponding actions.

The student-athlete will have five University business days of the date of the notice of the final determination to submit written notice of appeal and all supporting documentation to the Office of the Chancellor. The Office of the Chancellor will have the authority to amend or overturn a suspension or dismissal but will do so only (1) if the student-athlete presents evidence that the previous decision was clearly contrary to the information presented; (2) the student-athlete presents new evidence that was not reasonably available at the time of final determination and that affects the outcome of the matter; or (3) there was a clear procedural error and, but for the error, the student-athlete would not have been suspended or dismissed.

Within five University business days of receipt of the student-athlete's appeal, the Office of the Chancellor will provide the student-athlete with a written decision, which shall be final.

E.Miscellaneous Provisions

## 1.Request for Review of DIA Actions Based on Substantial Change in Circumstances

If there is a substantial change in circumstances affecting a student-athlete who has been dismissed from a program or remains withheld from athletic activities including participation in practice, competition, and/or any other DIA services, the student-athlete may petition the Panel for review. Such petitions may include a written statement in support of the request. If the Panel finds that circumstances warrant a change in the student-athlete's status regarding participation in athletic activities, the student-athlete may be reinstated to resume athletic activities.

## 2.Disclosure of Criminal Charges

If a student-athlete is arrested, cited, or otherwise charged with a criminal offense by any law enforcement agency, the student-athlete must report this information to his or her head coach and/or sport administrator within twenty-four hours. Failure to comply with this requirement may result in the student-athlete being withheld from athletic activities.

## 3.Reporting Allegations of Misconduct or Other Violations

Student-athletes are expected to report any actual or potential violations of NCAA or Big Ten rules violations by other student-athletes, coaches or DIA administrators. Student-athletes are encouraged to report any other potential misconduct or wrongdoing on the part of others. Retaliation against any student-athlete reporting, in good faith, a real, perceived or potential violation is strictly prohibited by University policy and state law.

Although student-athletes are encouraged to raise any such concerns internally to the DIA, student-athletes also have the option of reporting such allegations externally as described below.

*Where to report perceived violations or concerns of NCAA or Big Ten Conference rules internally:*

- Director of Athletics: Josh Whitman // 217-333-3631
- Associate Athletic Director for Compliance: Benji Wilber // 217-300-4615 //wwilber@illinois.edu
- Compliance Office on fightingillini.com

*Where to report perceived violations or concerns of any laws, University or DIA rules or regulations (other than NCAA or Big Ten Conference rules) internally:*

- A student-athlete's sport administrator
- Director of Athletics Josh Whitman
- Executive Senior Associate Athletic Director/Senior Woman Admin/Deputy Title IX Coordinator Sara Burton
- Executive Senior Associate Athletic Director/Chief Integrity Officer Ryan Squire // 217-333-573
- Anonymously to RealResponse platform (all student-athletes have anonymous reporting link)

*Where to report sexual harassment, sexual misconduct or sexual abuse externally:*

Title IX Coordinator Danielle Fleenor // 844-616-7978

*Where to report perceived violations or concerns of any type externally:*

- Dean of Students HELPdean@illinois.edu 217-333-0050
- Faculty Athletic Representatives
    - Brenda Lindsey 217-333-2261 blindsey@illinois.edu
    - Tiffany White 217-333-4597 tbwhite@illinois.edu
- EthicsLine (reports may be made anonymously) 866-758-2146

# EXHIBIT I



**ADMINISTRATION**

University of Illinois at Urbana-Champaign
Division of Intercollegiate Athletics
Bielfeldt Athletic Administration Building
1700 South Fourth Street
Champaign, Illinois 61820
Office: (217) 333-3631
Fax: (217) 244-9753

January 3, 2024

Dear Terrence Shannon, Jr.,

The Conduct Panel met today and determined that the interim action to withhold you from organized team activities should remain in place pending resolution of the charges against you stemming from the September 2023 incident in Kansas. You may not return to organized team basketball activities at this time.

You may continue to access athletic facilities, receive medical and academic support, and participate in student-athlete development activities. You are permitted to receive nutritional support and eat in the Varsity Room. Your athletically related financial aid is not affected. If you have questions about which services and activities you may access, please contact me at any time.

<u>This decision is not a determination of guilt or responsibility on your part</u>. The interim action to withhold is a step that is imposed when there is credible information that a student-athlete has committed a major offense under DIA policy.

If new and relevant information becomes available, the Panel may reconvene to review this decision. Otherwise, you may not return to organized team athletic activities until there is a resolution of the charges against you. At that time, the final athletic sanctions, if any, will be determined by the Division of Intercollegiate Athletics.

Thank you for your understanding and cooperation throughout the process and please let me know if you have any questions.

Sincerely,

Ryan Squire
Executive Senior Associate Athletic Director/Chief Integrity Officer

081

# EXHIBIT J

# Office for Student Conflict Resolution

**I** conflictresolution.illinois.edu/

Body

The Office for Student Conflict Resolution (OSCR) supports the community standards of the University of Illinois Urbana-Champaign by promoting ethical decision making, encouraging personal and social responsibility, and facilitating the effective resolution of conflict.



## Know the Code

As a student at the University of Illinois you are responsible for knowing and complying with the regulations of the university and policies within the Student Code. The university only publishes a digital version of the code which is available online at studentcode.illinois.edu.

Go to Student Code



## We Care

Visit the We Care website for sexual misconduct support, response, and prevention information and resources.

Go to We Care

# EXHIBIT K

# Article 1 » Student Code » Illinois

**I** studentcode.illinois.edu/article1/

## Crumb Navigation

1. Home
2. Current: Article 1 – Student Rights and Responsibilities

## Article 1 – Student Rights and Responsibilities

## Main Content

## Part 1 – Student Rights

- § 1-101 Preamble
- § 1-102 In the Classroom
- § 1-103 Campus Expression
- § 1-104 Privacy
- § 1-105 Student Records
- § 1-106 Student Affairs
- § 1-107 Religious Beliefs, Observances, and Practices
- § 1-108 Nondiscrimination Policy
- § 1-109 Policy on Workplace-Related Intimate Personal Relationships
- § 1-110 Policy for the Provision of Academic Accommodations, Auxiliary Aids & Services for Students with Disabilities
- § 1-111 Sexual Misconduct Policy

## Part 2 – General Responsibilities of Students

§ 1-201 Responsibilities of Students

## Part 3 – Student Discipline

- § 1-301 Basis for Discipline – Source and Jurisdiction
- § 1-302 Rules of Conduct
- § 1-303 Falsification of Documents
- § 1-304 Identification Cards
- § 1-305 Policy on Drugs
- § 1-306 Alcoholic Beverages – Preamble
- § 1-307 Alcoholic Beverages – General Rules
- § 1-308 Alcoholic Beverages – Special Rules Relating to University Property

**086**

- § 1-309 Possession or Storage of Weapons
- § 1-310 Unauthorized Use, Abuse, or Interference with Fire Protection Equipment, Building Security Systems, Security or Fire Personnel, or Warning Devices
- § 1-311 Certain Consequences of Disciplinary Action

## Part 4 – Academic Integrity and Procedure

- § 1-401 Policy Statement; Application; Definitions
- § 1-402 Academic Integrity Infractions
- § 1-403 Initial Determination
- § 1-404 Sanctions and Student Status
- § 1-405 Appeal Procedures
- § 1-406 Continuing Jurisdiction of the Senate Committee on Student Discipline
- § 1-407 Reporting and Record Keeping

## Part 5 – Class Attendance

- § 1-501 All Students
- § 1-502 Student Athletes

## Part 6 – Educational Technologies

- § 1-601 All Students

# Part 1, Article 1 » Student Code » Illinois

**studentcode.illinois.edu**/article1/part1/1-111/

## Secondary Navigation

## Part 1 – Student Rights

- [1-101 Preamble](#)
- [1-102 In the Classroom](#)
- [1-103 Campus Expression](#)
- [1-104 Privacy](#)
- [1-105 Student Records](#)
- [1-106 Student Affairs](#)
- [1-107 Religious Beliefs, Observances, and Practices](#)
- [1-108 Nondiscrimination Policy](#)
- [1-109 Policy on Workplace-Related Intimate Personal Relationships](#)
- [1-110 Policy for the Provision of Academic Accommodations, Auxiliary Aids & Services for Students with Disabilities](#)
- [1-111 Sexual Misconduct Policy](#)

## § 1-111 Sexual Misconduct Policy

1. Purpose

The purpose of this policy is to provide a safe and welcoming educational and work environment and to establish standards of conduct that are appropriate for our campus community; and to comply with Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106; Section 304 of the Violence Against Women Reauthorization Act of 2013 ("VAWA"), 20 U.S.C. 1092(f), and its implementing regulations, 34 C.F.R. Part 668.46; Title VII of the Civil Rights Act of 1964 ("Title VII"); the Illinois Human Rights Act; and the Illinois Preventing Sexual Violence in Higher Education Act, 110 ILCS 155/1 et seq.

This policy was revised in July 2020 as part of the effort to align the university's policy and procedures with new Title IX regulations and to incorporate recommendations made by the Committee on Faculty Sexual Misconduct for addressing unwelcome sexual, sex or gender-based conduct by employees. When investigating and adjudicating complaints of "Title IX Sexual Harassment" (as defined below), federal regulations require the university to follow specific procedures, some of which are unique to Title IX. This policy also addresses other categories of sexual misconduct that do not fall within the definition of "Title IX Sexual Harassment" (for example, because of the nature of the alleged conduct, where it took place, or who was involved) but that may violate other conduct requirements.

The purpose of this policy in delineating which conduct is "Title IX Sexual Harassment" is not to imply that the university considers certain conduct more or less objectionable, nor to discourage any person from submitting a report. Rather, the purpose of this policy is to ensure that all persons who experience sexual misconduct described in this policy have full access to the rights and resources they are entitled to, and that every complaint is handled fairly and equitably, in a manner consistent with applicable law, and with the ultimate aim of maintaining an institutional climate of safety and accountability. Title IX requires a definition of "Title IX Sexual Harassment" that provides a floor—not a ceiling—to the varied forms of misconduct that can be prohibited at a university, and the University of Illinois has decided to go beyond this floor to promote a safe and welcoming culture and climate.

**Relation to Other Laws and Policies**

Conduct prohibited by this policy may violate other laws and policies, including, but not limited to, the university's <u>Nondiscrimination Policy</u>, the university <u>Code of Conduct</u>, and the <u>Student Code</u>. Sexual misconduct that constitutes Title IX Sexual Harassment will be addressed pursuant to the university's Title IX grievance procedure(s). Nothing in this policy prevents the university from addressing prohibited sexual misconduct that does not trigger the university's Title IX response obligations under other applicable policies and procedures.

In addition, this policy does not cover every allegation of discrimination based on sex. Other university policies prohibit discrimination and harassment that would not constitute sexual misconduct, as defined in this policy. When an individual alleges discriminatory action that is not sexual misconduct, as defined in this policy, the allegations are assessed under the applicable university policy. For information regarding other university policies addressing discrimination and harassment, visit the Nondiscrimination Policy.

If the regulations implementing Title IX at 85 Fed. Reg. 30026, 30026-30579 are enjoined or invalidated by a Federal Court with jurisdiction over the university or reversed or replaced by any agency with sufficient authority, the Prohibited Sexual Misconduct Processes (§ 1-111 (e)) will immediately begin to apply to all reports and complaints of Prohibited Sexual Misconduct, including Title IX Sexual Harassment, and the Title IX Sexual Harassment Process (§ 1-111 (d)) will immediately be inoperative unless and until any such injunction, invalidation, reversal, or replacement is overturned.

2. The University of Illinois Urbana-Champaign ("university") is committed to providing a safe and welcoming campus environment that is free from all forms of discrimination based on sex. Discrimination based on sex includes discrimination on the basis of sexual orientation or gender identity. The university does not discriminate against any person based on sex in its education programs or activities or in employment. This policy includes the processes to be used for all reports or complaints of sexual misconduct. The grievance processes for Title IX Sexual Harassment and other Prohibited Sexual Misconduct shall be distinct as set out in this policy. The university also prohibits retaliation against any person who, in good faith, reports or discloses a violation of this policy, files a complaint, or otherwise participates in an investigation, proceeding, complaint, or hearing under this policy.

3. This policy applies to
    1. All students, Registered Organizations, Registered Student Organizations, and others subject to student discipline pursuant to § 1-301 of the Student Code;
    2. All university employees;
    3. Applicants for enrollment or employment with the university;
    4. Other affiliated individuals, including but not limited to, for purposes of this policy, visiting faculty, visiting scholars, and post-doctoral fellows; and
    5. Third parties, including but not limited to contractors, subcontractors, volunteers, and visitors.

4. Title IX Sexual Harassment Process

The Department of Education Office for Civil Rights amended in 2020 the regulations implementing Title IX. Under the regulations, Title IX prohibits sex discrimination, including Title IX Sexual Harassment, as defined below, in an education program or activity of the university against a person in the United States. An education program or activity of the university includes locations, events, or circumstances over which the university exercised substantial control over both the respondent and the context in which the alleged misconduct occurred, and also any building owned or controlled by a student organization that is officially recognized by the university.

Title IX Sexual Harassment is defined as conduct on the basis of sex that falls into one or more of the following categories as defined below in this policy: Quid Pro Quo Sexual Harassment, Hostile Environment Sexual Harassment, Sexual Assault, Dating Violence, Domestic Violence, or Stalking. If a reported incident of sexual misconduct falls under the scope of Title IX (as determined by the Title IX Coordinator or their designee), the university will promptly contact the Complainant to review the university's Title IX Sexual Harassment grievance process, review and offer available supportive measures, and provide information on the university's process for filing a Formal Complaint of Title IX Sexual Harassment, if desired. If a Formal Complaint of Title IX Sexual Harassment is filed or if the Title IX Coordinator signs a Formal Complaint, the university will respond promptly in a manner that is not deliberately indifferent and will follow its Title IX Sexual Harassment grievance procedures. Additional information about the university's Title IX Sexual Harassment grievance procedures for Formal Complaints involving an employee respondent and for student conduct can be found on the We Care website, specifically at wecare.illinois.edu/policies/campus/.

Reports of sexual misconduct that fall outside the university's jurisdiction for responding to complaints of Title IX Sexual Harassment will be dismissed under the university's applicable Title IX Sexual Harassment grievance procedure. Additionally, the university may dismiss a Formal Complaint of Title IX Sexual Harassment, or any allegations therein, if at any time during the investigation or hearing

1. the Complainant notifies the Title IX Coordinator in writing that they would like to withdraw the Formal Complaint or any allegations therein;
2. the respondent is no longer enrolled or employed by the university; or
3. specific circumstances prevent the university from gathering evidence sufficient to reach a determination as to the Formal Complaint or any allegations therein.

5. Prohibited Sexual Misconduct Processes

Reports or complaints of sexual misconduct that are not one of the categories included in Title IX Sexual Harassment will be addressed following the processes set out in the Office for Student Conflict Resolution's Case Coordinator and Subcommittee Hearing Procedures (for student respondents) or the Office for Access & Equity's Procedures for Addressing Discrimination, Harassment, and Non-Title IX Sexual Misconduct Complaints (for employee respondents). Additional information about these procedures can be found on the We Care website, specifically at wecare.illinois.edu/policies/campus/.

6. Definitions

1. Sexual Misconduct means Title IX Sexual Harassment, sexual harassment, sexual assault, dating violence, domestic violence, stalking, unwelcome sexual, sex or gender-based conduct, sexual violence, or sexual exploitation, as defined below.

2. Prohibited Sexual Misconduct means any conduct prohibited by this policy other than Title IX Sexual Harassment.

3. Title IX Sexual Harassment means conduct on the basis of sex that satisfies one or more of the following:

   1. Quid Pro Quo: A university employee conditioning the provision of an aid, benefit, or service of the university on an individual's participation in unwelcome sexual conduct;

   2. Hostile Environment: Unwelcome conduct that a reasonable person would determine to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the university's education program or activity;

   3. Sexual Assault (as defined in this policy);

   4. Stalking (as defined in this policy);

   5. Dating Violence (as defined in this policy);

   6. Domestic Violence (as defined in this policy).

4. Sexual Assault (See 20 U.S.C. 1092(f)(6)(A)(v)) means:

   1. Forcible Fondling. Fondling is the touching of the private body parts of another person for the purpose of sexual gratification, without the Consent of the victim. Private body parts include breasts, buttocks, groin, and sex organs.

   2. Incest. Sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.

   3. Rape. The penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the Consent of the victim. This offense includes attempted rape and assault with intent to commit rape.

   4. Sexual Assault with an Object. To use an object or instrument to unlawfully penetrate, however slightly, the genital or anal opening of the body of another person, without the Consent of the victim.

   5. Forcible Sodomy. Oral or anal sexual intercourse with another person, without the Consent of the victim.

   6. Statutory Rape. Statutory Rape is sexual intercourse with a person who is under the statutory age of consent.

5. Consent means mutually understood words or actions indicating a freely given, informed agreement to engage in a particular sexual activity with a specific person or persons. Consent must be voluntarily given and cannot be the result of Coercion. A person's lack of verbal or physical resistance or submission resulting from the use or threat of force does not constitute consent. A person's manner of dress does not constitute consent. A person's consent to past sexual activity does not constitute consent to future sexual activity. A person's consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another. A person can withdraw consent at any time.

   A person cannot consent to sexual activity if the person is unable to understand the nature, fact, or extent of the activity or give knowing consent due to circumstances including without limitation the following:

   1. the person is incapacitated due to the use or influence of alcohol or other drugs;
   2. the person is asleep or unconscious;
   3. the person is under the legal age to provide consent; or
   4. the person has a disability that prevents such person from having the ability or capacity to give consent.

   To be found responsible in a case involving a Complainant who could not consent to sexual activity, the Respondent must have known, or should have known, the Complainant was unable to understand the nature of the sexual activity or give knowing consent due to the circumstances. "Should have known" is an objective, reasonable person standard. That is, would a reasonable person have recognized that the Complainant could not consent to the sexual activity.

6. Coercion is the use of force, threats, intimidation, or severe or persistent pressure that would reasonably cause an individual to fear significant consequences if they refuse to engage in sexual contact. In evaluating whether Coercion was used, the university will consider: (1) the frequency, intensity, and duration of the pressure; (2) the degree of isolation of the person being pressured; and (3) any actual or perceived power differential between the parties in the context of their respective roles within the university. For example, when a person expresses a decision not to participate in a particular sexual activity, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can become coercive.

7. Stalking means engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others; or suffer substantial emotional distress. For the purposes of this definition:
    1. Course of conduct means two or more acts, including but not limited to, acts which the stalker directly, indirectly, or through third parties, by any action, method, device or means follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.
    2. Reasonable person means a reasonable person under similar circumstances and with similar identities to the victim.
    3. Substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.
8. Dating Violence means violence committed by a person:
    1. who is or has been in a social relationship of a romantic or intimate nature with the victim; and
    2. where the existence of such a relationship is determined based on consideration of the following factors:
        1. of the length of relationship;
        2. the type of the relationship; and
        3. the frequency of the interaction between the persons involved in the relationship.

    Dating violence does not include acts covered under the definition of Domestic Violence.
9. Domestic Violence means any crime(s) committed against an individual by a current or former spouse or intimate partner (as defined under the family or domestic violence laws of Illinois), including but not limited to, domestic battery, aggravated domestic battery, stalking, aggravated stalking, cyberstalking, sexual assault, and sexual abuse.

10. Unwelcome Sexual, Sex or Gender-Based Conduct means any unwelcome sexual, sex-based, or gender-based conduct occurring within or having an adverse impact on the workplace or academic environment, regardless of how it is conducted (physically, verbally, in writing, or via an electronic medium) and regardless of the sexes or genders of the individuals involved. This category of misconduct comes in three forms, each of which may also qualify as Title IX Sexual Harassment or violate the Nondiscrimination Policy in some circumstances:

    1. Gender-Based or Sexual Hostility: Objectively offensive treatment of another person or group, through words or conduct, with hostility, objectification, exclusion, or as having inferior status based on sex, gender (including gender identity or gender expression), or sexual orientation.

    2. Unwanted Sexual Attention: Objectively offensive sexual attention, advances, or comments that a person reasonably should know are unwanted or which continue to occur or persist after the recipient has communicated a desire that the behavior stop.

    3. Sexual Coercion: Use of force, violence, threats, or other threats of harm by an individual to compel or attempt to compel another individual to engage in unwelcome sexual activity.

Unwelcome sexual, sex or gender-based conduct need not be illegal under existing laws to violate this policy. To be disciplined through a formal complaint process, however, the behavior must be by an employee acting in the course of employment. In investigating and responding to reports of violations, due consideration will be given to an individual's rights to free speech, expression, and academic freedom. While speech can be used to harass or engage in unwelcome sexual, sex or gender-based conduct and can provide evidence of discriminatory intent, speech does not violate this policy just because it is subjectively offensive. A reasonable person must also find it offensive, it must lack bona fide academic purpose, and it must fall within one of the definitions of misconduct found in this policy. What sanctions or other responsive actions may be deemed appropriate, if any, will depend on the facts and circumstances of the case.

11. Sexual Harassment means unwelcome conduct of a sexual nature or unwelcome conduct based on sex, sexual orientation, or gender identity when:
1. submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or educational opportunities, assessment or status at the university;
2. submission to or rejection of such conduct by an individual is used as the basis for employment or educational decisions affecting such individual, or
3. such conduct is sufficiently severe or pervasive; and objectively offensive; and unreasonably interferes with, denies, or limits a person's ability to participate or benefit from educational or employment opportunities, assessments, or status at the university.

12. Sexual Exploitation means the use of another person's nudity or sexual activity without consent for the purpose of sexual gratification, financial gain, or anyone's advantage or benefit other than the person whose nudity or sexual activity is being used. Sexual Exploitation includes, but is not limited to:
1. observing, recording, or photographing nudity or sexual activity of one or more persons without their Consent in a location where there is a reasonable expectation of privacy;
2. allowing another to observe, record, or photograph nudity or sexual activity of one or more persons without their Consent; or
3. otherwise distributing recordings, photographs, or other images of the nudity or sexual activity of one or more persons without their Consent.

13. Sexual Violence means physical sexual acts attempted or perpetrated against a person's will or when a person is incapable of giving Consent.

7. Retaliation means intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX, its implementing regulations, or this policy, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy. Retaliation may include, but is not limited to harassment, discrimination, threats, or adverse employment action. Any person or group within the scope of this policy who engages in prohibited retaliation is subject to a separate complaint of retaliation under this policy.

