## University of Illinois Athletics

**2023-24 Men's Basketball Schedule**

**SEATGEEK**

| Overall | | PCT | | Conf | | PCT | |
|---------|--|-----|--|------|--|-----|--|
| 11-3 | | .786 | | 2-1 | | .667 | |
| **Streak** | | **Home** | | **Away** | | **Neutral** | |
| L1 | | 8-1 | | 1-2 | | 2-0 | |



FIGHTING ILLINI BASKETBALL

120 YEARS OF TRADITION THAT CAN'T BE REPLICATED AT HOME.

TICKETS ON SALE NOW

GET TICKETS

*All dates subject to change.*

| Date | Time | At | Opponent | Location | TV | Radio | Tournament | Result |
|------|------|-----|----------|----------|-----|-------|-----------|--------|
| October 20, 2023 (Friday) | 8 pm CT | Home | Ottawa (Exh.) | Champaign, Ill. / State Farm Center | B1G+ (Stream) | Busey Bank Illini Sports Network | | W, 116-65 |
| October 29, 2023 (Sunday) | 5 pm CT | Home | Kansas (Exh.) | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | Maui Strong Relief Matchup | W, 82-75 |
| November 6, 2023 (Monday) | 7 pm CT | Home | Eastern Illinois | Champaign, Ill. / State Farm Center | B1G+ (Stream) | Busey Bank Illini Sports Network | | W, 80-52 |
| November 10, 2023 (Friday) | 7 pm CT | Home | Oakland | Champaign, Ill. / State Farm Center | B1G+ (Stream) | Busey Bank Illini Sports Network | | W, 64-53 |
| November 14, 2023 (Tuesday) | 7 pm CT | Home | Marquette | Champaign, Ill. / State Farm Center | FS1 | Busey Bank Illini Sports Network | Gavitt Tipoff Games | L, 64-71 |
| November 17, 2023 (Friday) | 7 pm CT | Home | Valparaiso | Champaign, Ill. / State Farm Center | B1G+ (Stream) | Busey Bank Illini Sports Network | | W, 87-64 |
| November 19, 2023 (Sunday) | 7 pm CT | Home | Southern | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | W, 88-60 |

| Date | Time | At | Opponent | Location | TV | Radio | Tournament | Result |
|------|------|----|---------|---------|----|----|-----------|--------|
| November 24, 2023 (Friday) | 8 pm CT | Home | Western Illinois | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | W, 84-52 |
| December 2, 2023 (Saturday) | 3 pm CT | Away | Rutgers | Piscataway, N.J. | BTN | Busey Bank Illini Sports Network | | W, 76-58 |
| December 5, 2023 (Tuesday) | 5:30 pm CT | Neutral | Florida Atlantic | New York, N.Y. / Madison Square Garden | ESPN | Busey Bank Illini Sports Network | Jimmy V Classic | W, 98-89 |
| December 9, 2023 (Saturday) | 11 am CT | Away | Tennessee | Knoxville, Tenn. | CBS | Busey Bank Illini Sports Network | | L, 79-86 |
| December 17, 2023 (Sunday) | 12 pm CT | Home | Colgate | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | W, 74-57 |
| December 22, 2023 (Friday) | 8 pm CT | Neutral | Missouri | St. Louis, Mo. / Enterprise Center | FS1 | Busey Bank Illini Sports Network | McBride Homes Braggin' Rights | W, 97-73 |
| December 29, 2023 (Friday) | 8 pm CT | Home | Fairleigh Dickinson | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | W, 104-71 |
| January 2, 2024 (Tuesday) | 8 pm CT | Home | Northwestern | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | W, 96-66 |
| January 5, 2024 (Friday) | 7:30 pm CT | Away | Purdue | West Lafayette, Ind. | FS1 | Busey Bank Illini Sports Network | | L, 78-83 |
| January 11, 2024 (Thursday) | 8 pm CT | Home | Michigan State | Champaign, Ill. / State Farm Center | FS1 | Busey Bank Illini Sports Network | | |
| January 14, 2024 (Sunday) | 1/5 pm CT | Home | Maryland | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | |
| January 18, 2024 (Thursday) | 7:30 pm CT | Away | Michigan | Ann Arbor, Mich. | FS1 | Busey Bank Illini Sports Network | | |
| January 21, 2024 (Sunday) | 12 pm CT | Home | Rutgers | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | |
| January 24, 2024 (Wednesday) | 8 pm CT | Away | Northwestern | Evanston, Ill. | BTN | Busey Bank Illini Sports Network | | |
| January 27, 2024 (Saturday) | 2 pm CT | Home | Indiana | Champaign, Ill. / State Farm Center | FOX | Busey Bank Illini Sports Network | | |
| January 30, 2024 (Tuesday) | 6 pm CT | Away | Ohio State | Columbus, Ohio | Peacock (Stream) | Busey Bank Illini Sports Network | | |

**292**

| Date | Time | At | Opponent | Location | TV | Radio | Tournament | Result |
|---|---|---|---|---|---|---|---|---|
| February 4, 2024 (Sunday) | 5:30 pm CT | Home | Nebraska | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | |
| February 10, 2024 (Saturday) | 1 pm CT | Away | Michigan State | East Lansing, Mich. | CBS | Busey Bank Illini Sports Network | | |
| February 13, 2024 (Tuesday) | 6 pm CT | Home | Michigan | Champaign, Ill. / State Farm Center | Peacock (Stream) | Busey Bank Illini Sports Network | | |
| February 17, 2024 (Saturday) | 4:30 pm CT | Away | Maryland | College Park, Md. | FOX | Busey Bank Illini Sports Network | | |
| February 21, 2024 (Wednesday) | 5:30 pm CT | Away | Penn State | University Park, Pa. | BTN | Busey Bank Illini Sports Network | | |
| February 24, 2024 (Saturday) | 1:15 pm CT | Home | Iowa | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | |
| February 28, 2024 (Wednesday) | 8 pm CT | Home | Minnesota | Champaign, Ill. / State Farm Center | BTN | Busey Bank Illini Sports Network | | |
| March 2, 2024 (Saturday) | 12 pm CT | Away | Wisconsin | Madison, Wis. | BTN | Busey Bank Illini Sports Network | | |
| March 5, 2024 (Tuesday) | 6 pm CT | Home | Purdue | Champaign, Ill. / State Farm Center | Peacock (Stream) | Busey Bank Illini Sports Network | | |
| March 10, 2024 (Sunday) | 6 pm CT | Away | Iowa | Iowa City, Iowa | FS1 | Busey Bank Illini Sports Network | | |
| March 13, 2024 (Wednesday) | TBA | Neutral | Big Ten Tournament | Minneapolis, Minn. / Target Center | | Busey Bank Illini Sports Network | Big Ten Tournament | |
| March 19, 2024 (Tuesday) | TBA | Neutral | NCAA Tournament | TBA | | Busey Bank Illini Sports Network | NCAA Tournament | |

Copyright © 2024 University of Illinois Athletics

# EXHIBIT U-1

# Falsely Accused: The Brian Banks Story

legaltalknetwork.com/blog/2023/04/falsely-accused-the-brian-banks-story/

April 14, 2023

- By Paige Locke
- April 14, 2023

In 2002, Brian Banks was a 17-year-old high school football star with a promising future ahead of him. Unfortunately, his life took a drastic turn when he was falsely accused of kidnapping and raping a female classmate. Despite maintaining his innocence, the combination of poor legal counsel, lack of investigative work, and a broken justice system resulted in Banks being convicted and spending over five years in prison for a crime he did not commit.

Banks' story is a powerful example of the injustices that can occur within the criminal justice system. His incredible story of wrongful conviction – and eventual exoneration – is the focus of the latest series of Legal Talk Network's new "California Innocence Project Podcast".



California Innocence Project Podcast

<u>Brian Banks' Story – Part 1</u>



## A Promising Football Star's Tragic Turn of Events

In his junior year at Long Beach Poly High, Brian dominated the football field as a linebacker.  He had verbally accepted an offer to play at the University of Southern California (USC) with a full ride scholarship. At just 16-years-old, Brian had everything in the world to look forward to; however, all of this came crashing down when he was falsely accused and wrongfully convicted of raping a fellow classmate, Wanetta Gibson.

## A False Accusation and an Impossible Choice

Although there was no DNA found on the accuser or her clothing, no eye-witness testimony, and no other evidence to support Gibson's claims, Brian was arrested for the crime. After months of awaiting trial, Banks was urged to take a plea deal by his lawyer, who believed that he would be unable to win his case in court. At just 17-years-old, Brian was being tried as an adult. He faced an impossible decision – either fight the charges against him and risk spending 41 years-to-life in prison, or accept a plea deal for a shorter sentence, and serve time in prison for a crime he did not commit.

Out of fear and pressure from his lawyer, Brian pleaded no contest to the charges and was sentenced to a decade of prison and probation. Brian went to prison on his 18th birthday, marking the first day of what would be a long and challenging five-year prison sentence.

## From Exoneration to the NFL: Brian Banks' Incredible Journey

After his release from prison and nearly a decade after the alleged crime, Banks' accuser reached out to him on social media. She confessed to Brian and his legal team that she had lied. With the help of the <u>California Innocence Project</u> – and his accuser's recanted testimony – Banks was able to have his conviction overturned in 2012.

**296**

Following his exoneration, Banks sought to resume his dream of playing football. In the summer of 2012, Brian received tryouts with several NFL teams, including the Kansas City Chiefs, San Diego Chargers, and San Francisco 49ers. Banks signed with the Atlanta Falcons on April 3rd, 2013. And although he only played four preseason games with the Falcons before being released, Banks was able to fulfill his lifelong dream of playing in the NFL.



## Raising Awareness and Inspiring Change

Unfortunately, Brian's story is just one of many. He was a victim of false accusations and wrongful conviction, and lost over five years of his life as a result. His story is a powerful reminder of the importance of fighting for justice, and a testament to the strength and resilience of the human spirit.

By sharing his story, Banks is helping to raise awareness about wrongful convictions, the systemic issues within our criminal justice system that contribute to these injustices, and inspiring others in their fight for freedom.








Posted by

Paige Locke

# EXHIBIT U-2

# After Being Acquitted of Rape, Former Baylor Player Hopes to Join NFL

nbcdfw.com/news/local/after-being-acquitted-of-rape-former-baylor-player-hopes-to-join-nfl/212022/

Katy Blakey



After being acquitted of rape, former Baylor football player Shawn Oakman hopes to enter the NFL.

In 2016, Shawn Oakman was on the cusp of entering the NFL.

The Baylor defensive end was preparing to enter the draft when he was accused of raping a classmate.

After a three-year legal battle, trial and ultimately acquittal, Oakman is now trying to pursue football again.

"One phone call could change your life, so you just got to be patient," Oakman said. "[I want] to get back into the locker room and that community that I'm use to, that family that I'm use to."

Since a Waco jury found him not guilty, Oakman has been living in Dallas and working out with a trainer, hoping to get a call from an NFL coach.

Oakman was coming off his final season at Baylor when a graduate student accused him of sexually assaulting her at his off-campus duplex after a night out in 2016.

She said it was rape. Oakman said it was consensual.

## Local

The latest news from around North Texas.

Two other former Baylor players were convicted of rape. University President Ken Starr and head football coach Art Briles lost their jobs and the university ultimately settled lawsuits with women who said they were raped by Baylor players.

During the three years Oakman waited for trial, he said he repeatedly rejected plea deals from McLennan County prosecutors.

"I was confident in God, ya know, to bring me through," Oakman said.

In February 2019, the case went to trial. Oakman's accuser took the stand and told the jury the encounter left her anxious and fearful. Two days of testimony led to two hours of deliberations and the jury returned a verdict of not guilty.

Oakman emotionally told Waco reporters after the verdict, "They slandered my name, they fired my coach and I felt like all that was on me."

Since his acquittal, Oakman said his only focus is on football.

"You try to leave it in the past," he said. "At the end of the day, I'm not looking forward to those three years. I'm looking forward to my next three."

And to those that believe the jury got it wrong, Oakman said he's moved on.

"I ain't got nothing to do with that," Oakman said. "I can only control what I can control and I stand ready for my next opportunity. Everything you go through is for a reason. At the end of the day, I had to keep my faith and that's going to propel me to the next level."

# EXHIBIT U-3

# Duke Lacrosse Incident

---

🌐 **today.duke.edu**/showcase/lacrosseincident/

This website provides information about the "Duke Lacrosse Case" in which three Duke players were accused in 2006 of rape and other crimes they did not commit. It includes links to the following information from Duke:

- <u>Statements and announcements</u> about the case from President Richard H. Brodhead and other Duke officials
- Information about the five <u>committees</u> appointed to investigate issues related to the case - their membership, findings, etc.
- A sample of <u>media coverage</u> of the story
- A sample of <u>published opinions</u> and other material about the story
- <u>Duke's guidelines for news media</u> covering the story



All of these links are imported directly from a "real-time" website that Duke's Office of News and Communications (ONC) maintained during the 13 months the case unfolded. Since ONC will not be posting regular updates to this new site, which was launched in May 2007, readers should view it as a historical record and expect some of the linked material to become inactive over time.

Additional sources of information about the case are available from multiple other sources. Readers looking for specific information from Duke might also try using the search box on the university home page.

The previous website, in its final May 2007 version, can be found <u>here</u>.

On April 11, 2007, North Carolina Attorney General Roy Cooper stepped before a crowded press conference and spoke the words that ended one of the most publicized legal stories in recent American history. "We believe these three individuals are innocent of these charges," he said.

Cooper's long-awaited decision ended a legal ordeal for three Duke University students who had been charged with first-degree sexual offense, kidnapping and, earlier, with rape. The allegations were made by one of two exotic dancers that members of the Duke men's lacrosse team had hired to perform at an off-campus party in March 2006. Durham District Attorney Mike Nifong stated publicly that a rape had taken place and prosecuted the three students vigorously even as evidence mounted that raised serious questions about the accuser's credibility and the veracity of the charges.

Cooper took over the case in January 2007 after the state bar association filed ethics charges against Nifong for withholding exculpatory evidence and making inflammatory statements about the case. In dismissing the charges and stating the attack never occurred, Cooper spoke of a "rush to accuse" and said "there were many points in this case where caution would have served justice better than bravado." In one of the many similar judgments made about how the news media covered the case, columnist David Broder described "a painful exercise in journalistic excess."

The case changed the lives of the three young men and their families and deeply affected the broader Duke community, which found itself in the spotlight with major stories in *The New York Times*, *Newsweek*, *The New Yorker*, *Rolling Stone*, *Sports Illustrated* and thousands of other outlets. Five segments on "60 Minutes" were devoted to the case, as were extensive commentaries on blogs and tabloid television shows.

Faced with the case and its larger implications, Duke President Richard H. Brodhead moved to address broader university issues highlighted by the situation, forming a council of advisers and four committees to examine the lacrosse team, the administration's response to the incident, the student judicial process and Duke's campus culture. In the weeks and months that followed, the committees issued their findings, all of which Duke made public immediately.

Independent of the legal case, given the standards expected of teams that represent Duke, the university forfeited two lacrosse games in the immediate aftermath of the incident as a response to admitted behaviors by team members, such as underage drinking. Brodhead later suspended the remaining games – not as punishment, but as a necessary action until the legal situation became clearer, based on concerns including the safety of Duke's players. At the time, the district attorney was saying emphatically that as many as 46 of the players were still under suspicion for the alleged crimes. After the district attorney indicted three of the players, Duke placed on interim suspension the two who had not yet graduated – part of a routine protocol most U.S. universities follow when students are charged with violent felony crimes. Duke later modified the status of the two players to "administrative leave" and, soon after it became clear in court that Nifong's statements were "not credible, invited them to return in good standing, months before Cooper's decision. In addition, in an effort to create a

**305**

fresh start for the program, Duke replaced Coach Mike Pressler with an interim coach and, subsequently, with John Danowski, who previously coached the lacrosse team at Hofstra University.

Brodhead told "60 Minutes" in August 2006 that "the DA's case will be on trial just as much as our students will be." After Nifong dropped the most serious of the charges – rape – in December 2006, Brodhead called on him to recuse himself from the case, saying, "Mr. Nifong has an obligation to explain to all of us his conduct in this matter."

From the beginning of the affair, other observers voiced strong, often harsh, opinions about the players, the district attorney, the university and nearly every other aspect of the story. Initial criticism focused on the players, with protesters assembling outside the house where the party occurred, banging pots and shouting their concerns. As doubts grew about the charges, criticism shifted to Nifong and his team, as well as to some administrators, students, community members and others – including a group of faculty members who published an ad in *The Chronicle* – who were accused of prejudging the players or of using the case to promote their own agendas. The lacrosse team returned to the field in February 2007 before a cheering crowd that included Brodhead and much of the university's senior leadership, as well as thousands of students and the largest group of reporters ever to attend a regular-season Duke lacrosse game. The team went on to win the league championship and to reach the national championship final game while also maintaining a strong record in the classroom and the community.

Meanwhile, Duke began responding to the concerns raised by the committee that had examined the campus culture. Approximately one year after the event, Duke's fund raising hit record levels, applications for student admissions remained near record levels, new media guidelines were in place to enhance the privacy of students and campus life began to return to normal.

On the legal front, in June 2007 a N.C. State Bar disciplinary panel concluded after a trial that DA Nifong had made inflammatory and prejudicial comments about the case, intentionally withheld DNA evidence and lied to court officials. The panel called for his disbarment and Nifong resigned his office.

Also in June, university leaders announced a settlement with David Evans, Collin Finnerty and Reade Seligmann, noting in a statement how "these young men and their families have been the subject of intense scrutiny that has taken a heavy toll" and saying "it is in the best interests of the Duke community to eliminate the possibility of future litigation and move forward." An accompanying statement from Evans, Finnerty and Seligmann said, "We hope that today's resolution will begin to bring the Duke family back together again, and we look forward to working with the University to develop and implement initiatives that will prevent similar injustices and ensure that the lessons of the last year are never forgotten."

**306**  3/4

Robert K. Steel, the chairman of Duke's Board of Trustees, summarized Duke's remarkable "lacrosse story" in a message he sent to the campus community following Cooper's decision in April. "There is much to learn from the events that we have lived through, and we intend to put this learning to use," Steel wrote. "Duke is a great university that steps up to challenges and opportunities, and together we will use this moment to make our community stronger."

# EXHIBIT U-4

# Duke lacrosse case

W **en.wikipedia.org**/wiki/Duke_lacrosse_case

Contributors to Wikimedia projects

36.00831°N 78.91203°W The **Duke lacrosse case** was a widely reported 2006 criminal case in Durham, North Carolina, United States, in which three members of the Duke University men's lacrosse team were falsely accused of rape.[1][2][3] The three students were David Evans, Collin Finnerty, and Reade Seligmann. The accuser was Crystal Mangum, a student at North Carolina Central University[4][1] who worked part-time as a strip tease dancer.[5] She alleged that the rape occurred at a party hosted by the lacrosse team, held at the Durham residence of two of the team's captains, and where she had worked on March 13, 2006.

Investigation and resolution of the case sparked public discussion of racism, sexual violence, media bias, and due process on campuses. The former lead prosecutor, Durham County District Attorney Mike Nifong, ultimately resigned in disgrace, and was disbarred and briefly imprisoned for violating ethics standards.

On April 11, 2007, North Carolina Attorney General Roy Cooper dropped all charges, declaring the three lacrosse players "innocent" and victims of a "tragic rush to accuse".[6][7]

Cooper described Nifong as a "rogue prosecutor"; the district attorney withdrew from the case in January 2007 after the North Carolina State Bar filed ethics charges against him. In June 2007, Nifong was disbarred for "dishonesty, fraud, deceit and misrepresentation", making him the first prosecutor in North Carolina disbarred for trial conduct. Nifong served one day in jail for lying about sharing DNA tests (criminal contempt); he had not given results to the defense team. The lab director said it was a misunderstanding and Nifong claimed it was due to weak memory.[8]

While DNA analysis did not show evidence from any of the men she accused, Mangum continued to insist she was sexually assaulted that night. She was not charged for her allegations.[9]

Cooper noted several inconsistencies between Mangum's accounts of the evening, and the alibis offered by Seligmann and Finnerty, which was supported by forensic evidence. The Durham Police Department was strongly criticized for violating their own policies by allowing Nifong to act as the *de facto* head of the investigation; using an unreliable suspect-only photo identification procedure with Mangum; pursuing the case despite vast discrepancies in notes taken by Investigator Benjamin Himan and Sgt. Mark Gottlieb; and distributing a poster that appeared to presume the suspects' guilt shortly after the allegations were made public.[10]

Seligmann, Finnerty, and Evans brought a civil lawsuit against Duke University, which was settled. The university paid approximately $20 million to each claimant. The claimants also sought further unspecified damages and called for criminal justice reform laws in a federal civil rights lawsuit filed against the City of Durham and its police department.[10]

## Timeline of events

### Events at the house



The house at 610 North Buchanan Boulevard (demolished in July 2010)

In March 2006, Crystal Mangum,[11][12] a student at North Carolina Central University,[4] had been working part-time as a stripper. She was divorced and supported two children. Although Mangum claimed that she had only recently taken up stripping, further investigating revealed that she had worked at strip clubs since at least 2002, during which time she was arrested for attempting to run over a police officer in a taxi she had stolen. The incident report stated that she had been lap dancing at a strip club that evening.[13]

On March 13, 2006, the lacrosse team held a party at 610 North Buchanan Boulevard, a house owned by Duke University and used as the off-campus residence of the lacrosse team's captains. The team intended for the party to be compensation for having to remain on campus during spring break, due to their competition schedule, and alcohol was consumed. Several players were unaware that strippers had been hired, and only after their arrival were they asked to contribute to the strippers' fees.[14]

A team captain contacted Allure, an escort service, and requested two white strippers. However, the two women who had arrived, Mangum and Kim Mera Roberts (aka Kim Mera Pittman), were black and biracial (half-black/half-Asian), respectively. Before arriving at the party, Mangum, by her own admission, had consumed alcohol and Flexeril (a prescription muscle relaxant).[15] Mangum and Roberts traveled to the party separately. Roberts drove herself and arrived first, and Mangum was later dropped off by a man.[16][17][18]

According to the team captains, while the strippers were dancing, a player asked if the women had any sex toys. Roberts responded by asking if the player's penis was too small. The player brandished a broomstick and suggested that she "use this [as a sex toy]". At this exchange, the women stopped their performance, and left the living room, shutting themselves in the main bathroom of the house. While the women were still in the bathroom, players Reade Seligmann and Collin Finnerty left the house. When the women eventually came out, Mangum began roaming around the yard, half-dressed and shouting.[17]

According to Mangum, the women were coaxed back into the house with an apology, at which point they were separated. She asserts that she was dragged into a bathroom and raped, beaten, and choked for a half hour.[19] Later, police received a 9-1-1 call from a woman complaining that white men had gathered outside of the house where the party took place, had called her racial slurs, and threatened to sodomize her with a broomstick.[19]

Some of the party attendees expressed displeasure that the strippers had delivered a very short performance, despite being paid several hundred dollars apiece to perform. The team captain who had hired the strippers tried to convince the women to go back inside and complete the performance. Both women returned inside, but upon being approached by the player who had earlier brandished the broomstick, again refused to perform, and once again locked themselves in the bathroom. By this point, a number of the party guests had left. House residents, including player David Evans, asked the remaining guests to leave because they were concerned that the noise would cause neighbors to complain to police. When the strippers left the bathroom, and the house, for the second time, a resident locked the door so they (and the guests who had left the house) could not return.[18]

Around 1:00 a.m., while attempting to leave the party, Mangum and Roberts called the partygoers "short dick white boys", and jeered about "how he couldn't get it on his own and had to pay for it".[20] One player responded, "We asked for whites, not niggers." Mangum and Roberts departed in Roberts's car.[17][21] Roberts called 9-1-1 and reported that she had just come from 610 North Buchanan, and a "white guy" had yelled "nigger" at her from near the East Campus wall. The party ended shortly thereafter and everyone, including the residents, left the house. Police returned to the house later, as a result of Roberts' complaint, but did not receive an answer at the door; a neighbor confirmed that an earlier party had ended.[22]

## After departure

As Roberts drove away with Mangum, the two women began to argue. Roberts stopped the car and attempted to push Mangum out.[23] When that failed, Roberts drove Mangum to a nearby Kroger supermarket, went inside, and told a female security guard that a woman was refusing to leave her car. The guard walked to the car and asked Mangum to leave, but Mangum remained in the vehicle. The guard later said she had not smelled alcohol on

Mangum's breath, but thought she might have been under the influence of other drugs. At 1:22 a.m., the guard called 9-1-1 to report that Mangum was refusing to leave a vehicle that did not belong to her. Police arrived, removed Mangum from the car, and questioned her.[24]

As Mangum had no identification, would not talk to police, was having difficulty walking, and seemed severely impaired, police took her to Durham Center Access, a mental-health and substance-abuse facility, for involuntary commitment. During the admission process, she claimed that she had been raped prior to her arrival.[22][25]

Mangum was transferred to Duke University Medical Center. Examination of her skin, arms, and legs revealed no swelling, no abnormalities, and three small cuts on her right knee and right heel. When asked, she specifically, and repeatedly, denied receiving any physical blows by hands. Further examination showed no tenderness in the back, chest, and neck.[26] There was, however, diffuse swelling of her vagina. Mangum later claimed that she had performed using a vibrator, for a couple in a hotel room, shortly before the lacrosse team party. This activity, or a yeast infection, could have caused the swelling. Investigators did not note any other injuries in the rest of the report.[27][28][29][30][31]

## McFadyen e-mail

A couple of hours after the party ended, Ryan McFadyen, a member of the lacrosse team, sent an e-mail to other players saying that he planned to have some strippers over, kill them, and cut off their skin while wearing his Duke-issue spandex and ejaculating.[32]

The e-mail began:

> To whom it may concern, tomorrow night, after tonights show, ive decided to have some strippers over to edens 2c. all are welcome.. however there will be no nudity. I plan on killing the bitches as soon as the[y] walk in and proceding [*sic*] to cut their skin off while cumming in my duke issue spandex . . all in besides arch and tack [two of his teammates] please respond[33]

