## IN THE CIRCUIT OF THE SIXTH JUDICIAL CIRCUIT
## CHAMPAIGN COUNTY, ILLINOIS

| | | |
|---|---|---|
| TERRENCE SHANNON JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2024 CH _____ |
| | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | 24-2010 |
| UNIVERSITY OF ILLINOIS, | ) | |
| a body corporate and politic, and | ) | |
| TIMOTHY KILLEEN, in his | ) | |
| official capacity as President of the | ) | |
| University of Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S VERIFIED MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR EXPEDITED DISCOVERY

Robert H. Lang (ARDC #6225414)
Zoe S. Spector (ARDC #6333392)
Thompson Coburn LLP
55 East Monroe Street, 37th Fl.
Chicago, IL 60603
rhlang@thompsoncoburn.com
(312) 346-7500
Fax: (312) 580-2201

J. Steven Beckett (ARDC #0151580)
Steve Beckett Law Office LLC
508 S. Broadway Avenue
Urbana, IL 61801
steve@stevebeckettllc.com
(217) 328-0263
Fax: (217) 328-0290

Mark C. Goldenberg (ARDC #0990221)
Thomas C. Horscroft (ARDC #6327049)
Goldenberg Heller & Antognoli, P.C.
2227 South State Route 157
Edwardsville, IL 62025
mark@ghalaw.com
(618) 656-5150
Fax: (618) 656-6230

Mark Sutter (ARDC #6238207)
Sutter Law Group, LLC
One Lincoln Centre
18w140 Butterfield Road, Suite 1500
Oakbrook Terrace, IL 60181
msutter@sutterlawgroup.com
(312) 724-5600

## TABLE OF CONTENTS
### PLAINTIFF'S VERIFIED MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR EXPEDITED DISCOVERY

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.  Alleged circumstances leading to the Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.  Illinois' Suspension of TJ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.  Illinois initiates another action against TJ after the Suspension . . . . . . . . . . . . . . . . .9

    D.  More facts bearing on irreparable harm and inadequate legal remedies  . . . . . . . . .12

    E.  TJ's claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.  Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.  Preservation of the status quo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

        2.  Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        3.  TRO and Preliminary injunction factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

            a.  Ascertainable right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            b.  Irreparable harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

            c.  Inadequate legal remedy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            d.  Likelihood of success on the merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            e.  Discretionary factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

            f.  Bond. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

    B.  Title IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    C.  Procedural Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    D.  Implied Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    E.  Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

    F.  Unconscionability of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

G. *Khan v. Yale University* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

Argument: TJ Has Made a Prima Facie Case of the TRO
and Preliminary Injunction Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

A. Temporary and preliminary injunctive relief
is necessary to preserve the status quo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B. TJ has ascertainable rights in need of protection . . . . . . . . . . . . . . . . . . . . . . . . 24

C. TJ will suffer irreparable harm without the requested injunctive relief . . . . . . . . . . 24

D. TJ has inadequate legal remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

E. TJ has at least raised a fair question of his likelihood of success on the merits . . . . .25

F. TJ has raised a fair question as to the discretionary factors,
If the Court chooses to apply them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

G. Overall, TJ has met his burden of proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

H. TJ should not be required to post a bond if this Motion is granted . . . . . . . . . . . . . 29

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

## IN THE CIRCUIT OF THE SIXTH JUDICIAL CIRCUIT
## CHAMPAIGN COUNTY, ILLINOIS

| | | |
|---|---|---|
| TERRENCE SHANNON JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2024 CH _____ |
| | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| a body corporate and politic, and | ) | |
| TIMOTHY KILLEEN, in his | ) | |
| official capacity as President of the | ) | |
| University of Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S VERIFIED MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR EXPEDITED DISCOVERY

Plaintiff, Terrence Shannon Jr. ("TJ"), by and through his attorneys, for his Verified Motion for Temporary Restraining Order ("TRO"), Preliminary Injunction, and/or Expedited Discovery against the Defendants, The Board of Trustees of the University of Illinois, a body corporate and politic ("Illinois") and Timothy Killeen, in his official capacity as President of the University of Illinois, alleges as follows:

### I.     INTRODUCTION

1.     TJ's Verified Complaint ("Complaint") has been contemporaneously filed and is fully incorporated by reference. The Complaint verifies the facts in support of this Motion.

2.     TJ plays for the University of Illinois at Urbana-Champaign's ("UIUC") men's basketball team ("Team") and was widely projected to be a "lottery pick" in the National Basketball Association's ("NBA") 2024 draft. TJ has been accused of crimes in Douglas County,

Kansas, for an alleged September 9, 2023, incident in Lawrence, Kansas. Illinois has known about, and even interviewed TJ about these allegations, since at least late September 2023.

3.     TJ played in the Team's first eleven games. Then, on December 28, 2023, Illinois suspended TJ from the Team. On January 3, 2024, Illinois then extended the suspension until the charges against him ("Charges") are resolved. However, the Charges will not be tried in Douglas County until well after the Team's current season and the June 27, 2024, NBA draft.

4.     Therefore, TJ will suffer immediate and irreparable harm if he is not immediately reinstated to the Team, with the Court enjoining Illinois from taking any further actions against TJ without due process. TJ welcomes a fair process.

5.     In being hit with the suspension, TJ was subjected to a futile and unfair exercise. Behind closed doors at a meeting, without TJ being present, Illinois acted as judge, jury, and executioner of TJ's future by suspending TJ from the team before the resolution of the Charges, eradicating the presumption of innocence and other due process to which TJ is entitled.

6.     Illinois, by its own admission, had several options to determine the trajectory of TJ's life, but chose the one with zero safeguards in TJ's favor to take the devastating action of suspending him from the Team. Illinois could have easily provided TJ with safeguards to protect his presumption of innocence and other basic rights but failed to do so in suspending TJ. Haste makes waste.

7.     The purpose of a TRO in this case is merely to preserve the status quo prior to the controversy when TJ was playing for the Team. That's it. The Court at this stage is not to decide the merits of TJ's civil case, and in no event is the Court to assess the merits of the Charges.

8.     Instead, the focus is on the traditional TRO (and then preliminary injunction) factors. There is no question that TJ has ascertainable rights in his business interests, his reputation, and his purported contractual rights that will be irreparably harmed without a TRO,

without the promise of adequate money damages. There is no way to calculate in money terms the damage that is being done to TJ with each day of the suspension.

9.      As to the TJ's likelihood of success on the merits, all he must do at this stage is show a prima facie case, or a "fair question" as to the validity of his claims. It is a low bar that TJ more than exceeds. (TJ's Complaint is solely for declaratory and injunctive relief.)

