# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS

TERRENCE SHANNON JR.,    )
    )
        Plaintiff,    )
    )
v.    )    Case No. 2:24-cv-2010
    )
THE BOARD OF TRUSTEES OF THE    )
UNIVERSITY OF ILLINOIS,    )
a body corporate and politic, and    )
TIMOTHY KILLEEN, in his    )
official capacity as President of the    )
University of Illinois,    )
    )
        Defendants.    )

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS VERIFIED MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR EXPEDITED DISCOVERY

Robert H. Lang (ARDC #6225414)
Zoe S. Spector (ARDC #6333392)
Thompson Coburn LLP
55 East Monroe Street, 37th Fl.
Chicago, IL 60603
rhlang@thompsoncoburn.com
(312) 346-7500
Fax: (312) 580-2201
*Admission pending pursuant to ICD Local Rule 85(A)*

Mark C. Goldenberg (ARDC #0990221)
Thomas C. Horscroft (ARDC #6327049)
Goldenberg Heller & Antognoli, P.C.
2227 South State Route 157
Edwardsville, IL 62025
mark@ghalaw.com
(618) 656-5150
Fax: (618) 656-6230

J. Steven Beckett (ARDC #0151580)
Steve Beckett Law Office LLC
508 S. Broadway Avenue
Urbana, IL 61801
steve@stevebeckettllc.com
(217) 328-0263
Fax: (217) 328-0290

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTS ................................................................................................................ 5

      A.      Alleged circumstances leading to the Charges ....................................... 5

      B.      Illinois' Suspension of TJ ...................................................................... 6

      C.      Illinois initiates another action against TJ *after* the Suspension............ 8

      D.      More facts bearing on irreparable harm and the inadequacy of legal remedies ................................................................................................. 10

      E.      TJ's claims ............................................................................................ 11

III.    LEGAL STANDARDS ...................................................................................... 12

      A.      Injunctive Relief................................................................................... 12

            1.      Preservation of the status quo .................................................. 12

            2.      TRO-specific standards............................................................. 12

            3.      Preliminary injunction standards .............................................. 13

                 a.      Likelihood of success on the merits............................ 14

                 b.      Inadequate legal remedy and irreparable harm............ 14

                 c.      Sliding scale to balance harms and public interest ...... 16

                 d.      Discretionary factors................................................... 16

                 e.      Security ....................................................................... 16

      B.      Title IX................................................................................................. 17

      C.      Procedural Due Process ........................................................................ 20

      D.      Implied contracts.................................................................................. 21

      E.      Waiver .................................................................................................. 22

      F.      Unconscionability of contract .............................................................. 22

G.    *Khan v. Yale University* ............................................................................. 23

IV.    ARGUMENT: TJ HAS MADE A PRIMA FACIE CASE OF THE TRO AND PRELIMINARY INJUNCTION FACTORS .................................................................. 24

    A.    TJ has demonstrated some likelihood of success on the merits........................... 24

    B.    TJ has inadequate legal remedies that will be irreparably harmed without injunctive relief ............................................................................................... 28

    C.    The balancing of harms favors granting a TRO and preliminary injunction ........ 30

    D.    The public interest is not harmed by injunctive relief .......................................... 31

    E.    TJ should not be required to post a bond if this Motion is granted ..................... 31

V.    CONCLUSION.............................................................................................................. 31

## **TABLE OF AUTHORITIES**

I.      INTRODUCTION ................................................................................................ 1

    *Ohio v. NCAA*, No. 1:23-CV-100, 2023 WL 9103711 (N.D. W. Va. Dec.
       13, 2023) ...................................................................................................... 2

II.     FACTS ................................................................................................................ 5

    A.      Alleged circumstances leading to the Charges ...................................... 5

    B.      Illinois' Suspension of TJ ..................................................................... 6

    C.      Illinois initiates another action against TJ *after* the Suspension ............ 8

        Fed. R. Evid. 404 .................................................................................. 9

    D.      More facts bearing on irreparable harm and the inadequacy of legal
        remedies ............................................................................................. 10

    E.      TJ's claims ......................................................................................... 11

III.    LEGAL STANDARDS ..................................................................................... 12

    A.      Injunctive Relief ................................................................................. 12

        1.      Preservation of the status quo ................................................. 12

            *Consumer Sales & Mktg., Inc. v. Digital Equipment Corp.*,
               No. 95 C 5049, 1995 WL 548765 (N.D. Ill. Sept. 13,
               1995) ......................................................................................... 12

            *Ellis v. Sheahan*, 412 F.3d 754 (7th Cir. 2005) ......................... 12

            *Kay v. Individual Defendants, P'ships, & Unincorporated
               Ass'ns*, No. 22-cv-3033—RJD, 2023 WL 4350645
               (S.D. Ill. Apr. 14, 2023) ............................................................ 12

            *Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940
               (7th Cir. 2006) .......................................................................... 12

        2.      TRO-specific standards ........................................................... 12

            *Kay v. Individual Defendants, P'ships, & Unincorporated
               Ass'ns*, No. 22-cv-3033—RJD, 2023 WL 4350645
               (S.D. Ill. Apr. 14, 2023) ......................................................12, 13

3.   Preliminary injunction standards ............................................. 13

    *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35
        F.3d 1134 (7th Cir. 1994) ...................................................13

    *Int'l Profit Assocs., Inc. v. Paisola*, 461 F. Supp. 2d 672
        (N.D. Ill. 2006)...................................................................13

    *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808 (7th
        Cir. 2002), *as amended* (Oct. 18, 2002)................................13

    *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531 (7th Cir.
        2021) ...................................................................................14

    *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6
        (7th Cir. 1992) ...................................................................14

    a.    Likelihood of success on the merits................................ 14

        *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St.
           Louis*, 35 F.3d 1134 (7th Cir. 1994)..........................14

        *Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020) ...................14

        *Dunnet Bay Const. Co. v. Hannig,* No. 10-3051,
           2010 WL 1326560 (C.D. Ill. Mar. 26, 2010) ...........14

    b.    Inadequate legal remedy and irreparable harm ............................ 14

        *Craig v. Pepperidge Farm, Inc.*, No. 1:06-CV-954-
           SEB-JMS, 2008 WL 4280154 (S.D. Ind. Sept.
           15, 2008) ...................................................................14

        *Kamerling v. Massanari*, 295 F.3d 206 (2d Cir.
           2002) .........................................................................14

        *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531 (7th
           Cir. 2021) ...................................................................14

        *Doe v. Mukwonago Area Sch. Dist.*, No. 23-C-0876,
           2023 WL 4505245 (E.D. Wis. July 11, 2023) ...........15

        *S.A. v. Sioux Falls School Dist. 49-5,* 2023 WL
           6794207 (D. S.D. Oct. 13, 2023) ..............................15

        *Portz v. St. Cloud State Univ.*, 16 F.4th 577 (8th Cir.
           2021) .........................................................................15

*McCormick ex rel. McCormick v. Sch. Dist. 01 Mamaroneck,* 370 F.3d 275 (2d Cir. 2004) ............................15

*Navarro v. Florida Inst. of Technology, Inc.*, 2023 WL 2078264 (M.D. Fla., Feb. 17, 2023) .................................15

*Biediger v. Quinnipiac Univ.,* 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ....................................................15

*Mayerova v. E. Mich. Univ.*, 346 F.Supp.3d, 983 (E.D. Mich. 2018) ..................................................15

*Ohio v. NCAA*, No. 1:23-CV-100, 2023 WL 9103711 (N.D. W. Va. Dec. 13, 2023) .............................15

*Ganden v. NCAA,* No. 96 C 6953, 1996 WL 680000 (N.D. Ill., Nov. 21, 1996).........................................15

*Hutsonville Cmty. Unit Sch. Dist. No. 1 v. Illinois High Sch. Ass'n*, 2021 IL App (5th) 210308 ...........................15

    c.    Sliding scale to balance harms and public interest ...................... 16

*Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) ...................................................16

    d.    Discretionary factors ................................................................ 16

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134 (7th Cir. 1994)...........................16

    e.    Security ..................................................................................... 16

Rule 65 ...............................................................................16, 17

Fed. R. Civ. P. 65(c) ..................................................................16

*Gen'l Elec. Capital Corp. v. Alliance Transp. Grp. LLC*, No. 09 C 734, 2009 WL 10702069 (N.D. Ill. Feb. 13, 2009)..............................................16

*Navarro v. Florida Inst. of Technology, Inc.*, 2023 WL 2078264 (M.D. Fla., Feb. 17, 2023) .................................16

