# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Clarksburg**

STATE OF OHIO,
STATE OF COLORADO,
STATE OF ILLINOIS,
STATE OF NEW YORK,
STATE OF NORTH CAROLINA,
STATE OF TENNESSEE, and
STATE OF WEST VIRGINIA,

                Plaintiffs,

      v.                              **CIVIL ACTION NO. 1:23-CV-100**
                                             Judge Bailey

**NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,**

                Defendant.

## ORDER

Pending before this Court is Plaintiff States[1] Motion for a Temporary Restraining

Order and Preliminary Injunction [Doc. 2], filed December 7, 2023. This Court held a

hearing on the Motion for a Temporary Restraining Order on December 13, 2023.

## I.    Background

As stated in the National Collegiate Athletic Association's Preamble:

The National Collegiate Athletic Association is a voluntary, self-governing

organization of four-year colleges, universities and conferences committed

---

[1] Plaintiff States consist of the States of Ohio, Colorado, Illinois, New York, North Carolina, Tennessee, and West Virginia.

to the well-being and development of student-athletes, to sound academic

standards and the academic success of student-athletes, and to diversity,

equity and inclusion. Member institutions and conferences believe that

intercollegiate athletics programs provide student-athletes with the

opportunity to participate in sports and compete as a vital, co-curricular part

of their educational experience. The member schools and conferences

likewise are committed to integrity and sportsmanship in their athletics

programs and to institutional control of and responsibility for those programs.

The basic purpose of the Association is to support and promote healthy and

safe intercollegiate athletics, including national championships, as an integral

part of the education program and the student-athlete as an integral part of

the student body.

[Doc. 2-2 at 14]. The Northern District of California provided a history of the NCAA in ***In***

***re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litigation***,:

The NCAA, then known as the Intercollegiate Athletic Association

(IAA), was founded in 1905 to regulate college football. Today, the NCAA

and its members collectively issue rules that govern many aspects of athletic

competitions among NCAA member schools. Joint Stipulation of Facts (Stip.

Facts) ¶ 1, Docket No. 1098.

The NCAA comprises three Divisions. Id. ¶ 2. Of the NCAA's eleven

hundred schools, approximately three hundred and fifty schools compete in

Division I. Id. ¶ 5. Division I itself is divided, for the purposes of football

competition, into two subdivisions, one of which is the FBS. Id. ¶ 6. There are

thirty-two conferences in Division I. Id. ¶ 7. Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. Id.

The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors. Id. ¶¶ 11, 12. The rules that Plaintiffs challenge here govern a small subset of the conduct that the NCAA regulates.

The NCAA generates approximately one billion dollars in revenues each year. See Defs.' Ex. 0532 (D0532); Pls.' Ex. 0030 (P0030). Its revenues have increased consistently over the years. See P0030. Most of the NCAA's revenues are derived from the Division I men's basketball post-season tournament known as March Madness, and the media and marketing rights relating to it. Trial Transcript (Tr.) (McNeely) at 2134; D0532 at 0006. The total value of the current multi-year media contracts for March Madness, which extend to 2032, is $ 19.6 billion. See P0045 at 0001-02. Each year, the NCAA distributes about half of its revenues to the conferences. Joint Ex. 0021 (J0021); P0030.

Division I conferences negotiate their own contracts and generate their own revenues from regular-season basketball and regular-and post-season FBS football. See, e.g., Dr. Daniel Rascher Direct Testimony Declaration ¶¶ 169-172, Docket No. 865-3. The FBS conferences have a multi-year media contract with ESPN for the College Football Playoff, the total value of which is $ 5.64 billion. See P0045 at 0006-07. The five

3

conferences with the largest revenues, known as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them. See P0031; P0032; P0033; P0036; see also P0037 (showing that SEC made more than $ 409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $ 650 million that year). The revenues of the Power Five have increased over time and are projected to continue to increase. See P0031; P0032; P0033; P0036; P0037. Conferences distribute most of their revenues to their member schools.

375 F.Supp.3d 1058, 1062–1063 (N.D. Cal. 2019).

In the Motion, Plaintiff States move this Court for a Temporary Restraining Order and Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65 enjoining the National Collegiate Athletic Association (hereinafter "NCAA") from enforcing NCAA Bylaw 14.5.5.1 ("Transfer Eligibility Rule"). In support, Plaintiff States assert "Division I college athletes subject to the Transfer Eligibility Rule will suffer immediate and irreparable harm by continuing to be barred from competing this season in their respective collegiate sports and by facing transfer decisions burdened by the risks of ineligibility that the Rule imposes on second-time transferring college athletes." [Doc. 2 at 1]. Moreover, Plaintiff States assert that "for temporary and preliminary injunctive relief against the Transfer Eligibility Rule to be effective, the Court must also enjoin [the NCAA] from enforcing Bylaw 12.11.4.2 . . . [which] allows [the NCAA] to punish its member institutions when a college athlete who is ineligible for competition participates in games under a court order allowing

the college athlete's participation if the court order is later vacated, reversed, or otherwise invalidated." [Id.].

## II.    Legal Standard

Before issuing a temporary restraining order, this Court must consider (1) the movant's likelihood of success on the merits, (2) the likelihood of irreparable harm absent injunctive relief, (3) the balance of hardships, and (4) the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Federal Rule of Civil Procedure 65 provides

Every order granting an injunction and every restraining order must:

(A) state the reasons why it issued;

(B) state its term specifically; and

(C) describe in reasonable detail--and not by referring to the complaint or

other document--the act or acts restrained or required.

## III.   Analysis

At the heart of this case is NCAA Bylaw 14.5.5.1, commonly known as the "Transfer Eligibility Rule," which provides:

14.5.5.1 General Rule. A transfer student from a four-year institution shall

not be eligible for intercollegiate competition until the student has fulfilled an

academic year of residence (see Bylaw 14.02.10) at the certifying institution

unless the student qualifies for one of the transfer exceptions set forth in

Bylaws 14.5.5.1.1, 14.5.5.1.2 or 14.5.5.1.3. A transfer student (other than

one under disciplinary suspension per Bylaw 14.5.1.2) may qualify for an

5

exception to the academic year of residence requirement provided they do

not have an unfulfilled residence requirement at the institution from which

they are transferring. (See Bylaw 14.1.11, for student-athletes participating

in a recognized foreign exchange/study abroad program).

[Doc. 2-2 at 178].

Balancing the four factors in issuing an injunction, Plaintiff States can meet the

requirements for a temporary restraining order against the NCAA's enforcement of the

Transfer Eligibility Rule and the Rule of Restitution.

### A. Plaintiff States have a likelihood of success on the merits of the Sherman Act Section 1 claim.

While a plaintiff is required to make a clear showing that he is likely to succeed on

the merits in order to obtain injunctive relief, a plaintiff is not required to establish with

certainty that he will succeed on the merits. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir.

2013); *Roe v. U.S.*, 947 U.S. 207, 219 (4th Cir. 2020). Indeed "[a] district court's

determination that such a showing [of likelihood of success on the merits] has been made

is best understood as a prediction of a probable, but necessarily uncertain, outcome…."

*Stinnie v. Holcomb*, 37 F.4th 977, 982 (4th Cir. 2022) (quoting *Smyth ex rel. Smyth v.*

*Rivero*, 282 F.3d 268, 276 (4th Cir. 2002)); *Stinnie v. Holcomb*, 77 F.4th 200, 208 (4th

Cir. 2023). Moreover, in showing a likelihood of success on the merits, a plaintiff is not

required to demonstrate a likelihood of success on all claims. *Power Balance LLC*

*v. Power Force LLC, No. SACV*, 2010 WL 5174957, at *5 (C.D. Cal. Dec. 14, 2010); *see*

*Hudson v. AFGE*, 292 F.Supp.3d 145, 153 (D. D.C. Nov. 9, 2017) (Boasberg, J.) ("the

Court begins with [movant's] likelihood of success on the merits of at least one claim"

[emphasis added]); *see also Miller v. Garland*, 2023 WL 3692841, at *34 (E.D. Va. May 26, 2023) (Alston, Jr., J.); see also *Winter*, 555 U.S. at 19 n.4 (Circuit Court's discussion limited to a single claim of Plaintiff's multi-claim complaint).

The above-styled action is an antitrust lawsuit challenging the NCAA's Transfer Eligibility Rule. Specifically, Plaintiff States allege that the NCAA's rules violate § 1 of the Sherman Act,[2] which prohibits "contract[s], combination[s], or conspirac[ies] in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court of the United States

has "long recognized that in view of the common law and the law in this country when the Sherman Act was passed, the 'restraint of trade' is best read to mean 'undue restraint.'" *Ohio v. American Express Co.*, 138 S.Ct. 2274, 2283 (2018) (brackets and some internal quotation marks omitted). Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for what we have described as a "rule of reason analysis." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Standard Oil Co. of N. J. v. United States*, 221 U.S. 1, 60–62 (1911). That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition." *American Express*, 138 S.Ct. at 2284 (internal quotation marks omitted). Always, "[t]he goal is to distinguish between restraints with anticompetitive effect that are harmful to the

---

[2] The Supreme Court of the United States "has already recognized that the NCAA itself *is* subject to the Sherman Act." *National Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141, 2159 (2021).

consumer and restraints stimulating competition that are in the consumer's best interest." *Ibid*. (brackets and internal quotation marks omitted). *National Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141, 2151 (2021).

When analyzing a claim under Section 1 of the Sherman Act to determine whether a restraint violates the rule of reason, courts use a "three-step, burden shifting framework." *American Express*, 138 S.Ct. at 2284. Under this framework,

> the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. . . . If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. . . . If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

*Id*. "[T]he amount of work needed to conduct a fair assessment of these questions can vary. . . . [T]his Court has suggested that sometimes we can determine the competitive effects of a challenged restraint in the "'twinkling of an eye.'" *Alston*, 141 S.Ct. at 2155 (citing *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 465 U.S. 85, 110, n.39 (1984) (quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37–38 (Federal Judicial Center, June 1981))).

"At one end of the spectrum, some restraints may be so obviously incapable of harming competition that they require little scrutiny. . . . At the other end, some agreements among competitors so obviously threaten to reduce output and raise prices that they might

be condemned as unlawful *per se* or rejected after only a quick look." *Alston*, 141 S.Ct. at 2155–56.

As the *Alston* Court explained, the NCAA admits that it participates in "horizontal price fixing in a market where the defendants exercise monopoly control." *Id*. at 2154. Moreover, it was noted by the Supreme Court that, at least in that case, "[n]o one dispute[d] that the NCAA's restrictions in fact decrease the compensation that student-athletes receive compared to what a competitive market would yield. No one question[ed] either that decreases in compensation also depress participation by student-athletes in the relevant labor market—so that price and quantity are both suppressed." *Id*.

Here, these bylaws are essentially horizontal agreements among competitors that compete in the same sport-specific markets within NCAA Division I theatrics. Once an institution lures an athlete to transfer to their school (often with the promise of NIL money), the institution does not want anyone else to take the student-athlete as a transfer. The sole difference between this case and *Alston* is that *Alston* involved compensation provided to athletes while Plaintiff here challenges an even more direct restraint on trade: the NCAA's transfer rules which prohibit a student from playing immediately following their second transfer. Finally, the NCAA's stated preference of allowing transfers near a student's home but not far is essentially a geographic market-allocation that is also a antitrust violation. Plaintiff States have, therefore, a likelihood of success showing that the NCAA has committed a violation of the Sherman Antitrust Act.

