# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

Terrence Shannon Jr.         )

                  )     No. 2:24-cv-2010

        Plaintiff      )

                  )

     v.            )     Judge Colleen R. Lawless

                  )

The Board of Trustees of the    )

University of Illinois and Timothy   )

Killeen, in his official capacity    )

                  )

        Defendants.    )

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Peter G. Land (Lead Counsel) #6229659
Gwendolyn B. Morales
Mary E. Deweese
Katherine M. Tierney
Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois 60606
(312) 655-1500
Peter.Land@huschblackwell.com
Gwendolyn.Morales@huschblackwell.com
Mary.Deweese@huschblackwell.com
Katherine.Tierney@huschblackwell.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

RELEVANT BACKGROUND ............................................................................................... 5

    I.    Plaintiff's September 2023 Out-of-State Personal Trip.......................................... 5

    II.    DIA Policy and Procedures.................................................................................... 6

    III.    The University's Non-Title IX Sexual Misconduct Procedures .................................. 10

    IV.    Plaintiff's Lawsuit ............................................................................................... 12

ARGUMENT ......................................................................................................................... 12

    I.    Legal Standard ..................................................................................................... 12

    II.    The Court Should Deny Plaintiff's Motion for a Preliminary Injunction in its Entirety. . 13

        A.    Plaintiff Has Not Shown a Likelihood of Success on the Merits of his Title IX-Based Claim in Count I.................................................................................................... 14

            1.    The Title IX "Emergency Removal" Regulation is Not Applicable...................... 16

            2.    A Failure to Follow Title IX Regulations Does Not Give Rise to a Private Right of Action.................................................................................................................. 21

        B.    Plaintiff Has Not Shown a Likelihood of Success on the Merits of a Due Process Claim.................................................................................................................. 22

            1.    Plaintiff does not have a constitutionally protected interest in participating in athletic activities with the Team. .......................................................................... 22

            2.    Plaintiff was given appropriate process. .......................................................... 26

        C.    Plaintiff Has Not Shown a Likelihood of Success on the Merits of a Breach of Contract Claim. ................................................................................................... 28

            1.    There Was No Breach of the Scholarship Contract ................................. 30

            2.    There Was No Breach of the DIA Policy. ..................................................... 30

            3.    Plaintiff's Unconscionability Arguments are Unavailing....................................... 33

            4.    There Has Been No Waiver. ....................................................................... 35

        D.    Defendants' Decision to Follow Procedure is an Academic Decision Entitled to Judicial Deference................................................................................................ 36

    III.    Plaintiff's Harm is Not Irreparable.......................................................................... 37

        E.    An Interim Suspension from College Athletics in Connection to a Felony Arrest is Not Irreparable Harm. ......................................................................................... 38

            1.    Plaintiff's Potential Harm Related to His Future Career is Too Speculative to Constitute Irreparable Harm. .............................................................................. 40

            2.    Lost Income and Reputational Damages Are Not Irreparable Harm...................... 41

    IV.    The Balance of Harms is in the University's Favor ...................................................... 42

CONCLUSION...................................................................................................................... 43

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Ill. Coll. of Podiatric Med.*, 77 Ill. App. 3d 471 (1st Dist. 1979) ................................. 29

*Am. Food Mgmt., Inc. v. Henson*, 434 N.E.2d 59 (5th Dist. 1982)........................................ 33, 34

*Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470 (7th Cir. 2001) .................................... 37

*Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978)........................................ 29, 36

*Bedrossian v. Nw. Mem. Hosp.*, 409 F.3d 840 (7th Cir. 2005)...................................................... 41

*Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, No. 01 C 585, 2001 WL 128164 (N.D. Ill. Feb. 9, 2001) ........................................................................................................................ 12

*Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009).......................................... 39

*Blasdel v. Nw. Univ.*, 687 F.3d 813 (7th Cir. 2012).................................................................... 42

*Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499 (M.D. Pa. 2022).............................. 39

*Caldwell v. University of New Mexico Board of Regents*, 510 F. Supp. 3d 982 (D.N.M. 2020) . 23

*Central Water Works Supply Inc. v. Fisher*, 608 N.E.2d 618 (Ill. App. 1993)............................ 42

*Cephus v. Blank*, 2022 WL 17668793 (W.D. Wis. Dec. 14, 2022). ............................... 23, 26, 41

*Coronado v. Valleyview Pub. Sch. Dist. 365-U*, 537 F.3d 791 (7th Cir. 2008)........................... 28

*Courthouse News Serv. v. Brown*, 908 F.3d 1063 (7th Cir. 2018) .............................................. 13

*Cox v. City of Chi.*, 868 F.2d 217 (7th Cir. 1989)....................................................................... 13

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999) .......... 17

*DiPerna v. Chi. Sch. of Pro. Psychology*, 893 F.3d 1001(7th Cir. 2018)............................... 32, 37

*DM Trans, LLC v. Scott*, 38 F.4th 608 (7th Cir. 2022)........................................................... 13, 37

*Doe v. Blackburn Coll.*, No. 06-3205, 2012 WL 640046 (C.D. Ill. Feb. 27, 2012) .................... 17

*Doe v. Columbia Coll. Chi.*, 933 F.3d 849 (7th Cir. 2019).................................... 16, 29, 31, 37

*Doe v. George Washington Univ.*, 305 F. Supp. 3d 126 (D.D.C. 2018)....................................... 14

*Doe. Ind. Univ.-Bloomington*, No. 1:18-cv-03713-TWP-MJD, 2019 WL 341760 (S.D. Ind. Jan. 28, 2019) ........................................................................................................................ 14

*Doe v. Loyola Univ. Chi.*, 2022 WL 4535090 (N.D. Ill. Sept. 28, 2022).......................... 30, 31, 37

*Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017), *on reconsideration in part*, 323 F. Supp. 3d 962 (S.D. Ohio 2018) ................................................................................ 15

*Doe v. Portland Pub. Sch.*, 2023 WL 7301072 (D. Me. Nov. 3, 2023)........................................ 40

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019). ............................................................. 25, 26

*Doe v. Trs. of Ind. Univ.*, 496 F. Supp. 3d 1210 (S.D. Ind. 2020) ............................................. 26

*Doe v. Univ. of S. Ind.*, 43 F.4th 784 (7th Cir. 2022).......................................................... 14, 16

*Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984 (D. Minn. 2017)............................................ 21

*Doe v. Vanderbilt Univ.*, 2019 WL 4748310 (M.D. Tenn. Sept. 30, 2019)................................. 15

*Doe v. Vassar Coll.*, No. 19-cv-9601 (NSR), 2019 WL 6222918 (S.D.N.Y. Nov. 21, 2019)...... 14

*Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) .................................. 25

*Falcon, Ltd. V. Corr's Natural Beverages, Inc.*, 520 N.E.2d 831 (Ill. App. 1987) ..................... 41

*Fleming v. Chi. of Pro. Psychology*, 2019 WL 247537 (N.D. Ill. Jan. 16, 2019)........................ 31

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) .................................................... 21

*Goodman v. Ill. Dep't Fin. & Prof'l Reg.*, 430 F.3d 432 (7th Cir. 2005) ............................. 13, 22

*Granberg v. Didrickson*, 665 N.E.2d 398 (Ill. App. 1996)......................................................... 41

*Hall v. National Collegiate Athletic Association*, 985 F. Supp. 782 (N.D. Ill. 1997) ................ 38

*Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599 (7th Cir. 2008)........................ 16

*Hawkins v. Nat'l Coll. Athletic Ass'n*, 652 F. Supp. 602 (C.D. Ill. 1987) ...................................... 23

*Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155 (7th Cir. 1998) ............................................................ 43

*Johnson v. Thompson-Smith*, 203 F. Supp. 3d 895 (N.D. Ill. 2016). ............................................. 22

*Khan v. Yale Univ.*, 347 Conn. 1 (2023) ................................................................................. 27, 28

*Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250 (Ill. 2006) ........................................................ 33

*Kole v. Vill. of Norridge*, 941 F. Supp. 2d 933 (N.D. Ill. 2013) ..................................................... 15

*Kupec v. Atlantic Coast Conference*, 399 F. Supp. 1377 (M.D.N.C. 1975) ................................... 40

*Lapka* v. *Chertoff*, 517 F.3d 974 (7th Cir. 2008) .................................................................... 18, 19

*Malhotra v. Univ. of Illinois at Urbana-Champaign*, 77 F.4th 532 (7th Cir. 2023).......... 24, 25, 26

*Marshall v. Ohio State Univ.*, No. 2:15-CV-775, 2015 WL 7254213 (S.D. Ohio Nov. 17, 2015). ...... 15

*Mathis v. Krause*, No. 22-cv-47-jdp, 2023 WL 3934049 (W.D. Wis. June 9, 2023) .................... 26

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)) .............................................................................. 13

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 (2d Cir. 2004) ....... 39

*McGee v. Va. High Sch. League, Inc.*, 801 F. Supp. 2d 526 (W.D. Va. 2011) .............................. 40

*Nat'l Coll. Athletic Ass'n v. Yeo*, 171 S.W.3d 863 (Tex. 2005) ..................................................... 23

*Navarro v. Fla. Inst. of Tech., Inc.*, 2023 WL 2078264 (M.D. Fla. Feb. 17, 2023) .................... 39

*O'Shea v. Augustana Coll.*, 593 F. Supp. 3d 838 (C.D. Ill. 2022).......................................... 17, 19

*Ohio-Sealy Mattress Mfg. Co. v. Duncan*, 486 F. Supp 1047 (N.D. Ill. 1980)............................. 40

*Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003) .............................................................. 17

*Parker v. Trinity High Sch.*, 823 F. Supp. 511 (N.D. Ill. 1993)..................................................... 42

*People of State of Illinois ex rel. Barra v. Archer Daniels Midland Co.*, 704 F.2d 935 (7th Cir. 1983) ..........................................................................................................................................15

*Pogorzelska v. VanderCook College of Music*, No. 19-cv-05683, 2023 WL 3819025 (N.D. Ill. June 5, 2023) ........................................................................................................................ 19

*Portz v. St. Cloud State Univ.*, 401 F.Supp.3d 834 (D. Minn. 2019)............................................. 39

*Pugel v. Bd. of Trs. of the Univ. of Ill.*, 378 F.3d 659 (7th Cir. 2004))......................................... 27

*Radwan v. Manuel*, 55 F.4th 101 (2d Cir. 2022) .......................................................................... 23

*Raethz v. Aurora Univ.*, 805 N.E.2d 696 (2d Dist. 2004) ....................................................... 29, 37

*Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007 (7th Cir. 2002)........................................... 28

*Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.*, 798 A.2d 830 (Commonwealth Court of Pa. May 21, 2002) .............................................................................................................................. 40

*Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 80 F. Supp. 3d 829 (N.D. Ill. 2015) ...................................................................................................................................... 37, 40, 42

*Robertson v. Bd. of Trs. of Kent State Univ.*, No. 82-3590, 1983 U.S. App. LEXIS 12414 (6th Cir. Nov. 8, 1983) .................................................................................................................. 23

*Roe v. Gustine Unified School District*, 678 F. Supp. 2d 1008 (E.D. Ca. 2009) ......................... 18

*Roe v. St. Louis Univ.*, 746 F.3d 874 (8th Cir. 2014); ................................................................... 17

*Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992) .............................................. 29, 30, 31, 32

*S.A. v. Sioux Falls Sch. Dist. 49-5*, 2023 WL 6794207 (D. S.D. Oct. 13, 2023)......................... 39

*Sampson v. Murray*, 415 U.S. 61 (1974). .................................................................................... 41

*Samuelson v. Oregon State Univ.*, 162 F. Supp. 3d 1123 (D. Ore. 2016), *aff'd*, 725 F. App'x 598 (9th Cir. 2018)....................................................................................................................... 17

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020)................................................... 13, 42

