## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **TERRENCE SHANNON JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 24-cv-2010** |
| | ) | |
| **THE BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITY OF ILLINOIS, and** | ) | |
| **TIMOTHY KILLEEN, in his official** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>OPINION</u>

**COLLEEN R. LAWLESS, United States District Judge:**

Plaintiff Terrence Shannon Jr. was suspended from the University of Illinois basketball team after being charged with felony rape and misdemeanor sexual battery under Kansas law. Plaintiff asks the Court to enjoin Defendants from continuing his interim suspension and order his reinstatement to the basketball team because the procedures used to suspend Plaintiff violated his rights. This case is not about the propriety of the Kansas criminal charges or whether the University of Illinois used the best procedure or policy in determining whether Plaintiff could remain on the basketball team. The question before the Court is whether the procedures used by the University of Illinois violated Plaintiff's constitutional, statutory, or contractual rights to such an extent that entry of a preliminary injunction[1] is warranted.

---

[1] Under Federal Rule of Civil Procedure 65(a)(1), a preliminary injunction may be issued only on notice to the adverse party, while Rule 65(b)(1) permits a temporary restraining order to be

## I.     BACKGROUND

On January 8, 2024, Plaintiff Terrence Shannon Jr. filed a state court complaint for injunctive relief (Doc. 1 at 1) and a motion for emergency injunctive relief. (Doc. 5).  The action was removed to this Court on the same day. (*Id.*) Subsequently, Plaintiff filed his verified motion for a temporary restraining order, preliminary injunction, and/or expedited discovery. (Doc. 10). Defendants Board of Trustees of the University of Illinois ("University" or "Illinois") and Timothy Killeen, in his official capacity, filed an expedited response, as directed. (Doc. 14). On January 12, 2024, the Court held a hearing on Plaintiff's motion. (Minute Entry of 1/12/2024).

Plaintiff is the captain of the University of Illinois at Urbana-Champaign's men's basketball team and, prior to his suspension, was projected to be a lottery pick in the National Basketball Association's ("NBA") draft.[2] (Doc. 11 at 1). He played in the first 11 games before being suspended from the team on December 28, 2023, after Illinois learned he had been charged with felony rape and misdemeanor sexual battery in Douglas County, Kansas, following an alleged incident at a bar in Lawrence, Kansas, on or about

---

issued without notice in certain circumstances. Because Plaintiff provided Defendants with notice, the issues have been fully briefed, and oral argument has been conducted, the Court's analysis focuses on whether Plaintiff is entitled to a preliminary injunction.

[2] Attached to Plaintiff's complaint are mock NBA drafts that project Plaintiff to be drafted 51st (in the second round of the NBA Draft) by the Sacramento Kings, see nba.com/news/bleacher-report-mock-draft-round-1-nba-comparisons-nov-28-2023, Doc. 1-2, Ex. R-1 at 23, and 14th by the Oklahoma City Thunder, *see* bleacherreport.com/articles/10101207-2024-nba-mock-draft-pro-comparisons-and-full-2-round-predictions, dated 12/21/2023. (Doc. 1-2, Ex. R-2 at 13-14). In a January 5, 2024 mock draft, following the criminal charges and his suspension, Plaintiff had fallen to the first pick of the second round, projected to be taken by the Toronto Raptors with the 31st selection. *See* nbadraft.net/nba-mock-drafts, dated 1/5/2024  (Doc. 1-2, Ex. R-3). The 14th pick in the 2024 draft is projected to earn $3,591,800 in his first year, while the 30th or last selection of the first round is projected to earn $2,011,100.

September 9, 2023. (*Id.* at 1-2; Doc. 14 at 6). On January 3, 2024, Illinois extended the "interim" suspension of Plaintiff pending resolution of the criminal charges. (Doc. 11 at 2). The charges likely will not be resolved until well after the current college basketball season and the June 27, 2024 NBA Draft. (*Id.*).

Plaintiff alleges Illinois graduate assistant (student manager) DyShawn Hobson drove Plaintiff and basketball teammate Justin Harmon to and from Lawrence on September 8 and 9, 2023, at the direction of Illinois assistant coaches. (Doc. 11 at 5). Plaintiff, Hobson, and Harmon are roommates who travelled to Lawrence to attend the Illinois-Kansas University football game and visit with friends. (Doc. 14 at 8). After the football game, Plaintiff, Harmon, and Hobson socialized with KU basketball players at a bar called the Jayhawk Café, before driving back to Champaign at 4:30 a.m. on September 9, 2023. (*Id.*).

While at the Jayhawk Café, Plaintiff is alleged to have grabbed a woman's buttocks and digitally penetrated her vagina without her consent. (Doc. 14-5 at 3). The alleged incident occurred at a crowded bar in an area subject to surveillance video. (Doc. 11 at 5). However, Plaintiff claims there are no witnesses to the alleged incident, no video showing Plaintiff and the complainant together, and no physical evidence tying Plaintiff to the alleged incident. (*Id.*). The Lawrence Police Department ("LPD") did not interview Hobson or Harmon, who were with Plaintiff the night of the incident. (*Id.* at 5-6). The KU players who were with Plaintiff that night were not interviewed until after criminal charges were filed. (*Id.* at 5). The alleged victim identified Plaintiff from social media after reviewing the KU basketball roster, most of the KU football roster, and the Illinois

basketball roster. (Doc. 1-1, Ex. B-3 at 4). According to Detective Josh Leitner of the LPD, before the alleged victim identified Plaintiff, her phone was used to conduct searches "related to the KU Basketball team, KU football team, Illinois Football team and the Illinois basketball team." (Doc. 1-1 at B-5 at 022).

Illinois Director of Athletics Josh Whitman is tasked with overseeing all elements associated with the University's Division of Intercollegiate Athletics ("DIA"). (Doc. 14-2 at 1). In that capacity, Whitman has broad responsibility for managing all DIA personnel and directing and assisting in the enforcement of, and compliance with, the academic and conduct policies applicable to student-athletes. (*Id.*). DIA administers the DIA Student-Athlete Handbook, which includes the Student-Athlete Code of Conduct and Discipline Process ("DIA Policy"). (*Id.*). According to Whitman, the DIA Policy was first introduced in 2017-2018 for the purpose of removing DIA personnel, especially coaches and administrators, from investigatory roles and short-term decision-making responsibilities. (Doc.14-2; Doc. 1-1, Ex. F). Pursuant to the DIA Policy, DIA has procedures for acting upon receipt of credible information that a student-athlete may have engaged in misconduct based on the seriousness of the offense. (Doc.14-2 at 2). According to the policy, "upon receipt of credible information that a student-athlete may have engaged in misconduct, the DIA will evaluate the information to determine whether the allegations, if substantiated, would constitute a Major Offense…" (Doc. 14-2 at 14). If "credible information does describe a possible Major Offense," the DIA will proceed as stated in the DIA policy and "in accordance with applicable regulations and University policies and procedures." (*Id.*).