8. Title IX

The lead Title IX Coordinator is responsible for and authorized to coordinate the university's efforts to comply with and carry out its responsibilities under Title IX, which prohibits sex discrimination in education programs and activities for institutions that receive federal financial assistance, as well as retaliation for the purpose of interfering with any right or privilege protected by Title IX. The lead Title IX Coordinator also oversees the university's response to all reports and complaints of Prohibited Sexual Misconduct and Title IX Sexual Harassment to monitor outcomes, identify any patterns, and assess their effects on the campus climate. The lead Title IX Coordinator evaluates requests for confidentiality by those who report or complain about Prohibited Sexual Misconduct and Title IX Sexual Harassment in the context of the university's responsibility to provide a safe and welcoming campus environment for all students free from discrimination based on sex. The lead Title IX Coordinator is also responsible for effective implementation of any supportive measures or remedies for Prohibited Sexual Misconduct and Title IX Sexual Harassment, and for overseeing the university's recordkeeping obligations under Title IX. All formal complaints of Title IX Sexual Harassment shall be reviewed and addressed in accordance with the grievance process set forth in the university's Title IX Sexual Harassment grievance procedures for Formal Complaints which are required to:

1. Treat complainants and respondents equitably in all manners, including by providing remedies to a Title IX Complainant where a determination of responsibility for Title IX Sexual Harassment has been made against the respondent, and by following the grievance process before the imposition of any disciplinary sanctions or other actions that are not supportive measures against a Title IX respondent;

2. Require an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence, and provide that credibility determinations will not be based on a person's status as a complainant, respondent, or witness;

3. Require that any individual designated by the university as a Title IX Coordinator, investigator, decision-maker, or any person designated by the university to facilitate an informal resolution process: a) not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent; and b) receive training on the definition of sexual harassment, the scope of the university's education program or activity, how to conduct an investigation and grievance process, and how to serve impartially;

4. Require that any individual designated by the university as a decision-maker receive training on any technology to be used at a live hearing and on issues of relevance of questions and evidence;

5. Require that any individual designated by the university as an investigator receive training on issues of relevance to create an investigative report that fairly summarizes relevant evidence.

6. Include a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process;

7. Include reasonably prompt timeframes for conclusion of the grievance process;

8. Describe the range of possible disciplinary sanctions and remedies or list the possible disciplinary sanctions and remedies that the university may implement following any determination of responsibility;

9. Base all decisions on the preponderance of the evidence standard;

10. Include the procedures and permissible bases for the complainant and respondent to appeal;

11. Describe the range of supportive measures available to complainants and respondents; and

12. Not require, allow, rely upon, or otherwise use questions or evidence that constitutes or seeks disclosure of, information protected under a legally recognized privilege unless the person holding such privilege has waived the privilege.

9. Danielle Fleenor serves as the university's lead Title IX Coordinator and can be contacted in person or by mail at 614 E. Daniel Street, Suite 303, Champaign, IL 61820; by phone at (844) 616-7978; or by email at titleixcoordinator@illinois.edu.

10. A person should contact the lead Title IX Coordinator's office to:

1. seek information or training about rights and available actions to resolve reports or formal complaints involving potential sex discrimination, including Title IX Sexual Harassment and other Prohibited Sexual Misconduct;

2. file a formal complaint or make a report of sex discrimination, including Title IX Sexual Harassment and other Prohibited Sexual Misconduct;

3. obtain information about the availability of and for coordination of resources (including confidential resources) and supportive measures relating to sex discrimination, including Title IX Sexual Harassment and other Prohibited Sexual Misconduct;

4. notify the university of an incident, policy, or procedure that may raise potential Title IX concerns; and

5. ask questions about the university's policies and procedures related to sex discrimination, including Title IX Sexual Harassment and other Prohibited Sexual Misconduct.

# EXHIBIT L

**From:** illinois-advocate@advocate.symplicity.com <illinois-advocate@advocate.symplicity.com>
**Sent:** Friday, January 5, 2024 3:57:55 PM
**To:** Shannon, Terrence <ts49@illinois.edu>
**Subject:** UIUC Student Conduct Update: Charge Notice - IMPORTANT



**Student Affairs**

Office for Student Conflict Resolution
300 Turner Student Services Building, MC-306
610 E. John St.
Champaign, IL 61820

January 05, 2024

==**Note: The complainant has been copied on this communication.**==

Terrence Shannon Jr.
sent via email to ts49@illinois.edu

Dear Terrence:

The Office for Student Conflict Resolution has received a report in which it is alleged that on September 09, 2023, you were involved in an incident which may violate the Student Code at the University of Illinois at Urbana-Champaign. It is alleged that on September 9, 2023, at the Jayhawk Cafe in Lawrence, KS, you grabbed the buttocks of another person and then inserted your finger into her vagina, without her consent. (To protect privacy, the name is being provided contemporaneously to your attorney in writing). Such conduct, if proven, would fall within the jurisdiction of the student discipline system and could constitute a violation of our community standards, specifically:

**Student Code/1-302.b.1 - Sexual assault**
The Student Code is available for review at https://studentcode.illinois.edu/.

I have been assigned as your case coordinator. Please call my office, 217-333-3680, during normal business hours (Monday - Friday, 8:30 a.m. - 5 p.m.) and no later than January 12, 2024, to arrange an appointment with me through my assistant. This meeting should occur within seven business days of this notice, unless a conflict between my availability and your academic schedule requires a delay. Office staff will not be prepared to discuss your case over the phone when you call.

During this appointment, we will discuss this process and the allegations against you, and you will have an opportunity to provide your perspective on what may have happened. I will take notes on our discussion and may have additional questions for you. You may bring someone with you to this appointment to advise you, but this advisor may not actively participate in our discussion.

This letter also serves as a reminder that the university prohibits retaliation against anyone who, in good faith, reports or discloses a violation of university policy, files a complaint, or otherwise participates in an investigation, proceeding, complaint, or hearing in the student discipline system. Retaliation may include but is not limited to harassment, intimidation, threats, coercion, or adverse employment action. Retaliation is a serious violation and can result in dismissal from the university.

The Student Code also prohibits knowingly making false statements or submitting false information to university officials. Although you may choose not to speak about these allegations or not to answer questions, you must be honest throughout this process.

Prior to our meeting, you should review Articles II and III of the Student Disciplinary Procedures, which includes a list of your rights and a detailed description of the process we will follow in addressing this matter. This is available at http://conflictresolution.illinois.edu/policies/student-discipline/. Should you have questions after reading this appendix, you may contact me. You will also be provided an opportunity to ask questions during our meeting.

Sincerely,

Robert Wilczynski
Director, Office for Student Conflict Resolution

xc: Student File (00031-001-2024) -- Student ID:  651470906; Title IX Office; Complainant



**Student Affairs**

Office for Student Conflict Resolution
300 Turner Student Services Building, MC-306
610 E. John St.
Champaign, IL 61820

## Where to Begin

When a student is alleged to have violated the community standards outlined in the *Student Code*, the Office for Student Conflict Resolution (OSCR) staff and other OSCR-affiliated employees are responsible for investigating those allegations in accordance with the Student Disciplinary Procedures as authored and authorized by the Senate Committee on Student Discipline.

This document contains basic information about your rights in this process, but you are strongly encouraged to review the relevant sections of the Student Disciplinary Procedures as well. You will also find valuable information in Article I of the *Student Code* and on the OSCR website.

## Terminology

A student alleged to have violated the *Student Code* is called a respondent. A person who claims to have been or is reported to have been a victim of sexual misconduct is called a complainant. The person responsible for investigating allegations against a student on behalf of the university is called a case coordinator (CC).

## Participant Rights

| Respondent Rights | Complainant Rights |
|---|---|
| **Advisor**: The respondent may bring an advisor with them to any meeting with the CC or any disciplinary proceeding to which they are invited. | **Advisor**: The complainant may bring an advisor with them to any meeting with the CC or any disciplinary proceeding to which they are invited. |
| **Appeal**: The respondent may appeal the decision in their case to the appropriate appeal body. | **Appeal**: The complainant may appeal the decision in their case to the appropriate appeal body. |
| **Disability Accommodations**: See §1-110 of the *Student Code*. | **Disability Accommodations**: See §1-110 of the *Student Code*. |
| **Interpreter**: The respondent may bring an interpreter with them to any meeting with the CC or any disciplinary proceeding to which they are invited. | **Interpreter**: The complainant may bring an interpreter with them to any meeting the CC or any disciplinary proceeding to which they are invited. |
| **Notice**: The respondent will receive timely written notification of the allegations against them and of any meetings or proceedings they are expected to attend. | **Notice**: The complainant will receive timely written notification of any meetings or proceedings they are expected to attend. |
| **Objectivity**: All disciplinary decisions will be based on an objective evaluation of evidence. | **Objectivity**: All disciplinary decisions will be based on an objective evaluation of evidence. |
| **Participation**: The respondent will have an opportunity to identify and present witnesses, to | **Participation**: The complainant will have an opportunity to identify and present witnesses, to |

| | |
|---|---|
| provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, the respondent may refuse to provide a requested statement or to answer a question posed to them. | provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, the respondent may refuse to provide a requested statement or to answer a question posed to them. |
| **Timely Investigation and Decision**: Any investigation into the respondent's behavior will begin promptly and proceed in a timely manner. The respondent will receive a timely written decision following any case coordinator decision, administrative hearing, or appellate review. | **Timely Investigation and Decision**: Any investigation into the respondent's behavior will begin promptly and proceed in a timely manner. The respondent will receive a timely written decision following any case coordinator decision, administrative hearing, or appellate review. |

## Meeting with Your Case Coordinator

You are generally expected to meet with your case coordinator as soon as possible.  You are expected to set up an appointment within five business days of your charge notice being sent and attend that appointment no later than seven business days. At this first meeting, your case coordinator will summarize the allegations against you, explain the process, and give you an opportunity to discuss what happened. Your case coordinator may also inform you that your case will ultimately be decided by one of the subcommittees on student conduct and explain that process to you as well. You should use this first meeting to ask any questions you have about the process and what you might expect along the way.

If you do not believe you are responsible for violating the *Student Code*, you have a right to provide additional information on your behalf and to identify witnesses. Your case coordinator may give you a deadline for submitting this information. If they do not, you should ask them if they want you to submit this information by a particular date.

## The Family Educational Rights and Privacy Act (FERPA)

Student disciplinary records are protected by FERPA. Although OSCR staff will not typically discuss disciplinary records with your parent/guardian (or other unaffiliated individuals) without your permission, FERPA does allow the university to disclose disciplinary information under certain circumstances. For more information about FERPA, access to student records, and possible exceptions, you can review the Office of the Registrar website as well as Article 3, Part 6 of the *Student Code*.

## Frequently Asked Questions

For answers to frequently asked questions, please visit http://conflictresolution.illinois.edu/faq/.

# EXHIBIT M

# STUDENT DISCIPLINARY PROCEDURES

## TABLE OF CONTENTS

Article I. BACKGROUND ................................................................ 2

    Section 1.01: History ................................................................ 2

    Section 1.02: Philosophy ............................................................ 2

    Section 1.03: Scope ................................................................ 3

    Section 1.04: Nature of System ...................................................... 3

    Section 1.05: Jurisdiction .......................................................... 3

Article II. CASE COORDINATOR AND SUBCOMMITTEE HEARING PROCEDURES ........................... 4

    Section 2.01: Definitions ............................................................ 4

    Section 2.02: Complainant Rights (Sexual Misconduct Cases Only) ........................... 6

    Section 2.03: Respondent Rights ...................................................... 7

    Section 2.04: Initial Investigation ..................................................... 8

    Section 2.05: Case Coordinator (CC) Decision Procedures .................................. 9

    Section 2.06: Subcommittee Decision Procedures ........................................ 11

    Section 2.07: Privacy ............................................................... 17

    Section 2.08: Conflicts of Interest and Bias ............................................. 17

    Section 2.09: Complaints against CCs .................................................. 17

    Section 2.10: Actions Possible in Individual Student Discipline Cases ........................ 18

Article III. APPEALS .................................................................... 21

    Section 3.01: In General ............................................................ 21

    Section 3.02: Appeals to the Director .................................................. 21

    Section 3.03: Appeals to the SCSD .................................................... 22

Article IV. MISCELLANEOUS ............................................................. 25

    Section 4.01: Subcommittee Member Selection and Removal ............................... 25

    Section 4.02: Student Petitions ....................................................... 26

    Section 4.03: Procedures in Cases of Interim Suspension by the Chancellor .................. 28

    Section 4.04: Criminal/Disciplinary History Review Committee ............................. 29

    Section 4.05: Access to Records and Record Retention .................................... 29

    Section 4.06: No Contact Directives ................................................... 30

    Section 4.07: Informal Resolution Options .............................................. 31

APPENDIX A.................................................................................................... 34

APPENDIX B.................................................................................................... 35

APPENDIX C.................................................................................................... 41

APPENDIX D.................................................................................................... 52

## Article I. BACKGROUND

### Section 1.01: History

The conduct governance system of the University of Illinois was established in the University Statutes by the Board of Trustees in l931 and was reaffirmed in l957. In January, l972, the Board of Trustees again affirmed the existing status of the university governance system and adopted recommendations for strengthening the system. The Trustees asserted their belief in the concept that the university discipline system shall be separate from, but coexistent with, general systems established by society to deal with the conduct of citizens of society. They emphasized again that, as provided by the Statutes in Article XI, section 2, the Senate Committee on Student Discipline (SCSD) shall have jurisdiction over the hearing and adjudication of the application of rules of student conduct to particular cases. The committee shall not have responsibility for or right to make or define the rules or regulations or to concern itself with the responsibility of the Chancellor to exercise powers to meet an emergency, safeguard persons and property, and maintain educational activities.

### Section 1.02: Philosophy

As a community of scholars, the University of Illinois at Urbana-Champaign is committed to providing an environment that values academic excellence, personal integrity, justice, equity, and diversity in an orderly and peaceful environment. Such an environment is essential for fostering the intellectual growth and personal development of all students. All members of the academic community share responsibility for maintaining conditions which support the university's mission.

The community supports each member's right to study and work in a quiet, respectful, non-violent atmosphere that is conducive to the pursuit and acquisition of knowledge. Students who voluntarily join this university community assume the obligation of abiding by the standards commonly held by that community. Every student at the University of Illinois at Urbana-Champaign is therefore obligated to assume responsibility for their actions, to respect constituted authority, to be truthful, and to respect the rights of others, as well as to protect personal and public property.

The goal of the disciplinary system is to educate and discipline the individual as well as to protect the integrity and security of the university community and its mission by serving as a deterrent.

**Section 1.03: Scope**

The university discipline system recognizes that not all violations of local, State, and Federal law affect the interests of the university community and the discipline system accepts jurisdiction in those instances where the university community's interest is substantially affected, regardless of whether the conduct in question occurs on or off campus.  The rules governing conduct may come under the jurisdiction of the legal system but are typically and necessarily broader in coverage than statutes and ordinances.  The university discipline system is based on the most recent edition of the Student Code. Action taken through university disciplinary committees does not abrogate the right of any dean or director to deny admission or readmission based on scholarship.

As students enrolled in the College of Law are preparing for careers in a profession demanding honesty and integrity, the College requires high standards of conduct specific to its students. Therefore, The College of Law operates under an honor system and has special additional policies and procedures outlined in an appendix to this document.

**Section 1.04: Nature of System**

Our disciplinary system is not intended to be adversarial in nature and is substantially less formal than a court of law.  The majority of cases, in which severe sanctions are not likely to be considered, can and should be handled informally.  The objective of a system of student discipline is to promote responsible citizenship in a complex organizational or social setting.

**Section 1.05: Jurisdiction**

The University has jurisdiction over student conduct that occurs on university property, or in connection with official university programs or functions whether on or off university property. The university may, at its sole discretion, exercise jurisdiction over student behavior that occurs off campus and that would violate student conduct policies or regulations in those instances in which the university community's interest is substantially affected. The university discipline system recognizes that not all violations of law affect the interests of the university community. Additionally, the university may take disciplinary action for incidents that violate the university's rules of conduct whether or not such alleged conduct is not prosecuted in the courts.

In determining whether or not to exercise off-campus jurisdiction, the University may consider factors including but not limited to:

1. the alleged misconduct indicates the student posed or poses a threat to the safety or security of any individual; or

2. the alleged misconduct involves academic work or the forgery, alteration or misuse of any University document, record, key, electronic device, or identification.
3. The seriousness of the alleged misconduct; whether an alleged victim is a member of the campus community; the ability of the University to gather information, including the statements of witnesses; and whether the off-campus conduct is part of a series of actions that occurred either on or off campus.


**Article II. CASE COORDINATOR AND SUBCOMMITTEE HEARING PROCEDURES**

**Section 2.01: Definitions**

(a) Advisor. A person who provides a respondent or complainant support, guidance, or advice. Respondents and complainants may be accompanied by an advisor of their choosing to any meeting with an CC or to any proceeding to which the advisee is invited. The university will directly communicate the case to the student.  Under no circumstances will the university directly communicate with the advisor alone. The student is responsible for updating their advisor and/or forwarding any correspondence to them.

(b) Business Day. Any weekday when university offices are open for official business.

(c) Case. A situation of which the Office for Student Conflict Resolution is aware and in which a student respondent has been alleged to have violated the Student Code.

(d) Case Coordinator (CC). A person responsible for investigating and/or deciding alleged violations of the Student Code by undergraduate and graduate students on behalf of the university. The SCSD has designated as CCs all professional staff in OSCR as well as specific professional staff in University Housing and in select colleges. In addition, the Director is empowered to designate other trained individuals as CCs as needed. For students in the College of Veterinary Medicine (who are not alleged to have violated the Sexual Misconduct Policy), the Dean of the college or their designee may serve as the CC, though this responsibility may be delegated to the Office for Student Conflict Resolution. For students in the Carle Illinois College of Medicine (who are not alleged to have violated the Sexual Misconduct Policy), the Dean or their designee may serve as the CC. Procedures for the College of Law (for cases not involving allegations of sexual misconduct) are located in Appendix C. Regardless of the student respondent's college affiliation, however, cases involving allegations of sexual misconduct may only be assigned to CCs that the Director recognizes as having been trained, on an annual basis, on the issues related to dating violence, domestic violence, sexual assault, and stalking and on how to conduct an investigation and hearing process that protects the safety of complainants and promotes accountability.

(e) Complainant. A person who claims to have been or is reported to have been a victim of sexual misconduct. Cases that are determined by the Title IX Coordinator or their designee to include allegations of Title IX Sexual Harassment in an education program or

activity of the university against a person in the United States are addressed through the procedures described in Appendix D.

(f) Director (or Executive Director). The Director of the Office for Student Conflict Resolution or their designee.

(g) Evidence. Any information, including testimony, collected during an investigation that is relevant to the determination of whether the respondent has violated the Student Code. Neither information that solely addresses the character of any person nor information about any complainant's prior sexual conduct with anyone other than the respondent (unless such information is offered to prove that someone other than the respondent is responsible for the alleged conduct) is evidence.

(h) Investigative Materials. A summary of any interviews conducted, and any documents or other materials collected during an investigation that are relevant to the determination of whether the respondent has violated the Student Code.

(i) OSCR. The Office for Student Conflict Resolution.

(j) Panel. A group of members of the appropriate subcommittee on student conduct selected to decide a case. A Panel of the Subcommittee on Sexual Misconduct consists of three members. Panels of the Subcommittees on Undergraduate Student Conduct and Graduate Student Conduct consist of at least three members. All Panels must include at least one student member.

(k) Panel Chair (or Chair). The faculty or staff member designated by the Director to run a hearing.

(l) Party. Any person identified as a complainant or a respondent with respect to a given case.

(m) Respondent. A student who is alleged to have violated the Student Code.

(n) Sanction, Educational. An assignment, requirement, or task educationally related to a policy violation.

(o) Sanction, Formal. A disciplinary status imposed by the university in response to a policy violation.

(p) SCSD. The Senate Committee on Student Discipline.

(q) Subcommittee on Graduate Student Conduct. The group of faculty, staff, and graduate students responsible for adjudicating graduate student cases that do not involve allegations of sexual misconduct. This group is selected through an application process overseen by OSCR and approved by the SCSD. All members of the Subcommittee on Graduate Student Conduct are trained by OSCR staff.

(r) Subcommittee on Sexual Misconduct. The group of faculty, staff, and students responsible for adjudicating cases that include allegations of sexual misconduct. This group is selected through an application process overseen by OSCR and approved by the SCSD. All members are trained on the university's Sexual Misconduct Policy; the scope

of the university's education program or activity; how to conduct an investigation and grievance process; how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias; any technology to be used at a live hearing; issues of relevance of questions and evidence, including when questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant; and other topics deemed appropriate by OSCR staff or required by state and federal law.

(s) Subcommittee on Undergraduate Student Conduct. The group of faculty, staff, and undergraduate students responsible for adjudicating undergraduate student cases that do not involve allegations of sexual misconduct. This group is selected through an application process overseen by OSCR and approved by the SCSD. All members of the Subcommittee on Undergraduate Student Conduct are trained by OSCR staff.

(t) Witness. A person who has relevant information regarding the facts of the case.

**Section 2.02: Complainant Rights (Sexual Misconduct Cases Only)**

(a) Advisor. The complainant may bring an advisor with them to any meeting with the CC or any disciplinary proceeding to which they are invited. This individual may communicate nondisruptively with the complainant during such proceedings but may not speak for the complainant or otherwise directly participate. An advisor who fails to follow these instructions or behaves disruptively may be asked to leave. Upon request, OSCR staff will connect a complainant to a trained confidential advisor (see https://wecare.illinois.edu/policies/terms/#advisor). The university will directly communicate the case to the student.  Under no circumstances will the university directly communicate with the advisor alone. The student is responsible for updating their advisor and/or forwarding any correspondence to them.

(b) Appeal. The complainant may appeal the decision in their case to the appropriate appeal body. This process is described in Article III.

(c) Disability Accommodations. A qualifying complainant has the right to reasonable accommodations during any disciplinary process or proceeding in accordance with §1-110 of the *Student Code*.

(d) Interpreter. The complainant may also bring an interpreter with them to any meeting with the CC or any disciplinary proceeding to which they are invited, provided that this individual is not also a witness in the investigation. An interpreter who behaves disruptively may be asked to leave. The use of an interpreter does not preclude the complainant's ability to have an advisor present.

(e) Notice. The complainant will receive timely written notification of any meetings or proceedings they are expected to attend. Notice is deemed given immediately when hand delivered or sent to the complainant's email address, or on the following business day when mailed.

(f) Objectivity. All disciplinary decisions will be based on an objective evaluation of evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the university's Nondiscrimination Policy.

(g) Participation. The complainant will have an opportunity to identify and present witnesses, to provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, the complainant may refuse to provide a requested statement or to answer a question posed to them.

(h) Timely Investigation and Decision. Any investigation into the respondent's behavior will begin promptly and proceed in a timely manner. The complainant will receive a timely written decision following any case coordinator decision, administrative hearing, or appellate review.

**Section 2.03: Respondent Rights**

(a) Advisor. The respondent may bring an advisor with them to any meeting with the CC or any disciplinary proceeding to which they are invited. This individual may communicate nondisruptively with the respondent during such proceedings but may not speak for the respondent or otherwise directly participate. An advisor who fails to follow these instructions or behaves disruptively may be asked to leave. The university will directly communicate the case to the student.  Under no circumstances will the university directly communicate with the advisor alone. The student is responsible for updating their advisor and/or forwarding any correspondence to them.

(b) Appeal. The respondent may appeal the decision in their case to the appropriate appeal body. This process is described in Article III.

(c) Disability Accommodations. A qualifying respondent has the right to reasonable accommodations during any disciplinary process or proceeding in accordance with §1-110 of the *Student Code*.