Some of the players suggested the e-mail was intended as humorous irony. Administrators asserted the e-mail was in imitation of Patrick Bateman, the protagonist in the Bret Easton Ellis novel *American Psycho*, which was read and lectured upon in more than one Duke class, as evidenced by the e-mail responses from other players. One wrote, "I'll bring the Phil Collins," a reference to the *American Psycho* book and film. Police released the McFadyen e-mail but refused to release the following e-mail exchanges, leaving the impression that the McFadyen e-mail was intended as a serious threat. McFadyen thereafter received a thousand death threats in one week.[34]

The e-mail led many people to assume guilt on the part of the players.[33] McFadyen was not charged with any crime, but he was temporarily suspended from Duke, with the university citing safety concerns. He was invited back to Duke to continue his studies later that

summer.[35]

## Investigation and prosecution

### Arrests and investigation timeline

On March 14, 2006, the day after the party, the Durham Police Department (DPD) began their investigation into the rape allegations by interviewing Mangum and searching 610 North Buchanan pursuant to a warrant. The three team captains who lived at the house, including Evans, voluntarily gave statements and DNA samples to police and offered to take lie detector tests. The police turned down the offer.[36][17][37]

The DPD made their investigation public on March 15, when Sgt. Mark Gottlieb, the police supervisor, posted on a digital community bulletin board that they were investigating the rape of a young woman by three males at 610 North Buchanan on March 13, and asking anyone in the area who saw or heard anything unusual to contact Investigator Benjamin Himan.[37]

Between March 16 and 21, police showed Mangum photo arrays in an attempt to have her identify her attackers. Each photo array contained photographs only of lacrosse team members. This did not follow the DPD's recommended policy of including photos of individuals not regarded as potential suspects (known as "fillers"). Mangum identified Seligmann as someone who attended the party, but not as an attacker, and did not identify Evans at all despite seeing his photo twice.[38]

On March 27, Durham County District Attorney Mike Nifong received his first briefing on the case from Gottlieb and Himan. Within a few hours of receiving the briefing, Nifong made his first public statement on the case. Over the following week, Nifong by his own estimate gave fifty to seventy interviews and devoted more than forty hours to reporters. After that he continued to make statements, albeit less frequently. Many of these statements concerned the team members' alleged failure or refusal to provide information to law enforcement authorities, their invocation of their constitutional rights, or consisted of Nifong's own opinions that a crime had occurred, that it was racially motivated, and that one or more lacrosse players were guilty.[39]

Mangum was shown another photo array containing only photos of the 46 white lacrosse team members, including members who had not attended the party. There were no fillers included. The photos were shown to Mangum as a PowerPoint presentation, with each photo projected individually to her, rather than the pictures being arrayed together. For the first time, Mangum identified photos of Seligmann, Evans, and Finnerty as her attackers. She also identified at least one other photo as being a player who was present at the party; further investigation showed he had not been there.[38]

On April 10, an attorney retained by one of the lacrosse players stated that time-stamped photographs existed which showed that Mangum was already injured when she arrived at the party, and was visibly impaired.[40] Players' attorneys announced that DNA testing by the North Carolina state crime lab had failed to connect any members of the Duke men's lacrosse team to the alleged rape.[41]

Seligmann and Finnerty were arrested and indicted on April 18 on charges of first degree forcible rape, first degree sexual offense and kidnapping.[42][43][44][45] The same day, search warrants were executed on Finnerty and Seligmann's dorm rooms.[46] Seligmann reportedly told multiple teammates, "I'm glad they picked me", alluding to a solid alibi in the form of ATM records, photographs, cell phone records, an affidavit from a taxi driver, and a record of his DukeCard being swiped at his dorm.[47][48]

DNA Security Inc. (DSI), a private company engaged by Nifong to perform a second round of DNA testing, produced an incomplete[49] report. It contained an analysis of DNA found on false fingernails discarded by Mangum in the bathroom trash bin, and concluded that 2% of the male population, including Evans, could not be excluded from a match with the fingernail DNA.[50] DSI director Brian Meehan later testified that, pursuant to an agreement with Nifong, he had deliberately withheld information from the lab's report.[49]

On May 15, 2006, former team captain and 2006 Duke graduate Evans[51] was also indicted on charges of first-degree forcible rape, sexual offense and kidnapping. Just before turning himself in at the Durham County Detention Center, he publicly declared his innocence and his expectation of being cleared of the charges within weeks.[52][53][54][55]

Court documents revealed that Roberts, in her initial statement, had said she was with Mangum the entire evening except for a period of less than five minutes. After hearing Mangum claim she was sexually assaulted, Roberts called those claims "a crock".[56]

On December 22, 2006, Nifong dropped the rape charges against all three lacrosse players after Mangum told an investigator a different version of events and said she was no longer sure about some aspects of her original story. The kidnapping and sexual offense charges were still pending against all three players.[57]

On December 28, 2006, the North Carolina bar filed ethics charges against Nifong over his conduct in the case, accusing him of making public statements that were prejudicial to the administration of justice and heightened public condemnation of the accused, and of engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. The 17-page document accused Nifong of violating four rules of professional conduct, listing more than 100 examples of statements he made to the media.[39][58]

On January 12, 2007, Nifong sent a letter to North Carolina Attorney General Roy Cooper asking to be taken off the case.[59] The following day, January 13, Cooper announced that his office would take over the case.[60]

On January 24, 2007, the North Carolina State Bar filed a second round of ethics charges against Nifong for a systematic abuse of prosecutorial discretion that was prejudicial to the administration of justice by his withheld DNA evidence to mislead the court.[61]

On March 23, 2007, Justin Paul Caulfield, a legal analyst for the sports magazine *Inside Lacrosse*, stated on Fox News that the charges against Evans, Finnerty, and Seligmann would soon be dropped.[62] While the North Carolina Attorney General's Office first disputed the report, on April 11, 2007, it announced that it had dismissed all charges against the three lacrosse players.[63]

Cooper also took the unusual step of declaring the accused players innocent. He announced that Mangum would not be prosecuted, stating that investigators and attorneys who had interviewed her thought "she may actually believe the many different stories that she has been telling ... it's in the best interest of justice not to bring charges".[64]

On April 12, 2007, the attorney general, in declaring Seligmann, Finnerty, and Evans innocent, described Nifong as a "rogue prosecutor".[65][66][67]

## DNA tests

Shortly after the party, the prosecution ordered 46 of the 47 lacrosse team members to provide DNA samples, although some members had not attended the event. The sole black member of the team was exempt because Mangum had stated that her attackers were white. On April 10, 2006, the district attorney announced that DNA testing by the state crime lab did not connect any of the 46 tested team members to the alleged rape.[41]

After the initial tests by the state crime lab, prosecutor Nifong sought the services of a private laboratory, DNA Security, Inc. (aka DSI) of Burlington, North Carolina, to conduct additional tests. DNA from multiple unidentified males had been found in forensic evidence from Mangum and upon the rape kit items that had been tested, but none matched any of the lacrosse players.[68] Nifong falsely represented to the court and the public that DNA had been found only from a single male source, Mangum's boyfriend.[69][70]

In a motion made on December 15, 2006, defense attorneys argued that the DNA analysis report written by DSI and provided to them by Nifong's office was incomplete, because it omitted information showing that none of the genetic material from several men found on Mangum matched any DNA sample from the lacrosse team. Brian Meehan, the director of DSI who wrote the misleading report, testified that his lab did not try to withhold information, but acknowledged that the decision not to release the full report violated the lab's policies. Meehan testified that after discussions with Nifong, he decided to withhold the names of the persons excluded by the DNA testing (all 46 tested members of the lacrosse team) to protect the privacy of players not implicated in the case. But two players (Reade Seligmann and

Collin Finnerty) had already been indicted for rape more than three weeks prior to the release date of the report.[49][71] Meehan was later fired in October 2007 based on his actions in this case.[72]

DNA was also taken from all surfaces of three of Mangum's false fingernails retrieved from the trash in the party house bathroom (widely but inaccurately reported as DNA taken only from the "underside" of a single fingernail). According to DNA Security, the fingernail DNA showed some characteristics similar to lacrosse player David Evans's DNA. However, the match was not conclusive, as 2% of the male population (including Evans) could not be excluded based on the sample.[50][73] In addition, because Evans lived in the house, defense attorneys contended that any DNA present might have come from the tissue paper, cotton swabs, or other hygiene-related trash that had been in the garbage can along with the fingernail. This was confirmed later by Attorney General Cooper's investigation: "to the extent that Evans's DNA could not be excluded, the SBI experts confirmed that the DNA could easily have been transferred to the fingernails from other materials in the trash can".[38]

Nifong contended that lack of DNA evidence is not unusual and that 75–80% of all sexual assault cases lack DNA evidence. Rape victims often delay reporting by days or weeks, inadvertently destroying DNA evidence. However, in this case, Mangum had a rape-kit exam administered only hours after the end of the party, so experts believed that it was unlikely that there ever had been DNA evidence implicating any player. [74]

Nifong was tried for ethics violations on June 14, 2007. That day, the complete DNA findings were revealed during defense attorney Brad Bannon's testimony. According to conservative estimates, the lab had discovered at least two unidentified males' DNA in Mangum's pubic region; at least two unidentified males' DNA in her rectum; at least four to five unidentified males' DNA on her underpants; and at least one identified male's DNA in her vagina.[75]

## Collin Finnerty previous incident

In November 2005, Finnerty and two of his Chaminade High School lacrosse teammates were charged with misdemeanor simple assault in Washington, D.C., following an altercation with a Washington man outside a Georgetown bar.[76] Finnerty was accused of threatening and taunting the man.[77]

Although the man alleged that Finnerty had pushed and threatened him, the man was punched by a third party (a friend of Finnerty), who admitted to the punch.[78] Witnesses later testified that Finnerty had been hit in the head by a friend of the alleged victim.[79] Although the man alleged that Finnerty and his companions had called him "gay" (among other derogatory names),[76] the incident was not prosecuted as a hate crime. Finnerty was initially accepted into a diversion program for first offenders, allowing for the simple assault charge to be dismissed upon his completion of community service.[76]

But, after Finnerty was charged in Durham, the Washington, D.C., prosecutor cancelled his diversion agreement and proceeded to trial on the assault charge.

Finnerty was convicted and sentenced to six months' probation. Afterward, he was repeatedly threatened by Judge John H. Bayly, Jr. with confinement. Once after an anonymous blog post falsely accused him of violating an order that prohibited him from being in Georgetown; and again after he was absent from home and missed an obligatory curfew in order to be in Durham to work on his defense there. But he had cleared this absence with the judge.[80] According to R. B. Parrish, this treatment was similar to attempts by the government to pressure witnesses to testify in a certain manner.[81] On December 28, 2006, shortly after the Durham rape charges against Finnerty were dropped, Judge Bayly ended Finnerty's probation.

In January 2007, Finnerty's assault conviction was vacated (by an order signed by Bayly) and his record was cleared.[82]

## Defense and media questioning

### Credibility of Crystal Mangum as accuser

#### Possible intoxication and mental state

Lawyers for the Duke lacrosse players have said that Mangum was intoxicated with alcohol and possibly other drugs on the night of the party.[83] By the accuser's own admission to police, she had taken prescription Flexeril and drank "one or two large-size beers" before she went to the party.[84]

The Attorney General's office later noted that Mangum had taken Ambien, methadone, Paxil, and amitriptyline, although when she began taking these medications is uncertain.[38] She had a long history of mental problems and reportedly was diagnosed with bipolar disorder.[85]

#### Inconsistencies in Mangum's story

Over the course of the scandal, police reports, media investigations, and defense attorneys' motions and press conferences brought to light several key inconsistencies in Mangum's story.[85][86]

Some of the questions about her credibility were:

- Durham police said that Mangum kept changing her story and was not credible, reporting that she initially told them she was raped by 20 white men, later reducing the number to three.
- Another police report states that Mangum initially claimed she was groped, rather than raped, but changed her story before going to the hospital.

**317**

- On December 22, 2006, Nifong dropped the rape charges after Mangum stated that she was penetrated from behind but that she did not know with what. In North Carolina, penetration with an object is considered sexual assault, not rape.[87]
- On January 11, 2007, several more inconsistencies came to light after the defense filed a motion detailing her interview on December 21, 2006. For example, she changed details about when she was attacked, who attacked her, and how they attacked her:[88][89]
  - In the new version from the December 21 interview, Mangum claims she was attacked from 11:35 p.m. to midnight, much earlier than her previous accusations. This new timing was before the well-documented alibi evidence for Reade Seligmann that placed him away from the house. However, the defense said that during this new timing, Seligmann was shown to be on the phone with his girlfriend during the height of the attack. Additionally, Mangum received an incoming call at 11:36 p.m. and somebody stayed on the line for 3 minutes, which would be during the party, according to the new timetable.
  - The new statement contradicted time-stamped photos that show Mangum dancing between 12:00 and 12:04 a.m. If the revised statement time was true, it would mean that the two women stayed at the party for nearly an hour after the supposed attack. Kim Roberts left with Mangum at 12:53 a.m. In her April statement, Mangum said they left immediately after the attack.
  - Mangum changed the names of her attackers, claiming they had used multiple pseudonyms.
  - She also changed her description of Evans. She previously said that she was attacked by a man who looked like Evans with the addition of a mustache. Later she said this assailant had a five o'clock shadow.
  - Mangum claimed that Evans stood in front of her, making her perform oral sex on him. Previously, she stated that Seligmann did this. In the latest statement, she said that Seligmann did not commit any sex act with her, and that he had said that he could not participate because he was getting married. Although he has a girlfriend, there is no evidence that they were engaged or planning marriage.
- North Carolina Attorney General Roy Cooper said Mangum told many different accounts of the attack. In one account, she claimed she was suspended in mid-air and was being assaulted by all three of them in the bathroom. Cooper said this event seemed very implausible because of the small size of the bathroom. According to a *60 Minutes* investigation, Mangum gave at least a dozen different stories.
- *The News & Observer*, North Carolina's second largest newspaper, conducted its own investigation. It determined that Mangum gave at least five different versions of the incident to police and medical interviewers by August 2006.[28]

- At one point, Mangum said that both Evans and Finnerty helped her into her car upon departure. However, a photo shows her being helped by another player. Electronic records and witnesses reported that Evans and Finnerty had already left before she did. Upon seeing the photo, Mangum claimed that it must have been doctored or that Duke University paid someone off.[90]
- Mangum did not consistently identify the same three defendants in the photo lineups. Media reports have disclosed at least two photo lineups that occurred in March and April in which she was asked to recall who she saw at the party and in what capacity. In the March lineup, she did not choose Dave Evans at all. During these two sessions, she identified only Brad Ross with 100% certainty as being at the party.[91] After being identified, Ross provided police investigators with indisputable evidence that he was with his girlfriend at North Carolina State University before, during, and after the party —through cell phone records and an affidavit from a witness.[91][92]

## Other credibility issues

The Duke defense lawyers or media reports have indicated:

- The second stripper who performed at the house, Kim Roberts, said that Mangum was not raped. She stated that Mangum was not obviously hurt. Likewise, she refuted other aspects of Mangum's story including denying that she helped dress Mangum after the party and saying that they were not forcefully separated by players as Mangum had reported.[93]
- DNA results revealed that Mangum had sex with a man who was not a Duke lacrosse player. Attorney Joseph Cheshire said the tests indicated DNA from a single male source came from a vaginal swab. Media outlets reported that this DNA was from her boyfriend.[69] However, it was later revealed that DNA from multiple males who were neither the lacrosse players nor Mangum's boyfriend had been found, but that these findings had been deliberately withheld from the Court and the defense.[94]
- She had made a similar claim in the past which she did not pursue. On August 18, 1996, the dancer – then 18 years old – told a police officer in Creedmoor she had been raped by three men in June 1993, according to a police document. The officer who took the woman's report at that time asked her to write a detailed timeline of the night's events and bring the account back to the police, but she never returned.[12][95][96]
- The strip club's security officer said that Mangum told co-workers four days after the party that she was going to get money from some boys at a Duke party who had not paid her, mentioning that the boys were white. The security guard did not make a big deal of it because he felt that no one took her seriously.[97]
- Mangum was arrested in 2002 for stealing a cab from a strip club where she had been working. She led police officers on a high-speed chase before she was apprehended, at which point her blood alcohol level was more than twice the legal limit.[98] She was sentenced to three weekends in detention.[11][99]

## Durham Police Department's actions

Lawyers and media have questioned the methods of the photo identification process, and have argued that the police supervisor in the case, Sgt. Mark Gottlieb, has unfairly targeted Duke students in the past.[100]

### Photo identification

Lawyers and media reports alike suggested the photo identification process was severely flawed. During the photo identifications, Mangum was told that she would be viewing Duke University lacrosse players who attended the party, and was asked if she remembered seeing them at the party and in what capacity. Defense attorneys claimed this was essentially a "multiple-choice test in which there were no wrong answers",[101] while Duke law professor James Earl Coleman Jr. posits that "[t]he officer was telling the witness that all are suspects, and say, in effect, 'Pick three.' It's so wrong."[102]

U.S. Department of Justice guidelines suggest including at least five non-suspect filler photos for each suspect included,[103] as did the Durham Police Department's own General Order 4077, adopted in February 2006.[104]

Ross (the only player she identified as attending the party with 100% certainty during both procedures) provided police investigators with evidence that he was with his girlfriend at North Carolina State University before, during, and after the party through cell phone records and an affidavit from a witness. Another person whom the accuser had identified in April also provided police with evidence that he did not attend the party at all. In regards to Seligmann's identification, Mangum's confidence increased from 70% in March to 100% in April. Gary Wells—an Iowa State University professor and expert on police identification procedures— has asserted that memory does not improve with time.[105]

According to the transcript of the photo identification released on *The Abrams Report*, Mangum also stated that David Evans had a mustache on the night of the attack. Evans's lawyer stated that his client has never had a mustache and that photos as well as eyewitness testimony would reveal that Evans has never had a mustache.[106]

### Accusations of intimidation tactics

Defense lawyers suggested police used intimidation tactics on witnesses. On May 11, Moezeldin Elmostafa, an immigrant taxi driver who signed a sworn statement about Seligmann's whereabouts that defense lawyers say provides a solid alibi, was arrested on a 2½-year-old shoplifting charge. Arresting officers first asked if he had anything new to say about the lacrosse case. When he refused to alter his testimony, he was taken into custody. An arrest and conviction would have destroyed his chance for citizenship and could have led

to his deportation. Elmostafa was subsequently tried on the shoplifting charge and acquitted, after a grainy security tape proved that a security guard who was the prosecution's chief witness had "misremembered" events.[107][108]

Police also arrested Mangum's former husband, Kenneth McNeil; her boyfriend, Matthew Murchison; and another friend, with the disposition of their own separate cases entirely in the hands of District Attorney Nifong. The daughter of Durham's police chief was arrested on an old warrant, and the chief himself remained absent from duty and invisible to the press for most of the case.[109]

## Supervisor

_The News & Observer_ suggested that the supervisor of the lacrosse investigation, Sgt. Mark Gottlieb, had unfairly targeted Duke students in the past, putting some of his investigational tactics into question. Gottlieb has made a disproportionate number of arrests of Duke students for misdemeanor violations, such as carrying an open container of alcohol. Normally, these violations earn offenders a pink ticket similar to a traffic ticket.

From May 2005 to February 2006, when Sgt. Gottlieb was a patrol officer in District 2, he made 28 total arrests. Twenty of those arrests were Duke students, and at least 15 were handcuffed and taken to jail. This is in stark contrast to the other two officers on duty in the same district during that same 10-month period. They made 64 total arrests, only two of which were Duke students. Similarly, _The News & Observer_ charges that Gottlieb treated non-students very differently. For example, he wrote up a young man for illegally carrying a concealed .45-caliber handgun and possession of marijuana (crimes far more severe than the Duke students who were taken to jail committed), but did not take him to jail. Residents complimented Gottlieb for dealing fairly with loud parties and disorderly conduct by students.[100]

Duke's student newspaper, _The Chronicle_, depicted other examples of violence and dishonesty from Sgt. Gottlieb. It published that one student threw a party at his rental home off-East Campus before a Rolling Stones concert in October 2005. The morning after the concert, at 3:00 a.m., Sgt. Gottlieb led a raid on the home with nine other officers while the students were half asleep. It reported that one student was dragged out of bed and then dragged down the stairs, that all seven housemates were put in handcuffs, arrested, and taken into custody for violating a noise ordinance and open container of alcohol violations. Sgt. Gottlieb reportedly told one student, an American citizen of Serbian descent, that he could be deported. Other stories include the throwing of a 130-pound male against his car for an open container of alcohol violation, refusing the ID of a student because he was international, searching through a purse without a warrant, refusing to tell a student her rights, and accusations of perjury.[110]

## Prosecutor Nifong's actions

### Possible political motivation

At the time the rape allegations were made in March 2006, Mike Nifong was in the midst of a difficult Democratic primary election campaign to keep his position as Durham County District Attorney, facing strong opposition. It was understood that if Nifong lost the primary, he would very likely lose his job. Some commentators have opined that Nifong's prosecution of the Duke lacrosse players and his many statements to the media were driven by his political strategy to attract African-American voters. The primary was held on May 6, 2006, and Nifong won by a slim margin of 883 votes. Results showed Nifong won the primary on the basis of strong support from the black community. Nifong went on to win the general election in November 2006, although by a lower margin than usual for Democratic candidates in Durham County at that time.[111]

### Prosecution's chief investigator

Nifong hired Linwood E. Wilson as his chief investigator. During Wilson's private detective career, at least seven formal inquiries into his conduct were performed. In 1997, Wilson was reprimanded by the state commission. After his appeal of the decision was rejected, he allowed his detective license to expire. In response to criticism, Wilson stated that no one had ever questioned his integrity. On June 25, 2007, shortly after Nifong's disbarment and removal from office, it was reported that Nifong's replacement, interim district attorney Jim Hardin Jr., fired Wilson from his post.[112]

## Wider effects

### Effects on Duke faculty



Wikinews has related news:

> Duke lacrosse season ends, coach resigns

Mike Pressler, the coach of the lacrosse team, received threatening e-mails and hate calls, had castigating signs placed on his property, and was the frequent victim of vandalism in the aftermath of the accusations.[47] On April 5, 2006, he resigned (later revealed to have been forced) shortly after the McFadyen e-mail became public. Through his lawyer, he stated that his resignation was not an admission of wrongdoing on his part.[47][113] On the same day, Richard H. Brodhead, president of Duke University, suspended the remainder of the lacrosse season.[114]

Other Duke faculty members (sometimes referred to as the Group of 88[115] or the "Gang of 88") have been criticized for their "Social Disaster" letter as well as individual comments and reactions which created a perception of prejudgment.[116]

### Effect on Duke students

Shortly after the party, the University's president warned in a school-wide e-mail of threats of gang violence against Duke students.[117] Other Duke students claimed they had been threatened.[118] Mobs protested outside the house that had been the site of the party, banging pots and pans at early hours of the morning.[119]

Photographs of lacrosse team members had been posted prominently around Durham and on the Duke University campus with accompanying captions requesting that they come forward with information about the incident.[120]

## Media policies regarding identity revelation of accusers and accused

Fox News was the sole national television news outlet to reveal Mangum's photo following the dismissal of the case, although MSNBC and _60 Minutes_ revealed her name.[4] Several major broadcasters did not publish Mangum's name at any point, including ABC, PBS, CNN, and NBC.

### Publication of Mangum's identity

Partially obscured photos of Mangum at the party were broadcast by _The Abrams Report_ on cable news channel MSNBC and by local television affiliate NBC 17 WNCN in North Carolina. On April 21, 2006, outspoken talk-radio host Tom Leykis disclosed Mangum's name during his nationally syndicated talk-radio program. Leykis has disclosed identities of accusers of sexual assault in the past. On May 15, 2006, MSNBC host Tucker Carlson disclosed Mangum's first name only on his show, _Tucker_.[121] Court records presented by the defense revealed Mangum's name.

On April 11, 2007, several other mainstream media sources revealed or used Mangum's name and/or picture after the attorney general dropped all the charges and declared the players innocent. These sources include: CBS,[90] _The News & Observer_,[122] WRAL,[123] all The McClatchy Company's newspapers (which includes 24 newspapers across the country), Fox News, _The Charlotte Observer_, the _New York Post_, Comedy Central's _The Daily Show_ (airdate April 12, 2007) and MSNBC.[124]

## Effect on community relations

The allegations have inflamed already strained relations between Duke University and its host city of Durham, with members of the Duke lacrosse team being vilified in the press and defamed on and off campus. On May 1, 2006, the New Black Panthers held a protest outside Duke University.[125] The case drew national attention and highlighted racial tensions within the Durham area.[126]

## Jesse Jackson and Rainbow/PUSH involvement

In 2006, Jesse Jackson promised the Rainbow/PUSH Coalition would pay the college tuition for Mangum. Jackson said the tuition offer would still be good even if Mangum had fabricated her story.[127]

## Aftermath

Main article: Reactions to the Duke lacrosse case

### Mike Nifong

Main article: Mike Nifong

Wikinews has related news:

US prosecutor Mike Nifong to be disbarred for ethics violations

On June 16, 2007, the North Carolina State Bar ordered Nifong disbarred after the bar's three-member disciplinary panel unanimously found him guilty of fraud, dishonesty, deceit or misrepresentation; of making false statements of material fact before a judge; of making false statements of material fact before bar investigators, and of lying about withholding exculpatory DNA evidence.[128]

Following the state bar's announcement, Nifong submitted a letter of resignation from his post as Durham County district attorney, that would have become effective in July 2007. However, on June 18, Durham Superior Court Judge Orlando Hudson ordered that Nifong be immediately removed from office.[129]

On August 31, 2007, Nifong was held in criminal contempt of court for knowingly making false statements to the court during the criminal proceedings. Durham Superior Court Judge W. Osmond Smith III sentenced Nifong to one day in jail, which he subsequently served.[130]

### Crystal Mangum

Main article: Crystal Mangum

On December 15, 2006, it was reported that Mangum was pregnant and the judge in the case ordered a paternity test.[71][131][132]

In May 2008, Mangum graduated from North Carolina Central University with a degree in police psychology.[133]

On August 22, 2008, a press release announced the planned publication in October 2008 of a memoir by Mangum, *The Last Dance for Grace: The Crystal Mangum Story*.[134]

The press release indicated the book "can't and doesn't deal with the complex legal aspects of the case" but that "the muddling of facts about Crystal's life, along with North Carolina Attorney General Roy Cooper's desire to settle the dispute over open file discovery,

swallowed the case whole". Defense attorney Joseph Cheshire responded to the news by saying that if the book was truthful, "I think it would be fabulous, and I don't think anybody would think badly about her in any way, shape or form", but that if the memoir did not acknowledge the falsity of her allegations against the players, that he would advise them to initiate civil action against her.[135] Her book was published later that year. In it, she continued to contend that she had been raped at the party and that the dropping of the case was politically motivated. The book outlined her earlier life, including a claim that she was first raped at the age of 14.[136]

In November 2013, she was found guilty of second-degree murder after she stabbed boyfriend Reginald Daye, who died 10 days after.[137] She argued that she acted in self-defense, fearing that Daye would kill her.[138] She was sentenced to 14 to 18 years in prison.