10.     First as to the merits, Illinois has refused to afford the protections to which TJ is entitled pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), which would require that Illinois allow TJ to fully participate on the Team until the Charges against him are totally resolved. An Illinois employee in the scope of his employment and in furtherance of Illinois' interests transported and escorted TJ during his subject trip to Lawrence, at the direction of his superiors, also Illinois employees. Illinois has refused to apply Title IX to this situation, even though Title IX is to be liberally applied by law.

11.     Therefore, according to Illinois, had the alleged incident occurred on UIUC's campus (for example), TJ would have been afforded Title IX's critical safeguards that have been promulgated to protect the presumption of innocence. But because Illinois unilaterally deemed the alleged incident to fall outside of Title IX's purview (which is at least a disputed factual question) Illinois afforded TJ no such safeguards. A student's future should not turn so arbitrarily.

12.     Alternatively as to the merits, (a) Illinois has violated its own policies in suspending TJ from the Team; (b) Illinois has breached its contractual obligations to TJ in doing the same; (c) Illinois has been vague and contradictory in defining exactly what standards apply to disciplinary proceedings against TJ; and/or (d) the various standards that Illinois has applied do not provide due process, are unconscionable, and/or waived by Illinois in waiting to apply them to the allegations against TJ.

13.     When the Court resolves this case on the merits, it will address the following separate and independent claims by TJ:

    a.  That Title IX applies: if the Court agrees, then Illinois must immediately reinstate TJ to the Team and cannot suspend him unless and until Illinois first performs an independent risk analysis (which Illinois has not yet done) and finds TJ to be a threat to others on campus (which would be unlikely given that TJ has been on campus since the alleged incident without any issues, has no criminal or disciplinary history, and has numerous character affiants attesting to his rule-following and good-natured character-including three Illinois employees.) If the Court ultimately finds that Title IX applies, it need not address TJ's other claims.

    b.  Alternatively, that TJ has not been permitted a fair and due process to date, and therefore Illinois must do things the right way, even if Title IX applies, or, at a minimum Illinois has attempted to impose unconscionable contractual obligations on TJ.

    c.  In any event, that Illinois waived any alleged right to take actions leading to TJ's suspension or other discipline by waiting three months to take such action.

Either way, the Court should grant a TRO and then a preliminary injunction. There are at least fair questions in TJ's favor as to the merits of these claims, the types of questions that cannot be resolved now by the Court. That is precisely the purpose of temporary and preliminary injunctive relief, to allow the parties and the Court to take a breath, put the genie back in the bottle, and come to the right decision while not trashing TJ's career in the process.

## II.    <u>FACTS</u>

14.     The Complaint submits verified facts supporting this Motion at ¶¶ 13 through 5660 They will be summarized here.

### A.  Alleged circumstances leading to the Charges.

15.     Illinois graduate assistant DyShawn Hobson ("<u>Hobson</u>") drove TJ and fellow Team member Justin Harmon ("<u>Harmon</u>") to and from Lawrence on September 8 and 9, 2023 at the directive of three Team assistant coaches to see the Illinois-University of Kansas ("<u>KU</u>") football game. (Complaint, ¶¶ 14-15.) Hobson did so as an Illinois employee in furtherance of

Illinois' basketball program, checking in with his superiors (also Illinois employees) the entire trip. (Complaint, ¶ 15.)

16.     The alleged incident occurred the early morning of September 9, 2023, at a crowded KU bar in an area subject to surveillance video. (Complaint, ¶¶ 16-18.) Yet, according to police records made available to TJ through UIUC and otherwise, there are no witnesses to the alleged incident, no video showing TJ and the complainant together, and no physical evidence tying TJ to the alleged incident. (*Id.*) To TJ's knowledge, the LPD did not interview anyone other than the complainant and her friend (the latter of whom did not witness the alleged incident). (Complaint, ¶¶ 16 and 20-21.)   The LPD did not interview any of the several KU basketball players who were with TJ that night until January 3, 2024, after the Charges were brought a month earlier, and even though the complainant allegedly advised the LPD that she recognized at least one KU player as being at the scene of the alleged incident. (Complaint, ¶¶ 20-21.)   Nor has the LPD ever interviewed Hobson or Harmon, who were with TJ the entire night of the alleged incident. (Complaint, ¶ 21.)

17.     The Charges were brought against TJ by a prosecutor's office that has a recent history of wrongfully convicting an African-American male KU student of rape. (Complaint, ¶ 23.)

18.     The Charges were brought without any convening of a grand jury or indictment, include a misdemeanor "in the alternative," and, unless dismissed, will not be resolved through trial until after the June 27, 2024, NBA draft. (Complaint, ¶ 19.)   TJ has not even received any discovery from the prosecution yet, and only found out the identity of the complainant from Illinois, not the prosecution. (Complaint, ¶¶ 19, 35.)

**B.  Illinois' Suspension of TJ**

19.     Illinois first learned of a LPD criminal investigation regarding the alleged incident, and that TJ was a target, in or around late September 2023. (Complaint, ¶ 24.)   Illinois

interviewed TJ about the alleged incident and found him to be "very forthcoming."   (Complaint,
¶ 25.)   Illinois concluded that it would take no action against TJ at that time. (Complaint, ¶ 26.)

20.     Illinois asserts that it first learned that TJ was charged on December 27, 2023, and
that was also the first time that Illinois received any documentation of the Charges (i.e. police
reports or the criminal complaint) (Complaint, ¶ 28.)   Illinois temporarily suspended TJ from the
Team on December 28, 2023, and then effectively suspended TJ on a permanent basis (given that
the criminal trial would not proceed until after the Team's season) on January 3, 2024
("Suspension"). (Complaint, ¶¶ 28-30.)

21.     The Suspension apparently was decided by a panel of three Illinois faculty
members ("DIA Panel"), pursuant to the UIUC's Division of Intercollegiate Athletics' ("DIA")
student-athlete policy ("DIA Policy"). The DIA Policy's decision-making standard is entirely
Illinois-centered (not athlete-centered), based on a weighing of the harm **to Illinois** in suspending
versus not suspending the student athlete. (Complaint, ¶ 29.)

22.     The Suspension was continued by Illinois on January 3, 2024, until the Charges
are resolved, which will not be resolved until well after the Team's season and after the NBA
draft. (Complaint, ¶¶ 19 and 30.)

23.     Illinois has refused to review TJ's situation pursuant to Title IX, despite the fact
that an Illinois employee in the scope of his employment at Illinois transported and oversaw TJ's
trip to Lawrence. (Complaint, ¶¶ 14-15, and 41.)   Had Illinois applied Title IX, it could not have
suspended TJ at this time, and not in the future unless and until Illinois' Title IX coordinator
conducts a risk analysis of TJ, and finds him dangerous to others, which has not occurred.
(Complaint, ¶¶ 41-42.)   To the contrary, TJ has no criminal history, has been allowed by Illinois
to stay on campus without any issues since the alleged incident playing for the Team for most of
that time, is working towards his Sociology degree from Illinois this May, and is supported by
numerous character affiants, including three university employees. (Complaint, ¶ 42.)