B.    Title IX............................................................................................... 17

20 U.S.C. §1681 et. seq.................................................................17

85 Fed. Reg. 30026, 30044 (May 14, 2020) .................................17

85 Fed. Reg. 30048 ...................................................................................17

34 CFR §106.44(c) .....................................................................................18

Jack Baer, *Texas Tech star Pop Isaacs reportedly accused of sexually assaulting a minor in the Bahamas*, Yahoo! Sports, Jan. 7, 2024-https://sports.yahoo.com/texas-tech-star-pop-isaacs-reportedly-accused-of-sexually-assaulting-a-minor-in-the-bahamas-010202075.html ....................................................18

34 CFR §106.44(a) ..............................................................................18, 20

*Roe v. Gustine Unified School Dist.*, 678 F. Supp.2d 1008 (E.D. Ca. 2009) ...............................................................................................18

*Pogorzelska v. VanderCook Coll. of Music*, No. 19-CV-05683, 2023 WL 3819025 (N.D. Ill. 2023) .............................................18

*Lapka* v. *Chertoff*, 517 F.3d 974 (7th Cir. 2008) ............................18, 19

U.S. Constitution ........................................................................................20

C.    Procedural Due Process ......................................................... 20

*Dempsey v. Johnson,* 2016 IL App (1st) 153377 .................................20

*Segers v. Industrial Com'n,* 191 Ill. 2d 421 (2000) ............................20

*Bartlow v. Shannon,* 399 Ill. App. 3d 560 (5th Dist. 2010) .................20

*People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164 (2002) ........20

D.    Implied contracts ................................................................... 21

*Trapani Cons. Co., Inc. v. Elliot Grp., Inc.*, 2016 IL App (1st) 143734 ...........................................................................................21

*Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290 (1st Dist. 1991) ...............................................................................21

*Liu v. Nw. Univ.,* 78 F. Supp. 3d 839 (N.D. Ill. 2015) ........................21

*Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828 (7th Cir. 2012) ........................................................................................21

*Stiles v. Brown Univ.*, No. 1:21-cv-00497 (D. R.I. January 25, 2022) ....................................................................................21, 22

E.    Waiver ................................................................................... 22

*Whalen v. Kmart Corp.*, 166 Ill. App. 3d 339 (1st Dist. 1998)..............................22

*Wagner Excello Foods, Inc. v. Fearn Intern., Inc.,* 235 Ill. App. 3d 224 (1st Dist. 1992)..................................................................22

F.   Unconscionability of contract ........................................................ 22

*Kinkel v. Cingular Wireless LLC,* 223 Ill. 2d 1 (2006)..................................22, 23

*Am. Food Mgmt., Inc. v. Henson,* 105 Ill. App. 3d 141 (5th Dist. 1982) ........................................................................................23

G.   *Khan v. Yale University* ................................................................ 23

*Khan v. Yale Univ.*, 347 Conn. 1 (2023)................................................23

*Khan v. Yale Univ.*, 85 F.4th 86 (2d Cir. 2023) ..............................23, 24

IV.   ARGUMENT: TJ HAS MADE A PRIMA FACIE CASE OF THE TRO AND PRELIMINARY INJUNCTION FACTORS .................................................. 24

A.   TJ has demonstrated some likelihood of success on the merits........................... 24

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134 (7th Cir. 1994)..................................................................24

*Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531 (7th Cir. 2021) .........................24

*Stiles v. Brown Univ.*, No. 1:21-cv-00497 (D. R.I. January 25, 2022) ........................................................................................26

*Kinkel v. Cingular Wireless LLC,* 223 Ill. 2d 1 (2006)...........................................26

*Khan v. Yale Univ.*, 347 Conn. 1 (2023)................................................27

B.   TJ has inadequate legal remedies that will be irreparably harmed without injunctive relief ................................................................. 28

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) ........................................................................................28

*State of Ohio v. NCAA* ......................................................................28, 29

*Ganden v. NCAA,* No. 96 C 6953, 1996 WL 680000 (N.D. Ill., Nov. 21, 1996) ........................................................................28

C.   The balancing of harms favors granting a TRO and preliminary injunction........ 30

D.   The public interest is not harmed by injunctive relief .......................................... 31

E.    TJ should not be required to post a bond if this Motion is granted ...................... 31

V.    CONCLUSION.............................................................................................................. 31

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| TERRENCE SHANNON JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 2:24-cv-2010 |
| | ) |
| THE BOARD OF TRUSTEES OF THE | ) |
| UNIVERSITY OF ILLINOIS, | ) |
| a body corporate and politic, and | ) |
| TIMOTHY KILLEEN, in his | ) |
| official capacity as President of the | ) |
| University of Illinois, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS
VERIFIED MOTION FOR A TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND/OR EXPEDITED DISCOVERY**

Plaintiff, Terrence Shannon Jr. ("TJ"), by and through his attorneys and pursuant to Federal

Rule of Civil Procedure 65, for his memorandum of law in support of his Verified Motion for

Temporary Restraining Order ("TRO"), Preliminary Injunction, and/or Expedited Discovery

("Motion") against the Defendants, The Board of Trustees of the University of Illinois, a body

corporate and politic ("Illinois") and Timothy Killeen ("Killeen"), in his official capacity as

President of the University of Illinois, states as follows:

## I.      INTRODUCTION

1.      TJ's Verified Complaint ("Complaint") [Dkt. 1-1], which was filed in state court

on January 8, 2024, and then removed to this Court, is fully incorporated into this Motion by

reference and verifies the facts in support of the Motion.

2.      TJ plays for the University of Illinois at Urbana-Champaign's ("UIUC") men's

basketball team ("Team") and has been widely projected to be a "lottery pick" in the National

Basketball Association's ("NBA") 2024 draft. TJ has been accused of crimes in Douglas County,

Kansas, for an alleged September 9, 2023, incident in Lawrence, Kansas. Illinois has known about, and even interviewed TJ about these allegations, since at least late September 2023.

3.      TJ played in the Team's first eleven games. Then, on December 28, 2023, Illinois suspended TJ from the Team. On January 3, 2024, Illinois then extended the suspension until the charges against him ("Charges") are resolved. However, the Charges will not be tried in Douglas County until well after the Team's current season and the June 27, 2024, NBA draft.

4.      On January 5, 2024, Illinois started another disciplinary process against TJ that is utterly inconsistent with the first process that led to his suspension from the Team.

5.      The State of Illinois itself has recently and successfully argued in obtaining a preliminary injunction that "[c]ourts have **repeatedly** found that **'[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports**.'"   *Ohio v. NCAA*, No. 1:23-CV-100, 2023 WL 9103711, at *9 (N.D. W. Va. Dec. 13, 2023) (emphasis added) (collecting cases) [Exhibit A].

6.      The purpose of a TRO in this case is merely to preserve the status quo prior to the controversy when TJ was playing for the Team to prevent such irreparable harm to TJ. That's it. The Court at this stage is not to adjudicate the merits of TJ's civil case, and in no event is the Court to assess the merits of the Charges.

7.      As to the TJ's likelihood of success on the merits, all he must do at this stage is show that there is "some likelihood" that he will succeed on his claims. It is a low bar that TJ more than exceeds. (TJ's Complaint is solely for declaratory and injunctive relief.)

8.      First, as to the merits, Illinois has refused to afford the protections to which TJ is entitled pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), which would require that Illinois allow TJ to fully participate on the Team until the Charges against him are

totally resolved. An Illinois employee in the scope of his employment and in furtherance of Illinois' interests transported and escorted TJ during his subject trip to Lawrence, at the direction of his superiors, also Illinois employees. Illinois has refused to apply Title IX to this situation, even though Title IX is to be liberally construed by law.

9.      Therefore, according to Illinois, had the alleged incident occurred on UIUC's campus (for example), TJ would have been afforded critical Title IX safeguards that have been promulgated to protect the presumption of innocence. But because Illinois unilaterally deemed the alleged incident to fall outside of Title IX's purview (which is at least a disputed factual question) Illinois afforded TJ no such safeguards. A student's future should not turn so arbitrarily.

10.     Alternatively, as to the merits, (a) Illinois has violated its own policies in suspending TJ from the Team; (b) Illinois has breached its contractual obligations to TJ in doing the same; (c) Illinois has been vague and contradictory in defining exactly what standards apply to disciplinary proceedings against TJ; and/or (d) the various standards that Illinois has applied do not provide due process, are unconscionable, and/or waived by Illinois in waiting to apply them to the allegations against TJ.