### i. The United States is the "relevant market."

"Under the Sherman Act, a plaintiff making monopoly and attempted monopoly claims must allege a relevant geographic market to help the court determine whether the defendant has monopoly power." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 439 (4th Cir. 2011)

The Supreme Court of the United States in *Alston* explained that "[t]he NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition. . . . Unlike customers who would look elsewhere when a small van company raises its prices above market levels, the district court found (and the NCAA does not here contest) that student-athletes have nowhere else to sell their labor." 141 S.Ct. at 2156.

Within NCAA Division 1 athletics, the Transfer Eligibility Rule affects two (2) broad categories of labor markets: (1) athletic services in men's and women's Division 1 basketball and football bowl subdivision ("FBS"), wherein each college athlete participates in his or her sport-specific market, and (2) athletic services in all other men's and women's Division I sports, wherein each athlete participates in his or her sport-specific market.

The NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate rules and regulations for participation in Division I athletics. Thus, these labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets.

ii.     **The Transfer Eligibility Rule harms college athletes in the relevant markets.**

The Transfer Eligibility Rule hamstrings student-athletes by limiting the choices they have within the relevant market to find a Division I institution that provides the best environment for their academic, mental, and economic well-being. These same restrictions are not placed on students who do not participate in college athletics, are not placed on coaches who leave one NCAA member institution for another, nor placed on incoming freshman student-athletes who will have a more significant adjustment period coming from high school. The Transfer Eligibility Rule harms student-athletes in three (3) main areas of the relevant markets: (1) when student-athletes are making the decision on whether to transfer, (2) when college athletes decide to transfer and are searching for a new institution to attend; and (3) when college athletes are denied eligibility to compete for one year after transferring to a new institution.[3]

First, the Transfer Eligibility Rule harms student-athletes by penalizing transfer student-athletes with an entire academic year of ineligibility. With the potential of a year of ineligibility looming over transfer decisions, student-athletes may hesitate to transfer even when a different institution may offer a situation that is better for the student-athlete. Student-athletes cannot apply for a waiver of the Transfer Eligibility Rule until enrolled at a new member institution. For example: take Noah Fenske. Noah Fenske started his collegiate career at the University of Iowa on a football scholarship. Noah Fenske left Iowa

---

[3] These considerations are magnified given that student-athletes have five (5) calendar years to complete their four (4) seasons of eligibility in any one sport pursuant to NCAA Bylaw Rule 12.8.1.

due to mental health concerns and transferred to the University of Colorado ("Colorado"). While at Colorado, he dealt with mental health issues and sought counseling. The environment at Colorado was difficult and the school transitioned through more than one coaching staff while he was on the team. The new coach at Colorado made it clear that current players were not going to be welcomed back after spring practices, which left Noah Fenske with no choice but to look to transfer again in order to keep his scholarship. Noah Fenske, under the assumption he would immediately be eligible, transferred to Southern Illinois University ("SIU"). After arriving to SIU, Noah Fenske was made aware that a waiver would have to be filed with the NCAA for immediate eligibility. Noah Fenske had many coaches tell him he was good enough to enter the draft after the season, but because Noah Fenske did not get to compete, no one had the opportunity to assess his talent. In total, he missed 11 regular season and two FCS Playoff games during the Fall 2023 season. The Transfer Eligibility ruled harmed Noah Fenske's ability to play football, earn NIL[4] money, his mental health, and the possibility to play professional football.

Second, the Transfer Eligibility Rule restricts the options of affected college athletes by limiting their choices of new institutions after making the decision to transfer. Student-athletes who are not excepted from the Transfer Eligibility Rule face a competitive disadvantage in the relevant markets. The NCAA member institutions compete all year long for the best college athletes for their athletic teams. The Transfer Eligibility Rule has institutions facing the risk that a transferring student-athlete may not be eligible to play for an entire academic year. Institutions may be less likely to offer a scholarship position to

---

[4] NIL means a player's name, image and likeness, which allows student-athletes to make money from their personal brand.

student-athletes who are subject to the Transfer Eligibility Rule and who may not be eligible for an entire academic year. For example: RaeQuan Battle. RaeQuan Battle started his basketball career at the University of Washington. Thereafter, he transferred to Montana State University ("MSU"). RaeQuan Battle lost his coach at MSU, a situation over which he had no control, which prompted his decision to transfer to West Virginia University ("WVU"). WVU took a chance on RaeQuan Battle, who faced a disadvantage by being restricted by the Transfer Eligibility Rule. WVU applied for him to receive a waiver for immediate eligibility, as he and WVU believed that his circumstances fit within the NCAA's criteria for waiver requests. The NCAA denied his appeal for immediate eligibility. By RaeQuan Battle not being able to participate in competitive games, it significantly impacts his ability to pursue NIL compensation and his chances to pursue a career in professional basketball.

Third, the Transfer Eligibility Rule prevents student-athletes from realizing the benefits of competing in NCAA Division I athletics for an entire academic year after transferring. This does not prevent the student-athlete from practicing and participating in other team activities. Practicing with one's teammates and competing on gameday, in front of the cameras and live crowds, are not the same thing. The NCAA has often noted the importance of its student-athletes' opportunities to compete at the highest level:

> Student-athletes have the opportunity to travel across the country and around the world for regular-season contests, NCAA championships and foreign tours. These experiences can open doors for the few who will

compete professionally and for the majority who will go pro in something
other than sports.

The Value of College Sports, NCAA,
https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx (accessed Dec. 11,
2023).

It takes one throw, one catch, one shot, one block to make a student-athlete a
household name across the nation. Student-athletes are harmed by the Transfer Eligibility
Rule and are not able to show the world the fruits of their labor in instances where they are
forced to sit out a year of eligibility. In turn, this inhibits their ability to take advantage of
NIL deals and positions, and limits potential earning based on professional league drafts.

Not only does the Transfer Eligibility Rule harm the student-athletes economically,
but the Transfer Eligibility Rule impacts the student-athletes' overall mental well-being. All
three (3) student athletes, RaeQuan Battle, Jarrett Hensley, and Noah Fenske, have
alleged the Transfer Eligibility Rule has negatively affected their mental health.
*See* [Doc. 1 at ¶ 49, 56, 65; Doc. 2-3 at ¶ 14; Doc. 2-4 at ¶ 9; Doc. 2-5 at ¶ 11].

In the NCAA Division I 2023–24 Manual, the NCAA highlights their "Commitment
to Student-Athlete Well Being." In Bylaw 20.10.1.6, the NCAA states:

> Intercollegiate athletics programs shall be conducted in a manner designed
> to enhance the well-being of student-athletes who choose to participate and
> to prevent undue commercial or other influences that may interfere with their
> scholastic, athletics or related interests. The time required of student-athletes
> for participation in intercollegiate athletics shall be regulated to minimize

14

interference with their academic pursuits. It is the responsibility of each member institution to establish and maintain an environment in which student-athletes' activities, in all sports, are conducted to encourage academic success and individual development and as an integral part of the educational experience. Each member institution should also provide an environment that fosters fairness, sportsmanship, safety, honesty and positive relationships between student-athletes and representatives of the institution.

[Doc. 2-2 at 396]. The declarations by RaeQuan Battle, Jarrett Hensley, and Noah Fenske help show the harm the Transfer Eligibility Rule has caused these student-athletes.

### iii. The Transfer Eligibility Rule harms consumers of college athletics.

The Transfer Eligibility Rule causes negative downstream effects on consumers of college athletics. The value of the product that the NCAA provides to consumers is diminished when student-athletes are prevented from competing because of the Transfer Eligibility Rule. As stated above, teams fight all year long for the best of the best student-athletes to join their rosters. Teams may be less competitive without skilled transfer players which in turn harms consumers who lose the opportunity to see their college institutions compete to win on gameday.

This Court agrees that the Transfer Eligibility Rule "is a barrier to increased parity in college athletics that would create a better product for consumers. The Transfer Eligibility Rule discourages transfer, which may benefit larger and historically successful sports programs by allowing them to retain talented players on their depth charts who may

15

otherwise wish to transfer and actually play elsewhere.  A more level playing field of talent among Division I institutions creates a more compelling product for consumers of college athletics.  The Transfer Eligibility Rule harms consumers by making teams less competitive by ruling that student-athletes are subject to the Transfer Eligibility Rule and must sit out a full academic year.

> **iv.  The uncompelling "procompetitive justifications" for the Transfer Eligibility Rule are pretextual, and less restrictive alternatives could be implemented to accomplish the NCAA's purported "academic" goals.**

The NCAA has asserted several arguments in an attempt to justify the continued implementation of its draconian, heavy-handed, "my way or the highway" Transfer Eligibility Rule.  First, the NCAA contends that the Transfer Eligibility Rule promotes the academic well-being of college athletes.  In guidance to student-athletes on the transfer process, the NCAA has stated that "[r]equiring student-athletes to sit out of competition for a year after transferring encourages them to make decisions motivated by academics as well as athletics.  Most student-athletes who are not eligible to compete immediately benefit from a year to adjust to their new school and focus on their classes."  NCAA Eligibility Center, *2018–19 Guide for Two-Year Transfers*, available at https://flc.losrios.edu/flc/main/doc/support-services/Counseling/NCAA_TransferGuide.pdf. (last accessed Dec. 11, 2023).

Next, the NCAA contends that restrictions like the Transfer Eligibility Rule preserve the amateurism model of the NCAA.  *See Alston*, 141 S.Ct. at 2152.  In the past, the NCAA has asserted that these restrictions help it "widen[ ] consumer choice by providing a unique product–amateur college sports as distinct from professional sports."  *Id*.

However, this Court is unpersuaded by the NCAA's arguments related to its purported attempt to preserve "amateurism." As noted by the district court in *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, the NCAA has not even defined the nature of "amateurism," nor is it meaningfully defined within the organization's own constitution. 375 F.Supp.3d at 1071. Like the California district court, this Court cannot ascertain "any coherent definition" of this term, and apparently, it is not alone in this exercise. *Id*. at 1070–74 (noting the testimony of a former SEC commissioner stating that he has "never been clear on . . . what is really meant by amateurism") (internal quotation omitted).

The NCAA argues that the Transfer Eligibility Rule serves to promote the stability of a team's roster. However, nothing in the NCAA Bylaws prevents coaches from leaving or being fired mid-season. And, notably, the NCAA does not prevent first-time transfers in the NCAA. There is no meaningful distinction between a first-time transfer and second-time transfer in terms of a team's stability. Each time, the transfer student-athlete is joining a brand new roster. In sum, this Court finds the NCAA's stability argument to be without merit given that there are currently no restrictions on first-time transfers or coaches leaving.

These arguments are justifications in name only because they are pretextual and, even if valid, which they are not, could be accomplished through less restrictive alternatives as proposed by Plaintiff States.

While the NCAA maintains the Transfer Eligibility Rule is intended to help student-athletes progress towards a college degree, the Rule, in practicality, does very little

to help facilitate this goal. The Transfer Eligibility Rule only prevents college athletes from competing with their team in NCAA athletic events; it does not prohibit participation in practices or other team activities, nor does it prescribe a certain number of hours that college athletes must spend on their studies during the academic year of residence when they are ineligible for competition. Sitting out an entire year of practices, workouts, and other team events is not an option for student-athletes who want to maintain their standing as an NCAA Division I competitor in NCAA's gigantic, hyper-competitive sports business. Thus, in reality, student-athletes subject to the Transfer Eligibility Rule devote the same amount of their time, if not more, to athletics as their teammates save for a few hours of actual competition on gameday. *See* [Doc. 2-4 at ¶ 11; Doc. 2-5 at ¶ 9]. And the NCAA's argument that the point of the rule is based in academic performance is totally belied by the fact that no bylaw prevents freshman student-athletes, or first-year transfer student-athletes, from competing despite the challenges experienced by high school athletes and first-year student-athlete transfers in college academics and athletics.