*State of Ohio v. Nat'l Coll. Athletic Ass'n*, No. 1:23-CV-100, 2023 WL 9103711 (N.D.W. Va. Dec. 13, 2023)............................................................................................................... 38, 39, 40

*Stencil v. Johnson*, 605 F. Supp. 3d 1109 (E.D. Wis. 2022)....................................................... 15

*Stiles v. Brown University*, No. 1:21-cv-00497 (D.R.I. Jan. 25, 2022), ................................ 32, 33
*Swan v. Bd. of Educ. of City of Chi.*, 956 F. Supp. 2d 913, 918 (N.D. Ill. 2013) ........................ 25
*Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 601 N.E.2d 956 (1st Dist. 1992) ...................... 36
*Weckhorst v. Kansas State Univ.*, 241 F. Supp. 3d 1154 (D. Kan. 2017).................................... 17
*Whalen v. K–Mart Corp.*, 519 N.E.2d 991 (1st Dist. 1998) ............................................. 36
*Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7 (2008)..................................... 37
*Wozniak v. Adesida*, 368 F. Supp. 3d 1217 (C.D. Ill. 2018)........................................... 27

**Statutes**
20 U.S.C. § 1681(a) .................................................................. 15, 16, 18
28 U.S.C. § 2201 ........................................................................... 15
42 U.S.C. § 1983 ........................................................................... 22

**Regulations**
34 CFR §106.44(a)........................................................................... 17
34 CFR §106.44(c)................................................................... 12, 14, 16

## INTRODUCTION

Student-athletes at the University of Illinois Urbana Champaign ("University") are highly visible members of the University community. Accordingly, in addition to fulfilling their academic obligations as students and performing well athletically, they are expected to comport themselves in a manner that reflects positively on their team and the University. And when the University receives information that a student is alleged to have engaged in misconduct of such a nature that the student is charged with a serious felony crime, as occurred here, an interim removal from athletics pursuant to the University's own policies and procedures is appropriate. The matter before this Court—a Motion for Temporary Restraining Order ("TRO")[1]—is about how the University's Division of Intercollegiate Athletics ("DIA") sought to manage the challenges presented by a student-athlete's arrest for rape and sexual battery.

At their core, Plaintiff Terrance Shannon Jr.'s ("Plaintiff's") claims center on the process and procedures he believes the University should provide in connection with his temporary removal from the basketball team after being charged with rape and sexual battery. There are forums in which Plaintiff is entitled to the procedural measures he seeks, namely the court in Kansas where his criminal charges are pending. The DIA policy that gave rise to this case, however, is not such a forum. Plaintiff does not have a legally protected right to play on the

---

[1] Plaintiff's Verified Complaint for Injunctive Relief, consisting of 128 paragraphs and supported by 392 pages of exhibits, was filed in state court on January 8, 2024, along with his Verified Motion for Temporary Restraining Order, Preliminary Injunction, and/or Expedited Discovery ("Original TRO"), which had no exhibits (other than Exhibit A, a proposed order). Defendants removed the entire case to federal court that same day. *See* Dkt. 1. The Complaint was filed at Dkt. 1-1 and 1-2, and is cited herein as "Compl." Plaintiff refiled the same Original TRO in federal court on January 9, 2024.  Dkt. 5. The Court then entered an order on January 9, 2024 directing Defendants to file a response to the Original TRO by January 11, 2024, and setting a hearing for January 12, 2024 at 1:30pm. Dkt. 7. On January 10, 2024, at 3:15pm, Plaintiff filed a revised Verified Motion for Temporary Restraining Order, Preliminary Injunction, and/or Expedited Discovery, Dkt. 10, Memorandum of Law in Support of his Verified Motion for Temporary Restraining Order, Preliminary Injunction, and/or Expedited Discovery and five exhibits thereto, Dkt. 11, and a declaration, Dkt. 12 (collectively referred to as "TRO"), which was preceded by a Motion for Leave to Exceed Page/Word Limit, Dkt. 9. The University presumes that the filings at Dkt. 1-4 and Dkt. 1-5 have been superseded and that Plaintiff's TRO at Dkt. 10-12 is the operative motion pending before this Court. Citations to the TRO are made herein to the relevant docket entry.

basketball team in this case. In turn, Plaintiff cannot require that the University provide the procedural measures he is pursuing. Ultimately, the University did not infringe on any of Plaintiff's legal rights in closely following DIA policy and temporarily removing him from participating in basketball team activities, while he remains a student at the University and his athletically related financial aid remains intact.

The DIA is responsible for enforcing the Student-Athlete Code of Conduct and Discipline Process ("DIA Policy"), which is part of the Student-Athlete Handbook. All student-athletes at the University are expected to comply with both the Student Code (generally applicable to all students) and the Student-Athlete-Handbook, including the DIA Policy.

If a student-athlete is arrested for a "major offense" including sexual misconduct, DIA Policy allows for the student-athlete to be temporarily withheld from athletic participation (while remaining a student within the broader University community). The process involves an initial decision within DIA about whether the policy is triggered, followed by a non-DIA panel of University personnel (the "Student-Athlete Conduct Panel" or "Panel") that decides whether a student-athlete should be withheld from athletic participation during the pendency of criminal proceedings. The Panel's decision is informed by submissions of any evidence or information the student-athlete chooses to submit. The Panel's role is not to second-guess or judge whether the arrest, charges, or criminal prosecution were justified. Instead, its role pursuant to the DIA Policy is to assess whether the suspension remains appropriate, given the nature of the allegations, the circumstances of the case, and the information at hand; if so, the student-athlete's athletic participation remains on hold until the criminal process concludes or other "new information" is provided to the Panel that warrants lifting the interim suspension. The DIA Policy reflects that an arrest and criminal felony charge do not occur without serious evidence (including probable cause

attestations and judicial issuance of a warrant), and that for this reason, credible information of a major offense like an arrest and criminal charge must be taken seriously and may require interim action that continues while charges are pending. Even in such serious cases, the student-athlete is given an opportunity to be heard and to present evidence, if any exists, that an interim suspension is inappropriate, and the Panel will weigh that information in making its determination.

The DIA Policy was applied to Plaintiff as soon as the University learned he had been arrested for rape and sexual battery under Kansas law.  Although Plaintiff argues that his interim suspension gives the public a perception that his university has already found him tainted by the criminal charges, the University has made no determination as to whether Plaintiff committed any crime – nor is that the University's role. Instead, the University has adhered to its policy that permits withholding student-athletes from participation in athletic team activities after prosecutorial efforts lead to an arrest and while they are subject to prosecution for criminal sexual misconduct.

The arrest here stems from a road trip Plaintiff chose to make with two roommates to visit friends for entirely social reasons in Lawrence, Kansas. In Plaintiff's own words, he "traveled to Lawrence, Kansas with my roommates" and "stayed out at the Jayhawk Café for the evening with [a] group of friends." The Complaint and TRO seek to frame that trip as somehow part of a University "education program or activity" such that Title IX rules apply. But the entire trip had nothing to do with any University endeavor of any kind. Plaintiff and his student-athlete roommate made their own plans for a road trip to visit members of the Kansas University basketball team to have fun, unrelated to the University's basketball program or the University generally. When their other roommate (a graduate student manager) shared with coaches that those plans involved an excessive amount of driving in a short period of time, coaches suggested they not go and when

3

they insisted, a coach asked the graduate student to drive both players. That request did not convert the purpose or events of the trip into anything related to a University education program or activity. The bar that Plaintiff went to that night in Lawrence, Kansas, has no connection to the University. The woman who said she was raped by Plaintiff at that bar also has no connection whatsoever to the University. In those circumstances, applying the University's Title IX sexual harassment procedures would run directly contrary to Title IX regulations that limit Title IX jurisdiction.

As explained below, Plaintiff's Complaint asserts claims based on Title IX's application, federal due process, and contractual arguments for which he lacks a sufficient likelihood of success on the merits to warrant ordering the University to lift his interim suspension. Courts addressing cases involving similar off-campus conduct have held that Title IX is inapplicable to such conduct. Cases brought by student-athletes involving due process claims clarify that there is no liberty or property interest in collegiate athletic participation. Even if there was a constitutionally protected interest to participate in collegiate athletics, Plaintiff was provided all appropriate due process related to his interim suspension. Plaintiff's contractual arguments also cannot withstand scrutiny because: (1) Plaintiff has retained his financial aid (and thus there has been no breach of his scholarship agreement), (2) the University followed the DIA Policy, and (3) Plaintiff's arguments of unconscionability and waiver are inapplicable here.

The irreparable harm Plaintiff claims – negatively impacted NBA draft status, loss of potential earning capacity, and reputational harm – is speculative and does not support the extraordinary remedy of an emergency injunction. And, primarily, the potential harm to Plaintiff is directly connected to his criminal arrest for rape, not the University's decisions. Courts have also determined that the loss of participation in games during a season is also not irreparable harm.

For all these reasons, and as set forth below, this Court should deny the TRO.

4

## RELEVANT BACKGROUND

### I.   Plaintiff's September 2023 Out-of-State Personal Trip

Plaintiff Terrence Shannon, Jr. ("Plaintiff") is a member of the University's Men's Basketball Team ("Team"). Compl. ¶ 3. In September 2023, Plaintiff lived with another Team member, Justin Harmon ("Harmon"), and a graduate student manager, Dyshawn Hobson ("Hobson"). Alexander Dec. ¶¶ 3-4; Whitman Dec. ¶ 18.[2] On September 8, 2023, after a Team workout, Plaintiff and Harmon planned to drive themselves to Lawrence, Kansas to visit friends and attend, with those friends, a football game between the University and Kansas University ("KU"). Compl. Ex. A (hereinafter, Hobson Aff.) ¶¶ 3-4.[3] Plaintiff had an NIL[4] related appointment in Champaign, Illinois at 8:00 a.m. the next morning.  Alexander Dec. ¶ 3. When Team coaches learned of Plaintiff's social road trip plans, they were concerned because Plaintiff had previously been in a car accident relating to falling asleep behind the wheel. *Id.* Initially, coaches suggested that Plaintiff not go to the game because they were concerned that it would be unsafe, particularly given his history, to drive 12 hours (to and from Lawrence) in such a tight time frame. *Id.* ¶¶ 3-4. When Plaintiff insisted that he was going to go, a coach asked Hobson to drive, and Hobson agreed to do so. *Id.* There was no discussion of what Plaintiff planned to do while in Lawrence other than attend the football game, where he planned to go while in Lawrence, or who he planned to see. *Id.* ¶4.

---

[2] The declaration of Geoff Alexander is attached hereto as Exhibit 1. The declaration of Josh Whitman is attached hereto as Exhibit 2. The declaration of Ryan Squire is attached hereto as Exhibit 3. The declaration of Danielle Fleenor is attached hereto as Exhibit 4. The declaration of Robert Wilczynski is attached hereto as Exhibit 5. An unpublished case, *Robertson v. Bd. of Trs. of Kent State Univ.*, No. 82-3590, 1983 U.S. App. LEXIS 12414 (6th Cir. Nov. 8, 1983), is attached hereto as Exhibit 6.

[3] The Verified Statement of Dyshawn Hobson is Exhibit A to Plaintiff's Complaint. It is filed at Dkt. 1-1, pages 47-50.

[4] NIL refers to an individual's promotion of their own name, imagine, or likeness.

Plaintiff, Harmon, and Hobson drove to Lawrence and attended the football game on September 8, 2023, then socialized that night and into the early morning hours of September 9, 2023, with KU basketball players, including at a local bar called the Jayhawk Café. Hobson Aff. ¶¶ 7-8. The three of them left Lawrence to drive back to Champaign at 4:30 a.m. on September 9, 2023. *Id.* ¶ 11.