Once the interim decision to withhold the student-athlete from athletic activities is made and communicated to the student-athlete, the Student-Athlete Conduct Panel ("conduct panel") shall convene within 48 hours of said notice. (*Id.* at 15). The conduct panel consists of three University personnel who are not affiliated with DIA, and the panel does not act "as an investigative body but will exercise good faith and reasonable judgment to draw needed conclusions based on the information readily available." (*Id.*). DIA does not have the expertise or personnel to act as an investigator, especially when the claims become more serious or criminal. (Doc. 1-1 at 95).

The Panel "undertakes an individualized analysis to determine whether the available information justifies withholding the student-athlete from some or all athletic activities pending resolution of the charges or allegation, and "may consider a broad spectrum of risks to the University of (a) immediately reinstating the student-athlete, should further investigation reveal that the student-athlete committed the alleged major offense, against (b) continuing to withhold the student-athlete from athletic activities, should further investigation reveal that the student-athlete did not commit the alleged major offense." (Doc. 14-2 at 15). "If the Panel decides to withhold the student-athlete from any athletic activity…it will do so in compliance with, and consideration of, all applicable University, state and federal regulations . . ." (*Id.*)

DIA received preliminary information in late September 2023 that Plaintiff had been involved in an incident in Lawrence that was being investigated by the LPD. (Doc. 14-2 at 4). The information received by DIA was "vague and unspecific," and it was not immediately clear whether Plaintiff was the subject of an investigation or witness to an

incident under investigation. (*Id.* at 4). Later in the Fall of 2023, Whitman learned the LPD's investigation concerned an allegation that Plaintiff had inappropriately touched a woman in a bar in Lawrence. (*Id.*) The information received from the LPD continued to be unsubstantiated and vague until DIA received the arrest warrant. (*Id.* at 4-5).

Throughout the Fall of 2023, Whitman consulted with other appropriate University offices, including the Chancellor's Office, the Title IX Office, and the Office of University Counsel to determine whether interim action under the DIA Policy was warranted. (*Id.* at 5). It was unanimously determined that the information received at that point was not enough to trigger an interim action. (*Id.*). After DIA, on December 27, 2023, received an arrest warrant that had been issued two weeks earlier, along with written police reports regarding the incident at the Jayhawk Café, Whitman consulted with the Chancellor's Office and determined that interim action under the DIA Policy was necessary. (*Id.*). On the afternoon of December 27, 2023, Whitman informed men's basketball head coach, Brad Underwood, of his decision and personally told Plaintiff that he would be withheld from athletic activities effective immediately. (*Id.*).

In a letter dated December 28, 2023, the University's Executive Senior Associate Athletics Director/Chief Integrity Officer, Ryan Squire, provided Plaintiff formal written notice of the temporary suspension by stating, ""[p]er University of Illinois DIA Policy, a felony charge requires that you be temporarily suspended from all team activities effective immediately." (Doc. 14-3, Ex. A). Plaintiff was informed that the conduct panel would convene within 48 hours to review the interim action, and he was permitted to provide a written statement and/or other documentary evidence concerning the incident

before the conduct panel convened. (*Id.*). Plaintiff submitted the following written statement:

> On September 8, 2023, I traveled to Lawrence, Kansas with my roommates for the KU-Illinois football game. After the game, we went out in Lawrence with some friends who attended Kansas. We stayed out at the Jayhawk Café for the evening with group of friends. My friends were with me for the entire evening. I have recently been accused of a crime from the events of that evening. I unequivocally did not commit that crime. I am looking forward to my day in court.

(Doc. 14-3, Ex. B). After Plaintiff asked DIA to delay convening the conduct panel, Squire informed Plaintiff the panel would meet on January 3, 2024. (Doc. 14-3 at 3). Before the conduct panel convened, Plaintiff submitted additional information for consideration, including his personal statement, an 11-page supporting letter from his attorneys, and nearly 50 pages of exhibits to the attorneys' supporting letter. (*Id.* at 4). The conduct panel was told Plaintiff might receive "discovery" from the Lawrence criminal prosecution in late January or February 2024. (*Id.*).

The conduct panel met during the afternoon of January 3, 2024, and informed Squire of their decision that evening. (*Id.*). Squire provided written notification of the decision to Plaintiff on January 3 informing him that the conduct panel determined the interim action to withhold him from organized team activities should remain in place pending resolution of the criminal charges in Kansas. (Doc. 14-3, Ex. C). While Plaintiff was prohibited from returning to organized basketball activities, he was permitted to continue to access athletic facilities, receive medical and academic support, and participate in student-athlete development activities, in addition to receiving nutritional support and permission to eat in the Varsity Room (a dining facility exclusively for

varsity student-athletes). (*Id*.). The notice reiterated that DIA would continue to provide athletically related financial aid to Plaintiff. (*Id*.). Both letters from Squire reinforced that the decision to suspend him was not a determination of Plaintiff's guilt or responsibility for the alleged behavior. (Doc. 1-1 at 114, 127).

The University maintains a Sexual Misconduct Policy and related procedures that address reports of Title IX Sexual Harassment and Prohibited Sexual Misconduct (or non-Title IX sexual misconduct) against students. (Doc. 14-4 at 1). According to Illinois Title IX coordinator Danielle Fleenor, Title IX Sexual Harassment under the University's Student Code "is currently limited to certain categories of conduct (including sexual assault) if such conduct occurs within an education program or activity of the university." (*Id*.) "An education program or activity of the University includes locations, events, or circumstances over which the University exercised substantial control over both the person accused of sexual misconduct and the context in which the alleged misconduct occurred." (*Id*. at 1-2). The University's Title IX Sexual Harassment Grievance Procedures process formal complaints of Title IX Sexual Harassment against a student. (*Id*. at 2).

If the reported sexual misconduct does not contain allegations of Title IX Sexual Harassment (*i.e.*, fails to satisfy Title IX's jurisdictional limitations), the complaint is not processed pursuant to the University's Title IX Sexual Harassment grievance procedures. (*Id*.). Sexual misconduct that occurs outside of an education program or activity of the University may qualify as Prohibited Sexual Misconduct as defined by the Sexual Misconduct Policy included in the Student Code and is addressed pursuant to the University's Prohibited Sexual Misconduct Process. (*Id*.). The University thus has

procedures that fall outside the scope of Title IX for situations involving allegations of sexual misconduct against students. (*Id.*).

On January 3, 2024, Fleenor talked with the Director of the University's Office of Student Conflict Resolution ("OSCR"), Robert Wilczynski, about the extent to which information from the Lawrence police records implicated the University community's interests in pursuing possible disciplinary process against Plaintiff for Prohibited Sexual Misconduct (non-Title IX sexual misconduct). (*Id.* at 4-5). University procedures relating to such issues include a section concerning "jurisdiction" stating:

> The University has jurisdiction over student conduct that occurs on university property, or in connection with official university programs or functions on or off university property. The university may, at its discretion, exercise jurisdiction over student behavior that occurs off campus and that would violate student conduct policies or regulations in those instances in which the university's community interest is substantially affected.