(d) Interpreter. The respondent may also bring an interpreter with them to any meeting with a case coordinator or any disciplinary proceeding to which they are invited, provided that this individual is not also a witness in the investigation. An interpreter who behaves disruptively may be asked to leave. The use of an interpreter does not preclude the respondent's ability to have an advisor present.

(e) Notice. The respondent will receive timely written notification of the allegations against them and of any meetings or proceedings they are expected to attend. Notice is deemed given immediately when hand delivered or sent to the respondent's email address, or on the following business day when mailed.

(f) Objectivity. All disciplinary decisions will be based on an objective evaluation of evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the university's Nondiscrimination Policy.

(g) Participation. The respondent will have an opportunity to identify and present witnesses, to provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, the respondent may refuse to provide a requested statement or to answer a question posed to them.

(h) Timely Investigation and Decision. Any investigation into the respondent's behavior will begin promptly and proceed in a timely manner. The respondent will receive a timely written decision following any case coordinator decision, administrative hearing, or appellate review.

**Section 2.04: Initial Investigation**

(a) Intake and Review. Upon receipt of a report that a student may have engaged in misconduct, the Director will evaluate that report to determine whether the allegations, if substantiated, would constitute a violation of the Student Code. If not, the Director will close the case. If the report does describe a possible policy violation, the Director will assign the case to a CC, who will proceed according to subsection (b) below. If a complainant or witness provided the report directly to a CC during a scheduled appointment, the Director will typically assign the case to that CC.

(b) Charge Notice. The CC will issue a written charge notice to the respondent (to their university email address) that includes the following:

(i) A detailed description, including the date (if known) and location (if known), of the alleged incident(s);

(ii) The identity (if known) of any complainants involved in the incident(s);

(iii) The section(s) of the Student Code that the respondent has been accused of violating;

(iv) A link to these procedures or an attached copy of these procedures;

(v) Instructions for meeting with the CC (If the CC has scheduled the meeting for the respondent, the notice will include the date and time of the meeting, and the prescheduled date should be at least five business days from the date of the notice. If the CC is instructing the respondent to schedule a meeting, the notice will include instructions and a deadline for doing so. The meeting itself should occur within seven business days of the charge notice unless a conflict between the CC's availability and the respondent's academic schedule requires the meeting to be delayed further.); and

(vi)  A statement that the university prohibits retaliation, knowingly making false statements to university officials, and knowingly submitting false information to university officials.

(c)  Failure to Respond. If the respondent fails to respond to the charge notice or refuses to meet with the CC, the investigation will continue, and OSCR may apply a registration hold.

(d)  Administrative Appointment/Meeting. At the initial meeting with the respondent, the CC will summarize the allegations, explain the process, and discuss with the respondent the incident(s) under investigation, giving the respondent an opportunity to provide their perspective on the allegations. Informed by this discussion (if it occurs) and based on a reasonable evaluation of the case, the CC will determine whether the case must be decided by the CC or by the appropriate subcommittee on student conduct. The procedures for CC cases continue in §2.05. The procedures for subcommittee cases continue in §2.06.

## Section 2.05: Case Coordinator (CC) Decision Procedures

(a)  Case Coordinator Authority. With the exception of cases in which the allegations, if true, would likely result in suspension or dismissal from the university (as determined by the Director after a reasonable application of the sanctioning guidance issued by the SCSD), the CC has the authority to find facts and determine whether it is more likely than not that the respondent has violated the Student Code.

(b)  Additional Investigation with Contested Charges. If the respondent does not admit to the allegations and charges, the CC will proceed with a prompt, fair, and impartial investigation.

(i)  Written Response. If the respondent does not admit to the allegations and charges, the respondent may provide a written response to the allegations within three business days of their first meeting with the CC, unless the CC agrees to grant them additional time. The respondent should include in this response any information, including supporting documentation, they want the CC to consider and the names and contact information for any witnesses they want the CC to interview.

(ii)  Evidence Collection and Witness Interviews. After reviewing this response, the CC will attempt to interview relevant witnesses and may seek additional information, documentation, and witnesses from other sources (including any complainants).

(iii)  Updates. As appropriate, the CC will provide both the respondent (and any complainants) with periodic status updates during the investigation and any subsequent proceedings.

(iv)  Ongoing Notice. If, during an investigation, the CC decides to investigate allegations not included in the original charge notice, they will provide written notification to

the respondent (and any complainants) of the new allegations and any new sections of the Student Code that the respondent is accused of violating.

(v) Follow-up Interviews. The CC may request additional meetings with the respondent (and any complainants) to discuss any information gathered during the investigation.

(vi) Investigation Timeline. Any additional investigation will be completed promptly. The anticipated duration of an investigation that does not involve allegations of sexual misconduct is approximately 20 business days following the charge notice. The anticipated duration of a sexual misconduct investigation is approximately 40 business days following the charge notice. The actual duration of each investigation, however, may vary depending on the complexity of the investigation, the severity and extent of the allegations, the number of witnesses, the need for language assistance or accommodation of disabilities, and the possibility of interruption by break periods. If the duration of an investigation substantially exceed these estimates, the CC will notify, in writing, both the respondent and any complainants of the delay and the reason for the delay.

(vii)    Cooperation with Law Enforcement. If the incident under investigation has also been reported to the police, the CC will contact the police for any information they are willing to share and may interview officers, detectives, etc. as part of the OSCR investigation. At the request of law enforcement and so as not to interfere with active police investigations, the CC may delay interviewing specific individuals for short periods of time at the discretion of the Director. However, the OSCR and police investigations are separate processes. As such, they follow different procedures, rules, and regulations, and the outcome of one does not determine the outcome in the other.

(viii)    Failure to Participate. If the respondent fails to respond to communications from OSCR or to participate in the investigation, the CC is empowered to decide the case on the basis of the information collected. In such a situation, the CC is not required to provide the respondent with access to the investigative materials (as described in the following subsection) before deciding the case unless the respondent has requested such access in writing.

(ix) Evidence Review. Prior to deciding the case, the CC will provide the respondent and any complainants with timely and equal access to the investigative materials and give all parties an opportunity to submit a written response. In cases that do not involve allegations of sexual misconduct, the CC will set a reasonable amount of time for evidence review and response, typically between two and five business days. In cases involving allegations of sexual misconduct, the parties will have five business days to review and respond to the investigative materials. However, the CC may allow the parties additional time to review and respond based on the amount of information included in the investigative materials.

(c)  Decision. At the conclusion of the investigation or upon admission of responsibility by the respondent, the CC will apply the preponderance of the evidence standard to find

facts and to determine responsibility for any charges. If the respondent has violated the Student Code, the CC will also issue formal sanctions (other than suspension or dismissal) and educational sanctions as appropriate. The CC will communicate this decision, along with information about the appeal process, to the respondent and simultaneously to any complainants in writing (to their university email address, if possible). For any cases involving allegations of sexual misconduct, the CC will also include a rationale for the decision and for any issued sanctions.

**Section 2.06: Subcommittee Decision Procedures**

(a) Subcommittee Authority. The subcommittees have the authority to decide cases in which the allegations, if true, would likely result in the respondent's suspension or dismissal from the university (as determined by the Director after a reasonable application of the sanctioning guidance issued by the SCSD). For more information about each subcommittee, see the definitions in §2.01 above.

(b) Other University Violations

    (i) Any other University violation where due process was afforded in another process, the Director of Office for Student Conflict Resolution, in consultation with the Chair of the Senate Committee on Student Discipline has the sole discretion to hold a sanction-only hearing.

    A sanction-only hearing adopts the referred finding and supporting rationale of the original process. The hearing panel will meet with the student only to ask any remaining unresolved questions prior to entering deliberation (as defined in Section 2.06 (j)) then determine the most appropriate outcome This includes, but is not limited to:

    (1)  Academic Integrity

    (2) Research Integrity

    (3) Instances where the student accepts complete responsibility for the allegation and is only interested in addressing the panel about potential outcomes.

    (4) Policy violation involving a University High school student and/or a minor who is not enrolled in the university.

(c) Additional Investigation with Contested Charges. If the respondent does not admit to the allegations and charges, the CC will proceed with a prompt, fair, and impartial investigation.

    (i) Evidence Collection and Witness Interviews. The respondent (and any complainants) will be given the opportunity to provide supporting information and documentation and to identify witnesses. The CC will review all submitted materials and will attempt to interview all relevant witnesses. The CC may also seek additional information, documentation, and witnesses from other sources.

(ii)  Updates. As appropriate, the CC will provide both the respondent (and any complainants) with periodic status updates during the investigation and any subsequent proceedings.

(iii) Ongoing Notice. If, during an investigation, the CC decides to investigate allegations not included in the original charge notice, they will provide written notification to the respondent (and any complainants) of the new allegations and any new sections of the Student Code that the respondent is accused of violating.

(iv) Follow-up Interviews. The CC may request additional meetings with the respondent (and any complainants) to discuss any information gathered during the investigation.

(v)  Investigation Timeline. Any additional investigation will be completed promptly. The anticipated duration of an investigation that does not involve allegations of sexual misconduct is approximately 30 business days following the charge notice. The anticipated duration of a sexual misconduct investigation is approximately 40 business days following the charge notice. The actual duration of each investigation, however, may vary depending on the complexity of the investigation, the severity and extent of the allegations, the number of witnesses, the need for language assistance or accommodation of disabilities, and the possibility of interruption by break periods. If the duration of an investigation substantially exceeds these estimates, the CC will notify both the respondent and the complainant of the delay and the reason for the delay.

(vi) Cooperation with Law Enforcement. If the incident under investigation has also been reported to the police, the CC will contact the police for any information they are willing to share and may interview officers, detectives, etc. as part of the OSCR investigation. At the request of law enforcement and so as not to interfere with active police investigations, the CC may delay interviewing specific individuals for short periods of time at the discretion of the Director. However, the OSCR and police investigations are separate processes. As such, they follow different procedures, rules, and regulations, and the outcome of one does not determine the outcome in the other.

(vii)    Failure to Participate. If the respondent (or any complainant) fails to respond to communications from OSCR or to participate in the investigation, OSCR is empowered to proceed with the investigation and/or to schedule a hearing.

(viii)   Evidence Review. Prior to any hearing, the CC will provide the respondent and any complainants with timely and equal access to the investigative materials. In a typical case, the parties will have five business days to review the investigative materials, but the amount of time provided for review in any particular case is at the discretion of the CC. If new evidence becomes available during the evidence review period, the CC will determine whether the amount of time remaining is sufficient for the parties to review the new evidence or whether the evidence review period must be extended.

(ix) Administrative Closure. If, during the course of the investigation, the CC and the Director agree that no reasonable panel of decision-makers could, on the basis of the evidence available, find the respondent in violation of any of the Student Code sections identified in the allegation notice, the CC will notify the respondent (and any complainants) that the process has concluded, that all charges have been dropped, that no disciplinary action will be taken against the respondent at that time, and that the matter may be reopened if new substantial evidence is brought to the attention of OSCR from any source. In cases involving allegations of sexual misconduct, either the complainant or the respondent may request that the Title IX Coordinator ([mailto:titleixcoordinator@illinois.edu](mailto:titleixcoordinator@illinois.edu)) review OSCR's decision to conclude the investigation. If the Title IX Coordinator disagrees with OSCR's evaluation of the evidence, they may instruct OSCR staff to reopen the investigation. This decision lies in the sole discretion of the Title IX Coordinator, and the request is usually only granted in extraordinary circumstances. Other appeal options do not apply.

(d) Uncontested Charges. If the respondent admits to the allegations and charges, then the CC may offer the respondent an Expedited Case Disposition (described below). If the Expedited Case Disposition is not agreed to by all relevant parties or is not ratified by the appropriate subcommittee, then the CC may offer the respondent a Sanction-Only Hearing (described below). If the respondent does not agree to a Sanction-Only Hearing, then the CC will proceed as though the charges are contested and conduct a full investigation as described in §2.06(b).

(i) Expedited Case Disposition. If the respondent admits to the allegations and charges, the CC may offer the respondent an Expedited Case Disposition (ECD), which will include a description of the behavior, a waiver of the right to a formal hearing, a waiver of the right to appeal, specific responsibility determinations, and a set of sanctions and/or behavioral restrictions. If the respondent accepts and signs the offer, the CC will also share the offer with any complainants. If they also accept and sign the offer, the CC will present the ECD to a Panel of the appropriate subcommittee. If the Panel ratifies the ECD by simple majority vote, OSCR staff will notify the signatories, and the decision described in the ECD will be final. If the Panel does not ratify the ECD, the case will proceed according to the investigation and hearing procedures described above.

(ii) Sanction-Only Hearing: If the respondent admits to the allegations and charges, the CC may offer the option of participating in a Sanction-Only Hearing. In a Sanction-Only Hearing, the proceeding will address information pertaining to potential desired outcomes. The Chair will confirm, on the record, that the respondent is accepting responsibility. If the respondent so confirms, the Chair will proceed accordingly.

(e) Appointment of Panel. The Director will appoint a Panel composed of at least one student and at least one faculty or staff member of the appropriate committee and will designate one faculty or staff member to serve as the Chair. If the respondent is a

graduate student, the Panel will include a representative of the Graduate College as a non-voting member.

(f) Challenges to Panel Membership. The respondent (and any complainants) will be given an opportunity to challenge the objectivity of any Panel member. Such a challenge must be based on an identified bias (e.g., a prior relationship between the party and the member) or an identified conflict of interest. The Director will decide whether this opportunity is provided prior to the appointment of the Panel or during the hearing itself. If provided prior to the appointment of the Panel, the Director will consider these challenges when making a final decision regarding Panel membership. If provided during the hearing, the Chair (or the Director in the case of a challenge directed at the Chair) will determine whether to excuse the challenged Panel member from the hearing.

(g) Notice of the Hearing. OSCR staff will notify the respondent (and any complainants) by email of the date and time of the hearing and any instructions for participating in an online format at least five business days in advance. At the Director's discretion, OSCR may arrange for an in-person hearing to take place should circumstances arise.

(h) Hearing Rules

(i) The hearing will be closed to the public.

(ii) The Chair may exclude from the hearing any person who disrupts the orderly process of the hearing but will do so only after first issuing a warning. The Chair need not consider this cause to reschedule the hearing or continue the hearing on a later date.

(iii) The hearing may proceed (at the Chair's discretion) even if the respondent, any complainant, any advisor, or any witness fails to appear, provided the parties have been notified in accordance with §2.06(f).

(iv) Parties must submit all written, tangible, or documentary evidence and identify all witnesses during the investigation and no later than the conclusion of Evidence Review (see §2.06(b)(viii)), provided such information was available to the party. If written, tangible, or documentary evidence or a witness's identity that was not available to a party prior to the conclusion of Evidence Review becomes available prior to, or on the day of, the hearing, the party should immediately submit this information to OSCR staff along with a statement of rationale for why it should be considered after the deadline. The Chair will then determine whether to proceed with the hearing (giving any other party sufficient time to review the information) or send the case back to the CC for further investigation. The Panel will assign appropriate weight to testimonial evidence that is provided at the hearing but was not previously provided to the CC.

(v) Persons who have no relevant evidence regarding the facts of the case may not participate as witnesses. This includes character references or witnesses to irrelevant incidents.

(vi) Any witness who is not also serving as an advisor may only participate in the hearing while providing evidence or answering questions.

(vii) The hearing will be audio recorded by OSCR staff. In order to protect the confidentiality of the process and the privacy of individuals involved, no other participants are permitted to record the hearing. The Panel's deliberation is not recorded.

(viii) The Director or their designee will advise the Panel and may participate in questioning and deliberation, but they may not vote.

(ix) The CC may participate in questioning and deliberation, but they may not vote.

(x) No respondent or complainant will be allowed to question, or otherwise address, any other respondent, complainant, or witness directly. Instead, when provided for by the hearing procedures, they may suggest questions to be posed by the Chair. The Chair may choose not to ask a question if it has already been answered, is irrelevant, or is inappropriate. The Chair may also reword a relevant question that is asked in a manner that, in the Chair's opinion, is confusing or is intended to disparage, intimidate, or otherwise harass the individual being questioned.

(xi) The Chair will identify at least one break of no fewer than ten minutes for every two hours of the hearing. The respondent and any participating complainant may also request additional breaks as needed, provided the number of requests is not disruptive to the orderly conduct of the hearing. The Chair will decide whether to grant any such requests.

(xii) The Chair may set a reasonable time frame for the hearing and reasonable time limits for each step of the hearing but may allow deviations, provided such allowances are fair and equitable. After consultation with the other Panel members, the Chair may also decide to continue the hearing to another day for good cause. Acceptable reasons include, but are not limited to, the need for additional investigation, the need to seek additional witness testimony, or the inability to complete all required steps of the hearing process within a reasonable time frame. All parties must be notified of the date, time, and location at least five business days in advance, but prior notification of possible continuance dates will satisfy this requirement.

(xiii) The Director may schedule a single hearing for multiple respondents when the allegations against those respondents arise out of the same facts or circumstances. Any Phase Two proceedings in such a hearing, however, would be conducted individually for each respondent.

(xiv) At the Chair's discretion, an employee of the Office of the Dean of Students may attend the hearing and the deliberation to provide administrative support to the Panel. This person will not participate in questioning or offer any opinions during deliberation.

(xv) The Chair may set additional rules for the hearing as needed, if none conflicts with any provision of this Article.

(i) Hearing Procedures: Fact Finding

    (i) Under the direction of the Chair, all Panel members and participants will introduce themselves by name and role.

    (ii) The Chair will briefly describe the order of the hearing.

    (iii) The Chair will invite the CC to make a statement (if they choose) regarding the investigation, and Panel members may question the CC. The respondent and any participating complainants will then have an opportunity to suggest questions for the CC.

    (iv) The Chair will invite each participating complainant (if applicable) to make an opening statement regarding the allegations. These statements should last no longer than ten minutes unless the Chair approves a greater duration. The Panel members will then question the complainant, after which the respondent will have an opportunity to suggest questions to be posed to the complainant.

    (v) The Chair will invite the respondent to make an opening statement regarding the allegations. This statement should last no longer than ten minutes unless the Chair approves a greater duration. The Panel members will then question the respondent, after which the complainant will have an opportunity to suggest questions to be posed to the respondent.

    (vi) The Chair will invite each participating witness into the hearing, one at a time, to answer questions from Panel members. For each witness, both the respondent and any participating complainants will have an opportunity to suggest questions to be posed by the Chair.

    (vii) Panel members will have a final opportunity to question any participating complainants, the respondent, and the CC regarding the allegations.

    (viii) If applicable, participating complainants will be given a final opportunity to suggest questions to be posed to the respondent, and the respondent will be given a final opportunity to suggest questions to be posed to participating complainants.

    (ix) The Chair will invite any participating complainant to make a closing statement regarding the allegations. This statement should last no longer than ten minutes.

    (x) The Chair will invite the respondent to make a closing statement regarding the allegations. This statement should last no longer than ten minutes.

    (xi) The Chair will excuse the respondent, any participating complainants, and the investigating CC from the hearing, and the Panel will enter closed deliberation to find facts and determine responsibility. The Panel will make its decisions by simple majority vote and will apply the preponderance standard.

(j) Hearing Procedures - Deliberation

(i)  If the respondent(s) is found not responsible, the deliberation is complete.

(ii)  If a responsibility finding is made, the Director or designee will provide any written statement of desired outcome, character statements, or impact statements. If a student has disciplinary history that was not deemed relevant to the allegations, that will also be shared after a responsibility finding is made. The Panel will determine an appropriate formal sanction (see §2.10(b) of the Student Disciplinary Procedures) for the respondent. The Panel may also issue educational sanctions and apply additional conditions or restrictions set forth in §2.10(c) of the Student Disciplinary Procedures.

(k)  Notice of Action Taken. OSCR staff will communicate the Panel's decision, along with information about the appeal process, to the respondent and simultaneously to any complainants in writing (to their university email address, if possible). For any cases involving allegations of sexual misconduct, this communication will also include a rationale for the decision and for any issued sanctions.

## Section 2.07: Privacy

(a)  Any proceeding, meeting, or hearing held as part of the process described in this appendix will protect the privacy of the participating parties and witnesses in accordance with applicable law.

(b)  The university will not disclose the identity of the respondent, any complainants, or any witnesses except as necessary to implement supportive measures and accommodations, investigate the allegations, conduct any hearing or judicial proceeding, or when provided by state or federal law.

## Section 2.08: Conflicts of Interest and Bias

(a)  Any OSCR staff member, CC, Panel member, or SCSD member who has a conflict of interest with respect to a specific case must recuse themselves from any role in that case.

(b)  Any OSCR staff member, CC, Panel member, or SCSD member who has a bias for or against the respondent or complainant or for or against complainants or respondents generally must recuse themselves from any role in that case.

## Section 2.09: Complaints against CCs

(a)  Any respondent or complainant who believes that a CC assigned to their case has a conflict of interest with respect to the case or that they have acted inappropriately or demonstrated bias at any point during the process described in this document should

report this immediately to the Director (contact information for whom is available on the OSCR website).

(b) Any respondent or complainant who has a complaint about the Director should report their concerns to the Dean of Students (contact information for whom is available on the Office of the Dean of Students website). In some cases, the Dean of Students may refer the complaining party to the Title IX Coordinator.


**Section 2.10: Actions Possible in Individual Student Discipline Cases**

(a) When determining whether a respondent has violated a university policy, CCs and Panels have the following options:

(i) **Finding of No Violation**. This action can occur at any stage of the procedure. If a finding of no violation occurs, the student has no disciplinary history. This information will not be considered in future proceedings.

(ii) **Charge(s) Dropped**. This action shall be taken when the CC or the Panel determines that the student cannot be found in violation of the university's regulations governing student conduct. The behavior may have been unrelated to the rules of conduct, or evidence may be unobtainable or insufficient, etc. A dropped charge may be reinstated at the discretion of the Director if substantial new information should become available. If a charge is reinstated, the respondent will be sent a charge notice. If a charge is dropped, the student will have no disciplinary history related to it.

(iii) **Finding of Violation**. This action occurs when the disciplinary body has established that a policy of the *Student Code* has been violated based on a preponderance of the evidence.

(b) Formal Sanction Options:

(i) **University Reprimand**. A University Reprimand indicates that the student's behavior is inappropriate for a member of the academic community.  A University Reprimand is a reportable entry in the student's disciplinary record for one year and would serve as a basis for further sanctioning should subsequent violations occur during that period.  A University Reprimand will not appear on the academic transcript.

(ii) **University Censure**. A University Censure is an official communication that a student's behavior is inappropriate for a member of the academic community.  A University Censure is a reportable entry in the student's disciplinary record until the student graduates and would serve as a basis for further sanctioning should subsequent violations occur during that period. A University Censure will not appear on the academic transcript.

(iii) **Conduct Probation**. Conduct Probation is a strong communication that a student is no longer in good disciplinary standing with the academic community, and that, if the student fails to comply with any assigned sanctions or otherwise violates the

Student Code while on probation, they should expect to be suspended or dismissed from the university. Cases resulting in Conduct Probation are reported to the Dean of the student's college and remain a reportable entry in the student's disciplinary record for seven years. Conduct Probation will not appear on the academic transcript and shall be terminated automatically upon graduation.