## Reade Seligmann, Collin Finnerty, and David Evans

On June 18, 2007, Duke University announced that it had reached a settlement with Seligmann, Finnerty and Evans.[139] No details of the settlement were disclosed.

Duke reportedly agreed to pay $60 million to the three accused (with each player receiving $20 million) subject to confidentiality requirements.[140] Seligmann's attorney told the *New York Daily News* that the settlement was "nowhere near that much money".[141]

Seligmann enrolled as a student at Brown University in the fall of 2007, and was an important part of Brown reaching the 2009 NCAA lacrosse tournament as well as a number 10 national ranking.[142] He became an active fundraiser and supporter for the Innocence Project.[143] He graduated from Brown in 2010 and from Emory University School of Law in 2013. He has stated that his experience during the Duke lacrosse case motivated him to attend law school and pursue a legal career.[144][145]

Finnerty enrolled at Loyola College in Maryland, leading the team in scoring as the Greyhounds qualified for the 2010 NCAA lacrosse tournament.[146] Finnerty graduated from Loyola in May 2010.[145]

David Evans, who had already graduated from Duke before being charged, received an MBA from the Wharton School of the University of Pennsylvania in May 2012.[147]

## Duke men's lacrosse team

> Not a month goes by when I am not reminded of the damage those accusations have had on my reputation and the public's perception of my character. Sometimes only time can heal wounds.
>
> —*anonymous Duke lacrosse player,* 30 for 30, *Fantastic Lies (2016)*

In January 2007, lacrosse team member Kyle Dowd filed a lawsuit against Duke University and against a visiting associate professor and member of the Group of 88, Kim Curtis, claiming he and another teammate were given failing grades on their final paper as a form of retaliation after the scandal broke.[148][149] The case was settled with the terms undisclosed except that Dowd's grade was altered to a P (for "Pass").[150]

Professor Houston Baker, who continued to accuse Dowd and the others of being "hooligans" and "rapists", called Dowd's mother "the mother of a farm animal" after she e-mailed him. Duke Provost Peter Lange responded to Baker, criticizing Baker for prejudging the team based on race and gender, citing this as a classic tactic of racism.[151]

Duke's athletic director at the time, Joe Alleva, who forced lacrosse coach Mike Pressler's resignation, faced criticism for his handling of this case. In 2008, Alleva announced he was leaving Duke for the athletic director position at Louisiana State University.[152] The lacrosse team, reinstated for the 2007 season, reached the NCAA Finals as the #1 seed. The Blue Devils lost to the Johns Hopkins University Blue Jays in the championship, 12–11.[153]

In May 2007, Duke requested that the NCAA restore a year's eligibility to the players on the 2006 men's team, part of whose season was canceled. The NCAA granted the team's request for another year of eligibility, which applies to the 33 members of the 2006 team who were underclassmen in 2006 and who remained at Duke in 2007.[142] Four of the seniors from 2006 attended graduate school at Duke in 2007 and played for the team.[146] In 2010, the final year in which the team included fifth-year seniors (freshmen in 2006), Duke won the NCAA Lacrosse Championship beating Notre Dame, 6–5 in overtime, to give the school its first lacrosse championship.[154]

On June 7, 2007, it was announced that lacrosse coach Mike Pressler and Duke had reached a financial settlement. Pressler was later hired as coach by Division II (now Division I) Bryant University in Rhode Island. In October 2007, Pressler filed suit seeking to undo the settlement and hold a trial on his wrongful termination claim on the grounds that Duke spokesman John Burness had made disparaging comments about him. After Duke failed in an attempt to have the case dismissed, the matter was settled in 2010 with Duke apologizing in a press release but refusing to comment regarding any compensation to Pressler.[155]

## Duke University

On September 29, 2007, Duke President Brodhead, speaking at a two-day conference at Duke Law School on the practice and ethics of trying cases in the media, apologized for "causing the families to feel abandoned when they most needed support."[156]

On July 12, 2010, Duke demolished the house where the party had taken place, 610 North Buchanan Boulevard, after it had sat unoccupied for the four years following the Duke lacrosse case.[157]

## Sgt. Mark Gottlieb

In July 2014, Sgt. Mark Gottlieb committed suicide in <u>DeKalb County, Georgia</u>, where he had worked as a <u>paramedic</u>.[158]

## Lawsuits filed by players

 **This section has multiple issues.** Please help **improve it** or discuss these issues on the **talk page**. (_Learn how and when to remove these template messages_)

This section **relies excessively on <u>references</u> to <u>primary sources</u>**. _(May 2017)_

This section **contains <u>too many or overly lengthy quotations</u>**. _(May 2017)_

On September 7, 2007, it was reported that the three accused players (Seligmann, Finnerty, and Evans), who had already settled with Duke University, planned to file a lawsuit for violations of their civil rights against the city of Durham and several city employees, unless the city agreed to a settlement including payment of $30 million over five years and the passage of new criminal justice reform laws. The city's liability insurance covers up to $5 million.[10]

Lawyers cited three main areas of vulnerability for the city:

- The suspect-only photo identification procedure given to Mangum.
- Vast discrepancies in notes taken by Investigator Benjamin Himan during his March interview with Mangum and Sgt. Gottlieb's notes in July
- The release of a <u>CrimeStoppers</u> poster by the police shortly after the allegations that a woman "was sodomized, raped, assaulted and robbed. This horrific crime sent shock waves throughout our community."[10]

Durham declined the settlement offer and on October 5, 2007, the three accused players filed a federal lawsuit alleging a broad conspiracy to frame them. Named in the suit were Nifong, the lab that handled the DNA work, the city of Durham, the city's former police chief, the deputy police chief, the two police detectives who handled the case and five other police department employees. The players were seeking unspecified damages, and also wanted to place the Durham Police Department under court supervision for 10 years, claiming the actions of the police department posed "a substantial risk of irreparable injury to other persons in the City of Durham". According to the suit, Nifong engineered the conspiracy to help him win support for his election bid. Nifong reportedly told his campaign manager that the case would provide "'millions of dollars' in free advertising".[159]

**327**

On January 15, 2008, the city of Durham filed a motion to remove itself as a defendant, arguing it had no responsibility for Nifong's actions. On the same day, Nifong filed for bankruptcy.[160] On May 27, 2008, Judge William L. Stocks lifted the stay from Nifong's bankruptcy filing and ruled that the plaintiffs' lawsuit could go forward.[161]

On March 31, 2011, Judge James Beaty issued a ruling on the *Evans et al.* case, upholding claims against Nifong and his hired investigator Wilson for conspiracy to commit malicious prosecution in the course of their investigation; the city of Durham for negligence; Nifong, Wilson, and police investigators Gottlieb and Himan for malicious prosecution, concealment of evidence, and fabrication of false evidence. However, the players' civil rights claims, which constituted the bulk of their Complaint, were dismissed on the grounds that the applicable civil rights laws pertained to persons of African-American descent, with little room for extension.[162]

> Plaintiffs contend that they have alleged race discrimination as white plaintiffs. However, the § 1985 claims based on this *971 contention fails for two reasons. First, the Supreme Court and Fourth Circuit have indicated an intent to limit the protections of § 1985 to discrimination against "those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence.'" Buschi, 775 F.2d at 1258 (quoting United Bhd. of Carpenters, 463 U.S. at 851, 103 S.Ct. at 3368); see also *Cloaninger v. McDevitt*, No. 106cv135, 2006 WL 2570586 (W.D.N.C. Sept. 3, 2006) ("As recognized by the controlling law in the Fourth Circuit, the only class of persons protected by Section 1985(3) are African Americans.") (citing Harrison, 766 F.2d at 161-62); *Stock v. Universal Foods Corp.*, 817 F. Supp. 1300, 1310 (D.Md.1993) (dismissing § 1985(3) claim because plaintiff, as a white male, was not a member of a class that has suffered historically pervasive discrimination); *Blackmon v. Perez*, 791 F. Supp. 1086, 1093 (E.D.Va.1992) (dismissing § 1985(3) claims by white plaintiffs because "plaintiffs do not represent a class of persons who [do] not enjoy the possibility of []effective state enforcement of their rights" (internal quotations omitted)).[163]

On December 17, 2012, the Fourth Circuit Court of Appeals rejected all of the players' federal claims in *Evans v. Chalmers* Case No. 11-1436 (C.A. 4), holding:

> To recapitulate, we hold as follows. We reverse the district court's denial of all defendants' motions to dismiss the federal claims alleged against them. We reverse the court's denial of the City's motion for summary judgment as to the state common-law claims alleged against it. We affirm the court's denial of Officers Gottlieb and Himan's motions to dismiss the state common-law malicious prosecution claims alleged against them. We reverse the court's denial of the officers' motions to dismiss all other state common-law claims. We dismiss for lack of appellate jurisdiction the City's appeal of the state constitutional claims alleged against it. Finally, we remand the cases for further proceedings consistent with this opinion.[164]

**328**

The only claims to survive this decision were state constitutional claims. Judge J. Harvie Wilkinson III concurred, ruling:

> A few additional observations may underscore the overblown nature of this case. Plaintiffs have sought to raise every experimental claim and to corral every conceivable defendant. The result is a case on the far limbs of law and one destined, were it to succeed in whole, to spread damage in all directions.[165]

On October 7, 2013, the United States Supreme Court denied the Petition for Certiorari filed by Seligmann, Finnerty, and Evans, declining to review the decision of the Fourth Circuit Court of Appeals.[166]

On May 16, 2014, the three accused lacrosse players and the City of Durham settled their long-running lawsuit. Seligmann, Finnerty, and Evans agreed to dismiss their lawsuit and received no monetary compensation whatsoever. The city agreed to make a $50,000 grant to the North Carolina Innocence Inquiry Commission.[167]

## Lawsuit filed by non-accused players and their families

On February 21, 2008, the families of 38 of the lacrosse team's 47 members who were not accused filed a 225-page lawsuit against Duke University, the Duke University Hospital, the city of Durham, and various officials of each organization for multiple claims of harassment, deprivation of civil rights, breach of contract and other claims.[168]

A Duke University spokesperson responded that "we have now seen the lawsuit and as we said before, if these plaintiffs have a complaint, it is with Mr. Nifong. Their legal strategy – attacking Duke – is misdirected and without merit. To help these families move on, Duke offered to cover the cost of any attorneys' fees or other out-of-pocket expenses, but they rejected this offer. We will vigorously defend the university against these claims."[169][170] The city never released an official response to the suit. The lawsuit against the university was settled out of court in 2013. Neither side would discuss the details of the settlement.[171]

## ESPN documentary: *Fantastic Lies*

The 2016 documentary film *Fantastic Lies*, which centered around the case and its aftermath, was part of ESPN's *30 for 30* film series. It premiered on March 13, 2016, 10 years to the day after the lacrosse players hosted the house party where Mangum claimed she was raped.[172]

Among the journalists invited to contribute was ESPN college basketball analyst and Duke graduate Jay Bilas, who in his other capacity as a practicing attorney later wrote a letter to the university administration criticizing their handling of the entire situation and describing president Brodhead as "incapable of effectively leading Duke into the future."[173] Crystal

Mangum was approached by the film crew to tell her side of the story and agreed to do so, but prison officials would not allow her to be filmed. None of the players involved in the case appeared in the film, but Reade Seligmann's parents and Colin Finnerty's father did.[174][175]

## See also

## References

1. ^ *a b* Katz, Neil (February 18, 2010). *"Crystal Mangum, stripper who falsely accused Duke lacrosse players, charged with attempted murder"*. CBS News. CBS. *Archived from the original on September 18, 2021. Retrieved March 9, 2019.* "In 2006, Mangum, then a North Carolina Central University student earning money as a stripper, said that three Duke lacrosse players raped her"

2. ^ *Associated Press* (November 22, 2013). *"North Carolina: Woman in Duke case guilty in killing"*. The New York Times. *Archived from the original on April 15, 2021. Retrieved March 9, 2019.*

3. ^ Yamato, Jen (March 12, 2016). *"The stripper who cried 'rape': Revisiting the Duke lacrosse case ten years later"*. The Daily Beast. *Archived from the original on December 10, 2021. Retrieved March 9, 2019.*

4. ^ *a b c* "Crystal Gail Mangum: Profile of the Duke Rape Accuser" Archived June 6, 2013, at the Wayback Machine, *Fox News*, April 11, 2007.

5. ^ Siemaszko, Corky (February 18, 2010). *"Crystal Gail Mangum, stripper in Duke lacrosse rape case, charged with arson and attempted murder"*. nydailynews.com. New York. Archived from the original on February 21, 2010. Retrieved September 11, 2010.

6. ^ *"N.C. attorney general: Duke players 'innocent'"*. CNN. April 11, 2007. *Archived from the original on April 15, 2021. Retrieved March 9, 2019.*

7. ^ Beard, Aaron (April 11, 2007). *"Prosecutors Drop Charges in Duke Case"*. The San Francisco Chronicle. Associated Press. Archived from the original on May 26, 2007. Retrieved April 11, 2007.

8. ^ Beard, Aaron (August 31, 2007). "Judge Finds Duke Prosecutor in Contempt". Associated Press.

9. ^ Chambers, Stanley B. Jr. (June 30, 2010). *"Duke lacrosse accuser holds press conference to defend herself"*. The News & Observer. Archived from the original on July 2, 2010. Retrieved August 14, 2020.

10. ^ *a b c d* *"Ex-players seek $30 million settlement"*. News & Observer. September 8, 2007. Archived from the original on December 28, 2014. Retrieved October 24, 2010.

11. ^ *a b* Mangum, Crystal G. Archived January 24, 2008, at the Wayback Machine, North Carolina Department of Correction Public Access Information System

12. ^ *a b* *"Dancer made prior allegation"*. Duke Chronicle. April 30, 2006. *Archived from the original on February 24, 2021. Retrieved October 24, 2010.*

13. ^ Smolkin, Rachel (August–September 2007). *"Justice Delayed"*. American Journalism Review. *Archived from the original on June 10, 2013. Retrieved November 3, 2014.*

14. ^ Parrish, R. B. (2009) *The Duke Lacrosse Case: A Documentary History and Analysis of the Modern Scottsboro*, p. 19; ISBN 1-4392-3590-2

15. ^ *Until Proven Innocent*, pg. 33

16. ^ Cohan, William D. (2015). *The Price of Silence: The Duke Lacrosse Scandal, The Power of the Elite, and the Corruption of Our Great Universities*. New York: Simon & Schuster. pp. 16–17. ISBN 978-1-4516-8179-6. Archived from the original on March 10, 2021. Retrieved May 11, 2015.

17. ^ *a b c d* Meadows, Amy (April 22, 2007). *"What Really Happened That Night at Duke"*. Newsweek. Archived from the original on December 19, 2009. Retrieved May 12, 2015.

18. ^ *a b* Mosteller, Robert P. (December 2007). *"The Duke Lacrosse Case, Innocence, and False Identifications: A Fundamental Failure to "Do Justice""* (PDF). Fordham Law Review. Fordham Univ. **76** (3): 1342–45. Archived (PDF) from the original on September 3, 2020. Retrieved May 13, 2015.

19. ^ Schorn, Daniel (October 11, 2006). *"Duke Rape Suspects Speak Out"*. 60 Minutes. CBS News. p. 3. Archived from the original on August 18, 2010. Retrieved October 9, 2010.

20. ^ Coultan, Mark (October 21, 2006). *"Doubts over US college rape case"*. The Age. Melbourne. Archived from the original on February 8, 2018. Retrieved September 11, 2010.

21. ^ *a b* Cohan, William D. (2015). *The Price of Silence: The Duke Lacrosse Scandal, The Power of the Elite, and the Corruption of Our Great Universities*. New York: Simon & Schuster. pp. 22–25. ISBN 978-1-4516-8179-6. Archived from the original on March 10, 2021. Retrieved May 11, 2015.

22. ^ "'Go Ahead, Put Marks on Me'" Archived November 27, 2016, at the Wayback Machine, abcnews.go.com, October 30, 2006.

23. ^ Cuomo, Chris & Lara Setrakian, "Exclusive: Guard Who Saw Alleged Duke Victim Says No Sign or Mention of Rape" Archived November 14, 2016, at the Wayback Machine *ABC News*, April 17, 2006.

24. ^ "Defense motion seeks more reports in Duke lacrosse case", *The News & Observer*, August 31, 2006.

25. ^ Parrish, R.B. (2009) *The Duke Lacrosse Case: A Documentary History and Analysis of the Modern Scottsboro*, p. 45; ISBN 1-4392-3590-2

26. ^ "Piecing together what happened at the Duke lacrosse-team party" Archived May 20, 2006, at the Wayback Machine, *The Seattle Times*, May 20, 2006.

27. ^ *a b* "Lacrosse files show gaps in DA's case". News & Observer. August 6, 2006. Archived from the original on September 30, 2012. Retrieved October 24, 2010.

28. ^ *"Defense Sources: Duke Accuser Gave Conflicting Stories About Alleged Rape"*. Fox News. May 24, 2006.

29. ^ *"Cop says nurse found trauma in Duke case"*. News & Observer. August 27, 2006. Archived from the original on December 28, 2014. Retrieved October 24, 2010.

30. ^ *Neff, Joseph (April 18, 2007). "To the end, the account continues to change". News & Observer. Archived from the original on December 28, 2014. Retrieved October 24, 2010.*

31. ^ *"Duke Rape Case E-mail Shocker". The Smoking Gun. April 5, 2006. Archived from the original on August 16, 2021. Retrieved December 31, 2010.*

32. ^ *a b* Ryan McFadyen e-mail Archived January 9, 2015, at the Wayback Machine, vanityfair.com, March 2014; accessed November 22, 2014.

33. ^ Parrish, R. B. (2009) *The Duke Lacrosse Case: A Documentary History and Analysis of the Modern Scottsboro*, pp. 159-61; ISBN 1-4392-3590-2.

34. ^ *"Duke's McFadyen reinstated after sending e-mail". USA Today. Associated Press. July 3, 2006. Archived from the original on December 31, 2010. Retrieved November 22, 2014.*

35. ^ *Roberts, Selena (March 31, 2006). "When Peer Pressure, Not a Conscience, Is Your Guide". The New York Times. Archived from the original on November 12, 2017. Retrieved December 10, 2013. "Correction: April 6, 2006, Thursday The Sports of The Times column on Friday, about the investigation involving a woman who said she had been raped by three players on the Duke University lacrosse team misstated the nature of the players' cooperation with the authorities. The police in Durham, N.C., said that although most team members had not voluntarily submitted to police interviews and DNA tests, the three residents of the house where the accuser said the incident occurred had done so."*

36. ^ *a b* Cohan, William D. (2015). *The Price of Silence: The Duke Lacrosse Scandal, The Power of the Elite, and the Corruption of Our Great Universities. New York: Simon & Schuster. pp. 63–68. ISBN 978-1-4516-8179-6. Archived from the original on March 10, 2021. Retrieved May 11, 2015.*

37. ^ *a b c d* Summary of Conclusions Archived March 3, 2016, at the Wayback Machine, North Carolina Attorney General's Office & North Carolina Department of Justice, online at ncdoj.gov, accessed May 13, 2015.

38. ^ *a b* Mosteller, Robert P. (December 2007). *"The Duke Lacrosse Case, Innocence, and False Identifications: A Fundamental Failure to "Do Justice"" (PDF). Fordham Law Review. Fordham Univ. 76 (3): 1348–51. Archived (PDF) from the original on September 3, 2020. Retrieved May 13, 2015.*

39. ^ "Attorney: Photos will clear Duke lacrosse players" Archived February 6, 2016, at the Wayback Machine, *ESPN*, April 10, 2006.

40. ^ *a b* Attorneys: No DNA match in Duke lacrosse case Archived February 6, 2016, at the Wayback Machine, *ESPN*, April 11, 2006.

41. ^ *North Carolina v. Collin Finnerty and Reade Seligmann* Archived October 24, 2016, at the Wayback Machine, findlaw.com, April 17, 2006.

42. ^ Chen, Saidi. "Lawyer claims player has alibi" Archived February 10, 2007, at the Wayback Machine, *The Chronicle*, April 21, 2006.

43. ^ *Nesbitt, Jim; Barrett, Barbara (April 19, 2006). "Seligmann's backers say he 'is not a nasty player'". News & Observer. Archived from the original on April 18, 2007. Retrieved May 10, 2015.*

44. ^ "Race and class divisions shade case against 2 lacrosse players" Archived March 17, 2012, at the Wayback Machine, usatoday.com, April 19, 2006.

45. ^ Duke Lacrosse Rape Case Search Warrants Archived October 24, 2016, at the Wayback Machine, FindLaw.com, April 18, 2006.

46. ^ Cuomo, C., Avram, E. & Setrakian, L. "Key Evidence Supports Alibi in Potential Rape Defense for One Indicted Duke Player" Archived November 14, 2016, at the Wayback Machine, *ABC News*, April 19, 2006.

47. ^ *a b c* Yaffe, Andrew. "Lab director withheld DNA information" Archived May 10, 2015, at the Wayback Machine *The Chronicle* December 15, 2006.

48. ^ *a b* Taylor, Stuart; Johnson, K. C. (2007). *Until Proven Innocent: Political Correctness and the Shameful Injustices of the Duke Lacrosse Rape Case. New York: St. Martin's Press. p. 221.* ISBN 978-0-312-36912-5.

49. ^ Duke's 2006 Commencement had been held on the preceding day, May 14, 2006. Kopty, Yazan, "Transcript of 2006 Graduation Speech" (editor's note), Archived August 28, 2016, at the Wayback Machine *Duke Today*, May 15, 2006, online at today.duke.edu, accessed May 13, 2015.

50. ^ Indictments (North Carolina v. Finnerty, Seligmann) Archived October 24, 2016, at the Wayback Machine FindLaw, April 17, 2006.

51. ^ "Dorm Room Search Warrants" Archived October 24, 2016, at the Wayback Machine, FindLaw.com, April 18, 2006.

52. ^ *"Duke Lacrosse Players Arrested on Rape Charges". April 18, 2006. Archived from the original on March 4, 2016 – via NPR.*

53. ^ "Duke University Rape Scandal; Interview With Dave Holloway" Archived October 5, 2016, at the Wayback Machine, transcripts.cnn.com, April 11, 2006

54. ^ Neff, Joseph. Filing: Second dancer called allegations a 'crock', *The News & Observer*. June 8, 2006.

55. ^ Beard, Aaron, "Duke Lacrosse Case Takes Dramatic Turn", Archived June 1, 2016, at the Wayback Machine WashingtonPost.com, December 23, 2006; accessed May 12, 2015.

56. ^ "State Bar Files Ethics Complaint Against Mike Nifong" Archived January 11, 2007, at the Wayback Machine, WRAL.com, December 28, 2006.

57. ^ *Setrakian, Lara (January 12, 2007). "DA in Duke Rape Case Asks to Be Taken off Case". ABC News. Archived from the original on August 30, 2021. Retrieved April 1, 2007.*

58. ^ *Hochberg, Adam (January 13, 2007). "State AG to Take Control of Duke Lacrosse Case". NPR. Archived from the original on March 10, 2021. Retrieved May 13, 2015.*

59. ^ *"Former Duke Lacrosse 'Rape' Prosecutor Charged With Withholding Evidence, Misleading Court". FOXNews.com. January 24, 2007. Archived from the original on October 23, 2012. Retrieved December 24, 2009.*

60. ^ *"Breaking News? No Surprise Here"*. *The Johnsville News. March 23, 2007. Archived from the original on August 18, 2021. Retrieved March 15, 2011.*

61. ^ *"Charges Dropped In Duke Lacrosse Case". April 11, 2007.*

62. ^ *"NC attorney general: Duke players "innocent""". Edition.cnn.com. Archived from the original on May 12, 2021. Retrieved April 16, 2010.*

63. ^ *"Nifong Criticizes AG Cooper In Statement". Raleigh Chronicle. April 12, 2007.*

64. ^ "As Duke rape case unravels, D.A.'s judgment questioned: Defense describes him as willing to skirt law for conviction" Archived January 24, 2008, at the Wayback Machine, *San Francisco Chronicle*

65. ^ *"Embattled Nifong Says He'll Resign"*. *WRAL.com. June 15, 2007. Archived from the original on May 30, 2016.*

66. ^ *Parker, Laura (June 19, 2007). "Disbarment may not be end for Nifong". USA Today. Archived from the original on October 16, 2011. Retrieved October 26, 2007.*

67. ^ *a b Beard, Aaron (May 12, 2006). "Defense attorney: 2nd DNA test shows no conclusive match". USA Today. Associated Press. Archived from the original on 2007-08-20. Retrieved 2017-08-26.*

68. ^ *a b* "Paternity Test Ordered in Duke Lacrosse Rape Case" Archived December 17, 2006, at the Wayback Machine, WRAL.com, December 15, 2006.

69. ^ *Waggoner, Martha (August 3, 2011). "Appeals court finds firing OK in Duke lacrosse case". The News & Observer. Archived from the original on February 20, 2015. Retrieved February 19, 2015.*

70. ^ "Report: DNA link possible for third Duke player" Archived November 21, 2007, at the Wayback Machine, *Associated Press* and the *Pittsburgh Tribune-Review* May 12, 2006.

71. ^ Spilbor, Jonna. "The Rape That Never Was: Why, In Light Of The Lack Of DNA Evidence, The Case Against Duke's Lacrosse Team Should Be Dropped" Archived April 29, 2016, at the Wayback Machine, FindLaw.com, April 14, 2006.

72. ^ Y-Str (Male) DNA Characteristics Discovered by DNA Security on the Rape Kit Items Archived March 3, 2016, at the Wayback Machine; retrieved June 14, 2007.

73. ^ *a b c* Macur, Juliet. "Amid Scrutiny at Duke, Details Emerge of '05 Assault", Archived January 15, 2016, at the Wayback Machine *The New York Times*, April 5, 2006.