24.     UIUC's athletic director (the "<u>AD</u>") promised that the DIA Action would respect the "presumption of innocence," which he said, "continues to apply" and "appropriate levels of due process." (Complaint, ¶¶ 36.) TJ, however, was afforded no presumption of innocence and TJ was provided no due process prior to the Suspension. The DIA Action standard was centered on the harm to Illinois, not TJ's presumption of innocence. There was no investigation. There was no hearing that TJ attended. There was no notice as to who exactly assessed his fate and how. He did not know of the identity of his accuser prior to the Suspension (although it appears that Illinois very well may have at the time of the Suspension because Illinois is the one who disclosed the accuser's identity to him on January 5, 2024). No record of any proceedings was provided to him. The utter lack of safeguards provided to TJ are detailed more below, especially when compared to Title IX and another process within Illinois that Illinois just started against TJ. (Complaint, ¶¶ 31-35.)

**C.  Illinois initiates another action against TJ *after* the Suspension.**

25.     The AD explained at a December 29, 2023, press conference that TJ was subject to three actions which ran "in parallel" and could intersect: the criminal prosecution, the DIA Policy action that led to his Suspension ("<u>DIA Action</u>"), and yet another Illinois process initiated on January 5, 2024, by Illinois' Office of Student Conflict Resolution ("<u>OSCR</u>"), pursuant to the OSCR policy ("<u>OSCR Policy</u>"). (Complaint, ¶¶ 32-33.) Illinois knew the complainant's identity before TJ (including possibly at the time of the Suspension) and did not inform TJ of that identity until January 5, 2024, when it served him the OSCR notice. (Complaint, ¶ 35(b).)

26.     The OSCR Policy action ("<u>OSCR Action</u>") just launched by Illinois against TJ is far from fair, but it has more safeguards that the DIA Action (which is not a difficult hurdle). An OSCR Action has the following safeguards that are nowhere found on the DIA Policy, and obviously were not afforded to TJ in the DIA Action: a "Respondents' rights section," appeal rights, actual participation in a hearing, detailed notice, identity of the complainant, initial face-

to-face meeting with case coordinator, an investigation, confirmation of the actual burden of proof, decision-making standard based on finding of actual policy violation (unlike a DIA action which is not interested in that issue), audio recording of the proceedings by OSCR, the presentation of witnesses and "evidence," sentencing procedure, access to the university's investigation and files, alternative dispute resolution, and references to "due process." (Complaint, ¶¶ 31, 33, and 43.) Confusingly, the OSCR Policy, which includes a sexual misconduct policy, also applies to all students such as TJ. (Complaint, ¶ 39.)

27.     As the AD acknowledged, the OSCR Action was available to Illinois at all relevant times, including since Illinois' first knowledge that TJ was the target of a criminal investigation in September. (Complaint, ¶ 32.) Yet Illinois chose to suspend TJ effectively for the Team's season under the DIA Action, which has ***no*** safeguards, just six days after TJ found out about the Charges. (Complaint, ¶ 48.)

28.     The OSCR Policy, and the action that emanates from it, are still grossly deficient as to fundamental fairness safeguards. The OSCR Action has the following deficiencies: no subpoena power, no right to directly confront witnesses or the complainant, no right to counsel's direct participation in the action, no admissibility of character evidence until the sentencing phase (*see e.g.* Fed. R. Ev. 404, allowing the admissibility of character evidence in a criminal case if first raised by the defendant, even prior to sentencing), the hearing is closed to the public and not recorded by a certified court reporter, witnesses are not sworn to tell the truth under oath and/or the penalty of perjury. (Complaint, ¶¶ 46-47.)   Just over two months ago, the Connecticut Supreme Court (7-0 decision) and the United States Court of Appeals for the Second Circuit found as follows regarding the same type of proceeding: "the collective absence of such features militates against a determination that the proceeding had adequate safeguards to ensure reliability and fundamental fairness."   (Complaint, ¶ 47.)   The Second Circuit allowed the accused to sue Yale University and the sexual misconduct complainant for defamation and other claims, holding

that Yale had no immunity given the lack of safeguards in the process it allowed. (*Id.*)   It is possible that Illinois has not yet had a chance to incorporate this decision into its policies, including, but not limited to, the OSCR Policy and/or the DIA Policy as the ruling was only issued on October 25, 2023.

29.     There is yet another standard in play. TJ does not recall signing any document wherein he agreed to the DIA Policy. However, TJ did execute a contract relating to his athletic scholarship with Illinois ("<u>Scholarship Contract</u>") that has generalities regarding Illinois policies without specifying any particular one, but which specifically does not allow Illinois to terminate TJ's scholarship unless he is convicted of a crime involving sexual misconduct, pleads guilty or no contest to such a crime, or is found responsible for the same by a "formal disciplinary action," none of which has occurred.   (Complaint, ¶ 38.)   The AD did not mention this as a track available to TJ. (Complaint, ¶ 50.)

**D.  More facts bearing on irreparable harm and inadequate legal remedies.**

30.     TJ's mother and father separated when he was two years old, and he has lived with his mom since that time prior to attending college. He now supports his mom and his four siblings through her (ages 7, 12, 14, and 21) and provides significant financial support to his other three siblings through his father (ages 12, 17, and 19). (Complaint, ¶¶ 51-52.)

31.     Although TJ believes that he might have one year of NCAA eligibility remaining, he intended to enter the NBA draft this June as he was projected to be an NBA lottery pick, and he was intending to get his Sociology degree from Illinois this May. (Complaint, ¶ 53.)

32.     TJ has been an Illini team captain for the past two seasons. This season, through his great play he upgraded himself from a projected second round pick to a lottery pick, making millions in the NBA, not to mention endorsement deals. Without question, TJ's draft stock will diminish to little to nothing unless he is immediately reinstated, as concluded by numerous experts including a sports agent. There are 17 games left in the Team's season, not including the

Big 10 and NCAA tournaments. (Complaint, ¶ 54.)   The Illini's next game is January 11, 2024,

against Michigan State. (Complaint, ¶ 55.) TJ also runs the risk of losing his NIL deal with the

Suspension. (*Id.*)

33.     TJ has no prior criminal history. He has no history of academic or athletic

disciplinary issues. To the contrary, coaches, religious personnel, one of his teachers at Illinois,

and his academic advisor at Illinois say that TJ is an "incredible [or "exceptional"] young man,"

who "plays by the rules," who "respects authority," who is a "rule follower," who is a "nice

person with a good heart," who "genuinely cares about others," and who treats women "with the

utmost respect."   (Complaint, ¶¶ 56-57.)

34.     Douglas County has a dubious history. In 2019, it wrongfully convicted a male

African-American KU student of rape (at the Jayhawk Café) and its District Attorney is currently

the subject of disciplinary proceedings. (Complaint, ¶¶ 22-23.)   There are numerous examples of

athletes being wrongfully charged with a crime of sexual misconduct while later being cleared of

such charges (some are well-known, some are not). (Complaint, ¶ 59.)