11.     In being hit with the suspension, TJ was subjected to a futile and unfair exercise. Behind closed doors at a meeting, without TJ being present, Illinois acted as judge, jury, and executioner of TJ's future by suspending TJ from the team before the resolution of the Charges, eradicating the presumption of innocence and other fair and due process to which TJ is entitled.

12.     Illinois, by its own admission, had several options to determine the trajectory of TJ's life, but chose the one with zero safeguards in TJ's favor to take the devastating action of suspending him from the Team. Illinois could have easily provided TJ with safeguards to protect

his presumption of innocence and other basic rights but failed to do so in suspending TJ. Haste makes waste.

13.     When the Court resolves this case on the merits, it will address the following separate and independent claims by TJ:

> a.   That Title IX applies: if the Court agrees, then Illinois must immediately reinstate TJ to the Team and cannot suspend him unless and until Illinois first performs an independent risk analysis (which Illinois has not yet done) and finds TJ to be a threat to others on campus (which would be unlikely given that TJ has been on campus since the alleged incident without any issues, has no criminal or disciplinary history, and has numerous character affiants attesting to his rule-following and good-natured character-including three Illinois employees.) If the Court ultimately finds that Title IX applies, it need not address TJ's other claims.

> b.   Alternatively, that TJ has not been permitted a fair and due process to date, and therefore Illinois must do things the right way, even if Title IX does not apply, or, at a minimum Illinois has attempted to impose unconscionable contractual obligations on TJ.

> c.   In any event, that Illinois waived any alleged right to take actions leading to TJ's suspension or other discipline by waiting three months to take such action.

14.     There is at least some likelihood that TJ will succeed on the merits of these claims, and there are factual questions that cannot be resolved now by the Court. That is precisely the purpose of temporary and preliminary injunctive relief, to allow the parties and the Court to take a breath, put the genie back in the bottle, and come to the right decision while not trashing TJ's career in the process.

15.     TJ will suffer immediate and irreparable harm for which there are not adequate legal remedies if he is not immediately reinstated to the Team, with the Court enjoining Illinois from taking any further actions against TJ without a fair process, which TJ welcomes. There is no question that TJ has ascertainable rights in his business interests, his reputation, and his purported contractual rights that will be irreparably harmed without a TRO, without the promise of adequate

- 4 -

money damages. There is no way to adequately calculate in money terms the damage that is being done to TJ with each day of the suspension.

16.     Accordingly, TJ seeks a TRO and a preliminary injunction enjoining Illinois' suspension of him from the Team, ordering his immediate reinstatement, and also enjoining yet another disciplinary process that Illinois has just initiated against TJ on January 5, 2024.

## II.     FACTS

17.     The Complaint submits verified facts supporting the Motion at ¶¶ 13 through 60. They will be summarized here.

### A. Alleged circumstances leading to the Charges

18.     Illinois graduate assistant DyShawn Hobson ("Hobson") drove TJ and fellow Team member Justin Harmon ("Harmon") to and from Lawrence on September 8 and 9, 2023 at the directive of three Team assistant coaches to see the Illinois-University of Kansas ("KU") football game. (Complaint, ¶¶ 14-15.) Hobson did so as an Illinois employee in furtherance of Illinois' basketball program, checking in with his superiors (also Illinois employees) the entire trip. (Complaint, ¶ 15.)

19.     The alleged incident occurred the early morning of September 9, 2023, at a crowded KU bar in an area subject to surveillance video. (Complaint, ¶¶ 16-18.) Yet, according to police records made available to TJ through UIUC and otherwise, there are no witnesses to the alleged incident, no video showing TJ and the complainant together, and no physical evidence tying TJ to the alleged incident. (*Id.*) To TJ's knowledge, the LPD did not interview anyone other than the complainant and her friend (the latter of whom did not witness the alleged incident). (Complaint, ¶¶ 16 and 20-21.) The LPD did not interview any of the several KU basketball players who were with TJ that night until January 3, 2024, after the Charges were brought a month earlier, and even though the complainant allegedly advised the LPD that she recognized at least one KU player as

being at the scene of the alleged incident. (Complaint, ¶¶ 20-21.) Nor has the LPD ever interviewed Hobson or Harmon, who were with TJ the entire night of the alleged incident. (Complaint, ¶ 21.)

20.     The Charges were brought against TJ by a prosecutor's office that has a recent history of wrongfully convicting an African-American male KU student of rape. (Complaint, ¶ 23.)

21.     The Charges were brought without any convening of a grand jury or indictment, include a misdemeanor "in the alternative," and, unless dismissed, will not be resolved through trial until after the June 27, 2024, NBA draft. (Complaint, ¶ 19.) TJ has not even received any discovery from the prosecution yet, and only found out the identity of the complainant from Illinois, not the prosecution. (Complaint, ¶¶ 19, 35.)

**B.  Illinois' Suspension of TJ**

22.     Illinois first learned of a LPD criminal investigation regarding the alleged incident, and that TJ was a target, in or around late September 2023. (Complaint, ¶ 24.) Illinois interviewed TJ about the alleged incident and found him to be "very forthcoming." (Complaint, ¶ 25.) Illinois concluded that it would take no action against TJ at that time. (Complaint, ¶ 26.)

23.     Illinois asserts that it first learned that TJ was charged on December 27, 2023, and that was also the first time that Illinois received any documentation of the Charges (i.e. police reports or the criminal complaint). (Complaint, ¶ 28.) Illinois temporarily suspended TJ from the Team on December 28, 2023, and then effectively suspended TJ on a permanent basis (given that the criminal trial would not proceed until after the Team's season) on January 3, 2024 ("Suspension"). (Complaint, ¶¶ 28-30.)

24.     The Suspension apparently was decided by a panel of three Illinois faculty members ("DIA Panel"), pursuant to the UIUC's Division of Intercollegiate Athletics' ("DIA") student-athlete policy ("DIA Policy"). The DIA Policy's decision-making standard is entirely Illinois-

centered (not athlete-centered), based on a weighing of the harm **to Illinois** in suspending versus not suspending the student athlete. (Complaint, ¶ 29.)

25.     The Suspension was continued by Illinois on January 3, 2024, until the Charges are resolved, which will not be resolved until well after the Team's season and after the NBA draft. (Complaint, ¶¶ 19 and 30.)

26.     Illinois has refused to review TJ's situation pursuant to Title IX, despite the fact that an Illinois employee in the scope of his employment at Illinois, in furtherance of Illinois' interests, transported TJ and oversaw his trip to Lawrence. (Complaint, ¶¶ 14-15, and 41.) Had Illinois applied Title IX, it could not have suspended TJ at this time, and not in the future unless and until Illinois' Title IX coordinator conducts a risk analysis of TJ, and finds him dangerous to others, which has not occurred. (Complaint, ¶¶ 41-42.) To the contrary, TJ has no criminal history, has been allowed by Illinois to stay on campus without any issues since the alleged incident playing for the Team for most of that time, is working towards his Sociology degree from Illinois this May, and is supported by numerous character affiants, including three university employees. (Complaint, ¶ 42.)

27.     Illinois' athletic director (the "<u>AD</u>") promised that the DIA Action would respect the "presumption of innocence," which he said, "continues to apply" and "appropriate levels of due process." (Complaint, ¶¶ 36.) TJ, however, was afforded no presumption of innocence and TJ was provided no fair or other due process prior to the Suspension. The DIA Action standard was centered on the harm to Illinois, not TJ's presumption of innocence. There was no investigation. There was no hearing that TJ attended. There was no notice as to who exactly assessed his fate and how. He did not know of the identity of his accuser prior to the Suspension (although it appears that Illinois very well may have at the time of the Suspension because Illinois is the one who

disclosed the accuser's identity to him on January 5, 2024). No record of any proceedings was provided to him. And there was no detailed explanation of the "ruling." The utter lack of safeguards provided to TJ are detailed more below, especially when compared to Title IX and another process within Illinois that Illinois just started against TJ. (Complaint, ¶¶ 31-35.)

**C.  Illinois initiates another action against TJ *after* the Suspension**

28.     The AD explained at a December 29, 2023, press conference that TJ was subject to three actions which ran "in parallel" and could intersect: the criminal prosecution, the DIA Policy action that led to his Suspension ("DIA Action"), and yet another Illinois process initiated on January 5, 2024, by Illinois' Office of Student Conflict Resolution ("OSCR"), pursuant to the OSCR policy ("OSCR Policy"). (Complaint, ¶¶ 32-33.) Illinois knew the complainant's identity before TJ (including possibly at the time of the Suspension) and did not inform TJ of that identity until January 5, 2024, when it served him the OSCR notice. (Complaint, ¶ 35(b).)