Additionally, the Transfer Eligibility Rule does not aid the NCAA in maintaining consumer interest by promoting its "unique product" of amateur sports as distinct from professional sports. As a matter of law, supposed benefits in the market for consuming college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student-athlete labor. This balancing approach "treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing)." ***Deslandes v. McDonald's United States, LLC***, 81 F.4th 699, 703 (7th Cir. 2023). As identified by movants, this approach "is equivalent to saying that antitrust law is unconcerned with

competition in the markets for inputs, and *Alston* establishes otherwise." *Id*. Accordingly, this Court believes that consumers' supposed desire for college athletes to be shackled to their respective teams cannot balance against the harm caused to those students, who are situated no differently than any other worker in an employment context but for the NCAA declaring so by corporate fiat.

Even if this cross-market balancing was legally cognizable, which it is not, the Transfer Eligibility Rule has nothing to do with student-athletes maintaining amateur status. NCAA Bylaw 12.1.2 requires that Division I student-athletes maintain amateur status to be eligible for NCAA competition. Notably, nothing in the Transfer Eligibility Rule affects the amateur status of student-athletes under the NCAA's own definitions. Preventing student-athletes from competing in NCAA athletic events solely because they made a decision in their own best interest and transferred schools has no relationship with the amateur status of those athletes–instead, such athletes are merely transferring from one school as an amateur athlete to another school as an amateur athlete. The NCAA's arguments to the contrary are pretextual and do not justify such anticompetitive restrictions.

In addition, both the academic and amateurism goals of the NCAA, to the extent they can be discerned, are accomplished through less restrictive alternatives already in place within NCAA bylaws. For example, the bylaws already require student-athletes to maintain progress toward degrees to be eligible to compete in NCAA events. NCAA Bylaw 14.4.1 requires student-athletes to "maintain progress toward a baccalaureate or equivalent degree at that institution" to be eligible for intercollegiate competition at their college or university. NCAA Bylaw 20.2.4.13 requires member institutions to publish their

19

progress-toward-degree requirements for student-athletes, thereby making these requirements available to student-athletes at each institution. Other NCAA bylaws require minimum credit hour and grade point averages for student-athletes to be eligible for competition. And NCAA bylaw 14.5.5.3 prevents student-athletes from transferring mid-season and competing in the same sport they competed in at the previous institution within the same season.

These bylaws related to academic progress, GPA, and in-season transfers accomplish the NCAA's academic and amateurism goals without the unjustified restrictions imposed by the Transfer Eligibility Rule.

Within the relevant markets, the Transfer Eligibility Rule harms student-athletes by discouraging them from freely seeking the most beneficial institution for their well-being, limiting their options after the decision to transfer is made, and denying them the benefits of NCAA competition for an entire academic year. Moreover, the Transfer Eligibility Rule harms consumers by decreasing the competitiveness of teams whose transfer players are ineligible under the Rule and by stifling increased parity in college athletics. These negative and uncompetitive effects of the Transfer Eligibility Rule are apparent to this Court in the "twinkling of an eye." Simply put, a rule of reason analysis of the Transfer Eligibility Rule reveals that it is the exact kind of unreasonable restraint of trade within labor markets that the relevant antitrust laws prohibit. Accordingly, Plaintiff States have a strong likelihood of success on the merits of their Sherman Act claim.

**B.** **Plaintiff States,[5] through harm to student-athletes in their respective states, are suffering and will continue to suffer irreparable harm without injunctive relief.**

Courts have repeatedly found that "[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports." *S.A. v. Sioux Falls School Dist. 49-5*, 2023 WL 6794207, at *9 (D. S.D. Oct. 13, 2023) (quoting *Portz v. St. Cloud State Univ.*, 401 F.Supp.3d 834, 868 (D. Min. 2019); *see also McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004); *Navarro v. Fla. Inst. of Tech., Inc.*, 2023 WL 2078264, at *16–17 (M.D. Fla. Feb. 17, 2023) (courts have consistently held that losing the opportunity to participate sports is irreparable harm); *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); *Brooks v. State Coll. Area Sch. Dist.*, 643 F.Supp.3d 499, 510 (M.D. Pa. Dec. 1, 2022); *Mayerova v. E. Mich. Univ.*, 346 F.Supp.3d 983, 997 (E.D. Mich. 2018); *but see Doe v. Portland Pub. Sch.*, 2023 WL 7301072, at *16

---

[5] Plaintiff States are granted authority to bring actions for injunctive relief under federal antitrust law pursuant to 15 U.S.C. § 26, which provides:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue. . . .

(D. Me. Nov. 3, 2023); ***Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.***, 798 A.2d 830, 837 (Commonwealth Court of Pa. May 21, 2002).

Recognizing that student-athletes encounter circumstances that may make a transfer in a student-athlete's best interest, the NCAA in recent years expanded the exception to the Transfer Eligibility Rule to allow student-athletes seeking a first-time transfer to switch schools without penalty and to guarantee financial aid through graduation to transferring college athletes.  The NCAA has stated:

> "Like their peers in the general student population, college athletes choose
> to transfer for any number of reasons. . . ."  "We believe the changes
> enacted today enable member schools to adapt to students' needs, while
> also positioning students for long-term academic success. These changes
> to NCAA rules recognize further study is needed on graduation rates before
> we consider authorizing multiple transfer opportunities with immediate
> eligibility. We will continue to review potential modifications to transfer rules
> as the landscape evolves over time."

Meghan Durham, Division I Board Adopts Changes to Transfer Rules, NCAA (Aug. 31, 2022, 4:45 PM), https://www.ncaa.org/news/2022/8/31/media-center-division-i-board-adopts-changes-to-transfer-rules.aspx.

As NCAA notes, "further study is needed" to consider "authorizing multiple transfer opportunities with immediate eligibility."  NCAA does not have compelling evidence or data to justify differential treatment between first-time and multiple-time transfers.  Instead, it

appears to this Court that NCAA thinks it best to restrain the student-athletes now, and conduct further studies later to determine if the restraint was necessary. Without evidence to suggest that multiple-time transfers fare any better or worse academically than first-time transfers, NCAA should treat all student-athletes equally.

NCAA Division 1 student-athletes spend around 33 hours for Athletics, 35.5 hours for Academics, 14.5 hours for Socializing, and 85 hours on "Other" activities, including sleep, jobs, and other extracurriculars. NCAA, Time Management (Aug. 2023), available at: http://fs.ncaa.org/Docs/eligibility_center/Student_Resources/Time_Management_DI_DII_DIII.pdf; *see also* [Doc. 2-3 at ¶ 21 "Notably, I am still part of the team and still spend many hours a week practicing and engaging in other athletic activities, though I am not allowed to play in competitive games."; Doc. 2-4 at ¶ 11 "Although I am not able to compete, I continue to put in over 25 hours per week toward basketball activity, with my team and on my own. I am hopeful to get to play, so I spend a lot of time in the gym, alone, trying to make myself better."; Doc. 2-5 at ¶ 9 "I spent 20 hours preparing with my team each week, but I also spent voluntary hours preparing to play because I hope the NCAA would approve my waiver."].

The countable athletically related activities ("CARA") time limits under NCAA rules include supplemental workouts, competition, film review, practice, and strength and conditioning. Id. Competition, or gameday, is only a part of the time a student-athlete spends on athletics and is the only portion that the Transfer Eligibility Rule sees fit to interfere with. The refusal to allow multiple-time transfer student-athletes from competing

cannot be justified, seeing as the multiple-time transfer student-athlete does all training, film review, practice, etc. with the team besides the gameday.

> **i.** **Student-Athletes in Winter Sports who are ineligible under the Transfer Eligibility Rule are facing current, immediate and irreparable damage through the denial of the opportunity to compete in NCAA athletic events.**

For winter sports, the Transfer Eligibility Rule has forced student-athletes to miss games which cannot be replayed. For example: WVU is playing thirty-one (31) regular season games this season. RaeQuan Battle has been unable to play in six (6) games so far. If he continues to sit out through December, he will miss an additional seven (7) games. The missed opportunities for these student-athletes in winter sports continues to mount. Missing regular season games constitutes a significant impact on the student-athletes' opportunities to develop as players in gametime conditions, develop in-game experience with their teammates, showcase their abilities to potential employers, and help their teams advance to their respective Conference Tournament and NCAA Tournament.

The success of a team in regular season dictates their entrance to their respective Conference Tournament and NCAA Tournament. Every game is crucial for a student-athlete and their team. Take, for example, March Madness. One good tournament run can cement a student-athlete or team's legacy in college sports. The absence of student-athletes from teams on gamedays could negatively impact a team's ranking and selection to tournaments. Moreover, it may have life-altering impacts on the student-athlete's ability to pursue NIL deals and a professional career in their sport as well as impacts on their mental health. The substantial and very current harm to winter sport Division I student-athletes is irreparable and cannot be easily remedied. However,

immediate temporary injunctive relief is necessary to allow these winter sport Division I student-athletes to compete on gamedays going forward in the season.

> **ii.** **Student-athletes in spring and fall sports, all of whom are currently in their transfer window, are immediately and irreparably harmed by the Transfer Eligibility's Rule effect on transfer decisions and restriction of options of schools to which to transfer.**

All fall and spring sports are in an active transfer window. NCAA, NCAA Division I Transfer Windows (Oct. 2023), available at: http://fs.ncaa.org/Docs/eligibility_center/Transfer/DIUG_Windows.pdf. With the transfer window being open, student-athletes are facing the potential of a year of ineligibility should a student-athlete decide to transfer. This potential may cause student-athletes to forgo opportunities to transfer that may be in their personal best interest. Even more dire, this potential may prevent student-athletes from transferring due to situations totally outside of their control. Without the restraint placed on student-athletes by the Transfer Eligibility Rule, student-athletes would be able to make the decision on whether to transfer solely based on what is in the student-athlete's best interest and free from the burden of weighing the risk of a year of ineligibility under the Rule.

Moreover, student-athletes would have more options of schools to which to transfer by not being under the restraint of the Transfer Eligibility Rule. As noted above, the risk that a student-athlete may not be immediately eligible upon transferring could make a Division I institution less likely to offer that athlete a scholarship position. Without the potential of being ineligible for a full academic year, this would put all student-athletes, regardless of the number of transfers, on equal footing.

C.     **The balance of the equities tip in Plaintiff States' favor.**

The balance of the equities supports Plaintiff States' Motion and favors issuance of a temporary restraining order and preliminary injunction enjoining the enforcement of the Transfer Eligibility Rule and the Rule of Restitution.   Student-athletes ineligible for competition under the Transfer Eligibility Rule face immediate and irreparable harm for every athletic contest they are forced to sit out, whether it be economic harm or well-being harm.

Student-athletes considering a transfer or already searching for a new institution are disadvantaged by the potential of a year of ineligibility under the Transfer Eligibility Rule. The equities favor allowing these student-athletes to realize the present and future economic potential of their participation in college athletics and allowing student-athletes in the transfer process to use the market to respond to changing circumstances and seek the most beneficial situation for their own well-being unencumbered by the ineligibility under the Transfer Eligibility Rule.

This Court does not see substantial harm to the NCAA that would result from this Court granting a temporary injunction.  A prohibition on enforcing the Transfer Eligibility Rule causes no harm to the NCAA or any other entity or individual.  Such relief would merely prevent the enforcement of one of the NCAA's many bylaws, allowing student-athletes to compete in athletic events already scheduled to take place.