Later in September 2023, DIA, including the Director of Athletics, Josh Whitman, received preliminary information that, while he was in Kansas Plaintiff had been involved in an incident that was being investigated by the Lawrence Police Department ("LPD"). Whitman Dec. ¶ 12. The preliminary information DIA personnel received did not clarify whether Plaintiff was the subject of or a witness to the investigation. *Id.* In subsequent exchanges with LPD in Fall 2023, facilitated by the University of Illinois Police Department ("UIPD"), DIA learned that the LPD's investigation involved an allegation that Plaintiff had engaged in inappropriate touching of a woman in a bar in Lawrence. *Id.* ¶ 13. Throughout Fall 2023, DIA continued to receive only verbal, unsubstantiated, and vague information from the LPD regarding its investigation and the allegations relating to Plaintiff. *Id.* It was not until December 27, 2023 that DIA received notice that a warrant had been issued (on December 13, 2023) for Plaintiff's arrest for the crime of rape, as well as written police reports regarding the incident at the Kansas bar. *Id.* ¶ 16.

## II.    DIA Policy and Procedures

DIA maintains a Student-Athlete Code of Conduct and Discipline Procedures ("DIA Policy"). Whitman Dec. ¶ 2; *see also id.* Attach. A. The DIA Policy describes actions DIA will take upon receipt of credible information that a student-athlete engaged in misconduct, based on the seriousness of the offense.  *Id.* ¶ 3. "Major Offenses" are defined to include allegations of "a violation of a state or federal law that is designated as a felony" and "any offense related to sexual misconduct," including but not limited to "criminal sexual assault" and "rape." *Id.*; *see also id.*

Attach A at 3. The DIA Policy provides that receipt of credible information (such as an arrest warrant) of a potential "Major Offense" authorizes Whitman, as Director of Athletics, to take interim action to withhold a student-athlete from athletic activities pending review by a Student-Athlete Conduct Panel ("Panel"). *Id.* ¶ 4. In such instances, the student-athlete receives written notice of the interim action that explains the student-athlete may submit a written statement and any other evidence or information for the Panel to consider in reviewing whether the student-athlete should be withheld from athletic activities. *Id.* ¶ 7. The Panel is not an investigative body and is not asked to determine whether the alleged misconduct occurred; rather, it considers information available to it at the time it convenes to determine whether that information justifies withholding the student-athlete from some or all athletic activities pending final resolution of the charges or allegations at issue. *Id.* ¶ 8. Since this process was initiated several years ago, the Panel has carefully considered several instances based on allegations of a Major Offense, withholding student-athletes from athletic participation in most cases but allowing others to resume athletic participation in other cases. *Id.* ¶ 10. This process is consistent with the following language in the Student-Athlete Handbook: "As highly visible members of the University of Illinois ('University') community, student-athletes are expected to conduct themselves in a way that positively reflects upon the University, the Division of Intercollegiate Athletics ("DIA"), their coaches, and their teammates." *Id.* Attach. A at 1.

Pursuant to the DIA Policy, during Fall 2023, Whitman assessed the information the LPD had provided regarding Plaintiff to determine whether it was sufficient to trigger an interim action. *Id.* ¶ 15. With unanimous agreement from University offices with whom Whitman consulted, he determined that the information the LPD had provided during Fall 2023 was not sufficient to trigger an interim action. *Id.* When DIA received, on December 27, 2023, the warrant for Plaintiff's

arrest as well as written police reports regarding the incident at the Kansas bar, DIA personnel learned for the first time that Plaintiff had been criminally charged with rape as defined by Kansas law. *Id.* ¶ 16; *see also id.* Attach. B. DIA determined that this new information was credible information of a Major Offense resulting in DIA taking interim action pursuant to the DIA Policy. *Id.* ¶ 17. Accordingly, on the afternoon of December 27, 2023, Whitman personally notified Plaintiff that he would be withheld from athletic activities, effective immediately. *Id.* Plaintiff received formal notice of his temporary suspension on December 28, 2023. Squire Dec. ¶ 8; *see also id.* Attach. A. This formal notice stated that, while the interim action was in place, Plaintiff would not be permitted to participate in organized practice, competition, conditioning workouts, or meetings with the basketball team. *Id.* That notice also informed Plaintiff that the Panel was scheduled to convene within 48 hours to review the interim action; that Plaintiff had the opportunity to provide a written statement and/or other documentary evidence related to the incident before the Panel convened; and that Plaintiff was entitled to request a delay in the convening of the Panel, but the suspension would continue during the delay. *Id.* ¶ 9. Plaintiff submitted a short initial statement on December 29, 2023 that stated:

> On September 8, 2023, I traveled to Lawrence, Kansas with my roommates for the KU-Illinois football game. After the game, we went out in Lawrence with some friends who attended Kansas. We stayed out at the Jayhawk Café for the evening with [a] group of friends. My friends were with me for the entire evening. I have recently been accused of a crime from the events of that evening. I unequivocally did not commit that crime. I am looking forward to my day in court.

*Id.* ¶ 10; *id.* Attach. B.

After Plaintiff requested a delay, the Panel meeting was set for January 3, 2024. *Id.* ¶ 11. The night before the Panel meeting, Plaintiff submitted additional information for the Panel to consider through his attorneys, including a personal statement written by Plaintiff, a supporting

letter from his attorneys, and exhibits. *Id.* ¶ 12. The Panel met in the afternoon of Wednesday, January 3, 2024. *Id.* ¶ 13.

Pursuant to the DIA Policy, the University's Title IX Coordinator, Danielle Fleenor ("Fleenor"), was appointed as a subject matter expert to advise the Panel on Title IX and related sexual misconduct policy and procedure matters. Fleenor Dec. ¶ 6. After reviewing Plaintiff's written submissions, which included documents from the criminal proceedings in Kansas that described the alleged conduct at issue, Fleenor determined that the circumstances surrounding the alleged sexual misconduct did not occur within an educational program or activity of the University. *Id.* ¶ 7. The woman who raised the allegations lacked any affiliation with the University, and the location was a private bar in Lawrence, Kansas, which Plaintiff visited with his two roommates for social purposes. *Id.* Coaches discouraged Plaintiff from even taking the personal road trip to Lawrence, and provided no instructions or expectations for what Hobson, Plaintiff, or anyone else would do while in Lawrence, and Hobson was not compensated in any way for driving to and from Lawrence. *See id.* Fleenor thus advised the Panel on January 3, 2024 that the alleged sexual misconduct incident did not occur within the context of a program or activity under the University's purview, the University did not exercise or have substantial control over Plaintiff or the bar he visited, and that the alleged incident fell outside of Title IX jurisdiction as defined by federal regulations and the University's policies. *Id.* ¶ 8. The Panel determined that the interim action to withhold Plaintiff from organized team activities should remain in place pending resolution of the charges against him stemming from the September 2023 incident in Kansas and subject to the Panel's ability to consider new information if it becomes available. Squire Dec. ¶ 13. The Panel issued a written notice informing Plaintiff that he was not permitted to return to organized team basketball activities but was permitted to continue to access athletic facilities,

9

receive medical and academic support, and participate in student-athlete development activities, as well as receive nutritional support and eat in the Varsity Room, and that his athletically related financial aid was not affected by the Panel's decision. *Id.* ¶¶ 13-14; *id.* Attach. C.

### III.    The University's Non-Title IX Sexual Misconduct Procedures

The University maintains a Sexual Misconduct Policy and related procedures that address complaints of Title IX Sexual Harassment and Prohibited Sexual Misconduct (or non-Title IX sexual misconduct) against students.  Fleenor Dec. ¶ 1.  Title IX Sexual Harassment, as defined by the Sexual Misconduct Policy included in the University's Student Code, is limited to certain categories of conduct (including sexual assault) if such conduct occurs within an education program or activity of the University. *Id.* ¶ 2. An education program or activity of the University includes locations, events, or circumstances over which the University exercised substantial control over both the person accused of misconduct and the context in which the alleged misconduct occurred. *Id.* Complaints of Title IX Sexual Harassment against a student are processed pursuant to the University's Title IX Sexual Harassment grievance procedures. *Id.*

Reports of sexual misconduct that do not contain allegations of Title IX Sexual Harassment (*i.e.*, that fail to satisfy Title IX jurisdictional limitations) are not processed pursuant to the Title IX Sexual Harassment grievance procedures. *Id.* Instead, sexual misconduct (including sexual assault) that occurs outside of an education program or activity of the University may qualify as Prohibited Sexual Misconduct as defined by the Sexual Misconduct Policy included in the Student Code and are addressed pursuant to the University's Prohibited Sexual Misconduct Process. *Id.* ¶ 3. As such, the University has procedures to address alleged sexual misconduct that does not satisfy jurisdictional limitations of Title IX Sexual Harassment. *Id.*

On January 3, 2023, Fleenor talked with the Director of the University's Office of Student Conflict Resolution ("OSCR"), Robert Wilczynski ("Wilczynski"), about the extent to which

10

information from the police records referenced above implicated the University community's interests in pursuing possible disciplinary process against Plaintiff for Prohibited Sexual Misconduct (non-Title IX sexual misconduct). *Id.* ¶ 9. University procedures relating to such issues include a section regarding "jurisdiction" stating:

> The University has jurisdiction over student conduct that occurs on university property, or in connection with official university programs or functions on or off university property.  The university may, at its discretion, exercise jurisdiction over student behavior that occurs off campus and that would violate student conduct policies or regulations in those instances in which the university's community interest is substantially affected.

Wilczynski Dec. ¶ 4. Among factors to be considered in exercising discretion over sexual misconduct allegedly occurring off campus and outside of any educational program or activity, the procedures include whether "the alleged misconduct indicates the student posed or poses a threat to the safety or security of any individual," "the seriousness of the alleged misconduct," and "the ability of the University to gather information, including the statements of witnesses."  *Id.*

Wilczynski considered the information presented to him in the LPD materials about the September 2023 incident in Kansas, in which it was alleged that Plaintiff had grabbed a woman's buttocks and digitally penetrated her without her consent. *Id.* at ¶ 5. Wilczynski determined that this alleged conduct indicated that the Plaintiff had posed a threat to the safety or security of another person (the woman in the bar) and the alleged sexual misconduct was serious. *Id.* He also determined that the University had the ability to gather information from Plaintiff, his roommates who were present at the bar during the incident, and potentially from the LPD that had investigated the criminal matter. *Id.*  He also determined that the University's community interests are substantially affected in this situation. *Id.* Based on these factors, Wilcyznski decided the University should initiate an investigation of this incident pursuant to the non-Title IX procedures, the Prohibited Sexual Misconduct process. *Id.*

11

On January 5, 2024, the University notified Plaintiff in writing that OSCR was initiating an investigation of potential sexual assault, pursuant to Student Code section 1-302.b.1 (the non-Title IX sexual assault section). *Id.* ¶ 6.

## IV.   Plaintiff's Lawsuit

Plaintiff's Complaint contains seven counts seeking only declaratory and injunctive relief, including: (1) a claim asking for judicial determination that "Title IX applies"; (2) a federal due process claim; and (3) several claims sounding in contract or "waiver" of contractual rights. The primary claim,[5] entitled "Count I – Injunctive and Declaratory Relief: Title IX," asserts that, pursuant to 34 CFR §106.44(c), which is a regulation of the Department of Education applicable to Title IX of the Education Amendments of 1972 ("Title IX"), Plaintiff cannot be subject to an interim removal unless there is a determination that he creates "an immediate threat to the physical health or safety of any student" and that, therefore, his interim suspension violates Title IX. Compl. ¶¶ 63, 69, 71. Based primarily on that theory, Plaintiff seeks a temporary restraining order directing the University to lift Plaintiff's temporary suspension from athletic participation. This Court should deny Plaintiff's TRO.[6]

## ARGUMENT

## I.   Legal Standard

Courts apply the same standard for analyzing motions for temporary restraining orders and preliminary injunctions. *See Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, No. 01 C 585, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001). "To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal

---

[5] Indeed, five of the six other claims are plead "in the alternative" to the Title IX focused claim.
[6] Defendants request that Plaintiff's request for both a temporary restraining order *and* preliminary injunctive relief be denied and use the term "TRO" broadly here.

remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) (*quoting Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). The plaintiff bears the burden of persuasion with regard to each factor. *See Cox v. City of Chi.*, 868 F.2d 217, 222 (7th Cir. 1989). If the plaintiff fails to meet even one of the prerequisites, then the injunction must be denied. *Id.* at 223. As the Seventh Circuit has stated, "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Goodman v. Ill. Dep't Fin. & Prof'l Reg.*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in original). "The moving party's likelihood of prevailing on the merits must exceed a mere possibility of success." *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022) (quotations omitted). If the Court determines that the plaintiff has established the initial temporary restraining order prerequisites, then the Court must balance the harm that the nonmoving party will suffer if preliminary relief is granted against the irreparable harm the moving party will suffer if relief is denied. *See Speech First, Inc.*, 968 F.3d at 637.