*Id.* at 5 (citing Student Disciplinary Procedures, Section 1.05). Factors to be considered in determining whether to exercise jurisdiction over sexual misconduct allegedly occurring off campus and outside of any educational program or activity include whether "the alleged misconduct indicates the student posed or poses a threat to the safety or security of any individual," "the seriousness of the alleged misconduct," and "the ability of the University to gather information, including the statements of witnesses." (*Id.*).

Based on those standards, Wilczynski determined that the alleged conduct according to the LPD materials received about the September 2023 incident included that Plaintiff had posed a threat to the safety or security to another person at the bar (grabbing buttocks and digital penetration of a woman's vagina without her consent), the alleged

misconduct was serious, and the University had the ability to gather information from Plaintiff, his roommates that were present at the bar at the time of the incident, and potentially from the LPD that has investigated the criminal case. (Doc. 14-5 at 3). Wilczynski further determined that the University's community interests are substantially affected in this situation. (*Id.*). For those reasons, Wilczynski decided that the University should initiate an investigation of the matter using the non-Title IX procedures—the Prohibited Sexual Misconduct process. (*Id.*). On January 5, 2024, the University notified Plaintiff in writing that OSCR was initiating an investigation of potential sexual assault, pursuant to Student Code section 1-302.b.1 (the non-Title IX sexual assault section). (*Id.* at 4).

Whitman explained at a December 29, 2023 press conference that Plaintiff was subject to three actions which ran "in parallel" and could intersect: the criminal prosecution, the DIA Policy action that led to his suspension, and the OSCR policy action. (Doc. 11 at 8). While "far from fair," Plaintiff states the OSCR action does have more safeguards than the DIA action. (*Id.*) Plaintiff also invokes his scholarship contract, which Illinois may not terminate unless Plaintiff is convicted of a crime involving sexual misconduct, pleads guilty or no contest to such a crime, or is found responsible for the same by a "formal disciplinary action," none of which has happened. (*Id.* at 10).

In Count I of the Complaint, Plaintiff seeks injunctive and declaratory relief against the University of Illinois on the basis that Title IX is applicable. (Doc. 1-1 at 23-26). Alternatively, Count II seeks declaratory and injunctive relief against Illinois under Plaintiff's scholarship contract. (*Id.* at 26-29). Count III is pled alternatively and seeks

injunctive relief based on an implied contract with Illinois under the DIA Policy and breach due to the failure to apply the presumption of innocence and other due process safeguards. (*Id.* at 30-32). Count IV is pled alternatively against Illinois and seeks declaratory and injunctive relief based on the unconscionability of the DIA Policy. (*Id.* at 32-35). Count V is pled alternatively against Illinois and is a declaratory and injunctive relief claim seeking a determination of which standards actually govern the suspension process, given the inconsistent and vague application of different standards. (*Id.* at 36-38). Count VI, pled alternatively, is a claim under 42 U.S.C. § 1983 against Illinois President Timothy Killeen for deprivation of Plaintiff's protected property interests without procedural due process. (*Id.* at 38-39). Count VII is a declaratory and injunctive relief claim against Illinois alleging it waived its rights to apply the DIA or OSCR Policies by not taking action for three months. (*Id.* at 39-41).

## II.      DISCUSSION

### A.  Legal Standard

To obtain preliminary injunctive relief, a plaintiff must show that (1) his underlying case has some likelihood of success on the merits, (2) no adequate remedy at law exists, and (3) he will suffer irreparable harm without the injunction. *Woods v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007). If those three factors are shown, the court then must balance the harm to each party and to the public interest from granting or denying the injunction. *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013); *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). Under the sliding scale approach, the greater the plaintiff's likelihood of success on the merits, the less the balance of harms needs to weigh in his

favor in order to obtain an injunction. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 n.3 (7th Cir. 1992). If the balance of harms weighs more heavily in plaintiff's favor, the likelihood of success need not be as great. *Id.*

"The first step in the analysis requires a plaintiff to demonstrate that his claim has some likelihood of success on the merits, not merely a better than negligible chance." *Doe v. Univ. of Southern Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (internal quotation marks and citations omitted). The first step is often decisive. *Id.* As for the second and third steps, courts consider whether a TRO is necessary to prevent irreparable harm that "cannot be fully rectified by the final judgment after trial." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012). "[S]peculative injuries do not justify this extraordinary remedy." *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005).

## B. Title IX Claim

### (1) Educational Programs or Activities

In Count I of his complaint, Plaintiff asks the Court to declare "that Title IX applies to this situation" and that the University "either immediately perform an individualized safety and risk analysis pursuant to 34 CFR § 106.44(c) . . . or immediately reinstate [Plaintiff] as a full participant on the Team." Because it receives federal financial assistance, Illinois is required to comply with Title IX. 20 U.S.C. § 1681 *et seq.* Title IX generally provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.

§ 1681(a). The preamble to Title IX's implementing regulations provides that a key purpose of the Title IX regulations is to "hold [institutions of higher education] accountable for responses to sexual harassment designed to protect complainant's equal educational access and provide due process protections to both parties before restricting a respondent's educational access." 85 Fed. Reg. 30026, 30044 (May 14, 2020). "A Title IX sex discrimination claim requires proof that (1) the educational institution received federal funding, (2) the plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against the plaintiff based on gender." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791-92 (7th Cir. 2022).

Plaintiff claims he has some likelihood of success on the merits of showing that the alleged incident took place during an "education program or activity" of Illinois because "an Illinois employee in the scope of his employment at Illinois, in furtherance of Illinois' interests, transported Plaintiff and oversaw his trip to Lawrence." If Illinois had applied Title IX, it could not have suspended Plaintiff from the team unless and until the Title IX coordinator "undertakes an individualized safety and risk analysis [and] determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of sexual harassment justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal." 34 C.F.R. § 106.44(c).

For conduct to occur within a "program or activity" under Title IX, the school must "exercise substantial control over both the harasser and the context in which the known

harassment occurs." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). The applicable regulation states:

> A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent. . . . "[E]ducation program or activity" includes locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by postsecondary institution.

34 C.F.R. § 106.44(a).

Plaintiff contends the University exercised substantial control over the trip because DyShawn Hobson, the Illinois graduate assistant/student manager, drove Plaintiff and teammate Justin Harmon to and from Lawrence at the direction of three assistant coaches acting as an employee in furtherance of Illinois' basketball program. On September 7, 2023, Hobson informed Illinois men's assistant basketball coaches Geoff Alexander, Chester Frazier, and Tyler Underwood about Plaintiff's and Harmon's plans to attend the Illinois/KU game on September 8, 2023, and return to Champaign for Plaintiff's Name, Image, and Likeness ("NIL")-related event early the following morning. Because of their concern about Plaintiff's driving following a recent accident in Florida, Hobson states the assistant coaches directed him to drive the two basketball players to and from Lawrence and oversee their activities that night. The Illinois coaches deny directing Hobson to monitor or oversee Plaintiff's activities while in Lawrence, Kansas.