(iv) **Suspension**. Suspension shall be imposed upon a student when the appropriate subcommittee of the SCSD determines that the student's relationship with the university must be suspended from the university for a definite period of time. While suspended, a student may not enroll in, or attend, any courses at the university and may not be awarded a degree from the university. Although a suspended student is not required to petition a subcommittee for permission to return, it is the responsibility of the student to communicate with their college prior to returning and to follow any applicable academic procedures. A copy of the suspension notice will be forwarded to the Dean of the student's college and to the Recorder for a notation on the transcript. Suspension records are maintained indefinitely, but the suspension transcript notation is removed after the period of suspension has expired. At the end of a suspension period, the student is placed on Conduct Probation until graduation, unless mitigating circumstances warrant a different sanction.

(v) **Dismissal**. Dismissal shall be imposed upon a student when the appropriate subcommittee or the SCSD determines that the student's relationship with the university must be terminated. While dismissed, a student may not enroll in, or attend, any courses at the university and may not be awarded a degree from the university. After a specified period, the dismissed student may petition the appropriate subcommittee for permission to pursue readmission to the university (or, if applicable, the release of their degree). A copy of the dismissal notice will be forwarded to the Dean of the student's college and to the Recorder for a notation on the transcript. Dismissal records are maintained indefinitely, but the dismissal transcript notation is removed once the student successfully petitions. A successful petition before the subcommittee does not abrogate the right of any dean or director to deny readmission based on scholarship. When the student is readmitted to the university, the student is placed on Conduct Probation until graduation, unless mitigating circumstances warrant a different sanction.

(vi) **Dismissal Held in Abeyance**. In rare cases, the SCSD or the appropriate subcommittee may determine that, while dismissal would be a justifiable formal sanction for the respondent, strong mitigating circumstances warrant holding the dismissal in abeyance for a defined period. During this period, the student may continue their enrollment provided they complete any educational sanctions on time, comply with any behavioral restrictions, and avoid any further violations of the *Student Code*. If, following a determination by a university case coordinator that the student has not completed an educational sanction on time or has not complied with a behavioral restriction, the student will be dismissed immediately with the ability to petition during the following Fall or Spring semester and with petitioning

requirements set by the Office for Student Conflict Resolution. If, following a determination by the appropriate subcommittee that the student has otherwise violated the *Student Code*, the subcommittee will dismiss the student for at least the current semester and the following semester and will impose petitioning requirements as appropriate. The student may appeal any imposed dismissal to the SCSD in accordance with § 3.03. Cases resulting in Dismissal Held in Abeyance are reported to the Dean of the student's college and, if the student is not actually dismissed, remain a reportable entry in the student's disciplinary record for seven years.

(c)  Other Sanctions or Restrictions

    (i)  **Educational Sanctions**. Educational sanctions are assignments, requirements, or tasks that the CC or Panel determine are warranted by their findings. They include, but are not limited to, community service, educational programs (including programs on substance use or violence prevention), research and reflective essays, presentations, restitution, and letters of apology.

    (ii)  **Behavioral Restrictions**. The student is restricted from certain activities on campus (e.g. participation in certain registered student organizations, intramural or varsity athletics; contact with specific people or physical locations; or other restrictions deemed just and appropriate).

    (iii)  **Deferral of the Degree**. The SCSD, Panel, or the Director may withhold the conferral of the degree until the disciplinary action has been resolved.

    (iv)  **Revocation of a Degree**.  A degree awarded by the institution may be revoked for fraud, misrepresentation, or other violation of the university standards in obtaining a degree, or for other serious violations committed by a student prior to graduation.

(d)  The SCSD may authorize any other sanctions it deems to be just and appropriate.

**Article III. APPEALS**

**Section 3.01: In General**

(a) **Jurisdiction**. The Director accepts appeals of all final CC disciplinary actions. If the Director has a conflict of interest with respect to an appellant, the appeal will instead be decided by the SCSD in accordance with §3.03.

Pursuant to the University Statutes, the SCSD accepts appeals of all final disciplinary actions of its subcommittees on student conduct.

(a) **Grounds for Appeal**. The appellant must base the appeal exclusively on one or more of the following grounds:

(i) Procedural irregularity that affected the outcome of the matter.

(ii) New evidence that was not reasonably available at the time the determination regarding responsibility was made, that could affect the outcome of the matter.

(iii) The CC or Panel members had a conflict of interest or bias that affected the outcome of the matter.

(iv) Any sanctions imposed by the CC or Panel were not appropriate for the violation(s) for which the respondent was found responsible.

**Section 3.02: Appeals to the Director**

(a) **Right to Appeal**. The respondent and any complainants have the right to appeal a final CC disciplinary action to the Director.

(b) **Notice of Appeal**. The appellant must submit a Notice of Appeal and all supporting documentation to the Office for Student Conflict Resolution within five business days of the date of notice of the CC's decision.

(c) **Content of Notice of Appeal**.  The Notice of Appeal must contain at least the following: (1) specific grounds for appeal; (2) specific outcome requested; and (3) the appellant's reasons in support of the grounds identified and outcome requested. The appellant must submit the Notice of Appeal in writing, and the appellant must either sign the Notice of Appeal or submit it by email to OSCR from their university email address (if applicable). Oral appeals are not accepted. In cases involving allegations of sexual misconduct, if only one party submits a Notice of Appeal, OSCR will notify the other party of the submission and grant the other party access to all submitted documentation. The other party will have five business days from the date of notification to submit a written response to be considered as part of the appeal. If both parties submit a Notice of Appeal, both parties will be informed, granted access to all submitted documentation, and given five business days to submit a written response.

(d) **Sanctions Held in Abeyance Pending Appeal**. Any formal or educational sanctions imposed will be held in abeyance automatically during the period in which the appeal

may be filed and, once an appeal is filed, until the Director reaches a decision on the appeal. Behavioral restrictions such as no contact directives, however, remain in place pending the appeal.

(e) **Appellate Review**. The Director may, but is not required to, conduct interviews with parties involved in the matter.

(f) **Authority of Director**.  If one (or more) of the grounds for appeal has been met, the Director may:

   (i)  Affirm the decision.

   (ii)  Modify the decision.

   (iii) Remand the case to the original CC (with instruction) or a new CC (with or without instruction) for a new decision.

   (iv) Modify any sanctions or restrictions imposed.

(g) **Finality of the Appeal Decision**. The decision of the Director is final and binding on all parties.

(h) **Notice and Record of Decision**. The Director will provide simultaneous email notification of the decision to the respondent and any complainants. In cases involving allegations of sexual misconduct, the Director will also provide a rationale for the decision.


## Section 3.03: Appeals to the SCSD

(a) **Right to Appeal**. The respondent and any complainants have the right to appeal a final Panel disciplinary action to the SCSD. The Dean of Students may also appeal a decision if they believe it was manifestly unfair to the university community.

(b) **Notice of Appeal**. The appellant must submit a Notice of Appeal and all supporting documentation to the Office for Student Conflict Resolution within five business days of the date of notice of the Panel's decision.

(c) **Content of Notice of Appeal**.  The Notice of Appeal must contain at least the following: (1) specific grounds for appeal; (2) specific outcome requested; and (3) the appellant's reasons in support of the grounds identified and outcome requested. The appellant must submit the Notice of Appeal in writing, and the appellant must either sign the Notice of Appeal or submit it by email to OSCR from their university email address (if applicable). Oral appeals are not accepted. In cases involving allegations of sexual misconduct, if only one party submits a Notice of Appeal, OSCR will notify the other party of the submission and grant the other party access to all submitted documentation. The other party will have five business days from the date of notification to submit a written response to be considered as part of the appeal. If both parties submit a Notice of Appeal, both parties will be informed, granted access to all submitted documentation, and given five business days to submit a written response.

(d) **Sanctions Held in Abeyance Pending Appeal**. Any formal or educational sanctions imposed will be held in abeyance automatically during the period in which the appeal may be filed and, once an appeal is filed, until the SCSD reaches a decision on the appeal. Behavioral restrictions such as no contact directives, however, remain in place pending the appeal.

(e) **Appellate Review**.

(i) The Chair of the SCSD or their designee will identify at least three SCSD members, of which one must be a faculty member and one must be a student, to consider appeals within the SCSD's jurisdiction. These individuals will constitute the Appeal Committee. Before the membership of this Appeal Committee is finalized, OSCR will provide the respondent (and any complainants) with a list of all members of the SCSD. At this point, the parties may challenge the objectivity of any person on this list. Such a challenge must be based on an identified bias (e.g., a prior relationship between the party and the member) or an identified conflict of interest. The Chair of the SCSD or their designee will consider these challenges when making a final decision regarding Appeal Committee membership. If the Chair of the SCSD does not serve on the Appeal Committee, they or their designee will select a faculty member to chair the Appeal Committee.

(ii) The Appeal Committee will review all materials that were provided to the Panel, the recording of the hearing, the Notice(s) of Appeal, any documentation provided in support of the Notice(s) of Appeal, and any responses to the Notice(s) of Appeal.

(iii) The Appeal Committee will meet to consider the appeal and will be advised by an OSCR staff member who did not serve as the CC; this OSCR staff member will not be allowed to vote. If the Chair of the SCSD or their designee determines that the Appeal Committee must question the CC, the Chair (or a member) of the Panel responsible for the original decision, the respondent, or any complainants to reach a decision, they will invite all of these individuals to participate in the meeting, which will be closed to the public.

(f) **Deliberations**. The Appeal Committee will deliberate in closed session and will decide by simple majority vote whether the appellant has met any of the grounds for appeal. Absent a majority to the contrary, the original decision shall be affirmed.

(g) **Authority of SCSD/subcommittee**. If one (or more) of the grounds for appeal has been met, the Appeal Committee may:

(i) Affirm the decision.

(ii) Modify the decision.

(iii) Remand the case to the original hearing body (with instruction) or a new hearing body (with or without instruction) for a new decision.

(iv) Modify any sanctions or restrictions imposed.

(h) **Finality of the Appeal Decision**. The decision of the Appeal Committee is final and binding on all parties.

(i) **Notice and Record of Decision**. OSCR staff will provide simultaneous email notification of the decision to the respondent and any complainants. In cases involving allegations of sexual misconduct, the notification will also include the Appeal Committee's rationale for their decision.

## Article IV. MISCELLANEOUS

### Section 4.01: Subcommittee Member Selection and Removal

(a) **Goal**.  In order to staff the graduate and undergraduate disciplinary subcommittees, students, staff, and faculty are encouraged to apply for this opportunity.  Information is sent to the Registered Student Organization office, department heads within Student Affairs and various campus offices requesting that they encourage interested students to serve.  The membership of the subcommittees should strive to be representative of the diverse make-up of the university community.  The Board of Fraternity Affairs, Board of Sorority Affairs, Veterinary Medicine and Law School subcommittee selection processes are noted in the appendices of this document.

(b) **Minimum qualifications of student members**.  Minimum qualifications of student members are:

(i) A student enrolled full-time at the UIUC campus.

(ii) Approximately two full semesters are still required for the degree.

(iii) Good academic standing with at least a 2.5 grade point average.

(iv) Note:  The selection committee may consider information about applicants currently subject to any disciplinary sanction or pending disciplinary action.

(c) **Minimum qualifications of faculty members**.  Minimum qualifications of faculty members are:

(i) A faculty member with a faculty appointment.

(ii) Primary appointment to the UIUC campus.

(iii) Demonstrated experience teaching, advising, and/or developing students.

(d) **Minimum qualifications of staff members**.  Minimum qualifications of staff members are:

(i) A staff member with an academic professional or civil service appointment at the UIUC campus.

(ii) Demonstrated experience working with students.

(iii) At least one year on the UIUC campus.

(e) **Solicitation Process**.  A Search Committee will be appointed by the Senate Committee on Student Discipline generally no later than the first week of class of the Spring Semester.  It will consist of the Chair of the Senate Committee on Student Discipline, or their designee, as Chair of the Search Committee, one faculty member and one undergraduate student member of the Senate Committee on Student Discipline, and one faculty member and one undergraduate student member of the subcommittee on Undergraduate Student Conduct.

(f) **Appointment**.  The Search Committee will submit a slate of nominees to the Senate Committee on Student Discipline generally no later than May 1.  The Senate Committee on Student Discipline shall appoint the members of its subcommittee(s) on Student Conduct.  Appointments will be effective on the first day of classes of the succeeding fall semester.  The appointment term is for one (1) year.  Appointment for an additional term may occur upon recommendation by the Senate Committee on Student Discipline.

(g) **Emergency Appointments**.  Emergency, one-time appointments to a subcommittee may be made by the Executive Director if that appointee has been previously trained on the disciplinary procedures.

(h) **Interim Appointments**.  Interim appointments beyond one week shall be appointed by the Senate Committee on Student Discipline and must be appropriately trained on the disciplinary procedures before engaging in the process.

(i) **Chair**.  The subcommittee Chair must be a member of the faculty or staff.

(j) **Removal**.  A subcommittee member may voluntarily terminate their appointment at any time.  A member may be involuntarily removed from service for cause.  Examples of removal for cause are:

    (i)  Failure to attend two (2) hearings without prior notice;

    (ii)  Breach of confidence;

    (iii) Poor performance;

    (iv) Disruptive behavior; or

    (v)  Acting in a manner that is not in the best interest of the university.

(k) **Removal Process**.  Requests to involuntarily remove a member for cause shall be brought to the attention of the Executive Director.  The Executive Director shall submit valid requests for removal to the Chair of the SCSD.  The SCSD shall have ultimate authority to consider or refuse to consider a request for removal.

**Section 4.02: Student Petitions**

(a) **Petitions to the Appropriate Subcommittee on Student Conduct**

    (i)  Persons who have been dismissed from the university for disciplinary reasons may petition for permission to re-enter the university.

    (ii)  A petitioner is not a member of the university community.  Petitioners must demonstrate that they are fit to return to the academic community, not simply that they have completed all listed sanctions in the dismissal letter.

    (iii) For a petition to be considered:

        (1)  The petition must be filed before November 1 for fall petition requests and before March 15 for spring petitions;

(2)  The petitioner must provide documentation that all educational requirements and conditions have been fully and completely satisfied.

(iv) This petition should minimally include:

(1)  A description of the incident(s) for which the sanction was assigned and the responsibility the student had in the violation.

(2)  A description of the behavioral changes the petitioner has made since the incident(s) and completion of the sanction(s).

(3)  The petitioner's anticipated graduation date and the career and/or additional education plans they have following graduation.

(v)  The petitioner will be invited to address the appropriate subcommittee to discuss the petition in a statement of ten or fewer minutes in duration.  The petitioner may invite an advisor to the petition, but this advisor may not actively participate in the petition hearing.

(vi) If (1) the final decision in the case for which the petitioner was dismissed included a finding that the petitioner caused bodily harm to a student victim or otherwise engaged in sexual misconduct directed at a student victim, and (2) the victim indicated to OSCR staff at the time of the original decision that they would like to participate in any future petition hearings (or later indicated to OSCR staff that they would like to participate in any future petition hearings), then the victim will be invited (by email) to participate in the petition hearing. If the victim chooses to participate, they may submit a written statement or present an oral statement of ten or fewer minutes in duration to the subcommittee prior to the petitioner's statement. Neither the petitioner nor the victim will be present while the other is addressing the subcommittee.

(vii)     A university case coordinator will participate as an advisor to the subcommittee during the petition hearing but may not vote. If the case coordinator originally assigned to the case for which the petitioner was dismissed is available and if, in the judgment of the Director, this individual's participation would not interfere with the operations of the Office for Student Conflict Resolution, then this individual will serve as the subcommittee's advisor.

(viii)    Petitions to the subcommittee may not be appealed by the petitioner and are therefore not audio recorded.  However, the Dean of Students may appeal a petition decision that is manifestly unfair to the university or the petitioner.

(ix) The decision of the Subcommittee will be made by a simple majority vote of members present, including the Chair. In the event of a tie vote, the petition will be denied.

(x)  The subcommittee may:

(1)  Deny the petition and assign a new date and new requirements for the next consideration of the petition;

(2) Grant the petition and allow the petitioner to pursue the readmission process for a specified Fall or Spring semester. Petitioners will not be allowed to register for Summer or Winter courses that are offered prior to the specified Fall or Spring semester.

(xi) Student petitioners granted permission to pursue readmission are assigned the formal sanction of Conduct Probation until Graduation. A subcommittee may assign a lesser formal sanction if strong mitigating factors warrant such action.

(xii) The subcommittee's decision to grant the petitioner the right to pursue the readmission process does not abrogate the right of any college to deny readmission on the basis of scholarship.

### Section 4.03: Procedures in Cases of Interim Suspension by the Chancellor

(a) **In General**.  The Chancellor's power of interim suspension exists independently of the jurisdiction of the Senate Committee on Student Discipline.  The Chancellor will develop and implement procedures to assure both effective disposition and due process.  Should the Chancellor choose to refer the matter, the Senate Committee on Student Discipline will conduct a preliminary hearing to assure that the interim suspension pending a formal hearing remains necessary.

(b) **Procedures for the Preliminary Hearing**.

(i) A special subcommittee of the Senate Committee on Student Discipline shall be appointed by the Chair of the SCSD to conduct a preliminary hearing.  The special subcommittee shall review the circumstances of the suspension within 24 hours of referral of the matter.  The preliminary hearing may be held later upon request of the Administration or of the respondent(s) if good cause is shown, or upon the initiative of the subcommittee if it appears that a hearing could not reasonably be conducted within this time period.

(ii) The special subcommittee shall be composed of three members of the Senate Committee on Student Discipline who shall be two faculty members and one student.  The Executive Director shall be an ex-officio member.

(iii) The Preliminary Hearing shall be limited to the question of whether continuation of the suspension is necessary to avoid an obvious danger to the university community.

(iv) The Chancellor or designee shall present to the special subcommittee information relating to (a) the reason(s) for invoking suspension; (b) the reason(s) for seeking continuation of the suspension; (c) the prior disciplinary record of the respondent; (d) and any other information considered by the Chancellor in making their decision.

(v) The respondent(s) shall be invited to attend the Preliminary Hearing of the subcommittee and shall be permitted to present information relating to the incident, their background, and academic record which may be relevant to the subcommittee's decision.

(vi) Depending upon the class status of the respondent(s), the Dean of Students for undergraduate students, the Dean of the College of Law for law students, the Dean of the College of Veterinary Medicine for veterinary medicine students, or the Dean of the Graduate College for graduate students, or their respective delegates, may be invited to participate in the Preliminary Hearing.

(vii)   Respondent(s) shall be permitted to invite an advisor to the Preliminary Hearing, but this advisor may not actively participate in the process.

(viii)   The subcommittee shall meet in executive session and may (a) continue the suspension, (b) remove the suspension, or (c) remove the suspension upon condition(s).

(ix) If the suspension is continued, the matter shall be referred directly to the appropriate subcommittee on student conduct or to an appointed CC for consideration as a matter of immediate priority.  If removed, the matter will be referred directly to the appropriate subcommittee on student conduct or to an appointed CC for consideration in due course.

(x) If the interim suspension is removed or ultimately the student is allowed to resume classes after a full hearing, the Chancellor's office shall communicate with the respondent's course instructors to facilitate make-up exams and assignments.

(xi) The interim suspension shall not be reflected on the respondent's transcript.

(xii) If the final hearing decision is appealed to SCSD, the three members of the special subcommittee may not be present at the appeal.

(xiii)   The respondent may waive their right to a preliminary hearing, in which case the matter will be referred to the appropriate subcommittee on student conduct.


**Section 4.04: Criminal/Disciplinary History Review Committee**

Consistent with university and system policies and procedures, the multidisciplinary Criminal/Disciplinary History Review Committee, which is chaired by the Director, reviews criminal and disciplinary history disclosures from undergraduate and graduate applicants to the university. The Senate Committee on Student Discipline authorizes this review committee to issue formal and educational sanctions (see §2.04) to students who accept admission but who have disclosed incidents that are concerning to the review committee. Disciplinary officers and the subcommittees on student conduct may consider any such sanction an aggravating factor if the student is subsequently found to have violated university policy while subject to the Student Code.


**Section 4.05: Access to Records and Record Retention**

(a) **Access**. Respondents and complainants are permitted to view disciplinary records and files.  Hard copies will not be provided unless a failure to provide copies would prevent an eligible party from accessing the necessary information.

(b) **Record Retention and Release**. Disciplinary records will be retained for a minimum of seven years. Disciplinary records are subject to release according to the retention policies dictated by the controlling formal sanction as outlined in §2.10 above. For students who have been sanctioned for more than one case, the most serious formal sanction is the controlling one. For students who have been issued their most serious formal sanction on more than one occasion, the most recent one is controlling.

## Section 4.06: No Contact Directives

(a) **Authority.** University case coordinators are among those responsible for the enforcement of student behavioral standards and, when possible, the prevention of violations of the *Student Code*. In addition, students are expected to comply with the reasonable directions of university officials acting in the performance of their duties. For these reasons, the Senate Committee on Student Discipline recognizes the right of case coordinators to direct an individual subject to student discipline, as described in §1-301(c) of the *Student Code*, to have no contact with one or more other persons.

(b) **Expectations of Recipients.** A university No Contact Directive prohibits all contact between the identified parties ("Contact" includes physical contact with the other party as well as written, verbal, electronic, and third-party communications to them. Contact does not include an exercise of the right to free speech, freedom of the press, or right to assembly that is otherwise lawful. Contact does not include inadvertent contact or merely being in the physical presence of the other party in a public location but does include intentional conduct directed at the other party that a reasonable person under the circumstances would conclude is intended to intimidate or harass, whether such conduct occurs in public or in private.

(c) **Violations.** If a No Contact Directive recipient fails to comply with the directive, they will face disciplinary action for violating §1-302(g) of the Student Code. The Senate Committee on Student Discipline recommends dismissal from the university in such cases. Please note that students who request No Contact Directives against other students thereby agree to be held to the same stipulations and will also face disciplinary action for initiating contact with the other party.

(d) **Procedures.**

(i) **Notice.** If, based upon a report received or a direct request from a member of the university community, a case coordinator believes that a No Contact Directive is warranted, the case coordinator will notify all recipients in writing, typically by email. The directive will be effective when the notification is sent and will last until further notice if no end date is specified. The University of Illinois Police Department is also notified of all No Contact Directives for informational purposes only.

(ii) **Meeting.** The issuing case coordinator will attempt to meet with all recipients. At this meeting, the case coordinator will explain their expectations in detail as well as the consequences for noncompliance. The recipient will also be given an opportunity to explain to the issuing case coordinator why the No Contact Directive should not be continued.

(iii) **Modifications.** If the issuing case coordinator decides that modifications or exceptions to the No Contact Directive are necessary, they will communicate these changes to all parties in writing, typically by email.

(iv) **Rescission.** A No Contact Directive may only be rescinded by the issuing case coordinator, the issuing case coordinator's supervisor, the Director, or, if the directive has been issued as part of an investigation, by the hearing body responsible for deciding the case.

(e) **Status of Record.** Unless issued as a sanction in a disciplinary case, a No Contact Directive does not, on its own, constitute a disciplinary finding against the student and is not part of the student's official disciplinary record. As such, it would not be reported as part of a routine disciplinary background check. A No Contact Directive issued as a sanction in a disciplinary case is subject to release according to the retention policies dictated by the controlling formal sanction as outlined in §2.10 above.