74. ^ Niolet, Benjamin. "Finnerty's D.C. Record To Be Cleared", *News & Observer*, January 9, 2007, archived **here**

75. ^ Striker, Clarissa. "Duke Lacrosse Player Gets Probation", Archived March 14, 2016, at the Wayback Machine CBSnews.com, July 11, 2006; retrieved May 10, 2015.

76. ^ Barrett, Barbara. DC Jury Hears Duke Lacrosse Player's Assault Case", Archived May 18, 2015, at the Wayback Machine McClatchy News Services, Mcclatchydc.com, July 10, 2006; retrieved May 10, 2015.

77. ^ *Taylor Jr., KC; Johnson, Stuart (2018). "Chapter 17". Until Proven Innocent: Political Correctness and the Shameful Injustices of the Duke Lacrosse Rape Case. Macmillan. ISBN 9780312384869. Retrieved 2020-10-02.*

78. ^ *Parrish, R. B. (2009) The Duke Lacrosse Case: A Documentary History and Analysis of the Modern Scottsboro*, pp. 162–70; ISBN 1-4392-3590-2

79. **^** Mallia, Joseph, and Melanie Lefkowitz. Collin Finnerty, once falsely accused, graduates from college" Archived August 26, 2016, at the Wayback Machine, Newsday.com, May 23, 2010; retrieved May 10, 2015.

80. **^** "Alleged Duke Rape Victim Wants Her Life Back" Archived March 3, 2016, at the Wayback Machine, *ABC News*, April 19, 2006.

81. **^** *"Report: Police Notes Bolster Prosecution Of Duke Lacrosse Case"*. WRAL.com. August 25, 2006. Archived from the original on May 30, 2016.

82. ^ *a b* Jarvis, Craig (April 13, 2007). *"Mangum's life: conflict, contradictions"*. News and Observer. Archived from the original on 2011-11-17.

83. **^** Khanna, Samiha & Anne Blythe. "Dancer gives details of ordeal" Archived April 27, 2006, at the Wayback Machine, *The News & Observer*, March 25, 2006.

84. **^** "Rape Charges Dropped in Duke Case" Archived March 28, 2016, at the Wayback Machine, *The New York Times*, December 22, 2006.

85. **^** *"Duke attack story shifts"*. News & Observer. January 12, 2007. Archived from the original on July 3, 2014. Retrieved October 24, 2010.

86. **^** *"Lacrosse Defense: Accuser's Story Changes Again"*. January 11, 2007. Archived from the original on September 18, 2021. Retrieved January 12, 2007.

87. ^ *a b* "The Duke Case: Innocent" Archived October 24, 2012, at the Wayback Machine, cbsnews.com, April 15, 2007.

88. ^ *a b* Suppression Archived March 3, 2016, at the Wayback Machine, abclocal.go.com; retrieved June 2, 2007.

89. **^** *Cohan, William D. (2014). The price of silence: The Duke lacrosse scandal, the power of the elite, and the corruption of our great universities. New York: Scribner. pp. 67, 116–117, 190–192. ISBN 9781451681802. Archived from the original on 10 March 2021. Retrieved 8 July 2017.*

90. **^** Tad Nelson, "Duke Lacrosse Debacle and Accuser's Credibility", FoxNews, January 14, 2007.
Archived November 22, 2014, at archive.today

91. **^** *"Event told of accuser in lacrosse rape case"*. News & Observer. November 14, 2006. Archived from the original on December 25, 2014. Retrieved October 24, 2010.

92. **^** Duke Rape Suspects Speak Out Archived October 21, 2012, at the Wayback Machine. *60 Minutes*, October 15, 2006.

93. **^** *"Accuser in Duke lacrosse case wanted money, man says"*. newsobserver.com. November 4, 2006. Archived from the original on December 28, 2014. Retrieved October 24, 2010.

94. **^** Graham, David. The Duke Lacrosse Accuser's New Trouble Archived April 8, 2011, at the Wayback Machine, *The Daily Beast*, April 5, 2011.

95. **^** "Duke lacrosse players' attorneys step up defense" Archived January 15, 2016, at the Wayback Machine, espn.go.com, April 9, 2006.

96. ^ *a b* *"Detective got tough with Duke students"*. News & Observer. September 9, 2006. Archived from the original on July 12, 2014. Retrieved October 24, 2010.

**335**

97. ^ "Duke Lacrosse Defense Wants Photo IDs Thrown Out" Archived October 5, 2015, at the Wayback Machine, WRAL.com, December 14, 2006; retrieved September 3, 2007.

98. ^ "Duke prof: Rape case needs new prosecutor". News & Observer. June 13, 2006. Archived from the original on December 28, 2014. Retrieved October 24, 2010.

99. ^ Wilson, Duff; Glater, Jonathan D. (August 25, 2006). "Files From Duke Rape Case Give Details but No Answers". Archived from the original on November 17, 2015 – via NYTimes.com.

100. ^ Stuart Taylor, Jr; K. C. Johnson (September 4, 2007). Until Proven Innocent: Political Correctness and the Shameful Injustices of the Duke Lacrosse Rape Case. Macmillan. ISBN 9780312369125 – via Google Books.

101. ^ Conflicting Identifications Archived October 2, 2008, at the Wayback Machine. The News & Observer; retrieved December 24, 2006.

102. ^ "3rd Duke lacrosse player: all 'fantastic lies'". Associated Press. May 16, 2006.

103. ^ "Cabbie in lacrosse case acquitted in shoplifting". News & Observer. August 30, 2006. Archived from the original on December 28, 2014. Retrieved October 24, 2010.

104. ^ Parrish, R. B. (2009) The Duke Lacrosse Case: A Documentary History and Analysis of the Modern Scottsboro, pp. 157-58; ISBN 1-4392-3590-2

105. ^ Parrish, R. B. (2009) The Duke Lacrosse Case: A Documentary History and Analysis of the Modern Scottsboro, pp. 175-76; ISBN 1-4392-3590-2

106. ^ Mueller, Jared. "Students criticize lax cop's behavior" Archived July 19, 2011, at the Wayback Machine, The Chronicle; accessed September 11, 2006.

107. ^ Mosteller, Robert P. (December 2007). "The Duke Lacrosse Case, Innocence, and False Identifications: A Fundamental Failure to "Do Justice"" (PDF). Fordham Law Review. Fordham Univ. 76 (3): 1354–57. Archived (PDF) from the original on September 3, 2020. Retrieved May 13, 2015.

108. ^ "Durham DA's investigator jobless". News & Observer. June 26, 2007. Archived from the original on December 25, 2014. Retrieved November 21, 2014.

109. ^ "Attorney: Pressler 'has done nothing wrong'". ESPN. April 6, 2006. Archived from the original on October 13, 2012. Retrieved December 14, 2007.

110. ^ "Duke lacrosse coach resigns, rest of season canceled" Archived January 15, 2016, at the Wayback Machine, Associated Press, April 6, 2006.

111. ^ "An Open Letter to the Duke Community". Concerned Duke Faculty. Archived from the original on June 18, 2007. Retrieved September 14, 2007.

112. ^ Police Warn Students About Suspicious Gang Activity Off East Campus Archived March 12, 2016, at the Wayback Machine. The Chronicle. March 31, 2006.

113. ^ "Students threatened, assaulted off campus", The Chronicle, April 3, 2006. Archived January 5, 2012, at the Wayback Machine

114. ^ Paul Montgomery (2007). Party Like a Lacrosse Star. Lulu.com. pp. 10–11. ISBN 978-0-615-17150-0.

115. ^ Hull, Anne (June 10, 2006). "Lacrosse Players' Case a Trial for Parents". Washingtonpost.com. Archived from the original on February 8, 2017. Retrieved April 16, 2010.

116. ^ Tucker Archived 2020-09-23 at the Wayback Machine , *NBC News*, May 15, 2006.

117. ^ Why We're Naming the Accuser Archived May 19, 2007, at the Wayback Machine. *The News & Observer*, April 11, 2007.

118. ^ "Faith in Justice System, Praise for Players Follow Dismissal" Archived October 26, 2016, at the Wayback Machine, WRAL-TV, April 11, 2007.

119. ^ *"Dismissing the Duke Case: Video". MSNBC. April 15, 2007.*

120. ^ *"Duke: 'We will not let the safety...be jeopardized'". News & Observer. April 29, 2006. Archived from the original on July 3, 2014. Retrieved October 24, 2010.*

121. ^ *"Report: All Charges Against Duke Lacrosse Players to Be Dropped Soon". FoxNews. March 23, 2007.*

122. ^ *Setrakian, Lara; Francescani, Chris (June 16, 2007).* *"Former Duke Prosecutor Nifong Disbarred". ABC News. Raleigh, N.C. Archived from the original on December 8, 2021. Retrieved May 12, 2015.*

123. ^ "Judge Suspends Resigned Nifong From DA's Office" Archived April 5, 2016, at the Wayback Machine, wral.com, June 18, 2007.

124. ^ *"Nifong Guilty of Criminal Contempt; Sentenced to 1 Day in Jail". WRAL. August 31, 2007. Archived from the original on September 18, 2021. Retrieved June 14, 2010.*

125. ^ CBS's *60 Minutes* segment "Duke Rape Suspects Speak Out" Archived 6 October 2013 at the Wayback Machine, cbsnews.com, October 15, 2006.

126. ^ "Who is the real victim in the Duke lacrosse case?" Archived May 5, 2007, at the Wayback Machine, rightsideoftheroad.com, January 8, 2007.

127. ^ "Summa cum loony" Archived May 19, 2008, at the Wayback Machine

128. ^ *"Duke LAX accuser pens memoir - 8/22/08-Raleigh News-abc11.com". Abclocal.go.com. August 22, 2008. Archived from the original on March 2, 2011. Retrieved April 16, 2010.*

129. ^ "Duke lacrosse attorney hopes accuser admits she lied" Archived August 28, 2016, at the Wayback Machine, wral.com; retrieved September 5, 2008.

130. ^ Andrew Hibbard, "Memoir chronicles lax accuser's troubled life", dukechronicle.com; accessed November 6, 2008. Archived May 18, 2015, at the Wayback Machine

131. ^ "Police: Boyfriend of Duke lacrosse accuser is dead" Archived 2014-09-24 at the Wayback Machine, newsobserver.com, April 14, 2011.

132. ^ *"Crystal Mangum, Duke lacrosse accuser, convicted, sentenced in boyfriend's stabbing death". New York Daily News. November 22, 2013. Archived from the original on September 18, 2021. Retrieved March 10, 2019.*

133. ^ *Duke Univ. Office of News and Communications (June 18, 2007), Duke University, Three Lacrosse Players Announce Settlement, Duke University, archived from the original on March 9, 2013, retrieved May 11, 2015*

134. ^ Flanagan, Caitlin, "Sunday Book Review: Nothing to Cheer About. 'The Price of Silence' by William D. Cohan" Archived April 21, 2016, at the Wayback Machine, nytimes.com, April 24, 2014; accessed May 11, 2015.

135. ^ *Mandell, Nina (February 25, 2011). "IRS claims former Duke lacrosse player Reade Seligmann owes millions, lawyer says bill is mistake". New York Daily News. Archived from the original on September 18, 2021. Retrieved April 17, 2015.*

136. ^ *ᵃ ᵇ "NCAA to allow Duke players to reclaim lost season". ESPN.com. 30 May 2007. Archived from the original on 29 November 2014. Retrieved May 31, 2007.*

137. ^ Clemmons, Anna Katherine, "Former Duke Players Move Forward" Archived May 18, 2015, at the Wayback Machine ESPN.com, March 10, 2010. Retrieved May 11, 2015.

138. ^ Annan-Brady, Rita, "Reade Seligmann Honored For Innocence Project", Archived May 21, 2016, at the Wayback Machine *The Progress*, online at NewJerseyHills.com, uploaded November 5, 2010; retrieved May 11, 2015.

139. ^ *ᵃ ᵇ Cohan, William D. (2015). The Price of Silence: The Duke Lacrosse Scandal, The Power of the Elite, and the Corruption of Our Great Universities. New York: Simon & Schuster. p. 602. ISBN 978-1-4516-8179-6. Archived from the original on August 18, 2021. Retrieved May 11, 2015.*

140. ^ *ᵃ ᵇ "4 return to Duke lacrosse for 5th year". Miami Herald. September 29, 2007. Archived from the original on November 8, 2007. Retrieved November 9, 2007.*

141. ^ *Cohan, William D. (2015). The Price of Silence: The Duke Lacrosse Scandal, The Power of the Elite, and the Corruption of Our Great Universities. New York: Simon & Schuster. p. 601. ISBN 978-1-4516-8179-6. Archived from the original on March 10, 2021. Retrieved May 11, 2015.*

142. ^ *"Duke Civil Lawsuit" (PDF). ABC News. April 11, 2007. Archived from the original (PDF) on June 20, 2007. Retrieved April 11, 2007.*

143. ^ *"LAX Player Files Lawsuit Against Duke University". ABC News. January 4, 2007. Archived from the original on November 7, 2012. Retrieved January 14, 2007.*

144. ^ *"Faculty revisits case, Nifong". The News&Observer. May 12, 2007. Archived from the original on September 22, 2007. Retrieved May 12, 2007.*

145. ^ Peter Applebome, "After Duke Prosecution Began to Collapse, Demonizing Continued" Archived January 21, 2016, at the Wayback Machine, *The New York Times*, April 15, 2007.

146. ^ "Alleva's tenure saw Duke's best and worst" Archived 27 March 2015 at the Wayback Machine, *Duke Chronicle*, April 14, 2008.

147. ^ *"Johns Hopkins 12, Duke 11". NCAA Sports.com.*

148. ^ *"Duke edges Irish for first lacrosse title". ESPN.com. 31 May 2010. Archived from the original on 20 February 2015. Retrieved February 19, 2015.*

149. ^ Duke settles with former lacrosse coach Pressler Archived June 9, 2016, at the Wayback Machine, TheChronicle.com; accessed November 21, 2014.

150. ^ *"Duke President Shares Lessons Learned, Regrets About Lacrosse Case". Dukenews.duke.edu. September 29, 2007. Archived from the original on July 28, 2012. Retrieved April 16, 2010.*

151. ^ "Infamous Duke lacrosse house demolished" Archived October 5, 2012, at the Wayback Machine, abclocal.go.com; retrieved July 13, 2010.

152. ^ Former detective in Duke lacrosse rape case commits suicide in Georgia Archived October 14, 2016, at the Wayback Machine, wral.com; retrieved July 16, 2014.

153. ^ "Copy of lawsuit" (PDF). Archived from the original (PDF) on March 27, 2009. Retrieved April 16, 2010.

154. ^ "Nifong files for bankruptcy; city replies to suit". January 16, 2008. Archived from the original on July 3, 2014. Retrieved October 24, 2010.

155. ^ "Judge: Duke lacrosse players can pursue lawsuit". FOXNews.com. May 28, 2008. Archived from the original on February 25, 2021. Retrieved April 16, 2010.

156. ^ Beaty, James A. (March 31, 2011). "MEMORANDUM AND OPINION that the Motions to Dismiss [Doc for MCFADYEN et al v. DUKE UNIVERSITY et al :"]. Justia Dockets & Filings. p. 137. Retrieved 2023-12-13.

157. ^ "Federal Cases > Constitutional Law Evans v Chalmers". Judicial View. Archived from the original on 2018-01-17. Retrieved 2017-05-23.

158. ^ "Casetext". Casetext. Archived from the original on 2021-03-10. Retrieved 2017-05-23.

159. ^ "Durham settles with wrongly accused Duke lacrosse players". WRAL.com. 2014-05-16. Archived from the original on 2021-02-25. Retrieved 2017-05-23.

160. ^ "Duke Lacrosse Players File Federal Lawsuit Against University, City of Durham". Fox News. February 21, 2008. Archived from the original on April 20, 2008. Retrieved May 22, 2009.

161. ^ "Other Duke players, parents file lawsuit". Baltimore Sun. 22 February 2008. Archived from the original on June 4, 2011. Retrieved May 22, 2009.

162. ^ "Duke Lacrosse Players File Federal Lawsuit Against University, City of Durham". FoxNews. February 21, 2008. Archived from the original on April 20, 2008. Retrieved May 22, 2009.

163. ^ Harris, Andrew M (March 1, 2013). "Ex-Duke Lacrosse Players End Lawsuit Against School". bloomberg.com. Archived from the original on March 10, 2021. Retrieved May 21, 2017.

164. ^ Deitsch, Richard (March 9, 2016). "New ESPN 30 for 30 documentary to look back at Duke lacrosse case". Sports Illustrated. Archived from the original on April 20, 2021. Retrieved March 28, 2016.

165. ^ "A 2006 open letter on leadership and justice". ESPN. March 14, 2016. Archived from the original on February 24, 2021. Retrieved March 28, 2016.

166. ^ {{cite web}}: CS1 maint: bot: original URL status unknown (link)

## Further reading

- *Until Proven Innocent: Political Correctness and the Shameful Injustices of the Duke Lacrosse Rape Case* by Stuart Taylor Jr. and KC Johnson (2007); ISBN 0-312-36912-3
- *It's Not About the Truth: The Untold Story of the Duke Lacrosse Rape Case and the Lives It Shattered* by Don Yaeger & Mike Pressler (2007); ISBN 1-4165-5146-8

- *A Rush to Injustice: How Power, Prejudice, Racism, and Political Correctness Overshadowed Truth and Justice in the Duke Lacrosse Rape Case* by Nader Baydoun and R. Stephanie Good (2007); ISBN 978-1-59555-118-4
- *The Duke Lacrosse Case: A Documentary History and Analysis of the Modern Scottsboro* by R. B. Parrish (2009); ISBN 978-1-4392-3590-4
- *Party Like a Lacrosse Star* by Paul Montgomery (2007); ISBN 978-0-615-17150-0
- *The Last Dance for Grace: The Crystal Gale Mangum Story* by Crystal Gale Mangum & Edward Clark (2008); ISBN 978-0-9817837-0-3

## External links

- Collected stories from The (Raleigh, N.C.) News & Observer
- "Duke Rape Scandal" Photo Gallery via Court TV
- Video: Duke Jurors Speak (Grand Jury)
- Exclusive: Duke Lacrosse Grand Jurors Speak Out - ABC News
- Complete transcript and audio of Duke University President Richard Brodhead's Apology and Address on the Ethics and Practice of Trying Cases in the Media - AmericanRhetoric.com

### Duke University

**Academics**   **Schools and Institutes**

Divinity School

Fuqua School of Business

Graduate School

Kenan Institute for Ethics

Nicholas School of the Environment

Pratt School of Engineering

Sanford School of Public Policy

School of Law

School of Medicine

School of Nursing

Trinity College of Arts and Sciences



**International**

Duke Kunshan University

Duke–NUS Medical School

**Programs**

FOCUS

Robertson Scholars

TIP

| **Athletics** | <ul><li>ACC</li><li>Athletic Director</li><li>Baseball</li><li>Basketball<ul><li>Men's</li><li>Women's</li></ul></li><li>*Blue and White*</li><li>Cameron Crazies</li><li>Cameron Indoor Stadium</li><li>Carlyle Cup</li><li>Duke–North Carolina rivalry</li><li>"Dear Old Duke"</li><li>Duke blue</li><li>"Fight! Blue Devils, Fight!"</li><li>Football</li><li>Blue Devil</li><li>Jack Coombs Field</li><li>Koskinen Stadium</li><li>Krzyzewskiville</li><li>Lacrosse</li><li>Soccer<ul><li>Men's</li><li>Women's</li></ul></li><li>Tobacco Road</li><li>Victory Bell</li><li>Wallace Wade Stadium</li></ul> |
|---|---|
| **Campus** | <ul><li>East Campus</li><li>West Campus</li><li>Duke Chapel</li><li>Duke Forest</li><li>Durham</li><li>Fitzpatrick Center</li><li>Douglas M. and Grace Knight House</li><li>J. Deryl Hart House</li><li>Franklin Center</li><li>Lee Monument</li><li>Libraries</li><li>Lemur Center</li><li>Levine Science Research Center</li><li>Medical Center</li><li>Rapid Transit Train</li><li>Nasher Museum of Art</li><li>Sarah P. Duke Gardens</li><li>Triangle Universities Nuclear Laboratory</li><li>Duke Smart Home</li><li>Marine Lab</li></ul> |

| **Student life** | • American Dance Festival |
| | • Cameron Crazies |
| | • *The Chronicle* |
| | • Krzyzewskiville |
| | • WXDU |
| | • *The Chanticleer* |
| | • The Pitchforks |

| **People** | • Alumni |
| | • James B. Duke |
| | • Julian S. Carr |
| | • Presidents |
| | • Washington Duke |

| **History** | • History of Duke University |
| | • Duke lacrosse case |
| | Group of 88 |
| | • 2010 faux sex thesis controversy |

| **Related** | The Duke Endowment |

- ⊕ Category
- ◐ Commons

# EXHIBIT U-5

# Black Former Football Players Sue College And White Woman For False Rape Allegations

 bet.com/article/qh0vy2/black-men-sue-white-woman-for-false-rape-allegations

<u>News</u>

Dhameer Bradley and Malik St. Hilaire accuse Sacred Heart University of failing to protect their rights.

<u>News</u>

By Rachel Herron

October 31, 2018

/

4:46 PM

**345**



(Photo: Bridgeport Police Department)

By Rachel Herron

October 31, 2018 / 4:46 PM

The two former college football players who were falsely accused of rape by a white Long Island student have accused Sacred Heart University of violating a contract protecting the rights of students.

Dhameer Bradley and Malik St. Hilaire filed a lawsuit against the school and the false accuser, Nikki Yovino. The former athletes claim Sacred Heart breached its contract which states students "Have the right to be treated with respect, dignity and compassion by university officials and by all persons involved in disciplinary procedures."

The suits also accused Nikki Yovino of slander, libel and the intentional infliction of emotional distress.

After Yovino made the false rape allegations, both Bradley and Hilaire were forced out of the school and had their reputations tarnished.

"The action taken by Sacred Heart was a violation of the contract they have with students," the men's lawyer, Augustin Sevillano, told the <u>Connecticut Post.</u> "Women who are sexually assaulted should never be doubted but unfortunately the school rules leave a large loophole that allows for false accusations to be made."

Yovino, 19, pleaded guilty to two counts of second-degree falsely reporting an incident and one count of interfering with police. She was sentenced to three years, suspended after she serves one year in prison, and followed by probation.

"We are assessing the allegations in the lawsuit and will defend it in due course," said Yovino's lawyer, Ryan O'Neill.

Once Yovino made allegations, both the boys were treated as guilty suspects without any consideration for their rights as students. Bradley was forced to withdraw from Sacred Heart for the fall semester of 2016 and lost his NCAA Division 1 football scholarship. St. Hilaire was academically suspended from the university, their lawyer confirmed.

He pointed out that the school's student handbook states, "A presumption of guilt should not be made as a result of any allegations."

"The Title IX officers are basically judge, jury and executioner; it's an unfair process lacking in due process," he said.

While Sevillano said his clients "didn't want to see this woman (Yovino) crucified, they just wanted a wrong righted," he also revealed their attitude changed when they saw her rolling her eyes during her sentencing hearing.

"Her attitude at the hearing was disgusting," he added. "She was given so many opportunities to fix this situation but wouldn't do it."

<u>national news</u><u>Connecticut</u><u>Rape</u>

347

# EXHIBIT U-6

# Ex-Ohio State football players acquitted of rape, kidnapping

**AP** apnews.com/article/sports-crime-amir-riep-jahsen-wint-ohio-bd5df037596a1ebc654ed8c46304fa92

February 9, 2023





- 
- U.S.
- 
- 
- 
- Science
- Fact Check
- Oddities
- Health
- Video
- Climate
- Spotlight

**349**

- [Photography](#)
-
- [Lifestyle](#)
- [Religion](#)
- [Press Releases](#)
-
-


- The Associated Press is an independent global news organization dedicated to factual reporting. Founded in 1846, AP today remains the most trusted source of fast, accurate, unbiased news in all formats and the essential provider of the technology and services vital to the news business. More than half the world's population sees AP journalism every day.

-
-
-
- Copyright 2024 The Associated Press. All Rights Reserved.

COLUMBUS, Ohio (AP) — Two former Ohio State football players were acquitted Thursday on charges of rape and kidnapping stemming from a sexual encounter they had with a woman in an apartment the two players shared.

Amir Riep and Jahsen Wint embraced each other and both cried after the jury verdict was read. Their attorneys argued at trial that the woman had consensual sex with both men but regretted it afterward. They also accused the victim's father of pushing her and authorities to pursue criminal charges.

Franklin County Assistant Prosecutor Daniel Meyer said the woman went to the apartment expecting to hang out with Riep, but that the two men violently raped her.

The jury deliberated for less than four hours between Wednesday and Thursday morning before finding Riep and Wint both innocent of two counts of rape and a kidnapping charge. Each man could have faced more than 30 years in prison and registration as sex offenders if convicted.

The two players were kicked off the team in February 2020 after their arrests.

The woman told police that she was having consensual sex with Riep before Wint came into the room and both forced her into sex. After several minutes, they stopped and Riep recorded the woman agreeing that the sex was consensual.

Riep and Lloyd McFarquhar, another former Ohio State football player, both testified on Wednesday that players had been told to get evidence that their sexual partners consented to protect themselves from prosecution.

# EXHIBIT U-7



---

NATION                                    **Kansas City Chiefs**    Add Topic

# Prosecutors ask judge to toss sexual battery charges against Jackson Mahomes

  **Natalie Neysa Alund**
USA TODAY

Published 1:26 p.m. ET Jan. 3, 2024 | **Updated 9:05 a.m. ET Jan. 5, 2024**

Prosecutors have filed a motion asking a judge to dismiss felony sexual assault charges against Jackson Mahomes, the younger brother of Kansas City Chiefs quarterback Patrick Mahomes.

According to court documents obtained by USA TODAY, the Johnson County District Attorney's Office said the alleged victim in the case is refusing to cooperate with prosecutors.

"The State is not seeking a continuance to continue to serve (the alleged victim) when she has made her lack of cooperation abundantly clear," according to the prosecution's motion to dismiss filed Tuesday.

In addition, an affidavit signed by the alleged victim in November shows the woman "never contacted law enforcement when the alleged acts occurred" and planned to invoke her Fifth Amendment privileges in the case.

"I will not cooperate with the State of Kansas in prosecuting the matter before the Court," the affidavit reads.