**E.  TJ's claims**

35.     All of TJ's counts seek injunctive relief, while some also seek declaratory relief.

Count I asserts that Title IX should be applied to TJ's situation. Count II alternatively asserts that

the terms of the Scholarship Contract should be applied. Count III alternatively asserts an implied

contract based on the DIA Policy, and breach of the same for Illinois' failure to apply the

presumption of innocence and other due process to TJ's situation, contrary to what Illinois had

promised. Count IV alternatively asserts that the DIA Policy is null and void because it is

unconscionable.   Count V alternatively requests that the Court declares exactly which standards

apply to TJ given Illinois' inconsistent and vague application of various standards. Count VI

alternatively seeks injunctive relief against the individual defendant who is Illinois' President for

deprivation of TJ's protected property interests without procedural due process. Count VII asserts

that in any event, Illinois waived the right to apply the DIA or OSCR Policies to TJ's situation by waiting three months to do so.

### III.   LEGAL STANDARDS

#### A. Injunctive Relief

##### 1.   Preservation of the status quo

36.     The purpose of temporary or preliminary injunctive relief is to preserve the status quo pending an adjudication of the case on the merits. *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 177 (2002); *Stocker Hinge Mfg. Co. v. Darnel Indus, Inc*., 94 Ill. 2d 535, 541-42 (1983) (purpose of TRO is to preserve status quo "until the court can hold a hearing to determine whether it should grant a preliminary injunction). The "status quo" is "the last actual, peaceful, non-contested status which preceded the pending controversy." *American Tel. and Tel. Co. v. Village of Arlington Heights,* 174 Ill. App. 3d 381, 387-88 (1st Dist. 1981) (internal citations omitted). "[I]t sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury on the complainant."  *Id.* (internal citations omitted). *Id.* By seeking to preserve the status quo, the movant seeks to preserve things as they were before the controversy began. *County of DuPage v. Gavrilos*, 359 Ill. App. 3d 629, 638 (2d Dist. 2005).

##### 2.  Burden of Proof

37.     "In considering whether injunctive relief is proper, the trial court should not decide contested issues of fact or the merits of the action." *Northwestern Steel & Wire Co. v. Industrial Com'n*, 254 Ill. App. 3d 472, 476 (1st Dist. 1993); *see also, C.D. Peters Const. Co., Inc. v. Tri-City Regional Port. Dist.*, 281 Ill. App. 3d 41, 48 (5th Dist. 1996) (TRO granted in part because material facts "would appear subject to some dispute.")

38.     "The proof required for issuance of a preliminary injunction requires a plaintiff to show a 'fair question' exists regarding his claimed right, and 'the court should preserve the status

quo until the case can be decided on the merits.' " *Lifetec, Inc. v. Edwards,* 377 Ill. App. 3d 260, 268 (4th Dist. 2007). TJ is only required to show that a "fair question" exists regarding its claimed rights and that the status quo should be preserved pending an evidentiary hearing for a preliminary injunction. *Stocker Hinge Mfg. Co.*, 94 Ill. 2d at 542. "A plaintiff need only make a *prima facie* showing of evidence on the requisite elements to obtain injunctive relief." *Prairie Eye Ctr., Ltd. v. Butler*, 305 Ill. App. 3d 442, 445 (4th Dist. 1999).

### 3.   TRO and preliminary injunction factors

39.     When determining whether to order injunctive relief, courts consider the following: (1) whether plaintiff possesses a clearly ascertainable right that needs protection; (2) whether plaintiff would suffer irreparable harm without the injunction; (3) whether plaintiff has an adequate remedy at law; (4) plaintiff's likelihood of success on the merits; and (5) whether the plaintiff will suffer more harm without the injunction than the defendant will suffer with it. *Granberg v. Didrickson*, 279 Ill. App. 3d 886, 888-89 (1st Dist. 1996).

### a.   Ascertainable right

40.     As to the first element, "[t]he standard for establishing a right that needs protection at the preliminary injunction phase is not difficult, requiring only that a fair question be raised as to the existence of the right claimed."   *Granberg*, 279 Ill. App. 3d at 889. "A TRO should not be refused or dissolved merely because the court may not be absolutely certain the plaintiff has the right he claims."   *Stocker Hinge Mfg. Co. v. Darnel Ind., Inc.*, 94 Ill. 2d 535, 541-42 (1983). Contractual rights satisfy this first element of the standard for injunctive relief. *See e.g. Happy R. Securities, LLC v. Agri-Sources, LLC*, 2013 IL App (3d) 120509, ¶ 21. Also, a "threatened business interest is an identifiable right which may be protected by injunctive relief." *Central Water Works Supply, Inc. v. Fisher,* 240 Ill. App. 3d 952, 959 (4th Dist. 1993). Additionally, harm to reputation is an ascertainable right that can be protected by injunctive

relief. *See e.g., Gannett Outdoor of Chicago v. Baise,* 163 Ill. App. 3d 717, 721-722 (1st Dist. 1987).

41.     An instructive case finding participation in athletic competition to be an ascertainable right is *Hutsonville Cmty. Unit Sch. Dist. No. 1 v. Illinois High Sch. Ass'n*, 2021 IL App (5th) 210308, ¶ 8, where the petitioner, a high school senior athlete, sought a TRO enjoining the IHSA from enforcing its prohibition from her school competing in state competitions, due to her school's failure to abide with the COVID mask mandate. The court found that she had (1) established a clearly ascertainable right in need of protection, as all she needed to establish was a "a fair question as to the existence of a right needing protection, leading the court to believe that the plaintiff will be entitled to the prayed-for relief if the proof presented at trial should sustain its allegations," and she established the existence of her right as a third-party beneficiary of the contract between the school and the IHSA; (2) she established irreparable harm because as a senior, she would never again be able to participate in the State Series; and (3) there was no adequate remedy at law because "failure to compete for a year was the type of injury that could not be corrected by monetary judgment." *Id*. at ¶ 9.

### b.  Irreparable harm

42.     As to the second element, "[a]n irreparable injury has been described by the court as one that cannot be adequately compensated."  *Granberg*, 279 Ill. App. 3d at 889. "The threat of irreparable injury is related to proof of a protectable interest, and once such an interest is established, there is a presumption that injury to the party seeking the injunction will follow if the interest is not protected." *Morrison Metalweld Process Corp. v. Valent*, 97 Ill. App. 3d 373, 380 (1st Dist. 1981). *See also, Lucas v. Peters,* 318 Ill. App. 3d 1, 16 (1st Dist. 2000) ("irreparable harm" does not mean injury that is beyond repair or compensation in damages but, rather, denotes transgressions of a continuing nature); *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019), *and Richmond v. Youngstown State Univ.*, No.