29.     The OSCR Policy action ("OSCR Action") just launched by Illinois against TJ is far from fair, but it has more safeguards that the DIA Action (which is not a difficult hurdle). An OSCR Action has the following safeguards that are nowhere found on the DIA Policy, and obviously were not afforded to TJ in the DIA Action: a "Respondents' rights section," appeal rights, actual participation in a hearing, detailed notice, identity of the complainant, initial face-to-face meeting with case coordinator, an investigation, confirmation of the actual burden of proof, decision-making standard based on finding of actual policy violation (unlike a DIA action which is not interested in that issue), audio recording of the proceedings by OSCR, the presentation of witnesses and "evidence," sentencing procedure, access to the university's investigation and files, alternative dispute resolution, and references to "due process."   (Complaint, ¶¶ 31, 33, and 43.) Confusingly, the OSCR Policy, which includes a sexual misconduct policy, also applies to all Illinois students such as TJ. (Complaint, ¶ 39.)

30.     As the AD acknowledged, the OSCR Action was available to Illinois at all relevant times, including since Illinois' first knowledge that TJ was the target of a criminal investigation in September. (Complaint, ¶ 32.) Yet Illinois chose to suspend TJ effectively for the Team's season under the DIA Action, which has **no** safeguards, just six days after TJ found out about the Charges. (Complaint, ¶ 48.)

31.     The OSCR Policy, and the action that emanates from it, are still grossly deficient as to fundamental fairness safeguards. The OSCR Action has the following deficiencies: no subpoena power, no right to directly confront witnesses or the complainant, no right to counsel's direct participation in the action, no admissibility of character evidence until the sentencing phase (*see, e.g.*, Fed. R. Evid. 404, allowing the admissibility of character evidence in a criminal case if first raised by the defendant, even prior to sentencing), the hearing is closed to the public and not recorded by a certified court reporter, witnesses are not sworn to tell the truth under oath and/or the penalty of perjury. (Complaint, ¶¶ 46-47.) Just over two months ago, the Connecticut Supreme Court (7-0 decision) and the United States Court of Appeals for the Second Circuit found as follows regarding the same type of proceeding: "the collective absence of such features militates against a determination that the proceeding had adequate safeguards to ensure reliability and fundamental fairness." (Complaint, ¶ 47.) The Second Circuit allowed the accused to sue Yale University and the sexual misconduct complainant for defamation and other claims, holding that Yale had no immunity given the lack of safeguards in the process it allowed. (*Id.*) It is possible that Illinois has not yet had a chance to incorporate this decision into its policies, including, but not limited to, the OSCR Policy and/or the DIA Policy as the ruling was only issued on October 25, 2023.

32.     There is yet another standard in play. TJ does not recall signing any document wherein he agreed to the DIA Policy. However, TJ did execute a contract relating to his athletic scholarship with Illinois ("Scholarship Contract") that has generalities regarding Illinois policies without specifying any particular one, but which specifically does not allow Illinois to terminate TJ's scholarship unless he is convicted of a crime involving sexual misconduct, pleads guilty or no contest to such a crime, or is found responsible for the same by a "formal disciplinary action," none of which has occurred. (Complaint, ¶ 38.) The AD did not mention this as a track available to TJ. (Complaint, ¶ 50.)

**D.  More facts bearing on irreparable harm and the inadequacy of legal remedies**

33.     TJ's mother and father separated when he was two years old, and he has lived with his mom since that time prior to attending college. He now supports his mom and his four siblings through her (ages 7, 12, 14, and 21) and provides significant financial support to his other three siblings through his father (ages 12, 17, and 19). (Complaint, ¶¶ 51-52.)

34.     Although TJ believes that he might have one year of NCAA eligibility remaining, he intended to enter the NBA draft this June as he was projected to be an NBA lottery pick, and he was intending to get his Sociology degree from Illinois this May. (Complaint, ¶ 53.)

35.     TJ has been an Illini team captain for the past two seasons. This season, through his great play he upgraded himself from a projected second round pick to a lottery pick, making millions in the NBA, not to mention endorsement deals. Without question, TJ's draft stock will diminish to little to nothing unless he is immediately reinstated, as concluded by numerous experts including a sports agent. There are 17 games left in the Team's season, not including the Big 10 and NCAA tournaments. (Complaint, ¶ 54.) The Illini's next game is January 11, 2024, against Michigan State. (Complaint, ¶ 55.) TJ also runs the risk of losing his NIL deal with the Suspension. (*Id.*)

36.     TJ has no prior criminal history. He has no history of academic or athletic disciplinary issues. To the contrary, coaches, religious personnel, one of his teachers at Illinois, and his academic advisor at Illinois say that TJ is an "incredible [or "exceptional"] young man," who "plays by the rules," who "respects authority," who is a "rule follower," who is a "nice person with a good heart," who "genuinely cares about others," and who treats women "with the utmost respect." (Complaint, ¶¶ 56-57.)

37.     Douglas County has a dubious history. In 2019, it wrongfully convicted a male African-American KU student of rape (at the Jayhawk Café) and its District Attorney is currently the subject of disciplinary proceedings. (Complaint, ¶¶ 22-23.) There are numerous examples of athletes being wrongfully charged with a crime of sexual misconduct while later being cleared of such charges (some are well-known, some are not). (Complaint, ¶ 59.)

**E.  TJ's claims**

38.     All of TJ's counts seek injunctive relief, while some also seek declaratory relief. Count I asserts that Title IX should be applied to TJ's situation. Count II alternatively asserts that the terms of the Scholarship Contract should be applied. Count III alternatively asserts an implied contract based on the DIA Policy, and breach of the same for Illinois' failure to apply the presumption of innocence and other due process to TJ's situation, contrary to what Illinois had promised. Count IV alternatively asserts that the DIA Policy is null and void because it is unconscionable. Count V alternatively requests that the Court declares exactly which standards apply to TJ given Illinois' inconsistent and vague application of various standards. Count VI alternatively seeks injunctive relief against the individual defendant who is Illinois' President (Killeen) for deprivation of TJ's protected property interests without procedural due process. Count VII asserts that in any event, Illinois waived the right to apply the DIA or OSCR Policies to TJ's situation by waiting three months to do so.

### III.   LEGAL STANDARDS

#### A.  Injunctive Relief

##### 1.  Preservation of the status quo

39.    The purpose of temporary or preliminary injunctive relief is to preserve the status quo pending an adjudication of the case on the merits. *Consumer Sales & Mktg., Inc. v. Digital Equipment Corp.*, No. 95 C 5049, 1995 WL 548765, at *2 (N.D. Ill. Sept. 13, 1995) (a TRO is "an emergency remedy issued to maintain the status quo until a hearing can be held on an application for a preliminary injunction") (citing *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F. Supp. 725, 726 (N.D. Ill. 1989)); *Ellis v. Sheahan*, 412 F.3d 754, 757 (7th Cir. 2005) (noting that "preliminary relief generally . . . is intended to preserve the status quo"). By seeking to preserve the status quo, the movant seeks to preserve things as they were before the controversy began. *Kay v. Individual Defendants, P'ships, & Unincorporated Ass'ns*, No. 22-cv-3033—RJD, 2023 WL 4350645, at *2 (S.D. Ill. Apr. 14, 2023) (the "underlying purpose" of temporary restraining orders is to "preserv[e] the status quo and prevent[] irreparable harm" (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974))).[1]

##### 2.  TRO-specific standards

40.    The elements necessary to obtain a TRO "mirror those of a preliminary injunction"—discussed below—but "'the essence of a temporary restraining order is its brevity, its *ex parte* character, and its . . . informality.'" *Kay*, 2023 WL 4350645, at *2 (quoting *Geneva Assurance Syndicate, Inc. v. Med. Emergency Servs. Assocs S.C.*, 964 F.2d 599, 600 (7th Cir.