The impact of injunctive relief would greatly benefit the student-athletes waiting to play their winter sport in the process of transferring or thinking about transferring.  The NCAA's own Preamble states it is "committed to the well-being and development of

student-athletes. . . ."  This Court sees no reason why allowing student-athletes who are already practicing with their respective teams to go to war on gamedays would harm the NCAA.

### D.    Injunctive relief serves the public interest of promoting free and fair competition in labor markets.

Temporary injunctive relief preventing the NCAA from enforcing the Transfer Eligibility Rule would serve the public interest in promoting free and fair competition in labor markets guaranteed by antitrust laws.  Free and fair competition in labor markets is essential to the American economy.  Protecting competition in the labor market for NCAA Division I student-athletes serves the public's interest in free and fair competition in labor markets.

### E.    For this Court's injunctive relief to be effective, NCAA must be enjoined from enforcing NCAA Bylaw 12.11.4.2.

NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," provides:

12.11.4.2 Restitution.  If a student-athlete who is ineligible under the terms

of the bylaws or other legislation of the Association is permitted to participate

in intercollegiate competition contrary to such NCAA legislation but in

accordance with the terms of a court restraining order or injunction operative

against the institution attended by such student-athlete or against the

Association, or both, and said injunction is voluntarily vacated, stayed, or

reversed or it is finally determined by the courts that injunctive relief is not or

was not justified, the Board of Directors may take any one or more of the

following actions against such institution in the interest of restitution and fairness to competing institutions:

(a)     Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(b)     Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(c)     Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;

(d)     Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(e)     Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f)     Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g)     Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h)     Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i)     Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

[Doc. 2-2 at 79–80]. The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. It is in fact a measure designed to inhibit a person's access to the courts.

Knowing this, many Division I institutions will not permit the student-athlete to compete, even if a court issues a temporary restraining order or a preliminary injunction finding that those rules are likely illegal. This, in turn, deters student-athletes from challenging the NCAA's substantive eligibility rules, such as the Transfer Eligibility Rule.

29

It appears to this Court that the Rule of Restitution's purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor. The Rule of Restitution forces student-athletes to run the risk of severe personal punishment and the risk of subjecting their institutions or teammates to the harsh sanctions of the Rule of Restitution simply by following the terms of a court order. For instance, suppose this Court issues an injunction that allows a student-athlete, like RaeQuan Battle, to play for the remainder of the 2023–2024 basketball season. Suppose, hypothetically, WVU goes on to win the Big 12 Championship and National Championship. If this Court does not enjoin NCAA Bylaw 12.11.4.2, NCAA could require that WVU be stripped of the Big 12 and National Championship Titles, all over WVU following a court order instructing WVU that RaeQuan Battle is good to play on gamedays. Thus, this Court will enjoin NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions.

## IV.    Conclusion

The Motion [**Doc. 2**] is **GRANTED IN PART**. This Court hereby issues a temporary restraining order for **fourteen (14) days** and hereby **ORDERS** the NCAA is **ENJOINED** from enforcing the Transfer Eligibility Rule, NCAA Bylaw 14.5.5.1, insofar as it requires a transferor to sit out for an academic year of residence, and the Rule of Restitution, NCAA Bylaw 12.11.4.2 until a hearing on the Preliminary Injunction is heard on **<u>Wednesday, December 27, 2023, at 10:00 a.m.</u>**

Security will not be required prior to issuing a temporary restraining order because the NCAA will not suffer financial burden in compliance with such injunctive relief.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: December 13, 2023.

JOHN PRESTON BAILEY
**UNITED STATES DISTRICT JUDGE**

2023 WL 9103711

Only the Westlaw citation is currently available.

United States District Court, N.D. West Virginia.

STATE OF OHIO, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF TENNESSEE, and STATE OF WEST VIRGINIA, Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

CIVIL ACTION NO. 1:23-CV-100

|

Filed 12/13/2023

## ORDER

JOHN PRESTON BAILEY UNITED STATES DISTRICT JUDGE

**\*1** Pending before this Court is Plaintiff States [1] Motion for a Temporary Restraining Order and Preliminary Injunction [Doc. 2], filed December 7, 2023. This Court held a hearing on the Motion for a Temporary Restraining Order on December 13, 2023.

---

[1]    Plaintiff States consist of the States of Ohio, Colorado, Illinois, New York, North Carolina, Tennessee, and West Virginia.

### I. Background

As stated in the National Collegiate Athletic Association's Preamble:

> The National Collegiate Athletic Association is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion. Member institutions and conferences believe that intercollegiate athletics programs provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience. The member schools and conferences likewise are committed to integrity and sportsmanship in their athletics programs and to institutional control of and responsibility for those programs. The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body.

[Doc. 2-2 at 14]. The Northern District of California provided a history of the NCAA in *In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litigation,*:

> The NCAA, then known as the Intercollegiate Athletic Association (IAA), was founded in 1905 to regulate college football. Today, the NCAA and its members collectively issue rules that govern many aspects of athletic competitions among NCAA member schools. Joint Stipulation of Facts (Stip. Facts) ¶ 1, Docket No. 1098.

> The NCAA comprises three Divisions. Id. ¶ 2. Of the NCAA's eleven hundred schools, approximately three hundred and fifty schools compete in Division I. Id. ¶ 5. Division I itself is divided, for the purposes of football competition, into two

subdivisions, one of which is the FBS. Id. ¶ 6. There are thirty-two conferences in Division I. Id. ¶ 7. Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. Id.

The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors. Id. ¶¶ 11, 12. The rules that Plaintiffs challenge here govern a small subset of the conduct that the NCAA regulates.

The NCAA generates approximately one billion dollars in revenues each year. See Defs.' Ex. 0532 (D0532); Pls.' Ex. 0030 (P0030). Its revenues have increased consistently over the years. See P0030. Most of the NCAA's revenues are derived from the Division I men's basketball post-season tournament known as March Madness, and the media and marketing rights relating to it. Trial Transcript (Tr.) (McNeely) at 2134; D0532 at 0006. The total value of the current multi-year media contracts for March Madness, which extend to 2032, is $ 19.6 billion. See P0045 at 0001-02. Each year, the NCAA distributes about half of its revenues to the conferences. Joint Ex. 0021 (J0021); P0030.

  **\*2** Division I conferences negotiate their own contracts and generate their own revenues from regular-season basketball and regular-and post-season FBS football. See, e.g., Dr. Daniel Rascher Direct Testimony Declaration ¶¶ 169-172, Docket No. 865-3. The FBS conferences have a multi-year media contract with ESPN for the College Football Playoff, the total value of which is $ 5.64 billion. See P0045 at 0006-07. The five conferences with the largest revenues, known as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them. See P0031; P0032; P0033; P0036; see also P0037 (showing that SEC made more than $ 409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $ 650 million that year). The revenues of the Power Five have increased over time and are projected to continue to increase. See P0031; P0032; P0033; P0036; P0037. Conferences distribute most of their revenues to their member schools.

375 F.Supp.3d 1058, 1062–1063 (N.D. Cal. 2019).

In the Motion, Plaintiff States move this Court for a Temporary Restraining Order and Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65 enjoining the National Collegiate Athletic Association (hereinafter "NCAA") from enforcing NCAA Bylaw 14.5.5.1 ("Transfer Eligibility Rule"). In support, Plaintiff States assert "Division I college athletes subject to the Transfer Eligibility Rule will suffer immediate and irreparable harm by continuing to be barred from competing this season in their respective collegiate sports and by facing transfer decisions burdened by the risks of ineligibility that the Rule imposes on second-time transferring college athletes." [Doc. 2 at 1]. Moreover, Plaintiff States assert that "for temporary and preliminary injunctive relief against the Transfer Eligibility Rule to be effective, the Court must also enjoin [the NCAA] from enforcing Bylaw 12.11.4.2 ... [which] allows [the NCAA] to punish its member institutions when a college athlete who is ineligible for competition participates in games under a court order allowing the college athlete's participation if the court order is later vacated, reversed, or otherwise invalidated." [Id.].

## II. Legal Standard

Before issuing a temporary restraining order, this Court must consider (1) the movant's likelihood of success on the merits, (2) the likelihood of irreparable harm absent injunctive relief, (3) the balance of hardships, and (4) the public interest. ***Winter v. Nat. Res. Def. Council, Inc.***, 555 U.S. 7, 20 (2008).

Federal Rule of Civil Procedure 65 provides

Every order granting an injunction and every restraining order must:

  (A) state the reasons why it issued;

  (B) state its term specifically; and

(C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required.

## III. Analysis

At the heart of this case is NCAA Bylaw 14.5.5.1, commonly known as the "Transfer Eligibility Rule," which provides:

> 14.5.5. 1 General Rule. A transfer student from a four-year institution shall not be eligible for intercollegiate competition until the student has fulfilled an academic year of residence (see Bylaw 14.02.10) at the certifying institution unless the student qualifies for one of the transfer exceptions set forth in Bylaws 14.5.5.1.1, 14.5.5.1.2 or 14.5.5.1.3. A transfer student (other than one under disciplinary suspension per Bylaw 14.5.1.2) may qualify for an exception to the academic year of residence requirement provided they do not have an unfulfilled residence requirement at the institution from which they are transferring. (See Bylaw 14.1.11, for student-athletes participating in a recognized foreign exchange/study abroad program).

[Doc. 2-2 at 178].

Balancing the four factors in issuing an injunction, Plaintiff States can meet the requirements for a temporary restraining order against the NCAA's enforcement of the Transfer Eligibility Rule and the Rule of Restitution.

### A. Plaintiff States have a likelihood of success on the merits of the Sherman Act Section 1 claim.

**\*3**  While a plaintiff is required to make a clear showing that he is likely to succeed on the merits in order to obtain injunctive relief, a plaintiff is not required to establish with certainty that he will succeed on the merits. ***Pashby v. Delia***, 709 F.3d 307, 321 (4th Cir. 2013); ***Roe v. U.S.***, 947 U.S. 207, 219 (4th Cir. 2020). Indeed "[a] district court's determination that such a showing [of likelihood of success on the merits] has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome...." ***Stinnie v. Holcomb***, 37 F.4th 977, 982 (4th Cir. 2022) (quoting ***Smyth ex rel. Smyth v. Rivero***, 282 F.3d 268, 276 (4th Cir. 2002)); ***Stinnie v. Holcomb***, 77 F.4th 200, 208 (4th Cir. 2023). Moreover, in showing a likelihood of success on the merits, a plaintiff is not required to demonstrate a likelihood of success on all claims. ***Power Balance LLC v. Power Force LLC, No. SACV***, 2010 WL 5174957, at \*5 (C.D. Cal. Dec. 14, 2010); see ***Hudson v. AFGE***, 292 F.Supp.3d 145, 153 (D. D.C. Nov. 9, 2017) (Boasberg, J.) ("the Court begins with [movant's] likelihood of success on the merits of at least one claim" [emphasis added]); *see also **Miller v. Garland***, 2023 WL 3692841, at \*34 (E.D. Va. May 26, 2023) (Alston, Jr., J.); see also ***Winter***, 555 U.S. at 19 n.4 (Circuit Court's discussion limited to a single claim of Plaintiff's multi-claim complaint).