## II.   The Court Should Deny Plaintiff's Motion for a Preliminary Injunction in its Entirety.

Applying the emergency injunctive standards described above to this matter reveals Plaintiff's motion must be denied.  Plaintiff cannot demonstrate (1) sufficient likelihood of success on any of the asserted claims, (2) that the ongoing suspension while criminal proceedings continue will cause irreparable harm, or (3) that any potential harm he may suffer from remaining on interim suspension would outweigh the harm to the University's interests that would result from a judicial order requiring that he be allowed to resume representing the University via athletic participation.

When evaluating these requests for preliminary injunctions, the Seventh Circuit has explained that courts "do not accept [Plaintiff's] allegations as true, nor do we give him the benefit

of all reasonable inferences in his favor. […] We also do not give [Plaintiff] the benefit of conflicting evidence, as we would in reviewing a grant of summary judgment." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791-92 (7th Cir. 2022); *see also, Doe v. George Washington Univ.*, 305 F. Supp. 3d 126, 134 (D.D.C. 2018) (denying motion for preliminary injunction under Title IX because even if "an inference may forestall dismissal . . . a plausible inference is not sufficient to show likelihood of success on the merits as required for a preliminary injunction."); *Doe v. Ind. Univ.-Bloomington*, No. 1:18-cv-03713-TWP-MJD, 2019 WL 341760, at *1 (S.D. Ind. Jan. 28, 2019) ("A preliminary injunction is an extraordinary remedy never awarded as a right*."); Doe v. Vassar Coll.*, No. 19-cv-9601 (NSR), 2019 WL 6222918, at *11 (S.D.N.Y. Nov. 21, 2019) ("There is no indication that the plaintiff's ability to meet that minimal [pleading] standard indicates that he presents a serious question on the merits for the purposes of demonstrating entitlement to a preliminary injunction."). Here, Plaintiff's request for emergency injunctive relief should be denied based on the University's evaluation of credible information about Plaintiff's arrest and the reasonable decisions it made pursuant to applicable policies.

### A. Plaintiff Has Not Shown a Likelihood of Success on the Merits of his Title IX-Based Claim in Count I.

In Count I of his Complaint, Plaintiff asks that this Court declare "that Title IX applies to this situation; and, that [the University] either immediately perform an individualized safety and risk analysis pursuant to 34 CFR §106.44(c) . . . or immediately reinstate [Plaintiff] as a full participant in on the Team," and declare "that [the University's] Title IX coordinator should initiate a Title IX Complaint." Compl. ¶ 75. Plaintiff asserts in his TRO that he "has some likelihood that [he] can show on the merits that the alleged incident took place during an 'education program or activity' of [the University] given the fact that [a University] employee, in the scope of his employment at [the University] and in furtherance of [the University's] interests, transported and

oversaw [him] during that time." Dkt. 11 ¶ 26. Plaintiff cannot state a viable Title IX claim on such a theory.

As a preliminary matter, in Count I Plaintiff seeks a declaration that Title IX governs his conduct. The Declaratory Judgment Act[7] does not itself create a private right of action; rather, there must be some independent basis for relief. *See Stencil v. Johnson*, 605 F. Supp. 3d 1109, 1114-15 (E.D. Wis. 2022) ("a party may not bring an action for declaratory relief if that party would not otherwise have a private cause of action"). Plaintiff can only maintain an action for declaratory judgment related to Title IX in this case—if this Court so chooses to exercise its *discretionary authority* under the Declaratory Judgment Act, 28 U.S.C. § 2201—if he has an actual case or controversy under Title IX. *See Doe v. Vanderbilt Univ.,* No. 3:18-CV-00569, 2019 WL 4748310, at *11 (M.D. Tenn. Sept. 30, 2019); *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1083 (S.D. Ohio 2017), *on reconsideration in part*, 323 F. Supp. 3d 962 (S.D. Ohio 2018); *Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 7254213, at *13–14 (S.D. Ohio Nov. 17, 2015). Accordingly, Count I, in order to even be justiciable, must be read as seeking to bring an action against the University for a violation of Title IX (in addition to seeking a declaratory judgment). Plaintiff is unlikely to succeed on the merits of any such action.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Although the statute itself contains only an "administrative enforcement scheme," "the Supreme Court has recognized an implied private right of action for the victim of illegal discrimination to

---

[7] Plaintiff brings his request for a declaratory judgment pursuant to the Illinois Declaratory Judgment Act, 735 ILCS 5/2-701, *et seq.* Compl. ¶ 62. Upon removal, the federal declaratory judgment statute, 28 U.S.C. § 2201, applies. *See People of State of Ill. ex rel. Barra v. Archer Daniels Midland Co*., 704 F.2d 935, 939 (7th Cir. 1983); *Kole v. Vill. of Norridge*, 941 F. Supp. 2d 933, 959 (N.D. Ill. 2013).

enforce the statute, as well as the ability to recover monetary damages." *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp*., 551 F.3d 599, 604-05 (7th Cir. 2008) (internal citations omitted). "A Title IX discrimination claim requires a plaintiff allege (1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019).[8] Thus, to be entitled to a TRO or preliminary injunctive relief on a Title IX claim, Plaintiff must establish that he was excluded from participation in the basketball program *because of* his gender. *See id.; see also Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791-92 (7th Cir. 2022) (denying motion for preliminary injunction based on Title IX claim).

As a preliminary and dispositive matter, Plaintiff does not attempt to assert any gender bias in Count I. The TRO contains no reference to different treatment of men or women. Thus, he lacks any likelihood of success on a claim pursuant to Title IX.

### 1. The Title IX "Emergency Removal" Regulation is Not Applicable.

Moreover, the University's alleged failure to comply with the emergency removal regulation at 34 CFR § 106.44(c) is inapplicable to the context in which Plaintiff's alleged misconduct occurred, which was a personal road trip, initiated by Plaintiff, for the purpose of visiting friends in Lawrence, Kansas. That context is crucial because Title IX prohibits sex-based discrimination, including sexual misconduct, occurring within an educational institution's "programs" or "activities." *See* 20 U.S.C. § 1681(a). The Department of Education has created a series of regulations that govern the procedures by which a university is to investigate sexual

---

[8] There is also a private right of action for deliberate indifference to "known acts of discrimination or harassment," through which a student subjected to sex-based harassment or misconduct from other students or employees of a university can bring a Title IX claim against the university. *See Hanson*, 551 F.3d at 605. This theory is not relevant here, as Plaintiff was not the alleged victim of sexual harassment or misconduct, but the alleged perpetrator.

misconduct, but only such conduct occurring within the university's programs or activities. To that end, and consistent with Title IX, the University's Sexual Misconduct Policy prohibits "sex discrimination . . . in an education program or activity of the University against a person in the United States." University Sexual Misconduct Policy, https://cam.illinois.edu/policies/hr-79; *see* Fleenor Dec. ¶ 1.

For conduct to occur within a "program or activity" under Title IX, courts recognize that the school must have "substantial control over ***both*** the harasser ***and*** the context in which the known harassment occurs." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999) (emphasis added). This requirement is also memorialized in Title IX's regulations:

> A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances. . . . "[E]ducation program or activity" includes locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution.

34 CFR §106.44(a). It is well-established that "sexual assaults that occur off-campus, in private settings, and within contexts that have little or no connection to the funding recipient do not trigger Title IX liability." *Weckhorst v. Kansas State Univ.*, 241 F. Supp. 3d 1154, 1165-68, 1170 (D. Kan. 2017); *see also O'Shea v. Augustana Coll.*, 593 F. Supp. 3d 838, 846-47 (C.D. Ill. 2022) (assaults at off campus bar outside of Title IX); *Doe v. Blackburn Coll.*, No. 06-3205, 2012 WL 640046, *12 (C.D. Ill. Feb. 27, 2012); *Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014); *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003); *Samuelson v. Oregon State Univ.*, 162 F. Supp. 3d 1123, 1132 (D. Ore. 2016), *aff'd*, 725 F. App'x 598 (9th Cir. 2018).[9] Consistent with this long-

_____

[9] The question of whether a university had "substantial control" typically arises in deliberate indifference cases, wherein a student who was sexually harassed or assaulted by another person brings suit against the university he/she

17

standing precedent, the University determined that Plaintiff's arrest for an alleged assault of a person lacking any connection to the University, at an off-campus, out-of-state, privately-owned bar while Plaintiff was socializing with friends on a personal road trip did not fall within its definition of "Title IX Sexual Harassment" and was not within the jurisdiction of Title IX. The University did not initiate that trip or direct what Plaintiff did while away, nor did it exercise substantial control over *either* Plaintiff *or* the context of the alleged assault at the Jayhawk Café in Kansas on September 9, 2023.

In seeking to avoid the conclusion that the Kansas social outing could not have involved an educational program or activity of the University, Plaintiff's Original TRO filings cited to inapposite legal authority and raised a series of factual arguments that cannot withstand scrutiny. First, Plaintiff's citations to *Lapka* v. *Chertoff,* 517 F.3d 974, 982–83 (7th Cir. 2008) and *Roe v. Gustine Unified School District*, 678 F. Supp. 2d 1008, 1025 (E.D. Ca. 2009) are unpersuasive. *See* Dkt. 11 ¶¶ 54-55. *Roe* is the only Title IX case, and the facts could not be more starkly different. The context of the harassment was a football camp, organized and promoted by the school, supervised by the school's coaches, and involving school-provided transportation on school-owned buses.  678 F. Supp. 2d at 1025. The entire environment at the camp was createdand run by the school, which is nothing like Plaintiff's self-initiated social trip to hang out with friends. *Lapka* is not at all applicable as it is a Title VII case, which has no analysis of the *statutory* requirement that Title IX's jurisdiction is limited to "any education program or activity." *See* 20 U.S.C. § 1681(a). Moreover, that case involved assault by one coworker of another while both

---

attends with allegations that the university did not respond to the harassment or assault in an appropriate or sufficient manner. *See* note 8, *supra*. In responding to Plaintiff's TRO, the University has been unable to find a discussion of the "substantial control" element in any direct discrimination cases, in which a respondent is suing the institution he/she attends and arguing that school responded to the sexual assault he/she perpetrated in a gender-biased manner. The cases cited above regarding an institution's lack of substantial control over off-campus sexual assaults all arose in the aforementioned deliberate indifference context.

were on-duty at a bar associated with a training facility related to their workplace, *see Lapka*, 517 F.3d at 982-83; in contrast, here the alleged victim and bar lack any connection to or affiliation with the University.

Second, Plaintiff's revised TRO filing cited to *Pogorzelska v. VanderCook College of Music*, No. 19-cv-05683, 2023 WL 3819025, at *15 (N.D. Ill. June 5, 2023), *see* Dkt. 11 ¶ 54, which is distinguishable. In *VanderCook* the court determined there were sufficient facts to create a jury question on whether the college could be held liable for deliberate indifference to alleged sexual harassment under Title IX: (i) the school apparently investigated the allegations under Title IX and "never took the position that the school was not required to do so under Title IX prior to this litigation," (ii) the alleged harassment occurred between two students at the college in the student respondent's apartment near campus, a location ("the off-campus residence of any VanderCook students") specifically recognized as subject to the college's disciplinary procedures, and (iii) the college stated it maintained a no-contact directive between the students due to "Title IX mandates," and despite that directive, the plaintiff alleged "she was harassed on campus on at least three separate occasions" by the other student after the investigation concluded. *Id.* at *1, 3, 5, 15. The instant matter bears no resemblance to *VanderCook*: the current facts do not involve a deliberate indifference case, the alleged assault is not between two current students at a student's apartment near campus, the University did not initiate an investigation under Title IX, and there is no policy language imposing some authority of the University over the context of a Kansas bar in the way that VanderCook's policy stated it had authority over students' off-campus residences.