Hobson claims it was not a leisure trip for him, given that he drove to various locations throughout the night and remained sober while keeping an eye on the two

players. After the Illinois-KU game, the three men socialized with KU players at their campus housing before going to the Jayhawk Café. Hobson states that, during the entire trip, Coaches Underwood and Alexander were checking in with him at various times via group text.

Geoff Alexander states that, as an assistant basketball coach, he has no supervisory authority over the graduate assistants. According to Josh Whitman, Hobson is not a graduate assistant as defined by the NCAA but, instead, he serves as a student manager, providing "traditional managerial duties" while sometimes assisting in film preparation and review, performance analytics, and scouting reports. Although he ultimately did not seek reimbursement from the University, Hobson states Coach Alexander told him he would be reimbursed for any gas or hotel expenses. Whitman states Hobson would not have been eligible for reimbursement of expenses because he was not acting in any official capacity during the trip.

In support of his claim under Title IX, Plaintiff directs the Court's attention to a recent article addressing the accusation of sexual assault of a minor against Pop Isaacs, a Texas Tech basketball player. The alleged incident involving Isaacs occurred when Texas Tech was competing in a college basketball tournament in the Bahamas in November 2023. Isaacs continued to play for the Texas Tech team after the matter was referred to Texas Tech's Title IX Office. Obviously, the fact that the Texas Tech basketball team was in the Bahamas for a tournament distinguishes the Isaacs situation from this case. If this incident had occurred following a trip to Lawrence by the Illinois basketball team for a game against Kansas, there would be no question that Title IX protections applied.

Plaintiff also cites *Lapka v. Chertoff*, 517 F.3d 974 (7th Cir. 2008), which involved an alleged rape that occurred at a hotel while the individuals were attending mandatory work-related training. *Id.* at 978-79. The incident followed a night out at a bar which was located at the training facility. *Id.* at 979. As a Title VII case, *Lapka* is inapposite because it does not have the jurisdictional limitation to "any education program or activity" of Title IX. *See* 20 U.S.C. § 1681. *Lapka* is factually distinguishable as well, given that prior to the assault the two employees were on-duty at a bar associated with the workplace training facility. *Lapka*, 517 F.3d at 982-83. Conversely, the alleged victim in Lawrence and the Jayhawk Café have no connection to the University.

Plaintiff's reliance on *Pogorzelska v. VanderCook College of Music*, 2023 WL 3819025 (N.D. Ill. June 5, 2023) is similarly distinguishable based on the clear language contained in VanderCook's own policy handbook. The case involved an alleged sexual assault by a fellow student at an off-campus party near campus and a Title IX deliberate indifference claim whereby the district court held there was a genuine issue of material fact concerning whether VanderCook exercised control over the alleged off-campus assault to such a degree that Title IX applied. *Id.* at *1-2. The district court noted "VanderCook's administrators began investigative and disciplinary procedures, and never took the position that the school was not required to do so on under Title IX prior to this litigation." *Id.* at 15. Additionally, "VanderCook's own policy handbook recognizes that its regulations and disciplinary procedures extend to 'the off-campus residence of any VanderCook students.'" *Id.*

Unlike *Pogorzelska*, this is not a deliberate indifference case and Illinois has never investigated the alleged incident under Title IX nor taken the position that the school was required to do so. The alleged assault did not involve two University students at a location near campus, and there is no policy language delegating authority to the University over the Kansas bar where the alleged assault occurred. Accordingly, the Court is not persuaded by *Pogorzelska*.

The cases cited by Defendants are generally analogous to the instant case, wherein the University determined that Plaintiff's arrest for an alleged assault of an individual with no connection to the University, at an off-campus, out-of-state bar while Plaintiff was socializing with friends did not constitute "Title IX Sexual Harassment" and was not within Title IX's jurisdiction. *See Weckhorst v. Kansas State Univ.*, 241 F. Supp.3d 1154, 1165-68 (D. Kan. 2017); *see also O'Shea v. Augustana Coll.*, 593 F. Supp.3d 838, 846-47 (C.D. Ill. 2022) (finding assault of college student by a prospective student at an off-campus bar to be outside the scope of Title IX); *Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (no evidence of university control when rape occurred at a private party in an off campus party); *Ostrander v. Duggan*, 341 F.3d 745, 747, 750 (8th Cir. 2003) (assault of student by fraternity member in home leased to fraternity members did not trigger Title IX liability because fraternity house was not under ownership, possession, or control of university); *Samuelson v. Oregon State Univ.*, 162 F. Supp.3d 1123, 1132 (D. Ore. 2016) (university had no control over off-campus party where rape of student by non-student occurred), *aff'd*, 725 F. App'x 598 (9th Cir. 2018).

There is no dispute that the trip to Lawrence was initiated by Plaintiff and was purely for personal or social reasons. Plaintiff was encouraged by Geoff Alexander and other basketball coaches not to make the trip to Lawrence, given the short timeframe and long distance. Plaintiff's December 29, 2023, account of the trip describes an entirely social experience with his "roommates," going "out in Lawrence with some friends," and going to "the Jayhawk Café for the evening with a group of friends." While there is some dispute about the frequency of contact between the assistant coaches and Hobson, it is apparent that any communication from the coaches was out of concern for the safety of their players.

While Hobson is employed as a graduate assistant, he is also Plaintiff's roommate who did not seek compensation and was not reimbursed for the trip as an employee of the University. There was no University program or activity at the Jayhawk Café at any time during the trip to and from Lawrence. The coaches' request for Hobson to drive Plaintiff and Harmon on the lengthy trip for safety reasons is simply not enough to convert a personal and social trip into a University education program or activity as defined by Title IX.

Based on the foregoing, the Court concludes Plaintiff has not established the requisite likelihood of success on the merits of his Title IX claim.

### (2) Private Right of Action under Title IX

Even if Plaintiff could show that his trip to Kansas involved an education program or activity of the University, it appears unlikely he would succeed on the merits of his Title IX claim because "the failure to promulgate a grievance procedure does not itself

constitute 'discrimination' under Title IX." *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 292 (1998). The Court in *Gebser* observed it had never held "that the implied right of action under Title IX allows recovery in damages for violations of those sorts of administrative requirements" *Id.* "Numerous district courts have interpreted *Gebser* to mean there is no private right of action to enforce grievance procedures and other regulations under Title IX." *Doe v. Univ. of St. Thomas*, 240 F. Supp.3d 984, 989 (D. Minn. 2017) (dismissing Declaratory Judgment Act claim based "solely on violations of regulations promulgated under Title IX—requiring the adoption of certain grievance procedures.") Thus, a plaintiff must establish discrimination based on gender to succeed on a Title IX discrimination claim. *See Univ. of S. Ind.*, 43 F.4th at 791-92. Because Plaintiff has not alleged he was discriminated against on the basis of gender and it is at least questionable such a claim would be viable, Plaintiff is unlikely to succeed on the merits of his Title IX claim in Count I.