**Section 4.07: Informal Resolution Options**

(a) **Informal Resolution Meeting Process.**

(i) Once a report of alleged misconduct is received by the Office for Student Conflict Resolution, the Director will evaluate whether the resulting case should be handled through the Informal Resolution Meeting Process (IRMP). The Director will apply the following principles when conducting this evaluation:

(1) If the report includes allegations of violence and/or sexual misconduct, the case is not appropriate for the IRMP.
(2) If the report includes allegations of misconduct directed at another student, the case is not appropriate for the IRMP.
(3) If the report includes allegations of noncompliance with emergency directives (including those associated with public health emergencies), directives from the Behavioral Intervention Team or any other university entity tasked with threat assessment and management, or any other directives intended to protect the university community or any individual member thereof, the case is not appropriate for the IRMP.
(4) If the report includes allegations that, either on their own or in combination with the student's disciplinary history, would render the student subject to suspension or dismissal, the case is not appropriate for the IRMP.
(5) If the student subject of the report has no disciplinary history (and has not participated in the IRMP before) and none of the above rules exclude the case

from consideration for the IRMP, then the case should strongly be considered for the IRMP.

(6) If the student subject of the report has some disciplinary history (or has participated in the IRMP before) and none of the above rules exclude the case from consideration, then the Director may still determine that the case is appropriate for the IRMP, but only after carefully assessing the nature of both the past incidents and the new report.

(ii) If the Director determines that a case is appropriate for the IRMP, then:

(1) The Director will assign the case to a Case Coordinator (CC).

(2) The CC will send a notice to the student informing them that (a) a report has been received; (b) no formal investigation has been opened or formal accusation has been made; (c) the student is required to meet with the CC and engage in the conversation; (d) if the student cooperates, the case will be closed without disciplinary action; (e) if the student does not cooperate, the case will be charged and investigated under Article II of the Student Disciplinary Procedures.

(3) The CC will meet with the student and broadly discuss the report and the student's experiences.

(4) Based on the meeting, the CC may refer the student to other campus or community resources, but the student will not be required to follow through.

(5) The CC will retain a record of the meeting and any referrals, but the record will not be considered part of the student's official disciplinary record.

**(b) Sexual Misconduct Informal Resolution Process**.

(i) Applicability. At the discretion of the Director and in accordance with the rules in subsection (ii) below, the Sexual Misconduct Informal Resolution Process (SMIRP) may be used to resolve any case involving allegations of sexual misconduct, including Title IX Sexual Harassment, and of retaliation (as defined in the Sexual Misconduct Policy).

(ii) Rules.

(1) Participation in SMIRP is voluntary.

(2) SMIRP may be initiated at any time prior to the formal hearing (or, if applicable, prior to the case coordinator's decision regarding responsibility).

(3) Any party may withdraw from SMIRP at any time prior to conclusion of the process and continue with the applicable formal procedures for investigation and adjudication.

(4) In cases involving allegations of Title IX Sexual Harassment, SMIRP may not be initiated until a formal complaint has received by OSCR.

(5) SMIRP may not be used to resolve a case in which a university employee is alleged to have engaged in Title IX Sexual Harassment against a student complainant.

(iii) Procedures.

(1) To initiate SMIRP, a respondent or complainant must submit their request, in writing, to their assigned case coordinator (or investigator).

(2) The Director, in consultation with the Title IX Coordinator, will evaluate the case to determine if SMIRP is appropriate. If SMIRP is not appropriate, OSCR staff will notify the requestor in writing. If SMIRP is appropriate, OSCR staff will notify the other parties to the case that SMIRP has been requested and will include in this notice information regarding the rules and procedures of SMIRP. Among the factors the Director may consider when determining whether SMIRP is appropriate are the following: the nature and severity of the alleged behavior, the results of a violence risk analysis, the respondent's disciplinary history, and any power dynamics between the parties.

(3) SMIRP will be initiated only if both the complainant and the respondent consent, in writing, to participate.

(4) Once initiated, the assigned facilitator will meet with the parties to understand their desires regarding process and resolution and to discuss next steps.

(5) The facilitator will then work with the parties to draft a resolution agreement. Once signed by the parties, this agreement will be reviewed by the Director in consultation with the Title IX Coordinator. If the Director determines that the agreement is reasonably enforceable and in the interest of the university, the Director will sign the agreement, at which point it will become final and binding.

(6) Once a resolution agreement is finalized, the formal complaint is thereby resolved and may not be refiled unless the Director determines that the respondent has failed to abide by the terms of the agreement. Additionally, the failure by any party to abide by the terms of the final resolution agreement may result in disciplinary action.

(7) If the parties are not able to reach an agreement within a reasonable amount of time (as determined by the Director) or the Director determines that the agreement is not both reasonably enforceable and in the interest of the university, SMIRP will conclude without resolution, and the formal process for investigation and adjudication will continue.

(iv) Records. The Office for Student Conflict Resolution will maintain SMIRP records for a period of no fewer than seven years.

**APPENDIX A**

**SELECTION AND QUORUM REQUIREMENTS FOR VETERINARY MEDICINE STUDENT
SUBCOMMITTEES**

I. **Subcommittee on Student Conduct for Veterinary Medicine Students**

   A. **Procedures**.  Unless otherwise noted in this appendix, the procedures of the
   subcommittee on Student Conduct for Veterinary Students will be substantially similar
   to those outlined elsewhere in this document.

   B. **Member Selection**.

   1. The subcommittee shall consist of three faculty members representing each
   academic department and four student members represent each Veterinary
   Medicine class.

   2. Faculty members of the subcommittee shall be nominated by the College of
   Veterinary Medicine (CVM) Committee on Committees for approval by the CVM
   faculty for two-year staggered terms.  The Chairperson of the subcommittee shall
   also be nominated, designated, and approved in this process.

   3. Student members of the subcommittee shall be nominated by the Dean.  The
   student members shall not be members of the Ethics Committee of the Illinois
   Student Chapter of the American Veterinary Medical Association (ISCAVMA)

   4. The Chairperson of the Ethics Committee, the faculty advisors of the ISCAVMA, and
   the Associate Dean for Academic and Student Affairs shall be ex-officio non-voting
   members.

   5. The Dean shall annually recommend the approved faculty members and nominated
   student members for appointment by the SCSD no later than May 1.

   C. **Quorum Requirements**.

   1. Quorum for original jurisdiction hearings and appeal hearings of the subcommittee
   shall be no less than four (4) members. The hearing committee must consist of at
   least one (1) faculty member and (1) student. The chair will count towards quorum.

**APPENDIX B**

**REGISTERED STUDENT ORGANIZATION (RSO) CONDUCT**

I.  **Procedures for Responding to Allegations Against an RSO**

A.  **Intake and Review**. Upon receipt of a report that an RSO may have engaged in misconduct, the Director of the Office for Student Conflict Resolution (OSCR), or their designee, will evaluate that report to determine whether the allegations, if substantiated, would constitute a violation of University policy. If not, the Director will close the case but may share the content of the report with other staff and/or units as appropriate. If the report does describe a possible policy violation, the Director will then evaluate the content, detail, and general credibility of the report to determine whether an informal resolution (see §I.B below), a formal case coordinator investigation (see §I.C below), or a full team investigation (see §I.D below) is most appropriate.

B.  **Informal Resolution**. If the Director determines that the report lacks sufficient detail and/or credibility to justify formal charges, the Director will assign the case to a case coordinator (CC) for informal resolution. Examples of informal resolutions include organizational self-investigations, educational conversations, and mediations. Although OSCR (and other appropriate offices) may retain a record of an informal resolution, these records will not constitute formal disciplinary history for the RSO.

C.  **Case Coordinator Investigation**. If the Director determines that the report is sufficiently detailed and credible to warrant formal charges and, after evaluating the complexity of the case, decides that a single CC can fully investigate the matter in a timely manner, the Director will assign the case to a case coordinator for investigation. The CC will conduct preliminary interviews as appropriate, notify the RSO of the allegations, interview the leadership of the organization, gather documentation, and conduct any additional interviews deemed necessary and appropriate. The CC will then either issue a decision per §II below or complete an investigative report for submission to the Subcommittee on Organizational Conduct.

D.  **Team Investigation**. If the Director determines that the report is sufficiently detailed and credible to warrant formal charges and, after evaluating the complexity of the case, decides that a single CC cannot fully investigate the matter in a timely manner, the Director will designate an OSCR staff member as the Investigation Coordinator, who will proceed with a Team Investigation. The concepts and procedures associated with a Team Investigation are as follows:

1.  **Investigators**. Investigators in a Team Investigation are designated staff, faculty, or graduate assistants responsible for conducting fact-finding investigations into RSO misconduct. Investigators are selected by the Director and trained by OSCR staff. Investigator training focuses on the education of current university policies and emphasizes fact-finding with efficient and effective techniques to swiftly move cases forward after an incident has been reported. Investigator selection may be conducted on an as needed or cyclical basis as determined by OSCR.

2.  **Organization Category Experts**. Some Investigators will be designated as Organization Category Experts (OCEs). These individuals will have a higher level of knowledge and/or experience of a specific RSO category and are intended to provide clarity and advocacy during an investigation of such RSOs. OCEs may be staff members from specialized units related to the category of the organization or their designees. If possible, there should be OCEs for the following RSO categories: Academic/Pre-Professional (including professional fraternities), Club Sports, Cultural/Ethnic, International, Religious, Residence Life, ROTC, Social Fraternities & Sororities, and Student Government & College Councils.

3.  **Investigation Team**. The Investigation Coordinator shall assemble an Investigation Team of two or more Investigators based on the complexity of the investigation. The Investigation Coordinator may either serve in a consultative role in the investigation or be a participating member of the Investigation Team, as determined by the Director. If an OCE is available for the category of RSO under investigation, one or more should be included on the Investigation Team.

4.  **Investigation Process**. The fundamental charge of the Investigation Team is to provide OSCR with facts and statements so that they may determine the next steps in the organization conduct process. After receiving an investigation charge from the Investigator Coordinator, the Investigation Team will immediately begin their investigation by reviewing submitted material/evidence; conducting interviews of witnesses, the leadership of the organization, and any other individuals with knowledge relevant to the case; and gathering additional documentation.

5.  **Timeline**. Typical investigations should take no longer than ten business days to complete. If the Investigation Team requires additional time, they must request and receive an extension from the Investigation Coordinator.

6.  **Investigative Report**. Upon conclusion of their investigation, the Investigation Team will submit an Investigative Report to the Director. This report shall contain copies of evidence and materials gathered during the investigation, summaries and/or written transcripts of interviews, and a compilation of all information discovered during the investigation. The Director will then determine whether the report will be submitted to a CC or the Subcommittee on Organizational Conduct for adjudication.

E. **Interim Suspension**. The Dean of Students, or their designee, may impose an interim suspension on an RSO who is under investigation and whose alleged conduct poses a significant risk to student health and/or safety. At the Dean's discretion, interim suspension may restrict some or all RSO activities.

1.  **Notice**. If the Dean of Students, or their designee, determines that interim suspension is appropriate, they will immediately notify the RSO and other appropriate parties (e.g. the RSO advisor, any parent/national organization, or relevant university departments) in writing of the interim suspension, including the reason(s) for the interim suspension and the scope of the interim suspension.

2. **Duration**. Interim suspension shall persist until the case is decided by the appropriate hearing body unless information gathered through the course of the investigation demonstrates that student health and safety is no longer at significant risk. The staff conducting the investigation shall make a recommendation to the Dean of Students for the removal of interim suspension in such instances, though the interim suspension will remain in effect until the Dean has notified the RSO in writing that it has been lifted.

F. **Witness Anonymity in RSO Cases**. The university reserves the right to withhold the identity of certain witnesses from the RSO to protect these individuals from retaliation. In such cases, information about the status, role, etc. of the witness will be shared with the RSO to the extent that doing so will not identify them. If the case is referred to a panel of the Subcommittee on Organizational Conduct for adjudication, the identity of these witnesses will also not be shared with the panel members.

II. **Case Coordinator (CC) Decisions**

A. **Jurisdiction**. University case coordinators who have been designated by the Senate Committee on Student Discipline are empowered to adjudicate RSO cases in which the allegations, if substantiated, would not result in revocation of RSO status. Such case coordinators may only issue sanctions up to, and including, Conduct Probation.

B. **Deliberation**. The CC assigned to adjudicate a given RSO case will review the results of the investigation and determine whether it is more likely true than not true that the RSO has violated the Student Code. If a violation is found, the CC will then select the most appropriate formal sanction and any number of appropriate educational sanctions and/or restrictions (see §IV below).

C. **Notice of Action Taken**. The CC will then communicate the decision to the RSO in writing. If the RSO has been found in violation, this written communication will include information about the RSO's right to appeal the decision in accordance with §V below.

III. **Subcommittee on Organizational Conduct Decisions**

A. **Jurisdiction**. The Subcommittee on Organizational Conduct is responsible for adjudicating RSO cases in which the allegations, if substantiated, could result in revocation of RSO status.

B. **Procedures**. Unless otherwise noted in this appendix, the procedures of the Subcommittee on Organizational Conduct are substantially similar to those outlined in Article II, Section 2.06 of the Student Disciplinary Procedures.

C. **Member Selection**.

1. The subcommittee shall consist of faculty, staff, and students.

2. All members of the Subcommittees on Undergraduate and Graduate Student Conduct are also members of the Subcommittee on Organizational Conduct.

3. Additional faculty and staff members of the subcommittee shall be appointed as needed by the Vice Chancellor with the approval of the Senate Committee on Student Discipline.

D. **Quorum Requirements**.

1. Quorum for hearings shall be no less than three (3) voting members. The hearing committee must consist of at least one (1) faculty/staff member and one (1) student. Each hearing committee will be chaired by a faculty/staff member, and the chair counts towards quorum.

IV. **Actions Possible in Organizational Conduct Cases**

A. When determining whether an organization has violated a university policy, decision-makers have the following options:

1. **Finding of No Violation**. This action can occur at any stage of the procedure. If a finding of no violation occurs, the organization has no disciplinary history. This information will not be considered in future proceedings.

2. **Charge(s) Dropped**. This action shall be taken when the CC or the hearing committee determines that the organization cannot be found in violation of the university's regulations governing organization conduct. The behavior may have been unrelated to the rules of conduct, evidence may be unobtainable or insufficient, etc. A dropped charge may be reinstated within one calendar year of the date it was dropped if substantial new information should become available. If a charge is dropped, the organization has no disciplinary history related to it.

3. **Finding of Violation**. This action occurs when the CC or hearing committee has established that a policy of the *Student Code* has been violated based on a preponderance of the evidence.

B. **Formal Sanction Options**.

1. **University Reprimand**. A University Reprimand indicates that the organization's behavior is inappropriate for a member of the academic community. A University Reprimand is maintained in the organization's disciplinary file for one year and would serve as a basis for further sanctioning should subsequent violations occur.

2. **University Censure**. A University Censure in an official communication that an organization's behavior is inappropriate for a member of the academic community. A University Censure is maintained in the organization's disciplinary file for four years and would serve as a basis for further sanctioning should subsequent violations occur.

3. **Conduct Probation**. Conduct Probation is a strong communication that an organization student is no longer in good disciplinary standing with the academic community, and that, if the organization fails to comply with any assigned sanctions or otherwise violates the *Student Code* while on probation, that organization should

expect to have their status as an RSO revoked. Conduct Probation records are maintained for seven years after the end of the probationary period.

4. **Revocation**. Revocation of registered organization status shall be imposed upon an organization when the hearing body determines that the organization's relationship with the university should be terminated. When Revocation is imposed, the hearing committee will specify a minimum duration for the sanction. After this time has elapsed, the original hearing body may consider formal requests for permission to pursue registration. Revocation records are maintained indefinitely.

5. **Formal Sanction Held in Abeyance**. In rare cases, the Senate Committee, appropriate subcommittee, or CC may determine that a certain sanction is the appropriate formal sanction for an organization, but strong mitigating circumstances warrant holding the formal sanction in abeyance. The organization will continue to be recognized under restrictions and conditions. An organization found to have violated the conditions or restrictions of a formal sanction held in abeyance will minimally have the formal sanction imposed. Formal sanctions held in abeyance for organizations must include an expiration date.

C. **Other Conditions or Restrictions**.

1. **Other educational sanctions**. This may include but is not limited to mandated service to the community, educational programs, research and reflective essays, presentations to the community, restitution, letters of apology, or other related discretionary sanctions.

2. **Restrictions**. The organization may be restricted from certain activities (e.g. serving alcohol at social events; participation in university activities and events; recruitment, or other restrictions deemed just and appropriate).

D. The Senate Committee on Student Discipline may authorize any other sanctions it deems to be just and appropriate.

V.   **Appeals**

A. **Jurisdiction**. The Director accepts all appeals of disciplinary decisions issued to an RSO by a case coordinator. If the Director has a conflict of interest with respect to an appellant, the appeal will instead be decided by the Senate Committee on Student Discipline. The Senate Committee on Student Discipline accepts appeals of all disciplinary decisions issued by the Subcommittee on Organizational Conduct.

B. **How to Appeal**. An RSO that has been found in violation of the Student Code may appeal that decision by submitting a written Notice of Appeal to the Office for Student Conflict Resolution within five business days of the original decision. The Notice of Appeal must contain at least the following: (1) specific grounds for appeal (see below); (2) specific relief requested; and (3) appellant's reasons in support of the grounds selected and the relief requested.

C. **Grounds for Appeal**. The appellant RSO must base the appeal exclusively on one or more of the grounds below:

1. Procedural irregularity that affected the outcome of the matter.

2. New evidence that was not reasonably available at the time the determination regarding responsibility was made, that could affect the outcome of the matter.

3. The CC or hearing committee members had a conflict of interest or bias that affected the outcome of the matter.

4. Any sanctions imposed by the hearing body were not appropriate for the violation(s) for which the RSO was found responsible.

D. **Appeal Procedures**. Unless otherwise noted in this appendix, the appeal procedures of in RSO cases are substantially similar to those outlined in Article III of the Student Disciplinary Procedures.

VI. **Additional Information**

A. **National/Parent Organizations**. If an RSO is affiliated with a national or parent organization, OSCR, assigned investigators, and other applicable offices reserve the right to communicate with that organization about relevant allegations, investigations, and outcomes, provided such communications are in compliance with FERPA.

B. **Definition of an RSO Event**. For purposes of holding RSOs accountable, the university considers an RSO event to be:

1. Any activity sponsored and/or hosted by the RSO and about which members and/or the public are notified (formally or informally);

2. Any activity funded by the RSO; or

3. Any activity reasonably associated with the RSO through, for example, the actions of its members.

An RSO event may occur on or off campus, including online. And an RSO event is not determined by the number of members present or participating. Lastly, the university may pursue disciplinary action against one or more individuals and an RSO for the same incident, and the responsibility for the individual(s) and the RSO will be assessed independently.

**APPENDIX C**

**PROCEDURES OF THE SUBCOMMITTEE ON STUDENT CONDUCT FOR LAW STUDENTS**

I.     **Honor Code**

Since students in the College are preparing for careers in a profession demanding honesty and integrity, the College requires high standards of conduct.  The College operates under an honor system, one feature of which is that all examinations are unproctored.  The College's Code of Student Responsibility, reprinted below, details the grounds on which students may be found in violation of this honor system.  The Code also imposes additional obligations on students.

II.    **College of Law Code of Student Responsibility**

§ 1.01  Students enrolled at the University of Illinois College of Law are subject to the Student Code, which is available on-line at: http://www.uiuc.edu/admin_manual/code/ .

§ 1.02  As future members of the legal profession, students at the College of Law bear a special responsibility to insist upon and to maintain high standards of integrity.  Accordingly, it is expected that each student of the College of Law will scrupulously regard the rights of others and will observe high standards of integrity in his or her personal conduct.  Toward this end the College of Law has defined the following academic and nonacademic violations, set out in Sections 1.03-1.08, which are subject to discipline in accordance with the procedures set forth in Sections 2.01-5.09.

§ 1.03  Misrepresentation.  Misrepresentation is any act of fraud or deception by which the student gains or attempts to gain a benefit or advantage from the University, its constituent institutions, its faculty, staff, or students, or persons dealing with the University.  Examples of this offense include, but are not limited to, the following:

   (a)  forging or altering any University document, record, or instrument of identification;

   (b)  furnishing material information which is known by the student to be false to any official, other employee, or agent of the University;

   (c)  furnishing to any person material information which is known to the student to be false and which related to the student's academic record or otherwise concerns activities in the University.

§ 1.04  Unfair Advantage.  Unfair advantage is any act of fraud, deception, or improper influence by which the student gains or attempts to gain an academic benefit or advantage from the University, its constituent institutions, its faculty, staff, or students, or persons dealing with the University.  "Academic benefit or advantage" results from the student's course work as well as from other activities (such as Law Review, Moot Court, and Client Counseling

Competition), which in any manner affect the student's professional education, training, or development.  Examples of this offense include, but are not limited to, the following:

(a) unauthorized copying collaboration, or use of notes or books on any examination, project, or paper;

(b) failure to observe time limits set for an examination by the instructor in charge;

(c) lying about the performance of academic work;

(d) submitting the same work, or portions of the same work, in more than one class unless explicitly authorized to do so;

(e) submitting as one's own and without citation, writings or ideas known by the student to be of another (including those of any person furnishing writing for hire) in any academic pursuit;

(f) offering or attempting to offer money or other thing or service to a member of the University community, including its faculty, staff, and students, in an effort to gain academic benefit or advantage.

§ 1.05  <u>Interference with Property</u>.  Interference with property is any taking or destruction of the property of the University, of its constituent institutions, or of its faculty, staff, or students.  Examples of this offense include, but are not limited to, the following:

(a) stealing, damaging, or destroying notes or books of students;

(b) stealing, hiding, or vandalizing library materials;

(c) stealing, damaging, destroying, or otherwise misusing other University property.

§ 1.06  <u>Harassment</u>.  Harassment is any physical assault upon, threat against, or substantial interference with work or study of a member of the University community, including its faculty, staff, and students, as well as of any other person who is lawfully present on university premises.  Examples of this offense include but are not limited to:

(a) intentionally blocking or attempting to block physical entry to, or exit from, a university building, corridor, or room to anyone apparently entitled to enter or leave;

(b) engaging in shouted interruptions, whistling, derisive laughter, or other means that alone or in conjunction with others prevent or seriously interfere with a class, speech program, or other teaching or learning process, under circumstances where the student knows or reasonably should have known the serious interference would occur.

(c) engaging in disruptive behavior directed toward one of more individuals in the library, offices, or other place, that seriously interferes with the work of others.

§ 1.07  <u>Gross Neglect of Professional Duty</u>.  Gross neglect of professional duty is a clear and knowing violation of generally accepted standards of integrity.  Examples of this offense include but are not limited to:

(a)  failure to report any suspected violation of this Code by any student having reasonable grounds to believe that such a violation has occurred;

(b)  failure to cooperate with the College of Law Committee on Student Discipline or with the Secretary to such Committee with respect to the conduct of any investigation or proceeding held in connection with any alleged violation by any other person of the College of Law Code of Student Responsibility;

(c)  aid intentionally given to another student in violation of this Code;

(d)  embezzlement or other breach of trust.