**Popular spots to live include Kansas:** Zillow's top 10 most popular markets of 2023 shows swing to the East

---

## The allegations against Jackson Mahomes

A social media influencer, Mahomes was arrested in May in Kansas and charged with one count of misdemeanor battery and three counts of aggravated sexual battery.

The arrest came two months after police confirmed the 23-year-old was the subject of an investigation for two separate incidents that occurred on Feb. 25 at Aspens Restaurant and Lounge in Overland Park, a suburb of Kansas City.

Mahomes allegedly forcibly kissed the 40-year-old owner and shoved a 19-year-old waiter more than once, the owner and waiter told the Kansas City Star.

He remained free Wednesday after posting a $100,000 bond following his arrest last spring.

**Chiefs at Chargers:** Predictions, picks and odds for NFL Week 18 game

---

# Gag order in place

Brandon Davies, an attorney for Mahomes, previously said the court has prohibited Mahomes and his lawyers from commenting on the case.

Mahomes has more than 1.1 million followers on TikTok, more than 250,000 on Instagram and has been a consistent presence around his Super Bowl champion brother.

Online court records show Mahomes is slated to appear in court Wednesday for a preliminary hearing on all four charges.

*Contributing: Chris Bumbaca.*

*Natalie Neysa Alund is a senior reporter for USA TODAY. Reach her at nalund@usatoday.com and follow her on X @nataliealund.*

# EXHIBIT U-8

# Jackson Mahomes sees felony charges in Kansas battery case get dropped

**foxnews.com**/sports/jackson-mahomes-sees-felony-charges-kansas-battery-case-get-dropped

Ryan Gaydos

Kansas City Chiefs

## Mahomes still faces a misdemeanor battery charge



By Ryan Gaydos Fox News

Published January 3, 2024 12:01pm EST | Updated January 3, 2024 3:41pm EST

close

356



Video

## Fox News Flash top sports headlines for January 3

Fox News Flash top sports headlines are here. Check out what's clicking on Foxnews.com.

A Kansas judge on Wednesday approved prosecutors' motion to drop three felony charges against Jackson Mahomes.

Mahomes, the brother of Kansas City Chiefs star Patrick Mahomes, faced three felony aggravated sexual battery charges along with a misdemeanor battery charge. The latter charge may end up going to trial, according to FOX 4 KC.

The social media influencer appeared in a Johnson County courtroom for a preliminary hearing where the judge ruled in his favor.

## CLICK HERE FOR MORE SPORTS COVERAGE ON FOXNEWS.COM



Jackson Mahomes on the sidelines before an NFL football game between the Philadelphia Eagles and Kansas City Chiefs on Nov 20, 2023 at GEHA Field at Arrowhead Stadium in Kansas City, Missouri. (Scott Winters/Icon Sportswire via Getty Images)

The alleged victim at the center of the case planned to assert her Fifth Amendment rights if she was compelled to testify, the station reported Tuesday, citing court documents.

Prosecutors said the alleged victim would tell the court she was not truthful to authorities and the 2023 encounter with the TikTok star was consensual even if immunity was offered.

Prosecutors "were prepared to proceed with the case because victims recant or become uncooperative for a host of reasons and that does not mean that the original account to law enforcement was inaccurate," Assistant District Attorney Megan Ahsens wrote, according to The Kansas City Star.



Jackson Mahomes, seen here on the Chiefs sidelines in January 2023. (Tammy Ljungblad/Kansas City Star/Tribune News Service via Getty Images)

However, Ahsens added that investigators tried to serve subpoenas in the case, but it has become clear that the alleged victim "is actively thwarting attempts to serve her to avoid coming to court.

"Like I said from the beginning, Jackson has done nothing wrong," Mahomes' attorney Brandon Davies told FOX 4 KC on Wednesday. "We had full confidence that the truth of the matter would ultimately be revealed. The defense will reserve further comment until the remaining count is disposed of."

The alleged victim in the felony battery case is not the same person tied to the misdemeanor battery case, according to prosecutors. Mahomes pleaded not guilty to the charges last year.



Jason Lee, left, and Jackson Mahomes attend Michael Rubin's 2023 Fanatics Super Bowl Party at the Arizona Biltmore on Feb. 11, 2023 in Phoenix. (Rich Polk/Getty Images for Fanatics))

In February, Mahomes was being investigated for allegedly shoving a waiter and forcibly kissing the female owner of an Overland Park restaurant. The owner of the restaurant, Aspen Vaughn, told The Kansas City Star that Mahomes grabbed her by the throat and forcibly kissed her at least twice.

"He forcibly kissed me out of nowhere," Vaughn said, "and I'm telling him, pushing him off saying, 'What are you doing?' and then he proceeded to do it two more times, where the last time I was pushing him off, and I can see on the cameras that somebody was outside the office door, and I was yelling for them to come help, because he's big and massive."

Brittany Mahomes, his sister-in-law, came to Jackson's defense in April.

"They are ignorant," she said of the people who criticize Jackson. "He is a human just trying to live his life and find his way and until you walk a day in his shoes (which no one ever will) you have no right to say s--- about him."

**CLICK HERE TO GET THE FOX NEWS APP**

She continued, "So it's best to just shut up."

Ryan Gaydos is a senior editor for Fox News Digital.

Receive your weekly recap of all the happenings around the world of sports.

Arrives Weekly

Subscribe

This material may not be published, broadcast, rewritten, or redistributed. ©2024 FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15

4/6

minutes. Market data provided by <u>Factset</u>. Powered and implemented by <u>FactSet Digital Solutions</u>. <u>Legal Statement</u>. Mutual Fund and ETF data provided by <u>Refinitiv Lipper</u>.

# EXHIBIT V



# Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021)
## (Updated June 28,2022)



UNITED STATES
DEPARTMENT OF
EDUCATION

Office for Civil Rights

July 20, 2021 (Updated
June 28, 2022)

**Question 23:   Is a school required to accept a formal complaint of sexual harassment from a complainant who is not currently enrolled in or attending the school?**

Answer 23:     Yes, but only if the complainant is attempting to participate in the school's education program or activity at the time they file the formal complaint.[80] Individuals who are currently participating in the school's education program or activity may also file formal complaints.[81] When a formal complaint is filed, the school must respond as described in Question 20.

The preamble gives several examples of situations of a complainant "attempting to participate" in a school's education program, including when a complainant:

(1) has withdrawn from the school due to alleged sexual harassment and expresses a desire to re-enroll if the school responds appropriately to the allegations,

(2) has graduated but intends to apply to a new program or intends to participate in alumni programs and activities,

(3) is on a leave of absence and is still enrolled as a student or intends to re-apply after the leave of absence, or

(4) has applied for admission.[82]

It is important to keep in mind that this requirement concerns a complainant's status at the time a formal complaint is filed and is not affected by a complainant's later decision to remain or leave the school.[83]

**Question 24:   If a complainant has not filed a formal complaint and is not participating in or attempting to participate in the school's education program or activity, may the school's Title IX Coordinator file a formal complaint?**

Answer 24:     Yes. A Title IX Coordinator may file a formal complaint even if the complainant is not associated with the school in any way.[84]

In some cases, a school may be in violation of Title IX if the Title IX Coordinator does not do so.[85] For example, the preamble explains that if a school "has actual knowledge of a pattern of alleged sexual harassment by a perpetrator in a position of authority," OCR may find the school to be deliberately indifferent (i.e., to have acted in a clearly unreasonable way) if the school's Title IX Coordinator does not sign a formal complaint, "even if the complainant . . . does not wish to file a formal complaint or participate in a grievance process."[86] Put simply, there are circumstances when a Title IX Coordinator may need to sign a formal complaint that obligates the school to initiate an investigation regardless of the complainant's relationship with the school or interest in participating in the Title IX grievance process. This is because the school has a Title IX obligation to provide all students, not just the complainant, with an educational environment that does not discriminate based on sex.

15

363

**Question 25:**  **If a complainant is not participating in or attempting to participate in the school's education program or activity, may a school respond to reports of sexual harassment under its own code of conduct?**

Answer 25:     Yes. As discussed in Question 7, a school has discretion to use its own student-conduct process to address alleged misconduct not covered by the 2020 amendments. This includes situations where a complainant is not participating in or attempting to participate in the school's education program or activity.[87] There are also circumstances when a Title IX Coordinator may need to file a formal complaint that obligates the school to initiate an investigation regardless of the complainant's relationship with the school or interest in participating in the Title IX grievance process. See Question 24.

**Question 26:**  **Is a school required to take action even if the respondent has left the school prior to the filing of a formal complaint with no plans to return?**

Answer 26:     Yes. As explained in the preamble, a school must always respond promptly to a complainant's report of sexual harassment when it has actual knowledge.[88] (For more on actual knowledge, see Question 14.) The Title IX Coordinator must inform the complainant about the availability of supportive measures, with or without the filing of a formal complaint, and consider the complainant's wishes regarding supportive measures. [89]

**Question 27:**  **Is a school required to dismiss a formal complaint if a respondent leaves the school?**

Answer 27:     No. Although a school may dismiss a formal complaint if, at any time during the grievance process, the respondent is "no longer enrolled or employed" by the school, dismissal is not required.[90] The preamble explains that a school has discretion to assess the facts and circumstances of a case before deciding whether to dismiss the complaint because the respondent has left the school.[91]

A school may consider, for example, "whether a respondent poses an ongoing risk to the [school's] community," or "whether a determination regarding responsibility provides a benefit to the complainant even where the [school] lacks control over the respondent and would be unable to issue disciplinary sanctions, or other reasons."[92]

Proceeding with the grievance process could potentially allow a school to determine the scope of the harassment, whether school employees knew about it but failed to respond, whether there is a pattern of harassment in particular programs or activities, whether multiple complainants experienced harassment by the same respondent, and what appropriate remedial actions are necessary.

# EXHIBIT W

January 2, 2024

Student-Athlete Conduct Panel
University of Illinois at Urbana-Champaign

On September 8, 2023, I went to Lawrence, Kansas for the Kansas-Illinois football game with an Illini grad assistant and fellow teammate. After the game, we went out in Lawrence with some friends who go to KU. We stayed out at the jam-packed Jayhawk Café for the evening with a group of friends. My travel partners were with me at the Jayhawk Café for the entire evening. As to the criminal charges against me, I am declaring my innocence, as I did back in September. I have totally cooperated with that process and will continue to do so. While I appreciate my lawyers and their ability to fight the case in court, I know that the criminal justice system takes time. So my day in court will not come about for a long time, most likely long after the NBA draft, and I may not be cleared of the charges until it's too late. The harm that I will suffer from an immediate suspension can never be undone, and I will never have this opportunity to further my collegiate career or fulfil my lifelong dream to play in the NBA. Going forward, I want nothing more than to play basketball for the University of Illinois, and I remain hopeful that my due process rights will be honored and allow for a full reinstatement while this case is pending.

It is impossible for you to get to know me as a person without sitting down with me face-to-face, which is an opportunity I would welcome. But let me provide some personal history: my mom and dad separated when I was 2 and I lived with my mom after that time. My mom Treanette is my rock. With my NIL money (which is was ████████ this year, and is expected to be ████████ next year), I am supporting my mother and my four siblings through her (a 7 year old brother, a 12 year old sister, a 14 year old sister, and a 21 year old sister). I pay for their rent, food, and other necessities. My mom is hard working; she is a dialysis clerk, but sometimes it's just not enough. Then I also provide a lot of financial support to my other three siblings through my father (a 12 year old brother, a 17 year old brother, and a 19 year old sister).

I have worked hard to earn my degree in sociology from the University of Illinois this May, something I'm extremely proud of. I believe that I might have one more year of NCAA eligibility, but given what I think is my current draft position (if I'm permitted to play again), now is the time to graduate, go pro, and make my family and university proud in the NBA. I really hope that I get to do so. I worked all my life to get to this point, and to have it taken away will be life changing in a devastating way.

I have no criminal history. None. My mom raised me well. I respect the law, my professors, coaches, and all those who support the team and the university. I love this school and everyone I've come across here. I was recruited by Illinois out of high school and always wanted to come back. After a successful time at Texas Tech, I was recruited by several schools but my heart was with Illinois. I'm glad I came back-I love the team, the school, and the students who cheer us on.

Basketball is my life, it always has been, and the game has given me the chance to not only follow my dreams, but to provide for my family. I would be lost without basketball. The work ethic required to play basketball at a high level guides me in other aspects of my life. When I can't sleep, I hit the gym. When I need to clear my head or need to get focused to prepare for a big exam, I hit the gym. In many ways, basketball is both my energy and my therapy. As it relates to my participation in Illini basketball, I can't put into words how much my coaches and teammates mean to me. We are a family, and I know my role. We all care for and support each other, and I want to get back to doing my part. Since I was a little boy, I have always thrived on competition. The success I have experienced is beyond my wildest dreams. As a team, I strongly believe we can make an impact in the NCAA and be formidable opponents in the March tournament. I need to get back to my basketball family as soon as possible.

But I'm still in shock and having difficulty coping mentally. When you are dealing with a situation like mine, you feel helpless. I really hope that nobody has to go through what I'm going through right now. My focus is just trying to stay positive. I've learned a lot through this situation about how to keep your mind positive, but honestly it is a struggle most days. I feel sympathy for victims of sexual assault. It's a horrific crime that leaves permanent scars. But this makes the pain even worse on my mental state—it's appalling to be associated with such a crime. I

1

worked my whole life to develop a good reputation. I was raised by my mom. I have sisters. I have the utmost respect for women.  I would be nothing without the women in my life.

As I said above, basketball has allowed me to care for those that have supported me throughout my life.  I have met so many amazing people along the way and have fostered relationships that have molded my future.  With the recent changes to N.I.L., I have been allowed the opportunity to provide for my mother, financially, as she has provided for me, as well as my many siblings.  I am finally able to give back and offer the support needed to care for my family, friends and loved ones in need.  Unfortunately, I have come to the devastating realization that, if suspended from basketball, all of this can be taken away from me (and everyone else).  Many people rely on me, and I certainly don't want to let anyone down.  All I ever wanted to do was to make my family proud.  I have worked very hard to position myself to accomplish my goals.

In closing, I want to again emphasize the fact that a continued suspension would alter the trajectory of my career and probably kill it.  I have been very focused and determined to finish my collegiate basketball career on a high note, and to graduate with a degree from one of the top universities in the country—I'm just as proud of that.  Through hard work and commitment to my team and the overall process, I have positioned myself among some elite players in the NCAA, and if allowed to play basketball, my sources are confident that I have the potential to be a lottery pick in this year's NBA draft.  Despite what has been alleged, my goals have not changed, nor has my loyalty to my coaches, team, and Illini community.  I have continued my training and have not relaxed my willingness to excel and get better every day.  I want to give everything to my team, my coaches, and the university.  I want to do anything I can to promote my school in a positive light and secure our best chance for a National Championship.  If sidelined now, to "wait until the criminal case is over", my life as I know it will be ruined.  I undoubtedly will have my day in court, and I trust my legal team will work in my favor to achieve success.  Unfortunately, I cannot wait for the wheels of justice from the sidelines.  My opportunity to showcase my work ethic, commitment, and talent will be eliminated.  So, too, will the opportunity to play this game professionally.  The harm I will suffer from a summary suspension cannot be reversed.

Most respectfully,

Terrence (TJ) Shannon Jr.

2

# EXHIBIT X

347 Conn. 1
Supreme Court of Connecticut.

Saifullah KHAN
v.
YALE UNIVERSITY et al.

(SC 20705)
|
Argued October 3, 2022
|
Officially Released June 27, 2023

**Synopsis**

**Background:** Former private university student, a foreign national, filed suit against university, several administrators and faculty members, and classmate, asserting, among other claims, various tort claims arising from classmate's accusation of sexual assault that had resulted in former student's expulsion from university. The United States District Court for the District of Connecticut, Kari A. Dooley, J., 511 F.Supp.3d 213, granted classmate's motion to dismiss for failure to state claims against her for defamation and tortious interference with business relationship. Former student appealed. The United States Court of Appeals for the Second Circuit, Raggi, Senior Circuit Judge, certified questions whether Connecticut law would extend quasi-judicial immunity to non-government proceedings generally, or to private university's disciplinary proceedings specifically.

**Holdings:** The Supreme Court, Mullins, J., held that:

proceedings failed to require complainants to testify under oath, provide sworn statements, or certify to the truth of their statements;

proceedings did not permit live, real-time cross-examination of witnesses or any reasonable opportunity for parties to confront witnesses;

proceedings did not provide parties a reasonable opportunity to call witnesses;

proceedings materially limited assistance of counsel;

proceedings limited a party's ability to seek review of decision because it failed to establish an adequate record

of the proceedings;

as a matter of first impression, public policy of Connecticut supports a qualified privilege for statements made by individuals alleging sexual assault to proper authorities at institutions of higher education; and

former student sufficiently alleged actual malice so as to defeat qualified immunity.

Certified questions answered.

**Procedural Posture(s):** Certified Question.

**Attorneys and Law Firms**

**861** Norman A. Pattis, Bethany, with whom, on the brief, was Cameron L. Atkinson, for the appellant (plaintiff).

James M. Sconzo, Hartford, with whom was Brendan N. Gooley, for the appellee (defendant Jane Doe).

Jennifer M. Becker filed a brief for Legal Momentum et al. as amici curiae.

Robinson, C. J., and McDonald, D'Auria, Mullins, Ecker, Alexander and Keller, Js.

**Opinion**

MULLINS, J.

**\*7** This case arises from disciplinary proceedings conducted in 2018 by the University-Wide Committee on Sexual Misconduct (UWC) of the named defendant, Yale University (Yale). In those proceedings, the defendant Jane Doe[1] accused another student, the plaintiff, Saifullah Khan, of sexual assault in violation of Yale's sexual misconduct policy, resulting in his expulsion from Yale. There is no question that, when Doe made those accusations during a criminal trial, an official governmental proceeding with inherent procedural safeguards, she enjoyed absolute immunity in any subsequent civil action challenging her testimony during the criminal proceeding as defamatory.[2] The primary question presented by this appeal, which reaches us in the form of questions of law certified by the United States Court of Appeals for the **862** Second Circuit; see General Statutes § 51-199b (d);[3] is whether Doe should likewise be afforded absolute **\*8** immunity from suit for

369

her statements made during the UWC proceeding.

As we explain in this opinion, absolute immunity attaches to statements made in judicial or quasi-judicial proceedings. Doe argues that the UWC proceeding is a quasi-judicial proceeding. Therefore, she contends, her statements made therein are entitled to absolute immunity because such immunity furthers the important public policy goal of permitting alleged victims of sexual assault to speak candidly and frankly with university officials without fear of retaliatory lawsuits.

Khan counters that the UWC proceeding is not quasi-judicial because it was neither a governmental proceeding nor a proceeding with sufficient judicial-like procedures to protect against malicious and defamatory statements. Khan asserts that, if absolute immunity is afforded to testimony provided in proceedings such as that conducted by the UWC, individuals who are falsely accused will be left with no recourse or protection against malicious and defamatory allegations.

Both parties' arguments are compelling. Supporting Doe's position, the amici[4] indicate that one in four women, and one in fifteen men, will experience sexual assault while attending college. These victims are often reluctant to report such crimes. In one survey, for example, college men and women identified these concerns as affecting their decision to report sexual assaults: (1) "shame, guilt, embarrassment," and "not wanting friends and family to know," (2) "concerns about confidentiality," and (3) "fear of not being believed ...." *9 *Doe* v. *Roe*, 295 F. Supp. 3d 664, 676 (E.D. Va. 2018).[5] We are mindful of these concerns and sensitive to the need to encourage alleged victims of sexual assault to report their abuse to the appropriate authority at any institution of higher education, free from fear of intimidation and retribution. More generally, we consider it foundational that all students must be able to attend school, move about campus, and enjoy the manifold privileges and benefits of their academic pursuits without fear of sexual harassment or assault by members of their own community. It is difficult to think of a right more fundamental than the right to physical safety. Indeed, the public policy of this state, established through General Statutes § 10a-55m,[6] demonstrates that sexual assault at institutions of higher education must be addressed by encouraging and supporting alleged victims of sexual assault to speak out, to vindicate their rights, and to bring the perpetrators to **863 justice if the allegations are proven. Likewise, the remedial powers of our judicial system must not be used as a means of intimidation to enable the perpetrators of sexual assault to silence their accusers by using the threat of civil litigation and liability for damages.

At the same time, however, we must recognize a competing public policy that those accused of crimes, especially as serious a crime as sexual assault, are entitled to fundamental fairness before being labeled a sexual predator. Statements made in sexual misconduct disciplinary proceedings that are offered and accepted without adequate procedural safeguards carry too great *10 a risk of unfair or unreliable outcomes. There is no benefit to society or the administration of fair and impartial disciplinary hearings in granting absolute immunity to those who make intentionally false and malicious accusations of sexual assault.[7] Those accused of sexual assault in the higher education context often face life altering and stigmatizing consequences, including suspension or expulsion, criminal referrals, lack or revocation of employment offers, loss of future academic opportunity, and deportation. In the face of these consequences, we must acknowledge that the accused's right to fundamental fairness is no less important than the right of the accuser or the larger community to achieve justice. Disciplinary proceedings that lack fundamental procedural safeguards "do not adequately protect a critical public policy undergirding the doctrine of absolute immunity—to encourage robust participation and candor in judicial and quasi-judicial proceedings while providing some deterrent against malicious falsehoods." *Priore* v. *Haig*, 344 Conn. 636, 651, 280 A.3d 402 (2022).

To balance and protect both of the aforementioned interests, we must clarify when a proceeding is quasi-judicial for the purpose of affording proceeding participants absolute immunity. As we explain hereinafter, we recognize a proceeding as quasi-judicial only when the proceeding at issue is specifically authorized by law, applies law to fact in an adjudicatory manner, contains adequate procedural safeguards, and is supported by a public policy encouraging absolute immunity for proceeding participants. In short, we accept the Second Circuit's invitation to clarify the scope of Connecticut's *11 absolute immunity doctrine and conclude that the UWC proceeding did not meet the conditions necessary to be considered quasi-judicial. Consequently, Doe is not entitled to absolute immunity.

Nevertheless, because the public interest in encouraging the reporting of sexual assaults to the proper authorities at institutions of higher education is sufficiently compelling to warrant protection of a defamatory statement, a qualified privilege is appropriate for alleged victims of sexual assault in this context. Because this matter is only at the motion to dismiss stage, however, we must accept as true Khan's factual allegations in his complaint that

Doe's statements were made with malice, which defeats Doe's asserted privilege at this stage of the proceedings. At a later stage of the proceedings, with a more complete factual record, it may be appropriate to revisit whether Doe's qualified privilege has been defeated.

**864 I

Khan brought the underlying action in the United States District Court for the District of Connecticut, alleging, among other things, defamation and tortious interference with business relationships against Doe.[8] *Khan* v. *Yale University*, 511 F. Supp. 3d 213, 216, 219 (D. Conn. 2021). The District Court's memorandum of decision contains the following factual allegations, taken from Khan's complaint, which we are required to accept as true and construe in Khan's favor for purposes *12 of answering the certified questions of law.[9] See, e.g., *Littlejohn* v. *New York*, 795 F.3d 297, 306 (2d Cir. 2015) (on motion to dismiss pursuant to rule 12 (b) (6) of Federal Rules of Civil Procedure, court must accept complaint's factual allegations as true and draw inferences in plaintiff's favor); *Lunardini* v. *Massachusetts Mutual Life Ins. Co.*, 696 F. Supp. 2d 149, 155 (D. Conn. 2010) ("[a] motion to dismiss under [r]ule 12 (b) (6) must be decided on facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference" (internal quotation marks omitted)), quoting *Leonard F.* v. *Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999).

"Khan is a [foreign national] who at all relevant times was enrolled as an undergraduate student at Yale. ... [In the fall of 2012, he enrolled as an undergraduate at Yale.] He was expected to graduate Yale with the [c]lass of 2016....

"[Doe] was a classmate of ... Khan's and was likewise enrolled at all relevant times as an undergraduate student at Yale. ... On Halloween night in 2015 ... Khan and ... Doe, who were familiar with one another from prior campus encounters, met at an [off campus] Halloween party before attending a musical performance at [Yale's] Woolsey Hall. ... Doe was not feeling well and so the two left the performance early and walked on campus together before returning to Trumbull College, [a Yale residential college] where they both resided. ... After ... Khan escorted ... *13 Doe to her room, she asked him to [enter] and the two ... engaged in consensual sexual intercourse. ... In the morning ... Doe reported to friends that she had been raped, though she informed a health care worker that she had engaged in unprotected consensual sex when [she

sought] contraception at the Yale [H]ealth [C]enter [later] that same day. ...

"In the days that followed ... Doe went public with her rape claim and issued a formal complaint against ... Khan on the advice of the Yale Women's Center. ... Khan was immediately suspended by Yale [College][10] Deputy Dean Joe Gordon based **865 on ... Doe's written complaint alone and was ordered to vacate campus, which rendered him homeless. ... The Yale Police Department opened an investigation and by mid-November [of 2015] the [s]tate ... filed criminal charges against ... Khan for [first degree] sexual assault. ... In the meantime [the UWC] ... [stayed] any disciplinary proceedings pending the outcome of the prosecution. ... Khan subsequently faced trial before a jury in early 2018 for first, second, third, and [fourth degree] sexual assault during a nearly [two week] trial and was acquitted on all counts after less than [one] day of deliberations. ...

"Following his acquittal ... Khan sought readmission [to] Yale, to which #MeToo activists galvanized an opposition, generating more than 77,000 signatures on a petition protesting his reenrollment. ... Khan was eventually readmitted and resumed full-time student status in the fall of 2018, though he was denied [on campus] housing and treated as unwelcome[d] on campus. ... In early October 2018, the Yale Daily News published an article relaying the allegations of a troubled young man who claimed that he had a romantic *14 relationship with ... Khan that included an episode in which ... Khan sexually assaulted him during an act of role-playing with a woman in Washington, D.C., and an instance in which ... Khan slapped him in the face while the two were together in [Indianapolis, Indiana]. ... The article did not provide any indication that this young man had any affiliation with Yale or had ever been to the Yale campus. ...

"Following publication of the article ... Khan was contacted by members of the Yale Police Department and by two Yale administrators to inquire as to his well-being and to determine whether he needed professional help. ... Khan agreed to undergo a mental health consultation but reported that he was fine and had not considered harming himself or others. ... Khan was then asked to meet with Yale administrators and after indicating that he would not do so ... Khan received a letter informing him that he was suspended [effective] immediately from Yale College ... which Dean Marvin Chun described as necessary for [Khan's] physical and emotional safety and well-being and/or the safety and well-being of the university community. ... Khan was thus barred from campus and prohibited from attending his classes; he was again

rendered homeless without warning and informed that he would lose his health care coverage effective November 1, 2018....