13

4:17CV1927, 2017 WL 6502833, at *1 (N.D. Ohio Sept. 14,2017) (cases finding irreparable harm in denial of participation in athletics). "A continuing violation of the United States Constitution (that cannot be adequately compensated with money) is a *per se* irreparable harm for injunction purposes." *Lucas,* 318 Ill. App. 3d at 16. Irreparable harm is "perhaps the single most important prerequisite for the issuance of a preliminary injunction." *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 268 (2d Dist. 2005), dissent, *citing Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).

### c. **Inadequate legal remedy**

43.     As to the third element, "[a]n adequate remedy at law is one which is clear, complete, and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy." *Granberg*, 279 Ill. App. 3d at 889. *See, also, Falcon, Ltd. v. Corr's Natural Beverages, Inc.*, 165 Ill. App. 3d 815, 835 (1st Dist. 1987) (finding no adequate remedy at law because "injury to plaintiffs' reputation and goodwill, and the resulting loss of existing and future business, is incalculable"); *Central Water Works Supply, Inc.*, 240 Ill. App. 3d at 959-60 ("A legal remedy is inadequate where damages are difficult to calculate at the time of the hearing.")

### d. **Likelihood of success on the merits**

44.     "[T]o show a likelihood of success on the merits, a party is not required to make out a case which in all events will warrant relief in the final hearing. All that is necessary is that the petitioning party raise a fair question as to the existence of the right claimed, lead the court to believe that he probably will be entitled to the relief prayed for if the proof should sustain his allegations, and make it appear advisable that the position of the parties should stay as they are until the court has had an opportunity to consider the case on the merits." *Baal v. McDonald's Corp.*, 97 Ill. App. 3d 495, 500-01 (1st Dist. 1981). "The injunction is properly allowed … even where there may be serious doubt as to the ultimate success of the complaint." *Id*. at 501. *See also, Central Water Works Supply, Inc.*, 240 Ill. App. 3d at 960. This factor is even more relaxed

as to TROs than preliminary injunctions. *Kable Printing Co. v. Mount Morris Bookbinders Union Local 65-B,* 63 Ill. 2d 514, 524 (1976).

### e. Discretionary factors

45.     Some courts will also balance the harms when assessing the various factors. *Lucas*, 318 Ill. App. 3d at 16-17. Similarly, movants need not prove that the public interest weighs in their favor, but some courts will consider this factor. *Prairie Eye Ctr., Ltd. v. Butler*, 305 Ill. App. 3d at 448-49.

### f. Bond

46.     The imposition of a bond is at the Court's discretion, and not required. 735 ILCS 5/11-103 ("court in its discretion, may require a bond.")   "When a preliminary injunction order is issued after notice and hearing, it is not error for the trial court to issue the injunction without bond." *Central Water Works Supply, Inc.*, 240 Ill. App. 3d at 960.

## B.  Title IX

47.     As an institution that receives federal financial assistance from the U.S. Department of Education (the "Department"), Illinois must comply with Title IX. 20 U.S.C. §1681 et. seq. As explained by the Department in the preamble to Title IX's implementing regulations, one key purpose of the Title IX regulations is to "hold [institutions of higher education] accountable for responses to sexual harassment designed to protect complainants' equal educational access and provide due process protections to both parties before restricting a respondent's educational access." 85 Fed. Reg. 30026, 30044 (May 14, 2020). The Department further noted that absent Title IX's regulations ensuring due process, institutional policies addressed sexual harassment grievance procedures "unevenly" and "at times employing procedures incompatible with constitutionally guaranteed due process and principles of fundamental fairness, and lacking impartiality and reliability." 85 Fed. Reg. 30048. Further, Title IX, as a remedial statute, must be liberally construed in favor of applicability. *See e.g.,* Keeley B.

Gogul, "The Title IX Pendulum: Taking Student Survivors Along for the Ride." 90 Univ. of Cincinnati Law Rev., 1016 (March 2022).

48.    Had Illinois applied Title IX, it could not suspend TJ from the Team unless and until Illinois' Title IX coordinator "undertakes an individualized safety and risk analysis, [and] determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of sexual harassment justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal" ("Title IX Risk Analysis").   34 CFR §106.44(c).

49.    The alleged conduct took place in an "education program or activity" of Illinois' because Illinois exercised substantial control over both TJ and the alleged context in which the alleged incident occurred. *See,* 34 CFR §106.44(a) ("education program or activity" covered by Title IX includes "circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs.")   *See also, Roe v. Gustine Unified School Dist.*, 678 F. Supp.2d 1008, 1025 (E.D. Ca. 2009) (Title IX applied to sexual harassment claim even though the alleged misconduct occurred outside school grounds at a football camp, because the camp was under the supervision of teachers and coaches including at the time of the alleged incidents, and the school transported the students, amongst other factors).

50.    In *Lapka* v. *Chertoff,* 517 F.3d 974, 982–83 (7th Cir. 2008), the 7th Circuit held that plaintiff sufficiently alleged workplace harassment even though the alleged rape occurred while the plaintiff and assailant were socializing after hours in a private hotel room, because the bar was part of the training facility where the plaintiff and assailant were required to attend work-related training sessions and thus were on "official duty" while at that facility, including the bar located in the facility, "so the event could be said to have grown out of the workplace environment" and the plaintiff and assailant were trainees expected to eat and drink at the facility

and "return to dormitories and hotel rooms provided by" the employer such that "[e]mployees in these situations can be expected to band together for society and socialize as a matter of course" justifying the Court's conclusion that the plaintiff had alleged sexual harassment (rape) that arose in the context of a workplace environment and to which the employer had an obligation to respond). Although *Lapka* was a case under Title VII, the final regulations would similarly analyze whether sexual harassment occurred in the school's program or activity by inquiring whether the school exercised substantial control over the context of the harassment and the alleged harasser.

51.     Further, Illinois is required to comply with §106.44(a) and (c), outlining circumstances when an emergency suspension/removal of a student is appropriate, regardless of whether a formal complaint is filed. However, Title IX applies even where the complainant has not filed a formal Title IX complaint "and is not participating in or attempting to participate in the school's education program or activity."   *See,* Question 24 of Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021) (PDF) (ed.gov) (Complaint, ¶ 72).   "Put simply, there are circumstances when a Title IX Coordinator may need to sign a formal complaint that obligates the school to initiate an investigation regardless of the complainant's relationship with the school or interest in participating in the Title IX grievance process. This is because the school has a Title IX obligation to provide all students, not just the complainant, with an educational environment that does not discriminate based on sex."   *Id.*

52.     Also, "[t]he Department [of Education] may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment."   34 CFR §106.44(a).