---

[1] In at least one opinion, the Seventh Circuit has raised questions over whether the "status quo ante bellum" formulation is helpful or whether it merely "fuzz[es] up the legal standard" because it can sometimes be hard to draw the line as to when the dispute began and what the status quo ante is. *See Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 943-44 (7th Cir. 2006). Here, there can be no question: the status quo, even in the months between the alleged incident in Lawrence and the filing of the Charges, was TJ's full participation as a member of the Team. In any event, preliminary injunctive relief is "properly sought" when it is "to avert irreparable harm ot the moving party," *id.* at 944, and TJ clearly will suffer irreparable harm if the Suspension continues and he is not reinstated to the Team.

1992)). A TRO "preserv[es] the status quo . . . just so long as is necessary to hold a hearing." *Id.* (quoting *Granny Goose*, 415 U.S. at 439).

41.     Although notice should not be an issue here since Defendants removed this case from state court immediately upon TJ filing his complaint and original state court TRO motion, this Court is authorized to issue a TRO even "without notice to the adverse party or its attorney" so long as it is supported by "specific facts in an affidavit or a verified complaint" to support the claims of "immediate and irreparable injury, loss, or damage" and the movant's attorney "certifies in writing any efforts made to give notice and the reasons why it should not be required." *Id.* (quoting Fed. R. Civ. P. 65(b)(1)).

### 3.  Preliminary injunction standards

42.     This Court is afforded "substantial deference" in determining whether to grant a preliminary injunction since it "involves the discretionary acts of weighing evidence [and] balancing equitable factors." *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1137 (7th Cir. 1994) (quoting *United States v. Baxter Healthcare Corp.*, 901 F.2d 1401, 1407 (7th Cir. 1990)).

43.     To obtain a preliminary injunction, a plaintiff need only "make a clear showing that [he] is entitled to the relief [he] seeks." *Int'l Profit Assocs., Inc. v. Paisola*, 461 F. Supp. 2d 672, 675 (N.D. Ill. 2006) (citing *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)).

44.     To obtain a preliminary injunction, the movant must demonstrate (1) *some* likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that it will suffer irreparable harm without injunctive relief. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002), *as amended* (Oct. 18, 2002). If these conditions are met, then the court (4) "weighs the harm of denying an injunction to the plaintiff against the harm to the defendant of

granting one," and (5) "also considers the public interest." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). The Court, "sitting as would a chancellor in equity, then 'weighs' all four factors" under a "sliding scale" approach." *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

### a. Likelihood of success on the merits

45.     A plaintiff seeking a TRO or preliminary injunction need only show that he "has *some likelihood* of success on the merits." *Gateway*, 35 F.3d at 1137 (emphasis added). The "precise showing necessary 'depends on the facts of the case at hand because of [the Seventh Circuit's] sliding scale approach,'" *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020); *Dunnet Bay Const. Co. v. Hannig,* No. 10-3051, 2010 WL 1326560, *4 (C.D. Ill. Mar. 26, 2010) ("Dunnet Bay has shown *some likelihood* of success on the merits.") (emphasis added).

### b. Inadequate legal remedy and irreparable harm

46.     A showing of irreparable harm is considered by some courts to be "the single most important prerequisite for the issuance of a preliminary injunction." *Craig v. Pepperidge Farm, Inc.*, No. 1:06-CV-954-SEB-JMS, 2008 WL 4280154, at *2 (S.D. Ind. Sept. 15, 2008) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine*, 8 F.4th at 545. "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Id.* (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). In situations where injunctive relief is necessary to preserve potential lost business opportunities, "'it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Id.* (quoting *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005)). The irreparable harm and inadequate legal remedy factors are analyzed together because "[h]arm is irreparable if legal remedies are

inadequate to cure it."  *Doe v. Mukwonago Area Sch. Dist.*, No. 23-C-0876, 2023 WL 4505245,

*7 (E.D. Wis. July 11, 2023).

47.     In another federal case where the State of Illinois and other states were just last

month granted a preliminary injunction against the NCAA on December 13, 2023, the court stated:

> Courts have ***repeatedly*** found that ***'[c]ollege students suffer irreparable harm when they
> are denied the opportunity to play sports***. *S.A. v. Sioux Falls School Dist. 49-5,*
> 2023 WL 6794207, at 9 (D. S.D. Oct. 13, 2023) (quoting *Portz v. St. Cloud State Univ.*,
> 401 F.Supp.3d 834,868 (D. Mm. 2019)2; see also *McCormick ex rel. McCormick v. Sch.
> Dist. 01 Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004); *Navarro v. Fla. Inst. of
> Tech., Inc.*, 2023 WL 2078264, at *16_17 (M.D. Fla. Feb. 17, 2023) (courts have
> consistently held that losing the opportunity to participate sports is irreparable harm);
> *Biedigerv. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have
> consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer
> irreparable harm by losing the opportunity to participate in their sport of choice on a
> continuous and uninterrupted basis."); *Brooks v. State Coil. Area Sch. Dist.,* 643
> F.Supp.3d 499, 510 (M.D. Pa. Dec. 1, 2022); *Mayerova v. E. Mich. Univ.*, 346 F.Supp.3d
> 983, 997 (E.D. Mich. 2018)….

*Ohio v. NCAA*, No. 1:23-CV-100, 2023 WL 9103711, at *9

48.     The *Ohio v. NCAA* decision (and the cases cited therein) reflect the well-recognized

principle that barring student athletes from competition creates an irreparable harm to the student

athlete for which there is no adequate legal remedy. *See also Ganden v. NCAA,* No. 96 C 6953,

1996 WL 680000, *6 (N.D. Ill., Nov. 21, 1996) (finding there to be irreparable harm and

inadequate legal remedies available to a college swimmer held out of competition, especially

because the careers of competitive swimmers are only ten years, "[t]hus, Ganden would lose an

entire year of competition and a significant proportion of his swimming career. In addition, the

evidence suggests that the loss of a year of competition is likely to inhibit his development as a

swimmer during a critical point in his career. It is difficult to imagine how a court could quantify

these losses in financial terms."); *Hutsonville Cmty. Unit Sch. Dist. No. 1 v. Illinois High Sch.*

---

[2] Affirmed in part, vacated in part, and reversed in part on other grounds in *Portz v. St. Cloud State Univ.*, 16 F.4th 577 (8th Cir. 2021).

*Ass'n*, 2021 IL App (5th) 210308, ¶¶ 8-9 (TRO granted to high school athlete; there was no adequate remedy at law because "failure to compete for a year was the type of injury that could not be corrected by monetary judgment").

### c. Sliding scale to balance harms and public interest

49.     Under the sliding scale approach, the greater the plaintiff's likelihood of success on the merits, the less the balance of harms needs to weigh in his favor in order to obtain the injunction. *Abbott Laboratories*, 971 F.2d at 12 & n.3. Conversely, if the balance of harms weighs more heavily in the plaintiff's favor, the requisite likelihood of success on the merits is lessened. *Id.*

### d. Discretionary factors

50.     The public interests for and against issuance of a TRO or preliminary injunction are also to be weighed but "are not dispositive," as courts "are concerned primarily that issuance of the injunction will not disserve (as opposed to serve) the public interests." *Gateway*, 35 F.3d at 1139 n.3.

### e. Security

51.     Under Rule 65, a TRO or preliminary injunction requires the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). This Court has discretion to "require a bond of a nominal amount in appropriate cases," and the bond requirement can even "be waived" where appropriate. *Gen'l Elec. Capital Corp. v. Alliance Transp. Grp. LLC*, No. 09 C 734, 2009 WL 10702069, at *4 (N.D. Ill. Feb. 13, 2009) (quoting *Coyne-Delany Co. v. Capital Dev. Bd.*, 717 F.2d 385, 391 (7th Cir. 1983)); *Navarro v. Florida Inst. of Technology, Inc.*, No. 6:22-cv-1950-CEM-EJK, 2023 WL 2078264, at *8 (M.D. Fla., Feb. 17, 2023) ("Plaintiffs 'seek excusal from the bond requirement since they are young student

athletes with limited resources.' Because this lawsuit is a form of public interest litigation, the Court will exercise discretion in this case and elect to require no security at all." (internal record citation omitted)) (citing *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ("[P]laintiffs were engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement.")).