The above-styled action is an antitrust lawsuit challenging the NCAA's Transfer Eligibility Rule. Specifically, Plaintiff States allege that the NCAA's rules violate § 1 of the Sherman Act, [2] which prohibits "contract[s], combination[s], or conspirac[ies] in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court of the United States

> has "long recognized that in view of the common law and the law in this country when the Sherman Act was passed, the 'restraint of trade' is best read to mean 'undue restraint.' " ***Ohio v. American Express Co.***, 138 S.Ct. 2274, 2283 (2018) (brackets and some internal quotation marks omitted). Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for what we have described as a "rule of reason analysis." ***Texaco Inc. v. Dagher***, 547 U.S. 1, 5 (2006); ***Standard Oil Co. of N. J. v. United States***, 221 U.S. 1, 60–62 (1911). That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition." ***American Express***, 138 S.Ct. at 2284 (internal quotation marks omitted). Always, "[t]he goal is

to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Ibid.* (brackets and internal quotation marks omitted).

*National Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141, 2151 (2021).

2      The Supreme Court of the United States "has already recognized that the NCAA itself *is* subject to the Sherman Act." *National Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141, 2159 (2021).

When analyzing a claim under Section 1 of the Sherman Act to determine whether a restraint violates the rule of reason, courts use a "three-step, burden shifting framework." *American Express*, 138 S.Ct. at 2284. Under this framework,

> the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. ... If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. ... If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

*Id.* "[T]he amount of work needed to conduct a fair assessment of these questions can vary.... [T]his Court has suggested that sometimes we can determine the competitive effects of a challenged restraint in the ' "twinkling of an eye.' " *Alston*, 141 S.Ct. at 2155 (citing *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 465 U.S. 85, 110, n.39 (1984) (quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37–38 (Federal Judicial Center, June 1981))).

 **\*4**   "At one end of the spectrum, some restraints may be so obviously incapable of harming competition that they require little scrutiny....At the other end, some agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful *per se* or rejected after only a quick look." *Alston*, 141 S.Ct. at 2155–56.

As the *Alston* Court explained, the NCAA admits that it participates in "horizontal price fixing in a market where the defendants exercise monopoly control." *Id.* at 2154. Moreover, it was noted by the Supreme Court that, at least in that case, "[n]o one dispute[d] that the NCAA's restrictions in fact decrease the compensation that student-athletes receive compared to what a competitive market would yield. No one question[ed] either that decreases in compensation also depress participation by student-athletes in the relevant labor market—so that price and quantity are both suppressed." *Id.*

Here, these bylaws are essentially horizontal agreements among competitors that compete in the same sport-specific markets within NCAA Division I theatrics. Once an institution lures an athlete to transfer to their school (often with the promise of NIL money), the institution does not want anyone else to take the student-athlete as a transfer. The sole difference between this case and *Alston* is that *Alston* involved compensation provided to athletes while Plaintiff here challenges an even more direct restraint on trade: the NCAA's transfer rules which prohibit a student from playing immediately following their second transfer. Finally, the NCAA's stated preference of allowing transfers near a student's home but not far is essentially a geographic market-allocation that is also a antitrust violation. Plaintiff States have, therefore, a likelihood of success showing that the NCAA has committed a violation of the Sherman Antitrust Act.

### i. The United States is the "relevant market."

"Under the Sherman Act, a plaintiff making monopoly and attempted monopoly claims must allege a relevant geographic market to help the court determine whether the defendant has monopoly power." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 439 (4th Cir. 2011)

The Supreme Court of the United States in *Alston* explained that "[t]he NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition.... Unlike customers who would look elsewhere when a small van company raises its prices above market levels, the district court found (and the NCAA does not here contest) that student-athletes have nowhere else to sell their labor." 141 S.Ct. at 2156.

Within NCAA Division 1 athletics, the Transfer Eligibility Rule affects two (2) broad categories of labor markets: (1) athletic services in men's and women's Division 1 basketball and football bowl subdivision ("FBS"), wherein each college athlete participates in his or her sport-specific market, and (2) athletic services in all other men's and women's Division I sports, wherein each athlete participates in his or her sport-specific market.

The NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate rules and regulations for participation in Division I athletics. Thus, these labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets.

### ii. The Transfer Eligibility Rule harms college athletes in the relevant markets.

**\*5**  The Transfer Eligibility Rule hamstrings student-athletes by limiting the choices they have within the relevant market to find a Division I institution that provides the best environment for their academic, mental, and economic well-being. These same restrictions are not placed on students who do not participate in college athletics, are not placed on coaches who leave one NCAA member institution for another, nor placed on incoming freshman student-athletes who will have a more significant adjustment period coming from high school. The Transfer Eligibility Rule harms student-athletes in three (3) main areas of the relevant markets: (1) when student-athletes are making the decision on whether to transfer, (2) when college athletes decide to transfer and are searching for a new institution to attend; and (3) when college athletes are denied eligibility to compete for one year after transferring to a new institution. [3]

---

[3]   These considerations are magnified given that student-athletes have five (5) calendar years to complete their four (4) seasons of eligibility in any one sport pursuant to NCAA Bylaw Rule 12.8.1.

First, the Transfer Eligibility Rule harms student-athletes by penalizing transfer student-athletes with an entire academic year of ineligibility. With the potential of a year of ineligibility looming over transfer decisions, student-athletes may hesitate to transfer even when a different institution may offer a situation that is better for the student-athlete. Student-athletes cannot apply for a waiver of the Transfer Eligibility Rule until enrolled at a new member institution. For example: take Noah Fenske. Noah Fenske started his collegiate career at the University of Iowa on a football scholarship. Noah Fenske left Iowa due to mental health concerns and transferred to the University of Colorado ("Colorado"). While at Colorado, he dealt with mental health issues and sought counseling. The environment at Colorado was difficult and the school transitioned through more than one coaching staff while he was on the team. The new coach at Colorado made it clear that current players were not going to be welcomed back after spring practices, which left Noah Fenske with no choice but to look to transfer again in order to keep his scholarship. Noah Fenske, under the assumption he would immediately be eligible, transferred to Southern Illinois University ("SIU"). After arriving at SIU, Noah Fenske was made aware that a waiver would have to be filed with the NCAA for immediate eligibility. Noah Fenske had many coaches tell him he was good enough to enter the draft after the season, but because Noah Fenske did not get to compete, no one had the opportunity to assess his talent. In total, he missed 11 regular season and two FCS Playoff games during the Fall 2023 season. The Transfer Eligibility ruled harmed Noah Fenske's ability to play football, earn NIL [4] money, his mental health, and the possibility to play professional football.

---

[4]   NIL means a player's name, image and likeness, which allows student-athletes to make money from their personal brand.

Second, the Transfer Eligibility Rule restricts the options of affected college athletes by limiting their choices of new institutions after making the decision to transfer. Student-athletes who are not excepted from the Transfer Eligibility Rule face a competitive disadvantage in the relevant markets. The NCAA member institutions compete all year long for the best college athletes for their athletic teams. The Transfer Eligibility Rule has institutions facing the risk that a transferring student-athlete may not be eligible to play for an entire academic year. Institutions may be less likely to offer a scholarship position to student-athletes who are subject to the Transfer Eligibility Rule and who may not be eligible for an entire academic year. For example: RaeQuan Battle. RaeQuan Battle started his basketball career at the University of Washington. Thereafter, he transferred to Montana State University ("MSU"). RaeQuan Battle lost his coach at MSU, a situation over which he had no control, which prompted his decision to transfer to West Virginia University ("WVU"). WVU took a chance on RaeQuan Battle, who faced a disadvantage by being restricted by the Transfer Eligibility Rule. WVU applied for him to receive a waiver for immediate eligibility, as he and WVU believed that his circumstances fit within the NCAA's criteria for waiver requests. The NCAA denied his appeal for immediate eligibility. By RaeQuan Battle not being able to participate in competitive games, it significantly impacts his ability to pursue NIL compensation and his chances to pursue a career in professional basketball.

**\*6** Third, the Transfer Eligibility Rule prevents student-athletes from realizing the benefits of competing in NCAA Division I athletics for an entire academic year after transferring. This does not prevent the student-athlete from practicing and participating in other team activities. Practicing with one's teammates and competing on gameday, in front of the cameras and live crowds, are not the same thing. The NCAA has often noted the importance of its student-athletes' opportunities to compete at the highest level:

> Student-athletes have the opportunity to travel across the country and around the world for regular-season contests, NCAA championships and foreign tours. These experiences can open doors for the few who will compete professionally and for the majority who will go pro in something other than sports.

The Value of College Sports, NCAA, https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx (accessed Dec. 11, 2023).

It takes one throw, one catch, one shot, one block to make a student-athlete a household name across the nation. Student-athletes are harmed by the Transfer Eligibility Rule and are not able to show the world the fruits of their labor in instances where they are forced to sit out a year of eligibility. In turn, this inhibits their ability to take advantage of NIL deals and positions, and limits potential earning based on professional league drafts.

Not only does the Transfer Eligibility Rule harm the student-athletes economically, but the Transfer Eligibility Rule impacts the student-athletes' overall mental well-being. All three (3) student athletes, RaeQuan Battle, Jarrett Hensley, and Noah Fenske, have alleged the Transfer Eligibility Rule has negatively affected their mental health. *See* [Doc. 1 at ¶ 49, 56, 65; Doc. 2-3 at ¶ 14; Doc. 2-4 at ¶ 9; Doc. 2-5 at ¶ 11].

In the NCAA Division I 2023–24 Manual, the NCAA highlights their "Commitment to Student-Athlete Well Being." In Bylaw 20.10. 1. 6, the NCAA states:

> Intercollegiate athletics programs shall be conducted in a manner designed to enhance the well-being of student-athletes who choose to participate and to prevent undue commercial or other influences that may interfere with their scholastic, athletics or related interests. The time required of student-athletes for participation in intercollegiate athletics shall be regulated to minimize interference with their academic pursuits. It is the responsibility of each member institution to establish and maintain an environment in which student-athletes' activities, in all sports, are conducted to encourage academic success and

individual development and as an integral part of the educational experience. Each member institution should also provide an environment that fosters fairness, sportsmanship, safety, honesty and positive relationships between student-athletes and representatives of the institution.

[Doc. 2-2 at 396]. The declarations by RaeQuan Battle, Jarrett Hensley, and Noah Fenske help show the harm the Transfer Eligibility Rule has caused these student-athletes.

### iii. The Transfer Eligibility Rule harms consumers of college athletics.

The Transfer Eligibility Rule causes negative downstream effects on consumers of college athletics. The value of the product that the NCAA provides to consumers is diminished when student-athletes are prevented from competing because of the Transfer Eligibility Rule. As stated above, teams fight all year long for the best of the best student-athletes to join their rosters. Teams may be less competitive without skilled transfer players which in turn harms consumers who lose the opportunity to see their college institutions compete to win on gameday.

**\*7** This Court agrees that the Transfer Eligibility Rule "is a barrier to increased parity in college athletics that would create a better product for consumers. The Transfer Eligibility Rule discourages transfer, which may benefit larger and historically successful sports programs by allowing them to retain talented players on their depth charts who may otherwise wish to transfer and actually play elsewhere. A more level playing field of talent among Division I institutions creates a more compelling product for consumers of college athletics. The Transfer Eligibility Rule harms consumers by making teams less competitive by ruling that student-athletes are subject to the Transfer Eligibility Rule and must sit out a full academic year.

### iv. The uncompelling "procompetitive justifications" for the Transfer Eligibility Rule are pretextual, and less restrictive alternatives could be implemented to accomplish the NCAA's purported "academic" goals.