For these reasons, this matter is more similar to *O'Shea*, in which the Central District of Illinois concluded that assaults at an off-campus bar were not within the college's control. 593 F.

19

Supp. 3d at 846-47. Pursuant to this precedent, and on the face of the Title IX regulations themselves, the guidance on emergency removals under Title IX is not applicable here.

In seeking to avoid this conclusion, Plaintiff raises a series of factual arguments about the role his student-manager roommate, Hobson, played during the trip to Lawrence. What Plaintiff does not challenge, however, is that (1) Plaintiff initiated plans for the road trip to visit friends, (2) coaches discouraged him from traveling at all, and (3) the activities Plaintiff and his roommates engaged in while in Lawrence were purely personal, social interactions. Indeed, in his December 29, 2023, email (which he wrote in response to notification of the interim suspension), Plaintiff expressly described the trip as with his "roommates" and stated that they "went out in Lawrence with some friends" and that he "stayed out at the Jayhawk Café for the evening with group of friends."  Squire Dec. ¶ 10, Attach. B.. As such, there was no University program or activity at the bar, during the time Plaintiff was out in Lawrence, or the trip to and from Kansas. Also, Plaintiff attempts to assert that Hobson "transported and escorted" and "oversaw" Plaintiff's movements "in furtherance of [the University's] interests" at the direction of Team coaches. Dkt. 11, ¶¶ 8, 18, 26, 68. But, Hobson was not "on the clock" during the trip, as demonstrated by his time sheets that did not seek compensation, and he received no pay or reimbursement for the trip.[10] Whitman Dec. ¶ 18. Indeed, Hobson was Plaintiff's roommate with no supervisory role over Plaintiff or anyone else at the University. His responsibilities as a student manager include traditional managerial duties such as equipment, laundry, and hydration and he may participate in limited on-court activities during practice, as well as sometimes assist in film preparation and review, performance analytics, and scouting reports. *Id.* Consistent with Plaintiff's initial plan, the visit to the bar at

---

[10] Hobson's role as a student manager with the Team also does not involve any supervisory or managerial duties, nor did he seek any reimbursement for expenses incurred on the trip, which would not have been reimbursed if he had. Whitman Dec. ¶ 18.

which the alleged conduct occurred was purely a social environment with other KU players with no indication that Hobson altered or directed Plaintiff's activities in Lawrence. Hobson was asked to drive Plaintiff and Harmon but only for their safety given the short time in which they planned to drive a total of 12 hours. *See* Alexander Dec. ¶ 3. Such a request does not convert a personal social trip into the University's education program or activity.

For all of these reasons, the context of Plaintiff's trip to Kansas and time in the bar at which he is accused of sexual misconduct does not qualify as an "education program or activity" of the University and thus does not implicate Title IX regulatory guidance.

### 2. *A Failure to Follow Title IX Regulations Does Not Give Rise to a Private Right of Action.*

Even if the Title IX regulation *were* applicable here, Plaintiff is not likely to succeed on the merits of claims premised on the University's failure to follow it, as a failure to comply with a specific regulatory guarantee is not a *prima facie* Title IX violation. Precedent is quite clear that there is no private right of action to enforce Title IX's regulations. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017) (dismissing Declaratory Judgment Act claim premised "solely on violations of regulations promulgated under Title IX—requiring the adoption of certain grievance procedures"; "Numerous district courts have interpreted *Gebser* to mean there is no private right of action to enforce grievance procedures and other regulations under Title IX" and "failure to promulgate a grievance process is not itself discrimination") (collecting cases). Even if the emergency removal regulation applied to Plaintiff (which it does not), a failure to comply with it does not give rise to a legal claim. The only way to succeed on a Title IX discrimination claim is to establish differential (and adverse) treatment on the basis of gender. Plaintiff has not even attempted to allege such a theory (nor would he be able to succeed on one, as it is clear that he was subjected to an interim

suspension for a non-discriminatory reason: because he was arrested for and charged with rape and sexual battery.

For these reasons, Plaintiff is unlikely to succeed on the merits of his Title IX claim in Count I and thus is not entitled to a TRO.

### B. Plaintiff Has Not Shown a Likelihood of Success on the Merits of a Due Process Claim.

Plaintiff additionally attempts, but is unable, to premise his TRO on a procedural due process claim. *See* Dkt. 11 ¶ 80. In order to state a claim for due process, a Plaintiff must "show three things: 'that (1) he had a constitutionally protected property [or liberty] interest, (2) he suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law.'" *Johnson v. Thompson-Smith*, 203 F. Supp. 3d 895, 906 (N.D. Ill. 2016). To prevail on a request for a temporary restraining order, Plaintiff must also not merely *allege* a due process violation, but he must make a "*clear showing*" of a likelihood of success on the merits. *See Goodman*, 430 F.3d at 437. Here, Plaintiff fails to even allege both the first and third elements of a due process claim and therefore does not meet the high bar required for a temporary restraining order.

#### 1. Plaintiff does not have a constitutionally protected interest in participating in athletic activities with the Team.

"The first inquiry in every procedural due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'" *Johnson*, 203 F. Supp. 3d at 906. If this element is not satisfied, the Court need not consider whether the other elements of a due process claim are met. *See id.* Plaintiff's TRO contains vague assertions to his "property and other interests" but fails to explicitly state what he believes those interests are. The Complaint brings a claim under 42 U.S.C. § 1983 against President Killen alleging that (a) he was deprived "of a constitutionally protected property interest by suspending him from the Team, thereby depriving

[him] of the right not to be suspended from the Team without good cause and due process"—
which he alleges is required by Title IX, his Scholarship Contract, and "otherwise"—and (b) he
was deprived of a "constitutionally protected liberty interest to pursue a career of his choice
without the stigma of the Suspension." Compl. ¶¶ 116-117.

As a preliminary, and fundamental, matter, student-athletes do not have a constitutionally
protected right to participate in collegiate athletics as "there is no property or liberty interest in
participating in interscholastic athletics." *See Hawkins v. NCAA*, 652 F. Supp. 602, 610-11 (C.D.
Ill. 1987); *see also Radwan v. Manuel*, 55 F.4th 101, 128 (2d Cir. 2022) ("over the years courts
have rejected the notion that an individual has a general right to play or participate in collegiate
athletics") (collecting cases); *Robertson v. Bd. of Trs. of Kent State Univ.*, No. 82-3590, 1983 U.S.
App. LEXIS 12414, at *1-4 (6th Cir. Nov. 8, 1983) (finding no due process violation where a
student was suspended from the tennis team without a hearing)[11]; *Nat'l Coll. Athletic Ass'n v. Yeo*,
171 S.W.3d 863, 869-70 (Tex. 2005) (finding no protected interest in collegiate athletics, even
where student athlete's athletic reputation was "stellar"). Furthermore, "there is no constitutionally
protected property interest in gaining tournament experience or media exposure," nor is there "a
constitutionally protected right to secure professional careers in athletics." *Hawkins*,  652 F. Supp.
at 610-11; *see also Cephus v. Blank*, No. 21-cv-126-wmc, 2022 WL 17668793, *5 (W.D. Wis.
Dec. 14, 2022) (dismissing a former student athlete's due process claim because it was not
"*virtually impossible*" for him to find employment in his chosen field); *Caldwell v. Univ. of New
Mexico Bd. of Regents*, 510 F. Supp. 3d 982, 1043 (D. N.M. 2020) (collecting cases showing "[t]he
view that no constitutionally protected interest in a professional sport arises out of participation in
scholastic sports is the consensus among courts, including the Tenth Circuit."). Indeed, Plaintiff's

---

[11] *Robertson v. Bd. of Trs. of Kent State Univ.*, No. 82-3590, 1983 U.S. App. LEXIS 12414 (6th Cir. Nov. 8, 1983) is
attached hereto as Exhibit 6.

TRO does not cite any cases in which a court found playing college sports was a constitutionally protected right.

Instead, participating in college athletics is a privilege gained by a student's academic and athletic performance, along with adherence to DIA's expectations and policies. *See* Student Athlete Handbook, main page (available at https://fightingillini.com/sports/2022/7/8/academics-student-athlete-handbook-master-page/) ("it is a privilege, and not a right, to be associated with our program"). As such, student-athletes are expected to take their academic responsibilities seriously, including a requirement to attend class and study halls, to conduct themselves according to the highest levels of ethical behavior, to maintain a proper level of physical conditioning, to engage in principles of good sportsmanship, and to follow local, state, and federal laws and NCAA, University, DIA, and team rules, policies, and regulations. If these expectations and rules are not met, student-athletes are subject to discipline or corrective action, including suspension from athletic participation and dismissal from the athletic program. Most reasons for athletic participation suspension are accompanied by no procedures, as they are determined by coaches or DIA staff discretion.

In cases involving suspensions or expulsions from school—a more severe action than interim suspension from athletic participation at issue here—courts are clear that there is no "stand-alone property interest in . . . continued education at state universities" and therefore to state a due process claim, the plaintiff must show both "the existence of an express or implied contract" and that this "contract entitled him to the specific right that the university allegedly took, such as ... the right not to be suspended without good cause." *Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 537 (7th Cir. 2023) (internal quotations omitted). Here, Plaintiff attempts to state he has a right to participate on the team due to his Scholarship Contract. But that contract merely

contains agreements relating to Plaintiff's financial aid and circumstances in which such aid can be removed, without any reference to participation in team activities or under what circumstances such participation may be suspended.  Plaintiff's financial aid remains intact, as specifically stated in documents notifying him of his interim suspension from team activities.  This cannot create a property interest capable of supporting a due process claim.

In addition, Plaintiff's "business interests" are not protected by the constitution. Compl. ¶ 60. The business interest to which Plaintiff appears to be referring is his income from his NIL agreements. The University is not a party to Plaintiff's NIL agreements, and any injunction entered against the University will not, as a matter of law, impact these agreements. *See Swan v. Bd. of Educ. of City of Chi.*, 956 F. Supp. 2d 913, 918 (N.D. Ill. 2013) ("It follows from these fundamental principles that where, as here, a plaintiff seeks an injunction against a defendant, he or she must demonstrate that the defendant to be enjoined has the authority to effectuate the injunction.").

To state a cognizable liberty interest, a plaintiff must satisfy the "stigma plus" test, which requires him "to allege both that he suffered a reputational injury ("stigma") and an alteration in legal status that deprived him of a right he previously held ("plus")." *Malhotra*, 77 F.4th at 538. As the Seventh Circuit recently clarified regarding the pleading requirements of the "stigma plus" test:

> [A] state actor can violate the Constitution by depriving a plaintiff of his "occupational liberty"—his right to pursue a career of his choice. [*Doe v.*] *Purdue* [*Univ.*], 928 F.3d [652,] 661 [(7th Cir. 2019)]. That said, "the loss of reputation is not itself a loss of liberty," even when the reputational loss causes a "serious impairment of one's future employment." *Purdue*, 928 F.3d at 662 (citation and quotation marks omitted). A state actor infringes on a liberty interest only by "cast[ing] doubt on an individual's ... reputation" to such a degree that "it becomes virtually impossible for the [individual] to find new employment in his chosen field." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) (citation and quotation marks omitted).