### C.  Procedural Due Process

In Count VI, Plaintiff alleges a claim under 42 U.S.C. § 1983 against Illinois President Timothy Killeen for deprivation of Plaintiff's protected interests without procedural due process. (Doc. 1-1 at 38-39). Section 1983 provides, in pertinent part, that "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. To state a valid claim for relief under § 1983, Plaintiff must establish that he was deprived of a constitutional right or a right secured by federal law,

and that the alleged deprivation was committed under color of state law. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999); *Padula v. Leimbach*, 656 F.3d 595, 600 (7th Cir. 2011).

The Fourteenth Amendment prevents a state from depriving a person of "property" or "liberty" without due process of law. U.S. Const. amend. XIV, § 1. In order to proceed under a procedural due process claim, the plaintiff must first identify the protected property or liberty interest at stake. *Malhotra v. University of Illinois at Urbana-Champaign*, 77 F.4th 532, 536 (7th Cir. 2023). Next, if the plaintiff was deprived of one of those interests, the court must determine what process was due under the circumstances. *Id.* (citing *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013)).

### (1) Property Interest

Property interests may take many forms. *Board of Regents v. Roth*, 408 U.S. 564, 576 (1972). The United States Supreme Court in *Roth* addressed the parameters under which a property interest protected by procedural due process emerges, stating: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation. He must, instead, have a legitimate claim of entitlement to it." *Id.* In *Doe v. Purdue University*, 928 F.3d 652, 659 (7th Cir. 2019), the Seventh Circuit summarized its precedent on determining whether a student has a stand-alone protected property interest in his education at a state university:

We have explained that "[a] college education – any education- is not "property" in the usual sense of the word. *Williams v. Wendler*, 530 F. 3d 584, 589 (7th Cir. 2008); *see also Charleston v. Bd. Of Trs. Of Univ. of Ill. At Chi.*, 741 F.3d 769, 772 (7th Cir. 2013) ("[O]ur circuit has rejected the proposition that an individual has a stand-alone property interest in an education at a state university, including a graduate university.). Instead, "we ask whether the student has shown that he has a legally protected entitlement to his continued education at the university." *Charleston*, 741 F. 3d at 773.

Like a college education, participation in a sport is not "property" in the usual sense of the word. However, Plaintiff's participation in sports is vital to the development of his career as well as his current and future economic opportunities considering Plaintiff's intention to declare for the 2024 NBA Draft. Prior to his suspension, Plaintiff was projected to be a lottery pick in the NBA. (Doc. 11 at 1). His participation in future games impact his prospects in the draft and his earning potential. *See supra* fn. 1. In similar circumstances, Courts have concluded that participation in athletics "must be deemed a property interest protected by the due process clause of the Fourteenth Amendment." *Boyd v. Board of Directors of McGehee Sch. Dist. No. 17*, 612 F.Supp. 86 (E.D. Ark. June 14, 1985).

Because this is in the higher education context, however, "any property interest is a matter of contract between the student and the university." *Purdue University*, 928 F.3d at 659 (citing *Bissessur v. Ind. Univ. Bd. Of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009)). Therefore, to demonstrate that he possesses the requisite property interest, a student must "do more than show he has a contract with the university; he must establish that the contract entitled him to a specific right that the university allegedly took." *Id.*

Contracts between universities and students can come from a variety of sources. *Gociman v. Loyola University of Chicago*, 41 F.4th 873, 883 (7th Cir. 2022). The relevant sources include student catalogs, policies, bulletins, and other publications. *Id.* For example, in *Stiles v. Brown*, No. 1:21-cv-00497 (D. R.I. January 25, 2022), a student sought a preliminary injunction after he was accused of sexual assault, and the university subsequently suspended the student from sports and school prior to completing its Title IX investigation. (Doc. 11-1 at 53.) The court analyzed the student's request for a preliminary injunction under a contract theory and found that the student policy imposed terms on the university including the presumption of innocence, meaningful participation in the process, and the opportunity to submit a "relevant response." (*Id.* at 55.) The district court granted the player a preliminary injunction, enjoining the university from continuing the suspension after finding that the student was likely to succeed on his claim. (*Id.* at 58.) The district court emphasized that "the university has failed to meet [the student's] reasonable expectations" of the terms of the relevant contract. (alterations in original).

Here, the DIA policy requires written notice to the student-athlete of the interim action to withhold the athlete from athletic activities. The student-athlete is then given an opportunity to respond to the notice. Unless a student requests a delay in the convening of the Panel, it convenes within 48 hours of the DIA providing that notice. The DIA policy specifically requires that "[i]f the Panel decides to withhold the student-athlete from any athletic activity or related support service, it will do so in compliance with, and consideration of, all applicable University, state and federal regulations…"

One of those applicable polices is the OSCR Policy wherein students accused of sexual misconduct at the University have a right to notice of the proceedings, participation in the administrative hearings, an investigative process, and an ability to review and respond to the evidence. The policy ensures a measure of objectivity and notes: "All disciplinary decisions will be based on an objective evaluation of evidence." The policy also requires that violations must be proven by a preponderance of evidence. If formal sanctions are imposed against the student, the Case Coordinator or Panel provides the student with a rationale for the decision and any imposed sanctions.

When explaining the intersection of policies at play for Plaintiff during a December 29, 2023 press conference, Whitman stated that Plaintiff was subject to three actions which ran "in parallel" and could intersect: the criminal prosecution, the DIA Policy action that led to his suspension, and the OSCR policy action. Whitman specifically noted that the University "respects due process" when the allegations are criminal in nature and that Plaintiff's "presumption of innocence" continues to apply. According to Whitman, while the criminal prosecution is ongoing, the OSCR policy is designed to determine what should occur "in that intermediate period of time" and that "we have to make sure that we are sending the appropriate message in terms of how we will approach sexual misconduct as an athletic program as a university, while at the same time honoring Terrence's due process rights, his presumption of innocence, and so it's a delicate balance …"

Similar to the plaintiff in *Stiles*, Plaintiff has alleged that the written and implied contracts entitled him to procedural safeguards. The DIA policy states that any interim

suspension would be done in compliance with all applicable University policies and regulations. The sensible reading of this means that the OSCR policy—which outlines the University's regulations for handling allegations of student sexual misconduct—would apply prior to the DIA's interim suspension. Plaintiff has, therefore, demonstrated some likelihood of success that his reliance on these contractual terms created a legitimate claim of entitlement to not be suspended from the team without good cause. *See, e.g., Radwan v. Manuel*, 55 F.4th 101, 126 (finding a property interest in a student-athlete's athletic scholarship where she demonstrated a reliance and dependence on her contractual terms).