§ 1.08  <u>Other University Offenses</u>.  It is a breach of this Code to fail to obey any duly promulgated University rule or regulation relating to student conduct and which is applicable to students in the College of Law, whether now or hereafter adopted by the Board of Trustees or other University authority.

<u>RULES GOVERNING DISCIPLINARY PROCEEDINGS</u>

<u>PART A.  Application</u>

§ 2.01  These procedures apply only to individual misconduct, and the appropriate procedures, as contained in the <u>System of Conduct Governance of Students</u>, will be implemented should a student enrolled in the College of Law become involved in an incident of extraordinary group misconduct.

<u>PART B.  Participants in Disciplinary Process</u>

§ 3.01  <u>Administrative Officer</u> means the Dean, an Associate Dean or Assistant Dean of the College of Law, any Officer of the Campus or University Administration, and any employee of the University to whom supervisory responsibility over matters relating to student conduct has been delegated except members of the Senate Committee on Student Discipline or of the Subcommittee.

§ 3.02  <u>Adviser</u> means a person who has agreed to appear with Respondent at any proceeding under these Rules.  A Respondent may be accompanied by and may consult with his or her Adviser at any such proceedings, but the Adviser may not represent Respondent.

§ 3.03  <u>Alternate</u> means a person appointed as a faculty or student Alternate to the Subcommittee who has not yet been designated by the Chair to replace an excused Member.

One (1) faculty Alternate and one (1) student Alternate shall be regularly appointed, and additional appointments shall be made as necessary to provide a full Subcommittee to conduct the proceedings concerning a particular Respondent.  Alternates shall have the same qualifications as and shall be selected in the same manner as Members.  A faculty Alternate may only replace an excused faculty Member, and a student Alternate may only replace an excused student Member.  Until designated for such replacement by the Chair, an Alternate shall not participate in any hearing, consideration, deliberation or vote concerning any matter before the Subcommittee.

§ 3.04  Chair means the individual serving as chairperson of the Subcommittee.  The Chair shall be selected according to current procedures of the College of Law and the Senate Committee on Student Discipline.

§ 3.05  Counsel means the person who has agreed to represent Respondent in any proceeding under these Rules.  A Respondent has a right to consult with and be represented by Counsel in all such proceedings, and the person so serving shall be the sole representative of Respondent. If Respondent has engaged Counsel, he or she shall notify the Dean of Counsel's name and address.

§ 3.06  Dean means the Dean of the College of Law or, when so designated by the Dean or Acting Dean, an Associate Dean.  In carrying out his or her responsibilities under these Rules, the Dean may consult with the Executive Committee of the College of Law.

§ 3.07  Member means a person appointed as a faculty or student Member of the Subcommittee who has not been excused, and a person appointed as a faculty or student Alternate who has been designated by the Chair to replace an excused Member.  Faculty Members shall be appointed from among permanent members of the College of Law faculty who are not Administrative Officers or members of the College Executive Committee.  Student Members shall be appointed from among full-time students who are J.D. candidates registered in the College of Law.  Members shall be selected according to current procedures of the College of Law and the Senate Committee on Student Discipline.

§ 3.08  Respondent means a law student upon whom a Formal Notice has been served.

§ 3.09  Secretary means an Administrative Officer or permanent member of the College of Law faculty who is not a Member of the Subcommittee or of the Senate Committee on Student Discipline and who is appointed by the Dean to investigate the allegations in a Formal Notice or instead or in addition to assist in drafting a Formal Charge and to present evidence regarding the charge to the Subcommittee.  The Secretary should obtain and present all available relevant information which, in the Secretary's judgment, will assure an informed and fair administrative review and Subcommittee hearing.  The same person or different persons may serve as Secretary at various stages, as determined by the Dean pursuant to § 5.04.

§ 3.10  Subcommittee means the Subcommittee on Student Discipline for Law Students, consisting of three (3) faculty Members and (2) student Members.  Any hearing before,

submission to or deliberations by the Subcommittee shall include all five (5) Members then serving.  Except as otherwise provided herein, Subcommittee decisions shall be by majority vote.

§ 3.11  <u>Witness</u> means a person called upon to provide information at a Subcommittee hearing or in a Secretary's investigation.  All law students and University employees shall cooperate fully when called upon to be Witnesses, and any refusal to be interviewed or to produce evidence may be a matter for disciplinary or employment action.  A Witness may refuse to testify or produce evidence which would tend to inculpate that person in any Violation of University or College Regulations or in any violation of law.  Any statement by or evidence of Respondent made or produced by Respondent to Counsel or an Adviser in that person's capacity as Counsel or Adviser is privileged.

PART C.  General Definitions and Guidelines

§ 4.01  <u>Formal Charge</u> means a statement of the Violation(s) charged with reference to the relevant University Regulations and College of Law Disciplinary Rules, and a statement of the ultimate facts which constitute the specification of the Violations(s) charged.

§ 4.02  <u>Formal Notice</u> means a statement that the Respondent is alleged to have been involved in a possible Violation, a summary statement of the alleged facts, and specification of the Violation(s) suggested by the alleged facts.

§ 4.03  <u>Informal Resolution</u> means a process whereby the matter is resolved informally by counseling or by permitting Respondent to accept a specified Sanction without further proceedings.  A Sanction may be so imposed by the Dean only with Respondent's consent.  If a proposed Sanction is accepted by Respondent, it will be imposed forthwith and without opportunity for appeal.  If a proposed Sanction is refused, the Dean may proceed with the next step in the administrative process.  The fact a Sanction was offered and refused and the nature of the proposed Sanction shall not limit or otherwise affect any further action.

§ 4.04  <u>Report</u> is the written submission of the Secretary to the Dean upon conclusion of an investigation.  It shall contain (i) a summary of the relevant facts and (ii) conclusions as to whether there is a factual basis for a Formal Charge.

§ 4.05  <u>Sanctions</u> which may be imposed upon informal disposition or upon a finding of a Violation by the Subcommittee are:  (1) reprimand not of official record; (2) reprimand of official record; (3) conduct probation not of official record; (4) conduct probation; (5) suspension; or (6) dismissal.  A sanction not of official record does not appear on the student's transcript but may have to be reported by the Dean and the student to appropriate authorities regarding a candidate's fitness for admission to the bar.  The fact Respondent has been or may be subject to other sanctions for the same conduct, whether such sanctions have been or may be imposed by civil authorities or by academic officials, shall not bar the initiation of disciplinary proceedings or the imposition of Sanctions for Violations.  The fact a student has been or may

be subject to Sanctions under this Code shall in no way affect the power of any academic official to grade or otherwise evaluate such student's performance for academic purposes.
§ 4.06  <u>Service</u> of papers upon Respondent shall be accomplished by delivery to Respondent personally or by regular mail to Respondent's current local address specified in College of Law records.  If mailed at a time when regular semester classes are not in session, a copy shall be mailed to any permanent address specified in College of Law records.  If Respondent has notified the Dean of his or her Counsel's name and address, a copy shall be mailed to Counsel at the specified address.

§ 4.07  <u>Violation</u> means conduct proscribed by University Regulation relating to student conduct or by the College of Law Code of Student Responsibility.

PART D.  Administrative Procedures

§ 5.01  <u>Preliminary Determination</u>.  Upon receipt of information regarding a possible violation by a law student, the Dean may informally gather such additional information as will facilitate a preliminary determination of how to proceed.  If the Dean determines that a possible Violation has occurred, he or she shall issue a Formal Notice unless it appears that the interests of the student involved and of the College of Law and University would be best served by counseling the student.

§ 5.02  <u>Notice to Respondent; Reply and Action</u>.  The Dean shall arrange for Service of the Formal Notice upon Respondent, together with copies of relevant University Regulations and College of Law Disciplinary Rules and shall call particular attention to Respondent's right to Counsel and an Adviser and right to reply.  Upon a request for an opportunity to reply, submitted to the Dean in person or by telephone or letter within three (3) business days of the date upon which the Formal Notice was personally delivered or five (5) business days of the date upon which the Formal Notice was mailed, the Dean shall set a date for the reply and the manner in which it shall be received and shall so notify Respondent.  In the reply, Respondent may present evidence in rebuttal of the summary of facts contained in the Formal Notice and instead or in addition may provide information bearing upon the propriety of Informal Resolution.  If no reply is made, the Dean shall designate a Secretary and refer the Formal Notice to the Secretary.  If a reply is made, the Dean upon consideration of it may withdraw the preliminary determination of a possible Violation, attempt Informal Resolution, or designate a Secretary and refer the Formal Notice to the Secretary.  If a Formal Notice is referred to the Secretary, the Dean shall arrange for Service upon Respondent of notification of this referral and of the Secretary's name, address and telephone number.

§ 5.03  <u>Investigation</u>.  The Secretary shall identify and interview available Witnesses and shall identify and obtain relevant and available real or documentary evidence.  Statements of Witnesses or summaries of interviews shall be prepared or obtained and preserved. Respondent shall have the right to submit statements or real or documentary evidence to the Secretary and to suggest people whom the Secretary should interview.  Upon completion of the investigation, the Secretary shall prepare and submit a Report to the Dean accompanied by all

statements, summaries and real and documentary evidence obtained or prepared by the Secretary.

§ 5.04  <u>Charge or Other Disposition</u>.  Upon review of the Report, the Dean may determine that the evidence is insufficient to establish a Violation and withdraw the Formal Notice, refer the matter back to the Secretary or to a newly appointed successor for further investigation, attempt Informal Resolution, or refer a Formal Charge to the Subcommittee.  If Informal Resolution is sought, the Dean shall first provide Respondent with a copy of the Report and an opportunity to inspect all evidence submitted to the Dean by the Secretary.  If the Dean decides to refer a Formal Charge, he or she shall designate the investigation Secretary or a successor to assist in preparation of the Formal Charge and to present evidence to the Subcommittee.  The Dean shall arrange for Service of the Formal Charge upon Respondent together with a copy of the Report, notice of Respondent's right to inspect and copy all evidence submitted to the Dean by the Secretary, a list of the name of all Subcommittee Members and Alternates, and the name, mailing address and telephone number of the Chair.  Once referred to the Subcommittee, a Formal Charge may be withdrawn only upon recommendation of the Dean and approval of the Subcommittee.

PART E.  Pre-Hearing Determinations; Preparation for Hearing

§ 6.01  <u>Recusal</u>.  The Chair shall provide copies of the Formal Charge to Subcommittee Members and Alternates.  Any Member or Alternate who believes he or she would be unable properly to participate because of serious illness, special interest or prior knowledge which has resulted in prejudgment shall notify the Chair and shall be excused.

§ 6.02  <u>Motions, Challenges and Requests</u>.  All motions, challenges and requests shall be delivered in writing to the Chair within five (5) business days of the date on which the Formal Charge was personally served upon Respondent or within seven (7) business days of the date on which the Formal Charge was mailed to Respondent.  Except in extraordinary circumstances, no motion, challenge or request will be considered unless timely made.  Challenges shall be considered before motions and requests.  The Subcommittee shall grant a challenge for cause, dismiss all or part of a Formal Charge, or otherwise grant a motion or request (except for Respondent's request for an open hearing or to transcribe or record the hearing proceedings) only upon the basis of information formally presented to the Subcommittee and only after affording the opposing party sufficient opportunity to contest the factual and legal bases for such action.

§ 6.03  <u>Peremptory Challenge</u>.  Respondent may challenge one Subcommittee Member or Alternate without stating any cause.  Upon receipt of such peremptory challenge, the named person shall be excused.

§ 6.04  <u>Challenge for Cause</u>.  Respondent and the Secretary may challenge any Subcommittee Member or Alternate for cause.  Such challenge shall state the special interest, prior knowledge or other cause for the challenge and sufficient facts to support the cause asserted.  The person

challenged shall not participate in the Subcommittee's actions regarding the challenge, but may be called upon by the Subcommittee to comment on the facts alleged to support the challenge. Each challenge shall be considered and decided separately.  If the challenge is granted, the person challenged shall be excused.

§ 6.05  <u>Motions</u>.  Normally, the only motion allowable at the prehearing stage of the proceedings is a motion to dismiss on the ground that the facts alleged in the Formal Charge, presumed to be true for purposes of the motion, do not or legally may not constitute a Violation.

§ 6.06  <u>Requests</u>.  Normally, only these types of requests are allowable:  (1) a request by Respondent that the hearing be open, which shall be granted as a matter of right; (2) a request by Respondent to transcribe or record the hearing proceedings at Respondent's own expense, which shall be granted as a matter of right; (3) a request for an extension of the time to file a challenge, motion or request, which shall be ruled upon by the Subcommittee.

§ 6.07  <u>Prehearing Conference</u>.  The Secretary and Respondent shall confer promptly after the Formal Charge has been served to consider and seek agreement on such matters as may facilitate a timely and fair disposition.  They shall agree upon no fewer than three (3) hearing days and so notify the Chair.  If they agree to a two-stage hearing procedure, they shall so notify the Chair, in which case the presentation of evidence principally related to an appropriate Sanction and related deliberations shall be deferred to a second stage following presentation of evidence, deliberations and findings on whether Respondent committed the Violation charged.  They shall review together the evidence which will be presented and shall stipulate to all evidence as to which there is no dispute as to fact.

§ 6.08  <u>Notice of Hearing; Responsibility of Participants</u>.  The Chair shall take account of the dates agreed to  by the Secretary and Respondent and of the availability of the Subcommittee in setting a date for the hearing at least ten (10) business days following the date of the Formal Charge.  By Service upon Respondent and like communication to the Secretary, the Chair shall give written notice of the date, time and place set for the hearing.  For good cause shown the Chair may grant a continuance requested by Respondent, the Secretary or a Member, subject to the request by a Member that the question be put to a vote of the Subcommittee.  It is the responsibility of the parties to notify and secure the presence of witnesses; of Respondent to secure the necessary recording equipment or personnel needed as a consequence of the granting of his request to record or transcribe; and of the Chair to secure the presence of all Members of the Subcommittee and required recording equipment or personnel.

<u>PART F.  Hearing and Deliberations</u>

§ 7.01  <u>Role of Chair</u>.  The Chair shall be primarily responsible for the conduct of the hearing, including the determination of whether there is good cause for a recess; provided, however, that any Member may request that a ruling by the Chair be submitted for a vote of the Subcommittee.  Deviation from any procedures specified herein is permissible only upon vote of the Subcommittee and in the interest of fairness and for good cause shown.

§ 7.02  <u>Spectators; Presence of Witnesses</u>.  Unless Respondent timely requested that the hearing be open, it shall be closed to all but the necessary parties.  Witnesses may be present only while presenting evidence or testimony.

§ 7.03  <u>Order and Nature of Hearing</u>.  The hearing should proceed in the following order:  (1) determination by the Chair that the parties are present and ready to proceed, except that the Subcommittee may proceed in Respondent's absence upon a determination that Respondent has forfeited the right to be present by his or her willful absence; (2) a brief and nonargumentative opening statement by the Secretary; (3) a like opening statement by Respondent, unless deferred until completion of the Secretary's presentation; (4) presentation in any logical order by the Secretary of testimony, real or documentary evidence, and stipulations; (5) like presentation by Respondent; (6) closing argument by the Secretary, which may include argument concerning appropriate findings and Sanction; (7) like closing statement by Respondent.  The Secretary and Respondent shall be permitted, at appropriate occasions during the hearing, to contest the veracity, reliability and relevance of any information, evidence or testimony presented and to suggest alternative conclusions which may be drawn from information presented.  Upon conclusion of Respondent's presentation, the Secretary or Respondent may request an opportunity to present additional evidence.  Such requests shall be granted by the Subcommittee only if the regular presentations have revealed an unanticipated need for such additional evidence.  In the same circumstances, the Subcommittee may request the submission of additional evidence.

§ 7.04  <u>Evidence</u>.  The formal rules of evidence shall not apply; the Subcommittee may consider all relevant testimony or real or documentary evidence.  Objection to the presentation of any evidence or testimony shall be made at the time such evidence or testimony is proposed to be presented to the Subcommittee.

§ 7.05  <u>Questioning of Witnesses</u>. Subject to the direction of the Chair, the Secretary and Respondent and any Subcommittee member may question any Witness.  The Chair shall assure that no Witness is abused or harassed.

§ 7.06  <u>Deliberations</u>.  Upon completion of the hearing the Subcommittee shall promptly meet for closed and unrecorded deliberations.  The Subcommittee shall first determine whether the conduct and Violation(s) charged were established by clear and convincing evidence.  In accordance with federal law and University policy, the Subcommittee shall follow the preponderance of the evidence standard in instances of allegations of sexual harassment or sexual violence.  Upon an affirmative finding, it shall then (or, if the two-stage hearing procedure is utilized, after further hearing) consider the imposition of an appropriate Sanction, taking into account aggravating and mitigating factors.  The Subcommittee shall consider not only the seriousness of the Violation within the University and College of Law communities but also its seriousness in light of the professional requirements and responsibilities of lawyers.  An affirmative vote of four (4) Members shall be necessary for imposition of the Sanction of dismissal.

## PART G.  Reports and Records

§ 8.01  <u>Limited Record Where No Formal Notice</u>.  If a Formal Notice is not made or is withdrawn, no record of the alleged violation will be made or preserved on the student's official transcript, but a record may be made or preserved solely for the purposes of the College of Law and to make required reports to the Senate Committee on Student Discipline.

§ 8.02  <u>Record of Subcommittee Proceedings</u>.  A minute record of any preliminary review and of the Subcommittee's deliberations will be made and preserved.  A verbatim transcript or recording
of the formal hearing shall be made and preserved.  Upon request, a Respondent may at his or her own expense obtain a copy of the verbatim transcript or recording.

§ 8.03  <u>Confidentiality</u>.  Access to the record of the hearing or of submissions and any record made in connection with a pre-hearing determination shall normally be limited to the Secretary, Respondent, the Subcommittee, the Senate Committee on Student Discipline, and Administrative Officers. This shall not limit in any way the Dean's authority and responsibility to provide information to appropriate authorities regarding a candidate's fitness for admission to the bar.

§ 8.04  <u>Report of Dismissal</u>.  Upon a determination to dismiss all or part of the Formal Charge, the Subcommittee shall adopt a written statement explaining the basis for such action.  The statement shall be signed by all members of the Subcommittee subscribing thereto; concurring or dissenting views may but need not be included.  The Chair shall transmit a copy of this statement to the Dean and the Secretary, and shall arrange for Service of a copy upon Respondent.

§ 8.05  <u>Report of Findings</u>.  After a hearing and deliberations, the Subcommittee shall adopt written findings which shall include a summary of the facts found by the Subcommittee, a statement specifying which Violation(s) charged the Subcommittee finds to have been committed by Respondent, and a statement specifying the Sanction imposed.  Any special aggravating, mitigating or extenuating circumstances found by the Subcommittee may also be stated.  The findings shall be signed by all Members of the Subcommittee subscribing thereto; concurring or dissenting views may but need not be included.  The Chair shall transmit a copy of the findings to the Dean and the Secretary, and shall arrange for Service of a copy upon Respondent together with a copy of the Rules of the Senate Committee on Student Discipline relating to appeal procedures.

§ 8.06  <u>Public Notice</u>.  After Respondent has been served with a copy of the findings or dismissal statement and, in the event of findings adverse to Respondent, after all University appeal procedures have been completed, the Subcommittee shall prepare and publish for the information of the College of Law community a public notice regarding the action taken.  This notice shall not identify the Respondent by name, but shall specify:  (1) the nature of each charged Violation disposed of; (2) whether the disposition was (a) dismissal, (b) a finding that the Violation was proved, or (c) a finding that the Violation was not proved; and (3) any

Sanction imposed.  This notice may also summarize the specifications of each charged Violation disposed of, explain the basis of any dismissal, and summarize findings regarding whether the charged Violation(s) were proved.

**APPENDIX D**

**Student Conduct Procedure for Allegations of Title IX Sexual Harassment**

In cases that are determined by the Title IX Coordinator or their designee to include an accusation that any student (including any student enrolled in the Carle Illinois College of Medicine, the College of Law, or the College of Veterinary Medicine) has engaged in Title IX Sexual Harassment in an education program or activity of the university against a person in the United States, the following provisions shall also apply. In the event of a conflict between this Appendix and any other part of the Student Disciplinary Procedures, this Appendix shall prevail.

If the regulations implementing Title IX at 85 Fed. Reg. 30026, 30026-30579 are enjoined or invalidated by a Federal Court with jurisdiction over the university or reversed or replaced by any agency with sufficient authority, the process described in Articles II and III will immediately begin to apply to all reports and complaints of sexual misconduct, including Title IX Sexual Harassment, and this appendix will immediately be inoperative unless and until any such injunction, invalidation, reversal, or replacement is overturned.

**Section 1: Definitions**

(a) Advisor. A person who provides a respondent or complainant support, guidance, or advice. Respondents and complainants may be accompanied by an advisor of their choosing to any meeting with an investigator or to any proceeding to which the advisee is invited. The university will directly communicate the case to the student.  The university will directly communicate the case to the student.  Under no circumstances will the university directly communicate with the advisor alone. The student is responsible for updating their advisor and/or forwarding any correspondence to them.

(b) Business Day. Any weekday when university offices are open for official business.

(c) Complainant. An individual who is alleged to be the victim of conduct that could constitute Title IX Sexual Harassment. Where the Title IX Coordinator signs a formal complaint, the Title IX Coordinator is not a complainant or otherwise a party in the case.

(d) Director (or Executive Director). The Director of the Office for Student Conflict Resolution or their designee.

(e) Evidence. Any information, including testimony, that is directly related to the allegations raised in the formal complaint.

(f) Evidence Packet. A compilation of the evidence in a case created at the conclusion of the investigation. Although all evidence is included, the investigator will separate evidence they determine to be relevant to reaching a determination regarding responsibility from evidence they determine to be irrelevant.

(g) Formal Complaint. A document filed by a complainant (and which contains the complainant's physical or digital signature, or otherwise indicates that the complainant

is the person filing the formal complaint) or signed by the Title IX Coordinator alleging Title IX Sexual Harassment against a respondent and requesting that the university investigate the allegation of Title IX Sexual Harassment. At the time of filing a formal complaint, a complainant must be participating in or attempting to participate in the education program or activity of the university with which the formal complaint is filed. A formal complaint may be filed with the Title IX Coordinator in person, by mail, or by electronic mail.

(h) Investigative Report. A document created by the investigator that fairly summarizes the procedural steps taken in the investigation and the relevant evidence.

(i) Investigator. The person responsible for investigating allegations of sexual misconduct on behalf of the university. All investigators are trained on the university's Sexual Misconduct Policy; the scope of the university's education program or activity; how to conduct an investigation and grievance process; how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias; and on issues of relevance to create an Investigative Report that fairly summarizes relevant evidence.

(j) OSCR. The Office for Student Conflict Resolution.

(k) Panel. A group of three members of the Subcommittee on Sexual Misconduct appointed by the Executive Director to adjudicate a case involving sexual misconduct. A Panel includes at least one student member.

(l) Panel Chair (or Chair). The faculty or staff member designated by the Director to run a formal hearing.

(m) Party. Any person identified as a complainant or a respondent with respect to a given formal complaint.

(n) Respondent. A student who has been reported to be the perpetrator of conduct that could constitute Title IX Sexual Harassment.

(o) Sanction, Educational. An assignment, requirement, or task imposed by the university that is educationally related to a policy violation.