"[Khan] alleges that Yale's professed concern with his safety and with the safety of the Yale community [was] not credible, as there [was] no evidence that ... Khan posed a danger to himself or to anyone else .... [Furthermore, Khan completed a psychiatric examination during his suspension, in which the evaluator concluded that Khan posed no threat.] Instead ... Khan asserts that his suspension was pretextual and arose from a confluence of factors that included his unique history at Yale and the heightened sensibilities surrounding sexual assault claims, which were often credited **\*15** without investigation or due process at Yale as a function of the university's pervasive #MeToo culture. ... Following his suspension ... Khan placed Yale on notice that he intended to seek judicial relief and open an investigation into Yale's alleged Title IX[11] violations in connection with his **\*\*866** suspension and with the university's failure to convene a hearing on the claims of ... Doe .... Khan also requested and was denied permission to attend his classes with an escort to address Yale's safety concerns, though Yale had afforded other male students accused of sexual misconduct the ability to complete their degrees off-site. ...

"In November 2018 ... Khan was permitted to return to campus for a hearing convened by the UWC on ... Doe's 2015 sexual assault complaint. ... Doe, who had since graduated from Yale, was not present and provided a statement via teleconference. ... Khan was not permitted to be in the room when the UWC [hearing] panel questioned ... Doe and was instead required to sit in an anteroom where he listened to an [audio feed] of the hearing; as a result ... Khan [claims that he] was denied an opportunity to confront his accuser. ... And although ... Khan had counsel present, his attorney was not permitted to speak, question witnesses, or [raise] objections when panel members assumed facts not in evidence and asked compound questions. ... A member of [Yale's Office of the General Counsel] was present throughout the proceedings to provide counsel to the UWC panel. ... Khan also requested a transcript or recording of the **\*16** hearing, which the panel denied.[12] ... The UWC panel decided to expel ... Khan as a result of the hearing, which he contends failed to afford him the basic due process that Title IX demands. ... As a result of losing his opportunity to complete his Yale education ... Khan [was] subject to immediate deportation to [his country of citizenship], where he [faced] serious physical danger due to his family's decision to seek refuge in [another country]."[13] (Citations omitted; footnotes added; footnote altered;

footnote omitted; internal quotation marks omitted.) *Khan v. Yale University*, supra, 511 F. Supp. 3d at 216–18.

The following additional procedural history is relevant. After Khan brought the federal action against Yale, various Yale employees, and Doe, the District Court granted Doe's motion to dismiss Khan's claims of defamation and tortious interference with business relationships. See id., at 216, 219, 226, 228; see also footnote 8 of this opinion. Insofar as Khan sued Doe for defamation on the basis of her allegations of sexual assault in the UWC proceeding, the District Court concluded that the UWC proceeding was quasi-judicial in nature, and, therefore, under Connecticut law, Doe enjoyed absolute immunity for statements she made in that proceeding. See *Khan v. Yale University*, supra, 511 F. Supp. 3d at 226. Although the District Court acknowledged that it was "reluctant to alter the landscape of Connecticut's immunity law" by extending absolute immunity to statements made during the proceedings of a nongovernmental entity—an area it said Connecticut courts have not resolved; id., at 224; the court concluded that extending **\*17** such immunity in the present case was warranted, both as a matter of public policy; id., at 225–26; and under the six factor test that this court had used to identify quasi-judicial proceedings in **\*\*867** *Kelley v. Bonney*, 221 Conn. 549, 567, 606 A.2d 693 (1992). See *Khan v. Yale University*, supra, at 220–22.

On appeal to the Second Circuit, "Khan argue[d] that the proceedings of [nongovernmental] entities cannot be quasi-judicial and, thus, Doe's accusations of sexual assault in a private university's disciplinary hearing are not shielded by absolute immunity." *Khan v. Yale University*, 27 F.4th 805, 810 (2d Cir. 2022). The Second Circuit concluded that the outcome of the appeal hinges on a question of Connecticut state law—namely, whether quasi-judicial immunity extends to proceedings like that of the 2018 Yale UWC proceeding—and that it could not predict how this court would resolve that question. See id., at 833. Consequently, the Second Circuit certified the following questions of law, which we modify to address issues of Connecticut law pertinent to this appeal:[14]

(1) What requirements must be satisfied for a proceeding to be recognized as quasi-judicial for purposes of affording absolute immunity to proceeding participants? Specifically:

(a) Must an entity apply controlling law, and not simply its own rules, to the facts at issue in the proceeding? See *Petyan v. Ellis*, 200 Conn. 243, 246, 510 A.2d 1337 (1986); see also W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 114, pp. 818–19.

(b) How, if at all, do the power factors enumerated in *Kelley* v. *Bonney*, supra, 221 Conn. at 567, 606 A.2d 693, and **\*18** *Craig* v. *Stafford Construction, Inc.*, 271 Conn. 78, 85, 856 A.2d 372 (2004), apply to the identification of a proceeding as quasi-judicial; and, if they do apply, are these factors in addition to; see *id.*; or independent of, a preliminary law to fact requirement?

(c) How, if at all, does public policy inform the identification of a proceeding as quasi-judicial, and, if it does, is this consideration in addition to, or independent of, a law to fact requirement and the *Kelley/Craig* factors?

(d) How, if at all, do procedures usually associated with traditional judicial proceedings—such as notice and the opportunity to be heard; the ability to be physically present throughout a proceeding; an oath requirement; the ability to call, examine, confront, and cross-examine witnesses; and the ability to be represented by counsel—inform the identification of a proceeding as quasi-judicial? See *id.*, at 87–88, 856 A.2d 372; *Kelley* v. *Bonney*, supra, 221 Conn. at 568–70, 606 A.2d 693.[15]

(2) Was the 2018 Yale UWC proceeding at issue in the present appeal properly recognized as quasi-judicial?

(3) If the answer to the second question is yes, would Connecticut extend absolute quasi-judicial immunity to Doe for her statements in the Yale UWC proceeding?

(4) If the answer to the second question is no, would Connecticut afford Doe qualified immunity or no immunity at all? See *Khan* v. *Yale University*, supra, 27 F.4th at 833–34.

Although the Second Circuit also asked us to answer whether, under Connecticut law, a proceeding before a nongovernmental entity could *ever* be deemed quasi-judicial **\*19 \*\*868** for purposes of affording absolute immunity to proceeding participants; *id.*, at 833; we conclude that it is unnecessary to answer that question in order to resolve whether Yale's UWC proceeding was quasi-judicial. Instead, we answer the certified questions focusing on the requirements that any proceeding must satisfy to be considered quasi-judicial.

## II

We first address what requirements must be satisfied for a proceeding to be recognized as quasi-judicial for purposes of affording absolute immunity to proceeding participants. See *id.* At the outset, we recognize that "the determination of whether [a proceeding] constitutes a quasi-judicial proceeding is a question of law over which our review is plenary." *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 83, 856 A.2d 372. "[W]hether a particular proceeding is quasi-judicial in nature, for the purposes of triggering absolute immunity, will depend on the particular facts and circumstances of each case." (Internal quotation marks omitted.) *Priore* v. *Haig*, supra, 344 Conn. at 645, 280 A.3d 402.

The doctrine of absolute judicial immunity, or absolute privilege, which shields judges, parties, and witnesses from liability for their testimony in judicial and quasi-judicial proceedings, has its origins in English common law.[16] In Connecticut, we have long held that "communications uttered or published in the course of judicial proceedings are absolutely privileged [as] long as they are in some way pertinent to the subject of the controversy." (Internal quotation marks omitted.) *Gallo* v. *Barile*, 284 Conn. 459, 466, 935 A.2d 103 (2007); see **\*20** also *Charles W. Blakeslee & Sons* v. *Carroll*, 64 Conn. 223, 232, 29 A. 473 (1894) (*Blakeslee*) (relying on English common law to first recognize privilege), overruled in part on other grounds by *Petyan* v. *Ellis*, 200 Conn. 243, 510 A.2d 1337 (1986).

Our earliest cases recognizing absolute immunity limited the privilege to official adjudicative proceedings, i.e., formal dispute resolution proceedings or forums, that were specifically authorized by law. In *Blakeslee*, for example, this court held that "[a] judicial proceeding within the meaning of the rule as to absolute privilege must ... be *one carried on in a court of justice established or recognized by law*, [in which] the rights of parties which are recognized and protected by law are involved and may be determined." (Emphasis added.) *Charles W. Blakeslee & Sons* v. *Carroll*, supra, 64 Conn. at 234, 29 A. 473.

Since *Blakeslee*, we have acknowledged that "[t]he judicial proceeding to which [absolute] immunity attaches has not been defined very exactly. [At the very least, it] includes any hearing before a tribunal [that] performs a judicial function, ex parte or otherwise, and whether the hearing is public or not. It includes ... [competency], bankruptcy, or naturalization proceedings, and an election contest. It extends also to the proceedings of many administrative officers, such as boards and commissions, so far as they have powers of discretion in applying the law to the facts [that] are regarded as judicial or [quasi-judicial], in character."[17] (Internal quotation marks **\*\*869** omitted.) **\*21** *Kelley* v. *Bonney*, supra, 221 Conn. at 566, 606 A.2d 693; see also *Hopkins* v. *O'Connor*, 282

Conn. 821, 839, 925 A.2d 1030 (2007) (" 'judicial proceeding' has been defined liberally to encompass much more than civil litigation or criminal trials").

Although we have never expressly said so, a review of our case law demonstrates that a threshold requirement of any quasi-judicial proceeding is that the proceeding must be specifically authorized by law, meaning that the proceeding is governed by or conducted pursuant to a state or federal statute.[18] For example, in *Petyan* v. *Ellis, supra*, 200 Conn. 243, 510 A.2d 1337, General Statutes (Rev. to 1979) §§ 31-241, 31-242 and 31-249 authorized officials of the Employment Security Division of the state Department of Labor to conduct reviews of unemployment compensation claims. See *id.*, at 248–49, 510 A.2d 1337. In *Kelley* v. *Bonney, supra*, 221 Conn. 549, 606 A.2d 693, a state Board of Education's hearing to revoke a teaching certificate was prescribed by General Statutes (Rev. to 1987) § 10-145b (m). See *id.*, at 567, 606 A.2d 693. In *Craig* v. *Stafford Construction, Inc., supra*, 271 Conn. 78, 856 A.2d 372, a proceeding by the Hartford Police Department was required by the department's official code of conduct, enacted pursuant to both city charter and a collective bargaining agreement in accordance with Connecticut's Municipal Employee Relations Act. See *id.*, at 86, 856 A.2d 372; see also General Statutes § 7-467 et seq.

Similarly, our appellate courts have recognized that arbitration proceedings, both contractual and court mandated, were specifically authorized by law and qualified **\*22** as quasi-judicial.[19] See *Larmel* v. *Metro North Commuter Railroad Co.*, 341 Conn. 332, 341, 267 A.3d 162 (2021) ("[court mandated] arbitration proceeding pursuant to [General Statutes] § 52-549u is, undoubtedly, a quasi-judicial examination of the parties' claims, as arbitrators are statutorily authorized to carry out functions that are judicial in nature"); *Preston* v. *O'Rourke*, 74 Conn. App. 301, 310–12, 314–15, 811 A.2d 753 (2002) (arbitration proceeding conducted pursuant to State Employee Relations Act and governed by General Statutes §§ 52-408 through 52-424 was quasi-judicial in nature).

Requiring that a proceeding be specifically authorized by or conducted **\*\*870** pursuant to law is consistent with the purposes of absolute immunity because, among other things, the imposition of absolute immunity is intended to be a public benefit and a societal necessity. A proceeding that is not specifically authorized by or conducted pursuant to law provides little foundation for this court to determine that the public has an interest in encouraging participation and unfettered candor in the proceeding. See *Logan's Super Markets, Inc.* v. *McCalla*, 208 Tenn. 68,

72, 343 S.W.2d 892 (1961) ("[absolute immunity] belongs to the public, not to the individual, and the public should not stand to lose the benefit it derives"). Indeed, a proceeding that lacks authorization by law provides no assurance that the public interest in the proceeding is sufficiently vital to justify affording absolute immunity to its participants.

Beyond a specific authorization by law, our decision in *Priore*, which was released after the Second Circuit **\*23** certified this question, sets forth the general requirements that must be satisfied for any proceeding to be recognized as quasi-judicial: "[A] quasi-judicial proceeding is one in which the entity conducting the proceeding has the power of discretion in applying the law to the facts within a framework that contains procedural protections against defamatory statements. As part of their inquiry into whether a proceeding is truly quasi-judicial, courts may consider the relevant factors enumerated by this court in *Kelley* to determine whether the entity exercises powers akin to a judicial entity. ... Courts may also consider other factors that are relevant to a given proceeding, including the procedural safeguards of the proceeding and the authority of the entity to regulate the proceeding. Finally, courts must always carefully scrutinize whether there is a sound public policy justification for the application of absolute immunity in any particular context." (Citation omitted.) *Priore* v. *Haig, supra*, 344 Conn. at 652–53, 280 A.3d 402. We now discuss in greater detail how each of these requirements applies to adjudicative proceedings, in response to the auxiliary questions posed by the Second Circuit.

A

The Second Circuit asks whether the entity conducting a quasi-judicial proceeding must "apply controlling law, and not simply its own rules, to [the] facts at issue in the proceeding ...." *Khan* v. *Yale University, supra*, 27 F.4th at 833. We have repeatedly held that "a quasi-judicial proceeding is one in which the entity conducting the proceeding has the power of discretion in applying the law to the facts ...." *Priore* v. *Haig, supra*, 344 Conn. at 652, 280 A.3d 402. Although we have recognized various sources of official law—statutes, regulations, municipal codes—in each case in which we deemed the proceeding at issue to be quasi-judicial, the entity conducting the proceeding applied more than its own internal policies or rules of decision.

**\*24** The law to fact requirement originated in judicial proceedings and was derived to distinguish proceedings

295 A.3d 855

involving mere investigatory powers from proceedings that involved investigation *and* adjudication of the matter.[20] In the nineteenth century, **871 this court determined that a committee proceeding to investigate the truth of certain statements made by the New Haven Board of Aldermen did not constitute a judicial or quasi-judicial proceeding. See *Charles W. Blakeslee & Sons* v. *Carroll*, supra, 64 Conn. at 234, 29 A. 473. The court explained that "the power and the duty of the committee were simply to obtain ... information .... The persons who were to make the inquiry had no judicial character or office ... had no settled jurisdiction or fixed mode of procedure ... and they had no judicial function to exercise, for they could decide nothing, and could only report their action to a board [that] might altogether disregard what the committee had done." *Id.*

Nearly one century later, in *Petyan* v. *Ellis*, supra, 200 Conn. 243, 510 A.2d 1337, this court clarified that a proceeding can be quasi-judicial if the entity conducting the proceeding "ha[s] powers of discretion in applying the law to the facts ...." (Internal quotation marks omitted.) *25 *Id.*, at 246, 510 A.2d 1337. Unlike in *Blakeslee*, the entity conducting the proceeding in *Petyan* "decide[d] the facts and then appl[ied] the appropriate law" to the facts to render a decision. *Id.*, at 248, 510 A.2d 1337. At issue was whether statements provided by a defendant-employer on a " 'fact-finding supplement' " form of the Employment Security Division of the state Department of Labor were subject to absolute immunity. *Id.*, at 247–48, 510 A.2d 1337. The court concluded that, because, "[i]n the processing of unemployment compensation claims, the administrator, the referee and the [E]mployment [S]ecurity [B]oard of [R]eview decide the facts and then apply the appropriate law ... [t]he [E]mployment [S]ecurity [D]ivision ... acts in a quasi-judicial capacity when it acts [on] claims for unemployment compensation." (Citation omitted; footnotes omitted.) *Id.*, at 248–49, 510 A.2d 1337. Specifically, in *Petyan*, the adjudicators were authorized by statute to determine unemployment claims. See *id.*

Similarly, in *Kelley*, this court placed special emphasis on the Board of Education's duty to apply Connecticut laws and regulations to its findings of fact in order to properly revoke a teaching certificate. See *Kelley* v. *Bonney*, supra, 221 Conn. at 567–68, 606 A.2d 693. This court observed that the proceedings had to conform to statutory regulations that listed well delineated causes for a teacher's license revocation. *Id.*, at 568, 606 A.2d 693; see also *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 84–89, 856 A.2d 372 (Hartford Police Department applied its official code of conduct and collective bargaining agreement to facts, thus satisfying law to fact requirement).[21]

Most recently, in *Priore* v. *Haig*, supra, 344 Conn. 636, 280 A.3d 402, we likewise observed that "the [Greenwich Planning and Zoning Commission] has the discretion to *26 apply the law, [the Greenwich zoning **872 regulations] ... to the facts set forth in the application before it." *Id.*, at 654, 280 A.3d 402. We explained that, "when acting in this administrative capacity on a special permit application, a planning and zoning commission ... decides [whether] all of the standards enumerated in the special permit regulations are met ...." (Internal quotation marks omitted.) *Id.*, at 653, 280 A.3d 402.[22]

A review of our cases thus demonstrates that the entity conducting a quasi-judicial proceeding must apply public law—whether it be constitutional, statutory, administrative, municipal, or common law—to facts for the purpose of rendering an adjudicatory decision. The law that is applied is promulgated by a public official or entity, and the application of the law is either subject to judicial review or may be altered or repealed by a public official or entity. In other words, although a private entity may adopt publicly created law to govern its affairs, the law applied is controlled and formulated by the public and is designed to benefit the greater public. Thus, an entity that creates and applies only its internal policies lacks the necessary components of public participation and approval to be considered quasi-judicial for the purpose of affording participants absolute immunity.

**B**

We next turn to the question of how "procedures usually associated with traditional judicial proceedings—such as notice and the opportunity to be heard; the ability to be physically present throughout a proceeding; an oath requirement; the ability to call, examine, confront, and cross-examine witnesses; [and] the *27 ability to be represented by counsel—inform the identification of a proceeding as quasi-judicial?" *Khan* v. *Yale University*, supra, 27 F.4th at 833. Because the doctrine of absolute immunity has applied to statements made during official judicial proceedings, which feature all of these procedures, the extent to which these procedures are present will often be determinative of whether a proceeding qualifies as quasi-judicial. Our recent decision in *Priore* provides guidance.

In that case, we concluded that, in addition to the law to fact requirement, "our case law also looks to the procedural safeguards that attend to the proceeding ...

which promote reliability and due process, as part of the analysis to determine whether a proceeding is truly quasi-judicial in nature." *Priore* v. *Haig*, supra, 344 Conn. at 648–49, 280 A.3d 402. We explained that "it [is] eminently reasonable for courts to consider the procedural safeguards attendant to a proceeding because [s]tatements made during proceedings that lack basic [due process] protections generally do not engender fair or reliable outcomes." (Internal quotation marks omitted.) *Id.*, at 651, 280 A.3d 402.

In *Priore*, we ultimately concluded that statements made during a town planning and zoning commission public hearing were not entitled to absolute immunity. See *id.*, at 661, 663, 280 A.3d 402. Although the commission applied law to fact and the public hearing satisfied many of the *Kelley* factors; see *id.*, at 654, 661, 280 A.3d 402; see also part II C of this opinion; we declined to recognize the hearing as quasi-judicial because, among other things, "the hearing before the commission had almost no procedural safeguards in place to ensure the reliability of the information presented **\*\*873** at the proceeding." *Priore* v. *Haig*, supra, 344 Conn. at 655, 280 A.3d 402. Specifically, we identified two significant procedural safeguards that were missing: (1) the declarant did not testify under oath or certify the truth of her statements, and (2) there was no practical opportunity to cross-examine witnesses or to hold declarants accountable **\*28** for false or misleading statements. See *id.*, at 655–57, 280 A.3d 402; see also *id.*, at 655 n.4, 280 A.3d 402.

We explained in *Priore* that it is important for any declarant receiving absolute immunity to make the statements under oath or otherwise certify that the information is true and correct because, without doing so, there is no judicial remedy available to deter a witness from giving false information. See *id.*, at 655, 280 A.3d 402. This is consistent with a long line of Connecticut cases holding that, for absolute immunity to apply, it is vitally important that statements be sworn, made under oath, or otherwise subject to the penalty of perjury. See, e.g., *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 87, 856 A.2d 372 (emphasizing that "witnesses [gave] sworn statements to the investigator during the investigation, and the form on which they sign[ed] their statement inform[ed] the witness that he or she [could] be criminally liable for filing a false statement"); *Kelley* v. *Bonney*, supra, 221 Conn. at 568–69, 606 A.2d 693 (relying on fact that "a request for revok[ing] ... [a teaching certificate had to be] made under oath"); *DeLaurentis* v. *New Haven*, 220 Conn. 225, 264, 597 A.2d 807 (1991) (holding that, "[although] no civil remedies can guard against lies, the oath and the fear of being charged with perjury are adequate to warrant an

absolute privilege for a witness' statements"); *Petyan* v. *Ellis*, supra, 200 Conn. at 250–51, 510 A.2d 1337 (emphasizing that defendant was required to certify that information presented was true and correct and that she could have been summoned to testify under oath, subject to criminal penalties, if she perjured herself); see also *Larmel* v. *Metro North Commuter Railroad Co.*, supra, 341 Conn. at 341, 267 A.3d 162 (relying on fact that arbitrators are statutorily authorized to administer oaths); *Preston* v. *O'Rourke*, supra, 74 Conn. App. at 312, 811 A.2d 753 (noting that "witnesses [in contractual arbitration] testified under oath"). Because absolute immunity removes the threat of private defamation actions in order to incentivize witnesses to participate **\*29** candidly and willingly in the proceeding, it is crucial that there be some strong deterrent, such as the threat of a perjury prosecution, against abuse of the privilege by the giving of untruthful testimony.[23]

The second missing safeguard in *Priore* was the opportunity for parties to meaningfully challenge the veracity of participants' statements, whether through cross-examination or other comparable means. **\*\*874** See *Priore* v. *Haig*, supra, 344 Conn. at 657, 280 A.3d 402. "For two centuries, [common-law] judges and lawyers have regarded the opportunity of cross-examination as an essential safeguard of the accuracy and completeness of testimony." (Internal quotation marks omitted.) *Pagano* v. *Ippoliti*, 245 Conn. 640, 656, 716 A.2d 848 (1998) (*McDonald, J.*, dissenting). It has been said many times that "cross-examination is beyond any doubt the greatest legal engine ever invented for the discovery of truth." (Internal quotation marks omitted.) *State* v. *Ali*, 233 Conn. 403, 424, 660 A.2d 337 (1995). The procedure allows counsel to "expose [testimonial infirmities, such as forgetfulness, confusion, or evasion] ... thereby calling to the attention of the [fact finder] the reasons for giving scant weight to the witness' testimony." (Internal quotation **\*30** marks omitted.) *State* v. *Hutton*, 188 Conn. App. 481, 504, 205 A.3d 637 (2019).

It is not surprising, then, that, as we discussed in *Priore*, several of this court's prior cases recognizing quasi-judicial proceedings, including *Hopkins*, *Craig*, and *Kelley*, relied on the respondent's ability to cross-examine adverse witnesses or to otherwise challenge the credibility of witness testimony in quasi-judicial proceedings. See *Priore* v. *Haig*, supra, 344 Conn. at 649–51, 280 A.3d 402; see, e.g., *Hopkins* v. *O'Connor*, supra, 282 Conn. at 834–37, 925 A.2d 1030 (patient confined to hospital under emergency certificate had right to cross-examine adverse witnesses); *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 88, 856 A.2d 372 (police officer who was under investigation had right to cross-examine

adverse witnesses); *Kelley* v. *Bonney*, supra, 221 Conn. at 570 n.14, 606 A.2d 693 (parties possessed right to cross-examine adverse witnesses); see also, e.g., *Spencer* v. *Klementi*, 136 Nev. 325, 332, 466 P.3d 1241 (2020) ("to qualify as a quasi-judicial proceeding for purposes of the absolute privilege, a proceeding must, at a minimum ... allow opposing parties to cross-examine, impeach, or otherwise confront a witness"). The failure to provide a mechanism to challenge the veracity of testimony weighs heavily against the conclusion that a proceeding is quasi-judicial.

In addition to these two key procedural protections that were absent from the town planning and zoning commission hearing in *Priore*, this court has frequently relied on the presence of other procedural protections in determining whether a proceeding qualifies as quasi-judicial. One threshold requirement is notice. Indeed, "[t]he essence of due process is the requirement that a person in jeopardy of a serious loss [be given] notice of the case against him and [an] opportunity to meet it." (Internal quotation marks omitted.) *State* v. *Lopez*, 235 Conn. 487, 493, 668 A.2d 360 (1995). Thus, notice to the accused, who may be subjected to serious loss, **\*31** is an important and necessary procedural safeguard that accompanies any quasi-judicial proceeding. See *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 88, 856 A.2d 372 (police officer must be given notice of charges against him and date of formal hearing); *Kelley* v. *Bonney*, supra, 221 Conn. at 569 n.14, 606 A.2d 693 (teacher is required to be given notice of teaching certificate decertification proceeding); *Preston* v. *O'Rourke*, supra, 74 Conn. App. at 310–11, 811 A.2d 753 (contractual arbitration proceedings require formal notice to parties).

This court has also stressed the importance of procedures such as the opportunity for parties to call witnesses or otherwise have them subpoenaed, to have the meaningful assistance of counsel during the proceeding, and to appeal on the record of the proceeding. Nearly all the **\*\*875** proceedings recognized by this court as quasi-judicial have provided a reasonable opportunity for the decision makers or parties to subpoena or call witnesses. See, e.g., *Larmel* v. *Metro North Commuter Railroad Co.*, supra, 341 Conn. at 341, 267 A.3d 162 (arbitrator authorized to issue subpoenas pursuant to General Statutes § 52-549w (c)); *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 88, 856 A.2d 372 (police department officials had subpoena power and officer being investigated could call witnesses on his or her own behalf at formal hearing); *Kelley* v. *Bonney*, supra, 221 Conn. at 570 n.14, 606 A.2d 693 (counsel were granted reasonable opportunity to call witnesses); *Petyan* v. *Ellis*, supra, 200 Conn. at 251, 510

A.2d 1337 (officials of Employment Security Division of state Department of Labor possessed subpoena power); see also *Preston* v. *O'Rourke*, supra, 74 Conn. App. at 312, 811 A.2d 753 (noting arbitrator's power to subpoena witnesses pursuant to General Statutes § 52-412). Thus, the ability of the entity conducting the proceeding to subpoena witnesses, or procedures that allow parties to call their own witnesses to testify; see *Kelley* v. *Bonney*, supra, at 570 n.14, 606 A.2d 693; are procedural safeguards common to quasi-judicial proceedings.