### C. Procedural Due Process

53.     "…The plaintiff must prove … two elements … in her section 1983 claim: (1) the defendant's actions deprived the plaintiff of a state or federal constitutional right, and (2) the defendant was acting under color of state law when engaging in the conduct complained of by the plaintiff." *Dempsey v. Johnson,* 2016 IL App (1st) 1533777,¶ 48. The aim of section 1983 "is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." (citation omitted). Section 1983 does not create substantive rights, but instead creates a cause of action to remedy certain deprivations of rights elsewhere conferred." *Id.* at ¶ 14.

54.     Procedural due process "protect[s] persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty or property." *Segers v. Industrial Com'n,* 191 Ill.2d 421, 434 (2000). Procedural due process generally refers to notice and the opportunity to be heard. *Bartlow v. Shannon,* 399 Ill. App. 3d 560, 570 (5th Dist. 2010). Procedural due process rights include a right to present evidence and argument, a right to cross-examine witnesses, and impartiality in rulings upon the evidence which is offered. *Bartlow,* 399 Ill. App. 3d at 570. *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 184 (2002) ("Due process is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process.") (internal citation omitted).

### D. Implied contracts

55.     Illinois law recognizes implied contracts in some circumstances, but only if there is not an express contract between the parties. *Trapani Cons. Co., Inc. v. Elliot Grp., Inc.*, 2016 IL App (1st) 143734, ¶ 42; *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 295 (1st

Dist. 1991).  *See also, Liu v. Nw. Univ.,* 78 F. Supp. 3d 839, 846 (N.D. Ill. 2015) ("Northwestern does not dispute that an implied contract can arise out of its student handbook."); *Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012).

### E. Waiver

56.     "Waiver is either an express or implied voluntary and intentional relinquishment of a known and existing right."   *Whalen v. Kmart Corp.*, 166 Ill. App. 3d 339, 343 (1st Dist. 1998). "An analysis of whether there was in fact a waiver of contractual provisions focuses on the intent of the non-breaching party."   *Id.* If he has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement."   *Id.* "The question of waiver is a question of fact when the material facts are in dispute or when 'reasonable minds' differ from the inferences drawn from undisputed evidence."   *Wagner Excello Foods, Inc. v. Fearn Intern., Inc.,* 235 Ill. App. 3d 224, 233 (1st Dist. 1992).

### F. Unconscionability of contract

57.     "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it * * *." *Kinkel v. Cingular Wireless LLC,* 223 Ill. 2d 1, 22 (2006) (internal citations omitted). "This analysis also takes into account the disparity of bargaining power between the drafter of the contract and the party claiming unconscionability."   *Id.* "Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity."   *Id.* at 28 (internal citation omitted). *See, also, Am. Food Mgmt., Inc. v. Henson,* 105 Ill. App. 3d 141, 146 (5th Dist. 1982) (applying unconscionability outside of the consumer or UCC contexts, and finding non-

compete in employment contract procedurally unconscionable and rejecting trial court's conclusion that contract was not adhesive where "[employer's] conduct in failing, whether intentionally or unintentionally, to give reasonable notice that agreement to a covenant not to compete would be a condition of employment before defendant Henson had relocated and begun working for plaintiff amounted to overreaching by a contracting party in an unfairly superior bargaining position.")

### G.    *Khan v. Yale University*

58.    In *Khan v. Yale Univ.*, 347 Conn. 1, 38-39 (2023), a **7-0** panel of the Connecticut Supreme Court found as follows as to Yale University's disciplinary proceedings regarding sexual misconduct (proceedings very similar to Illinois'):

> After reviewing the record before us, we conclude that the UWC proceeding did not incorporate sufficient procedural safeguards to be considered quasi-judicial. Specifically, the UWC proceeding failed **(1) to require complainants to testify under oath or to subject them to explicit and meaningful penalties for untruthful statements,** (2) **to provide Khan, or his counsel, the meaningful opportunity to cross-examine adverse witnesses in real time,** (3) to provide parties a reasonable opportunity to call witnesses to testify, **(4) to afford Khan the opportunity to have the active assistance of counsel during the UWC hearing,** and (5) **to provide Khan any record or transcript of the proceeding that would assist him in obtaining adequate review of the UWC decision or to expose the legitimacy or fairness of the proceeding to public scrutiny.** Although we do not maintain that all of these procedural features are required for our recognition of a quasi-judicial proceeding, **we conclude that the collective absence of such features militates against a determination that the proceeding had adequate safeguards to ensure reliability and promote fundamental fairness**. (emphasis added)

The Connecticut Supreme Court in *Khan* was answering certified questions on Connecticut law directed to it by the United States Court of Appeals for the Second Circuit as to the accused's federal lawsuit involving the (in his words) "kangaroo court" to which he was subjected, very similar to Illinois' OSCR Action.   *Khan v. Yale Univ.*, 85 F.4th 86 (2d Cir. 2023. The Second Circuit left all but one of the accused's claims intact (the one being dismissed based on statute of limitations grounds) in this ruling dated October 25, 2023)).

IV.    ARGUMENT: TJ HAS MADE A PRIMA FACIE CASE OF THE TRO AND
PRELIMINARY INJUNCTION FACTORS

Respectfully, TJ believes that the above-stated facts and law more than sufficiently make

his argument. Therefore, TJ will only summarize in this section.

**A. Temporary and preliminary injunctive relief is necessary to preserve the status quo**

59.    The status quo before the Suspension was that TJ was playing for the Team and

was not subject to the DIA Action and/or the OSCR Action. TJ has already missed three games,

and therefore immediate relief is necessary (the Team's next game is January 11).

**B. TJ has ascertainable rights in need of protection**

60.    TJ has ascertainable business interests (a lucrative professional career),

reputational interests (the Suspension certainly gives the appearance of guilt), interests in playing

athletics, and an interest in fully preserving his presumption of innocence. As to that last interest,

the Suspension burdens TJ with an appearance of guilt, with his institution taking drastic action

against him without his day in criminal court. Although it is possible that evidence of the

Suspension will be excluded *in limine* prior to trial, that far from guarantees the prevention of the

tainting of potential jurors (as this is a high-profile case), judges, and the prosecution team.

Instead, the Court should let TJ's fate be decided in criminal court, not the court of public

opinion. TJ has at least raised a "fair question" on this factor. *Granberg*, 279 Ill. App. 3d at 889.

**C. TJ will suffer irreparable harm without the requested injunctive relief**

61.    TJ's *prima facie* showing of his multiple ascertainable rights affords him a

presumption of irreparable harm. *See e.g., Morrison Metalweld Process Corp.*, 97 Ill. App. 3d at

380. Irreparable harm, legally the single most important factor to the relief TJ seeks in this

motion, is painfully obvious here.    Without that requested relief, TJ will not be able to play this

season, dramatically dropping his NBA draft stock to perhaps nothing, all the while eliminating

his potential earning of tens of millions of dollars and supporting his family members. Further,

TJ's reputation will be irreversibly diminished, giving the public the perception that his

21

university has already found him to be tainted in some way as to the Charges. Obviously, TJ's

right to continue in athletic competition will be eliminated without such relief. Additionally, a

continuance of the Suspension will not only eradicate the presumption of innocence, it will flip

that presumption to one of guilt for TJ, negatively impacting his criminal defense.