### B.  Title IX

52.     As an institution that receives federal financial assistance from the U.S. Department of Education (the "Department"), Illinois must comply with Title IX. 20 U.S.C. §1681 et. seq. As explained by the Department in the preamble to Title IX's implementing regulations, one key purpose of the Title IX regulations is to "hold [institutions of higher education] accountable for responses to sexual harassment designed to protect complainants' equal educational access and provide due process protections to both parties before restricting a respondent's educational access." 85 Fed. Reg. 30026, 30044 (May 14, 2020). The Department further noted that absent Title IX's regulations ensuring due process, institutional policies addressed sexual harassment grievance procedures "unevenly" and "at times employing procedures incompatible with constitutionally guaranteed due process and principles of fundamental fairness, and lacking impartiality and reliability." 85 Fed. Reg. 30048. Further, Title IX, as a remedial statute, must be liberally construed in favor of applicability. *See e.g.,* Keeley B. Gogul, "The Title IX Pendulum: Taking Student Survivors Along for the Ride." 90 Univ. Cin. L. Rev. 1016 (March 2022).

53.     Had Illinois applied Title IX, it could not suspend TJ from the Team unless and until Illinois' Title IX coordinator "undertakes an individualized safety and risk analysis, [and] determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of sexual harassment justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the

removal" ("Title IX Risk Analysis").   34 CFR §106.44(c). *See* Jack Baer, *Texas Tech star Pop Isaacs reportedly accused of sexually assaulting a minor in the Bahamas*, Yahoo! Sports, Jan. 7, 2024-https://sports.yahoo.com/texas-tech-star-pop-isaacs-reportedly-accused-of-sexually-assaulting-a-minor-in-the-bahamas-010202075.html (noting that player participated in practice and a game while the allegations were being investigated by university's Title IX office) [Exhibit B].

54.    The alleged conduct took place in an "education program or activity" of Illinois' because Illinois exercised substantial control over both TJ and the alleged context in which the alleged incident occurred. *See,* 34 CFR §106.44(a) (education program or activity covered by Title IX includes "circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs."); *see also, Roe v. Gustine Unified School Dist.*, 678 F. Supp.2d 1008, 1025 (E.D. Ca. 2009) (Title IX applied to sexual harassment claim even though the alleged misconduct occurred outside school grounds at a football camp, because the camp was under the supervision of teachers and coaches including at the time of the alleged incidents, and the school transported the students, amongst other factors); *Pogorzelska v. VanderCook Coll. of Music*, No. 19-CV-05683, 2023 WL 3819025, at *15 (N.D. Ill. 2023) (there was sufficient evidence to conclude that the school exercised substantial control over the harasser and the alleged context of the harassment because "[a] school may be liable for peer-on-peer harassment in circumstances where the harasser is under the school's disciplinary authority," and the school's policy handbook recognized that its regulations and disciplinary procedures extend to off-campus residences of students).

55.    In *Lapka* v. *Chertoff,* 517 F.3d 974, 982–83 (7th Cir. 2008), the 7th Circuit held that plaintiff sufficiently alleged workplace harassment even though the alleged rape occurred

while the plaintiff and assailant were socializing after hours in a private hotel room, because the bar was part of the training facility where the plaintiff and assailant were required to attend work-related training sessions and thus were on "official duty" while at that facility, including the bar located in the facility, "so the event could be said to have grown out of the workplace environment" and the plaintiff and assailant were trainees expected to eat and drink at the facility and "return to dormitories and hotel rooms provided by" the employer such that "[e]mployees in these situations can be expected to band together for society and socialize as a matter of course" justifying the Court's conclusion that the plaintiff had alleged sexual harassment (rape) that arose in the context of a workplace environment and to which the employer had an obligation to respond. Although *Lapka* was a case under Title VII, the final regulations would similarly analyze whether sexual harassment occurred in the school's program or activity by inquiring whether the school exercised substantial control over the context of the harassment and the alleged harasser.

56.     Further, Illinois is required to comply with §106.44(a) and (c), outlining circumstances when an emergency suspension/removal of a student is appropriate, regardless of whether a formal complaint is filed. However, Title IX applies even where the complainant has not filed a formal Title IX complaint "and is not participating in or attempting to participate in the school's education program or activity."     *See,* Question 24 of Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021) (PDF) (ed.gov) (Complaint, ¶ 72).    "Put simply, there are circumstances when a Title IX Coordinator may need to sign a formal complaint that obligates the school to initiate an investigation regardless of the complainant's relationship with the school or interest in participating in the Title IX grievance process. This is because the school has a Title IX obligation to provide all students, not just the complainant, with an educational environment that does not discriminate based on sex."     *Id.*

57.     Also, "[t]he Department [of Education] may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment."    34 CFR §106.44(a).

**C. Procedural Due Process**

58.     A plaintiff must prove two elements in a section 1983 claim: (1) the defendant's actions deprived the plaintiff of a state or federal constitutional right, and (2) the defendant was acting under color of state law when engaging in the conduct complained of by the plaintiff." *Dempsey v. Johnson,* 2016 IL App (1st) 153377,¶ 48. The aim of section 1983 "is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." (citation omitted). *Id* at ¶ 14. Section 1983 does not create substantive rights, but instead creates a cause of action to remedy certain deprivations of rights elsewhere conferred."    *Id.* at ¶ 14.

59.     Procedural due process "protect[s] persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty or property." *Segers v. Industrial Com'n,* 191 Ill. 2d 421, 434 (2000). Procedural due process generally refers to notice and the opportunity to be heard. *Bartlow v. Shannon,* 399 Ill. App. 3d 560, 570 (5th Dist. 2010). Procedural due process rights include a right to present evidence and argument, a right to cross-examine witnesses, and impartiality in rulings upon the evidence which is offered. *Bartlow,* 399 Ill. App. 3d at 570; *see also, People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 184 (2002) ("Due process is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the

procedures which have traditionally been associated with the judicial process.") (internal citation omitted).

**D. Implied contracts**

60.     Illinois law recognizes implied contracts in some circumstances, but only if there is not an express contract between the parties. *Trapani Cons. Co., Inc. v. Elliot Grp., Inc.*, 2016 IL App (1st) 143734, ¶ 42; *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 295 (1st Dist. 1991). *See also, Liu v. Nw. Univ.,* 78 F. Supp. 3d 839, 846 (N.D. Ill. 2015) ("Northwestern does not dispute that an implied contract can arise out of its student handbook."); *Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012).

61.     Another instructive case is *Stiles v. Brown Univ.*, No. 1:21-cv-00497 (D. R.I. January 25, 2022) [Exhibit C]. There, a lacrosse player was accused of sexual assault, and his accuser filed a Title IX complaint with the university. *Id.* at 1. The university then conducted a threat assessment on the accused. *Id.* at 2. Although the threat assessment overall found factors indicating that the accused was not at risk to other students, the university nonetheless suspended the student from sports and school "due to the egregious nature of the alleged behavior."  *Id.* The court analyzed the lacrosse player's claim under a contract theory (not Title IX *per se*), and found that the student policy imposed terms on the university including the presumption of innocence, meaningful participation in the process, and the opportunity to submit a "relevant response."  *Id.* at 4. The District Court granted the player a preliminary injunction, enjoining the university from continuing the suspension. *Id.* at 7. First, as to the likelihood of success on the merits factor,  the court found that the university failed to afford the player the presumption of innocence. *Id.* at 5. "Instead, it focused on the nature of the unproven allegations and removed him from campus and suspended him before performing any investigation of those allegations."  *Id.*

62.     Second, the stigma of the suspension irreparably harmed the player and his academic record. *Id.* at 6. Third, as to the balancing of the equities and the public interest, the university faced "little hardship in allowing the plaintiff to proceed with his academic and athletic activities while the disciplinary process plays out. The ramifications of the suspension to the plaintiff, however, are substantial." *Id.*

### E.  Waiver

63.     "Waiver is either an express or implied voluntary and intentional relinquishment of a known and existing right."    *Whalen v. Kmart Corp.*, 166 Ill. App. 3d 339, 343 (1st Dist. 1998). "An analysis of whether there was in fact a waiver of contractual provisions focuses on the intent of the non-breaching party."    *Id.* If he has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement."    *Id.* "The question of waiver is a question of fact when the material facts are in dispute or when 'reasonable minds' differ from the inferences drawn from undisputed evidence."    *Wagner Excello Foods, Inc. v. Fearn Intern., Inc.,* 235 Ill. App. 3d 224, 233 (1st Dist. 1992).