The NCAA has asserted several arguments in an attempt to justify the continued implementation of its draconian, heavy-handed, "my way or the highway" Transfer Eligibility Rule. First, the NCAA contends that the Transfer Eligibility Rule promotes the academic well-being of college athletes. In guidance to student-athletes on the transfer process, the NCAA has stated that "[r]equiring student-athletes to sit out of competition for a year after transferring encourages them to make decisions motivated by academics as well as athletics. Most student-athletes who are not eligible to compete immediately benefit from a year to adjust to their new school and focus on their classes." NCAA Eligibility Center, *2018-19 Guide for Two-Year Transfers*, available at https://flc.losrios.edu/flc/main/doc/support-services/Counseling/NCAA_TransferGuide.pdf. (last accessed Dec. 11, 2023).

Next, the NCAA contends that restrictions like the Transfer Eligibility Rule preserve the amateurism model of the NCAA. *See Alston*, 141 S.Ct. at 2152. In the past, the NCAA has asserted that these restrictions help it "widen[ ] consumer choice by providing a unique product–amateur college sports as distinct from professional sports." *Id.* However, this Court is unpersuaded by the NCAA's arguments related to its purported attempt to preserve "amateurism." As noted by the district court in *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, the NCAA has not even defined the nature of "amateurism," nor is it meaningfully defined within the organization's own constitution. 375 F.Supp.3d at 1071. Like the California district court, this Court cannot ascertain "any coherent definition" of this term, and apparently, it is not alone in this exercise. *Id.* at 1070–74 (noting the testimony of a former SEC commissioner stating that he has "never been clear on ... what is really meant by amateurism") (internal quotation omitted).

The NCAA argues that the Transfer Eligibility Rule serves to promote the stability of a team's roster. However, nothing in the NCAA Bylaws prevents coaches from leaving or being fired mid-season. And, notably, the NCAA does not prevent first-time transfers in the NCAA. There is no meaningful distinction between a first-time transfer and second-time transfer in terms of

a team's stability. Each time, the transfer student-athlete is joining a brand new roster. In sum, this Court finds the NCAA's stability argument to be without merit given that there are currently no restrictions on first-time transfers or coaches leaving.

These arguments are justifications in name only because they are pretextual and, even if valid, which they are not, could be accomplished through less restrictive alternatives as proposed by Plaintiff States.

While the NCAA maintains the Transfer Eligibility Rule is intended to help student-athletes progress towards a college degree, the Rule, in practicality, does very little to help facilitate this goal. The Transfer Eligibility Rule only prevents college athletes from competing with their team in NCAA athletic events; it does not prohibit participation in practices or other team activities, nor does it prescribe a certain number of hours that college athletes must spend on their studies during the academic year of residence when they are ineligible for competition. Sitting out an entire year of practices, workouts, and other team events is not an option for student-athletes who want to maintain their standing as an NCAA Division I competitor in NCAA's gigantic, hyper-competitive sports business. Thus, in reality, student-athletes subject to the Transfer Eligibility Rule devote the same amount of their time, if not more, to athletics as their teammates save for a few hours of actual competition on gameday. *See* [Doc. 2-4 at ¶ 11; Doc. 2-5 at ¶ 9]. And the NCAA's argument that the point of the rule is based in academic performance is totally belied by the fact that no bylaw prevents freshman student-athletes, or first-year transfer student-athletes, from competing despite the challenges experienced by high school athletes and first-year student-athlete transfers in college academics and athletics.

 **\*8**  Additionally, the Transfer Eligibility Rule does not aid the NCAA in maintaining consumer interest by promoting its "unique product" of amateur sports as distinct from professional sports. As a matter of law, supposed benefits in the market for consuming college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student-athlete labor. This balancing approach "treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing)." ***Deslandes v. McDonald's United States, LLC***, 81 F.4th 699, 703 (7th Cir. 2023). As identified by movants, this approach "is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and ***Alston*** establishes otherwise." *Id.* Accordingly, this Court believes that consumers' supposed desire for college athletes to be shackled to their respective teams cannot balance against the harm caused to those students, who are situated no differently than any other worker in an employment context but for the NCAA declaring so by corporate fiat.

Even if this cross-market balancing was legally cognizable, which it is not, the Transfer Eligibility Rule has nothing to do with student-athletes maintaining amateur status. NCAA Bylaw 12. 1. 2 requires that Division I student-athletes maintain amateur status to be eligible for NCAA competition. Notably, nothing in the Transfer Eligibility Rule affects the amateur status of student-athletes under the NCAA's own definitions. Preventing studentathletes from competing in NCAA athletic events solely because they made a decision in their own best interest and transferred schools has no relationship with the amateur status of those athletes–instead, such athletes are merely transferring from one school as an amateur athlete to another school as an amateur athlete. The NCAA's arguments to the contrary are pretextual and do not justify such anticompetitive restrictions.

In addition, both the academic and amateurism goals of the NCAA, to the extent they can be discerned, are accomplished through less restrictive alternatives already in place within NCAA bylaws. For example, the bylaws already require student-athletes to maintain progress toward degrees to be eligible to compete in NCAA events. NCAA Bylaw 14.4.1 requires student-athletes to "maintain progress toward a baccalaureate or equivalent degree at that institution" to be eligible for intercollegiate competition at their college or university. NCAA Bylaw 20.2.4.13 requires member institutions to publish their progress-toward-degree requirements for student-athletes, thereby making these requirements available to student-athletes at each institution. Other NCAA bylaws require minimum credit hour and grade point averages for student-athletes to be eligible for competition. And NCAA bylaw 14.5.5.3 prevents student-athletes from transferring midseason and competing in the same sport they competed in at the previous institution within the same season.

These bylaws related to academic progress, GPA, and in-season transfers accomplish the NCAA's academic and amateurism goals without the unjustified restrictions imposed by the Transfer Eligibility Rule.

Within the relevant markets, the Transfer Eligibility Rule harms student-athletes by discouraging them from freely seeking the most beneficial institution for their well-being, limiting their options after the decision to transfer is made, and denying them the benefits of NCAA competition for an entire academic year. Moreover, the Transfer Eligibility Rule harms consumers by decreasing the competitiveness of teams whose transfer players are ineligible under the Rule and by stifling increased parity in college athletics. These negative and uncompetitive effects of the Transfer Eligibility Rule are apparent to this Court in the "twinkling of an eye." Simply put, a rule of reason analysis of the Transfer Eligibility Rule reveals that it is the exact kind of unreasonable restraint of trade within labor markets that the relevant antitrust laws prohibit. Accordingly, Plaintiff States have a strong likelihood of success on the merits of their Sherman Act claim.

**B. Plaintiff States,[5] through harm to student-athletes in their respective states, are suffering and will continue to suffer irreparable harm without injunctive relief.**

[5]     Plaintiff States are granted authority to bring actions for injunctive relief under federal antitrust law pursuant to 15 U.S.C. § 26, which provides:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue....

**\*9** Courts have repeatedly found that "[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports." ***S.A. v. Sioux Falls School Dist. 49-5,*** 2023 WL 6794207, at \*9 (D. S.D. Oct. 13, 2023) (quoting ***Portz v. St. Cloud State Univ.,*** 401 F.Supp.3d 834, 868 (D. Min. 2019); *see also* ***McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck,*** 370 F.3d 275, 302 n.25 (2d Cir. 2004); ***Navarro v. Fla. Inst. of Tech., Inc.,*** 2023 WL 2078264, at \*16–17 (M.D. Fla. Feb. 17, 2023) (courts have consistently held that losing the opportunity to participate sports is irreparable harm); ***Biediger v. Quinnipiac Univ.,*** 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); ***Brooks v. State Coll. Area Sch. Dist.,*** 643 F.Supp.3d 499, 510 (M.D. Pa. Dec. 1, 2022); ***Mayerova v. E. Mich. Univ.,*** 346 F.Supp.3d 983, 997 (E.D. Mich. 2018); *but see* ***Doe v. Portland Pub. Schs.,*** 2023 WL 7301072, at \*16 (D. Me. Nov. 3, 2023); ***Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.,*** 798 A.2d 830, 837 (Commonwealth Court of Pa. May 21, 2002).

Recognizing that student-athletes encounter circumstances that may make a transfer in a student-athlete's best interest, the NCAA in recent years expanded the exception to the Transfer Eligibility Rule to allow student-athletes seeking a first-time transfer to switch schools without penalty and to guarantee financial aid through graduation to transferring college athletes. The NCAA has stated:

> "Like their peers in the general student population, college athletes choose to transfer for any number of reasons...." "We believe the changes enacted today enable member schools to adapt to students' needs, while also positioning students for long-term academic success. These changes to NCAA rules recognize further study is needed on graduation rates before we consider authorizing multiple transfer opportunities with immediate eligibility. We will continue to review potential modifications to transfer rules as the landscape evolves over time."

Meghan Durham, Division I Board Adopts Changes to Transfer Rules, NCAA (Aug. 31, 2022, 4:45 PM), https://www.ncaa. org/news/2022/8/31/media-center-division-i-board-adopts-changes-to-transfer-rules.aspx.

As NCAA notes, "further study is needed" to consider "authorizing multiple transfer opportunities with immediate eligibility." NCAA does not have compelling evidence or data to justify differential treatment between first-time and multiple-time transfers. Instead, it appears to this Court that NCAA thinks it best to restrain the student-athletes now, and conduct further studies later

to determine if the restraint was necessary. Without evidence to suggest that multiple-time transfers fare any better or worse academically than first-time transfers, NCAA should treat all student-athletes equally.

NCAA Division 1 student-athletes spend around 33 hours for Athletics, 35.5 hours for Academics, 14.5 hours for Socializing, and 85 hours on "Other" activities, including sleep, jobs, and other extracurriculars. NCAA, Time Management (Aug. 2023), available at: http://fs.ncaa.org/Docs/eligibility_center/Student_ Resources/Time_Management_DI_DII_DIll.pdf; *see also* [Doc. 2-3 at ¶ 21 "Notably, I am still part of the team and still spend many hours a week practicing and engaging in other athletic activities, though I am not allowed to play in competitive games."; Doc. 2-4 at ¶ 11 "Although I am not able to compete, I continue to put in over 25 hours per week toward basketball activity, with my team and on my own. I am hopeful to get to play, so I spend a lot of time in the gym, alone, trying to make myself better."; Doc. 2-5 at ¶ 9 "I spent 20 hours preparing with my team each week, but I also spent voluntary hours preparing to play because I hope the NCAA would approve my waiver."].

**\*10**  The countable athletically related activities ("CARA") time limits under NCAA rules include supplemental workouts, competition, film review, practice, and strength and conditioning. Id. Competition, or gameday, is only a part of the time a student-athlete spends on athletics and is the only portion that the Transfer Eligibility Rule sees fit to interfere with. The refusal to allow multiple-time transfer student-athletes from competing cannot be justified, seeing as the multiple-time transfer student-athlete does all training, film review, practice, etc. with the team besides the gameday.

### i. Student-Athletes in Winter Sports who are ineligible under the Transfer Eligibility Rule are facing current, immediate and irreparable damage through the denial of the opportunity to compete in NCAA athletic events.

For winter sports, the Transfer Eligibility Rule has forced student-athletes to miss games which cannot be replayed. For example: WVU is playing thirty-one (31) regular season games this season. RaeQuan Battle has been unable to play in six (6) games so far. If he continues to sit out through December, he will miss an additional seven (7) games. The missed opportunities for these student-athletes in winter sports continues to mount. Missing regular season games constitutes a significant impact on the studentathletes' opportunities to develop as players in gametime conditions, develop in-game experience with their teammates, showcase their abilities to potential employers, and help their teams advance to their respective Conference Tournament and NCAA Tournament.