*Id.* Thus, Plaintiff must allege that (1) the state disclosed information that damaged his reputation, (2) the reputational harm made it "*virtually impossible*" for him to find employment in his chosen field, and (3) his legal status was altered, depriving him of a previously held right. *See id.*; *Doe v. Trs. of Ind. Univ.*, 496 F. Supp. 3d 1210, 1216 (S.D. Ind. 2020) (citing *Purdue*, 928 F.3d at 661). Here, Plaintiff fails to even to adequately *plead* a stigma plus claim, let alone show a clear likelihood of success.

Three matters are dispositive. First, any "stigma plus" claim would fail because any harm to Plaintiff's reputation would come, primarily, from his arrest, not the interim suspension *after* that arrest. *See Mathis v. Krause*, No. 22-cv-47-jdp, 2023 WL 3934049, at *4 (W.D. Wis. June 9, 2023) (finding no authority suggesting "that a plaintiff can establish a due process violation by combining two separate actions taken for different reasons by different state actors."). Second, Plaintiff also has not shown that any reputational harm will make it "*virtually impossible*" for him to find employment as a professional basketball player, instead arguing that his NBA draft stock may drop to "*perhaps* nothing." Dkt. 11 ¶ 87 (emphasis added). Other courts have dismissed student-athlete claims related to arrest-caused suspensions from athletic participation as incapable of satisfying the liberty interest requirement because the suspensions did not render future professional sport employment "virtually impossible." *Cephus*, 2022 WL 17668793, at *5 (no authority for the idea there is a liberty interest in a better or more lucrative professional sports position). Third, for the reasons discussed previously, the University's decision to suspend Plaintiff from athletic competition does not deprive him of a previously held right—that is, the University has not altered his legal status.

### 2. *Plaintiff was given appropriate process.*

Even if Plaintiff had shown a protected liberty or property interest, which he has not, the due process claim would still fail because the University provided him notice and an opportunity

to be heard - "'[t]he hallmarks of procedural due process.'" *Wozniak v. Adesida*, 368 F. Supp. 3d 1217, 1247 (C.D. Ill. 2018) (citing *Pugel v. Bd. of Trs. of the Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004)). Due process "does not require all University policies to be followed" (though such policies were followed here) but instead "guarantees advance notice of charges and a fair chance to refute them." *Id.* at 1247-48 (quotations omitted). Here, Plaintiff received ample notice of the allegations against him and opportunity to be heard via the Panel process. *See* Squire Dec. ¶¶ 8-10. After requesting and being granted a delay in the Panel's review, Plaintiff submitted a written statement to the Committee that included his own personal statement, an 11-page letter in from his attorneys, and nearly 50 pages of exhibits designed to support his case. *Id.* ¶ 12. Indeed, the Panel also gave Plaintiff extra time, at his request, to provide this additional information. *Id.* The Panel considered the information submitted by Plaintiff and his attorneys in determining that the interim action to withhold Plaintiff from organized team activities would remain in place. *Id.* ¶ 13. Plaintiff was also directly informed that "if new and relevant information becomes available, the Panel may reconvene to review this decision." *Id.* ¶ 14.[12]

Plaintiff cites to *Khan v. Yale Univ.*, 347 Conn. 1 (2023) as supportive of his claim that he was not provided "adequate safeguards to ensure reliability and promote fundamental fairness." *See* Dkt. 11 ¶ 80. *Khan* is not only distinguishable because it's a state court case from a different state. It is not even about due process. In *Khan*, the question before the court was whether the principle of "quasi-judicial immunity"—a Connecticut legal principle which allows for absolute immunity from defamation claims for statements made in judicial and quasi-judicial proceedings—applies to statements made by a student during a proceeding under a college's sexual

---

[12] Plaintiff's submissions explained that they were focused on information contained in LPD reports and that he expected to receive more robust "discovery" from the prosecution in his criminal case in late January or February. Squire Dec. ¶ 12. Once received, Plaintiff could submit any new information he receives, which could result in the Panel reconvening to review whether to lift the temporary suspension.

assault policy. 347 Conn. 7-8. The court concluded that the college proceeding did not meet the requirements to be considered "quasi-judicial" in nature under Connecticut law for the purpose of affording the student absolute immunity in a subsequent defamation case. *Id.* at *48. There is no requirement, however, that a proceeding be "quasi-judicial" in order to satisfy due process in a student disciplinary matter—this would be taking the due process clause further than it has ever been read. As the Seventh Circuit has explicitly explained time and time again, "[d]ue process does not, however, require a judicial or quasi-judicial trial ... before a school may punish misconduct." *Coronado v. Valleyview Pub. Sch. Dist. 365-U*, 537 F.3d 791, 795 (7th Cir. 2008); *see also Remer v. Burlington Area Sch. Dist*., 286 F.3d 1007, 1010–11 (7th Cir. 2002) ("To comport with due process, expulsion procedures must provide the student with a meaningful opportunity to be heard. . . . The proceedings need not, however, take the form of a judicial or quasi-judicial trial.").

Plaintiff cannot show a clear likelihood of success on the merits of a due process claim when he does not identify a property or liberty interest. Even if Plaintiff had identified a protected interest, he received ample process to support a temporary suspension from Team activities, and therefore, his request for a temporary restraining order should be denied.

### C.  Plaintiff Has Not Shown a Likelihood of Success on the Merits of a Breach of Contract Claim.

In his TRO, Plaintiff asserts that there is a "fair question" of his success on one of at least three separate contract theories: first, that the University has breached implied contracts created by the Scholarship Contract and/or DIA Policy by suspending him from the Team (*see* Counts II and III); second, that the DIA Policy is unconscionable and unenforceable, and therefore the University is not entitled to subject him to the Interim Action permitted by the DIA Policy; (Count

IV); and three, that the University waived its right to enforce the DIA Policy and/or OSCR Policy (Count VII).[13] Plaintiff is unlikely to succeed on a contract claim premised on any of these theories.

Under Illinois law, a "university and its students have a contractual relationship," the terms of which "are generally set forth in the school's catalogs and bulletins." *Raethz v. Aurora Univ.*, 805 N.E.2d 696, 699 (2d Dist. 2004); *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 858 (7th Cir. 2019) (citing *Raethz*, 805 N.E.2d at 699). To prevail on a breach of contract claim, Plaintiff must first satisfy the traditional elements of a breach of contract claim, including identifying a specific, identifiable contractual promise that the University breached. *See Ross v. Creighton Univ.*, 957 F.2d 410, 416-17 (7th Cir. 1992) (applying Illinois law); *Abrams v. Ill. Coll. of Podiatric Med.*, 77 Ill. App. 3d 471, 476-77 (1st Dist. 1979); *Columbia Coll. Chi.*, 933 F.3d at 858. Additionally, a student has a remedy for breach of contract when there has been an adverse action or decision against him only when the university made that decision arbitrarily, capriciously, or in bad faith. *See Columbia Coll. Chi.*, 933 F.3d at 858.

Courts have held that the arbitrary, capricious, or in bad faith standard is met only where the school "disciplined [the student] without any rational basis" or in such a way to "demonstrate that [the university] did not actually exercise professional judgment." *See id.*; *Raethz*, 805 N.E.2d at 699; *see also Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90-91 (1978); *Doe v.*

---

[13] In his TRO, Plaintiff seems to focus on implied contracts, waiver, and unconscionability of contract. Dkt. 11 at Table of Contents, "Legal Standards: D. Implied Contracts, E. Waiver, F. Unconscionability of Contract"; Dkt. 11 ¶¶ 60-64. In his Complaint, Plaintiff brings a claim seeking a declaratory judgment that the Scholarship Contract applies and supersedes the DIA Policy and an injunction reinstating him to the team on such basis (Count II, Compl. ¶¶ 85-86); a claim for breach of an implied covenant of good faith and fair dealing premised on an implied contract created by the DIA Policy and an injunction reinstating him to the team on such basis (Count III,. Compl. ¶¶ 89-93); a claim seeking a declaration that the DIA Policy is unconscionable and unenforceable and an injunction reinstating him to the team on such basis (Count IV, Compl. ¶¶ 97, 98, 104-105); and a claim that the University has "waived its right to enforce the DIA Policy and/or the OSCR Policy" and seeking an injunction reinstating him to the team on such basis (Count VII, Compl. ¶¶ 124-125, 127-128). The Complaint also contains a claim seeking a declaration that the Court either order the DIA Action and OSCR Action "null and void unless and until Illinois demonstrates to the Court exactly which standards apply"—that is, the Title IX Policy, the OSCR Policy, or the DIA Policy—or order that the OSCR Policy applies and Plaintiff be reinstated to the team pending the completion of the OSCR process (Count V, Compl. ¶ 112). This does not appear to be a contract claim upon which the TRO is premised.

*Loyola Univ. Chi.*, No. 18-cv-7335, 2022 WL 4535090 at *36 (N.D. Ill. Sept. 28, 2022). Plaintiff

has not shown any likelihood that he will meet this bar.

### 1.  *There Was No Breach of the Scholarship Contract.*

In Count II, Plaintiff asserts that the University breached his Scholarship Contract because

the Scholarship Contract "only allow[s] action against [Plaintiff], as to sexual misconduct crimes,

if he is convicted, pleads guilty, pleads no contest, or is found guilty of the same through

institutional disciplinary proceedings." Dkt. 11 ¶ 71. But the Scholarship Contract contains no such

language or promise. Rather, it plainly and unambiguously states that Plaintiff's "*athletic aid* may

be reduced or cancelled" for certain specific reasons, including those cited by Plaintiff. *See* Compl.

¶ 83; *id.* at Page 225-228. The Scholarship Contract states that Plaintiff must comply with DIA

policies and does not otherwise reference Plaintiff's participation in team activities. It is

undisputed that Plaintiff's athletic aid has not been reduced or cancelled; indeed, the January 3

interim suspension notice he received clearly notified him that his "athletically related financial

aid is not affected." Squire Dec. Attach. C. Because Plaintiff fails to identify a specific, identifiable

contractual promise contained in the Scholarship Contract that the University allegedly breached

with regard to his interim suspension, he fails to demonstrate a likelihood that he will be able to

plead, let alone prevail on, a claim alleging breach of the Scholarship Contract. *See Ross*, 957 F.2d

at 416-17.

### 2.  *There Was No Breach of the DIA Policy.*

In Count III, Plaintiff asserts a breach of the DIA Policy, which he argues he should not be

bound by but if he were it is only through an "an implied contract" theory "because [he] does not

recall signing a document that specifically subjected him to this policy." Dkt. 11 ¶ 72. As a general

matter, "a formal university-student contract is rarely employed and, consequently, the general

nature and terms of the agreement are usually implied, with specific terms to be found in the

university bulletin and other publications; custom and usages can also become specific terms by implication." *Ross*, 957 F.2d at 417 (applying Illinois law) (internal quotations omitted).[14] To that end, the terms of a relationship between a university and its students, as set forth in various handbooks and policies, can be found to create a contractual relationship of sorts; but the student must still point to a *specific* "identifiable contractual promise that the defendant failed to honor" *and* show that the contractual promise was "arbitrarily disregarded." *Id.* at 416-17.

First, Plaintiff has failed to identify a specific, identifiable contractual promise in the DIA Policy that the University allegedly breached. In his TRO, Plaintiff asserts that the DIA Policy contained terms "that [Plaintiff] is to be presumed innocent" and "afforded 'appropriate' due process." Dkt. 11 ¶ 72. He fails, however, to identify any specific language in the DIA Policy that either sets forth such promises—and indeed, there is no such language in the DIA Policy.[15]

Second, Plaintiff does not, and cannot, allege any facts to suggest that the University's decision to remove him on an interim basis from the Team was made "arbitrarily, capriciously, and in bad faith" as required under Illinois law. *See Loyola Univ. Chi.*, 2022 WL 4535090, at *36-37; *Columbia Coll. Chi.*, 933 F.3d at 858; *see also* Compl. ¶ 92 (alleging that "the DIA Policy contains an implied covenant of good faith and fair dealing that precludes Illinois from acting arbitrarily or unreasonably in its exercise of any discretion it enjoys under the DIA Policy."). To succeed on his breach of contract claim, Plaintiff must demonstrate "not that the [University] failed to perform *adequately* [the] promised" provisions of the DIA Policy, "but rather that it failed to perform that service *at all.*" *Fleming v. Chi. of Pro. Psychology*, No. 15 C 9036, 2019 WL 247537,

---

[14] It is thus irrelevant whether this student-athlete handbook or DIA Policy was signed.