In light of the intersection between these policies and the impact on his future career opportunities, Plaintiff's property interest claim has some likelihood of success on the merits.

### (2) Liberty Interest

The Supreme Court has noted that the meaning of "liberty," in the context of the Fourteenth Amendment, "must be broad indeed" and has long included the liberty to follow a trade, profession, or other calling. *Roth*, 408 U.S. at 572; *Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984). To succeed on a theory that the University deprived him of his "occupational liberty," Plaintiff must satisfy the "stigma plus" test, which requires him to show that the state inflicted reputational damage accompanied by an alteration in legal status that deprived him of a right he previously held. *Purdue*, 928 F.3d at 661. "A state actor infringes on a liberty interest only by 'cast[ing] doubt on an individual's ... reputation' to such a degree that 'it becomes virtually

impossible for the [individual] to find new employment in his chosen field.'" *Malhotra*, 77 F.4th at 538 (quoting *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 617 (7th Cir. 2002)) (alterations in original).

In *Purdue*, the Seventh Circuit held the plaintiff adequately alleged that Purdue University deprived him of a protected liberty interest in his freedom to pursue his occupation of choice. 928 F.3d at 66. The plaintiff was suspended for an academic year after the University found him guilty of sexual violence under Title IX, and based on the finding of guilt, "John was expelled from the Navy ROTC program, which terminated his ROTC scholarship and plan to pursue a career in the Navy." *Id*. The Seventh Circuit held the university's decision to brand the plaintiff as a sex offender inflicted reputational harm which resulted in his expulsion from the Naval ROTC program and foreclosed his re-enrollment in the program. *Id*. at 661. Because of that, the plaintiff's chances of pursuing naval service were thwarted. *Id*. at 662–63. The Court concluded that the University's decision to suspend Plaintiff for sexual misconduct stigmatized him and the change in his legal status from "full-time student in good standing to one suspended for an academic year" based on sexual misconduct satisfied the "stigma plus" test. *Id*. at 663.

Similarly, in *Kroupa v. Nielsen*, 731 F.3d 813, 819-20 (8th Cir. 2013), the Eighth Circuit held that public accusations of misconduct by state officials against a plaintiff who was prohibited from participating in 4-H competitions involved sufficient liberty interests to support procedural due process claims. The Eighth Circuit noted that those public accusations could interfere with educational opportunities and career development from which she had obtained significant income. *Id*. at 819-20. "When state

actors deprive a person of a significant right or status conferred by state law based upon their public determination that the person was guilty of 'dishonesty, immorality, criminality, racism and the like,' that person may well be entitled to the minimum requirements of due process." *Id.* (citations omitted). As such, the Eighth Circuit upheld the district court's decision to grant the plaintiff's preliminary injunction, which allowed her to compete in 4-H activities until further order of the court. *Id.* at 816, 822.

Similar to *Purdue* and *Kroupa*, Plaintiff has alleged that the University's arbitrary decision to suspend him for sexual misconduct has deprived him of a protected liberty interest: his freedom to pursue a career of his choice in basketball. (Doc. 1-1 at 38.) Plaintiff argues that he has satisfied the "stigma plus" test because President Killen inflicted reputational harm by wrongfully suspending him for allegations of sexual misconduct without affording adequate due process. (*Id.*) Plaintiff's suspension for sexual misconduct and removal of his status as an eligible University of Illinois basketball player under a national media spotlight substantially limits his ability to pursue his career in professional basketball.

Defendants rely on *Hawkins v. National Collegiate Athletic Ass'n*, 652 F. Supp. 602, 611 (C.D. Ill. Jan. 30, 1987), for the proposition that there is no "constitutionally protected right to secure professional careers in athletics." (Doc. 14 at 23). In *Hawkins*, the plaintiffs claimed the NCAA sanctions against the team deprived them of their opportunity to gain post-season experience, gain media exposure, and a right to secure professional careers in athletics. 652 F.Supp. at 611. The court relied on precedent from the Fifth, Sixth, and Ninth Circuits to hold that plaintiffs' claims did not rise to the level of a constitutionally

protected interest, as "future professional careers are mere expectations, far too speculative to command constitutional due process protection." *Id.* at 610-11.

Unlike the plaintiffs in *Hawkins*, Plaintiff's claim here is not speculative given the proximity between the remainder of the season, University of Illinois' standings, and the projections for his chances in the upcoming June 2024 NBA Draft. It is also noteworthy that the status and economic rights afforded to college athletes has changed dramatically in recent years with their ability to earn income through NIL contracts. There is no dispute that Plaintiff has developed his brand and currently receives income to support his family based on his status as a University of Illinois basketball player. The impact of NIL rights and income on the constitutional protections afforded under the Fourteenth Amendment has not been addressed by the Seventh Circuit.

Similar to the plaintiff in *Krupa*, Plaintiff's suspension can and will impact his career opportunities, current income from his NIL contract, and anticipated future income. In the collegiate athletic context, a suspension can significantly inhibit a student-athlete's career prospects and earning potential that cannot be recovered through any adequate remedies at law. *See, e.g., Boman v. Bluestem Unified Sch. Dist. No. 205*, 2000 U.S. Dist. LEXIS 5389, 2000 WL 297167, at *3 (D. Kan. Jan. 28, 2000) (noting that suspension of student constitutes irreparable harm); *Ganden v. National Collegiate Athletic Association*, 1996 U.S. Dist. LEXIS 17368, 1996 WL 680000, at *6-7 (N.D. Ill. Nov. 21, 1996) (noting that because elite collegiate athletes have only a limited span of competitiveness, losing a year of competition would irreparably inhibit their development as athletes).

Additionally, just like the plaintiff in *Purdue,* the alteration of Plaintiff's legal status stems from the decision to suspend him from the basketball team—not his status as a criminal defendant. Plaintiff went from an active player to being suspended from the team for the likely duration of the season. It is because of this suspension that Plaintiff's occupational liberty interest was impacted. His status as a criminal defendant, on the other hand, affords him with numerous constitutional protections, including the presumption of innocence. Therefore, Plaintiff has satisfied the "stigma plus" test and demonstrated a likelihood of success on his claim that the University deprived him of a protected occupational liberty interest.