(p) Sanction, Formal. A disciplinary status imposed by the university in response to a policy violation.

(q) SCSD. The Senate Committee on Student Discipline.

(r) Subcommittee on Sexual Misconduct. The group of faculty, staff, and students responsible for adjudicating cases that include allegations of sexual misconduct. This group is selected through an application process overseen by OSCR and approved by the SCSD. All members are trained on the university's Sexual Misconduct Policy; the scope of the university's education program or activity; how to conduct an investigation and grievance process; how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias; any technology to be used at a live hearing; issues of relevance of questions and evidence, including when questions and evidence

about the complainant's sexual predisposition or prior sexual behavior are not relevant; and other topics deemed appropriate by OSCR staff or required by state and federal law.

(s) Supportive Measures. Non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or respondent before or after the filing of a formal complaint. Such measures are designed to restore or preserve equal access to the university's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the university's educational environment, or deter Title IX Sexual Harassment. Supportive measures include, but are not limited to, counseling, extensions of deadlines or other course-related adjustments, modifications or work or class schedules, no contact directives, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures. The university will maintain as confidential any supportive measures provided to the complainant or the respondent, to the extent that maintaining such confidentiality would not impair the ability of the university to provide the supportive measures. Additional examples of supportive measures are available on the We Care website.

(t) Title IX Sexual Harassment. Conduct on the basis of sex that falls into one or more of the following categories as defined in the university's Sexual Misconduct Policy: Quid Pro Quo Sexual Harassment, Hostile Environment Sexual Harassment, Sexual Assault, Dating Violence, Domestic Violence, or Stalking.

(u) University-Provided Hearing Advisor. An individual of the university's choice who is present at the live hearing, if a party does not otherwise have an advisor present at the live hearing, to conduct cross-examination, i.e., to ask the other party and any witnesses relevant questions and follow-up questions, including those challenging credibility, on behalf of the party. This will be done without fee or charge to that party. If the party is present at the hearing, their University-Appointed Hearing Advisor will relay the party's own questions during cross-examination. The University-Appointed Hearing Advisor may, but is not required to, ask additional cross-examination questions that they deem appropriate. If the party and their advisor of choice are not present at the hearing, the University-Appointed Hearing Advisor will conduct cross-examination on behalf of that party. The university cannot guarantee equal advisory rights, meaning that if one party selects an advisor who is an attorney, but the other party does not or cannot afford an attorney, the university is not obligated to provide an attorney.

(v) Witness. A person who has relevant information regarding the facts of the case.

**Section 2: Complainant Rights**

(a) Advisor. The complainant may bring an advisor with them to any meeting with the investigator or any disciplinary proceeding to which they are invited. This individual may communicate nondisruptively with the complainant during such proceedings but may not speak for the complainant or otherwise directly participate except when conducting

cross-examination as described in §8 below. An advisor who fails to follow these instructions or behaves disruptively may be asked to leave. A complainant who chooses not to attend a formal hearing may send an advisor in their place to conduct cross-examination. The university will directly communicate the case to the student.  Under no circumstances will the university directly communicate with the advisor alone. The student is responsible for updating their advisor and/or forwarding any correspondence to them.

(b) Appeal. The complainant may appeal the investigator's decision to dismiss the formal complaint or any allegation therein or the Panel's decision to the SCSD. This process is described in §9 below.

(c) Disability Accommodations. A qualifying complainant has the right to reasonable accommodations during any disciplinary process or proceeding in accordance with §1-110 of the *Student Code*.

(d) Evidence Review. The complainant will have the opportunity to inspect and review all evidence obtained as part of the investigation that is directly related to the allegations raised in the formal complaint, including the evidence which will not be relied upon in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to the conclusion of the investigation.

(e) Interpreter. The complainant may bring an interpreter with them to any meeting with the investigator or any disciplinary proceeding to which they are invited, provided that this individual is not also a witness in the investigation. An interpreter who behaves disruptively may be asked to leave. The use of an interpreter does not preclude the complainant's ability to have an advisor present.

(f) Notice. The complainant will receive written notification of any meetings or proceedings they are expected to attend. Notice is deemed given immediately when hand delivered or sent to the complainant's email address, or on the following business day when mailed.

(g) Objectivity. All disciplinary decisions will be based on an objective evaluation of evidence, including both inculpatory and exculpatory evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the university's Nondiscrimination Policy.

(h) Participation. The complainant will have an opportunity to identify and present witnesses, including expert witnesses; to provide information directly related to the allegations, including inculpatory and exculpatory evidence; and to participate in any scheduled formal hearing. In addition, the complainant may refuse to provide a requested statement or to answer a question posed to them.

(i) Supportive Measures. The complainant has the right to request supportive measures. The Title IX Coordinator or their designee is responsible for coordinating the effective

implementation of supportive measures, but the complainant may directly request that the investigator issue a no contact directive.

(j) Timely Investigation and Decision. Any investigation of a formal complaint will begin promptly and proceed in a timely manner. The complainant will receive a timely written decision following a formal hearing or appellate review.

**Section 3: Respondent Rights**

(a) Advisor. The respondent may bring an advisor with them to any meeting with the investigator or any disciplinary proceeding to which they are invited. This individual may communicate nondisruptively with the respondent during such proceedings but may not speak for the respondent or otherwise directly participate except when conducting cross-examination as described in §8 below. An advisor who fails to follow these instructions or behaves disruptively may be asked to leave. A respondent who chooses not to attend a formal hearing may send an advisor in their place to conduct cross-examination. The university will directly communicate the case to the student. Under no circumstances will the university directly communicate with the advisor alone. The student is responsible for updating their advisor and/or forwarding any correspondence to them.

(b) Appeal. The respondent may appeal the investigator's decision to dismiss the formal complaint or any allegation therein or the Panel's decision to the SCSD. This process is described in §9 below.

(c) Disability Accommodations. A qualifying respondent has the right to reasonable accommodations during any disciplinary process or proceeding in accordance with §1-110 of the *Student Code*.

(d) Evidence Review. The respondent will have the opportunity to inspect and review all evidence obtained as part of the investigation that is directly related to the allegations raised in the formal complaint, including the evidence which will not be relied upon in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to the conclusion of the investigation.

(e) Interpreter. The respondent may also bring an interpreter with them to any meeting with the investigator or any disciplinary proceeding to which they are invited, provided that this individual is not also a witness in the investigation. An interpreter who behaves disruptively may be asked to leave. The use of an interpreter does not preclude the respondent's ability to have an advisor present.

(f) Notice. The respondent will receive written notification of the allegations against them and of any meetings or proceedings they are expected to attend. Notice is deemed given immediately when hand delivered or sent to the respondent's email address, or on the following business day when mailed.

(g) Objectivity. All disciplinary decisions will be based on an objective evaluation of evidence, including both inculpatory and exculpatory evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the university's Nondiscrimination Policy.

(h) Participation. The respondent will have an opportunity to identify and present witnesses, including expert witnesses; to provide information directly related to the allegations, including inculpatory and exculpatory evidence; and to participate in any scheduled formal hearing. In addition, the respondent may refuse to provide a requested statement or to answer a question posed to them.

(i) Presumption of No Violation. The respondent is presumed not to be responsible for the alleged conduct until a final determination regarding responsibility has been made at the conclusion of this process.

(j) Supportive Measures. The respondent has the right to request supportive measures. The Title IX Coordinator or their designee is responsible for coordinating the effective implementation of supportive measures, but the respondent may directly request that the investigator issue a no contact directive.

(k) Timely Investigation and Decision. Any investigation of a formal complaint will begin promptly and proceed in a timely manner. The respondent will receive a timely written decision following a formal hearing or appellate review.

**Section 4: Evidence**

(a) As defined above and for the purposes of this appendix, evidence is any information, including testimony, that is directly related to the allegations raised in the formal complaint. The investigator and the Panel have the right to reject or disregard information that is not directly related to the allegations when compiling the Evidence Packet, creating the Investigative Report, dismissing the formal complaint, or reaching a determination regarding responsibility.

(b) Furthermore, the investigator and the Panel will only rely on relevant evidence when dismissing the formal complaint or reaching a determination regarding responsibility. Evidence is relevant if:

(1) It has any tendency to make a fact more or less probable than it would be without the evidence; and

(2) The fact is of consequence for determining whether the formal complaint may or must be dismissed or whether the respondent is responsible for any alleged violations of the *Student Code* under investigation or under consideration by a Panel.

(c) During cross-examination, as described in §8 below, the Chair will only allow relevant questions, where a relevant question is one that seeks relevant evidence.

(d) Questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence about the complainant's prior sexual behavior are offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent.

(e) The investigator and the Panel will not require, allow, rely upon, or otherwise use questions or evidence that constitute, or seek disclosure of, information protected under a legally recognized privilege, unless the person holding such privilege has waived the privilege.

**Section 5: Investigation of a Formal Complaint**

(a) Intake and Review.

    (1) OSCR will oversee investigations of formal complainants against student respondents. Upon receipt of a formal complaint, the Director will assign an investigator to conduct the investigation. This assigned investigator may be assisted by other investigators as necessary.

    (2) The assigned investigator will first attempt to interview the complainant to determine the precise nature of the allegations.

(b) Consolidation of Formal Complaints. OSCR may consolidate formal complaints as to allegations of Title IX Sexual Harassment against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, where the allegations arise out of the same facts or circumstances. When a case involves more than one complainant or more than one respondent, references in this appendix to the singular "party," "complainant," or "respondent" include the plural, as applicable.

(c) Dismissal of the Formal Complaint or Any Allegations Therein.

    (1) OSCR will dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing, it is determined that:

        (i) The conduct alleged in the formal complaint would not constitute Title IX Sexual Harassment as defined in the Sexual Misconduct Policy, even if proved; and/or

        (ii) The conduct did not occur in an education program or activity of the university as defined in the Sexual Misconduct Policy; and/or

        (iii) The conduct did not occur against a person in the United States; and/or

        (iv) At the time of filing a formal complaint, the complainant was not participating in or attempting to participate in the education program or activity of the university.

(2) OSCR may dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing, it is determined that:

(i) A complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the formal complaint or any allegations therein; or

(ii) The respondent is no longer enrolled in or employed by the university; or

(iii) Specific circumstances prevent OSCR from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein.

(3) Upon any such dismissal, OSCR staff will promptly send written notification of the dismissal and the rationale for the dismissal simultaneously to the respondent and the complainant.

(4) The dismissal of a formal complaint or any allegations therein may be appealed by either party to the SCSD in accordance with §9 below.

(5) At OSCR's discretion, allegations dismissed under this section may be investigated and/or adjudicated through the process described in Articles II and III of the Student Disciplinary Procedures.

(d) Allegation Notice. As soon as is practicable after interviewing the complainant (or after unsuccessfully attempting to interview the complainant), the investigator will issue a written allegation notice (to each party's university email address, if they have one) that informs the respondent and the complainant of the following:

(1) A detailed description, including the date (if known) and location (if known), of the alleged incident(s).

(2) The identity (if known) of any complainants involved in the incident(s).

(3) The section(s) of the *Student Code* that the respondent has been accused of violating.

(4) A link to these procedures or an attached copy of these procedures.

(5) A statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of this process.

(6) A statement that the parties may have an advisor of their choice, who may be, but is not required to be, an attorney.

(7) A statement that the parties may inspect and review evidence in accordance with §6 below.

(8) Instructions and a deadline for the respondent to schedule a meeting with the investigator. This meeting should occur within ten business days of the allegation notice, unless a conflict between the investigator's availability and the respondent's academic schedule requires the meeting to be delayed further.

(9)  A statement that the *Student Code* prohibits retaliation (under §1-302(b)(6) of the *Student Code*) and knowingly making false statements or knowingly submitting false information during the resolution of a formal complaint (under both §1-302(g) and §1-302(o) of the *Student Code*).

(e)  Respondent Interview. The investigator will attempt to interview the respondent in a timely manner (as described above). If the respondent fails to respond to the allegation notice or refuses to meet with the investigator, the investigation will continue.

(f)  Evidence Collection and Witness Interviews. Both parties will be given the opportunity to provide supporting information and documentation and to identify witnesses. The investigator will review all submitted materials and will attempt to interview all witnesses (other than expert witnesses). The investigator may also seek additional information, documentation, and witnesses from other sources.

(g)  Follow-up Interviews. The investigator may request additional meetings with the respondent and any complainant to discuss any information gathered during the investigation.

(h)  Updates. As deemed appropriate by the investigator, OSCR staff will provide both the respondent and the complainant with periodic status updates during the investigation, the review process, and the appeal process.

(i)  Ongoing Notice. If, during an investigation, the investigator decides to investigate allegations not included in the original allegation notice, they will issue a new allegation notice in accordance with §5(d) above (with the possible exception of the instruction to schedule a meeting).

(j)  Cooperation with Law Enforcement. If the incident under investigation has also been reported to the police, the investigator will contact the police for any information they are willing to share and may interview officers, detectives, etc. as part of the OSCR investigation. At the request of law enforcement and so as not to interfere with active police investigations, the investigator may delay interviewing specific individuals for short periods of time at the discretion of the Executive Director. However, the OSCR and police investigations are separate processes. As such, they follow different procedures, rules, and regulations, and the outcome of one does not determine the outcome in the other.

## Section 6: Review of Evidence

(a)  Review of Evidence by the Parties. At the conclusion of the investigation but prior to the completion of the Investigative Report, the investigator will compile all evidence into an Evidence Packet and send this packet (in either electronic or hard copy format, at the investigator's discretion) to each party and the party's advisor, if any.

(b)  Written Responses to the Evidence Packet. The parties will have ten business days to review the Evidence Packet and to submit a written response. The investigator is not

required to accept documentary evidence submitted after this deadline or fact witnesses identified after this deadline.

## Section 7: Investigative Report

(a) Investigative Report Creation. As soon as is practicable after the evidence review period, the investigator will create an Investigative Report that fairly summarizes the procedural steps taken in the investigation and the relevant evidence. If any party has submitted a timely written response to the Evidence Packet, the investigator will consider that response before completing the Investigative Report.

(b) Investigative Report Distribution and Review. The investigator will provide an electronic copy of the Investigative Report to both the respondent and the complainant and their advisors, if any, and notify them that they may submit a written response to the report no later than five business days after the report has been sent.

## Section 8: Formal Hearing

(a) Appointment of Panel. The Director will appoint a Panel of three members, including at least one student member, of the Subcommittee on Sexual Misconduct (according to their availability and the frequency of their participation) and designate a faculty or staff member to serve as the Chair. Before the membership of this Panel is finalized, OSCR will provide both the respondent and the complainant with a list of all members of the Subcommittee on Sexual Misconduct. At this point, the parties may challenge the objectivity of any person on this list. Such a challenge must be based on an identified bias (e.g., a prior relationship between the party and the member) or an identified conflict of interest. The Director will consider these challenges when making a final decision regarding Panel membership.

(b) Panel Review of Materials. OSCR staff will provide the members of the Panel with electronic access to the Investigative Report, Evidence Packet, and any written responses from the parties and give them sufficient time to review these materials thoroughly.

(c) Scheduling of the Hearing. OSCR staff will schedule a formal hearing before the Panel to take place at least ten business days after the Investigative Report was sent to the parties. The hearing will typically take place in an online format using technology that enables the participants to see and hear each other simultaneously. At the Director's discretion, OSCR may arrange for an in-person hearing to take place should circumstances arise.

(d) Notice of the Hearing. OSCR staff will notify both the respondent and the complainant by email of the date, time, format, location (if applicable), participants (including invited witnesses), and purpose of the hearing at least seven business days in advance.

(e) Hearing Rules

(1)   The hearing will be closed to the public.

(2)   The Chair may exclude from the hearing any person who disrupts the orderly process of the hearing but will do so only after first issuing a warning. The Chair need not consider this cause to reschedule the hearing or continue the hearing at a later date.

(3)   The hearing may proceed (at the Chair's discretion) even if the respondent, the complainant, any advisor (subject to subsection (4) below)), or any witness fails to appear, provided the parties have been notified in accordance with §8(d) above.

(4)   The respondent and the complainant must each have an advisor (or university-provided hearing advisor) present at the hearing to conduct cross-examination. If a party chooses not to attend the hearing, then their chosen advisor may attend the hearing to conduct cross-examination on their behalf. If a party does not bring an advisor to the hearing or if neither the party nor their chosen advisor chooses to attend the hearing, then OSCR will assign a university-provided hearing advisor to conduct cross-examination on their behalf.

(5)   The Evidence Packet will be available at the hearing to give each party an equal opportunity to refer to the evidence during the hearing, including for purposes of cross-examination.

(6)   Parties must submit all written, tangible, or documentary evidence and identify all fact witnesses during the investigation and no later than the conclusion of evidence review, provided such information was available to the submitting party. If written, tangible, or documentary evidence or a witness's identity that was not available to a party prior to the conclusion of evidence review becomes available prior to, or on the day of, the hearing, the party should immediately submit this information to OSCR staff. The party should also document why this new information should be included after the documented deadline. The Chair will then determine whether to provide the information to the other party and their advisor, providing them with sufficient time for review, or to send the complaint back to the investigator for further investigation. The Panel will assign appropriate weight to testimonial evidence that is provided at the hearing but was not previously provided to the investigator.

(7)   Persons who have no relevant evidence to provide may not participate as witnesses.

(8)   Any witness who is not also serving as an advisor may only participate in the hearing while providing evidence or answering questions.

(9)   Both parties may identify expert witnesses to provide testimony at the hearing, but to do so, the party must submit in writing to the investigator the name and contact information for the expert witness by the Investigative Report response deadline described in §7(b) above. Also, by this deadline, the expert witness must submit to the investigator a written report describing their credentials and detailing their

intended testimony. This information will be provided to the other party in a timely manner, and they will have an opportunity to challenge the witness's expertise. The Chair will determine whether the expert witness will be allowed to participate based on the relevance of their testimony.

(10) The hearing will be audio recorded by OSCR staff. To protect the confidentiality of the process and the privacy of individuals involved, no other participants are permitted to record the hearing. The Panel's deliberation is not audio recorded. Any party may review this recording at any time during the seven years following its creation (subject to any procedures or limitations OSCR has in place at the time the review is requested).

(11) The investigator will attend the hearing but will leave the hearing prior to deliberation.

(12) At the Chair's discretion, an employee of the Office of the Dean of Students may attend the hearing and the deliberation to provide administrative support to the Panel. This person will not participate in questioning or offer any opinions during deliberation.

(13) Neither the complainant nor the respondent will be allowed to cross-examine, or otherwise address, each other or any witness directly. Instead, when provided for by the hearing procedures, each party's advisor of choice (or university-provided hearing advisor) will be allowed to cross-examine the investigator, the other party (or parties), and the witnesses. All questions asked during cross-examination must be relevant.

(14) The Chair may instruct a complainant, respondent, or witness not to answer a question asked during cross-examination (or at any other time) if that question has already been answered or is irrelevant, provided the Chair explains their decision. Prior to deciding on a question's relevance, the Chair may ask the questioner to explain the question's relevance. The Chair may also instruct the questioner to reword a relevant question that is asked in a manner that, in the Chair's opinion, is intended to disparage, intimidate, or otherwise harass the individual being questioned.

(15) The Panel may consider statements made by parties or witnesses that are otherwise permitted under these procedures in reaching a determination regarding responsibility even if those parties or witnesses do not participate in cross-examination at the hearing. Furthermore, the Panel may not draw any inference about the determination regarding responsibility based solely on a party's or witness's absence from the hearing or refusal to answer questions.

(16) At the request of the respondent or the complainant, OSCR staff will make arrangements for the parties to participate in the hearing while in different locations using technology enabling the Panel members and the parties to simultaneously see and hear any person who is answering questions.

(17) The Chair will identify at least one break of no fewer than ten minutes for every two hours of the hearing. The respondent and the complainant may also request additional breaks as needed, provided the number of requests is not disruptive to the orderly conduct of the hearing. The Chair will decide whether to grant any such requests.

(18) The Chair may set a reasonable time frame for the hearing and reasonable time limits for each step of the hearing but may allow deviations, provided such allowances are fair and equitable. After consultation with the other Panel members, the Chair may also decide to continue the hearing to another day for good cause. Acceptable reasons include, but are not limited to, the need for additional investigation, the need to seek additional witness testimony, or the inability to complete all required steps of the hearing process within a reasonable time frame. Both parties must be notified of the date, time, and location at least seven business days in advance, but prior notification of possible continuance dates will satisfy this requirement.

(19) The Chair may set additional rules for the hearing as needed, if none conflict with any provision of this appendix.

(f) Hearing Procedures: Fact Finding

(1) Under the direction of the Chair, all Panel members and participants will introduce themselves by name and role.

(2) The Chair will briefly describe the order of the hearing.

(3) The Chair will invite the investigator to make a statement (if they choose) regarding the investigation, and Panel members may question the investigator. The respondent's advisor and the complainant's advisor will then have an opportunity to question the investigator.

(4) The Chair will invite the complainant to make an opening statement regarding the allegations. This statement should last no longer than ten minutes unless the Chair approves a greater duration. The Panel members will then question the complainant, after which the respondent's advisor will have an opportunity to cross-examine the complainant.

(5) The Chair will invite the respondent to make an opening statement regarding the allegations. This statement should last no longer than ten minutes unless the Chair approves a greater duration. The Panel members will then question the respondent, after which the complainant's advisor will have an opportunity to cross-examine the respondent.

(6) The Panel Chair will invite each participating witness into the room, one at a time, to answer questions from Panel members. For each witness, the respondent's advisor and the complainant's advisor will have an opportunity to as cross-examination questions.

(7)   Panel members will have a final opportunity to question the complainant, the respondent, and the investigator regarding the allegations.

(8)   The complainant's advisor will have a final opportunity to cross-examine the respondent. And the respondent's advisor will have a final opportunity to cross-examine the complainant.

(9)   The Chair will invite the complainant to make a closing statement regarding the allegations. Each statement should last no longer than five minutes.

(10) The Chair will invite the respondent to make a closing statement regarding the allegations. This statement should last no longer than five minutes.

(11) The Chair will excuse the respondent, the complainant, and the investigator from the hearing, and the Panel will enter into closed deliberation to find facts and make a determination regarding responsibility. The Panel will make its decisions by simple majority vote and will apply the preponderance of the evidence standard.

(g) Hearing Procedures: Deliberation

(1) If the respondent(s) is found not responsible, the deliberation is complete.

(2) If a responsibility finding is made, the Director or designee will provide any written statement of desired outcome, character statements, or impact statements. If a student has disciplinary history that was not deemed relevant to the allegations, that will also be shared after a responsibility finding is made. The Panel will determine an appropriate formal sanction (see §2.10(b) of the Student Disciplinary Procedures) for the respondent. The Panel may also issue educational sanctions and apply additional conditions or restrictions set forth in §2.10(c) of the Student Disciplinary Procedures.