This court also has recognized the opportunity for counsel to be present and meaningfully assist their client during **\*32** the proceeding as an important safeguard that helps to identify a quasi-judicial proceeding. The presence of counsel in adjudicatory proceedings serves to protect the parties from unfair or improper procedures and provides a means by which parties may effectively defend themselves. In concluding that the revocation hearing in *Kelley* was quasi-judicial, this court noted that the governing legislation specifically allowed for counsel to call witnesses, to cross-examine adverse witnesses, and to present oral argument. Id. (quoting provision in State Board of Education Regulations); see also id., at 570, 606 A.2d 693. Indeed, many of the proceedings recognized by this court as quasi-judicial provided parties the same opportunity to have counsel present and to assist them during the proceeding. See, e.g., *Larmel* v. *Metro North Commuter Railroad Co.*, supra, 341 Conn. at 336, 341, 267 A.3d 162 (plaintiff to arbitration proceeding was represented by counsel and could object to evidence); *Hopkins* v. *O'Connor*, supra, 282 Conn. at 831 n.3, 925 A.2d 1030 (respondents to commitment proceeding were entitled to representation by counsel, who could cross-examine adverse witnesses); *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 88, 856 A.2d 372 (police officer subject to internal affairs investigation had right to counsel).

Finally, this court frequently has recognized a party's right to appeal the adjudicator's decision as part of its conclusion that the proceeding at issue was quasi-judicial. In *Petyan*, the court relied on the fact that, "[a]t any time before the referee's decision [on an unemployment compensation claim] has become final within the periods of limitation ... any party including the administrator, [could] appeal therefrom to the [Employment Security Board of Review]." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, supra, 200 Conn. at 249 n.4, 510 A.2d 1337; see also *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 88, 856 A.2d 372 ("the [police] officer ha[d] a right to appeal to the personnel board of the city ... [and] [t]hereafter ... to the state labor board"); **\*33** *Preston* v. *O'Rourke*, supra, 74 Conn. App. at 312, 811 A.2d 753

("either party could appeal to the trial court to request an order confirming the arbitrator's award or to vacate, modify or correct the award").

**876** The right to appeal, or to have the proceeding officially reviewed, requires that an adequate record of the proceeding be available. See *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 88, 856 A.2d 372 ("the hearing officer [took] notes on the testimony and evidence presented ... which constitute[d] the record for the purposes of the hearing"); *Kelley* v. *Bonney*, supra, 221 Conn. at 570 n.14, 606 A.2d 693 ("[a] verbatim transcript of the hearing shall be made and shall be supplied to all [parties and adjudicators]" (internal quotation marks omitted)); *Petyan* v. *Ellis*, supra, 200 Conn. at 249 n.4, 510 A.2d 1337 ("[any] appeal to the board shall be heard on the record of the hearing before the referee" (internal quotation marks omitted)). Therefore, when considering whether a proceeding is quasi-judicial in nature, we recognize a party's right to a meaningful appeal, which requires an adequate record of the proceeding, as an important procedural safeguard to ensure that facts were properly found and that law was appropriately applied.

In sum, there must be sufficient procedural safeguards to ensure reliability and to promote fundamental fairness. The more robust the procedural safeguards, the more likely a given proceeding will resemble a judicial proceeding and thereby be considered a quasi-judicial proceeding to which absolute immunity would apply.

### C

The Second Circuit next asks us "[h]ow, if at all ... the power factors enumerated in *Kelley* ... and *Craig* ... apply to the identification of a [proceeding] as quasi-judicial; and, if they do apply, are these factors in addition to ... or independent of, a preliminary **34** [law to fact] requirement?" (Citations omitted; internal quotation marks omitted.) *Khan* v. *Yale University*, supra, 27 F.4th at 833. *Kelley* established, and *Priore* affirmed, that the *Kelley* factors are in addition to, not in lieu of, the other criteria discussed in this part of the opinion.

In *Kelley*, we recognized "a number of factors that *assist* in determining whether a proceeding is [quasi-judicial] in nature. Among them are whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and decide;[34] (3) make binding orders and judgments; (4) affect the personal or property rights of private persons; (5) examine witnesses

and hear the litigation of the issues on a hearing; and (6) enforce decisions or impose penalties." (Emphasis added; footnote added.) *Kelley* v. *Bonney*, supra, 221 Conn. at 567, 606 A.2d 693. *Kelley* explained that courts must consider whether the entity conducting the proceeding has the power to determine facts and to apply appropriate law and requires proceeding participants to certify that statements were true and correct and to determine if there are sound public policy reasons for permitting absolute immunity. See *id.*

Since *Kelley*, we have explained that the *Kelley* factors are not exclusive and that, for the most part, they supplement, and function in addition to, the criteria already discussed in this part of the opinion. See *Priore* v. *Haig*, supra, 344 Conn. at 648, 280 A.3d 402. Accordingly, a court should consider the *Kelley* factors but need not conclude that they are dispositive. See *id.*

### D

Next, the Second Circuit inquires "[h]ow, if at all, does public policy inform **877** the identification of a [proceeding] **35** as quasi-judicial and, if it does, is this consideration in addition to, or independent of, a [law to fact] requirement and the enumerated *Kelley/Craig* factors?" *Khan* v. *Yale University*, supra, 27 F.4th at 833. In *Priore*, we clarified that "courts must always carefully scrutinize whether there is a sound public policy justification for the application of absolute immunity in any particular context." *Priore* v. *Haig*, supra, 344 Conn. at 653, 280 A.3d 402.

We explained in *Priore* that, "[i]n most cases, the policy considerations require balancing the public interest of encouraging public participation and candor, on the one hand, and the private interest of protecting individuals from false and malicious statements, on the other." Id., at 652, 280 A.3d 402. "The rationale underlying the [absolute] privilege is grounded [on] the proper and efficient administration of justice. ... Participants in a judicial process must be able to testify or otherwise take part without being hampered by fear of [actions seeking damages for their statements]." (Internal quotation marks omitted.) Id., at 646, 280 A.3d 402. However, because "[a]bsolute immunity ... is strong medicine"; (internal quotation marks omitted) id., at 652, 280 A.3d 402; it "must be reserved for those situations [in which] the public interest is so vital and apparent that it mandates complete freedom of expression without inquiry into a [speaker's] motives." (Internal quotation marks omitted.) Id., at 663, 280 A.3d 402. It is only in these situations and

judicial-like forums that "[t]he inconvenience of the individual [will] yield to a rule for the good of the general public." (Internal quotation marks omitted.) *Post v. Mendel*, 510 Pa. 213, 221, 507 A.2d 351 (1986).

Therefore, even if an entity applies law to facts in a proceeding with adequate procedural safeguards, the proceeding is not quasi-judicial if there is no discernable public policy supporting absolute immunity for proceeding participants. Likewise, public policy alone will not justify affording absolute immunity to proceeding **\*36** participants if the proceeding is devoid of the basic, fundamental procedural protections inherent in judicial and quasi-judicial proceedings. Rather, a proceeding is quasi-judicial if, in addition to satisfying the indicia of an official judicial proceeding, as discussed in part II A through C of this opinion, public policy favors providing absolute immunity for proceeding participants.

### III

Next, we are asked whether, in light of our responses to the above questions, the 2018 Yale UWC proceeding at issue was properly recognized as quasi-judicial. See *Khan v. Yale University*, supra, 27 F.4th at 833. We answer that question in the negative; the UWC proceeding cannot properly be recognized as quasi-judicial because it lacked the adequate procedural safeguards necessary for absolute immunity to apply.[25]

### A

As a threshold matter, we recognize that disciplinary proceedings in response to allegations of sexual assault at institutions of higher education are specifically **\*\*878** authorized by Connecticut law. Section 10a-55m (b) requires each Connecticut institution of higher education to adopt policies regarding sexual assault.[26] Such **\*37** policies provide for, among other requirements, an investigation and disciplinary proceedings related to allegations of sexual violence. See General Statutes § 10a-55m (b) (6). If a disciplinary hearing is held, certain procedures and substantive requirements must be followed as specifically governed by state law. See General Statutes § 10a-55m (b) (6) (mandating procedural requirements and affirmative consent standards). Therefore, because the UWC proceeding was specifically authorized by law,[27] we now analyze whether it satisfies the requirements necessary for a proceeding to be

recognized as quasi-judicial under Connecticut law.

### B

Khan asserts that the UWC proceeding should not be recognized as quasi-judicial because the proceeding **\*38** lacked judicial-like procedures and other indicia of reliability. Doe responds that the proceeding provided more than the minimum procedural safeguards that fundamental fairness requires. We agree with Khan and conclude that, even if the UWC hearing panel applied law to fact,[28] that the UWC proceeding **\*\*879** did not have adequate procedural safeguards to be recognized as quasi-judicial for the purpose of affording absolute immunity to Doe. In reaching this conclusion, we reiterate that, in light of the procedural posture in which this case reaches us, we are obliged to accept the factual allegations as true and to draw all inferences in Khan's favor, and that we have considered in that light the complaint and all the documents appended to the complaint or incorporated in the complaint by reference, including the UWC procedures. See part I of this opinion.

After reviewing the record before us, we conclude that the UWC proceeding did not incorporate sufficient **\*39** procedural safeguards to be considered quasi-judicial. Specifically, the UWC proceeding failed (1) to require complainants to testify under oath or to subject them to explicit and meaningful penalties for untruthful statements, (2) to provide Khan, or his counsel, the meaningful opportunity to cross-examine adverse witnesses in real time, (3) to provide parties a reasonable opportunity to call witnesses to testify, (4) to afford Khan the opportunity to have the active assistance of counsel during the UWC hearing, and (5) to provide Khan any record or transcript of the proceeding that would assist him in obtaining adequate review of the UWC decision or to expose the legitimacy or fairness of the proceeding to public scrutiny. Although we do not maintain that all of these procedural features are required for our recognition of a quasi-judicial proceeding, we conclude that the collective absence of such features militates against a determination that the proceeding had adequate safeguards to ensure reliability and promote fundamental fairness.

### 1

First, witnesses in the UWC proceeding did not testify

under oath, provide sworn statements, or certify to the truth of their statements. The UWC's only protection against false statements is the threat that the "[f]ailure to provide truthful information ... may result in a recommendation for a more severe penalty or a referral for discipline." Because Doe had graduated from Yale by the time of the proceedings; *Khan* v. *Yale University*, *supra*, 511 F. Supp. 3d at 218; she presumably could not be subject to any disciplinary consequences for failing to testify truthfully.

The failure of the UWC to place Doe under oath or otherwise have her certify to the truth of her statements, subject to a penalty for untruthfulness, undermined the reliability of Doe's statements. See **\*40** *Priore* v. *Haig*, *supra*, 344 Conn. at 655, 280 A.3d 402 (declining to recognize town planning and zoning commission's public hearing as quasi-judicial in part because declarants were not under oath or required to certify truth of statements). As we explained in *Petyan*, the penalty of **\*\*880** perjury is "simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, *supra*, 200 Conn. at 251, 510 A.2d 1337; see *Priore* v. *Haig*, *supra*, at 655 n.4, 280 A.3d 402 ("[a] witness' reliability is ensured by his [or her] oath, the hazard of cross-examination and the threat of prosecution for perjury" (internal quotation marks omitted)). The oath or certification requirement is fundamental to the reliability of the information presented. Yale's failure to display any means of holding witnesses accountable for untruthful statements significantly weakens Doe's contention that the UWC proceeding is quasi-judicial.

2

Second, the UWC proceeding did not permit live, real-time cross-examination of witnesses or any reasonable opportunity for parties to confront witnesses. In fact, neither Khan nor his counsel was permitted to be in the hearing room when Doe was questioned. Rather, they were required to sit in an anteroom, where they could only listen to an audio feed of the hearing and could not see or be seen by Doe. Khan claims that he and his counsel were denied the opportunity to ask *any* questions of Doe or to cross-examine her in *any* way.[29] As a result, Khan alleges that he was "denied any reasonable **\*41** opportunity to confront, question, or otherwise face his accuser."

The opportunity to meaningfully cross-examine adverse witnesses is vitally important to the truth seeking function of any judicial or quasi-judicial proceeding and is necessary if a university's disciplinary proceeding is to be considered quasi-judicial. In *Doe* v. *Baum*, 903 F.3d 575 (6th Cir. 2018), the United States Court of Appeals for the Sixth Circuit concluded that due process required that universities allow for some form of live cross-examination when a witness' "credibility" is at issue in a school disciplinary hearing. *Id.*, at 581; see also *id.*, at 583. The court explained that, "when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." *Id.*, at 581.[30]

**\*\*881** The California Court of Appeal reached a similar conclusion in *Doe* v. *Allee*, 30 Cal. App. 5th 1036, 242 Cal. Rptr. 3d 109 (2019). There, the court held that, "when a student accused of sexual misconduct faces severe disciplinary sanctions, and the credibility of witnesses **\*42** (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation, fundamental fairness requires, at a minimum, that the university provide a mechanism by which the accused may cross-examine those witnesses, directly or indirectly ...." *Id.*, at 1039, 242 Cal.Rptr.3d 109.

Meaningful cross-examination allows for witness testimony to be challenged in real time, whether in person or through advanced video technology that allows for instant two-way communications and follow-up questions. It is equally important, in our view, that the accused *and the accuser* be provided a chance to cross-examine one another so as to allow the fact finder to assess the consistency of testimony and demeanor of both the parties when their testimony is called into question. See, e.g., *id.*, at 1065–66, 242 Cal.Rptr.3d 109.

Our review of the UWC procedures provides us with no assurance that Khan had a meaningful opportunity to cross-examine or otherwise confront Doe in real time. We also have no record of the proceeding to demonstrate that the UWC varied from the procedures incorporated in the complaint in a manner that afforded Khan fundamental fairness. Although, under the UWC procedures, Khan and Doe were able to submit questions that they wanted the UWC hearing panel to ask, the panel had sole discretion to reject the questions or not to ask them. Thus, the UWC procedures hampered Khan's ability to ask legitimate questions or to sequence questions in a way he believed would test the veracity of Doe's testimony at the hearing. Accordingly, the procedures utilized by the UWC failed to provide Khan with an opportunity to challenge the statements Doe made to the investigator and to the UWC

panel.

Allowing for confrontation of an accuser while still preventing abusive questioning is no doubt a difficult balance to strike, but fundamental fairness requires **\*43** some measure of meaningful cross-examination, and the present record compels us to conclude that the UWC procedures fall short. Therefore, Khan was denied a fundamental procedural protection essential to quasi-judicial proceedings because he was not given a meaningful opportunity to test the veracity or reliability of Doe's testimony in real time.

3

Third, unlike most of the proceedings that this court has recognized as quasi-judicial, the UWC proceeding did not provide the parties a reasonable opportunity to call witnesses. Although the UWC procedures allowed parties to request that the UWC hearing panel call witnesses to testify, the procedures provided no standards regarding whether the panel would in fact call or interview them, and there was no independent mechanism by which parties could call their own witnesses.[31]

At private universities, as in other settings, "basic principles of ... fundamental **\*\*882** fairness [are] adhered to [when] the students involved ... [are allowed, among other things] to *call their own witnesses* ...." (Emphasis added; internal quotation marks omitted.) *Doe* v. *University of the Sciences*, 961 F.3d 203, 214 (3d Cir. 2020); see, e.g., *id., at 211, 215–16* (determining that student conduct procedures were not fair in breach of contract case). Supporting this basic tenet of procedural fairness, § 10a-55m (b), the Connecticut statutory provision that authorizes sexual assault disciplinary proceedings at institutions of higher education, requires that "[e]ach institution of higher education ... adopt **\*44** and disclose ... (6) ... a summary of such institution's student investigation and disciplinary procedures, including clear statements ... (C) [that the student responding to reports of sexual assault] ... (ii) *shall have the opportunity to present evidence and witnesses* on their behalf during any disciplinary proceeding ...." (Emphasis added.)

The fact that the UWC hearing panel could, "[a]t its sole discretion," reject any witnesses recommended by Khan deprived Khan of a fair opportunity to present a defense by calling or presenting witnesses, if he so chose,[32] to testify on his behalf. Under these circumstances, a person in Khan's position is left to rely on the grace of the panel

to aid in his defense by presenting the in-person testimony of favorable witnesses. As a result, Yale's UWC policy does not comport with the protections typical of quasi-judicial proceedings.

4

Fourth, the UWC proceeding materially limited the assistance of counsel throughout the hearing. Under the UWC procedures, "[a] party may be accompanied by an adviser ... [but] [t]he adviser may not submit documents, either directly or indirectly, on a party's behalf at any stage of the process, nor speak for the party during an interview with a [fact finder] or during a formal hearing." In practice, this meant that counsel could not present any argument, either orally or in writing, on Khan's behalf, raise objections, or be present during—let alone participate in—the questioning of witnesses. These restrictions effectively rendered counsel irrelevant, relegating Khan's attorney to the status of the proverbial potted plant.

**\*45** Our cases recognize that the assistance of counsel during a quasi-judicial proceeding is an important procedural safeguard to ensure the procedural and evidentiary fairness of a judicial proceeding. See part II B of this opinion. The active assistance of counsel is especially important in settings like the one at issue, when the accused or accuser may lack experience with self-advocacy or representing his or her interests in an adversarial process that involves significant consequences for the individual parties. Limitations on counsel's assistance during the proceeding will bear on whether the proceeding is quasi-judicial. In the present case, the UWC's procedures prohibited Khan's counsel from speaking on Khan's behalf, objecting to evidence, examining Khan's accusers, and submitting documents to the UWC panel. Although we do not agree with Khan's contention that these prohibitions predetermined the outcome of the hearing, we do agree that the restrictions placed on counsel's participation in the proceeding support the conclusion that the proceeding was not quasi-judicial.

5

Finally, the UWC proceeding limited a party's ability to seek review of the **\*\*883** UWC panel's decision because it failed to establish an adequate record of the

proceedings.[33] Although the UWC procedures require that the secretary of the UWC keep minutes from the meeting and a record of all the actions and reports filed, they explicitly provide that "[t]he minutes do not record statements, testimony, or questions." The UWC panel specifically denied Khan's request that it make a transcript **46 or other electronic recording of the hearing for the purpose of further review.

We have long recognized that the maintenance of a transcript or record is critical and a key feature of any quasi-judicial proceeding. For instance, in concluding that the proceeding in *Craig* was quasi-judicial, we relied on the fact that, "[d]uring the hearing, the hearing officer [took] notes on the testimony and evidence presented and, thereafter, transcribes his notes into typed form, which constitute[d] the record for the purposes of the hearing." *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. at 88, 856 A.2d 372. After the hearing, the record could be reviewed on appeal. See *id.* Similarly, in *Kelley*, the applicable state Board of Education regulation required that "[a] verbatim transcript of the hearing ... be supplied to all members of the board, to the holder, to the requesting party, and to the secretary of the local board." (Internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 221 Conn. at 570 n.14, 606 A.2d 693.

In the present case, Khan's ability to appeal was severely constrained by the absence of any transcript or recording of statements, testimony, or questions raised during the UWC hearing. That restriction was especially prejudicial in light of the fact that his counsel was not permitted to object when UWC panel members allegedly assumed facts not in evidence and otherwise violated core evidentiary principles.

C

On the basis of the foregoing, we conclude that the UWC proceeding lacked adequate procedural safeguards to ensure the reliability of the statements made in the proceeding and, therefore, did not qualify as quasi-judicial for purposes of absolute immunity. Our conclusion finds support in the decisions of other courts determining whether a university disciplinary proceeding had adequate procedural protections.

**47 We find persuasive the decision of the United States District Court for the Eastern District of Virginia in *Doe* v. *Roe*, supra, 295 F. Supp. 3d 664. In that case, the District Court determined that disciplinary proceedings conducted at Marymount University were not quasi-judicial because they failed to afford the plaintiff basic due process protections. See *id.*, at 674. The District Court explained that, "[i]n determining whether a proceeding is quasi-judicial in nature, [courts] have stressed elements associated with notions of due process, including requirements for notice, a hearing, an unbiased adjudicator, and the ability to [marshal and present evidence and to call and cross-examine witnesses]." (Internal quotation marks omitted.) *Id.* The court ultimately held that, because the plaintiff "was not permitted to present exculpatory or documentary evidence, to call witnesses, or to confront and cross-examine his accuser, and significantly **884 ... was denied the opportunity to have an in-person hearing before [an] adjudicator ... [there were no] guarantees of due process and fairness ...." (Citation omitted; footnote omitted.) *Id.*, at 674–75.

That court's reasoning is echoed in federal appellate decisions. For example, in *Overall* v. *University of Pennsylvania*, 412 F.3d 492 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit declined to recognize a private grievance proceeding at a university as quasi-judicial in nature. See *id.*, at 498. Observing that quasi-judicial proceedings "involve basic procedural safeguards," the court relied on the fact that the private grievance proceeding at issue "did not require sworn testimony. The volunteer faculty members who presided over the hearing lacked the power to make any binding judgment or enforce any disciplinary measures ... [a]nd of particular relevance to [the] case, no one kept a transcript of what was said during the hearing, so there is no record of exactly what [the defendant] said when he allegedly defamed [the plaintiff]." *Id.*

**48 Likewise, in *Doe* v. *University of the Sciences*, supra, 961 F.3d 203, the Third Circuit determined that, at private universities, "basic principles of ... fundamental fairness [are] adhered to [when] the students [involved] ... [are] given notice of the charges and evidence against them, [are] allowed to be present and to participate in the hearing assisted by faculty, to call their own witnesses and to cross-examine the witnesses against them, and [are] fully apprised of the findings of the [h]earing [p]anel." (Internal quotation marks omitted.) *Id.*, at 214. The Third Circuit cautioned that fair process at a private university's sexual misconduct investigation would require, at a minimum, "the modest procedural protections of a live, meaningful, and adversarial hearing and the chance to test witnesses' credibility through some method of cross-examination." *Id.*, at 215.

Accordingly, because the UWC proceeding lacked the basic procedural safeguards that this court and other

courts have deemed necessary to ensure the reliability of the information presented, we decline to recognize the UWC proceeding as quasi-judicial in nature for the purpose of affording Doe absolute immunity for her statements.[34]

## IV

The Second Circuit next asks us, in light of our determination that the UWC proceeding was not quasi-judicial, whether Connecticut law would afford Doe qualified immunity or no immunity at all. *Khan* v. *Yale University*, supra, 27 F.4th at 834.[35] We answer that public **\*49** policy supports a qualified privilege for participants in certain sexual misconduct proceedings. Nevertheless, **\*\*885** because this matter is at the motion to dismiss stage and Khan has sufficiently alleged malice, we are unable to determine whether Doe is entitled to qualified immunity as a matter of law. At a later stage in the case, a court may reconsider the privilege as the factual record is developed.

Our standard of review is clear: "A defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege. ... When considering whether a qualified privilege protects a defendant in a defamation case, the court must resolve two inquiries. ... The first is whether the privilege applies, which is a question of law over which our review is plenary. ... The second is whether the applicable privilege nevertheless has been defeated through its abuse, which is a question of fact." (Citations omitted.) *Gambardella* v. *Apple Health Care, Inc.*, 291 Conn. 620, 628, 969 A.2d 736 (2009).

### A

We first consider whether a qualified privilege should apply to statements made by alleged victims in a sexual misconduct hearing at an institution of higher education.

Unlike absolute immunity, which provides a blanket protection for a speaker's false statements, a qualified privilege protects only those allegedly defamatory statements that are not made maliciously. See *Gallo* v. *Barile*, supra, 284 Conn. at 463 n.6, 935 A.2d 103. A qualified privilege is appropriate **\*50** when it "is based [on] a public policy that recognizes that it is desirable that true information be given whenever it is reasonably

necessary for the protection of the actor's own interests, the interests of a third person or certain interests of the public ...." (Internal quotation marks omitted.) *Id.*, at 468 n.12, 935 A.2d 103; see 3 Restatement (Second), Torts §§ 594 through 598, pp. 263–81 (1977). In other words, a qualified privilege is appropriate when the legitimate public or private interest underlying the publication of statements outweighs the important reputational interests of the individual. See 50 Am. Jur. 2d 624, Libel and Slander § 259 (2017); see also *Rioux* v. *Barry*, 283 Conn. 338, 346, 927 A.2d 304 (2007) ("whether and what form of immunity applies in any given case is a matter of policy that requires a balancing of interests"). Importantly, a qualified privilege for communications made to advance certain public interests or to protect individuals is applicable only when the communications are made to those who may be expected to take official action of some kind for the protection of those interests or individuals. See, e.g., *Gallo* v. *Barile*, supra, at 468–69 n.12, 935 A.2d 103, citing W. Keeton et al., supra, § 115, p. 830; *Government Micro Resources, Inc.* v. *Jackson*, 271 Va. 29, 43, 624 S.E.2d 63 (2006) ("qualified privilege protects a communication from allegations of defamation if made in good faith, to and by persons who have corresponding duties or interests in the subject of the communication"); see also, e.g., 3 Restatement (Second), supra, § 598, p. 281.

For example, in *Gallo* v. *Barile*, supra, 284 Conn. 459, 935 A.2d 103, this court engaged in a balancing test to determine whether an absolute or a qualified privilege is appropriate for statements made to the police in connection with a criminal investigation. See *id.*, at 468–72, 935 A.2d 103. This court concluded that those statements were subject to a qualified privilege, explaining that "a qualified privilege is sufficiently protective of [those] wishing to report **\*51** events concerning [a] crime ... [because] [t]here is no benefit to society or the administration of justice in protecting **\*\*886** those who make intentionally false and malicious defamatory statements to the police. The countervailing harm caused by the malicious destruction of another's reputation by false accusation can have irreparable consequences. ... [T]he law should provide a [judicial] remedy in [such] situations ...." (Internal quotation marks omitted.) *Id.*, at 471–72, 935 A.2d 103; see also *Petyan* v. *Ellis*, supra, 200 Conn. at 252, 510 A.2d 1337 (recognizing qualified immunity for complaining witness who initiates prosecution).