**D.  TJ has inadequate legal remedies**

62.     Similarly, there cannot be any legitimate dispute that money damages are not

clear, complete, practical, and efficient in this case. One cannot put a price tag on reputation.

Regardless, nobody can adequately value the tanking of an entire NBA career with attendant

endorsements, possible post-playing careers in sportscasting, and other opportunities.

**E.   TJ has at least raised a fair question of his likelihood of success on the merits**

63.     All TJ must do as to this factor is raise a fair question, a standard that is even more

relaxed as to TROs. *Kable Printing Co.*, 63 Ill. 2d at 524; *see also*, *Baal*, 97 Ill. App. 3d at 501

(plaintiff who raises a "fair question" has made a *prima facie* case of this factor, even "where

there may be serious doubt as to the ultimate success of the complaint.")

64.     As to Count I of his Complaint, TJ has raised a fair question as to his Title IX

claim, especially considering that Title IX, as a remedial statute, is to be liberally construed to

apply. There is at least a fair question that the alleged incident took place during an "education

program or activity" of Illinois given the fact that an Illinois employee, in the scope of his

employment at Illinois and in furtherance of Illinois, transported and oversaw TJ during that

time. TJ understands that Illinois strenuously disputes that these facts require the application of

Title IX, but that factual dispute is one that must be fully resolved on the merits, not at this time.

65.     As to Count II of his Complaint, pleaded in the alternative, TJ has raised a fair

question on specific standards of the Scholarship Contract, which only allow action against TJ, as

to sexual misconduct crimes, if he is convicted, pleads guilty, pleads no contest, or is found

guilty of the same through institutional disciplinary proceedings. The Scholarship Contract is the only executed contract with Illinois of which TJ is aware or recalls.

66.     As to Count III of the Complaint, also pleaded in the alternative, to the extent the Court finds TJ to be bound by the DIA Policy, that could only be through an implied contract because TJ does not recall signing a document that specifically subjected him to this policy. (TJ has asked Illinois for such a document, and none has been provided. Illinois only provided the Scholarship Contract when TJ requested all signed contracts.)   As admitted by Illinois' AD, two terms of this implied contract are that TJ is to be presumed innocent and is to be afforded "appropriate" due process. There is more than a fair question that Illinois has breached these terms in suspending TJ, obviously not presuming his innocence, or providing any semblance of due process.

67.     Similarly, as to Count IV of the Complaint, also pleaded in the alternative, there is at least a fair question that the DIA Policy is procedurally and substantively unconscionable. Procedurally, the patchwork of "parallel" and "intersecting" "standards" that Illinois has applied, and is applying, to TJ are "so difficult to find, read, or understand" that TJ "cannot fairly be said to have been aware he was agreeing to it…." *Kinkel*, 223 Ill. 2d at 22. Alternatively, there is at least a "fair question" that the DIA policy is substantively unconscionable because the terms of the DIA Policy are so obviously oppressive to TJ and one-sided for Illinois.

68.     As to Count V of the Complaint, pleaded alternatively, TJ has raised a fair question that there is an actual and justiciable controversy between the parties as to exactly what the governing standards are. One would need a Venn Diagram to explain the various overlapping standards and to fully expose their internal inconsistencies.

69.     As to Count V, again pleaded alternatively, there is at least a fair question that there is an actual and justiciable controversy in need of the Court's resolution, as to exactly which standards apply to TJ given Illinois' inconsistent and vague application of various "rules."

Illinois obviously acknowledges that the DIA Policy and OSCR Policy apply to TJ, despite their wildly inconsistent standards, with one providing some safeguards and the other (through which TJ was suspended), none. That discrepancy alone provides the need for court intervention.

70.     And, this is regardless of Title IX, but the Court should consider applying Title IX standards to TJ's situation (which would require that he "fail" a risk analysis before being suspended). Title IX standards provide due process if followed correctly.

71.     Further, there is the Scholarship Contract, which sets forth yet more standards that are more favorable to TJ and inconsistent with the others. There is a "fair question" that the Scholarship Contract, through which TJ enrolled at Illinois and joined the Team, the only contract TJ signed with Illinois to his recollection, governs and does not allow for the Suspension.

72.     As to Count VI, which alternatively seeks injunctive relief against the individual defendant who is Illinois' President for deprivation of TJ's protected property interests without procedural due process, there is at least a fair question that TJ has been deprived of constitutionally protected property and other interests, under the color of state law (as Illinois is a state school) without procedural due process. The DIA Action is the focus of this count and does not provide TJ with "adequate safeguards to ensure reliability and promote fundamental fairness." *Khan,* 347 Conn. at 39. But the OSCR Action will not fare much better, if it is permitted to proceed. *Id.*

73.     It is not a stretch to say that the DIA Action, as applied to TJ, is like a Politburo action, and an OSCR Action is a "kangaroo court" especially when brought against a student-athlete whose case is very high profile, while he is defending criminal charges. Thus, it is highly unlikely that anybody on UIUC's campus can be genuinely objective. At a minimum, this situation, taken in its entirety, cries out for the introduction of truly independent neutrals.

74.     Finally, as to Count VII, which TJ asserts in any event, there is more than a fair question that Illinois waived the right to apply the DIA or OSCR Policies to TJ's situation by waiting three months to do so. Illinois is likely to assert that it was the fact of the Charges that moved the needle from no DIA action to DIA Action. However, Illinois knew that TJ was the target of the investigation since late September 2023, and a review of the DIA Policy and OSCR Policy shows that Illinois likely could have acted under either back then. This same situation ripened into the Charges, but Illinois seemed to learn facts before TJ, such as the identity of the complainant (which TJ learned from Illinois). Illinois was enough "in the know" back in September that there is at least a fair question of waiver, undoubtedly a question of fact in this case.

## F.  **TJ has raised a fair question as to the discretionary factors, if the Court chooses to apply them**

75.     A balancing of the harms favors TJ. The harm to TJ if the Suspension is not enjoined is obvious. His NBA career will tank, as will his reputation, the ability to support his family, his ability to play collegiate athletics (and perhaps professional sports), and his presumption of innocence. Illinois cannot prove that TJ is a threat to the Illinois community-the evidence is clearly to the contrary. Illinois has allowed TJ to stay on campus, and rightfully so as he has no criminal history, has numerous character affiants, and has been on campus since the alleged incident without any issue. In other words, allowing TJ to play for the Team does not materially harm Illinois beyond allowing TJ to remain a student on campus as it has done throughout this ordeal. Further, any alleged harm to Illinois would be mitigated by the fact that a court of equity would be directing Illinois what to do. Finally, if Title IX applied there is no question that TJ would be allowed to play for the Team, and even if only the OSCR Policy were applied TJ would still be playing for the Team at this time, until that process concluded.