### F.  Unconscionability of contract

64.     "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it * * *." *Kinkel v. Cingular Wireless LLC,* 223 Ill. 2d 1, 22 (2006) (internal citations omitted). "This analysis also takes into account the disparity of bargaining power between the drafter of the contract and the party claiming unconscionability."    *Id.* "Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations

and rights imposed by the bargain, and significant cost-price disparity." *Id.* at 28 (internal citation omitted). *See, also, Am. Food Mgmt., Inc. v. Henson,* 105 Ill. App. 3d 141, 146 (5th Dist. 1982) (applying unconscionability outside of the consumer or UCC contexts, and finding non-compete in employment contract procedurally unconscionable and rejecting trial court's conclusion that contract was not adhesive where "[employer's] conduct in failing, whether intentionally or unintentionally, to give reasonable notice that agreement to a covenant not to compete would be a condition of employment before defendant Henson had relocated and begun working for plaintiff amounted to overreaching by a contracting party in an unfairly superior bargaining position.").

**G. *Khan v. Yale University***

65. In *Khan v. Yale Univ.*, 347 Conn. 1, 38-39 (2023), a **7-0** panel of the Connecticut Supreme Court found as follows as to Yale University's disciplinary proceedings regarding sexual misconduct (proceedings very similar to Illinois'):

> After reviewing the record before us, we conclude that the UWC proceeding did not incorporate sufficient procedural safeguards to be considered quasi-judicial. Specifically, the UWC proceeding failed **(1) to require complainants to testify under oath or to subject them to explicit and meaningful penalties for untruthful statements,** (2) **to provide Khan, or his counsel, the meaningful opportunity to cross-examine adverse witnesses in real time,** (3) to provide parties a reasonable opportunity to call witnesses to testify, **(4) to afford Khan the opportunity to have the active assistance of counsel during the UWC hearing,** and **(5) to provide Khan any record or transcript of the proceeding that would assist him in obtaining adequate review of the UWC decision or to expose the legitimacy or fairness of the proceeding to public scrutiny.** Although we do not maintain that all of these procedural features are required for our recognition of a quasi-judicial proceeding, **we conclude that the collective absence of such features militates against a determination that the proceeding had adequate safeguards to ensure reliability and promote fundamental fairness**. (emphasis added)

The Connecticut Supreme Court in *Khan* was answering certified questions on Connecticut law directed to it by the United States Court of Appeals for the Second Circuit as to the accused's federal lawsuit involving the (in his words) "kangaroo court" to which he was subjected, very

- 23 -

similar to Illinois' OSCR Action.  *Khan v. Yale Univ.*, 85 F.4th 86 (2d Cir. 2023. The Second Circuit left all but one of the accused's claims intact (the one being dismissed based on statute of limitations grounds) in this ruling dated October 25, 2023)).

## IV.     ARGUMENT: TJ HAS MADE A PRIMA FACIE CASE OF THE TRO AND PRELIMINARY INJUNCTION FACTORS

66.     Respectfully, TJ believes that the above-stated facts and law more than sufficiently make his argument. Therefore, TJ will only summarize in this section. At the outset, this situation cries out for preservation of the status quo prior to the Suspension. TJ suffers irreversible harm with each game missed.

### A.  TJ has demonstrated some likelihood of success on the merits

67.     TJ has sufficiently demonstrated he "has some likelihood of success on the merits," *Gateway*, 35 F.3d at 1137, particularly under the sliding scale test and in light of the significant irreparable harm he will suffer absent injunctive relief. *See Life Spine*, 8 F.4th at 540 (citation omitted), the "precise showing necessary 'depends on the facts of the case at hand because of [the Seventh Circuit's] sliding scale approach,'" *id.* (quoting *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020)). TJ need only show a likelihood of success on *one* of his seven claims. *See supra* para. 42.

68.     As to Count I of his Complaint, TJ has some likelihood of success as to his Title IX claim, especially considering that Title IX, as a remedial statute, is to be liberally construed in favor of applicability. Alternatively, there is at least some likelihood that the DIA Policy is found to be substantively unconscionable because the terms of the DIA Policy are so obviously oppressive to TJ and one-sided for Illinois. There is at least some likelihood that TJ can show on the merits that the alleged incident took place during an "education program or activity" of Illinois given the fact that an Illinois employee, in the scope of his employment at Illinois and in furtherance of Illinois' interests, transported and oversaw TJ during that time. TJ understands that

Illinois strenuously disputes that these facts require the application of Title IX, but that factual dispute is one that must be fully resolved on the merits, not at this time.

69.     The impact of the application of Title IX to TJ is painfully apparent. As set forth in Exhibit B, one of the players on Texas Tech University's men's basketball team allegedly sexually assaulted a seventeen year old after a post-game party in the Bahamas. The Texas Tech player, however, continues to play because his university is reviewing the issue under Title IX.   TJ, however, is suspended because Illinois refuses to apply Title IX.

70.     Title IX is to be liberally construed, and there is a genuine factual dispute as to its application. There are likely more facts that will come out regarding this issue through discovery that will allow this issue to be decided on the merits.

71.     As to Count II of his Complaint, pleaded in the alternative, TJ has some likelihood of success that the specific standards of the Scholarship Contract apply to TJ's situation, which only allow action against TJ, as to sexual misconduct crimes, if he is convicted, pleads guilty, pleads no contest, or is found guilty of the same through institutional disciplinary proceedings. The Scholarship Contract is the only executed contract with Illinois of which TJ is aware or recalls, and specifically applies to allegations of sexual misconduct.

72.     As to Count III of the Complaint, also pleaded in the alternative, to the extent the Court finds TJ to be bound by the DIA Policy, that could only be through an implied contract because TJ does not recall signing a document that specifically subjected him to this policy. (TJ has asked Illinois for such a document, and none has been provided. Illinois only provided the Scholarship Contract when TJ requested all signed contracts.)   As admitted by Illinois' AD, two terms of this implied contract are that TJ is to be presumed innocent and is to be afforded "appropriate" due process. There is more than some likelihood of success in TJ's claims that

Illinois has breached these terms in suspending TJ, obviously not presuming his innocence, or providing any semblance of due process.

73.     The *Stiles v. Brown Univ.* case is similar to TJ's case in the sense that the student-athletes in both cases allege(d) contract claims, and the universities in both cases ignored the presumption of innocence purportedly due to the nature of the charges, along with ignoring other contractual terms (like due process, which Illinois' AD promised would be part of the DIA Process). Overall, both universities' reactions led to a flawed process.

74.     Similarly, as to Count IV of the Complaint, also pleaded in the alternative, there also is some likelihood of success that the DIA Policy is procedurally and substantively unconscionable. Procedurally, the patchwork of "parallel" and "intersecting" "standards" that Illinois has applied, and is applying, to TJ are "so difficult to find, read, or understand" that TJ "cannot fairly be said to have been aware he was agreeing to it…."   *Kinkel*, 223 Ill. 2d at 22.

75.     Illinois was sufficiently "in the know" back in September to support TJ's position that there is some likelihood that he will succeed on his waiver claim, which is undoubtedly a question of fact in this case.

76.     As to Count V, again pleaded alternatively, TJ has some likelihood of success in proving that there is an actual and justiciable controversy in need of the Court's resolution, as to exactly which standards apply to TJ given Illinois' inconsistent and vague application of various "rules." Illinois obviously acknowledges that the DIA Policy and OSCR Policy apply to TJ, despite their wildly inconsistent standards, with one providing some safeguards and the other (through which TJ was suspended), none.

77.     That discrepancy alone provides the need for court intervention. And, this is regardless of Title IX, but the Court should consider applying Title IX standards to TJ's situation

(which would require that he "fail" a risk analysis before being suspended). Title IX standards provide due process if followed correctly.

78.     Further, there is the Scholarship Contract, which sets forth yet more standards that are more favorable to TJ and inconsistent with the others. This is the very contract through which TJ enrolled at Illinois and joined the Team, the only contract TJ signed with Illinois to his recollection, governs and does not allow for the Suspension.

79.     Overall, as to Count V, one would need a Venn Diagram to explain Illinois' various overlapping standards and to fully expose their internal inconsistencies.

80.     As to Count VI, which alternatively seeks injunctive relief against the individual defendant who is Illinois' President for deprivation of TJ's protected property interests without procedural due process, TJ has some likelihood of success in showing that he has been deprived of constitutionally protected property and other interests, under the color of state law (as Illinois is a state school) without procedural due process. The DIA Action is the focus of this count and does not provide TJ with "adequate safeguards to ensure reliability and promote fundamental fairness." *Khan,* 347 Conn. at 39. But the OSCR Action will not fare much better, if it is permitted to proceed. *Id.* It is not a stretch to say that the DIA Action, as applied to TJ, is like a Politburo action, and an OSCR Action is a "kangaroo court" especially when brought against a student-athlete whose case is very high profile, while he is defending criminal charges. Thus, it is highly unlikely that anybody on UIUC's campus can be genuinely objective. At a minimum, this situation, taken in its entirety, cries out for the introduction of truly independent neutrals.