The success of a team in regular season dictates their entrance to their respective Conference Tournament and NCAA Tournament. Every game is crucial for a student-athlete and their team. Take, for example, March Madness. One good tournament run can cement a student-athlete or team's legacy in college sports. The absence of student-athletes from teams on gamedays could negatively impact a team's ranking and selection to tournaments. Moreover, it may have life-altering impacts on the student-athlete's ability to pursue NIL deals and a professional career in their sport as well as impacts on their mental health. The substantial and very current harm to winter sport Division I student-athletes is irreparable and cannot be easily remedied. However, immediate temporary injunctive relief is necessary to allow these winter sport Division I student-athletes to compete on gamedays going forward in the season.

### ii. Student-athletes in spring and fall sports, all of whom are currently in their transfer window, are immediately and irreparably harmed by the Transfer Eligibility's Rule effect on transfer decisions and restriction of options of schools to which to transfer.

All fall and spring sports are in an active transfer window. NCAA, NCAA Division I Transfer Windows (Oct. 2023), available at: http://fs.ncaa.org/Docs/eligibility_center/Transfer/DIUG_Windows.pdf. With the transfer window being open, student-athletes are facing the potential of a year of ineligibility should a student-athlete decide to transfer. This potential may cause student-athletes to forgo opportunities to transfer that may be in their personal best interest. Even more dire, this potential may prevent student-athletes from transferring due to situations totally outside of their control. Without the restraint placed on student-athletes by the Transfer Eligibility Rule, student-athletes would be able to make the decision on whether to transfer solely based on what is in the student-athlete's best interest and free from the burden of weighing the risk of a year of ineligibility under the Rule.

**\*11**  Moreover, student-athletes would have more options of schools to which to transfer by not being under the restraint of the Transfer Eligibility Rule. As noted above, the risk that a student-athlete may not be immediately eligible upon transferring could make a Division I institution less likely to offer that athlete a scholarship position. Without the potential of being ineligible for a full academic year, this would put all student-athletes, regardless of the number of transfers, on equal footing.

### C. The balance of the equities tip in Plaintiff States' favor.

The balance of the equities supports Plaintiff States' Motion and favors issuance of a temporary restraining order and preliminary injunction enjoining the enforcement of the Transfer Eligibility Rule and the Rule of Restitution. Student-athletes ineligible for competition under the Transfer Eligibility Rule face immediate and irreparable harm for every athletic contest they are forced to sit out, whether it be economic harm or well-being harm.

Student-athletes considering a transfer or already searching for a new institution are disadvantaged by the potential of a year of ineligibility under the Transfer Eligibility Rule. The equities favor allowing these student-athletes to realize the present and future economic potential of their participation in college athletics and allowing student-athletes in the transfer process to use the market to respond to changing circumstances and seek the most beneficial situation for their own well-being unencumbered by the ineligibility under the Transfer Eligibility Rule.

This Court does not see substantial harm to the NCAA that would result from this Court granting a temporary injunction. A prohibition on enforcing the Transfer Eligibility Rule causes no harm to the NCAA or any other entity or individual. Such relief would merely prevent the enforcement of one of the NCAA's many bylaws, allowing student-athletes to compete in athletic events already scheduled to take place.

The impact of injunctive relief would greatly benefit the student-athletes waiting to play their winter sport in the process of transferring or thinking about transferring. The NCAA's own Preamble states it is "committed to the well-being and development of student-athletes...." This Court sees no reason why allowing student-athletes who are already practicing with their respective teams to go to war on gamedays would harm the NCAA.

### D. Injunctive relief serves the public interest of promoting free and fair competition in labor markets.

Temporary injunctive relief preventing the NCAA from enforcing the Transfer Eligibility Rule would serve the public interest in promoting free and fair competition in labor markets guaranteed by antitrust laws. Free and fair competition in labor markets is essential to the American economy. Protecting competition in the labor market for NCAA Division I student-athletes serves the public's interest in free and fair competition in labor markets.

### E. For this Court's injunctive relief to be effective, NCAA must be enjoined from enforcing NCAA Bylaw 12.11.4.2.

NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," provides:

12.11.4.2 Restitution. If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed, or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions:

**\*12**  (a) Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(b) Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(c) Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;

(d) Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(e) Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f) Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g) Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h) Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i) Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

[Doc. 2-2 at 79–80]. The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. It is in fact a measure designed to inhibit a person's access to the courts.

Knowing this, many Division I institutions will not permit the student-athlete to compete, even if a court issues a temporary restraining order or a preliminary injunction finding that those rules are likely illegal. This, in turn, deters student-athletes from challenging the NCAA's substantive eligibility rules, such as the Transfer Eligibility Rule.

It appears to this Court that the Rule of Restitution's purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor. The Rule of Restitution forces student-athletes to run the risk of severe personal punishment and the risk of subjecting their institutions or teammates to the harsh sanctions of the Rule of Restitution simply by following the terms of a court order. For instance, suppose this Court issues an injunction that allows a student-athlete, like RaeQuan Battle, to play for the remainder of the 2023–2024 basketball season. Suppose, hypothetically, WVU goes on to win the Big 12 Championship and National Championship. If this Court does not enjoin NCAA Bylaw 12.11.4.2, NCAA could require that WVU be stripped of the Big 12 and National Championship Titles, all over WVU following a court order instructing WVU that RaeQuan Battle is good to play on gamedays. Thus, this Court will enjoin NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions.

**IV. Conclusion**
 **\*13**  The Motion **[Doc. 2]** is **GRANTED IN PART.** This Court hereby issues a temporary restraining order for **fourteen (14) days** and hereby **ORDERS** the NCAA is **ENJOINED** from enforcing the Transfer Eligibility Rule, NCAA Bylaw 14.5.5.1, insofar as it requires a transferor to sit out for an academic year of residence, and the Rule of Restitution, NCAA Bylaw 12.11.4.2 until a hearing on the Preliminary Injunction is heard on **<u>Wednesday, December 27, 2023, at 10:00 a.m.</u>**

Security will not be required prior to issuing a temporary restraining order because the NCAA will not suffer financial burden in compliance with such injunctive relief.

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**All Citations**

Slip Copy, 2023 WL 9103711

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

# Texas Tech star Pop Isaacs reportedly accused of sexually assaulting a minor in the Bahamas

**sports.yahoo.com**/texas-tech-star-pop-isaacs-reportedly-accused-of-sexually-assaulting-a-minor-in-the-bahamas-010202075.html

Jack Baer

## Despite the lawsuit, Pop Isaacs played in Texas Tech's upset win over No. 20 Texas on Saturday night



Texas Tech guard Pop Isaacs is accused of sexually assaulting a minor in November. (Michael Hickey/Getty Images)

Texas Tech leading scorer Pop Isaacs is accused of sexually assaulting a minor during his team's trip to the Bahamas in November, according to ESPN.

A civil lawsuit alleging the assault was reportedly filed in Lubbock County District Court by the parents of the alleged victim, who was 17 at the time of the alleged incident. The age of consent is 16 in the Bahamas, but the suit reportedly claims the girl was intoxicated and could not give consent.

The lawsuit requests $1 million in damages.

The alleged incident occurred when the Texas Tech men's basketball team was competing in the Battle 4 Atlantis, the early-season college basketball tournament that frequently attracts some of the sport's top programs. The Red Raiders, competing in the event for the first time, finished in fifth place after losing to eventual champion Villanova in their opener, then winning two consolation games.

The lawsuit reportedly alleges a Texas Tech booster bought alcoholic drinks for the 20-year-old Isaacs and his teammates in a room with two girls, age 17 and 16. Isaacs is alleged to have gone into another room with the 17-year-old and sexually assaulted her while she "attempted to fight him off."

Isaacs was present at practice Friday, and he played with the Red Raiders Saturday in their Big 12 opener. Isaacs dropped a team-high 21 points to lead Texas Tech to a 78-67 win over No. 20 Texas in Austin. He was booed by Texas fans nearly every time he touched the ball.

Texas Tech released a statement to The Messenger's Jeff Goodman, saying they had reported the matter to the school's Title IX office and had been told twice that Isaacs remains in good standing:

> "Upon learning of the allegations, the matter was immediately and properly reported to the University's Title IX Office. The Title IX Office and its process are external to and independent from TTU Athletics. The Title IX Office's investigation into the allegations promptly commenced. Athletics reached out to the Title IX Office on two occasions and was informed both times that based upon the information, Pop Isaacs remains in good standing, and there is no reason to withhold him from University activities, including basketball competition. The Title IX Office will continue to follow its process until it is completed, regardless of the civil lawsuit."

Isaacs did not speak after the game Saturday, and first-year head coach Grant McCasland declined to get into the decision to keep playing Isaacs.

"The statement that was made by the university is the one that I'm going to stand by," he said, via ESPN. "We're committed to that."

A Big 12 All-Freshman honoree last season, Isaacs has started all 14 games for the Red Raiders (12-2 overall, 1-0 Big 12) and leads the team in scoring with 16.2 points per game. He shot 7-of-15 from the field on Saturday against the Longhorns (11-3, 0-1), which marked

the program's seventh straight win.

They'll take on Oklahoma State (8-6, 0-1) next on Tuesday.

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| | ) | |
| JOHN STILES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:21-cv-00497-MSM-LDA |
| | ) | |
| BROWN UNIVERSITY, | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Mary S. McElroy, United States District Judge.

Before the Court is the Motion of the plaintiff, John Stiles ("Stiles")[1], for entry of a preliminary injunction to restrain and enjoin the defendant, Brown University ("Brown"), from enforcing its decision to suspend him from academic and athletic activities pending the resolution of a Title IX complaint against him. The Court has carefully considered the memoranda and documents filed by both parties and heard extended argument on January 20, 2022.

For the following reasons, the Court GRANTS the plaintiff's Motion. (ECF No. 10.)

## I.    BACKGROUND

The plaintiff is a senior at Brown and a member of the varsity lacrosse team. As a result of an alleged incident on October 30, 2021, a fellow student, Jane Roe, accused the plaintiff of sexual assault and filed a Title IX complaint with Brown on

---

[1] The plaintiff is referred to by the pseudonym of John Stiles per order of this Court.

November 18, 2021.  A Brown Threat Assessment Team met the next day to "determine whether there is reasonable cause to believe that the Prohibited Conduct is likely to continue and/or the [plaintiff] poses a significant threat of harm to the health, safety, and welfare of others and the University community." (ECF No. 22-2.)  The Threat Assessment Team completed a rubric of questions concerning the allegations, any potential threat to the community, and any pattern of similar transgressions.  Most of the questions were answered in the negative, but "due to the egregious nature of the alleged behavior" the Threat Assessment Team recommended an interim suspension pending determination of the Title IX complaint.  *Id.*

On November 30, 2021, John appealed his interim suspension to Vice President Eric Estes and submitted his response to the Title IX complaint. (ECF No. 1 ¶¶ 11-12).  On December 6, 2021, Mr. Estes partially granted John's appeal by allowing him to complete the current semester remotely and remanded the question of John's suspension for the Spring semester to Brown's threat assessment team for renewed consideration based on John's response to the Title IX complaint.  *Id.* ¶ 13. On December 10, 2021, the Threat Assessment Team affirmed its conclusion that the plaintiff's "Prohibited Conduct was likely to continue" as well as Mr. Estes' decision that the plaintiff should be suspended beginning on January 7, 2022, pending an investigation and resolution of the Title IX complaint.  (ECF No. 22-7.)

The plaintiff filed the instant Complaint alleging that Brown's suspension of him while the resolution of the Title IX complaint is pending is in breach of its contract with him.  He moves for injunctive relief enjoining Brown from removing

him from campus and suspending him from academic and athletic activities prior to the resolution of the Title IX matter.

This matter is brought pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332; as such, Rhode Island law applies.