[15] Plaintiff's additional allegations of breach of the DIA Policy as set forth in his Complaint, ¶ 93, fail for this same reason. Indeed, Plaintiff acknowledges that the DIA Policy states that the Panel "may consider the broad spectrum of risks to the University" "[b]ased on the information available to the panel at the time the Panel is convened." *Id.* ¶ 93(c). He alleges that he "does not know if the panel actually performed this analysis." *Id.* This is not sufficient to show breach.

at *3 (N.D. Ill. Jan. 16, 2019) (emphasis added) (citing *Ross,* 957 F.2d at 417). He must show that the University had no "rational basis" upon which to remove him from the Team and the Conduct Panel made its decision to uphold that removal "without a rational basis" at all. *DiPerna v. Chi. Sch. of Pro. Psychology,* 893 F.3d 1001, 1008 (7th Cir. 2018) (affirming summary judgment on contract claim where university dismissed student with only "*some* evidence that plagiarism occurred") (emphasis original).

Plaintiff does not meet this standard. To the contrary, Plaintiff's own allegations admit that he was arrested for rape and sexual battery, placed on interim suspension but allowed opportunity to submit materials to the Panel, which reviewed such materials and issued a decision upholding the interim suspension pending either "new information" or resolution of the criminal process. Plaintiff's allegations thus establish that the University followed its procedures, including the DIA Policy, and exercised its professional judgment in responding to information received from the LPD regarding rape and sexual misconduct charges against Plaintiff. Disagreement with the outcome of that process is insufficient to allege the kind of arbitrary, capricious, and bad faith conduct that is required under well-established Illinois law.

*Stiles v. Brown University*, No. 1:21-cv-00497 (D.R.I. Jan. 25, 2022), on which Plaintiff relies, is inapposite. [16] In *Stiles*, the student-plaintiff was placed on an interim suspension after a fellow student filed a Title IX claim accusing him of sexual assault. Importantly, that suspension was both from athletic participation and from school entirely. *Id.* at 1, 3, 6-7. That alone differentiates *Stiles* from this case. The reasoning in that case is also inapplicable here. The court determined the student had shown a sufficient likelihood of success on a breach of contract claim based on specific language from Brown's procedures requiring a determination that there was

---

[16] A copy of this case is attached as Exhibit C to Plaintiff's revised TRO (Dkt. 11-1).

"reasonable cause to believe" that a student would continue the alleged prohibited conduct or otherwise be a threat to the community in order to impose such an interim suspension, where the facts indicated that Brown had not made such a "reasonable cause" determination before issuing the suspension. *See id.* at p. 5. Here, the DIA Policy contains no such specific language requiring a determination as to the merits of the underlying charges that the University allegedly breached. Additionally, because the *Stiles* court applied Rhode Island law, its analysis is entirely inapplicable here: Rhode Island law does not appear to require, and the *Stiles* court did not consider, the significant additional requirement under Illinois law that a student asserting a breach of contract claim against a university must present facts to indicate that the challenged decision was made "arbitrarily, capriciously, and in bad faith." Ultimately, because Plaintiff has not identified a specific promise in the DIA Policy the University breached or presented facts to indicate that the interim suspension decision lacked any rational basis, as required by Illinois law, he has not shown a likelihood of success on a claim of breach of the DIA Policy.

### 3.  *Plaintiff's Unconscionability Arguments are Unavailing.*

Plaintiff also has not established a likelihood of success on his claims in Counts IV or V, in which he asserts that the DIA Policy is "procedurally and substantively unconscionable" because it is "difficult to find, read, or understand" in the context of the University's other policies, and therefore his suspension is invalid, and seeks judicial intervention to determine which University policy applies to him. *See* Dkt. 11 ¶¶ 74-79.

The concept of procedural unconscionability does not apply here. The case law Plaintiff cites concerns contractual terms in arbitration and non-competition agreements that restrict what the plaintiff-party can do *outside* of its relationship with the defendant-party—for example, contracts that prohibit a party from bringing a lawsuit or being employed in certain jobs. *See Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 265 (Ill. 2006); *Am. Food Mgmt., Inc. v. Henson*, 434

N.E.2d 59 (5th Dist. 1982). This concept has no relevance to the University's policies. Plaintiff is not seeking to escape the University's enforcement of a contract which limits his right to engage in outside activities, as were the plaintiffs in *Kinkel* and *Henson*. The DIA Policy simply sets forth the procedure by which the University will respond to credible allegations of various offenses involving student-athletes. The doctrine of unconscionability is entirely inapplicable; this is not a contract enforcement case.

Moreover, the TRO's assertions that the University's policies related to student and student-athlete discipline are too confusing to follow are insufficient to establish a likelihood of success on an unconscionability claim. Plaintiff cites no authority, nor can he, to support an argument that the University is not entitled to maintain different policies addressing different types of student matters. Review of the plain language of the policies indicates that they are not prohibitively difficult to follow, either individually or considered together. Put simply, the DIA Policy concerns conduct expectations for DIA student-athletes specifically and actions the DIA can take in addressing alleged violations of those expectations, which can result in limitations on athletic participation. The University's Student Code includes rules of conduct applicable to all students, which, if violated, can result in sanctions related to a student's status at the University, including dismissal from the University. Conduct for which students are subject to discipline includes sexual assault and Title IX sexual harassment, as defined in the University's Sexual Misconduct Policy. The University's Student Disciplinary Procedures are the procedures administered by the Office for Student Conflict Resolution ("OSCR") to resolve alleged violations of the Student Code. The University's Student Disciplinary Procedures includes procedures for addressing allegations of sexual misconduct that meet the definition of Title IX Sexual Harassment, as defined in the Sexual Misconduct Policy pursuant to and consistent with the federal

regulations implementing Title IX, and the procedures for addressing allegations of sexual misconduct that do not fall into the definition of Title IX Sexual Harassment, including because they did not occur in an education program or activity of the University.

Plaintiff has not demonstrated a likelihood of success on Counts IV or V because (1) there is no valid legal argument that the University is not permitted to maintain different policies addressing student conduct matters, (2) review of these three policies demonstrate that they are not too difficult for a reasonable person to follow, and (3) the authority Plaintiff cites regarding procedural and substantive unconscionability is inapplicable in this context.

### 4.  *There Has Been No Waiver.*

Finally, Plaintiff has not established a likelihood of success on his claim in Count VII that the University waived its rights to enforce the DIA Policy and/or OSCR Policy against Plaintiff because it did not issue an interim suspension under the DIA Policy or initiate an investigation under the OSCR Policy prior to December 28, 2023. Dkt. 11 ¶ 81. As an initial matter, Plaintiff has not identified a specific contractual promise in the DIA Policy or the Prohibited Sexual Misconduct Process regarding the timing of an Interim Action or investigation, that the University allegedly breached and therefore allegedly waived. Nor can he. The DIA Policy specifically provides that the DIA may issue an interim suspension "upon receipt of *credible* information that a student-athlete committed a Major Offense." Compl. ¶ 91; *id.* at Page 120 (emphasis added). As Athletic Director Josh Whitman has attested, the DIA did not receive *credible* information of a potential "Major Offense" until they received Plaintiff's arrest warrant on December 27, 2023, and pursuant to the DIA Policy, notified Plaintiff that he would be suspended that same day. Whitman Dec. ¶¶ 15-17. Similarly, Plaintiff points to no specific language in the Prohibited Sexual Misconduct Process that required the initiation of an investigation prior to the University's receipt of concrete, as opposed to unverified, information regarding the charges and allegations against

Plaintiff concerning an incident involving an individual unaffiliated with the University at a bar in Kansas unaffiliated with the University. In short, because the terms of the DIA Policy and Prohibited Sexual Misconduct Process did not require the University to issue an Interim Action or begin an investigation prior to December 27, 2023, the University did not waive any such requirement.

Moreover, as with Count IV, the doctrine of waiver is not relevant to the University's policies. In contract law, waiver "is designed to prevent the waiving party from 'lull[ing] another into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance.'" *Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 601 N.E.2d 956, 962 (1st Dist. 1992) (quoting *Whalen v. K–Mart Corp.*, 519 N.E.2d 991, 994 (1st Dist. 1998)). As noted, this is not a contract enforcement action; rather, the University's DIA Policy and Prohibited Sexual Misconduct Process simply set forth procedures by which the University will respond to credible allegations of various offenses, including allegations of sexual misconduct.

### D. Defendants' Decision to Follow Procedure is an Academic Decision Entitled to Judicial Deference.

In addition to the reasons set forth above, Plaintiff has not established a likelihood of success on the merits of any of his claims because the University's decisions about how to enforce the DIA Policy are entitled to judicial deference. As courts in the Seventh Circuit have consistently observed, the academic decisions of universities are entitled to significant deference and cannot be disturbed absent evidence of arbitrary and capricious conduct. *See Columbia Coll. Chi.*, 933 F.3d at 858 (applying academic deference to student disciplinary decisions and finding that defendant college would not be liable "even if we find it exercised its academic judgment unwisely; rather it must have disciplined a student without any rational basis"); *see also Horowitz*, 435 U.S. at 90-91. Courts grant universities this deference not only in purely academic decisions,

but also in decisions relating to student discipline. *See e.g., Columbia Coll. Chi.*, 933 F.3d at 858 (applying deference to the university's decision in a Title IX proceeding); *DiPerna*, 893 F. 3d at 1007 (finding that "courts are reluctant to interfere with the academic affairs and regulation of student conduct") (citing *Raethz*, 805 N.E. 2d at 699); *Loyola Univ. Chi.*, 2022 WL 4535090 at *36 (emphasizing that "the discretion [granted to universities] extends beyond academic decisions – it covers the 'regulation of student conduct,' too.").

### III.  <u>Plaintiff's Harm is Not Irreparable.</u>

To demonstrate irreparable harm, a plaintiff must show that he will suffer immediate harm that cannot be rectified by a final judgment after trial. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001).[17] The threat of irreparable injury necessary to justify a TRO "must be real, substantial, and immediate, not speculative or conjectural." *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 80 F. Supp. 3d 829, 836 (N.D. Ill. 2015) (quotations omitted). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the Plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 22 (2008).

In his TRO, Plaintiff alleges that he will have to sit out the remaining 17 games of the season, as well as any post-season games; that "the suspension of a student-athlete constitutes irreparable harm that cannot be adequately compensated by damages"; that he will miss out on playing televised games; and that there is not "a price tag on reputation" and "nobody can adequately value the tanking of an entire NBA career with attendant endorsements, possible post-

---

[17] Typically, courts consider the elements of irreparable harm and inadequate legal remedies together, as harm is irreparable only "if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *See DM Trans,* 38 F.4th at 618 (internal citation omitted).

playing careers in sportscasting, and other opportunities." Dkt. 11 ¶¶ 82-84. These allegations are

not supported by Plaintiff's briefing and they are insufficient to show irreparable harm.

### E. An Interim Suspension from College Athletics in Connection to a Felony Arrest is Not Irreparable Harm.

Courts in this circuit have held that an inability to play collegiate athletics for an entire

season is not irreparable harm for purposes of preliminary injunctive relief. *See Hall v. Nat'l Coll.*

*Athletic Ass'n,* 985 F. Supp. 782, 784-85, 791 (N.D. Ill. 1997); *see also Marcantonio v. Dudzinski,*

155 F. Supp. 3d 619, 635-36 (W.D. Va. 2015) ("Cases widely hold that college athletic

scholarships and participation in collegiate athletics are not cognizable property interests.").