### (3) Procedural Fairness

Having determined that Plaintiff has demonstrated some likelihood of success as to the deprivation of his property and liberty interests, the Court must assess whether Defendant used fundamentally unfair procedures in the decision to suspend him. When a right is protected by the Due Process Clause, a state actor "may not withdraw [it] on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred." *Purdue*, 928 F.3d at 663 (citing *Goss v. Lopez*, 419 U.S. 565, 574 (1975)) (alterations in original). The court must consider the nature of the interest and the severity of its impairment when determining whether a process is fundamentally unfair. *Id.* "In the disciplinary context, the required process depends on a number of factors, including the severity of the consequence and the level of education." *Id*. at 663

In *Purdue*, the Seventh Circuit held that the plaintiff adequately alleged the process was deficient when he was given notice of the allegations against him, but the university

did not disclose its evidence to him. 928 F.3d at 663. This proved fatal to the process, as "withholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair." *Id*. The Seventh Circuit emphasized that the hearing must be "a real one, not a sham or pretense." Of particular concern to the Court was the fact that the committee found the complainant more credible than the plaintiff in a case that "boiled down to a he said/she said" without ever receiving a statement written by the complainant herself, much less a sworn statement, or asking the complainant any questions during the investigation. *Id*. at 664. The Seventh Circuit reasonably questioned how the committee could have conducted an evaluation of credibility under those circumstances.

The same holds true in this case. Plaintiff received notice of the temporary suspension and the process of evaluation under the DIA Policy on December 28, 2023. After Plaintiff asked DIA to delay convening the conduct panel, Squire informed Plaintiff the panel would meet on January 3, 2024. Before the conduct panel convened, Plaintiff submitted information for consideration, including his personal statement, an 11-page supporting letter from his attorneys, and nearly 50 pages of exhibits to the attorneys' supporting letter. The panel was told Plaintiff might receive "discovery" from the Lawrence criminal prosecution in late January or February 2024.

The conduct panel convened during the afternoon of January 3, 2024, and Squire provided Plaintiff with written notification of the panel's decision on that same day, without any findings of fact or reasoning for the decision. The written notice informed Plaintiff that the conduct panel determined that the interim action to withhold him from

organized team activities should remain in place pending resolution of the criminal charges in Kansas.

Just as in *Purdue*, Plaintiff was given notice and the opportunity to submit evidence but only in the form of a written statement and documents. He was unaware of the alleged victim's identity and there is no indication that he was given an opportunity to view the evidence against him. In reliance on the DIA policy, the conduct panel did not investigate the alleged offense, consider a written statement by the complainant, or have the ability to weigh the credibility of evidence in light of the nature of the allegation. Plaintiff was not allowed in the hearing and no recording or transcript of the proceeding was provided to him. The conduct panel is not required to submit a written decision or findings of fact for Plaintiff to ascertain the basis for the interim decision, and there is no avenue to appeal an interim decision.

Conversely, the procedural safeguards awarded to Plaintiff under the OSCR policy do not appear fundamentally unfair as written. The policy provides adequate safeguards through detailed notice, levels of review, an actual investigation, disclosure of evidence, witness participation, a defined burden of proof, and a written decision.

Based on the foregoing, Plaintiff has demonstrated a likelihood of success as to the inadequate procedural safeguards afforded to him during the DIA disciplinary process.

### D. Irreparability of Harm

Having determined that Plaintiff has established some likelihood of success on the merits of his due process claims in Count VI, the Court now considers whether there exists an adequate remedy at law and whether Plaintiff will suffer irreparable harm

without the injunction. To show irreparable harm, a plaintiff must demonstrate that he will suffer immediate harm that cannot be rectified by a final judgment after trial. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001). "[S]peculative injuries do not justify this extraordinary remedy." *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005). Defendants claim an interim suspension from the Illinois basketball team in connection to a felony arrest is not irreparable harm and any potential harm concerning Plaintiff's NBA draft status is speculative and not irreparable.

While Plaintiff's suspension is classified as an "interim suspension," the suspension for all practical purposes is for the remainder of Plaintiff's college basketball career, given the pace of the criminal proceedings and Plaintiff's intention to declare for the 2024 NBA Draft. Illinois has 14 games remaining in the regular season which ends on March 10, 2024. Following the regular season, Illinois will compete in the Big Ten Tournament and likely in the NCAA Tournament. In alleging irreparable harm, Plaintiff notes many of these games will be against other nationally ranked teams and will be on national television. The intensity of games down the stretch of the season is well-known to college basketball fans. As one district court recently stated:

> The success of a team in regular season dictates their entrance into their respective Conference Tournament and NCAA Tournament. Every game is crucial for a student-athlete and their team. Take, for example, March Madness. One good tournament run can cement a student-athlete or team's legacy in college sports. The absence from student-athletes from teams on gamedays could negatively impact a team's ranking and selection to tournaments. Moreover, it may have life-altering impacts on the student-athlete's ability to pursue NIL deals and a professional career in their sport as well as impacts on their mental health. The substantial and very current harm to winter sport Division I student-athletes is

irreparable and cannot be easily remedied. However, immediate temporary injunctive relief is necessary to allow these winter sport Division I student-athletes to compete on gamedays going forward in the season.

*State of Ohio, et al. v. NCAA*, 2023 WL 9103711, at *10 (N.D. W.Va. Dec. 13, 2023). The Court recognizes that the issues in *State of Ohio*, which concerned the NCAA's Transfer Eligibility Rule and the requirement for student-athletes to sit out for an academic year, *see id.* at 8-11, are significantly different than the issues present here. However, the passage above is instructive particularly given Plaintiff's status as an NBA prospect and uncertainty concerning how the suspension will affect his NIL deal. Plaintiff's NBA stock has fallen since his suspension and likely will continue to fall as long as he is not playing. While this may also be due to the criminal charges, Plaintiff notes that the suspension gives the appearance of guilt without having afforded him any procedural safeguards when issuing the interim suspension.

Other courts have held that preventing student-athletes from competition creates an irreparable harm for which there is no adequate legal remedy. *See Ganden v. NCAA*, 1996 WL 680000, at *6 (N.D. Ill. Nov. 21, 1996). In *Ganden*, in considering a motion for injunctive relief filed by a freshman swimmer at Michigan State University, the district court found there would be irreparable harm for which there is no adequate remedy absent an injunction, particularly because the careers for competitive swimmers last only a few years and peak between the ages of 19 and 21. *Id.* at *1, 6. The court noted the swimmer would "lose an entire year of competition and a significant proportion of his swimming career" and "that the loss of a year of competition is likely to inhibit his development as a swimmer during a critical point in his career." *Id.* Ultimately, the court

concluded the losses would be difficult to quantify in financial terms. *Id.; see also Hutsonville Cmty. Unit Sch. Dist. No. 1 v. Illinois High Sch. Ass'n*, 195 N.E.3d 662, 666-667 (5th Dist. 2021) (high school senior athlete granted TRO "because failure to compete for a year was the type of injury that could not be corrected by monetary judgment").