(h) Notice of Action Taken. OSCR staff will provide simultaneous email notification of the Panel's decision to the respondent and the complainant within five business days. This notification will also include:

(1) A statement of the allegations considered by the Panel, including any allegations of Title IX Sexual Harassment;

(2) A description of the procedural steps taken from the receipt of the formal complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held;

(3) Findings of fact supporting the determination regarding responsibility;

(4) Conclusions regarding the application of the *Student Code* and other relevant policies to the facts;

(5) A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility;

(6) A list of any formal sanctions, educational sanctions, or behavioral restrictions imposed;

(7) A statement regarding whether remedies designed to restore or preserve equal access to the university's education program or activity will be provided to the complainant; and

(8) Information regarding the parties' right to appeal the Panel's decision.

(i) Finality of Decisions Not Appealed. The Panel's decision will become final after five business days from the date of notice of the Panel's decision unless either party submits a timely Notice of Appeal. If OSCR dismisses the formal complaint or any allegations therein, then that decision will likewise become final after five business days from the date of the notice of the decision unless either party submits a timely Notice of Appeal.

## Section 9: Appeal Procedures

(a) Right to Appeal. Both parties have the right to appeal the Panel's decision or the decision of the investigator to dismiss a formal complaint or any allegations therein.

(b) Grounds for Appeal. The appellant must base the appeal exclusively on one or more of the following grounds:

(1) Procedural irregularity that affected the outcome of the matter.

(2) New evidence that was not reasonably available at the time the determination regarding responsibility or the decision to dismiss the formal complaint or any allegation therein was made, that could affect the outcome of the matter.

(3) The Title IX Coordinator, investigator(s), or Panel members had a conflict of interest or bias for or against complainants or respondents generally or any individual complainant or respondent that affected the outcome of the matter.

(4) Any sanctions imposed by the Panel were not appropriate for the violation(s) for which the respondent was found responsible.

(c) Notice of Appeal. The appellant must submit a Notice of Appeal and all supporting documentation to the Office for Student Conflict Resolution within five business days of the date of notice of the Panel's decision (or of the investigator's decision to dismiss the formal complaint or any allegations therein).

(d) Content of Notice of Appeal. The Notice of Appeal must contain at least the following: (1) specific grounds for appeal; (2) specific outcome requested; and (3) the appellant's reasons in support of the grounds identified and the outcome requested. The appellant must submit the Notice of Appeal in writing, and the appellant must either sign the Notice of Appeal or submit it by email to OSCR from their university email address (if applicable). Oral appeals are not accepted. If only one party submits a Notice of Appeal, OSCR will notify the other party of the submission and grant the other party access to all submitted documentation. The other party will have five business days from the date of

notification to submit a written response to be considered as part of the appeal. If both parties submit a Notice of Appeal, both parties will be informed, granted access to all submitted documentation, and given five business days to submit a written response.

(e) Sanctions Held in Abeyance Pending Appeal. Any formal or educational sanctions imposed will be held in abeyance automatically during the period in which the appeal may be filed and, once an appeal is filed, until the committee reaches a decision on the appeal. Behavioral restrictions such as no contact directives, however, remain in place pending the appeal.

(f) Appellate Review.

(1) The Chair of the SCSD or their designee will identify three SCSD members, of which one must be a faculty member and one a student, to decide the appeal. These individuals will constitute the Appeal Committee. Before the membership of this Appeal Committee is finalized, OSCR will provide both the respondent and the complainant with a list of all members of the SCSD. At this point, the parties may challenge the objectivity of any person on this list. Such a challenge must be based on an identified bias (e.g., a prior relationship between the party and the member) or an identified conflict of interest. The Chair of the SCSD or their designee will consider these challenges when making a final decision regarding Appeal Committee membership. If the Chair of the SCSD does not serve on the Appeal Committee, they or their designee will select a faculty member to chair the Appeal Committee.

(2) The Appeal Committee will review all materials that were provided to the Panel, the recording of the hearing, the Notice(s) of Appeal, any documentation provided in support of the Notice(s) of Appeal, and any responses to the Notice(s) of Appeal.

(3) The Appeal Committee will meet to consider the appeal and will be advised by an OSCR staff member who did not serve as an investigator; this OSCR staff member will not be allowed to vote. Neither the respondent nor the complainant will be allowed to attend the deliberations of the Appeal Committee.

(g) Deliberations. The Appeal Committee will decide by simple majority vote whether the appellant has met any of the grounds for appeal. The decision of the Appeal Committee is final and binding on all parties.

(h) Authority of the Appeal Committee. If the Appeal Committee determines that one (or more) of the grounds for appeal has been met, the Appeal Committee may:

(1) Affirm the decision;

(2) Modify the decision;

(3) Remand the case to the original investigator or Panel (with instruction) or to a new investigator or Panel (with or without instruction) for a new decision; and/or

(4) Modify any sanctions or restrictions imposed.

(i)  Notice of Decision. OSCR staff will provide simultaneous email notification of the Appeal Committee's decision, including a rationale, to the parties within five business days of that decision.

## Section 10: Procedural Time Frames

(a)  The anticipated duration of the investigation and hearing process, from the receipt of the formal complainant to the written notification of the Panel's decision, is no more than 60 business days, but the investigator may extend this timeframe in increments of 10 business days for good cause provided the investigator or their designee notifies both parties in writing of the delay and the reason for the delay. Acceptable reasons include, but are not limited to, the complexity of the investigation, the number of witnesses, the need for language assistance or accommodation of disabilities, and the possibility of interruption by break periods.

(b)  The anticipated duration of the appeal process, from the written notification of the Panel's decision to the notification of the Appeal Committee's decision, is no more than 25 business days, but the Director may extend this timeframe in increments of 10 business days for good cause provided the Director or their designee notifies both parties in writing of the delay and the reason for the delay.

## Section 11: Petitions to the Subcommittee on Sexual Misconduct

Persons who have been dismissed from the university for sexual misconduct may petition the Subcommittee on Sexual Misconduct for permission to re-enter the university in accordance with the procedures described in Article IV, Section 4.02.

## Section 12: Additional Responsibilities of the Title IX Coordinator in the Student Discipline System

(a)  Advisory Role of the Title IX Coordinator. The Director and the investigators may seek advice from the Title IX Coordinator or their designee regarding investigations, supportive measures, corrective action remedies, training, and compliance with Title IX and other federal, state, or local laws and regulations.

(b)  Review by Title IX Coordinator. The Title IX Coordinator or their designee will review all Title IX Sexual Harassment cases upon their completion to determine whether the university needs to take additional action that was not available through the disciplinary process. A non-exclusive list of potential supportive measures and corrective action remedies is available at https://wecare.illinois.edu/policies/campus/interim/.

## Section 13: Privacy

(a) Any proceeding, meeting, or hearing held as part of the process described in this appendix will protect the privacy of the participating parties and witnesses in accordance with applicable law.

(b) The university will not disclose the identity of the respondent, the complainant, or witnesses except as necessary to implement supportive measures and accommodations, investigate the allegations, conduct any hearing or judicial proceeding, or when provided by state or federal law.

## Section 14: Conflicts of Interest and Bias

(a) Any OSCR staff member, investigator, Panel member, or SCSD member who has a conflict of interest with respect to a specific case must recuse themselves from any role in that case.

(b) Any OSCR staff member, investigator, Panel member, or SCSD member who has a bias for or against the respondent or complainant or for or against complainants or respondents generally must recuse themselves from any role in a Title IX Sexual Harassment case.

## Section 15: Record-Keeping

(a) OSCR will maintain for a period of at least seven years records of the following:

(1) The investigation, including any determinations regarding responsibility and any sanctions or behavioral restrictions imposed;

(2) The recording of the formal hearing;

(3) Any appeal and the result therefrom; and

(4) Any remedies provided to the complainant unless records of such remedies are maintained elsewhere, as in the Title IX Office.

# EXHIBIT N

# No. 11 Illinois suspends Terrence Shannon Jr. with FDU up next

cbssports.com/college-basketball/news/no-11-illinois-suspends-terrence-shannon-jr-with-fdu-up-next/

FLM                                                                December 29, 2023



Watch Now:

No. 11 Illinois suspended senior guard Terrence Shannon Jr. on Thursday and tries to focus on a home encounter with Fairleigh Dickinson on Friday.

Shannon is suspended indefinitely from all team activities. A warrant for his arrest was issued Wednesday. He is facing a rape charge in Lawrence, Kan., and the alleged incident took place during Shannon's visit to the Illinois-Kansas football game on Sept. 8, the school said in a release.

Shannon traveled to Kansas and turned himself into authorities.

"The University and DIA have shown time and again that we have zero tolerance for sexual misconduct," Illinois athletic director Josh Whitman said in a university press release. "At the same time, DIA policy affords student-athletes appropriate levels of due process based on the nature and severity of the allegations. We will rely on that policy and our prior experiences to manage this situation appropriately for the University and the involved parties."

Whitman is scheduled to meet with media on Friday.

Illinois (9-2) has little time to refocus on Fairleigh Dickinson (6-7) without Shannon, who is averaging 21.7 points and 4.5 rebounds while leading the Illini in assists, blocks and steals.

Illinois coach Brad Underwood used the transfer portal to restock his backcourt in the offseason but it was Shannon's decision to return for a second season that helped restore the Fighting Illini as Big Ten contenders.

Marcus Domask, who has started 117 games in his career, matched Shannon's career-high 33 points in a Dec. 5 win over Florida Atlantic with his own career-high 33 points. Quincy Guerrier, who has played 142 games in his career, buttressed Shannon's 30 points against Missouri on Dec. 22 with a career-high 28 points. Coleman Hawkins added a season-high 15 points against Missouri as he drilled 3 of 5 3-pointers with the Tigers' defense focused on slowing those guards.

"We're basically pick your poison," Underwood said after the Missouri game. "We're not just one-dimensional. We're not just a Terrence Shannon basketball team. You leave Quincy open, that opens up the floor. Space is what the game is about. And we're able to space."

According to KenPom.com, Illinois ranks 15th in the nation in Division I experience, though that number is calculated including Shannon, one of the three fifth-year players normally in Underwood's starting lineup.

Prior to the suspension, Underwood said he was counting on the team approach to win games. He'll need it now more than ever.

"(It's) maturity," Underwood said. "They're playing to win. There's no other agendas. They all are mature enough to know that winning helps all of them. There's no 'me, me, me.' It's all about their approach. They have fun together. They're connected."

This veteran bunch is in the middle of a nine-game stretch against schools that played in the NCAA Tournament last season. Fairleigh Dickinson is No. 5 in this run and ordinarily would rank last in terms of name recognition -- but these are the Knights who became the second No. 16 seed in NCAA history to knock off a No. 1 seed when they beat Purdue last year.

While FDU head coach Tobin Anderson jumped to Iona shortly after stunning Purdue, the Knights elevated 39-year-old assistant Jack Castleberry to the top spot.

The Knights retain three starters and three backups from last year's squad -- including center Ansley Almonor (16.7 points, 5.8 rebounds) and Boilermakers slayer Sean Moore (11.5 points, 7.3 rebounds) -- but the magic's not quite the same this year even though they're still playing at a dizzying tempo.

They are coming off a 92-69 loss to Fairfield before the holiday break, a game that saw the Knights outshot on field goals, three-point attempts and at the free-throw line. They also were outrebounded 40-37 and had 12 turnovers to eight for Fairfield.

**177**

"We need a lot more focus on some of the scouting report stuff and get back to who we are supposed to be," Castleberry said after the game.

According to KenPom.com, the Knights rank 358th out of 362 Division I teams in defensive efficiency as they surrender 116.2 points per 100 possessions. Illinois, on the other hand, stands 13th nationally at 92.9 points allowed per 100 possessions.

"Everything we do (offensively) is based on the defensive side," Underwood said.

--Field Level Media

Copyright 2024 STATS LLC and Associated Press. Any commercial use or distribution without the express written consent of STATS LLC and Associated Press is strictly prohibited.

# EXHIBIT O

**BIG TEN TENDER OF FINANCIAL AID**
SIGNED FOR ENROLLMENT IN ACADEMIC YEAR <u>2022-23</u>

From <u>University of Illinois - Urbana Champaign</u>
(Institution)

To <u>Terrence Shannon</u>
(Name)

<u>1011 S. Ashland Ave.</u>
(Street Address)

<u>Chicago, IL 60607</u>
(City, State, Zip)

Date <u>04/27/2022</u>   Sport <u>Men's Basketball</u>

**Date of First Attendance:**

At this institution <u>Fall 2022</u> At any institution <u>Fall 2019</u>

**Period of Award:** <u>2022-23; 2023-24</u>

(Please specify applicable academic years and/or terms)

**Type of Award:** [✔] Initial
[ ] Initial w/ Letter of Intent
[ ] Renewal
[ ] Noncounter (Competition completed/ Medical Exemption)

**CONDITIONS OF FINANCIAL AID**

1. This Tender covers the following as checked:

   [✔] (A) Full Grant [includes tuition, fees, room, board, books and other expenses related to attendance at this institution up to the cost of attendance (per NCAA legislation)]

   [ ] (B) The following items (per NCAA legislation):
   [ ] (1) Tuition
   [ ] (2) Fees
   [ ] (3) Board
   [ ] (4) Room
   [ ] (5) Books
   [ ] (6) Other expenses related to attendance at this institution up to the cost of attendance
   [ ] (7) Other explanation of award:_____

2. This Tender is subject to your fulfillment of the admission requirements of this institution.

3. Your receipt of financial aid under this Tender is subject to your full compliance with this institution's policies and the rules, regulations, bylaws and other legislation of the Big Ten Conference and the NCAA.

4. This Tender is also subject to the additional conditions of financial aid, if any, that are established by this institution and set forth on Schedule A, a copy of which is attached hereto and incorporated herein.

5. This Tender applies to the receipt of financial aid on or after August 1, 2022, for the academic year 2022-2023 and, if applicable, any such later academic year(s).

6. If this Tender is issued with a National Letter of Intent, it must be signed in accordance with the National Letter of Intent procedures, signing and filing dates.

   If you wish to accept this Tender, return this form to the Financial Aid Office of this institution BY: <u>05/04/2022</u>

SIGNED <u>Brian Russell, Ph.D.</u> Digitally signed by Brian Russell, Ph.D. Date: 2022.04.27 15:16:46 -05'00'
Director of Athletics

SIGNED <u>Kimberly Hamilton</u> Digitally signed by Kimberly Hamilton Date: 2022.04.27 15:19:54 -05'00'
Financial Aid Director

ACCEPTANCE *By signing this offer of financial aid and Schedule A, I understand and agree to the "Conditions of Financial Aid" set forth above and further that:*

1. I will become ineligible for intercollegiate athletics competition if I receive any financial assistance other than that authorized by the NCAA or exceed the financial aid limits stipulated under NCAA Bylaw 15 (Financial Aid).

2. I am ineligible to receive this Tender, and this Tender will be void, if I am under contract to or currently receiving compensation from a professional sports organization except as provided under NCAA Bylaw 12 (Amateurism) and NCAA Bylaw 15 (Financial Aid).

3. Any modification, cancellation, renewal or nonrenewal of this Tender must be in compliance with institutional policies and with Big Ten Conference and NCAA rules, regulations, bylaws and other legislation.

4. My eligibility to receive financial aid under this Tender is subject to my full compliance with the institution's policies, including without limitation any of the conditions set forth on Schedule A attached hereto, and with the rules, regulations, bylaws and other legislation of the Big Ten Conference and the NCAA.

SIGNED _____    DATE 4/28/22 STUDENT ID # (optional) _____
Student's Signature

SIGNED _____    DATE _____
Parent or Legal Guardian's Signature

## SCHEDULE A TO TENDER OF FINANCIAL AID
## DURING ACADEMIC YEAR(S) 22-23, 23-24

Pursuant to paragraph 4 of the "Conditions of Financial Aid" section and paragraph 4 of the "Acceptance" section of the Tender of Financial Aid, the following additional conditions of financial aid apply at this institution: Athletic aid may be reduced or cancelled in cases of serious or repeated violations of the Division of Intercollegiate Athletics Code of Conduct, published team rules, and/or published academic standards Athletic aid may also be reduced, cancelled or not renewed for the following reasons:

* Failure to disclose or misrepresentation of a known physical or mental medical condition;
* Conviction, guilty plea or no contest plea to a crime involving sexual misconduct or dating or domestic violence;
* A finding of responsibility for sexual misconduct or dating or domestic violence by a formal institutional disciplinary action of any collegiate or secondary educational institution;
* Failure to graduate at the end of the period of the award if the student-athlete has remaining eligibility (multi-year tenders only);
* Failure to graduate within four years after initial full-time enrollment at any collegiate or secondary educational institution;
* Graduation;
* The Division of Intercollegiate Athletics reserves the right to reduce athletic aid where a student-athlete receives an increase in exempted institutional financial aid as defined under NCAA legislation.

SIGNED _Brian Russell, Ph.D._ Digitally signed by Brian Russell, Ph.D. Date: 2022.04.27 15:17:04.45'0'
Director of Athletics

SIGNED _Kimberly Hamilton_ Digitally signed by Kimberly Hamilton Date: 2022.04.27 15:20:07 -05'00'
Financial Aid Director

SIGNED _____
Student's Signature

DATE _5/28/22_   STUDENT ID # (optional) _____

SIGNED _____   DATE _____
Parent or Legal Guardian's Signature

# EXHIBIT P



UNIVERSITY OF ILLINOIS URBANA-CHAMPAIGN

**Campus Administrative Manual**

Search this site

All    A - Z    By Category ⌄    By Role ⌄    Feedback

---

SEXUAL MISCONDUCT

---

# Purpose

The purpose of this policy is to provide a safe and welcoming educational and work environment and to establish standards of conduct that are appropriate for our campus community; and to comply with Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106; Section 304 of the Violence Against Women Reauthorization Act of 2013 ("VAWA"), 20 U.S.C. 1092(f), and its implementing regulations, 34 C.F.R. Part 668.46; Title VII of the Civil Rights Act of 1964 ("Title VII"); the Illinois Human Rights Act; and the Illinois Preventing Sexual Violence in Higher Education Act, 110 ILCS 155/1 et seq.

This policy was revised in July 2020 as part of the effort to align the University's policy and procedures with new Title IX regulations and to incorporate recommendations made by the Committee on Faculty Sexual Misconduct for addressing unwelcome sexual, sex or gender-based conduct by employees. When investigating and adjudicating complaints of "Title IX Sexual Harassment" (as defined below), federal regulations require the University to follow specific procedures, some of which are unique to Title IX. This policy also addresses other categories of sexual misconduct that do not fall within the definition of "Title IX Sexual Harassment" (for example, because of the nature of the alleged conduct, where it took place, or who was involved) but that may violate other conduct requirements.

The purpose of this policy in delineating which conduct is "Title IX Sexual Harassment" is not to imply that the University considers certain conduct more or less objectionable, nor to discourage any person from submitting a report. Rather, the purpose of this policy is to ensure that all persons who experience sexual misconduct described in this policy have full access to the rights and resources they are entitled to, and that every complaint is handled fairly and equitably, in a manner consistent with applicable law, and with the ultimate aim of maintaining an institutional climate of safety and accountability. Title IX requires a definition of "Title IX Sexual Harassment" that provides a floor—not a ceiling—to the varied forms of misconduct that can be prohibited at a university, and the University of Illinois has decided to go beyond this floor to promote a safe and welcoming culture and climate.

**Relation to Other Laws and Policies**

Conduct prohibited by this policy may violate other laws and policies, including, but not limited to, the University's Nondiscrimination Policy, the University Code of Conduct, and the Student Code. Sexual misconduct that constitutes Title IX Sexual Harassment will be addressed pursuant to the University's Title IX grievance procedure(s). Nothing in this policy prevents the University from addressing prohibited sexual misconduct that does not trigger the University's Title IX response obligations under other applicable policies and procedures.

In addition, this policy does not cover every allegation of discrimination based on sex. Other University policies prohibit discrimination and harassment that would not constitute sexual misconduct, as defined in this policy. When an individual alleges discriminatory action that is not sexual misconduct, as defined in this policy, the allegations are assessed under the applicable University policy. For information regarding other University policies addressing discrimination and harassment, visit the Nondiscrimination Policy.

**Issued:**
June 30, 2015

**Revised:**
September 28, 2022

**Last Reviewed:**
September 28, 2022

**Policy Number:**
HR-79

**Responsible Office:**
Office of the Chancellor

**Policy Contact:**
Danielle Fleenor
Title IX Coordinator
614 E. Daniel Street, Suite 303
Champaign, Illinois 61820
(844) 616-7978
titleixcoordinator@illinois.edu

Provide Feedback 💬 »

Print Policy 🖨 »

**184**

If the regulations implementing Title IX at 85 Fed. Reg. 30026, 30026-30579 are enjoined or invalidated by a Federal Court with jurisdiction over the University or reversed or replaced by any agency with sufficient authority, the *Prohibited Sexual Misconduct Processes* will immediately begin to apply to all reports and complaints of Prohibited Sexual Misconduct, including Title IX Sexual Harassment, and the *Title IX Sexual Harassment Process* will immediately be inoperative unless and until any such injunction, invalidation, reversal, or replacement is overturned.

## Scope

This policy applies to:

1. All students, Registered Organizations, Registered Student Organizations, and others subject to student discipline pursuant to the Student Code;
2. All University employees;
3. Applicants for enrollment or employment with the University;
4. Other affiliated individuals, including but not limited to, visiting faculty, visiting scholars, and post-doctoral fellows; and
5. Third parties, including but not limited to contractors, subcontractors, volunteers, and visitors.

## Authority

Office of the Chancellor.

## Policy

The University of Illinois Urbana-Champaign ("University") is committed to providing a safe and welcoming campus environment that is free from all forms of discrimination based on sex. Discrimination based on sex includes discrimination on the basis of sexual orientation or gender identity. The University does not discriminate against any person based on sex in its education programs or activities or in employment. This policy includes the processes to be used for all reports or complaints of sexual misconduct. The grievance processes for Title IX Sexual Harassment and other Prohibited Sexual Misconduct shall be distinct as set out in this policy.

The University also prohibits retaliation against any person who, in good faith, reports or discloses a violation of this policy, files a complaint, or otherwise participates in an investigation, proceeding, complaint, or hearing under this policy.

### Title IX

The lead Title IX Coordinator is responsible for and authorized to coordinate the University's efforts to comply with and carry out its responsibilities under Title IX, which prohibits sex discrimination in education programs and activities for institutions that receive federal financial assistance, as well as retaliation for the purpose of interfering with any right or privilege protected by Title IX. The lead Title IX Coordinator also oversees the University's response to all reports and complaints of Prohibited Sexual Misconduct and Title IX Sexual Harassment to monitor outcomes, identify any patterns, and assess their effects on the campus climate. The lead Title IX Coordinator evaluates requests for confidentiality by those who report or complain about Prohibited Sexual Misconduct and Title IX Sexual Harassment in the context of the University's responsibility to provide a safe and welcoming campus environment for all students free from discrimination based on sex. The lead Title IX Coordinator is also responsible for effective implementation of any supportive measures or remedies for Prohibited Sexual Misconduct and Title IX Sexual Harassment, and for overseeing the University's recordkeeping obligations under Title IX. All formal complaints of Title IX Sexual Harassment shall be reviewed and addressed in accordance with the grievance process set forth in the University's Title IX Sexual Harassment grievance procedures for Formal Complaints which are required to:

1. Treat complainants and respondents equitably in all manners, including by providing remedies to a Title IX Complainant where a determination of responsibility for Title IX Sexual Harassment has been made against the respondent, and by

**185**