Although the question of whether a qualified privilege should be afforded to statements made at sexual misconduct hearings at institutions of higher education is one of first impression for this court, we find instructive

the decision of the United States District Court for the District of Maryland in *Doe* v. *Salisbury Univ*ersity, 123 F. Supp. 3d 748 (D. Md. 2015). In that case, the District Court recognized that defamatory statements made regarding an alleged sexual assault on a college campus would enjoy a conditional, or qualified, privilege under Maryland law. See *id.*, at 758–59. The court reasoned that Maryland courts recognize a conditional privilege for statements "made in furtherance of [the victims'] legitimate interest in personal safety and the safety of those closest to [them]." *Id.*, at 758; see also *id.*, at 759. Without such privilege, "[v]ictims would have to weigh, on the one hand, the value of reaching out for help in the aftermath of a traumatic sexual assault, and on the other hand the risk that they could be subject to civil liability for defamation if the occurrence of sexual assault is contested by the alleged perpetrator." *Id.*, at 759.

Similarly, in *Doe* v. *Roe, supra*, 295 F. Supp. 3d 664, the District Court for the Eastern District of Virginia concluded that, when allegations of sexual assault are made during a university Title IX investigation, "qualified **\*52** immunity, not absolute immunity, is the appropriate privilege to apply ...." *Id.*, at 676. The court reached that conclusion after determining that the proceeding lacked basic due process protections to afford proceeding participants absolute immunity. See *id.*, at 674–75; see also part III C of this opinion.

Just as our case law provides a qualified privilege to individuals reporting crimes to the police, the public policy of this state supports providing a qualified privilege for statements made by individuals alleging sexual assault to proper authorities at institutions of higher education. See General Statutes § 10a-55m. As the amici explain, sexual assault remains a serious and vastly underreported crime. The hesitation of victims to report such crimes is, in no small part, due to a fear of retaliation.[36] The hesitation to report sexual misconduct may be especially pronounced on college campuses, and fears and concerns surrounding such reports would undoubtedly be compounded if victims had to worry that any report they made could also be the subject of a defamation suit. See, e.g., *Sagaille* v. *Carrega*, 194 App. Div. 3d 92, 94, 143 N.Y.S.3d 36 ("defamation suits ... constitute [one] form of retaliation against those with the courage to speak out"), appeal denied, 37 N.Y.3d 909, 2021 WL 4164671 (2021).

**\*\*887** Our legislature has responded aggressively to address these concerns. As we discussed, § 10a-55m requires institutions of higher education to establish disciplinary committees and related reporting systems for crimes **\*53** of sexual violence. See part III A and footnote

26 of this opinion. In 2012, the Connecticut legislature expanded on the federal Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act)[37] by enacting No. 12-78 of the 2012 Public Acts (P.A. 12-78), titled "An Act Concerning Sexual Violence on College Campuses."[38] Public Act 12-78, § 1, requires higher education institutions to run prevention and awareness programs for all students that provide information concerning the reporting of incidences of sexual assault and violence. In addition, P.A. 12-78, § 1, as codified, requires institutions to establish a campus resource team dedicated to providing support and a victim centered response to reported sexual assault victims and to provide free counseling and advocacy services. See General Statutes (Rev. to 2013) § 10a-55m (b) (2) (now § 10a-55m (b) (3)).

In 2014, our legislature passed a law to provide additional services for those victimized by sexual violence on college campuses. Public Acts 2014, No. 14-11, § 2 (P.A. 14-11). Specifically, P.A. 14-11, § 2, as codified, permits anonymous reporting to authorities at institutions of higher education.[39] General Statutes (Rev. to 2015) **\*54** § 10a-55m (d). Public Act 14-11, § 2, as codified, also mandates that institutions of higher education disclose their disciplinary and reporting procedures to the joint standing committee of the General Assembly having cognizance of matters relating to higher education. See General Statutes (Rev. to 2015) § 10a-55m (f).

The legislature took further action in 2016, enacting No. 16-106 of the 2016 Public Acts, which required all campus hearings regarding claims of sexual misconduct to apply an affirmative consent[40] standard. See Public Acts 2016, No. 16-106, § 1. Each of these measures reflects a strong public commitment to protecting alleged victims of sexual assault on college and university campuses, encouraging them to report claims of sexual violence, and allowing them to obtain justice with dignity and privacy.

**\*\*888** Thus, given the legitimate public interests that our legislature has articulated, we conclude that a qualified privilege is appropriate to afford alleged victims of sexual assault who report their abuse to proper authorities at institutions of higher education. "On the one hand, the privilege encourages victims of sexual assault to speak candidly with university officials and to report abuse by immunizing their good-faith reports. ... At the same time, the qualified nature of the privilege provides plaintiffs with an opportunity to overcome the privilege in those rare instances [in which] a report is made, not in good faith, but rather with malice." *Doe* v. *Roe, supra*, 295 F. Supp. 3d at 677.

295 A.3d 855

B

Because a qualified privilege is available to Doe, the question becomes whether the privilege has been **\*55** defeated. See *Bleich* v. *Ortiz*, 196 Conn. 498, 504, 493 A.2d 236 (1985) ("[e]ven [if the court determines that] a legitimate interest is at stake, a claim of conditional [or qualified] privilege is defeated if the defendant acts with malice in making the defamatory communication at issue").[41]

At the motion to dismiss stage, the court must accept the factual allegations in the complaint as true and must draw inferences in the plaintiff's favor. See Fed. R. Civ. P. 12 (b) (6). Consequently, if the plaintiff sufficiently alleges with particular facts that the defendant acted with malice when making the statement(s) at issue, at the motion to dismiss stage, the court must take those allegations as true, and, therefore, the privilege will be defeated at this stage of the proceedings.[42] See *Doe* v. *College of Wooster*, Docket No. 5:16-cv-979, 2018 WL 838630, \*9 (N.D. Ohio February 13, 2018) (denying motion to dismiss sexual assault defamation claim based on qualified privilege because pleadings demonstrated actual malice sufficient to defeat qualified privilege); *Jackson* v. *Liberty University*, Docket No. 6:17-CV-00041, 2017 WL 3326972, \*14 (W.D. Va. August 3, 2017) (at motion to dismiss stage, "there [were] sufficient, **\*56** [nonconclusory] facts showing the malice required to overcome the qualified privilege [because the plaintiff pleaded facts indicating that sexual assault accusations were unjustifiably motivated]"); *Routh* v. *University of Rochester*, 981 F. Supp. 2d 184, 213 (W.D.N.Y. 2013) ("consideration of facts outside of the complaint [is] inappropriate ... on a motion to dismiss" (internal quotation marks omitted)), appeal with-drawn, United States Court of Appeals, Docket No. 13-4623 (2d Cir. January 9, 2014).

In this case, Khan alleged in his complaint that Doe made false accusations for the sake of trying to expel Khan as **\*\*889** part of a larger political movement and personal vendetta. Khan asserts that Doe made romantic advances toward him. He further alleges that, at first, she told a campus health care worker that she had engaged in consensual unprotected sex. Khan contends that Doe reported rape to her friends and, ultimately, to the Title IX coordinator only because she was ashamed of her sexual advances and encouraged by the larger political movement waged against Khan. Specifically, Khan cites in his complaint how, despite a jury's dismissing Doe's

allegation and finding Khan not guilty of criminal sexual assault charges, more than 77,000 people signed a petition protesting Khan's readmission to Yale. On the basis of these assertions, which must be accepted as true for the purpose of reviewing Doe's motion to dismiss, a reasonable inference could be drawn that Doe knowingly fabricated claims of sexual assault.

Therefore, we conclude that, although a qualified privilege against claims of defamation is available to participants in sexual misconduct proceedings at institutions of higher education, Khan has alleged sufficient facts in his complaint to defeat Doe's qualified privilege at the motion to dismiss stage. A more complete factual record, however, may warrant revisiting Doe's qualified privilege at the summary judgment stage or when submitting **\*57** the matter to a jury. See *Doe* v. *Roe*, supra, 295 F. Supp. 3d at 677–78 (concluding that defendant was not entitled to qualified immunity at motion to dismiss stage but not foreclosing that qualified immunity may be established as matter of law during later stage of proceedings).

SUMMARY

The answer to the first certified question as modified is: A quasi-judicial proceeding is an adjudicative one, in which the proceeding is specifically authorized by law, the entity conducting the proceeding applies the law to the facts within a framework that contains procedural safeguards, and there is a sound public policy justification for affording proceeding participants absolute immunity.

The answer to the second certified question as modified is: No, the UWC proceeding was not quasi-judicial because it lacked important procedural safeguards. Accordingly, we need not answer the third certified question.

The answer to the fourth certified question as modified is: Yes, a qualified privilege is available to alleged victims of sexual assault who report their abuse to proper authorities at institutions of higher education, but, at this stage of the proceedings, the allegations of malice in Khan's complaint are sufficient to defeat Doe's entitlement to qualified immunity as a matter of law.

No costs shall be taxed in this court to any party.

295 A.3d 855

In this opinion the other justices concurred.                    347 Conn. 1, 295 A.3d 855

**All Citations**

### Footnotes

1       In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

2       As we discuss hereinafter, Khan was tried for and acquitted of criminal sexual assault charges arising from Doe's accusations. *Khan v. Yale University*, 27 F.4th 805, 811 (2d Cir. 2022). Khan has not raised any claims against Doe for her statements to law enforcement or her testimony at his criminal trial. See *Khan v. Yale University*, 511 F. Supp. 3d 213, 227 (D. Conn. 2021).

3       General Statutes § 51-199b (d) provides in relevant part: "The Supreme Court may answer a question of law certified to it by a court of the United States ... if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state."

4       After accepting the certified questions of law, we granted permission to Legal Momentum, Fierberg National Law Group and thirteen coamici to file an amici curiae brief in support of Doe's claim that statements made in the course of Title IX processes should be afforded absolute immunity.

5       The court cited to M. Sable et al., "Barriers to Reporting Sexual Assault for Women and Men: Perspectives of College Students," 55 J. Am. Coll. Health 157, 157–62 (2006).

6       Although § 10a-55m was the subject of certain amendments since the events underlying this appeal; see, e.g., Public Acts 2021, No. 21-81, §§ 1 and 4; Public Acts 2019, No. 19-189, § 2; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, unless otherwise indicated, we refer to the current revision of the statute.

7       Although we do not doubt that false accusations of this nature are uncommon, they can be made, especially if certain fundamental procedural safeguards are not securely in place. See National Sexual Violence Resource Center, False Reporting: Overview (2012) pp. 2–3, available at https://www.nsvrc.org/sites/default/files/Publications_NSVRC_Overview_False-Reporting.pdf (last visited June 21, 2023) (estimating that prevalence of false reporting of sexual assaults is between 2 and 10 percent of total reports).

8       Khan also alleged violations of Title IX; see footnote 11 of this opinion; breach of contract, breach of the implied

386

295 A.3d 855

warranty of fair dealing, negligent infliction of emotional distress, intentional infliction of emotional distress, and breach of privacy against Yale and various employees of Yale. See *Khan* v. *Yale University*, 511 F. Supp. 3d 213, 216, 219 (D. Conn. 2021). Yale and its employees also were named as defendants, but they are not parties to this appeal. For the sake of simplicity, we refer to Doe by name throughout this opinion and to the other defendants by name when necessary.

9    Section 51-199b (g) directs that, "[i]f the parties cannot agree upon a statement of facts, then the certifying court shall determine the relevant facts and shall state them as a part of its certification order."

However, given the procedural posture of this case, no facts have yet been found because Khan appealed to the Second Circuit from the District Court's granting of Doe's motion to dismiss pursuant to rule 12 (b) (6) of the Federal Rules of Civil Procedure.

10    Yale College is the undergraduate branch of Yale University. We hereinafter refer to Yale College by its full name.

11    Title IX was enacted as part of the Education Amendments of 1972. Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, 373–75 (codified as amended at 20 U.S.C. § 1681 et seq.). Title IX provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...." 20 U.S.C. § 1681 (a) (2018).

12    As we explain later, "[the UWC procedures] explicitly provide that '[t]he minutes [of the UWC hearing] do not record statements, testimony, or questions.' " Part III B 5 of this opinion.

13    In his complaint, Khan alleges that he was born in a refugee camp in Pakistan after his family fled from the Taliban in Afghanistan and that he and his family subsequently fled from a Pakistani terrorist group to the United Arab Emirates.

14    *Khan* v. *Yale University*, supra, 27 F.4th at 834 ("the Connecticut Supreme Court may modify or expand these certified questions or address any other issues of Connecticut law pertinent to this appeal").

15    On September 7, 2022, after the parties filed briefs in this appeal, we released our decision in *Priore* v. *Haig*, supra, 344 Conn. 636, 280 A.3d 402, which addressed issues relating to quasi-judicial proceedings and absolute immunity. Accordingly, prior to oral arguments before this court, we ordered the parties to file supplemental briefs to address the applicability, if any, of *Priore*.

16    See, e.g., *Briscoe* v. *LaHue*, 460 U.S. 325, 330–31, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983) (tracing judicial immunity to sixteenth century); *Khan* v. *Yale University*, supra, 27 F.4th at 818 (explaining origins of absolute immunity); see also,

e.g., *Buckley* v. *Wood*, 76 Eng. Rep. 888, 889 (K.B. 1591) (holding that accused could not pursue defamation action because accuser's statements were made in "[the] course of justice").

[17]   *Kelley* further explained that "an absolute privilege also attaches to relevant statements made during administrative proceedings [that] are [quasi-judicial] in nature. ... Once it is determined that a proceeding is [quasi-judicial] in nature, the absolute privilege that is granted to statements made in furtherance of it extends to every step of the proceeding until final disposition." (Citations omitted; internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 221 Conn. at 566, 606 A.2d 693.

[18]   Other courts have adhered to a similar requirement. See, e.g., *Overall* v. *University of Pennsylvania*, 412 F.3d 492, 497 (3d Cir. 2005) ("quasi-judicial privilege consistently involve[s] proceedings before federal, state, or local governmental bodies, *or proceedings held pursuant to a statute or administrative regulation*" (emphasis added)); see also, e.g., *Bose* v. *Bea*, 947 F.3d 983, 995 (6th Cir. 2020) ("[quasi-judicial proceedings must be] *tied to a statute* or to powers [that] the [state] legislature had specifically granted to the tribunal at issue" (emphasis added)), cert. denied, ––– U.S. –––, 141 S. Ct. 1051, 208 L. Ed. 2d 521 (2021).

[19]   Although arbitration proceedings fall outside of the scope of traditional governmental proceedings and administrative hearings, we nonetheless recognize that arbitrations are statutorily authorized, designed to be an alternative dispute resolution forum to official judicial proceedings, contain procedural safeguards, and are subject to judicial review. Thus, we have concluded that arbitrations may be quasi-judicial. See *Larmel* v. *Metro North Commuter Railroad Co.*, 341 Conn. 332, 341, 267 A.3d 162 (2021).

[20]   We note that, "[a]lthough Connecticut appellate courts have not addressed [legislative immunity for witnesses], other jurisdictions have held that witnesses in a legislative proceeding are entitled to absolute immunity." *Priore* v. *Haig*, supra, 344 Conn. at 670, 280 A.3d 402 (*D'Auria, J.*, concurring in part and concurring in the judgment); see, e.g., *Beverly Enterprises, Inc.* v. *Trump*, 1 F. Supp. 2d 489, 493 (W.D. Pa. 1998) ("the definition of a legislative proceeding is broad enough to encompass proceedings—including informal fact-finding, information gathering, or investigative activities—that are conducted by legislators with the objective purpose of aiding the legislators in the drafting, debating, or adopting of proposed legislation"), aff'd, 182 F.3d 183 (3d Cir. 1999), cert. denied, 528 U.S. 1078, 120 S. Ct. 795, 145 L. Ed. 2d 670 (2000); 3 Restatement (Second), Torts § 590A, p. 254 (1977) ("[a] witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding"). In this matter, the doctrine of legislative immunity has no application.

[21]   The collective bargaining agreement in *Craig* was governed by the Municipal Employee Relations Act. See *Khan* v. *Yale University*, supra, 27 F.4th at 822 n.22.

[22]   Although we determined that the zoning commission applied law to fact, we concluded that the proceeding was not quasi-judicial for the reasons articulated in part II B of this opinion. See *Priore* v. *Haig*, supra, 344 Conn. at 655, 661, 280 A.3d 402.

23    General Statutes § 53a-156 (a) provides that "[a] person is guilty of perjury if, in any official proceeding, such person intentionally, *under oath* or in an unsworn declaration under sections 1-65aa to 1-65hh, inclusive, makes a false statement, swears, affirms or testifies falsely, to a material statement which such person does not believe to be true." (Emphasis added.)

General Statutes § 53a-146 (1) defines an "official proceeding" as "any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence *under oath*, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding." (Emphasis added.)

For purposes of this appeal, we need not decide whether it would ever be appropriate to afford absolute immunity to participants in a proceeding that did not qualify as official for purposes of §§ 53a-146 and 53a-156, or that did not provide explicit and meaningful penalties for false testimony made during the proceeding.

24    We note that "the first two factors largely mirror *Petyan*'s law to fact requirement." *Priore* v. *Haig*, supra, 344 Conn. at 648, 280 A.3d 402.

25    We need not consider whether participants to a proceeding may receive absolute immunity on some ground other than quasi-judicial immunity, as "the only question before [this] court is whether the UWC disciplinary proceeding itself is quasi-judicial. Doe does not assert, and the [D]istrict [C]ourt did not find, that, even if that proceeding was not quasi-judicial, there was some other basis for extending absolute immunity to Doe's statements at the proceeding." *Khan* v. *Yale University*, supra, 27 F.4th at 830.

26    General Statutes § 10a-55m (b) provides in relevant part: "Each institution of higher education shall adopt and disclose in such institution's annual uniform campus crime report one or more policies regarding sexual assault .... Such policy or policies shall include provisions for:

"(1) Informing students and employees that ... (A) affirmative consent is the standard ...

\* \* \*

"(6) Disclosing a summary of such institution's student investigation and disciplinary procedures, including clear statements advising that (A) a student or employee who reports or discloses being a victim of sexual assault ... shall have the opportunity to request that an investigation begin promptly, (B) the investigation and any disciplinary proceedings shall be conducted by an official trained annually ... (C) both the student or employee who reports or discloses the alleged assault ... and the student responding to such report or disclosure (i) are entitled to be accompanied to any meeting or proceeding relating to the allegation of such assault ... by an advisor or support person of their choice, provided the involvement of such advisor or support person does not result in the postponement or delay of such meeting as scheduled, and (ii) shall have the opportunity to present evidence and witnesses on their behalf during any disciplinary proceeding, (D) both the student or employee reporting or disclosing the alleged assault ... and such responding student are entitled to be informed in writing of the results of any disciplinary proceeding not later than one business day after the conclusion of such proceeding, (E) the institution of higher education shall not disclose the identity of any party to an investigation or disciplinary proceeding, except as necessary to carry out the investigation or disciplinary proceeding or as permitted under state or federal law, (F) a standard of affirmative consent is used in determining whether consent to engage in sexual

activity was given by all persons who engaged in the sexual activity, and ...

* * *

"(8) Disclosing the range of sanctions that may be imposed following the implementation of such institution's student and employee disciplinary procedures in response to such assault ...."

[27]   We need not address whether the UWC proceeding was specifically authorized by federal law because it was specifically authorized by state law. Nonetheless, we note that many of the Title IX disciplinary procedures for sexual assault at the time of Khan's hearing were guidance and not yet codified at 34 C.F.R. § 106.45 (b) (6) (i) (2020).

[28]   The parties disagree as to whether the UWC hearing panel had the power of discretion to apply law to fact. Doe argues that the UWC panel applied both Title IX regulations and § 10a-55m, which mandated that the panel determine whether she affirmatively consented to the parties' sexual encounter. Khan argues that Title IX simply requires the development and application of a sexual misconduct policy, whereas § 10a-55m only mandated the application of an affirmative consent standard. Therefore, he argues that the only authority being applied is university policy, not the law. Beyond the dispute about whether the UWC panel applied established law, we have doubts regarding whether the panel functioned in an adjudicatory manner, or had the power to apply law to fact, considering that the panel merely penned a recommendation to the dean of Yale College, who ultimately decided the fate of Khan without conducting a fact-finding inquiry. See UWC Procedures § 7.5, p. 107 (October 26, 2015) ("the [dean of Yale College] will ... accept the panel's findings of fact, but may accept, reject, or modify the panel's conclusions or recommendations, in whole or in part"). Nonetheless, because we conclude that minimum procedural safeguards were lacking, we need not resolve this dispute and determine whether the proceeding satisfied the law to fact requirement.

[29]   Doe argues that the UWC procedures allowed Khan to submit questions to the UWC panel, but neither the policies nor Doe specified the timing of when those questions could be submitted. Khan argues that neither he nor his counsel had any opportunity to ask Doe questions because the UWC procedures permitted only the UWC panel to ask questions and provided the panel with sole discretion to reject or not to ask any questions.

[30]   The importance of cross-examination is also reflected in the preamble to the Title IX final rules. The United States Department of Education wrote that it "believes that in the context of sexual harassment allegations under Title IX, a rule of [nonreliance] on untested statements is more likely to lead to reliable outcomes than a rule of reliance on untested statements. If statements untested by cross-examination may still be considered and relied on, the benefits of cross-examination as a truth-seeking device will largely be lost in the Title IX grievance process." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,347 (May 19, 2020).

At the time this opinion was written, the Department of Education had proposed amendments to Title IX regulations that would eliminate any cross-examination requirement at postsecondary institutions. See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390, 41,502–41,503 (proposed July 12, 2022). Regardless of how Title IX regulations may be amended, we conclude that, for absolute immunity to apply under Connecticut law, fundamental fairness requires meaningful cross-examination in proceedings like the one at issue.

[31] Specifically, the UWC procedures provide that, "[i]f a party believes the panel should interview witnesses, the party must submit to the [s]ecretary [of the UWC] the names of the witnesses and the subject of their testimony at least four days before the hearing. ... At its sole discretion, the panel may request the testimony of additional witnesses." There is no indication in the record that the UWC panel called any witnesses other than Doe and Khan.

[32] We note that the record, which lacks a transcript of the hearing, does not indicate whether Khan attempted, but was denied the opportunity, to call witnesses.

[33] If Khan wished to appeal the UWC hearing panel's or Yale College dean's decision, according to the UWC procedures, he could appeal to Yale's provost, but only on two grounds: (1) procedural error preventing a fair adjudication, or (2) new evidence not reasonably available at the time of the hearing. The provost may, in his or her discretion, return the matter to "the hearing panel for reconsideration."

[34] In light of this conclusion, it is unnecessary to address the other criteria discussed in *Priore* and in part II of this opinion.

[35] "[A]bsolute privileges are properly ... classified as immunities ... [because] they are based [on] the personal position or status of the actor. ... [However,] over a period of some centuries, these particular immunities always have been called privileges by the courts when they arise in connection with defamation ...." (Internal quotation marks omitted.) 2 F. Harper et al., Harper, James and Gray on Torts (3d Ed. 2006) § 5.21, pp. 209–10; see also, e.g., 3 Restatement (Second), Torts §§ 583 through 592A, pp. 240–57 (1977) (discussing absolute privileges). "Privileges of the second class ... are commonly called conditional or qualified privileges. ... They are more properly to be classified as privileges, [as] they arise out of the particular occasion [on] which the defamation is published." 2 F. Harper et al., supra, § 5.21, p. 210; see also 8 S. Speiser et al., The American Law of Torts (1991) § 29:87, p. 596 ("this 'privilege' is more properly termed an 'immunity' ").

[36] See, e.g., Conn. Joint Standing Committee Hearings, Higher Education and Employment Advancement, Pt. 3, 2012 Sess., p. 862, testimony of Women's Center of Greater Danbury (identifying fear of reprisal as dominant reason for victims not to report sexual assault); see also, e.g., Bureau of Justice Statistics, Office of Justice Programs, United States Department of Justice, Female Victims of Sexual Violence, 1994–2010 (Rev. May 31, 2016) p. 7, available at https://www.bjs.gov/content/pub/pdf/fvsv9410.pdf (last visited June 21, 2023).

[37] The Clery Act, which is codified at 20 U.S.C. § 1092 (f), was enacted in 1990, after the 1986 rape and murder of Jeanne Clery, a nineteen year old college student. T. Franklin, Note, "*Brown v. Delta Tau Delta*: In a Claim of Premises Liability, How Far Should the Law Court Go To Assign a Duty of Care," 68 Me. L. Rev. 363, 369 (2016). The Clery Act requires colleges and universities that participate in federal financial aid programs (known as Title IX schools) to disclose information about crimes occurring on their campuses, as well as to have specific campus safety and security related policies and procedures in place. See id.

**Khan v. Yale University, 347 Conn. 1 (2023)**

295 A.3d 855

[38]   Representative Roberta B. Willis, the bill's sponsor, stated that the act "asks our schools, both private and public, to play an active role in preventing [sexual] assaults .... [P]reventing sexual assault on college campuses takes a [community-wide] commitment to changing the culture and conditions that allow violence to occur." 55 H.R. Proc., Pt. 13, 2012 Sess., p. 4297.

[39]   Anonymous reporting may trigger further investigations and, if a subsequent hearing ensues, require that the victim's identity be disclosed. See General Statutes § 10a-55m (d).

[40]   The law defines "affirmative consent" as "an active, clear and voluntary agreement by a person to engage in sexual activity with another person ...." General Statutes § 10a-55m (a) (1). Connecticut does not require a covered institution to adopt this statutory definition verbatim, as long as it uses a definition with a substantially similar meaning. General Statutes § 10a-55m (h).

[41]   "[T]he malice required to overcome a qualified privilege in defamation cases is malice in fact or actual malice." *Hopkins* v. *O'Connor*, supra, 282 Conn. at 845, 925 A.2d 1030. "Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false. ... A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth. ... Malice in fact is sufficiently shown by proof that the [statement was] made with improper and unjustifiable motives." (Citation omitted; internal quotation marks omitted.) Id., at 846–47, 925 A.2d 1030; see also *Bleich* v. *Ortiz*, supra, 196 Conn. at 504, 493 A.2d 236 ("[f]or purposes of our law of defamation, malice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive").

[42]   We note that "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." (Internal quotation marks omitted.) *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006).

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

**392**