76.     The public interest is not disserved by injunctive relief. The public has an interest in preserving the presumption of innocence, and there is no evidence that TJ poses any threat to the Illinois community or anyone else for that matter.

**G. Overall, TJ has met his burden of proof**

77.     TJ only needed to make a *prima facie* case of the necessary elements. He has more than done so, thoroughly alleging facts and applicable law as set forth herein.

**H. TJ should not be required to post a bond if this Motion is granted**

78.     Under the circumstances, TJ should not be required to post a bond, which is at the Court's discretion. TJ has been on UIUC's campus since the alleged incident in September. Allowing TJ to play for the Team will not materially harm Illinois, as set forth above. Also, TJ is supporting numerous family members, and he cannot afford a large bond.

## V.     CONCLUSION

79.     Attached to this Motion as Exhibit A is TJ's proposed order, which fully sets forth the relief requested herein, including a TRO, preliminary injunction, and expedited discovery.

WHEREFORE, Plaintiff, Terrence Shannon Jr. respectfully requests that the Court enter a temporary restraining order and/or a preliminary injunction as outlined in Plaintiff's proposed order, Exhibit A, also ordering expedited discovery. Plaintiff seeks other relief deemed just by this Court.

**Respectfully submitted,**
**Terrence Shannon Jr., Plaintiff**

By:   /s/ Robert H. Lang
Robert H. Lang (ARDC #6225414)
Zoe S. Spector (ARDC #6333392)
Thompson Coburn LLP
55 East Monroe Street, 37th Fl.
Chicago, IL 60603
rhlang@thompsoncoburn.com
(312) 346-7500
Fax: (312) 580-2201

By: /s/ Mark C. Goldenberg
Mark C. Goldenberg (ARDC #0990221)
Thomas C. Horscroft (ARDC #6327049)
Goldenberg Heller & Antognoli, P.C.
2227 South State Route 157
Edwardsville, IL 62025
mark@ghalaw.com
(618) 656-5150
Fax: (618) 656-6230

By: /s/ J. Steven Beckett
J. Steven Beckett (ARDC #0151580)
Steve Beckett Law Office LLC
508 S. Broadway Avenue
Urbana, IL 61801
(217) 328-0263
Fax: (217) 328-0290

By: /s/ Mark Sutter
Mark Sutter (ARDC # 6238207)
Sutter Law Group, LLC
One Lincoln Centre
18w140 Butterfield Road
Suite 1500
Oakbrook Terrace, IL 60181
msutter@sutterlawgroup.com
(312) 724-5600

**<u>VERIFICATION</u>**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements as set forth in the above **PLAINTIFF'S VERIFIED MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR EXPEDITED DISCOVERY** are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true to the best of his knowledge, recollection, and belief.

_____
**Terrence Shannon Jr.**

- 2 -

28

# Exhibit A

**IN THE CIRCUIT OF THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS**

| | |
|---|---|
| TERRENCE SHANNON JR.,        ) | |
|                           ) | |
|                Plaintiff,    ) | |

TERRENCE SHANNON JR.,      )

             )

        Plaintiff,   )

             )

v.                 )     2024 CH _____

             )

THE BOARD OF TRUSTEES OF THE   )

UNIVERSITY OF ILLINOIS,   )

a body corporate and politic,  and   )

TIMOTHY KILLEEN, in his   )

official capacity as President of the   )

University of Illinois,   )

             )

        Defendants.   )

## **TEMPORARY RESTRAINING ORDER**

This cause coming to be heard on Plaintiff's Motion for Temporary Restraining Order ("TRO"), Preliminary Injunction, and/or Expedited Discovery ("Plaintiff's Motion"), upon due notice to the Parties and the Court having been fully advised on the premises, and additionally for the reasons stated on the records;

**IT IS HEREBY ORDERED THAT:**

1.     The Court finds based on the Verified Complaint and the supporting Plaintiff's Motion, that Plaintiff has established that he has a clearly ascertainable right that needs protection, will suffer irreparable harm without the TRO, has no adequate remedy at law, is likely to succeed on the merits, and that a TRO is necessary to preserve the status quo:

        a.   [The Court further finds that a balancing of the harms favors Plaintiff.]

        b.   [The Court also finds that the public interest will not be harmed by a granting of a TRO to the Plaintiff.]

2.      Defendant, The Board of Trustees of the University of Illinois, and all of its officers (including, but not limited to, Defendant Timothy Killeen), administration, employees, units, divisions, affiliates, and other agents, are enjoined from continuing to suspend Plaintiff from full participation in the men's basketball team ("Team") at the University of Illinois at Urbana-Champaign, and shall immediately reinstate Plaintiff to the Team.

3.      Defendant is enjoined from subjecting Plaintiff to any further disciplinary or other proceedings until further order of the Court.

4.       The obligations of Defendants pursuant to this TRO are to be construed as broadly as possible.

5.      The Court finds good cause to waive bond.

6.      This Order shall remain in effect until modified or terminated by a subsequent order.

7.      The Parties may issue written discovery requests to each other in regards to Plaintiff's Motion for Preliminary Injunction on or before _____, 2024; the Parties shall fully respond to written discovery requests on or before _____, 2024; the Parties shall complete depositions by _____, 2024;  and the Court will hold a preliminary injunction hearing on _____ through _____, starting at _____ each day.

8.      Defendant shall file a response to Plaintiff's Motion on or before _____, 2024 and Plaintiff shall file a reply in support thereof on or before _____, 2024.

9.      Defendant  shall answer or otherwise plead to Plaintiff's Complaint on or before _____, 2024.

**ORDERED**

_____

**Dated:** _____

Robert H. Lang (ARDC # 6225414)
Thompson Coburn LLP
55 East Monroe Street, 37th Fl.
Chicago, IL 60603
rhlang@thompsoncoburn.com
(312) 346-7500
Fax: (312) 580-2201

Mark C. Goldenberg (ARDC #0990221)
Goldenberg Heller & Antognoli, P.C.
2227 South State Route 157
Edwardsville, IL 62025
mark@ghalaw.com
(618) 656-5150
Fax: (618) 656-6230

J. Steven Beckett (ARDC # #0151580)
Steve Beckett Law Office LLC
508 S. Broadway Avenue
Urbana, IL 61801
(217) 328-0263
Fax: (217) 328-0290

Mark Sutter #6238207)
Sutter Law Group, LLC
One Lincoln Centre
18w140 Butterfield Road
Suite 1500
Oakbrook Terrace, IL 60181
msutter@sutterlawgroup.com
(312) 724-5600
_Attorneys for Terrence Shannon Jr., Plaintiff_

3