81.     Finally, as to Count VII, which TJ asserts in any event, TJ has some likelihood of success in proving that Illinois waived the right to apply the DIA or OSCR Policies to TJ's situation by waiting three months to do so. Illinois is likely to assert that it was the fact of the Charges that

moved the needle from no DIA action to DIA Action. However, Illinois knew that TJ was the target of the investigation since late September 2023, and a review of the DIA Policy and OSCR Policy shows that Illinois likely could have acted under either back then. This same situation ripened into the Charges, but Illinois seemed to learn facts before TJ, such as the identity of the complainant (which TJ learned from Illinois). Illinois was enough "in the know" back in September that there is some likelihood that TJ will succeed on his claim of waiver, which is undoubtedly a question of fact in this case.

**B. TJ has inadequate legal remedies that will be irreparably harmed without injunctive relief**

82.    These factors (inadequate legal remedies and irreparable harm) are often taken together. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) Similarly, there cannot be any legitimate dispute that money damages are not clear, complete, practical, and efficient in this case. The *State of Ohio* case [Exhibit A], the multiple cases cited in that case, and other cases such as *Ganden v. NCAA,* 1996 WL 680000, leave no doubt: the suspension of a student-athlete constitutes irreparable harm that cannot be adequately compensated by damages. This is not even a close call in this case. With the Suspension, TJ will be forced to continue to sit out the rest of the Team's season, which is at least 17 games, plus in all likelihood a good number of post-season games given the Team's Top 10 ranking: NCAA College Basketball Rankings: AP Top 25 Basketball Poll | AP News.

83.    Also, the games that TJ is threatened with missing without injunctive relief include many against other nationally-ranked or prominent teams that will be on national television. Those who follow college basketball do not need to be told about the focus and intensity on games in January, February, and March, down the home stretch to the Big 10 Tournament and the "Big Dance," the NCAA tournament. Unfortunately, the possibility of career-ending injuries always

looms for basketball players, and therefore the rest of this season could theoretically be a large percentage of TJ's remaining career.   Another federal court may have said it best in the *State of Ohio* case, supporting the State of Illinois and other states' irreparable harm argument on behalf of student-athletes:

> The success of a team in regular season dictates their entrance to their respective Conference Tournament and NCAA Tournament. Every game is crucial for a student-athlete and their team. Take, for example, March Madness. One good tournament run can cement a student-athlete or team's legacy in college sports. The absence of student-athletes from teams on gamedays could negatively impact a team's ranking and selection to tournaments. Moreover, it may have life-altering impacts on the student-athlete's ability to pursue NIL deals and a professional career in their sport as well as impacts on their mental health. The substantial and very current harm to winter sport Division I student-athletes is irreparable and cannot be easily remedied. However, immediate temporary injunctive relief is necessary to allow these winter sport Division I student-athletes to compete on gamedays going forward in the season.

*State of Ohio v. NCAA* [Exhibit A] at 24-25.

84.     Additionally, one cannot put a price tag on reputation. Regardless, nobody can adequately value the tanking of an entire NBA career with attendant endorsements, possible post-playing careers in sportscasting, and other opportunities.

85.     Thus, TJ has ascertainable rights in playing college sports, business interests (a lucrative professional career), reputational interests (the Suspension certainly gives the appearance of guilt), and an interest in fully preserving his presumption of innocence. As to that last interest, the Suspension further burdens TJ with an appearance of guilt, with his institution taking drastic action against him without his day in criminal court. Although it is possible that evidence of the Suspension will be excluded *in limine* prior to trial, that far from guarantees the prevention of the tainting of potential jurors (as this is a high-profile case), judges, and the prosecution team. Instead, the Court should let TJ's fate be decided in criminal court, not the court of public opinion.

86.     The status quo before the Suspension was that TJ was playing for the Team and was not subject to the DIA Action and/or the OSCR Action. TJ has already missed three games, and therefore immediate relief is necessary (the Team's next game is January 11).

87.     Without the requested relief, TJ will not be able to play this season, dramatically dropping his NBA draft stock to perhaps nothing, all the while eliminating his potential earning of tens of millions of dollars and supporting his family members. Further, TJ's reputation will be irreversibly diminished, giving the public the perception that his university has already found him to be tainted in some way as to the Charges. Obviously, TJ's right to continue in athletic competition will be eliminated without such relief. Additionally, a continuance of the Suspension will not only eradicate the presumption of innocence, it will flip that presumption to one of guilt for TJ, negatively impacting his criminal defense.

88.     It is painfully obvious that TJ will be irreparably harmed and has inadequate legal remedies without temporary and preliminary injunctive relief. Accordingly, under a "sliding scale" analysis, the threshold that TJ must meet to show the other factors is even lower. Therefore, TJ has shown at least some likelihood of success on the merits of at least one or more of his seven claims. He also has demonstrated that he has inadequate legal remedies and irreparable harm.

**C.  The balancing of harms favors granting a TRO and preliminary injunction**

89.     A balancing of the harms favors TJ. The harm to TJ if the Suspension is not enjoined is obvious. His NBA career will tank, as will his reputation, the ability to support his family, his ability to play collegiate athletics (and perhaps professional sports), and his presumption of innocence. Illinois cannot prove that TJ is a threat to the Illinois community – the evidence is clearly to the contrary. Illinois has allowed TJ to stay on campus, and rightfully so as he has no criminal history, has numerous character affiants, and has been on campus since the alleged incident without any issue. In other words, allowing TJ to play for the Team does not

materially harm Illinois beyond allowing TJ to remain a student on campus as it has done throughout this ordeal. Further, any alleged harm to Illinois would be mitigated by the fact that a court of equity would be directing Illinois what to do. Finally, if Title IX applied there is no question that TJ would be allowed to play for the Team, and even if only the OSCR Policy were applied TJ would still be playing for the Team at this time, until that process concluded.

**D. The public interest is not harmed by injunctive relief**

90.     The public has an interest in preserving the presumption of innocence, and there is no evidence that TJ poses any threat to the Illinois community or anyone else for that matter.

**E. TJ should not be required to post a bond if this Motion is granted**

91.     Under the circumstances, TJ should not be required to post a bond, which is at the Court's discretion. TJ has been on UIUC's campus since the alleged incident in September. Allowing TJ to play for the Team will not materially harm Illinois, as set forth above. Also, TJ is supporting numerous family members, and he cannot afford a large bond. Illinois will not suffer damages if TJ is reinstated—he participated in Team games and activities for months following the alleged incident to Illinois' great benefit.

## V.     CONCLUSION

92.     Attached to this Motion as Exhibit D is TJ's proposed order for a TRO and Exhibit E is an alternative order for a preliminary injunction, which fully set forth the relief requested herein, including a TRO, preliminary injunction, and expedited discovery.

WHEREFORE, Plaintiff, Terrence Shannon Jr., respectfully requests that the Court enter a temporary restraining order and/or a preliminary injunction as outlined in Plaintiff's proposed order(s) and also order expedited discovery. Plaintiff seeks other relief deemed just by this Court.

**Respectfully submitted,**
**Terrence Shannon Jr., Plaintiff**

By:___/s/ Robert H. Lang_____
Robert H. Lang (ARDC #6225414)
Zoe S. Spector (ARDC #6333392)
Thompson Coburn LLP
55 East Monroe Street, 37th Fl.
Chicago, IL 60603
rhlang@thompsoncoburn.com
(312) 346-7500
Fax: (312) 580-2201
*Lead counsel*

Mark C. Goldenberg (ARDC #0990221)
Thomas C. Horscroft (ARDC #6327049)
Goldenberg Heller & Antognoli, P.C.
2227 South State Route 157
Edwardsville, IL 62025
mark@ghalaw.com
(618) 656-5150
Fax: (618) 656-6230

J. Steven Beckett (ARDC #0151580)
Steve Beckett Law Office LLC
508 S. Broadway Avenue
Urbana, IL 61801
steve@stevebeckettllc.com
(217) 328-0263
Fax: (217) 328-0290

## **VERIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements as set forth in the above **PLAINTIFF'S VERIFIED MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR EXPEDITED DISCOVERY** are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true to the best of his knowledge, recollection, and belief.

_____

**Terrence Shannon Jr.**

- 2 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record in this action.

<u>/s/ *Robert H. Lang*</u>