## II.    PRELIMINARY INJUNCTION STANDARD

"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). Of these factors, "[t]he movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). A party "need not prove its claims at the preliminary injunction stage, only that it is likely to be able to prove its claims later." *Kleczek on Behalf of Kleczek v. R.I. Interscholastic League, Inc.*, 768 F. Supp. 951, 953 (D.R.I. 1991).

## III.    DISCUSSION

### A. Likelihood of Success on the Merits

The plaintiff has alleged against Brown a breach of contract. Under Rhode Island law, the elements of an action for breach of contract are the existence of a contract, a breach, and damages flowing from the breach. *See Petrarca v. Fidelity and Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005). There is no dispute that a contract existed between the parties.

3

The "student and private university relationship is essentially contractual in nature." *Gorman v. St. Raphael Academy*, 853 A.2d 28, 34 (R.I. 2004). "The relevant terms of contractual relationship between a student and a university typically include the language found in the university's student handbook." *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007); *Gorman*, 853 A.2d at 34. Courts often interpret the terms of a student handbook "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them." *Havlik*, 509 F.3d at 34. "A breach of contract is established if the facts show that the university has failed to meet [the student's] reasonable expectations." *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61–62 (1st Cir. 2016) (internal quotation marks omitted).

The operative contract is Brown's Student Conduct Procedures and Sexual Misconduct Procedure. (ECF No. 1 ¶ 102.) Relevant here, the Student Conduct Procedures entitle the plaintiff to "not be presumed responsible of any alleged violations unless so found through the appropriate student conduct hearing" and to be "afforded an opportunity to offer a relevant response." *Id.* ¶ 104. The Sexual Misconduct Procedure also "presumes that the Respondent is not responsible for the alleged Prohibited conduct" and further guarantees John "meaningful opportunities to participate" in the Title IX process. *Id.* ¶ 105. This reasonably includes any important phase of the process that will affect John's rights, such as his continuing education, access to campus, or participation in school sponsored activities.

4

The Sexual Misconduct Procedure permits the "interim actions" of emergency removal from campus and suspension pending resolution of a complaint if "there is reasonable cause to believe that the "Prohibited Conduct is likely to continue and/or the Respondent poses a significant threat of harm to the health, safety, and welfare of others or the University community." *Id.* ¶ 106.

Here, however, the facts suggest that, in both assessments that it made, the Threat Assessment Team failed to demonstrate anything that would indicate they afforded the plaintiff a presumption that he was not responsible for the alleged conduct as required by contract. Instead, it focused on the nature of the unproven allegations and removed him from campus and suspended him before performing any investigation of those allegations. The plaintiff therefore is likely to succeed on his claim that Brown could not fairly determine if there were "reasonable cause to believe" that the plaintiff would likely continue his alleged prohibited conduct or otherwise be a threat to the university community.

In sum, the plaintiff has made a sufficient showing that he is likely to succeed on his claim that the Threat Assessment Team failed to afford him a presumption that he was not responsible for the misconduct alleged and thus that "the university has failed to meet [the student's] reasonable expectations" of the terms of the relevant contract. *See Walker*, 840 F.3d at 61–62.

## B. Irreparable Harm

The plaintiff meets his burden to demonstrate irreparable harm in the absence of an injunction. The plaintiff's transcript currently indicates that he is suspended for the Spring 2022 semester. (ECF No. 24-9.) It is not speculative to presume that

such a notation on his permanent record will have lasting, negative ramifications. *See Doe v. Univ. of Conn.*, 2020 WL 406356, at 2 (D. Conn. Jan. 23, 2020) (finding irreparable harm where the student "would also need to explain the suspension notation on his UCONN transcript, and a truthful explanation would seriously hinder his prospects"); *Doe v. Middlebury Coll.*, 2015 WL 5488109, at 3 (D. Vt. Sept. 16, 2015) (finding irreparable harm where the student "would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap"); *King v. DePauw Univ.*, 2014 WL 4197507, at 13 (S.D. Ind. Aug. 22, 2014) (finding irreparable harm where plaintiff would "forever have either a gap or a senior-year transfer on his record," noting the inevitability of questions by future employers or graduate schools for which "any explanation is unlikely to fully erase the stigma").

### C. Balance of the Equities and the Public Interest

The balance of the equities favors the plaintiff. Brown's interest in protecting the plaintiff's accuser is mitigated by the fact that a no-contact order is in place between the plaintiff and her, he has not contacted her since before it entered, when he responded to a text message that she sent. Indeed, the plaintiff was on the campus for nearly three weeks without incident between the alleged assault and the date of the suspension. Moreover, while Brown has an interest in applying its own disciplinary policies, it faces little hardship in allowing the plaintiff to proceed with his academic and athletic activities while the disciplinary process plays out. The ramifications of the suspension to the plaintiff, however, are substantial.

The public interest, and in particular the university community, is best served by the school applying its disciplinary procedures according to the terms of its policies.

## IV.   PRELIMINARY INJUNCTION

For the foregoing reasons, the Court GRANTS the plaintiff's Motion for a Preliminary Injunction (ECF No. 10) and issues the following PRELIMINARY INJUNCTION:

Brown University is enjoined from denying the plaintiff his contractual rights under the Student Conduct Procedures and Sexual Misconduct Procedure, from suspending him from campus pending resolution of Jane Roe's Title IX complaint, from denying him class attendance and participation and the ability to continue practicing and playing on the varsity lacrosse team, until such time as he is found responsible for the alleged Title IX violations or a renewed threat assessment is properly conducted in accordance with the plaintiff's contractual rights.

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge
January 25, 2022

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TERRENCE SHANNON JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:24-cv-02010-SLD-EIL |
| | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| a body corporate and politic,  and | ) | |
| TIMOTHY KILLEEN, in his | ) | |
| official capacity as President of the | ) | |
| University of Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

### TEMPORARY RESTRAINING ORDER

This cause coming to be heard on Plaintiff's Motion for Temporary Restraining Order ("TRO"), Preliminary Injunction, and/or Expedited Discovery ("Plaintiff's Motion"), upon due notice to the Parties and the Court having been fully advised on the premises, and additionally for the reasons stated on the records;

**IT IS HEREBY ORDERED THAT:**

1.    The Court finds based on the Verified Complaint and the supporting Plaintiff's Motion, that Plaintiff has established that he has a clearly ascertainable right that needs protection, will suffer irreparable harm without the TRO, has no adequate remedy at law, is likely to succeed on the merits, and that a TRO is necessary to preserve the status quo:

        a.   [The Court further finds that a balancing of the harms favors Plaintiff.]

        b.   [The Court also finds that the public interest will not be harmed by the granting of a TRO to the Plaintiff.]

2.      Defendant, The Board of Trustees of the University of Illinois, and all of its officers (including, but not limited to, Defendant Timothy Killeen), administration, employees, units, divisions, affiliates, and other agents, are temporarily restrained from continuing to suspend Plaintiff from full participation in the men's basketball team ("Team") at the University of Illinois at Urbana-Champaign, and shall immediately reinstate Plaintiff to the Team.

3.      Defendants are temporarily restrained from subjecting Plaintiff to any further disciplinary or other proceedings for the duration of this TRO, absent further order of this Court.

4.       The obligations of Defendants pursuant to this TRO are to be construed as broadly as possible.

5.      The Court finds good cause to waive bond.

6.      Pursuant to Federal Rule of Civil Procedure 65(b)(2), this Order shall remain in effect for fourteen (14) days, unless modified or terminated by a subsequent order. Before the expiration of that fourteen-day period, the Court will determine whether good cause exists to extend the duration of the TRO for another fourteen days.

7.      The Parties may issue written discovery requests to each other in regards to Plaintiff's Motion for Preliminary Injunction on or before _____, 2024; the Parties shall fully respond to written discovery requests on or before _____, 2024; the Parties shall complete depositions by _____, 2024; and the Court will hold a preliminary injunction hearing on _____ through _____, starting at _____ each day.

8.      Defendant shall file a response to Plaintiff's Motion on or before _____, 2024 and Plaintiff shall file a reply in support thereof on or before _____, 2024.

9.      Defendant shall answer or otherwise plead to Plaintiff's Complaint on or before _____, 2024.


**ORDERED**


_____

**Dated:** _____

Robert H. Lang (ARDC # 6225414)
Thompson Coburn LLP
55 East Monroe Street, 37th Fl.
Chicago, IL 60603
rhlang@thompsoncoburn.com
(312) 346-7500
Fax: (312) 580-2201
*Admission pending pursuant to ICD Local Rule 85(A)*

Mark C. Goldenberg (ARDC #0990221)
Goldenberg Heller & Antognoli, P.C.
2227 South State Route 157
Edwardsville, IL 62025
mark@ghalaw.com
(618) 656-5150
Fax: (618) 656-6230

J. Steven Beckett (ARDC # #0151580)
Steve Beckett Law Office LLC
508 S. Broadway Avenue
Urbana, IL 61801
(217) 328-0263
Fax: (217) 328-0290

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| TERRENCE SHANNON JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:24-cv-02010-SLD-EIL |
| | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| a body corporate and politic,  and | ) | |
| TIMOTHY KILLEEN, in his | ) | |
| official capacity as President of the | ) | |
| University of Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER GRANTING PRELIMINARY INJUNCTION</u>

This cause coming to be heard on Plaintiff's Motion for Temporary Restraining Order

("<u>TRO</u>"), Preliminary Injunction, and/or Expedited Discovery ("<u>Plaintiff's Motion</u>"), upon due

notice to the Parties and the Court having been fully advised on the premises, and additionally

for the reasons stated on the records;

**IT IS HEREBY ORDERED THAT:**

1.      The Court finds based on the Verified Complaint and the supporting Plaintiff's

Motion, that Plaintiff has established that he has a clearly ascertainable right that needs

protection, will suffer irreparable harm without a preliminary injunction, has no adequate remedy

at law, and is likely to succeed on the merits:

        a.   [The Court further finds that a balancing of the harms favors Plaintiff.]

        b.   [The Court also finds that the public interest will not be harmed by

            granting a preliminary injunction to Plaintiff.]

2.      Defendant, The Board of Trustees of the University of Illinois, and all of its officers (including, but not limited to, Defendant Timothy Killeen), administration, employees, units, divisions, affiliates, and other agents, are enjoined from continuing to suspend Plaintiff from full participation in the men's basketball team ("Team") at the University of Illinois at Urbana-Champaign, and shall immediately reinstate Plaintiff to the Team.

3.      Defendants are enjoined from subjecting Plaintiff to any further disciplinary or other proceedings, absent further order of this Court.

4.       The obligations of Defendants pursuant to this Order are to be construed as broadly as possible.

5.      The Court finds good cause to waive bond.

6.      This Order shall remain in effect until modified or terminated by a subsequent order.

**ORDERED**


_____

**Dated: _____**

Robert H. Lang (ARDC # 6225414)
Thompson Coburn LLP
55 East Monroe Street, 37th Fl.
Chicago, IL 60603
rhlang@thompsoncoburn.com
(312) 346-7500
Fax: (312) 580-2201
*Admission pending pursuant to ICD Local Rule 85(A)*

Mark C. Goldenberg (ARDC #0990221)
Goldenberg Heller & Antognoli, P.C.
2227 South State Route 157
Edwardsville, IL 62025
mark@ghalaw.com

2

(618) 656-5150
Fax: (618) 656-6230

J. Steven Beckett (ARDC # #0151580)
Steve Beckett Law Office LLC
508 S. Broadway Avenue
Urbana, IL 61801
(217) 328-0263
Fax: (217) 328-0290