Plaintiff now, in his revised TRO, cites to *State of Ohio v. NCAA,* No. 1:23-CV-100, 2023

WL 9103711 (N.D.W. Va. Dec. 13, 2023), which ruled that the NCAA's Transfer Eligibility Rule,

which barred certain student-athletes from athletic participation when they change schools, could

result in irreparable harm. The court's reasoning focused on how the Transfer Eligibility Rule

required student-athletes to sit out "for an entire academic year" and resulted in harms that included

lost in-game experience for the student-athlete, lost chances for team success or rankings, and a

possible impact on teams gaining access to conference or NCAA tournaments. 2023 WL 9103711,

at *8-11. As an initial matter, the irreparable harm ruling from that case is directly contradicted by

a decision in the Northern District of Illinois, *Hall v. NCAA*, 985 F. Sup. 782 (N.D. Ill. 1997). In

*Hall,* a Division I college basketball player who was deemed academically-ineligible under NCAA

standards was "ineligible to practice with, or compete on behalf of, Bradley's men's basketball

team" and "not allowed to receive any part of his full athletic scholarship" for his entire freshman

year. *Id.* The court denied injunctive relief finding a lack of irreparable harm, even though the

plaintiff alleged he would (without injunctive relief) "be denied the opportunity to play major

college basketball and pursue his dream of becoming a professional basketball player." The court

reasoned there was insufficient evidence that a "one season delay will extinguish [the plaintiff's] college (and hopeful professional) career," but rather that "sitting out a year" was an "inconvenience." *Id.* at 800-01. Here, Plaintiff's lost competition opportunities are far less severe than in *Hall* as Plaintiff has already played part of the season, and the suspension is only temporary and is subject to being lifted upon changed circumstances.

In addition, this case involves very different factors than *State of Ohio v. NCAA*. First, Plaintiff's suspension is temporary, based on his individualized circumstances as opposed to a blanket rule, may be lifted upon receipt of new information (including information from discovery in the criminal proceedings), and is not a full academic year ban on competition. Second, the case itself is of an entirely different sort:  the *State of Ohio* case was an antitrust case, challenging the application of an NCAA rule which was negatively impacting a large number of students and which, plaintiffs argued, had no benefit to the defendant (NCAA), whereas in this case, the claims are personal and specific to Plaintiff, and the University will itself suffer harm if it cannot enforce its own rules and standards for its athletes (as discussed in greater detail in Section F, *infra*).

Indeed, each of the cases cited by the *State of Ohio* case as supporting the proposition that "[c]ourts have repeatedly found that '[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports'" were about the elimination of or failure to create an entire athletic program (or, in one case, a failure to allow an entire team to participate in championships), and the challenge was brought by an entire group of athletes. *See* 2023 WL 9103711 at *9.[18] The

---

[18] *See S.A. v. Sioux Falls Sch. Dist. 49-5*, 2023 WL 6794207 (D. S.D. Oct. 13, 2023) (elimination of gymnastics program); *Portz v. St. Cloud State Univ.*, 401 F.Supp.3d 834 (D. Minn. 2019) (elimination of tennis and skiing teams); *Navarro v. Fla. Inst. of Tech., Inc.*, 2023 WL 2078264 (M.D. Fla. Feb. 17, 2023) (discontinuation of five varsity sports programs and transitioning them to club level); *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) (elimination of volleyball team as varsity sport); *Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499, 502 (M.D. Pa. 2022) (failure to create ice hockey team); *see also McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 (2d Cir. 2004) (challenging a decision to schedule the teams' seasons such that they could not participate in championships).

court itself cited two cases—*Doe v. Portland Pub. Sch.*, 2023 WL 7301072 (D. Me. Nov. 3, 2023) and *Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.*, 798 A.2d 830 (Commonwealth Court of Pa. May 21, 2002)—which did not support that students suffer irreparable harm when they are denied the opportunity to play sports. *Id.* In *Doe,* a case in which a student was suspended from school and participation in athletic activities, the court explained that "[c]ourts have routinely rejected the notion that a student suffers irreparable harm by not being permitted to participate in interscholastic athletics." 2023 WL 7301072, \*16 (quoting *McGee v. Va. High Sch. League, Inc.*, 801 F. Supp. 2d 526, 531 (W.D. Va. 2011)). *Revesz* held likewise. 798 A.2d at 836-37 ("the loss of an opportunity to play interscholastic athletics for one year does not constitute irreparable harm.").

Finally, in *State of Ohio*, the NCAA rule was the *exclusive* cause of the student-athletes' inability to compete for a full year, while the harms this TRO focuses on avoiding are fundamentally different. Specifically, the harm Plaintiff is attempting to prevent here flows from being charged and possibly convicted of serious felony charges. Such harm, however, will not be avoided unless and until the criminal process against Plaintiff is resolved in his favor. This alone is grounds to deny the TRO, as "injunctive relief should not be granted if it would be unavailing in preventing the irreparable harm of which the movant complains." *See Ohio-Sealy Mattress Mfg. Co. v. Duncan*, 486 F. Supp 1047, 1053 (N.D. Ill. 1980) (denying a motion for a preliminary injunction where "an order enjoining [Defendant] . . . in no way would forestall th[e] harm.").

### 1.  *Plaintiff's Potential Harm Related to His Future Career is Too Speculative to Constitute Irreparable Harm.*

Plaintiff's claim that, if a temporary restraining order is not granted, his NBA draft status will suffer is speculative, and therefore not irreparable. *See Right Field Rooftops LLC*, 80 F. Supp. 3d at 836; *see also Kupec v. Atlantic Coast Conference*, 399 F. Supp. 1377, 1379 (M.D. N.C. 1975)

(Finding that "[a]ny injury which the plaintiff might suffer to his professional football career if the inunction is not granted is speculative at best."). Plaintiff's own motion notes that the criminal charges against him "will not be tried in Douglas County until well after . . . the June 27, 2024, NBA draft." Dkt. 11 ¶ 3. It is thus probable that any impact to Plaintiff's professional basketball career will be caused by his pending criminal prosecution, not any action by the University.

### 2. *Lost Income and Reputational Damages Are Not Irreparable Harm.*

Moreover, even if Plaintiff had established an actual risk of faring worse in the NBA draft if his athletic suspension continues, the risk of diminishment to his draft stock is not irreparable harm justifying injunctive relief. As the Supreme Court has held, allegations of lost income and reputational damage are insufficient to justify a preliminary injunction enjoining an employee's termination. *Sampson v. Murray*, 415 U.S. 61, 91 (1974). Similarly, in affirming the denial of a physician's request for preliminary relief enjoining his termination, the Seventh Circuit held that "[t]he 'irreparable harms' of lost income and damaged reputation alleged by [plaintiff] are quite similar to those in *Sampson*" and, even when combined with an "inability to find another job," are compensable through money damages and do not constitute irreparable harm. *Bedrossian v. Nw. Mem. Hosp.*, 409 F.3d 840, 846 (7th Cir. 2005). This applies even when a Plaintiff's job involves athletics. *See e.g., Cephus v. Blank*, 2022 WL 17668793, at *5 ("[Plaintiff] cites no legal authority for the proposition that he had a liberty interest in a *better or more lucrative* position in the NFL. Instead, the Seventh Circuit has 'consistently drawn a distinction . . . between occupational liberty and the right to a specific job.'") (emphasis original). These cases, dealing with academic institutions and collegiate athletics, are more instructive than those cited by Plaintiff. *See Granberg v. Didrickson*, 665 N.E.2d 398 (Ill. App. 1996) (addressing the transfer of state funds from the State Road Fund to the Department of State Police); *Falcon, Ltd. V. Corr's Natural Beverages,*

*Inc.*, 520 N.E.2d 831 (Ill. App. 1987) (addressing concerns over a distributorship agreement for nonalcoholic beverages); *Central Water Works Supply Inc. v. Fisher*, 608 N.E.2d 618 (Ill. App. 1993) (addressing application of noncompete agreement in water and sewer supplies).

Furthermore, Plaintiff's assertion that the interim suspension creates "the risk" that he will lose his NIL deal is speculative, and it ignores the reality that he is more likely to lose any NIL funds based on the pending criminal charges against him rather than any decision made by the University. Dkt. 11 ¶ 35; *see Right Field Rooftops, LLC*, 80 F. Supp. 3d at 836 (N.D. Ill. 2015) (irreparable harm cannot be speculative).

Because the harms Plaintiff seeks to avoid are speculative and more contingent on the outcome of the criminal process than the University's actions, and, even if concrete, is addressable via monetary damages, he has failed to make a clear showing of irreparable harm and his motion should be denied.

## IV.  The Balance of Harms is in the University's Favor.

Even if the Court were to find that Plaintiff has both demonstrated irreparable harm and a likelihood of success on the merits, which he has not, the Court must still weigh the relative harms to each party. *Speech First*, 968 F.3d at 637. This balancing process also considers the public interest, or the effects the preliminary injunction—and its denial—would have on nonparties. *Id.*

The harm to the University stems from the fact that granting the Plaintiff's requested relief greatly undermines the University's ability to take swift remedial action in the face of credible information indicating that a student-athlete engaged in serious misconduct.  *See e.g.*, *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (courts "must not ignore the interest of colleges and universities in institutional autonomy."); *Parker v. Trinity High Sch.*, 823 F. Supp. 511, 521 (N.D. Ill. 1993) (granting preliminary injunction could affect "the perception and certainty" of the school's authority). The University must be able to take some interim measures consistent with its

policies and the law, as it did here, to address the unfortunate situations when there have been allegations of misconduct in the middle of the athletic season against a public facing representative. If Plaintiff is able to undo his suspension at this stage, the implication is that the University is effectively prevented from taking any immediate actions in these situations, regardless of the reasons underlying the University's actions.

If Plaintiff is able to undo his suspension at this stage, the University's athletics policy will be undermined and will fail to serve as a deterrent for involvement with the criminal justice system. If Plaintiff is allowed to compete, "by the time the litigation has settled, the sports season could well be over" and "win or lose, the student athlete would essentially obtain his entire requested remedy." *Hall*, 985 F. Supp at 801 (denying preliminary injunction); *see also Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998) (emphasizing that lost wages can be addressed via damages but decisions about personnel within a community "can create substantial and irreversible costs.").

Conversely, the harm to Plaintiff due to his inability to play basketball during this season is speculative. Any damage to Plaintiff's future career or NBA draft status stems primarily from the pending criminal charges, which will remain whether he resumes playing during this college season or not. Because Plaintiff's harm attributable to the University's interim suspension is speculative at best, the balance of harms favor the University.

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request that Plaintiff's Motion for Temporary Restraining Order, Preliminary Injunction, and/or Expedited Discovery be denied in its entirety.

Dated: January 11, 2024

Respectfully submitted,

University of Illinois Board of Trustees and
Timothy Killeen

By:     /s/ Peter G. Land
       One of Defendants' Attorneys

Peter G. Land (Lead Counsel) #6229659
Gwendolyn B. Morales
Mary E. Deweese
Katherine M. Tierney
Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois 60606
(312) 655-1500
Peter.Land@huschblackwell.com
Gwendolyn.Morales@huschblackwell.com
Mary.Deweese@huschblackwell.com
Katherine.Tierney@huschblackwell.com

***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification to all registered counsel of record this 11th day of January, 2024.

J. Steven Beckett
Steve Beckett Law Office, LLC
508 S Broadway Avenue
Urbana, IL 61801
steve@stevebeckettllc.com

Mark C Goldenberg
Goldenberg Heller & Antognoli P.C.
2227 South State Route 157
Edwardsville, IL 62025
msutter@sutterlawgroup.com

Robert H. Lang
Zoe Spector
Thompson Coburn LLP
37th Floor
55 E. Monroe Street
Chicago, IL 60603
rhlang@thompsoncoburn.com
zspector@thompsoncoburn.com

s/ Peter G. Land

*Attorney for Defendants*

45