In contending Plaintiff has not suffered irreparable harm, Defendants cite *Hall v. NCAA*, 985 F. Supp. 782 (N.D. Ill. 1997), wherein the court considered the plaintiff's request for injunctive relief after he was declared academically ineligible to play basketball at Bradley University. *Id.* at 784-785. The plaintiff in *Hall* was a freshman who had been highly recruited nationally out of high school. *Id.* at 785. Because he was deemed academically ineligible, the plaintiff was "ineligible to practice with, or compete on behalf of, Bradley's men's basketball team," and was "not allowed to receive any part of his full athletic scholarship." *Id.* at 791. The plaintiff alleged that absent an injunction, he would be "denied the opportunity to play major college basketball and pursue his dream of becoming a professional basketball player." *Id.* at 800. The district court determined that, while a one-season delay might be an "inconvenience," plaintiff had not shown that "a one season delay will extinguish [his] college (and hopeful professional) career, thereby irreparably harming him." *Id.*

Defendants contend Plaintiff's loss of the opportunity to compete is less severe than in *Hall* because Plaintiff has already played part of the season and the suspension is only temporary and subject to being lifted based on changed circumstances. The Court disagrees. Plaintiff is nearing the end of his college basketball career, not hoping to begin it like the plaintiff in *Hall*. The *Hall* plaintiff had at least three years to establish himself

as a professional basketball prospect. While the plaintiff in *Hall* aspired to play professional basketball, Plaintiff's professional basketball prospects are much more of a reality. Plaintiff's projected draft position improved significantly based on his performance during the early part of the season.

Plaintiff also receives compensation through his NIL deal due to his status on the team. (Doc. 11 at 10.) NIL is a new development in college sports. *See* ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness-policy. College athletes have had an opportunity to benefit from their name, image, and likeness since July 1, 2021. *Id.* Because NIL is so new, the Court is unaware of any cases addressing the loss of NIL opportunities as irreparable harm. However, it stands to reason that Plaintiff's name, image, and likeness is worth very little if he is not on the basketball court. While the likelihood that Plaintiff will lose his NIL deal is unclear from the record, the Court concludes that the potential loss of NIL opportunities can constitute irreparable harm.

Plaintiff has missed six games thus far since he was suspended upon the filing of criminal charges. As stated by Josh Whitman and as noted in the DIA Policy, the conduct panel that suspended Plaintiff is "not an investigative or fact-finding body." While the University's decision to suspend Plaintiff was "not a determination of guilt or responsibility on [his] part," the suspension pending resolution of the criminal charges effectively results in the end of Plaintiff's college basketball career. Given that Plaintiff's projected draft position fell 17 spots into the second round one week after he was suspended, his continued suspension almost certainly means Plaintiff's draft position

will continue to plummet and increases the likelihood he will not be selected in the June 2024 draft. Additionally, the suspension could result in the loss of Plaintiff's NIL deal. Given all of these circumstances, it is particularly difficult to quantify Plaintiff's potential financial losses. The Court concludes that these factors, along with the lost opportunity to compete in college basketball at the highest level, are sufficient to demonstrate immediate harm that cannot be rectified by a final judgment.

The Court recognizes that because of the pending criminal charges, some of this harm will remain whether or not Plaintiff resumes playing basketball this season. However, the Court finds there is some merit in Plaintiff's assertion that, absent reinstatement, the public perception may be that the University presumes Plaintiff to be guilty or, in the very least, actually investigated whether the allegations were substantiated before suspending him for the duration of the season.  More importantly, Plaintiff will not have an adequate remedy at law if, for argument purposes only, the pending criminal charges are dismissed, or he is acquitted on said charges after the conclusion of the basketball season and NBA Draft.

Therefore, the Court finds that Plaintiff has demonstrated that he has inadequate legal remedies and will suffer irreparable harm.

### E.  Balance of Harms

Because Plaintiff has demonstrated (1) some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) he will suffer irreparable harm if the injunction is not granted, the Court now considers the irreparable harm to the University upon entry of an injunction and balances that harm against Plaintiff's irreparable harm if

in the injunction were denied. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). The Court must also consider the public interest in granting or denying relief. *Id.*

Colleges and universities have an interest in institutional autonomy. *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) When serious misconduct is alleged, those institutions must be able to take remedial action. *See id.* Defendants allege the University simply acted in accordance with its policies to take interim measures to address allegations of misconduct by a high-profile athlete in the middle of the season. (Doc. 14 at 42-43.) Moreover, the entry of an injunction would potentially undermine the University's athletics policy and fail to serve as a deterrent for involvement with the criminal justice system. (*Id.* at 43.) Defendants further assert any harm to Plaintiff is speculative. (*Id.*)

The Court does not agree that the harm to Plaintiff in the absence of an injunction is speculative. While it may be difficult to quantify financially, the potential loss of Plaintiff's NBA career, NIL deal, and ability to support his family are more than speculative harms. Plaintiff alleges an injunction would eliminate the appearance of guilt and restore the presumption of innocence and status quo pending resolution of the criminal proceeding. The loss of the opportunity to play college basketball for the remainder of Plaintiff's career is also a significant harm that is difficult to place a value on. Given that it has allowed Plaintiff to stay on campus since the alleged incident and his suspension from the basketball team, Illinois does not believe that Plaintiff is a threat to other students or the Illinois community. While the Court recognizes the strong interest the University has in acting pursuant to its policies, the Court concludes that the

irreparable harm to Plaintiff by application of the DIA Policy outweighs the harm to Illinois.

### III.   CONCLUSION

For the reasons stated herein, Plaintiff has not shown a likelihood of success on his Title IX claim and is, therefore, not entitled to equitable relief as to Count I. As to Count VI, the Plaintiff has established that he has clearly ascertainable rights that need protection and there is some likelihood of success on the merits. The Court further finds that Plaintiff has no adequate remedy at law and will suffer irreparable harm without an injunction. The potential harm to Plaintiff outweighs any harm to the University. The public interest is not harmed by granting injunctive relief to allow for additional procedural safeguards while he is presumed innocent of the criminal charges. Because Plaintiff financially supports several family members, the Court will not require Plaintiff to post bond. *See Wayne Chemical, Inc. v. Columbus Agency Service Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) ("Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)"). Based on this finding, the Court will not address Plaintiff's remaining claims.

Therefore, Plaintiff Terrence Shannon, Jr.'s Verified Motion for a Preliminary Injunction (Doc. 10) is GRANTED.

**IT IS HEREBY ORDERED THAT:**

Defendant, The Board of Trustees of the University of Illinois, and all of its officers (including, but not limited to, Defendant Timothy Killeen), administration, employees,

units, divisions, affiliates, and other agents, are hereby enjoined from continuing to suspend Plaintiff from the basketball team pursuant to the DIA Policy.

Defendants are enjoined from suspending Plaintiff from the basketball team without at least affording him the protections of the OSCR Policy.

The obligations of Defendants pursuant to this Order are to be construed as broadly as possible.

This Order shall remain in effect until modified or terminated by a subsequent order.

ENTER:  January 19, 2024

_____/s/ Colleen R. Lawless_____
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE